# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

DEMOCRACY PARTNERS, LLC )
1250 Eye Street, N.W. Suite 250 )
Washington, D.C.  20005, )
)
)
STRATEGIC CONSULTING GROUP, NA, INC. )
1250 Eye Street, N.W. Suite 250 )
Washington, D.C. 20005 )
) Civil Action No.  1:17-cv-1047____
-and- )
)
)
ROBERT CREAMER )
1101 Ridge Avenue )
Evanston, IL 60202 )
                    Plaintiffs, )
)
     v. )
)
PROJECT VERITAS ACTION FUND )
1214 West Boston Post Road )
No. 156 )
Mamaroneck, New York 10543 )
)
PROJECT VERITAS )
1214 West Boston Post Road )
No. 156 )
Mamaroneck, New York 10543 )
)
JAMES O'KEEFE )
121 Goodwin Terrace )
Westwood, New Jersey 07675-2938 )
)
ALLISON MAASS )
19008 253rd Ave. N.W. )
Big Lake, MN 55309-9795, )
)
-and )
)
DANIEL SANDINI )
1926 W Burnside Street, Unit 706 )

Portland, Oregon 97209                                      )
                                                           )
                              `                            )
                      Defendants                           )
_____)

# COMPLAINT

COME NOW, Plaintiffs Robert Creamer, Strategic Consulting Group, NA, Inc. and

Democracy Partners, LLC, by and through counsel, and bring this Complaint against Defendants,

Project Veritas Action Fund, Project Veritas, James O'Keefe,  Allison Maass, and Daniel

Sandini, for interception and disclosure of oral communications in violation of federal wiretap

law, 18 U.S.C. §§ 2511(1)(a), 2511(1)(b), 2511 (1)(c), 2511(1)(d), 2520(a); interception and

disclosure of oral communications in violation of local wiretap law, D.C. Code §§ 23-542(a)(1),

23-542 (a)(2), 23-542 (a)(3), 23-542(b)(3), 23-554; and the common law based on breach of

fiduciary duty; trespass; fraudulent misrepresentation; and civil conspiracy.  In support thereof,

Plaintiffs state the following:

# PARTIES

1.  Plaintiff Robert Creamer is a citizen of the State of Illinois and domiciled in Chicago,

    Illinois and the District of Columbia.  He is the sole owner of Plaintiff Strategic

    Consulting Group, NA, Inc. which is a member of Plaintiff Democracy Partners.

2.  Plaintiff Democracy Partners, LLC is a District of Columbia limited liability

    company with its principal place of business in the District of Columbia.  Its member

    companies and individuals are citizens of California, the District of Columbia,

    Florida, Illinois, Maine and Oregon.

3. Plaintiff Strategic Consulting Group, NA, Inc. ("SCG") is an Illinois corporation with principal places of business both in Chicago, Illinois and in the District of Columbia. Plaintiff Strategic Consulting Group is a member of Plaintiff Democracy Partners.

4. Defendant Project Veritas Action Fund ("PVAF") is a Virginia nonstock, nonprofit corporation with its principal place of business in Mamaroneck, New York. PVAF claims exemption from federal taxation as a social welfare organization under section 501(c)(4) of the Internal Revenue Code of 1986 as amended.

5. Defendant Project Veritas ("PV") is a Virginia nonstock, nonprofit corporation with its principal place of business in Mamaroneck, New York. PV is an organization recognized as exempt from federal taxation as a charitable and educational organization under section 501(c)(3) of the Internal Revenue Code of 1986 as amended.

6. Defendant James O'Keefe is the President and founder of both Project Veritas Action Fund and Project Veritas.  He is a citizen of New Jersey, residing and domiciled in Westwood, New Jersey.

7. On information and belief, Defendant Allison Maass at all relevant times was an employee of or independent contractor to, Project Veritas Action Fund and Project Veritas. She is a citizen of Minnesota, residing and domiciled in Big Lake, Minnesota.

8. On information and belief, at all relevant times, Defendant Daniel Sandini was an employee of or contractor to Project Veritas Action Fund and Project Veritas, to enact the scheme discussed in this Complaint. He is a citizen of Oregon, residing and domiciled in Portland.

**JURISDICTION AND VENUE**

9.   This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331

because the action arises under federal law, specifically the Unlawful Interception of

Oral Communications, 18 U.S.C. § 2511 *et seq*.  This Court has supplemental

jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those

claims are so related to the claims arising under the federal law at issue that they form

part of the same case or controversy.

10.   This Court has personal jurisdiction over each of the Defendants under the District of

Columbia long-arm statute, D.C. Code § 13-423(a)(3), because each Defendant

caused tortious injury in the District of Columbia by acts that took place entirely in

the District of Columbia.

11.  Venue in this district is established by 28 U.S.C. §1391(b)(2) because a substantial

part of the events giving rise to the claims asserted herein occurred in the District of

Columbia.

**FACTUAL BACKGROUND**

12.  Project Veritas Action Fund ("PVAF") is a Virginia nonstock, nonprofit corporation,

claiming exemption from taxation under section 501(c)(4) of the Internal Revenue

Code of 1986 as amended. PVAF is an arm of Project Veritas, a right-wing nonprofit

organization, that has become notorious for attempted undercover "sting" operations

aimed at progressive organizations and Democratic Party campaigns and committees.

Both organizations are headed and run by Defendant O'Keefe.

13.  The modus operandi of PVAF and Project Veritas is to gain access to the offices of

these organizations and campaigns through fraudulent misrepresentation; then to

4

secretly videotape conversations and interactions with personnel of the organizations and campaigns; then to selectively edit the videotapes so as to distort and misrepresent what was said; and then to publicly release those selectively edited portions of the videotapes.

14. In 2009, Project Veritas released a series of undercover videos about a community organizing group known as ACORN.  As reported by The New Yorker, the "videos had an immediate effect, but raised serious questions about [O'Keefe's] methods and ethics—questions that have trailed him ever since.  He secretly filmed encounters in which he and a female colleague showed up at ACORN offices in various cities, claiming to be a pimp and an underage prostitute who wanted advice on how to make prostitution look like a legal business."

15. In the resulting ACORN case, after losing on summary judgment on a wire-tap claim, O'Keefe and his accomplice settled the matter for $100,000.

16. In 2010, O'Keefe and three accomplices were criminally charged for a scheme in which two of the accomplices had disguised themselves as telephone repairmen in order to enter the offices of a Democratic U.S. Senator.  O'Keefe pleaded guilty to a misdemeanor, and was sentenced to probation and community service and ordered to pay a fine.

17. Defendant Allison Maass is an employee and agent of Project Veritas and PVAF. In 2016, apart from the actions set forth in this Complaint, Maass gained access to the campaign offices of Hillary Clinton, Russ Feingold and Bernie Sanders, all Democratic candidates, on false pretenses, posing as a campaign volunteer.

18. Plaintiff Strategic Consulting Group ("SCG"), of which Plaintiff Creamer is the sole owner and principal, provides campaign-related services to progressive organizations and Democratic campaigns and committees.

19. SCG is a member of Democracy Partners, a company including a number of other consultants and vendors to progressive organizations and Democratic campaigns and committees, who market their services collectively through the company.

20. On or about June 8, 2016, SCG entered a contract with Mobilize, Inc. to serve as a subcontractor on a contract Mobilize had with the Democratic National Committee ("DNC"). SCG was subcontracted to assist the DNC in arranging events in opposition to the candidacy of Donald Trump for President, including events to take place before and/or after Trump campaign events in various cities. These events are sometimes referred to as "bracketing" events.

21. Democracy Partners' Washington, D.C. office is located at 1250 Eye Street, N.W. Suite 250, Washington, D.C. 20005. The office is not open to the general public; it is only open to Democracy Partners members, staff and invited guests.

22. On or about June 24, 2016, Plaintiff Robert Creamer was introduced to and met with a man who represented himself as a potential donor to Americans United for Change ("AUFC"), a 501(c)(4) organization that Creamer performed work for. The man introduced himself as "Charles Roth," which Plaintiffs later learned is a false and fictitious name. The individual's real name is Daniel Sandini. The individual is referred to in this Complaint as "Roth/Sandini."

23. On information and belief, Roth/Sandini is an employee of and or contractor to PVAF.

24. On or about July 15, 2016, Roth/Sandini told Creamer that he had a niece who wanted to volunteer to do some kind of political work for Democratic candidates or organizations while she was on a brief hiatus from college. He represented to Creamer that the name of his niece was "Angela Brandt."

25. Creamer first connected "Brandt" with a progressive organization working in Cleveland, Ohio during the 2016 Republican National Convention and "Brandt" performed volunteer work for that organization during that Convention.

26. In late August 2016, Roth/Sandini called Creamer and said his "niece", "Brandt", would like to gain more experience. Creamer interviewed "Brandt" for an internship with Creamer and SCG in the Democracy Partners office. During that interview, "Brandt" gave Creamer her name and background information. She told Creamer that her interest in obtaining an internship was to gain work experience in political and advocacy work.

27. Plaintiffs later learned after "Brandt" concluded her internship with Creamer and SCG in the Democracy Partners office, that "Angela Brandt" was a false and fictitious name; that the real name of this individual is Allison Maass; that the background information provided by Maass to Creamer was false; that Maass was not the niece of Roth/Sandini; that Maass had deliberately and repeatedly lied to Creamer about her identity and background; and that she falsely told Creamer that her interest in an internship was to gain work experience when, in fact, her actual interest and intent was to gain the trust and confidence of Plaintiffs and to record undercover videos of Creamer and Democracy Partners for her employers, PVAF and PV. Maass is the Allison Maass named as a Defendant in this action.

28. Based on the false information Maass provided in her interview, Creamer told Maass that she might qualify for an internship at Democracy Partners' Washington, D.C. office. He recommended that she speak with a former intern, Nick Guthman, to hear about his experience as an intern at Democracy Partners.

29. Maass spoke with Mr. Guthman on or about September 2, 2016 and then called Creamer and said she would like to intern at Democracy Partners and could work three days per week.

30. Maass started interning at Democracy Partners on September 21, 2016. Unbeknownst to any of the Plaintiffs during the period of her internship, she carried on her person at most or all times a camera and audio recording devices which were concealed and not visible to anyone talking or meeting with her in the Democracy Partners' offices.

31. Maass was given an electronic pass card by Democracy Partners, so that she could enter the office freely. This electronic pass card granted her access to the office at any hour, on any day, and allowed her to enter all rooms in the office, including areas that contained file cabinets and computers with confidential information. Mass was given access to a company computer and an account was created and password was created for her to use it. Maass was also given access to the password to the office wireless internet.

32. On her first day of work, Creamer gave Maass an overview of the work SCG and Democracy Partners was performing, how it interacted with clients and other information that was pertinent for an intern to know in order to perform her tasks. During this discussion, the information Creamer disclosed to Maass included confidential and sensitive business information including the identity of clients, client

information and programmatic details, and the identity of partners.  These disclosures were made just weeks before the presidential election, and Creamer explicitly told Maass that based on the confidential and sensitive nature of the mission and programming of Plaintiffs SCG and Democracy Partners, the information, and any additional information she was given over the course of her internship, was confidential and not to be shared with anyone other than persons with whom she had specifically been instructed to share that information. .

33. Unbeknownst to Creamer, Maass recorded audio and video of the conversation. Maass also recorded other confidential internal conversations with Creamer and other Democracy Partners members, as well as confidential conversations they had with SCG and Democracy Partner clients in-person and via conference call.

34. These videos were recorded in Democracy Partners' private offices that are not accessible to the general public, have 24-hour security, and are only accessible if one signs into the building at the lobby security desk, if one is provided entrance by Plaintiffs' receptionist, and/or if one has an electronic pass card. The electronic pass card is required to access the elevators to the office outside of regular business hours and a key is required to enter the office when no one is present.

35. Maass provided these audio and video recordings to PV and PVAF, and they were used in a series of videos disseminated to the public by PVAF.

36. Maass' tasks as an intern included coordinating and joining meetings with clients about highly sensitive political programs including planned "bracketing" events, the existence of which was maintained in confidence by the Democratic National Committee prior to the time the events took place; putting together news clips, as

described further below; researching and drafting client updates; and other tasks. The procedures for pulling news clips and the client update memos were proprietary to Democracy Partners and its clients and Maass received training on how to pull the news clips from a Democracy Partners client.

37. One of the most important projects that Maass was involved with was a "bracketing program." The program coordinated press events in areas being visited by then-candidates Donald Trump and Mike Pence. Prior to the public announcement of each event, information relating to the timing, location, nature of and the program to take place during each such event, was maintained in strict confidence by the DNC, other groups directly involved in the event, and their respective consultants. Maintaining that information in confidence was essential in order for each such event to be successful; otherwise the Republican Party and the Republican presidential campaign could adjust their own plans to anticipate or deflect the "bracketing" event.

38. Maass participated in planning calls for these "bracketing" events, sitting in on meetings, and drafting emails and reports that contained information about upcoming events and after-event reporting.

39. During the course of her internship, Maass was included among the recipients of highly confidential emails, and in confidential discussions in in-person meetings and on conference calls; and she was sent confidential documents. She was given the phone number and private access code for client conference calls. She was also brought to confidential client meetings. These calls, emails and documents all contained confidential business information which Creamer told her was confidential and not to be shared with anyone with whom she had not been instructed to share it.

40. Maass provided a number of these confidential documents and emails to PV and PVAF. PVAF then published them on its website under the heading "VeritasLeaks" on or around October 26, 2016. The website states "Here are some supporting documents for the Democracy Partners videos we have been releasing."

41. Creamer invited Maass to meetings so that she could gain the experience that she claimed to be seeking. One of those meetings was at the White House on or about September 9, 2016. To attend a meeting at the White House, visitors must provide their name, Social Security number and other personal information so that the Secret Service can perform a background check. On September 26, 2016, Creamer asked Maass for her information to submit on her behalf. She gave him the false name "Angela Brandt" and on information and belief, a false Social Security number. Creamer submitted the information she provided to the White House, without knowing that the information was fake. Causing the submission of false information to the U.S. Secret Service to gain admission to the White House is a federal felony pursuant to 18 U.S.C. §1001(a) (false statement), and 18 U.S.C. §2 (principals).  On the day of the White House meeting, Maass claimed to feel ill and did not attend the meeting.

42. Had Creamer known that Maass was an employee of PV and PVAF; that Roth/Sandini was an agent of Project Veritas and not an interested donor; that Maass' intention was not to gain experience through an internship but to conduct an undercover operation to record audio and video from internal confidential conversations and disseminate confidential documents to the general public; or Maass' real name or work experience, he never would have hired her as an intern. He

also would have never given her confidential documents, included her in meetings and on emails, brought her to meetings, or given her open access to the office and its computers and files.

43. On her first day of work, Maass was also asked to provide a resume. She provided a fabricated resume on September 22, 2016 that used the fake name, "Angela Brandt" and omitted her employment with Project Veritas, her real work history, her work for other conservative news outlets that oppose the candidates and projects SCG and Democracy Partners work with, and her real educational background degree. Instead, it provided an entirely false and fabricated work history and education.

44. Democracy Partners relied on this fabricated resume, and the trust Maass steadily gained through her volunteer work related to the Republican National Convention and the ongoing interest she expressed in gaining further advocacy and campaign-related experience, to continue Maass's internship and give her assignments. Had Maass provided her real employment history and educational background, she would never have been hired and her internship would have been immediately terminated.

45. On October 14, 2016, Creamer met Mike Carlson, who Roth/Sandini claimed was his financial advisor, for lunch at Tosca Restaurant in Washington, D.C. This lunch was surreptitiously videotaped. As Carlson and Creamer left lunch, Creamer was accosted by a film crew from Circa Media, a subsidiary of Sinclair Broadcasting. The ambush interview asked Creamer to respond to two video clips that show that he and others have been recorded without their knowledge or consent. Raffi Williams, the reporter who accosted him indicated to Creamer that they knew where to find him because they were tipped off by Defendant O'Keefe.

46. When Creamer returned to his office, Maass was no longer at the Democracy Partners office and never returned.

47. Later that day, Williams called Creamer and asked for an on-camera interview to respond to the videos. He indicated that O'Keefe had provided his network with hundreds of hours of raw tapes and that Sinclair agreed to syndicate four nightly news pieces on these videos beginning the next week – just weeks before the 2016 presidential election, when voters increasingly tune-in to politics.

48. That evening, Creamer agreed to meet Williams at the law offices of KaiserDillon, PLLC, located at 1401 K Street, NW Suite 600, Washington, D.C. 20005. At this meeting, Creamer and his attorney viewed approximately three hours of videos that showed recordings of Creamer, other Democracy Partners staff and members, such as Aaron Black, and Democracy Partners' and SCG's clients. Much of this footage was taken by Maass while she interned at Democracy Partners.

49. All of the videos and accompanying audio recordings were taken without the knowledge and consent of all parties to the conversations.

50. On Saturday, October 15th, 2016, Creamer's attorney wrote a letter to Sinclair Media's lawyers demanding to see all of the raw video from O'Keefe and PVAF. Sinclair Media responded by requesting a meeting for Monday morning.

51. On Monday, October 17th, Creamer and his attorney met with Sinclair Media's management and attorney at Sinclair Media's headquarters in Arlington, Virginia. In this meeting, additional footage was reviewed and Creamer's attorney discussed legal and factual issues relating to the videos.

52. During that meeting, Sinclair Media's attorneys said that they would postpone the first installment of their four-part series as they reviewed the legal and factual issues surrounding their recording and release. Sinclair Media never ran stories on the videos.

53. On Monday October 17th, PVAF released its first video that contained footage from the hidden camera videos – approximately three weeks before the 2016 presidential election, when voters increasingly tune-in to politics. The video was heavily edited and contained commentary by O'Keefe that drew false conclusions from the selectively edited videos, to charge that Plaintiffs were involved in a conspiracy to incite violence at rallies for then-candidate Donald Trump, and falsely implied that the ongoing work in planning and implementing the bracketing events was part of that conspiracy. The purpose of this video, and all of the videos, was falsely to portray the Democratic Party and progressive organizations as being engaged in unethical and illegal activity. This first video was released on Project Veritas' YouTube channel and heavily promoted it on its social media feeds.

54. This first video  contained footage from Maass' recordings of Creamer, Democracy Partners, and its clients and subcontractors.

55. On October 18, 2016, PVAF released a second video that contained footage from the hidden camera videos. This video was also released on its YouTube channel and heavily promoted on its social media feeds. It was heavily edited and contained commentary by O'Keefe that misrepresented what was actually said in the videos, in order to suggest, falsely, that Plaintiffs Creamer and Democracy Partners were

involved in a scheme with others to enable masses of non-citizens to vote illegally and otherwise to commit voter fraud.

56. This second report contained footage from Maass' recordings of Creamer, Democracy Partners, and its clients.

57. On Monday, October 24, 2016, PVAF published a third video and a fourth video was posted and distributed on October 26, 2016 – just two weeks before the 2016 presidential election.  These videos falsely implied that Secretary Clinton was personally involved in unethical and/or illegal activity; that activities carried out in connection with the bracketing events had been unlawfully coordinated with the Clinton Campaign; and that a group for which Creamer worked had unlawfully accepted a foreign contribution.  These videos were also released on the Project Veritas YouTube channel and heavily promoted on its social media feeds. The videos contained commentary by O'Keefe that misrepresented what was actually said in the videos and contained footage from Maass' recordings of Creamer, Democracy Partners and its clients.

58. In total, the four YouTube videos have been viewed over thirteen million times to-date (13,261,872), and have received tens of thousands of public comments to date (67,785).

59. In these videos, O'Keefe stated that Maass and Roth were employees of PVAF. In the fourth video, O'Keefe stated: "Charles Roth's niece, our journalist, got offered an internship at Creamer's firm Democracy Partners." The video captions her statements as coming from a "PVA Journalist."

60. Democracy Partners never authorized Maass to transfer or deliver to any third party that was not a Democracy Partners client any of the documents of Democracy Partners or its clients.

61. Democracy Partners never authorized Maass to publish or disclose any documents, recordings or other information she obtained or made during her internship.

62. Maass did not have the authorization or consent of Plaintiffs or their clients to record any meetings or conversations.

63. All of the actions of Maass as described in paragraphs 27 through 44 above, were undertaken at the direction of, pursuant to the active supervision of, and in coordination with O'Keefe.

64. As a direct result of Maass' disclosures of confidential information that she obtained through the actions described in paragraphs 27-44 above, a major labor organization cancelled a contract with SCG that was to pay SCG $36,000 per year and that had been in existence for a number of prior years.

65. In addition, as a direct result of those disclosures and actions, a labor organization withdrew funding from Americans United For Change, a nonprofit organization with which SCG had a contract that was to pay SCG $11,000 per month and that had been an ongoing contract for over ten years. As a result of the withdrawal of funding, the organization ceased operating and the contract with SCG was terminated.

66. In addition, as a direct result of those disclosures and actions, Democracy Partners was told by a prospective client, a nonprofit advocacy organization, that the organization was dropping plans to contract with Democracy Partners for certain

services, for which the organization would have paid Democracy Partners a minimum of $30,000.

67. But for the disclosures and actions of Maass described in paragraphs 27-44 above, SCG and Democracy Partners would have been paid at least $534,000 for actual services, revenue these Plaintiffs lost because of those disclosures and actions of Maass.

68. The disclosures and actions of Maass described in paragraphs 27-44 above have severely injured the reputations of Creamer, SCG and Democracy Partners; and have resulted in the loss of future contracts with those Plaintiffs, with a value of at least $500,000.

## COUNT ONE—BREACH OF FIDUCIARY DUTY (Defendant Maass)

69. Plaintiffs repeat and re-allege all of the allegations above as if fully alleged herein.

70. A fiduciary relationship existed between Maass and Democracy Partners based on Maass' status as an intern with access to confidential information at Democracy Partners.

71. As an intern at Democracy Partners, Maass owed fiduciary duties to Democracy Partners, including the duty of confidentiality and the duty of loyalty.

72. By virtue of her employment by Democracy Partners and her statements and representations to Democracy Partners and its members, Maass sought and obtained the confidence and trust of Democracy Partners and Plaintiff Creamer specifically.

73. Maass breached her fiduciary duties to Democracy Partners by, *inter alia*:

    a.   Surreptitiously recording meetings and conversations held in non-public spaces with Democracy Partners members, employees and clients without consent or authorization;

    b.   Providing those recordings to Project Veritas and Project Veritas Action Fund;

    c.   Providing Project Veritas and Project Veritas Action Fund with documents she obtained during her internship that contained sensitive and confidential business practices and political information without the consent of Democracy Partners;

    d.   Removing documents or copies of documents from the premises without consent or authorization;

    e.   Publishing said documents and said recordings in print and on the Internet;

    f.   Using these documents and videos to enrich herself and her employers and/or clients, specifically Project Veritas and/or Project Veritas Action Fund, in a manner and for purposes adverse to Democracy Partners.

74. Defendants induced Maass to gain the confidence and trust of Plaintiffs and to breach her fiduciary duty to Democracy Partners.

75. Defendants conspired with Maass to breach her fiduciary duties to Plaintiffs.

76. Plaintiffs have suffered and continue to suffer injury as a result of Maass' breach of her fiduciary duties including lost contracts, the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to their reputations.

77. As a result of Maass' breach of fiduciary duty, Plaintiffs have suffered at least $1,034,000 in actual damages including $534,000 in damages from lost contracts, and

$500,000 in damages from the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to reputation.

## COUNT TWO—UNLAWFUL INTERCEPTION OF ORAL COMMUNICATIONS

## (18 U.S.C. § 2511 *et. seq.*) (All Defendants)

78. Plaintiffs repeat and re-allege all of the allegations above as if fully alleged herein.

79. In violation of 18 U.S.C. §§ 2511(1)(a) and 2511(1)(b), Defendant Maass willfully intercepted the oral communications of Plaintiffs and their employees by using an electronic device concealed on her person to make video and audio recordings of conversations and meetings involving Plaintiffs and their employees and clients pertaining to Plaintiffs' confidential affairs and activities.

80. These recordings were all made in Plaintiffs' private offices that are not accessible to the general public.

81. Defendants procured Defendant Maass to intercept the oral communications. Defendants O'Keefe, PVF and PVAF are responsible for Maass' actions as described in paragraphs 74 and 75 because those actions were undertaken within the scope of Maass' employment by PV and PVAF and at the direction of and supervision of O'Keefe, PV and PVAF.

82. Defendants intercepted oral communications for the primary purpose of committing trespass, breach of fiduciary duty, fraudulent misrepresentation and other criminal or tortious acts in violation of the Constitution and the laws of the United States and the District of Columbia.

83. Defendants intentionally used and publicly disclosed the contents of the recordings taken by Maass and knew that the recordings were made through the interception of oral communications, in violation of 18 U.S.C. §§ 2511(1)(c) and 2511(1)( d).

84. Plaintiffs have suffered and continue to suffer injury as a result of Defendants' unlawful interception of oral communications as described in paragraphs 79 through 83 above, including lost contracts, the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to their reputations.

85.  As a result of  Defendants' unlawful interception of oral communications as described in paragraphs 79 through 83 above,  Plaintiffs have suffered at least $1,034,000 in actual damages including $534,000 in damages from lost contracts, and $500,000 in damages from the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to reputation.

## COUNT THREE—UNLAWFUL INTERCEPTION OF ORAL COMMUNICATIONS
### (D.C. CODE § 23-541, *et. seq.*) (All Defendants)

86.  Plaintiffs repeat and re-allege all of the allegations above as if fully alleged herein.

87. In violation of D.C. Code § 23-542(a)(1), Defendant Maass willfully intercepted oral communications of Plaintiffs and their employees by using an electronic device concealed on her person to make video and audio recordings of conversations and meetings involving Plaintiffs employees and clients and pertaining to Plaintiffs' confidential affairs and activities.

88. The recordings were all made in Plaintiffs' private offices that are not accessible to the general public. Defendants procured Defendant Maass to intercept the oral communications.

89. The actions of Maass described above were undertaken by Maasss within the scope of her employment by PV and PVAF and at the direction of and supervision of O'Keefe, PV and PVAF.

90. Defendants intercepted oral communications for the primary purpose of committing trespass, breach of fiduciary duty, fraudulent misrepresentation and other criminal and tortious acts in violation of the Constitution and the laws of the United States and the District of Columbia and for the purpose of committing other injurious acts.

91. Defendants willfully used and publicly disclosed the contents of the recorded oral conversations and evidence derived therefrom, knowing that the information was obtained through the interception of oral communications, in violation of DC Code § 23-542(a)(2) and § 23-542(a)(3) .

92. Plaintiffs have suffered and continue to suffer injury as a result of Defendants' unlawful interception of oral communications as described in paragraphs 86 through 91 above, including lost contracts, the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to their reputations.

93. As a result of  Defendants' unlawful interception of oral communications as described in paragraph 86 through 91 above,  Plaintiffs have suffered at least $1,034,000 in actual damages including $534,000 in damages from lost contracts, and

$500,000 in damages from the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to reputation.

## COUNT FOUR—TRESPASS (Defendant Maass)

94. Plaintiffs repeat and re-allege all of the allegations above as if fully alleged herein.

95. The Democracy Partners office is not open to the public and may be accessed by third parties only upon invitation and authorization.

96. Defendants combined and conspired to intentionally intrude upon the property of Democracy Partners.

97. Maass only gained access to the Democracy Partners office through the use of pretense, subterfuge, misrepresentation and/or concealment.

98. Maass also exceeded the consent she fraudulently induced from Plaintiffs by recording conversations in the Democracy Partners office without permission.

99. Defendants induced Maass to trespass on the property of Democracy Partners.

100.   Maass' intrusion invaded and disrupted Democracy Partners' possession and control over its own property.

101.   Plaintiffs have suffered and continue to suffer injury as a result of Maass' trespass including the diminution of the economic value of the office and the diminishment of the economic value of confidential and proprietary information, in the amount of at least $100,000.

## COUNT FIVE—FRAUDULENT MISREPRESENTATION (All defendants)

102.    Plaintiffs repeat and re-allege all of the allegations above as if fully alleged

herein.

103.    When Roth/Sandini connected Maass with Creamer, and when Creamer

interviewed Maass, Maass made false representations regarding her name, intent in

securing and maintaining the internship, purpose in seeking the internship, her

education, and work history, among other representations.

104.    Maass' representations about her purpose in seeking the internship, work history,

education, other qualifications and interests were material facts upon which Plaintiffs

relied in their decision to offer Maass an internship.

105.    The misrepresentations about her work history and education Maass made when

she provided her resume were material facts upon which Plaintiffs based their

decision to continue to employ Maass, provide her with information and access to

documents and to the secured office, and involve her in projects.

106.    At all times, Maass knew the representations she made to Plaintiffs were false.

107.    Maass made the representations with the intent to deceive Plaintiffs.

108.    If Roth/Sandini and Maass had not made the fraudulent representations, Plaintiffs

would not have offered her the internship or continued the internship.

109.    Defendants induced Maass to make the fraudulent misrepresentations.

110.    Defendants conspired to make fraudulent misrepresentations to Plaintiffs.

111.    Plaintiffs have suffered and continue to suffer injury as a result of Maass'

fraudulent misrepresentation including lost contracts and the diminishment of the

economic value of confidential and proprietary information.

112.    As a result of Maass' fraudulent misrepresentation, Plaintiffs have suffered at

least $1,034,000 in actual damages including lost contracts, the diminishment of the

economic value of confidential and proprietary information, loss of future contracts

and damage to reputation.

### COUNT SIX—CIVIL CONSPIRACY (All defendants)

113.    Plaintiffs repeat and re-allege all of the allegations above as if fully alleged

herein.

114.    Defendants combined and conspired for an unlawful purpose or for a lawful

purpose by unlawful means, including to commit trespass, fraudulent

misrepresentation, unlawful wiretap, and to breach fiduciary duties.

115.    Defendants committed overt tortious or illegal acts in furtherance of the

conspiracy.

116.    As a result of Defendants' conspiracy, Plaintiffs have suffered at least $1,034,000

in actual damages, including damages including lost contracts, the diminishment of

the economic value of confidential and proprietary information, loss of future

contracts and damage to reputation.

**RELIEF REQUESTED**

WHEREFORE, the Plaintiffs pray for the following relief:

A.   Enter judgment in favor of Plaintiffs and against Defendants on each of the causes of action asserted herein;

B.   Enjoin Defendants and their agents and associates from posting, publishing, disclosing, or in any way using any documents, recordings, or other information obtained from Plaintiffs, either directly or indirectly;

C.   Order Defendants and their agents and associates to return any documents, recordings, or other information obtained from Plaintiffs, either directly or indirectly;

D.   Award Plaintiffs actual damages of $1,034,000 for actual loss of amounts that would have been received under contracts but for the wrongful acts of Defendants as alleged herein; diminishment of the economic value of the space leased by SCG and of confidential and proprietary information; loss of future contracts; and damage to reputation of the Plaintiffs;

E.   Order Defendants to disgorge all profits from their unlawful conduct and use of Plaintiffs' property;

F.   Award Plaintiffs statutory damages of $10,000 or $100 a day for each day of violation, whichever is greater, pursuant to 18 U.S.C. § 2520(c)(2)(B), for each violation of 8 U.S.C. § 2511 *et seq*.;

G.  Award Plaintiffs statutory damages at the rate of $100 a day for each day of

   violation, or $1,000, whichever is greater, pursuant to D.C. Code § 23-

   554(a)(2)(A), for each violation of D.C. Code § 23-542 *et seq*.;

H.  Award Plaintiffs punitive damages pursuant to 18 U.S.C. § 2520(b)(2) and

   D.C. Code § 23-554(a)(2)(B) in an amount to be determined at trial;

I.  Award Plaintiffs the costs and expenses of this action, including attorney's

   fees, pursuant to 18 U.S.C. § 2520(b)(3) and D.C. Code § 23-554(a)(2)(C);

J.  Award Plaintiffs interest on any damages awarded;

K.  Order each Defendant to pay Plaintiffs' costs associated with this action; and

L.  Award such additional relief as the Court may determine to be just and proper.

**JURY DEMAND**

**Plaintiffs demand a trial by jury on all issues triable by a jury.**

Dated: June 1, 2017                Respectfully submitted,


  /s/ Joseph E. Sandler

Joseph E. Sandler, D.C. Bar No. 255919
SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.
1025 Vermont Ave., N.W.  Suite 300
Washington, D.C.  20005
Tel:  202-479-1111
Fax:  202-479-1115
sandler@sandlerreiff.com

Yael Bromberg, D.C. Bar No. 1045569
Aderson Francois, D.C. Bar No. 798544
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 662-9593
Fax: (202) 662-9634
Yael.bromberg@law.georgetown.edu

abf48@georgetown.edu

*Attorneys for Plaintiffs*