IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Democracy Partners, LLC, *et al.,*** <br> Plaintiffs; <br><br><br> **v.** <br><br><br> **Project Veritas Action Fund, *et al.,*** <br> Defendants. | <br><br><br><br> Civil Action No.: 1:17-cv-1047-ESH <br><br> **Oral Argument Requested** |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTIONS TO DISMISS
<u>BY THE PROJECT VERITAS DEFENDANTS</u>**

Daniel D. Mauler
(D.C. Bar No. 977757)
REDMON, PEYTON &
BRASWELL, LLP
510 King Street, Suite 301
Alexandria, VA 22314
Tel: (703) 684-2000
Fax: (703) 684-1509
dmauler@rpb-law.com

Benjamin T. Barr
(Admitted *pro hac vice*)
THE LAW OFFICE OF
BENJAMIN BARR
444 North Michigan Avenue
Suite 1200
Chicago, Illinois 60611
Tel: (202) 595-4671
B@benjaminbarr.com

Stephen R. Klein
(Admitted *pro hac vice*)
LAW OFFICE OF
STEPHEN R. KLEIN
500 Madison Street #419
Alexandria, VA 22314
Tel: (734) 233-1705
stephen.klein.esq@gmail.com

# TABLE OF CONTENTS

I.  Introduction ..................................................................................... 5

  A.  First Amendment principles are at stake in this case. .................................. 5

  B.  Summary of the case ................................................................. 7

  C.  What is *not* alleged in the Complaint: defamation. .................................... 8

II.  Legal Argument ............................................................................ 10

  A.  The problems with the Plaintiffs' damages claims. .................................. 10

      1.  Plaintiffs demand "reputation damages" without
          pleading defamation, violating the rule laid down by
          the Supreme Court in *Hustler v. Falwell*. ...................................... 10

      2.  Plaintiffs demand "lost contract" damages without
          pleading the necessary tortious interference with
          contract claim. ................................................................ 15

      3.  Plaintiffs' damages theory of "diminishment of the
          economic value" of information is not proper. .............................. 19

  B.  The problems with Plaintiffs' liability claims. ......................................... 20

      1.  Plaintiffs fail to adequately allege that an unpaid intern
          (who never signed any written confidentiality
          agreement) has a fiduciary duty in this case. (Count 1) .................. 20

      2.  Because the purpose of the recorded videos was for
          constitutionally-protected speech, the Plaintiffs' claims
          for violations of the Federal and DC Wiretap Acts must
          be dismissed.  (Counts 2 and 3) ..................................................... 22

          a.  The Wiretap Acts permit recording of conversations
              by a participant in those conversations. ....................................... 23

b.    The recordings were made for the purpose of constitutionally-protected speech, not for a criminal or tortious purpose. ....................................................... 25

c.    Courts across the nation have recognized that undercover, hidden-camera news-gathering investigations do not violate the Wiretap Acts............................. 26

3.    The Plaintiffs invited the undercover reporter into their offices, so their trespass claim fails as a matter of law. (Count 4) ........................................................................ 28

a.    Plaintiffs consented to Maas's entry into their offices................. 28

b.    Plaintiffs' trespass claim has a problem with proximate cause. ......................................................... 32

c.    Plaintiffs' claim for trespass damages due to the "diminution of economic value of the office" must be dismissed. ............................................................ 32

d.    Plaintiffs' claim for trespass damages due to the "diminishment of the economic value of confidential and proprietary information" must be dismissed. ........................ 33

4.    Plaintiffs' fraudulent misrepresentation claim fails to adequately allege the proximate cause of the supposed damages. (Count 5) ..................................................... 33

5.    Plaintiffs' civil conspiracy claim must be dismissed because the Defendants are not liable for the other torts alleged in the Complaint. (Count 6) ....................................... 37

C.    The District of Columbia's Anti-SLAPP Act supports dismissal.............. 38

III.    Conclusion ....................................................................... 43

At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. The freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole. We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions.

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46, 52 (1988)
(internal case citations
and quotation marks omitted)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTIONS TO DISMISS

Defendants Project Veritas Action Fund, Project Veritas, and James O'Keefe (collectively, "Project Veritas Action") move to dismiss all counts in the Complaint filed by Plaintiffs Democracy Partners, LLC; Strategic Consulting Group, NA, Inc.; and Robert Creamer (collectively, the "Plaintiffs").   This Memorandum is submitted in support of Project Veritas Action's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 14] and the Special Motion to Dismiss pursuant to the District of Columbia's Anti-SLAPP Act, D.C. Code § 16-5502 [ECF No. 15].

**I.   Introduction**

### A.  First Amendment principles are at stake in this case.

Undercover journalism plays an important role in creating positive social and legal changes. Without it, many frauds perpetrated upon society would go undetected and rampant abuse would remain hidden. From revealing the sad state of affairs at slaughterhouses to exposing medical fraud, America is a better place because of undercover journalism.

When unorthodox journalists step in to demonstrate abuses in America's asylums—like Nellie Bly did—or go undercover to show corruption in the American political process—like James O'Keefe does—the First Amendment must offer a serious defense against frivolous lawsuits designed to chill it. Ours is a nation proud of its "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v.*

*Sullivan*, 376 U.S. 254, 270 (1964). This commitment must be realized for undercover journalists, too.

Courts have witnessed no shortage of tort actions brought against the press after reporting embarrassing or unsettling news. In each instance, courts must ensure that standards protective of the First Amendment interests at hand are applied. Whether it is the actual malice standard—that ensured the New York Times could report on Southern civil rights issues—or the "innocent construction" rule—that allowed the Tribune Company to report on vice raids—speech protective standards are critical. *Sullivan*, 376 U.S. 254; *John v. Tribune Co.*, 24 Ill.2d 437 (1962).

Undercover journalism must be equally protected. Without deference to First Amendment concerns, undercover journalism will be impossible to practice. This should be especially startling here, where Project Veritas Action exposed likely violations of federal election law through its reporting. In its many exposés, Project Veritas Action has become a national leader in shining light on public mistruths and corruption—like its uncovering of a false campaign position by Mark Pryor in Arkansas or its reporting on the Bernie Sanders campaign using foreign nationals to aid its advocacy. Unlike many other news organizations, the *only* way Project Veritas Action operates is through surreptitious recording while honoring the requirement of the law.

While controversial, the deception employed in undercover journalism "actually advance[s] core First Amendment values by exposing misconduct to the public eye and facilitating dialogue on issues of considerable public interest." *Animal Legal Defense Fund v. Otter*, 118 F.Supp.3d 1195, 1204 (D. Idaho 2015). The First Amendment was designed

to especially protect hard-hitting stories of public interest that Project Veritas Action regularly delivers.

It is with this understanding that the *intent* behind Project Veritas Action's journalism is of paramount concern.  Of the menagerie of torts and statutes at issue here, each require an intent to do economic or reputational harm. They are designed to advance useful goals—like protect business competitors from unfair employment poaching or to cabin trade secrets. But without careful attention to the public interest in the speech in controversy here, these provisions can be turned into weapons that chill protected expression.

As will be demonstrated in this brief, this lawsuit is little more than Plaintiffs' attempt to muzzle reporting that caused public embarrassment.  But mere embarrassment—an incidental feature to many types of speech—is simply insufficient to form a legal cause of action.  Because of this, this Court should dismiss the Complaint to protect Project Veritas Action's ability to keep reporting items of public interest.

### B.  Summary of the case.

In this case, the Plaintiffs complain about an undercover, hidden camera investigation conducted by reporters affiliated with Defendant Project Veritas Action Fund.[1]  The Complaint alleges that Defendant Allison Maass applied for an unpaid internship with Plaintiff Democracy Partners, LLP, using a fake name and resume.  *See* Compl., ¶ 27.  Notably, the Complaint never alleges that she was *ever* asked to sign an

---

[1] The video publication at the root of this case is publicly available at:
https://www.youtube.com/playlist?list=PLXvy1DRoSfZlzszVv2sw3-IUPL6YlER6 (last accessed: July 28, 2017).

employment agreement, confidentiality agreement, non-disclosure agreement, or any other type of written agreement to outline her duties. As an unpaid intern, she was assigned low-level clerical assignments customary for an intern in a Washington, D.C.-based office. *See id.* at ¶ 36 (describing "Maass' [*sic*] tasks as an intern"). While performing her clerical assignments, she allegedly recorded video conversations with Defendant Robert Creamer and others discussing the Plaintiffs' political efforts in the 2017 presidential campaign. *See id.* at ¶¶ 27. These efforts included coordination with the Democratic National Committee and the Hillary Clinton Presidential Campaign. But these efforts also included "bracketing events" to insert protesters into the campaign rallies of Donald Trump. *See id.* at ¶ 20.

Among the recorded footage were numerous incriminating statements made by the Plaintiffs suggesting that they knowingly operated in violation of federal campaign finance laws and improperly coordinated with national campaign organizations. Project Veritas Action Fund then published a four-part video series containing the reporting. After the video publication, the Plaintiffs filed this lawsuit alleging breach of fiduciary duty (Count 1), violations of the Federal and DC "Wiretap" Acts (Counts 2 and 3), trespass (Count 4), fraudulent misrepresentation (Count 5), and civil conspiracy (Count 6). Plaintiffs seek over $1 million in damages due to Project Veritas Action's reporting.

### C. What is *not* alleged in the Complaint: Defamation.

The U.S. Supreme Court has provided wide-latitude for speech involving public figures and issues of public concern. Admittedly, that latitude is not absolute, and the guardrails for such speech is found in the defamation-plus-malice standard articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Such a defamation claim is

the proper remedy for a public figure who has been supposedly damaged due to another's exercise of constitutionally-protected speech.

But, in this case, the Plaintiffs do *not* allege defamation against the Defendants. Instead, the Plaintiffs *fail* to specifically identify any statement by the Defendants as false or defamatory.  (This is likely because the vast bulk of the published videos are simply the recorded statements of Plaintiff Robert Creamer himself.)  While the Plaintiffs' Complaint does include some throw-away lines that attempt to suggest that the published videos contained "false conclusions," "false[] impli[cations]," and "false[] . . . portray[als]" (Compl., ¶ 53), the Plaintiffs are noticeably absent with any straight-forward defamation claim. This is significant.

It is significant because the Plaintiffs do not challenge the *truth* of Project Veritas Action's broadcast.  Because Plaintiffs do not identify any allegedly false statements in the publication, this Court should assume that the publication was truthful, as other courts have done when considering similar claims brought against media defendants.  *See, e.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956, 962-63 (M.D.N.C. 1997) ("For purposes of this opinion and this case, it is assumed that the content of the *PrimeTime Live* broadcast about Food Lion was true.  Food Lion did not challenge the content of the broadcast by bringing a libel suit.  Instead, Food Lion attacked the methods used . . . to gather the information."), *aff'd* 194 F.3d 505 (4th Cir. 1999); *Frome v. Renner*, 97 Civ. 5461, 1997 WL 33308718, at *2 (C.D. Cal. Oct. 1, 1997) (in fraud claim against CBS reporter, court assumed truth of CBS's news broadcast after plaintiff failed to assert defamation claim).

As will be shown below, Project Veritas Action's publication concerned important public issues about the Plaintiffs, who are undoubtedly public figures.  The Plaintiffs now attempt to silence Project Veritas Action by seeking over $1 million dollars in damages as a consequence of that constitutionally-protected speech – but without pleading the required defamation claim under *New York Times v. Sullivan*.  The U.S. Supreme Court ruled long ago that the First Amendment prohibits such chilling of free speech.  For this leading reason, and for others that follow, the Plaintiffs' Complaint should be dismissed.

## II.   Legal Argument

The Plaintiffs' Complaint suffers from multiple problems that warrant dismissal in total, and those problems can be broadly grouped into two categories:  1) problems with the claims for damages, and 2) problems with the legal theories of liability.   This Memorandum will examine both categories in turn, explaining why the Complaint fails to state a claim upon which relief can be granted.  "[A] complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead 'enough facts to state a claim . . . that is plausible on its face.'"  *Hicks v. Assoc. of Am. Med. Coll.*, 503 F.Supp.2d 48, 50 (D.D.C. 2007) (*quoting Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)).  Therefore, dismissal is proper.

### A.  The problems with the Plaintiffs' damages claims.

#### 1.  Plaintiffs demand "Reputation Damages" without pleading Defamation, violating the rule laid down by the Supreme Court in *Hustler v. Falwell.*

When Project Veritas Action published the results of its undercover investigation of Democracy Partners, it was engaged in public speech protected by the First Amendment. The videos focused upon matters of significant public concern, namely whether Democracy

Partners was violating federal campaign finance laws in an attempt to improperly benefit a national candidate's presidential campaign.  Further, all three plaintiffs, main subjects in the videos, are public figures.  Yet, the plaintiffs now attempt to effectively muzzle Project Veritas Action's free speech rights by suing for over a million dollars.  This is not a new idea, however, and the First Amendment has stood as a bulwark against such attempts to silence free speech.

In this lawsuit, the plaintiffs seek to recover over $500,000 in damages to their reputations due to the publication of Project Veritas Action's reporting – but without pleading a claim for defamation.  *See, e.g.*, Compl., ¶ 68 ("The disclosures and actions of Maass . . . have severely injured the reputations of Creamer, SCG and Democracy Partners; and have resulted in the loss of future contracts with those Plaintiffs, with a value of at least $500,000.").

Indeed, this claim for "damage to reputation" permeates the entire Complaint and is found in at least five of the six counts:

- Breach of Fiduciary Duty (Count 1).  *See* Compl., ¶ 77 ("damage to reputation");
- Violation of Federal "Wiretap Act" (Count 2).  *See id.* at ¶ 85 ("damage to reputation");
- Violation of D.C. "Wiretap Act" (Count 3).  *See id.* at ¶ 93 ("damage to reputation");
- Fraudulent Misrepresentation (Count 5).  *See id.* at ¶ 112 ("damage to reputation");
- Civil Conspiracy (Count 6).  *See id.* at ¶ 116 ("damage to reputation"). [2]

Plaintiffs' claims for reputations damages are not permissible unless they actually prove defamation.  The U.S. Supreme Court has "consistently ruled that a public figure

---

[2] In fact, the Plaintiffs may also be seeking reputation damages under the trespass claim, which would then include all six counts of the Complaint.  In the trespass claim, the Plaintiffs make the curious demand for damages arising from the "diminution of the economic value of the office." Compl., ¶ 101.  This novel claim is new to D.C. law and does not appear in any reported D.C. case.  To the extent the claim seeks damages due to the *reputation* of the Plaintiffs' office, it must be dismissed for the same reasons.

may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood, but only if the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

In *Hustler Magazine*, the Reverend Jerry Falwell brought suit against Hustler Magazine after it published a parody lampooning Falwell.  In the parody, Falwell admitted in a fictitious "interview" that his first sexual experience was with his mother in an outhouse after a drunken night of debauchery.  *See Hustler Magazine*, 485 U.S. at 48.  This parody was modeled after popular Campari Liqueur advertisements featuring other celebrities describing their "first time" of drinking the liquor.  *See id.*  Falwell sued Hustler Magazine for libel and intentional infliction of emotional distress.  *Id.* at 48.  At trial, the jury found against Falwell on the libel claim but awarded $150,000 in damages on the intentional infliction of emotional distress claim.  *Id.* at 49.

The Supreme Court reversed and vacated the jury's award on First Amendment grounds.  *See id.* at 56-57.  The Court held that Falwell's claim implicated free speech principles protected by *New York Times v. Sullivan*, and therefore, it had to satisfy a defamation analysis:

> We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications . . . without showing in addition that the publication contains a false statement of fact which was made with actual malice, *i.e.*, knowledge that the statement was false or with reckless disregard as to whether or not it was true.  This is not merely a blind application of the *New York Times* standard, it reflects our considered judgment that such a standard is necessary to give adequate breathing space to the freedoms protected by the First Amendment.

*Id.* at 56 (internal citation and quotation marks omitted).

Thus, *Hustler* stands for the rule that when a claim for defamation fails because the defendant's speech is constitutionally-protected, that speech cannot form the basis for damages under another tort.  In other words, because Falwell failed to prove libel in his case, the First Amendment barred him from recovering any other damages that flowed from the publication.

But proving defamation is hard.  Because of this, many plaintiffs try to evade such difficulty by pleading other common law torts (such as negligence, breach of fiduciary duty, or fraud) but seek reputation damages allegedly suffered from a published statement, just as Democracy Partners tries to do in the case at bar.

This is not a new tactic.  *See, e.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) ("What [plaintiff] sought to do, then, was to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim.  We believe that such an end-run around First Amendment strictures is foreclosed by *Hustler*.").

And this tactic has already been tried and rejected by the D.C. Circuit Court.  In *Teltschik v. Williams & Jensen, PLLC*, 683 F.Supp.2d 33 (D.D.C. 2010), this Court faced a defamation claim brought against attorneys who made statements during settlement negotiations that supposedly damaged the plaintiff's reputation.  *See id.* at 53-54.  Because the judicial proceedings privilege provided immunity for such statements, the Court granted summary judgment on the plaintiff's libel claim.  *Id.* at 54.

The plaintiff was not deterred, however, and he attempted an end-run around the dismissal by seeking reputation damages under negligence and breach of fiduciary duty claims.  This Court rejected that attempt, and held that it was "it was inappropriate to allow

Plaintiff to recover reputation damages where Plaintiff was labeling his claim as 'negligence' or 'breach of fiduciary duty' when, in fact, the claims were nothing more than a reincarnation of his defamation claims." *Teltschik v. Williams & Jensen, PLLC*, No. CIV. A. 08-089 BJR, 2012 WL 3960607, at *2 (D.D.C. Sept. 10, 2012), *aff'd*, 748 F.3d 1285 (D.C. Cir. 2014).

On appeal, the D.C. Circuit affirmed: "In other words, plaintiffs complaining about a defamatory statement cannot end-run the requirements for a defamation claim by pleading it as a negligence claim. We agree with the District Court that we should not recognize such a novel claim under D.C. law." *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1288 (D.C. Cir. 2014). This decision makes sense because a court must examine the substance of a plaintiff's complaint, rather than the mere labels appended to the claims. "In examining a complaint we are bound to look beyond the literal meaning of the language used to ascertain the real cause of the complaint." *Jimenez-Nieves v. United States*, 682 F.2d 1, 6 (1st Cir. 1982). And the substance of "claims which involve the injury to [a plaintiff's] reputation and the consequent harm suffered" after statements are published "resound in the heartland of the tort of defamation: the injury is to reputation; the conduct is the communication of an idea, either implicitly or explicitly." *Id*.

The bottom-line is that if the plaintiffs want to recover for damage to their reputations, then they must plead and prove the tort of defamation. The Plaintiffs are, at the very least, limited-purpose public figures under D.C. law. *See Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987). They are public figures that "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Metastorm, Inc. v. Gartner Grp., Inc.*, 28 F. Supp. 2d 665, 668 (D.D.C. 1998)

(*quoting Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 325 (1974)).  This can be seen by their extensive campaign work for various progressive causes (*see, e.g.,* Compl., ¶ 18) and Mr. Creamer's invitations to the White House.  *See, e.g., id.* at ¶ 41.[3]  In other words, the Plaintiffs "thrust themselves" into the November 2017 Presidential election (a major public controversy), and as such, their actions and conduct are subject to fair comment by Project Veritas Action.  *See, e.g.*, Compl., ¶ 20 (raising issue of coordination between the Plaintiffs and national presidential campaigns and committees).  Any defamation claim brought by the Plaintiffs in this case will need to satisfy the heightened "malice" standard of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).  Without such a defamation claim, the multiple demands for reputation damages must be dismissed from the Complaint.

> ### 2. Plaintiffs demand "Lost Contract" damages without pleading the necessary Tortious Interference with Contract claim.

Plaintiffs' other major damages claim is for supposed lost contracts.  The Complaint alleges that multiple third-parties cancelled contracts with the Plaintiffs after the publication of Project Veritas Action's reporting, resulting in $534,000 in damages.  *See,*

---

[3]  Additionally, Mr. Creamer has been a public figure since at least 2002 when he was instrumental in the campaign of Rod Blagojevich for Governor of Illinois, and then later in 2005 when he pled guilty to two felonies for tax fraud, both which were extensively covered in the press.  *See, e.g., Congresswoman's husband pleads guilty to two felonies*, USA Today, Aug. 31, 2005, available at:  http://usatoday30.usatoday.com/news/washington/2005-08-31-congresswoman-husband_x.htm (last accessed:  July 28, 2017).  After completing his prison sentence, Mr. Creamer published a book on politics in 2007.  *See* Robert Creamer, *Stand Up Straight* (2007).  And since then, Mr. Creamer is a frequent writer for *The Huffington Post*, where he has published over 140 articles on progressive politics since 2005.  *See* Author Biography for Robert Creamer, HuffPost, available at:  http://www.huffingtonpost.com/author/robert-creamer (last accessed: July 28, 2017).

*e.g.* Compl., ¶¶ 68, 77.  And, in fact, this same claim for "lost contract" damages forms the bases of five of the six counts in the Complaint:

- Breach of Fiduciary Duty (Count 1) - ¶¶ 77-78.
- Violation of the Federal Wiretap Act (Count 2) - ¶¶ 84-85.
- Violation of the D.C. Wiretap Act (Count 3) - ¶¶ 92-93.
- Fraudulent Misrepresentation (Count 5) - ¶¶ 111-112.
- Civil Conspiracy (Count 6) - 116.

The problem with these "lost contract" damages, however, is that the Plaintiffs *do not* plead a claim for tortious interference with contractual relations under D.C. law.  Such "lost contract" damages are only recoverable under a proper tortious interference claim.  They cannot be recovered under the torts asserted in the Complaint.  As such, all claims for "lost contract" damages must be dismissed unless a proper tortious interference claim can be supported.  *See Taylor v. F.D.I.C.*, 132 F.3d 753, 761 (D.C. Cir. 1997) ("Dismissal under Rule 12(b)(6) is proper when . . . the court finds that the plaintiffs have failed to allege all the material elements of their cause of action.").

"To prevail on a claim of tortious interference with contract, a plaintiff must establish: '(1) the existence of a contract, (2) defendant's knowledge of the contract, (3) defendant's intentional procurement of the contract's breach, and (4) damages resulting from the breach.'"  *Murray v. Wells Fargo Home Mortg.* 953 A.2d 308, 325 (D.C. 2008) (*quoting Cooke v. Griffiths-Garcia Corp.*, 612 A.2d 1251, 1256 (D.C. 1992)).

Significantly, the Plaintiffs must plead that these third-parties *breached* their contracts when they were terminated.  "Unlike in some jurisdictions, courts in the District of Columbia have held that 'a breach of contract is an essential element' of the tort."  *Murray*, 953 A.2d at 326 (*quoting Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C. Cir. 1995)).

The Plaintiffs' claims for "lost contract" damages have multiple problems. The Complaint fails to plead that the defendants had *specific knowledge* of the third-party contracts or that the defendants *intended* to procure a breach of those specific contracts. Further, the Complaint fails to plead the "essential element" that the third parties *breached* their contracts with the Plaintiffs.

But the most significant problem with Plaintiffs' potential tortious interference claim is that it does not survive First Amendment scrutiny. The supposed $534,000 in lost contracts allegedly occurred as a result of the publication of the defendants' reporting. *See, e.g.*, Compl., ¶ 67 ("But for the disclosures and actions of Maas . . ., SCG and Democracy Partners would have been paid at least $534,000 for actual services, revenue these Plaintiffs lost because of those disclosures and actions of Maass."). As such, the "lost contract" damages arise from the defendants' constitutionally-protected speech.

"[W]hen a claim of tortious interference with business relationships is brought as a result of constitutionally protected speech, the claim is 'subject to the same First Amendment requirements that govern actions for defamation.'" *Medical Laboratory Mngt. Consultants v. Am. Broadcasting Companies, Inc.*, 306 F.3d 806, 821 (9th Cir. 2002) (*quoting Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990)).

Numerous other courts across the country agree. *See, e.g., Beverly Hills Foodland, Inc. v. United Food & Comm. Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (the constitutional requirements for defamation "must equally be met for a tortious interference claim based on the same conduct or statements"; otherwise "a plaintiff may . . . avoid the protection afforded by the Constitution . . . merely by the use of creative pleading"); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 973 (3d Cir. 1985) (unless defendants

"can be found liable for defamation, the intentional interference with contractual relations count is not actionable.").

Lawsuits over undercover reporting involving hidden cameras are nothing new, and Ninth Circuit faced similar claims in *Medical Laboratory Management* with facts remarkably similar to the case at bar.  There, an ABC News crew used hidden cameras to film inside a medical laboratory that analyzed high volumes of slides of women's pap smears, in an effort to detect cervical cancer.  306 F.3d at 809-10.  The news reports focused on whether the medical laboratory was using enough attention to accurately analyze the slides, or whether it was cutting corners in an effort to maximize profit. *See id.*  In a broadcast titled *Rush To Read,* ABC News broadcast the report and hidden camera footage on *PrimeTime Live*. *Id.*  Thereafter, the medical laboratory sued ABC News for tortious interference with contractual relations and prospective relations.[4] *Id.* at 809.  The district court granted summary judgment on these claims on the grounds that the news gathering and reporting were protected by the First Amendment, and the Ninth Circuit affirmed, saying:

> Medical Lab contends that Defendants' broadcast of *Rush To Read* tortiously interfered with its contractual relations and prospective economic relations . . . *Rush To Read* addressed a subject of unquestionable public concern, the frequency of testing errors by medical laboratories that analyze women's pap smear slides for cervical cancer.  Given this public interest in the publication of *Rush To Read*, the First Amendment requires Medical Lab to demonstrate the falsity of the statements made in the television segment, as well as Defendants' fault in broadcasting them, before recovering damages.

*Id.* at 821.

---

[4] The medical laboratory also sued ABC News for trespass, and that claim was dismissed on summary judgment.  This aspect of the case is discussed below at pp. 28 - 33.

The Plaintiffs fail to meet this constitutionally-mandated standard in their Complaint.  Because they have not alleged facts sufficient to support a claim of defamation against a public figure, they cannot recover any damages for tortious interference or "lost contracts."  Their claims for $534,000 in "lost contracts" damages must be dismissed.

### 3. Plaintiffs' damages theory of "diminishment of the economic value" of information is not proper.

One other problem exists in Plaintiffs' claims for damages.  As an element of damages, Plaintiffs claim that they should recover for the "diminishment of the economic value of confidential and proprietary information."  This claim appears in every count in the Complaint:

- Breach of Fiduciary Duty (Count 1).  *See* Compl., ¶ 76,
- Federal Wiretap Act (Count 2).  *Id.* at ¶ 85.
- DC Wiretap Act (Count 3).  *Id.* at ¶ 93.
- Trespass (Count 4).  *Id.* at ¶ 101.
- Fraudulent Misrepresentation (Count 5).  *Id.* at ¶ 112.
- Civil Conspiracy (Count 6).  *Id.* at ¶ 116.

The Complaint offers no details on this theory.  No *specific* pieces of confidential or proprietary information are identified as having been damaged, nor is a specific dollar value of damages assigned to each piece of information.

Moreover, Plaintiffs appear to be seeking compensation for damage to intangible property without pleading the appropriate claims under D.C. law.  This theory of damages should be dismissed from the Complaint.

**B.  The problems with Plaintiffs' liability claims.**

> **1.  Plaintiffs fail to adequately allege that an unpaid
>     intern (who never signed any written confidentiality
>     agreement) has a fiduciary duty in this case. (Count 1)**

Plaintiffs allege that Defendant Maas, as an unpaid intern, breached her fiduciary duty.  The elements of breach of fiduciary duty under D.C. are straight-forward:  "(1) [Defendant] owed [plaintiff] fiduciary duties; (2) [defendant] breached [its] duties; and (3) the breach was a proximate cause of an injury to [plaintiff]." *Armenian Genocide Museum & Meml., Inc. v. Cafesjian Fam. Found., Inc.*, 595 F. Supp. 2d 110, 116 (D.D.C. 2009). But, in the case at bar, the Complaint fails to adequately allege that Maass had any fiduciary duty in the first place. [5]

Courts nationwide recognize that fiduciary relationships exist in only the most extraordinary circumstances.  *See, e.g., In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002) (A fiduciary duty is the "highest order of duty imposed by law."); *ARA Automotive Group v. Central Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) (noting that under Texas state law, a fiduciary duty "'imposes extraordinary duties' and requires the fiduciary to 'put the interests of the beneficiary ahead of its own if the need arises.'"); *Somers v. Crane*, 295 S.W.2d 5, 12 (Mo. 2009) (fiduciary duties should not be recognized lightly); *Ahlan Wa Sahlan Hospitality Co. v. United Citizens Bank of So. Kentucky, Inc.*, No. 2011-CA-001349, 2013 WL 275636, at *2 (Ky. App. Jan. 25, 2013) ("A fiduciary duty only exists where there is a special relationship, and it is not a duty to be imposed lightly."); *Am. Fed. of State,*

---

[5] While the undersigned counsel does not represent Ms. Maass, the Plaintiffs seek to hold the Project Veritas Defendants liable for Maass's supposed torts through the Civil Conspiracy claim of Count 6.  *See* Compl., ¶ 114.

*County, & Mun. Employees v. Bristol Myers Squibb Co.*, 948 F.Supp.2d 338, 362 n. 18 (S.D.N.Y. 2013) (courts do not lightly infer the existence of a fiduciary relationship).

This Court has recognized that a "mere member of an organization does not have a fiduciary duty to the organization." *Dialog Info. Services, Inc. v. Am. Chem. Soc.*, CIV. A. 90-1338, 1991 WL 319679, at *1 (D.D.C. July 1, 1991).  Were it otherwise, every part-time store stocker, janitor, or dog walker would be saddled with highest legal duties known to the law and would require the janitor to "put the interests of the beneficiary ahead of [his] own if the need arises."  *ARA Automotive Group*, 124 F.3d at 723.  Against this backdrop, Plaintiffs allege that a lone unpaid intern, not subject to any contractual agreement, confidentiality contract, or non-disclosure provision, is bound by the same strict fiduciary duties as a lawyer.  An unpaid intern, who was never even issued a W-2 or an IRS Form-1099, simply cannot be saddled with the "highest order of duty imposed by law," nor should the unpaid intern be expected to put the "interests of the beneficiary ahead of her own."  Against reported case law and commonsense, the Plaintiffs' claim cannot stand.

Problematic for Defendants is that interns are routinely understood to be entry level students seeking experience in "real world" office settings. They rarely join a particular think tank or office to further that political cause. They usually join such groups to enhance and further their own experience, often in connection with college programs that impose reporting requirements. Interns are transitory, perform low-level tasks, and are not usually entrusted with "mission critical" or confidential operational information.

Courts nationwide understand that only particularly special, trusted employees given access to confidential information will bear the burdens of a fiduciary duty. *See TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 266 (D. Mass. 2008) ("duty of

loyalty does not extend to 'rank-and-file' employees under Massachusetts law, absent special circumstances indicating they held a position of 'trust and confidence.'"); *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 16 (Mo. 2012) ("This Court declines to extend the law of fiduciary duty . . . to include at-will employees who are not constrained by a non-compete agreement."); *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 269 Ga. 604, 607, 503 S.E.2d 278 (Ga. 1998) ("The employee-employer relationship is not one from which the law will necessarily imply fiduciary obligations"). Against this backdrop, it is difficult to imagine that a fiduciary duty exists for a volunteer intern in an office that took no steps to secure the privacy of its operations.

>    **2.  Because the purpose of the recorded videos was for constitutionally-protected speech, the Plaintiffs' claims for violations of the Federal and DC Wiretap Acts must be dismissed.  (Counts 2 and 3)**

In Count 2 of the Complaint, Plaintiffs alleged that Project Veritas Action is liable under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. §§ 2510-21.  Often referred to colloquially as the "Wiretap Act," § 2511(1) provides criminal liability for any person who "intentionally intercepts or procures any other person to intercept" any oral communication that occurs in a business affecting interstate commerce or occurs in the District of Columbia.  *See* 18 U.S.C. § 2511(1).  Civil liability for violations of § 2511(1) is provided for under 18 U.S.C. § 2520, but only to the extent that a plaintiff's "wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation" of Title III.  *See* 18 U.S.C. § 2520.

Similarly, in Count 3 of the Complaint, Plaintiffs allege that the Defendants' same conduct violates D.C. Code § 23-541, *et. seq*. The D.C. version of the Federal Wiretap Act

is substantially similar, and Plaintiffs' claims under both versions must be dismissed for the same reasons.

### a. The Wiretap Acts permit recording of conversations by a participant in those conversations.

The Wiretap Act has an important safety valve, which allows recording of a conversation if one of the parties to the conversation is doing the recording:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication *where such person is a party to the communicatio*n or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d) (emphasis added).[6]  As can be seen by the quoted text, the "safety valve" of one-party consent has, itself, an exception if the recording was made "for the purpose of committing any criminal or tortious act." *Id.*  This is commonly referred to as the "blackmail exception," and its purpose is to guard against those who would make secret recordings to be used for a later improper purpose.  "Where the taping is legal, but is done for the purpose of facilitating some further impropriety, such as blackmail, section 2511 applies.  Where the purpose is not illegal or tortious, but the means are, the victims must seek redress elsewhere."  *Sussman v. Am. Broadcasting Companies, Inc.*, 186 F.3d 1200, 1202-03 (9th Cir. 1999).

---

[6] The D.C. Wiretap Act mirrors the Federal version, and contains the substantially-similar safety valve language at D.C. Code § 23-542(b)(3).

The timing of the *purpose* is also critical.  Courts have construed this language to focus upon the purpose of the person making the recording *at the time the recording was made*.  As the court observed in *Medical Laboratory Management*,

> Plaintiffs allege that Defendants recorded the March 18, 1994 meeting for the purpose of committing intrusion, fraud, trespass, and tortious interference with contractual and prospective economic relations. However, they offer nothing to support this claim other than a summary of the same arguments for liabilities for the underlying torts. They offer no support for the assertion that Defendants recorded the meeting for the *purpose* of committing a tort, which, as the statute indicates, is the proper focus of inquiry in a § 2511 claim. Even if Defendants were found liable for fraud, the question is not whether they are ultimately liable for conduct found to be tortious, but whether, *at the time the recording took place*, they recorded the conversation with the express intent of committing a tort.

*Medical Laboratory Mngt.*, 30 F.Supp.2d at 1205 (first emphasis in original, second emphasis added).  *See also Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010) ("We join the courts that have considered this question and hold that a cause of action under § 2511(2)(d) requires that the interceptor intend to commit a crime or tort independent of the act of recording itself.  Thus, to survive a motion to dismiss, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording."); *Payne v. Norwest Corp.*, 911 F. Supp. 1299, 1304 (D. Mont. 1995) (under § 2511, "the focus is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception—its intended use—was criminal or tortious."), *aff'd in part and rev'd in part*, 113 F.3d 1079 (9th Cir. 1997).

Because Defendants Allison Maas and Daniel Sandini were parties to the communications, the Wiretap Acts can only be violated if the recordings were intended to be used to commit a further crime or tort.  Thus, the Plaintiffs' Wiretap claims (and this

Court's federal question and supplemental jurisdiction to hear this case) rises or falls upon the Defendants' immediate "purpose" for making the recordings.

"This distinction is significant," the court noted in *Medical Laboratory Management*, "for without it the media could be held liable for undercover reporting under § 2511 even when their sole intent was to gather news.  Such a result would appear to be contrary to the legislative intent behind" the Wiretap Act.  *Medical Laboratory Mngt.*, 30 F.Supp.2d at 1205.  The court went on to note that Congress amended § 2511 in 1986 specifically to eliminate liability for undercover news-gathering:

> That amendment, which was passed largely in response to a case in which a media defendant was held liable under § 2511 for secretly recording an interview, was designed to thwart attempts by parties to chill the exercise of First Amendment rights through the use of civil remedies under § 2511.  As the legislators noted, Congress did not intend for § 2511 to become a stumbling block in the path of journalists who record their own conversations.

*Id.* (internal citations and quotation marks omitted).

### b. The recordings were made for the purpose of constitutionally-protected speech, not for a criminal or tortious purpose.

The Defendants' immediate *purpose* at the time the videos were made was to expose potential violations of federal campaign finance law (in the form of potential illegal campaign coordination) and the "bracketing" of Trump campaign events.  *See, e.g.*, Compl., ¶¶ 20, 37.  In other words, the *purpose* at the time the recordings were made was to publish constitutionally-protected speech in the form of news reporting.  The Plaintiffs' own Complaint acknowledges this at Paragraph 35:  "Maass provided these audio and video recordings to PV and PVAF, and they were used in a series of videos disseminated to the public by PVAF."  Compl., ¶35.

The *purpose* of the recordings was not to blackmail the Plaintiffs, nor to commit any of the other torts listed in the Complaint.  For example, the *purpose* was not to commit trespass (after all, Maas was already allowed *in* the Plaintiffs' offices before the recordings were made).  The *purpose* was not to make a fraudulent misrepresentation (after all, Maas already had a cover story in place when the recordings were made).  The *purpose* was not to breach any fiduciary duty (the Plaintiffs never had Maas sign any confidentiality or non-disclosure agreements).  The *purpose* was not to commit civil conspiracy (one cannot conspire to engage in a constitutionally-protected activity).

### c. Courts across the nation have recognized that undercover, hidden-camera news-gathering investigations do not violate the Wiretap Acts.

Media defendants cannot be held liable for violations of Wiretap statutes when the purpose for their recordings is constitutionally-protected news gathering and publication. "Courts considering § 2511 claims against media defendants have agreed, failing to hold media defendants liable under § 2511 even when the defendants may ultimately be held liable for other tortious conduct." *Medical Laboratory Mngt.*, 30 F.Supp.2d at 1205.  In that case, the court granted summary judgment on the Wiretap claims because ABC News had no reason "to record the meeting with [plaintiffs] other than to gain information and video footage for their broadcast.  Thus, [plaintiffs] cannot prevail on their § 2511 claim." *Id.* at 1206.

Other courts across the country agree.  The Seventh Circuit in *Desnick v. Am. Broadcasting Companies, Inc.*, 44 F.3d 1345 (7th Cir. 1995), faced similar claims after ABC News used hidden camera footage in a *PrimeTime Live* broadcast regarding potential Medicare fraud originating from an ophthalmic clinic conducting high volumes of cataract

eye surgeries.  ABC News sent undercover reporters and camera operators into the clinic posing as potential patients seeking consultations on cataract surgery.  After the broadcast, the eye clinic sued ABC for trespass, fraud, defamation, and violations of both the federal and state (Wisconsin)[7] Wiretap statutes.  *See id.* at 1348, 1351.   The Seventh Circuit allowed the defamation claim to go forward but affirmed the Rule 12(b)(6) dismissal of the Wiretap claims (along with the fraud and trespass claims), focusing on the constitutionally-protected purpose for which the undercover videos were made:

> The defendants did not order the camera-armed testers into the Desnick Eye Center's premises in order to commit a crime or tort . . . The purpose, by the plaintiffs' own account, was to see whether the Center's physicians would recommend cataract surgery on the testers. By the same token it was not to injure the Desnick Eye Center, unless the public exposure of misconduct is an "injurious act" within the meaning of the Wisconsin statute. Telling the world the truth about a Medicare fraud is hardly what the framers of the statute could have had in mind in forbidding a person to record his own conversations if he was trying to commit an "injurious act."

*Id.* at 1353-54.

And in another example of hidden-camera reporting involving *PrimeTime Live*, in *Russell v. Am. Broadcasting Co., Inc.*, No. 94 C 5768, 1995 WL 330920, at *4 (N.D. Ill. May 31, 1995), the court observed that "the critical question under section 2511(2)(d) is why the communication was intercepted, not how the recording was ultimately used." *Id.* at *4.   Finding that the defendants' intent was to "expose sanitation problems in the commercial fish industry," the court held that "it is clear that defendants did not intercept

---

[7] The Wisconsin wiretap statute considered in *Desnick* was substantively identical to the current D.C. wiretap statute.  *Compare* Wis. Stat. Ann. § 968.31(2)(c) *with* D.C. Code Ann. § 23-542(b)(3).

and record plaintiff's conversations for the purpose of committing a crime or tort."  *Id.* Because of this, the court dismissed the Wiretap claim under Rule 12(b)(6).  *See id.*

The case law from across the nation indicates that recordings made for constitutionally-protected news-gathering and publication do not trigger the exception to Wiretap Act's safety valve.  As such, the Wiretap claims against the Defendants must be dismissed.

### 3.  The Plaintiffs invited the undercover reporter into their offices, so their Trespass claim fails as a matter of law.  (Count 4)

In Count 4 of the Complaint, Plaintiffs allege that Defendant Maass is liable for trespass into the Plaintiffs' offices.  Maass, however, is not liable for trespass under the facts alleged in the Complaint.  Alternatively, if Maass did commit a trespass under D.C. law, she would only be liable for either nominal damages or the damages that directly flow from her presence in the Plaintiffs' offices – and not any damages that flow from the *publication* of Project Veritas Action's reporting.

### a.  Plaintiffs consented to Maas's entry into their offices.

The elements for trespass are straight-forward: "The tort of trespass in the District of Columbia is the intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property."  *Daily v. Exxon Corp.*, 930 F.Supp. 1, 2 (D.D.C. 1996) (*citing Carrigan v. Purkhiser,* 466 A.2d 1243, 1243 (D.C. 1983)).

As the Complaint concedes, Maass had consent to be physically present in the Plaintiffs' office.  *See, e.g.*, Compl., ¶ 31 ("Maass was given an electronic pass card by Democracy Partners, so that she could enter the office freely.").  Importantly, the Complaint

fails to allege that Maass damaged the physical office in any way, or that she interfered with the Plaintiffs' use or possession of the physical office.

As a matter of law, Maass did not commit the tort of trespass. She had consent to be physically present in the office. She did not disrupt the Plaintiffs' "exclusive possession" of the property or damage the physical property in any way.

Other courts from across the country have concluded that consent to enter land, even if procured through a misrepresentation, bars a later trespass claim.[8] *See, e.g.*, *Ouderkirk v. People for the Ethical Treatment of Animals, Inc.*, No. 05-10111, 2007 WL 1035093, at *15 (E.D. Mich. Mar. 29, 2007) (dismissing trespass claim against animal rights activists who used deception to gain consent to enter farm where they secretly recorded animal slaughter practices); *Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 29 (N.C. App. 2003) (affirming dismissal of trespass claim against McClatchy News reporter who secretly recorded conversation but misrepresented his visit as a "social" call at plaintiff's home); *Baugh v. CBS, Inc.,* 828 F. Supp. 745, 757 (N. D. Cal., 1993) ("In a case where consent was fraudulently induced, but consent was nonetheless given, plaintiff has no claim for trespass."); *Martin v. Fidelity & Casualty Co. of New York,* 421 So.2d 109, 111 (Ala., 1982) ("'[A]n action for trespass . . . will not lie unless plaintiff's possession was intruded upon by defendant without his consent, even though consent may have been given under a mistake of facts, or procured by fraud . . . .'") (citation omitted).

This is equally true in the context of hidden-camera investigations by undercover journalists. The Seventh Circuit faced such a trespass claim in *Desnick v. Am. Broadcasting*

---

[8] Based upon the undersigned counsel's research, neither the D.C. Court of Appeals nor the D.C. Circuit has ruled on this question of trespass law.

*Companies, Inc.*   As discussed above, after the plaintiff's eye clinic was the subject of an

ABC News's broadcast on *PrimeTime Live*, the plaintiff claimed trespass.   In affirming the

Rule 12(b)(6) dismissal of the trespass claim, the Seventh Circuit described the "surprising

result" that even consent procured by fraud can be valid to enter land:

> Without it a restaurant critic could not conceal his identity when he ordered
> a meal, or a browser pretend to be interested in merchandise that he could
> not afford to buy. Dinner guests would be trespassers if they were false
> friends who never would have been invited had the host known their true
> character, and a consumer who in an effort to bargain down an automobile
> dealer falsely claimed to be able to buy the same car elsewhere at a lower
> price would be a trespasser in the dealer's showroom . . . The fact is that
> consent to an entry is often given legal effect even though the entrant has
> intentions that if known to the owner of the property would cause him for
> perfectly understandable and generally ethical or at least lawful reasons to
> revoke his consent.

*Desnick*, 44 F.3d at 1351.

The Seventh Circuit then focused on the interests that the tort of trespass is designed

to protect, specifically the peaceful *physical* possession of land:

> [T]he defendants' test patients gained entry into the plaintiffs' premises by
> misrepresenting their purposes (more precisely by a misleading omission to
> disclose those purposes).   But the entry was not invasive in the sense of
> infringing the kind of interest of the plaintiffs that the law of trespass
> protects; it was not an interference with the ownership or possession of land.

*Id.* at 1353.

And since the peaceful, physical possession was not disrupted by the undercover

ABC News crew, a trespass claim did not lie:   "There was no invasion in the present case

of any of the specific interests that the tort of trespass seeks to protect."   *Id.* at 1352.

Other courts have followed the Seventh Circuit's reasoning in *Desnick*.   In *Am.*

*Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 609 N.W.2d 607 (Mich. Ct. App. 2000), an

automotive repair shop sued a local television station for trespass after an undercover,

hidden-camera investigation by a reporter and a consumer activist.  *See id.* at 609.  The appellate court affirmed the dismissal of the trespass claim because the undercover reporter had the plaintiff's consent to enter its property:

> We likewise find *Desnick* persuasive and adopt its reasoning.  Accordingly, we conclude that the trial court properly granted summary disposition of the plaintiff's trespass claim.  Although [the consumer activist] misrepresented her purpose, plaintiffs' consent was still valid because she did not invade any of the specific interests relating to the peaceable possession of land that the tort of trespass seeks to protect.

*Id.* at 614.

Similarly, in *Keyzer v. Amerlink, Ltd.*, 618 S.E.2d 768 (N.C. App. 2005), the appellate court followed *Desnick* in affirming dismissal of a trespass claim.  There, private investigators made an appointment at the office of the plaintiff (a lawyer) posing as prospective clients.  *See id.* at 772.  The private investigators' real intention was to determine if the lawyer was abiding with an earlier settlement agreement containing a confidentiality provision.  *See id.* at 770.  The plaintiff contended that the investigators' misrepresentation of identities voided the plaintiff's consent to enter his office.  *Id*. at 772.  The court rejected this argument and held that no trespass occurred:

> [W]e find the reasoning of *Desnick* persuasive . . . Under these facts, the entry complained of was not of the kind that interfered with plaintiff's ownership or possession of the land; therefore, plaintiff has failed to raise a genuine issue of material fact that defendants made an unauthorized entry of the kind to support the tort of trespass.

*Id.* at 773.

### b. Plaintiffs' Trespass claim has a problem with Proximate Cause.

Alternatively, if this Court concludes that the defendants can be held liable for trespass, the Plaintiffs still have a problem proving anything beyond nominal damages under this claim.

It is black-letter law in D.C. that the Plaintiffs can only recover damages that the Defendants' "negligent or wrongful conduct proximately caused." Extent of Damages— Proximate Cause, STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA § 12.02 (2016 Rev. Ed.). *See also Shoemaker v. George Washington Univ.*, 669 A.2d 1291, 1295-96 (D.C. 1995) (damages not proximately caused are not recoverable).

In this case, Plaintiffs claim over $1 million in damages. But these damages flow from the *publication* of the Defendants' undercover reporting, not from the *trespass*. In other words, if the trespass occurred but not the later publication, the Plaintiffs would never have suffered such alleged damages.

Further, the Complaint fails to allege facts to support any damages proximately caused by Maass's alleged trespass. She did not block the Plaintiffs from using their office space, nor did she cause any physical damage to the premises – the type of damages that the law of trespass guards against. On the facts currently alleged, Plaintiffs cannot prove damages (or, anything beyond nominal damages).

### c. Plaintiffs' claim for Trespass damages due to the "Diminution of economic value of the office" must be dismissed.

Plaintiffs include an unusual claim under the trespass count for damages due to the "diminution of economic value of the office." Compl., ¶ 101. No further facts are given to explain or support this claim, other than claiming "at least $100,000" in compensatory

damages under the theory.  *See id.*  The undersigned counsel has found no reference to such

a damage claim in D.C. trespass caselaw.

If this is a claim for damage to the economic *reputation* of the Plaintiffs' office or

to the prospect of future business contracts, then this is not a *trespass* damages claim.

Instead, it is merely a restatement of Plaintiffs' other claims for reputation damages due to

the publication of constitutionally-protected news reporting.  As such, it must be dismissed

for the reasons stated above at pp. 10 to 19.

### d. Plaintiffs' claim for Trespass damages due to the "Diminishment of the economic value of confidential and proprietary information" must be dismissed.

Plaintiffs also make the unusual claim under the trespass count for damages due to

the "diminishment of the economic value of confidential and proprietary information."

Compl., ¶ 101.  Again, no further facts are given to explain or support this claim, other

than claiming $100,000 in damages.  *Id.*

At best, this is a claim for damages to the value of intangible property.  That is not

a damages remedy that is proper under a trespass claim – a claim which focuses on physical,

real property, or the interference with the use of that real property.  This damages theory

must be dismissed from the Complaint.

### 4. Plaintiffs' Fraudulent Misrepresentation claim fails to adequately allege the proximate cause of the supposed damages. (Count 5)

Plaintiffs claim that all Defendants are liable for the tort of fraudulent

misrepresentation.  Under D.C. law, "[f]raudulent misrepresentation requires proof of (1)

a false representation (2) made in reference to a material fact, (3) with knowledge of its

falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the

representation. To prevail, the plaintiff must also have suffered some injury as a consequence of his reliance on the misrepresentation." *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998) (internal citations and quotation marks omitted).  Further, "a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

Here, the problem with Plaintiffs' fraudulent misrepresentation claim is that of proximate causation of supposed damages.  According to the Complaint:  "As a result of Maass's fraudulent misrepresentations, Plaintiffs have suffered at least $1,034,000 in actual damages including lost contracts, the diminishment of the economic value of confidential and proprietary information, loss of future contracts, and damage to reputation."  Compl., ¶ 112.

Under D.C. law, damages for fraudulent misrepresentation are "restricted in all cases to such damages as were the natural and proximate consequences, or the direct consequences, of the fraud, and to such damages as can be clearly defined and ascertained." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 793 (D.C. Cir. 1983).  The ordinary measure of damages recoverable in a fraud action are the out-of-pocket losses, such as the "difference between the amount paid and the market value of the thing acquired." *Dresser v. Sunderland Apartments Tenants Ass'n, Inc.*, 465 A.2d 835, 840 (D.C. 1983).  And if the out-of-pocket measure of losses is inappropriate, a plaintiff may seek loss of bargain damages as an alternative on proper showing. *See id.*

But the facts alleged in the Complaint demonstrate that the *proximate* cause of the Plaintiffs' supposed $1 million in damages was the *publication* of Project Veritas Action's report, not any alleged misrepresentation of Maass.  If no videos had been published, this lawsuit would never have been filed.

Here, the Plaintiffs bargained for an unpaid intern to do clerical office work, and they received those services.  Plaintiffs do *not* allege that Maass failed to complete any assigned work tasks.  Plaintiffs do *not* allege that other unpaid interns were competing for Maass's job or waiting in the wings.  The bottom-line is that Plaintiffs do *not* adequately allege that they were deprived of the "benefit of the bargain" of an unpaid intern.  Considering that the Plaintiffs never bothered to have Maass execute a written employment contract, confidentiality agreement, or a non-disclosure agreement, the Plaintiffs have not pled adequate facts that they suffered any damages *proximately* caused by Maass's cover story.

In *Steele v. Isikoff*, 130 F.Supp.2d 223, 34-35 (D.D.C 2000), this Court recognized a similar distinction when facing a case stemming from the saga of President Bill Clinton and Kathleen Willey and involving a sexual affair.  In that case, the plaintiff asserted a fraud claim against *Newsweek* reporter Michael Isikoff, *Newsweek* magazine, and the *Washington Post* for revealing the plaintiff's name as an anonymous source after the plaintiff admitting fabricating her story to Isikoff.  *Id.* at 26-28.  After Isikoff, *Newsweek*, and the *Washington Post* printed the plaintiff's name despite the earlier promise of anonymity, the plaintiff sued, claiming that Isikoff's promise was a fraudulent misrepresentation, causing her damages.  *Id.*  This Court dismissed the fraud claim at the Rule 12(b)(6) stage on proximate causation grounds:

> Painful as the glaring spotlight may be, [plaintiff's] harm is rooted in her own lie, a deception by which she alone tied herself to a sordid news story that dominated all types of media . . . While Isikoff printed that fabrication and [plaintiff's] subsequent recantation, [plaintiff] herself proximately caused the harm.  In short, because [plaintiff's] conduct, not Isikoff's, proximately caused her harm, she cannot make out claims for the torts of fraud or negligent misrepresentation.

*Id.* at 35.

Other courts around the country have applied this same distinction regarding proximate cause in fraud claims against media defendants for hidden camera investigations. In *Food Lion*, the grocery chain plaintiff alleged fraud against ABC News reporters after they misrepresented their identities in order to be hired in the store's meat wrapping department. 964 F.Supp. at 962-63. After the broadcast showing meat-handling practices, the grocery chain sued, claiming that the damages to its reputation and lost profits were caused by the reporters' fraud. *See id.* The court rejected this argument on proximate causation grounds:

> Food Lion's lost sales and profits were the direct result of diminished consumer confidence in the store. While those losses occurred after the *Prime Time Live* broadcast, the broadcast merely provided a forum for the public to learn of activities which had taken place in Food Lion stores. Stated another way, tortious activities may have enabled access to store areas in which the public was not allowed and the consequent opportunity to film people, equipment and events from a perspective not available to the ordinary shopper, but it was the food handling practices themselves—not the method by which they were recorded—which caused the loss of consumer confidence. Those practices were not the probable consequence of Defendants' fraud and trespass and it cannot be argued under the evidence in this case that the filming of those practices by the *Prime Time Live* producers set any of those activities in motion.

*Id.   See also Frome v. Renner*, 97 Civ. 5461, 1997 WL 33308718, at *2 (C.D. Cal. Oct. 1, 1997) (defendant's undercover visit to plaintiff physician, which defendant later disparaged on a news program, did not proximately cause plaintiff's lost profits because the program "merely served as a forum through which the public could learn about Plaintiff's medical practices.").

The case at bar is similar to both *Food Lion* and *Frome*, and the Plaintiffs did not suffer any real damages proximately caused by Maass's cover story. In reality, the

Plaintiffs' claim for damages arises solely from the Plaintiffs' own statements shown in Project Veritas Action's constitutionally-protected report.

The Plaintiffs' remedy lies in a defamation claim, not in a fraud claim. This is the rule laid down by the U.S. Supreme Court in *Hustler Magazine*. "*Hustler* confirms that when a public figure plaintiff uses a law to seek damages resulting from speech covered by the First Amendment, the plaintiff must satisfy the proof standard of *New York Times*." *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 523 (4th Cir. 1999).

### 5. Plaintiffs' Civil Conspiracy claim must be dismissed because the Defendants are not liable for the other torts alleged in the Complaint. (Count 6)

The Plaintiffs seek to hold all Defendants jointly liable on all counts of the Complaint through a claim of civil conspiracy. Under D.C. law,

> The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme. In addition, civil conspiracy depends on the performance of some underlying tortious act. It is not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort.

*Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (internal citations omitted).

Thankfully, some courts nationwide have already determined that where protected First Amendment speech is in controversy, speakers are immune from civil conspiracy claims. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155 (3d Cir. 1988) (efforts taken by individuals to bring attention to poor conditions at nursing home were protected under the First Amendment and not subject to civil conspiracy claims). The reasons for these holdings is that courts understand that if provocative speakers were subject to civil

conspiracy claims each time they released a controversial story, no speakers would continue doing so.

As shown above, the Plaintiffs' other claims set forth in the Complaint must be dismissed.  Once those claims are dismissed, the civil conspiracy count must be dismissed.

### C.  The District of Columbia's Anti-SLAPP Act supports dismissal.

D.C. Code Section 16-5502 (the "Anti-SLAPP Act")[9] provides that a party may file a "special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service."  The moving party must make a "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits. . . ."[10]

To "make a prima facie showing," a movant must show that the claim arises from "an act in furtherance of the right of advocacy" which centers "on issues of public interest." Issues of public interest include discussions about a public figure, health or safety, or community well-being. D.C. Code § 16-5501(3).

Commentary posted on a publicly available website, like that of Project Veritas Action, is deemed subject to the protection of the law.  *Abbas v. Foreign Policy Group, LLC*, 975 F.Supp.2d 1, 11 (D.D.C. 2013).  Further, discussion about public figures, like Mr.

---

[9] "SLAPP" stands for "Strategic Lawsuits Against Public Participation," which is the title of Chapter 55 of Title 16 of the D.C. Code.

[10] Defendants acknowledge that *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C.Cir. 2015), held that the DC Anti-SLAPP law may not be applied where a federal court's jurisdiction is based solely in diversity. However, *Abbas* is not controlling where the court's jurisdiction is based on the presence of a valid federal question for this court to decide. *See* 28 U.S.C. § 1331.

Creamer or the Democracy Partners group, is commentary about "issues of public interest." *Id.* Individuals involved in public political issues, playing prominent roles in advocacy groups who do so, qualify at least as limited purpose public figures. *Id; see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

In addition, the videos in question raise an issue of heightened public concern— whether agents of Democracy Partners, Hillary for America, and other groups violated the Federal Election Campaign Act. *See, e.g.,* Complaint, ¶¶19-20, 54-57; *Rigging the Election*, *Video III*, available at: https://www.projectveritasaction.com/video/rigging-the-election-video-iii-creamer-confirms-hillary-clinton-was-personally-involved/; 00:19-00:22 ("We have to clear this with DNC"); 00:28-00:35 ("In the end, it was the candidate, Hillary Clinton, the future president of the United States, who wanted ducks on the ground"); 7:00-7:20 ("So, the operation is to insert and get the duck message in there if we can, or the extremist message, depending on . . . we have to clear this with the DNC, with Democratic National Committee, we have to clear which message we're going to be targeting at each event"); 13:41-14:36 (including discussion of the law and public policy concerning prohibited electoral coordination).[11]

Under the D.C. Anti-SLAPP Act, protected communications include those involving "communicating views to members of the public in connection with an issue of public interest." D.C. Code § 16-5501(1)(B). Project Veritas Action's videos and commentary are precisely the sort of speech protected by the D.C. Anti-SLAPP Act. Exposing potential

---

[11] As a result of this undercover investigation, a complaint was filed with the Federal Election Commission to determine whether provisions of the Federal Election Campaign Act were violated. *See* Public Interest Legal Foundation, FEC Complaint, October 18, 2016, available at: https://publicinterestlegal.org/files/PVA-FEC-Complaint.pdf.

fraud and corruption in political campaigns and the political process rests at the core of protected speech and advocacy. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 14 (1976) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution"). Because of this, the motion to dismiss "shall be granted unless [Plaintiffs] demonstrate[] that [their claims are] likely to succeed on the merits . . . ." D.C. Code § 16-5502(b).

In order to demonstrate that Plaintiffs claims are likely to succeed on the merits, courts use a standard "comparable to that used on a motion for judgment as a matter of law." *Forras v. Rauf*, 39 F. Supp. 3d 45, 54 (D.D.C. 2014) (internal quotations and citations omitted). Thus, Plaintiffs must demonstrate that the "complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Id*. Where a "plaintiff fails to present a sufficient legal basis for the claims or if the evidence offered is insufficiently substantial to support a judgment in favor of the plaintiff, then the defendant's anti-SLAPP motion should be granted." *Id.* (quoting *Arenas v. Shed Media U.S., Inc.*, 881 F.Supp.2d 1181, 1188 (C.D. Cal. 2011).

It is likely that Defendants will prevail in their special motion to dismiss for the same reasons supporting dismissal under Rule 12(b)(6). First, there remains no legal basis to explain how Plaintiffs could obtain reputational damages based on the causes of action pled here. This is understandable. Reputational damages must satisfy a rather rigorous First Amendment inquiry to survive. Otherwise, anyone speaking or reporting on a controversial topic could be financially destroyed (through expense litigation) for harming others' reputations. Stories would be "spiked" and speakers muted, but this the courts have not

allowed. Attempting to disguise a defamation claim under other causes of actions to harm constitutionally-protected free speech is indefensible. Whether it is the *New York Times*, *Hustler Magazine*, Nellie Bly, or James O'Keefe, hard-hitting, provocative journalism requires First Amendment safeguards to ensure that speech flourishes. This is precisely what D.C.'s Anti-SLAPP law delivers.

Second, Plaintiffs' multiple causes of action all share an underlying legal fallacy: the speech in question served public, not tortious, purposes. Project Veritas Action Fund and James O'Keefe, its founder, are innovative members of the media.  Today, Project Veritas Action is a leader in undercover, investigative journalism—a historical practice that, while controversial, has led to the development of important newsworthy stories.  *See, e.g., CBS News goes undercover to investigate gender price gap*, CBS NEWS, Jan. 25, 2016, available at http://www.cbsnews.com/videos/cbs-newsgoes-undercover-to-investigate-gender-price-gap/ (exposing dry cleaners charging disproportionate prices for cleaning male and female garments); *Anonymous, Inc*., CBS NEWS, Jan. 31, 2016, http://www.cbsnews.com/news/anonymous-inc-60-minutes-steve-kroft-investigation/ (exposing numerous attorneys offering to advise real estate transactions that might relate to money laundering).

In the numerous undercover investigations Project Veritas Action has performed, it has never intended to defame any party, sought to induce contractual breaches, or otherwise intended to damage those it reports upon.  Rather, as is common with most newsgathering and reporting, incidental consequences are the norm when journalists reveal a company can no longer be trusted or that fraud is rampant in a given industry.  This, then, reveals the truth woven in the holdings of *Food Lion*, *Medical Laboratory Management*, *Beverly Hills*

*Foodland, Inc.*, and *Desnick*: Project Veritas Action's purpose must be the intentional desire to commit a tort or crime for there to be a single, actionable claim here.  But where journalists simply report to report, any incidental consequences the investigated may complain about are disallowed by the First Amendment.

Plaintiffs' numerous legal theories simply wish to shut down speech that truthfully revealed the plotting and potentially illegal actions of Democracy Partners and related actors.  Notably, Plaintiffs are not suing under theories of defamation or false light, where remedies could be available if a news entity knowingly or recklessly published false stories.  *See, e.g., Time, Inc. v. Hill*, 385 U.S. 374 (1967).  They simply wish to make embarrassing speech go away by exposing Defendants to ornate and unsupportable (and expensive) causes of action. It matters not whether Plaintiffs ultimately succeed on the merits of their cause—the process (of lengthy litigation) is often the punishment.

Fourth, an anti-SLAPP motion should be granted if the "evidence offered is insufficiently substantial to support a judgment in favor of the plaintiff." *Abbas*, 975 F.Supp.2d at 13. In this instance, there is no indication in the record that Maass was bound by: (a) an internship agreement, (b) a non-disclosure agreement, (c) a confidentiality agreement, or (d) a data use policy.  These are common instruments used by many groups to set out and define the parameters of trust and confidentiality with volunteers, interns, or employees. They are also used to set objective boundaries and expectations for members of a group—a private ordering of sorts. But where an organization simply allows an individual to join them, places no limits on her access of shared information and later usage, and does not bind them by even the most rudimentary contract, serious legal problems arise in trying to discern the supposed duties owed in just such a circumstance.

Plaintiffs cannot show any evidence that Defendants acted for any tortious or criminal purpose in carrying out its newsgathering and reporting. What the record makes clear is that Project Veritas Action was engaged in protected First Amendment speech revealing the potentially illegal actions of Democracy Partners and related actors. Because this speech rests wholly within the safeguards of the First Amendment, it will be legally impossible for Plaintiffs to show a likelihood of prevailing.

## III.    Conclusion

This is a First Amendment case. The Plaintiffs are public figures, and they are attempting to silence Project Veritas Action from speaking publicly and reporting on issues of significant public concern. The Plaintiffs attempt to do so, not by the proper route of a defamation claim under *New York Times v. Sullivan*, but by an end-run around the First Amendment through garden-variety commercial torts such as trespass, breach of fiduciary duty, civil conspiracy, and others. The $1 million in damages claimed by the Plaintiffs, however, allegedly results from the *publication* of Project Veritas Action's news reporting. This end-run around the First Amendment was soundly rejected by the Supreme Court in *Hustler Magazine, Inc. v. Falwell*, by the D.C. Circuit in *Teltschik v. Williams & Jensen, PLLC*, and by many other courts across the nation. This Court should follow that same venerable precedent.

The Plaintiffs' Complaint should be dismissed, and the Defendants should be awarded their reasonable attorneys' fees against the Plaintiffs, pursuant to the D.C. Anti-SLAPP Act, D.C. Code § 16-5504(a).

Respectfully submitted,
**Project Veritas Action Fund**
**Project Veritas**
**James O'Keefe**
By Counsel

  /s/   Daniel D. Mauler
Daniel D. Mauler
(D.C. Bar No. 977757)
Redmon, Peyton & Braswell, LLP
510 King Street, Suite 301
Alexandria, VA  22314
Tel: (703) 684-2000
Fax: (703) 684-1509
dmauler@rpb-law.com

  /s/   Stephen R. Klein
Stephen R. Klein
(Admitted *pro hac vice*)
Law Office of Stephen R. Klein
500 Madison Street #419
Alexandria, VA 22314
Tel: (734) 233-1705
stephen.klein.esq@gmail.com

  /s/   Benjamin T. Barr
Benjamin T. Barr
(Admitted *pro hac vice*)
The Law Office of Benjamin Barr
444 North Michigan Avenue
Suite 1200
Chicago, Illinois 60611
Tel: (202) 595-4671
B@benjaminbarr.com

*Counsel for Defendants Project Veritas Action Fund,*
*Project Veritas, and James O'Keefe*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2017, a copy of the foregoing was filed and served via the CM/ECF system, which will serve a Notice of Electronic filing upon all counsel of record, including the following:

Joseph E. Sandler
SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.
1025 Vermont Ave., N.W. Suite 300
Washington, D.C. 20005

Yael Bromberg
Aderson Francois
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001

*Counsel for Plaintiffs*

  /s/   Daniel D. Mauler
Daniel D. Mauler (D.C. Bar No. 977757)
REDMON, PEYTON & BRASWELL LLP
510 King Street, Suite 301
Alexandria, VA  22314
Ph: (703) 684-2000
Fax: (703) 684-1509
dmauler@rpb-law.com
*Counsel for Defendants Project Veritas Action*
*Fund, Project Veritas, and James O'Keefe*