# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

DEMOCRACY PARTNERS, LLC, *et al.,*  )
                                             )
     Plaintiffs,  )
                                             )  Civ. No. 1:17-cv-1047-ESH
       v.  )
                                             )
PROJECT VERITAS ACTION FUND, LLC, *et al.*,  )
                                             )
     Defendants.  )
_____)

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION OF MOTIONS TO DISMISS BY THE PROJECT VERITAS DEFENDANTS

Joseph E. Sandler, D.C. Bar No. 255919
SANDLER REIFF LAMB ROSENSTEIN
& BIRKENSTOCK, P.C.
1090 Vermont Ave., N.W.  Suite 750
Washington, D.C.  20005
Tel:  202-479-1111
Fax:  202-479-1115
sandler@sandlerreiff.com

Yael Bromberg, D.C. Bar No. 1045569
Aderson Francois, D.C. Bar No. 798544
INSTITUTE FOR PUBLIC
REPRESENTATION
GEORGETOWN UNIVERSITY LAW
CENTER
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 662-9593
Fax: (202) 662-9634
Yael.bromberg@law.georgetown.edu
abf48@georgetown.edu

## <u>TABLE OF CONTENTS</u>

I.   Introduction .................................................................................................. 1

II.  Allegations of the Complaint ....................................................................... 4

III. Argument ..................................................................................................... 9

   A. Standard of Review .................................................................................. 9

   B. Plaintiffs Have Pleaded Cognizable Claims For Damages ...................... 9

      1. Plaintiffs' Claims For Reputational Damages Are Not
      Barred By The First Amendment ................................................................ 9

         a. Plaintiffs Are Not Seeking Reputation Damages Resulting
         From Any Publication .............................................................................. 10

         b. Plaintiffs Have Pleaded the Necessary Elements of Defamation ........... 13

      2. Plaintiffs' Claims For Lost Contract Damages Are Not
      Barred by the First Amendment ............................................................... 17

   C. Plaintiffs Have Sufficiently Pleaded Facts That Would
   Establish Defendants' Liability .................................................................. 19

      1. Plaintiffs Have Adequately Pleaded Their Claim For
      Breach Of Fiduciary Duty ....................................................................... 19

         a. A Fiduciary Relationship Existed Between Maass
         and Democracy Partners. ......................................................................... 20

         b. Maass Breached Her Fiduciary Duty to Democracy
         Partners By Disclosing Confidential, Proprietary Information
         For Her Own Interest. .............................................................................. 22

      2. Plaintiffs' Fraudulent Misrepresentation Claim Adequately
      Alleges Proximate Cause .......................................................................... 23

3.     Plaintiffs Have Sufficiently Pleaded Their Claim for Trespass ................................. 27

4.     The Complaint Alleges Sufficient Facts To Demonstrate
That The Recordings Were Made for Tortious and Criminal Purposes,
in violation of Federal and D.C. Wiretap Laws .................................................... 30

    a.     Defendants' Speech Is Not Protected By The First
    Amendment Because The Information Sought To Be Published
    Was Not Lawfully Acquired. .................................................... 32

    b.     Defendants' Primary Motivation, or a Determinative Factor
    in their Motivation, Was to Breach a Fiduciary Duty Owed To Plaintiffs ...................... 34

    c.     Defendants' Primary Motivation, Or A Determinative Factor
    In Their Motivation, Was Fraudulent Misrepresentation ................................ 36

    d.     Defendant's Primary Motivation, Or A Determinative Factor
    in their Motivation, was Trespass. ....................................... 37

5.     All Defendants Can Be Held Liable for Maass'
 Action Under the Claim Of Civil Conspiracy..................................................... 38

IV.    The District of Columbia Anti-SLAPP Act Cannot Be Applied
 To An Action In Federal Court ....................................................................... 39

V.   Conclusion ..................................................................................................... 40

## I.     Introduction

Plaintiff Democracy Partners is a group of consultants and vendors to progressive organizations and Democratic Party committees and campaigns. Plaintiff Strategic Consulting Group (SCG) is a member of Democracy Partners and provides campaign-related services; and Plaintiff Robert Creamer is sole owner of SCG. The moving Defendants are Project Veritas, Project Veritas Action Fund (PVAF), both non-profit organizations, and their head and founder James O'Keefe. Project Veritas is a right-wing advocacy group notorious for its attempted "sting" operations in which it gains access to the offices of progressive groups and campaigns through fraud and, often, criminal conduct; secretly videotapes conversations and interactions with staff of the organizations; and then selectively edits the videotapes to misrepresent and distort what was said and to publicly release the edited tapes.

In this case, a Project Veritas agent or employee, Allison Maass (also a defendant but not yet served), used a phony name and identity, phony background information and a series of lies to obtain an internship with Democracy Partners. She used that internship to obtain access to confidential and sensitive information from Democracy Partners' clients, to disclose that information to her principals at Project Veritas and to secretly record conversations with Creamer and other Democracy Partners members, including confidential client conversations. Evidently upset with the breach of client confidences, two existing clients cancelled contracts with SCG and Democracy Partners lost a significant potential client, costing the Plaintiffs more than $500,000. Plaintiffs assert claims for violations of federal and D.C. wiretap laws, and common law violations for breach of fiduciary duty, fraudulent misrepresentation, trespass and civil conspiracy.

Defendants' motion to dismiss these claims is built on assumptions that exist only in a fantasy world of their own creation. In this fantasy world, Defendants are heroic "undercover journalists" and Plaintiffs have sued them for defamation. In the real world, O'Keefe and Project Veritas are fraudsters and criminals, not journalists. And Plaintiffs have sued them for tortious and criminal conduct, not for defamation, and not for any reporting or publication.

The practices in which Project Veritas engages are "uncommon and generally considered unethical" by real journalists.  Paul Farhi, *What the Latest James O'Keefe video leaves out*, *Washington Post* (June 28, 2017) https://www.washingtonpost.com/lifestyle/style/what-you-dont-see-in-okeefe-video-may-be-as-important-as-what-you-do/2017/06/28/dcb67446-5b7c-11e7-a9f6-7c3296387341_story.html?utm_term=.06eb2a94eeb7. "Their work has been repeatedly criticized for intentionally deceptive editing… and O'Keefe has a criminal record in an effort to illegally infiltrate a Democratic Senator's office."  *Id*. The chair of the Society of Professional Journalists' ethics committee stated that "although mainstream news organizations sometimes cross ethical boundaries, O'Keefe regularly does so. 'James O'Keefe is not an ethical journalist. . . he obviously has an agenda... and has a history of distorting facts or context."  Paul Farhi, *Is it okay for James O'Keefe's 'investigative journalism' to rely on deception?*, *Washington Post* (Oct. 19, 2016) https://www.washingtonpost.com/lifestyle/style/is-it-okay-for-james-okeefes-investigative-reporting-to-rely-on-deception/2016/10/19/f32fd46a-962e-11e6-9b7c-57290af48a49_story.html?utm_term=.454ecc877b5c. "Many O'Keefe operations, … have fallen flat," and "O'Keefe's unseemly tactics have increasingly caused other conservatives, including Glenn Beck, to distance themselves from him."  Jane Mayer, *Sting of Myself*, *The New Yorker* (May 30, 2016) https://www.newyorker.com/magazine/2016/05/30/james-okeefe-accidentally-stings-himself.

Equally a fantasy is that Plaintiffs have sued for defamation. They have not. The majority of the damages Plaintiffs seek are not reputational, but lost contracts. Neither set of damages results from any act of journalistic reporting or publication. The damage resulted directly from Maass' actions in breaching client confidentiality through her tortious and criminal conduct. For those reasons, contrary to Defendants' assertion, Plaintiffs do not have to plead the elements of defamation in order to recover on their claims – although they have actually pleaded the requisite facts to support that cause of action in their Complaint.

Plaintiffs have pleaded facts sufficient to show that Maass was given access to highly confidential information and allowed to participate in confidential client meetings, in order to perform her work for Democracy Partners. These allegations establish the existence of a fiduciary relationship, which Maass unquestionably breached, as clearly alleged in the Complaint, by disclosing confidential, proprietary information for her own purposes.

The Complaint sufficiently alleges the elements of fraudulent misrepresentation, in particular, that Maass' fraudulent misrepresentations not only proximately but *directly* caused the harm to Plaintiffs for which they seek compensation – the breach of client confidentiality by Maass' disclosures, made possible only by her fraud and lies.

Plaintiffs have also adequately alleged the elements of trespass, since any consent to Maass' entry into Democracy Partners' premises was rendered null and void by her fraud.  Even if Plaintiffs can recover only nominal damages for this particular count, there is no basis for dismissing it.

The Complaint sufficiently alleges that the secret recordings violated the federal and D.C. wiretapping laws because the recordings were made for the purposes of committing tortious acts – thus vitiating application of the "one-party consent" rule. These tortious acts are laws of

general applicability and Defendants have shown no basis for creating any special exception for their conduct based on the First Amendment.

The Complaint sufficiently alleges civil conspiracy as to all Defendants, in that they combined and conspired, and are therefore liable for, the underlying torts directly committed by Defendant Maass.

Finally, Defendants' motion to dismiss under the D.C. Anti-SLAPP law must be dismissed, as that law, which the D.C. Circuit found to be a procedural rule in conflict with the Federal Rules of Civil Procedure, cannot be applied in a case brought in federal court.

For the reasons provided below, Defendants' motions to dismiss should be denied *in toto* and this case should proceed to discovery.

## II.      Allegations of the Complaint

Defendant Project Veritas Action Fund ("PVAF") is an arm of Defendant Project Veritas, a right-wing, non-profit corporation infamous for targeting and surreptitiously infiltrating progressive organizations and Democratic Party campaigns and committees. (Compl. ¶ 12.) Led by Defendant James O'Keefe, the organizations' *modus operandi* includes planting its employees in the offices of these progressive and political organizations and campaigns through fraudulent misrepresentation, then to secretly videotape confidential conversations and interactions, then to selectively edit the recordings to distort and misrepresent the statements made, and then to release those selectively edited clips to the public. (Compl. ¶¶ 12, 13.)

In 2009, Project Veritas released a series of undercover videos about a community organizing group known as ACORN. (Compl. ¶ 14.) As reported by The New Yorker, the "videos had an immediate effect, but raised serious questions about [O'Keefe's] methods and ethics – questions that have trailed him ever since." (Compl. ¶ 14.) In the resulting ACORN case,

after losing on summary judgment on a wiretap claim, O'Keefe and his accomplice settled the matter for $100,000. (Compl. ¶ 15.) In 2010, O'Keefe and three accomplices were criminally charged for a scheme in which they disguised themselves as telephone repairmen to gain access to the offices of a Democratic U.S. Senator. (Compl. ¶ 16.) O'Keefe plead guilty to a misdemeanor, and was sentenced to probation and community service and ordered to pay a fine. (*Id.*) Similarly, Allison Maass, who is also a Defendant in this case, gained access to the 2016 campaign offices of Hillary Clinton, Russ Feingold, and Bernie Sanders, on false pretenses and posing as a campaign volunteer. (Compl. ¶ 17.)

Defendants perpetrated a similar scheme in this case when they planted their agent Defendant Allison Maass in the offices of Plaintiff Democracy Partners. (Compl. ¶¶ 24-26; 63.) Democracy Partners is a progressive organization, headquartered in the District of Columbia, with member companies and individuals across several states. (Compl. ¶ 2.) One such member is Plaintiff Robert Creamer, the sole owner of Plaintiff Strategic Consulting Group ("SCG"). (Compl. ¶¶ 1, 19.) In June 2016, Defendant Daniel Sandini, also an agent of Project Veritas, introduced himself to Creamer under the false name "Charles Roth" in an effort to initiate a relationship with Democracy Partners. (Compl. ¶¶ 8, 22-26.) Shortly thereafter, Sandini told Creamer that he had a niece, "Angela Brandt," that was looking to engage in political work for progressive causes. (*Id.*) "Angela Brandt" was actually Defendant Maass. (Compl. ¶¶ 17, 24, 27.)

Maass used this false identity, which included a fake social security number, educational background, and fabricated resume, to gain Plaintiff's trust. (Compl. ¶¶ 27, 41, 43.) First, Creamer connected Maass to a volunteer opportunity with a progressive organization in Cleveland, Ohio during the 2016 Republican National Convention. (Compl. ¶ 25.) Then, Sandini again contacted Creamer on behalf of his "niece" in search of additional professional experience.

(Compl. ¶ 26.) Maass misrepresented her intentions in seeking, and eventually gaining, an internship with Democracy Partners. (Compl. ¶¶ 27, 41, 43.) Maass claimed an interest in political experience, and deliberately and continuously lied to Plaintiffs about her true identity and background as a PV employee. (*Id.*) Had Creamer or Democracy Partners known Maass' true background, she would have never been hired following her interview. (Compl. ¶¶ 28, 42, 44.)

After fraudulently obtaining her internship, Maass was given an electronic pass card that allowed her unobstructed access to Democracy Partners' secured file cabinets and computers. (Compl. ¶ 31.) Democracy Partners' offices are not open to the public and maintain 24-hour security. (Compl. ¶¶ 21, 34.) The only three methods of gaining entry require Democracy Partners' permission. (*Id.*) Maass was also allocated a company computer that required a unique username and password to unlock and access the company's password-protected wireless network. (Compl. ¶ 31.)

On her very first day of work, Maass had a conversation with Creamer during which he explicitly told her that any and all information she learned during the course of her internship was confidential and proprietary information not to be shared with anyone absent specific instructions. (Compl. ¶¶ 32, 39). Unbeknownst to Creamer or anyone else at Democracy Partners, Maass surreptitiously recorded audio and video of her conversations with Plaintiffs and Democracy Partners' members and clients during in-person and conference call meetings. (Compl. at ¶¶ 30, 33, 49.) Because Maass' internship included extensive participation in client meetings, conference calls, sensitive email chains, and – importantly – the coordination of campaign "bracketing" events, she had access to, and recorded, an immense amount of

Democracy Partners' confidential and proprietary business information. (Compl. at ¶¶ 36-39, 48.)

Throughout the course of her internship, Maass shared her recordings and other documents and emails containing confidential information with Defendants. (Compl. ¶¶ 35, 40.) Despite Creamer's clear instructions to Maass on her first day, all the recordings and documents were disclosed without authorization from Plaintiffs or Plaintiffs' clients. (Compl. ¶¶ 33, 49, 60-62.)

On October 17, 2016, PVAF released the first video containing footage from Maass recordings on YouTube – just three weeks before the 2016 presidential election when voters are most tuned into politics (Compl. ¶ 53.) The video was heavily edited from its original form and contained extensive commentary by O'Keefe that drew false conclusions, including a charge that Plaintiffs were involved in a conspiracy to incite violence at rallies for then-candidate Donald Trump. (*Id.*) Through October 26, 2016 – only a week before the presidential election – Defendants released three similar additional videos containing substantially edited footage secretly recorded during Maass' internship. (Compl. ¶¶ 55-57.) These videos contained an array of incendiary accusations implicating Plaintiffs in unlawful campaign coordination with the Clinton Campaign, in addition to schemes involving voter fraud, mass non-citizen voting, and the unlawful acceptance of foreign campaign contributions. (*Id.*) At the time the Complaint in this case was filed, these four YouTube videos had been viewed more than thirteen million times (13, 261,872) and garnered tens of thousands of public comments (67,785). (Compl. ¶ 58.)

As a direct result of Maass' fraud and disclosure to Defendants of Democracy Partners' confidential information, a major labor organization cancelled its $36,000-per-year contract with Democracy Partners and a nonprofit organization terminated its $11,000-per-month contract with

SCG. (Compl. ¶¶ 64-65.) Democracy Partners also lost a prospective client organization whose contract would have paid a minimum of $30,000. (Compl. ¶ 66.) But for these disclosures, Democracy Partners would not have lost at least $534,000 in revenue for actual services and would not have suffered injuries and lost future contracts valued at least at $500,000 – representing at least $1,034,000 in total harm. (Compl. ¶¶ 67-68.)

In light of the allegations summarized above, Plaintiffs have brought a lawsuit for statutory and common law violations.  Count One states a claim for breach of fiduciary duty against Maass for her surreptitious recording and subsequent disclosure of Democracy Partners' confidential information (Compl. ¶¶ 69-77.) Count Two states a claim under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2511 *et seq*., against all Defendants, for intentionally intercepting, intentionally using, and intentionally disclosing, the contents of surreptitious recordings of oral communications. (Compl. ¶¶ 78-85.) Count Three states an analogous wiretap claim under D.C. law against all defendants, pursuant to D.C. Code § 23-541 *et seq*. (Compl. ¶¶ 86-93.) Count Four states a claim for trespass against Maass for her nonconsensual intrusion upon the offices of Democracy Partners. (Compl. ¶¶ 94-101.) Count Five states a claim for fraudulent misrepresentation against all Defendants for their use of false representations to induce the trust of Plaintiffs. (Compl. ¶¶ 102-12.) Finally, Count Six states a claim of civil conspiracy against all Defendants for their collusion in seeking to commit the statutory and common law violations alleged. (Compl. ¶¶ 113-16.)

Presently before the court is Defendants' motion to dismiss all the aforementioned claims pursuant to Fed. R. Civ. P. 12(b)(6). Defendants have also brought a second motion to dismiss pursuant to D.C. Code § 16-5502 (the "Anti-SLAPP Act").

### III.    Argument

#### A.  Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) "should only be granted if Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002).  In reviewing a motion to dismiss, the Court must "accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Id*. (internal citation and quotation omitted). The question at the motion to dismiss stage is "whether or not the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Zimmerman v. Al Jazeera America*, Civ. No.16-cv-0013 (KBJ), 2017 WL 1207416, at *8 (D.D.C. March 31, 2017) (quoting *Harris v. D.C. Water & Sewer Auth*., 791 F.3d 65, 68 (D.C. Cir. 2015) (internal citation omitted).

#### B.  Plaintiffs Have Pleaded Cognizable Claims For Damages

##### 1.  Plaintiffs' Claims For Reputational Damages Are Not Barred By The First Amendment

Defendants contend that in five of the six counts in the Complaint, Plaintiffs are seeking compensation for "damage to reputation" which they cannot recover because they have not pleaded the necessary elements of defamation of a public figure.  (Memorandum of Points and Authorities in Support of Motions to Dismiss by the Project Veritas Defendants, Doc. No. 16 ("Def. Mem") at 10-14.)  This contention ignores the allegations of the Complaint and the applicable law. It is meritless.

The legal rule invoked by Defendants is that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publication . . . without showing in addition that the publication contains a false statement of fact which was

made with 'actual malice'…" *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).  As a more general rule, when a plaintiff is seeking "publication damages…for items relating to its reputation…" that plaintiff may not "avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims, while holding to the normal state law proof standards for these torts."  *Food Lion v. Capital Cities*, 194 F.3d 505, 522 (4th Cir. 1999). In this case, Plaintiffs are not attempting to do anything remotely resembling what that rule implicates.

### a. Plaintiffs Are Not Seeking Reputation Damages Resulting From Any Publication

Plaintiffs are not seeking reputational or any other damages for any act of expression or publication.  Paragraph 68 of the Complaint alleges that the "disclosures and actions of Maass described in paragraphs 27-44 above have severely injured the reputations of [Plaintiffs] . . . ." (Compl. ¶ 68.) Thus, the conduct of Maass on which each claim for damages is based, is set forth solely in paragraphs 27 through 44 of the Complaint. Those paragraphs which make no reference whatsoever to the creation or posting of the Project Veritas videos or any other publication.

Rather, the conduct on which Plaintiffs' claims for damages are based consists of Maass' gaining access to Plaintiffs' private offices through fraud, deception and lies, in breach of fiduciary duties, and unlawful recording in furtherance of those other torts.  (Compl. ¶¶ 27-44.) The Complaint alleges that those specific "disclosure and actions" — the ones set out in paragraphs 27 through 44 — "have severely injured the reputations of Creamer, SCG and Democracy Partners . . . ." (Compl. ¶ 68.) The clear implication of these allegations is that damage to Plaintiffs' reputation resulted from their clients' displeasure with the *breach of client confidentiality*—the fact that highly sensitive client confidential information was disclosed to outsiders without the client's authorization.

As the Complaint alleges, Maass had access to and disclosed (1) proprietary materials, (2) confidential materials, and (3) other internal or otherwise non-public information reflecting internal, non-public Democracy Partners affairs. (Comp. ¶ 39.) The Complaint further alleges that Defendants disclosed these materials to others. Such disclosures destroyed the confidentiality of those materials and information, thereby substantially diminishing the value to Democracy Partners and its clients. In the highly contentious arena of electoral politics, especially in the small handful of weeks before a major presidential election, maintaining the confidentiality of proprietary information is of significant importance to the clients of a political consulting and services firm such as Democracy Partners.

Democracy Partners took particular care to limit access to the information and materials within its office. The office maintains 24-hour security and is not open to the public. (Compl. ¶¶ 21, 34.) Democracy Partners members and staff are required to use an electronic pass provided by the organization to gain entry, and access to the organization's computers, internet, and telephone conferences all require a passcode. (Compl. ¶¶ 31-34.) Such measures are taken in part because many of Democracy Partners' initiatives derive their value from their proprietary and confidential nature. For example, the "bracketing" program – which was Maass' primary assignment for the duration of her internship – involved coordinating press events in areas being visited by then Republican candidates Donald Trump and Mike Pence. (Compl. ¶ 37.) The success of these events depended heavily on limiting the number of parties with knowledge of the timing, location, and nature of the events that were to take place. (*Id.*)

Thus, the harm flowing from Maass' actions in disclosing such information just weeks before the presidential election would have injured Democracy Partners – even if the YouTube videos had never been published. The essential nature of the injury lies in Maass' initial

disclosure. In other words, the injury occurred the moment Maass leaked Democracy Partners' confidential information to James O'Keefe and other parties affiliated with PV and PVAF.

Indeed, there are *no* facts alleged in the Complaint implying that any of Plaintiffs' clients actually watched the videos or believed that Plaintiffs had done anything wrong as a result of watching the videos. The bottom line is that Plaintiffs are *not* seeking damages for injury to reputation stemming from any publication.

In *Planned Parenthood Federation of America v Center for Medical Progress*, 214 F.Supp.3d 808 (N.D. Cal. 2016), *appeal pending*, No. 16-16997 (9th Cir. filed Oct. 31, 2016), Planned Parenthood sued the group that made secret recordings of conversations about Planned Parenthood officials discussing fetal tissue procurement issues. Planned Parenthood alleged that defendants created fake companies, fake identifications and engaged in illegal taping, and asserted claims under civil RICO, the federal wiretap law (exactly as in this case), for breach of contract and civil conspiracy and fraudulent misrepresentation and under certain provisions of California state law. Exactly as the Defendants are doing in this case, defendants, invoking *Hustler* and *Food Lion,* asserted that plaintiffs were seeking publication damages without meeting the First Amendment defamation standards. The Court disagreed, holding that:

> Whether First Amendment scrutiny applies, … does not turn on the label of the cause of action but on whether the "challenged conduct" is to some form of expression and relatedly whether the damages sought stemmed from that form of expression. . .. Here *the First Amendment does not impose heightened standards on plaintiffs' tort claims as long as plaintiffs do not seek reputational damages (lost profit, lost vendors) stemming from the publication conduct* of defendants.

214 F.Supp.3d at 841 (emphasis added). *See also Cohen v. Cowles Media*, 501 US. 663, 669 (1991) (plaintiff may seek damages even against a press outlet for violations of laws of general applicability); *Food Lion*, 194 F.3d at 521 (issue is whether the challenged conduct is "some form of expression").

Here, the reasonable inference to be drawn from the allegations of the Complaint is that the damage to Plaintiffs' reputation did not stem from any publication or form of expression, but from other conduct.  To the extent that there are other possible inferences, the Complaint must, of course, be construed giving Plaintiff "the benefit of all inferences that can be derived from the facts alleged," *Browning*, 292 F.3d at 242.

Defendants' reliance on *Teltschik v. Williams & Jensen,* 2012 WL 3960607 (D.D.C. Sept. 10, 2012), *aff'd*, 748 F.3d 1285 (D.C. Cir. 2014), is misplaced. In *Teltschik*, the plaintiff initially brought a defamation case that was dismissed due to judicial proceeding privilege. The Court then disallowed the plaintiff from recovering reputation damages under his additional negligence and breach of fiduciary duty claims "because those claims were subsumed by his defamation claim, which had already been dismissed. *Id.* at *1. The Court held that "[a] plaintiff should not be permitted to recover damages for the loss of his reputation in a negligence action, *when the alleged damage to his reputation was caused by a defendant's published communication and that communication was the basis of a failed defamation claim.*" *Id*. (emphasis added). Here, Plaintiffs have never asserted a defamation claim, and the alleged damage to Plaintiffs reputation was not caused by any communication published by the Defendants. Further, *Teltschik* involved a decision by the District Court on a motion for summary judgment following extensive discovery—not a motion to dismiss, as in this case.

### b.  Plaintiffs Have Pleaded the Necessary Elements of Defamation

Even if Plaintiffs were seeking reputational damages stemming from the publication of the videos, they have alleged the necessary elements for a defamation claim.  To state a claim for defamation under District of Columbia law, a plaintiff must allege "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party;

13

(3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm." *Zimmerman*, 2017 WL1207416, at * 8 (quoting *Farah v. Esquire Magazine*, 736 F.3d 528, 533-34 (D.C. Cir. 2013)).

The very allegations challenged by Plaintiffs—that the publication severely damaged Plaintiffs' reputations—are allegations that the publication was defamatory.  As to falsity, Defendants blithely assert that "Plaintiffs do not challenge the truth of Project Veritas Action's broadcast."  (Def. Mem. at 9).  Not so.  The Complaint alleges that the first video was

> heavily edited and contained commentary by [PV Founder and President, Defendant James] O'Keefe that drew *false* conclusions from the selectively edited videos, to charge that Plaintiffs were involved in a conspiracy to incite violence at rallies for then candidate Donald Trump and *falsely* implied that the ongoing work in planning and implementing the bracketing events was part of that conspiracy.

(Compl. ¶ 53, emphasis added).  The Complaint further alleges that the second video contained commentary by O'Keefe "that misrepresented what was actually said in the videos, in order to suggest, *falsely,* that Plaintiffs Creamer and Democracy Partners were involved in a scheme with others to enable masses of non-citizens to vote illegally and otherwise to commit voter fraud." (Compl. ¶ 55, emphasis added.) And the Complaint alleges that a third video "*falsely* implied that… activities carried out [by Plaintiffs] in connection with the bracketing events had been unlawfully coordinated with the Clinton campaign; and that a group for which [Plaintiff Robert] Creamer worked had unlawfully accepted a foreign contribution."  (Compl. ¶ 57, emphasis added.)

The Complaint clearly alleges that the videos were "published to a third party." (Compl. ¶ 58.) And the Complaint alleges <u>more </u>than negligence: it alleges that O'Keefe and Project Veritas Action deliberately edited the videos to create the false statements.  (Compl. ¶¶ 53-57.)

Defendants contend that the Complaint does not allege the element of "actual malice." But proof of actual malice would be required only if any of the Plaintiffs are "public officials" or "public figures." *Hustler*, 485 U.S. at 56. Defendants casually assert that, "[t]he Plaintiffs are, at the very least, limited purpose public figures under D.C. law." (Def. Mem. at 14). To be a limited purpose public figure, the plaintiff "must have 'thrust' himself to the 'forefront' of the public controversy at issue." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016) (*Jankovic IV*) (quoting *Waldbaum v. Fairchild Publ'n*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)). The "public controversy" cited by Defendants is the entire 2016 election, and they claim that that all three Plaintiffs "thrust themselves" into this "controversy" by dong "extensive work for various progressive causes;" (Def. Mem. at 15); because Creamer was invited to the White House (*id*.); and, based on factual assertions completely outside the Complaint, because Creamer allegedly published a book on politics nine years before the 2016 election and is a "frequent writer" for the Huffington Post. (*Id*. n. 3).

By Defendants' reckoning, every single person who worked on the 2016 presidential election campaign in any capacity – employee, volunteer, consultant, vendor, the company that provided ice water or copying paper – would be a "limited purpose public figure." They have pointed to no facts set forth in the Complaint that would actually make Creamer a "limited purpose public figure" for purposes of their videos.

Even if Creamer were such a figure, moreover, that would not automatically make the two Plaintiff companies, SCG and Democracy Partners, limited purpose public figures. The private contract work of SCG and Democracy Partners for clients related to the 2016 campaign was not publicized in any way (prior to the release of the Project Veritas videos) and Defendants point to no allegations in the Complaint that would show that these two companies "thrust

[themselves] into the vortex of" the 2016 election *Jankovic IV*, 822 F.3d at 587 (quoting *Gertz v. Robert Welch*, 418 U.S. 323, 351-52 (1974).  "[D]efamation is personal . . . [a]llegations of defamation by an organization and its members are not interchangeable. Statements which refer to individual members of an organization do not implicate the organization.'"  *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (*Jankovic I*) (quoting *Provisional Gov't of New Afrika v. ABC*, 609 F. Supp. 104, 108 (D.D.C. 1985)). None of the facts identified by Defendants would demonstrate that any of the Plaintiffs are limited purpose public figures.

In any event, the Complaint alleges facts that, if proven, would demonstrate that O'Keefe deliberately edited the videos to create a false impression and then deliberately made false statements about what the videos showed.  (Compl. ¶¶ 53, 55, 57.) The Complaint alleges that the modus operandi of PV defendants "is to gain access to the offices of [progressive] organizations and campaigns through fraudulent misrepresentation; then to secretly videotape conversations and interactions . . . then to selective edit the videotapes so as to distort and misrepresent what was said . . . ."  (Compl. ¶ 13.)  Taken together, and drawing all inferences in favor of the Plaintiffs, these allegations would suffice to show that the videos were edited and posted "with knowledge that it was false or with reckless disregard of whether it was false or not," *i.e.,* actual malice.  *Jankovic IV*, 822 F.3d at 584 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). At the pleading stage, even given that the "standard of actual malice is a daunting one," *id.* at 590, "when this Court grants these Plaintiffs 'the benefit of all inferences that can be derived from the facts alleged,' . . . as it must at this stage of the litigation, it concludes that their complaint survives the preliminary obstacle that a motion to dismiss constructs, because the complaint's allegations of fact support the inference that [defendants] entertained serious doubts as to [the reliability of the statements] and failed to investigate these

claims adequately which, together, suffice to support a plausible finding of actual malice.'"
*Zimmerman,* 2017 WL 1207416, at *18 (quoting *Sparrow v. United Air Lines,* 216 F.3d 1111,
1113 (D.C. Cir. 2000) (internal citations omitted)).

Thus, even if Plaintiffs were required to plead the elements of defamation in order to
claim reputational damages, they have sufficiently done so.

### 2.   Plaintiffs' Claims For Lost Contract Damages Are Not Barred by the First Amendment

Plaintiffs are *not*, in any of their counts, seeking compensation *solely* for any damage to
reputation.  In addition to statutory and punitive damages sought under the D.C. and federal
wiretapping statutes, 18 U.S.C. §2520(c)(2)(B), -- (b)(2) and D.C. Code §23-554(a)(2)(A)-(B)),
the specific damages cited by Plaintiffs are the loss of revenue that would have been received
under two then-existing contracts and one prospective contract.  (Compl. ¶¶ 64-66.)  Defendants
again argue that the lost contract damages resulted from "publication of the defendants'
reporting," and thus that Plaintiffs must plead the relevant elements of defamation. (Def. Mem. at
17).

In fact, the majority of the damages sought by Plaintiffs—$534,000—are attributed to
loss of these three contracts, *not* to damage to reputation. (Compl. ¶ 67.)  Nowhere in paragraph
67 is there any reference to reputation. Because all of Plaintiffs' claims include a claim for these
non-reputational damages, and because the non-reputational damages are not alleged to stem
from any publication, there is no basis for dismissing any of these claims.

In *Steele v. Isikoff,* 130 F.Supp.2d 23 (D.D.C. 2000), a well-known investigative
reporter revealed the name of his source in a newsmagazine article.  The source sued, alleging
that she and the reporter had agreed that the conversations would be off the record.  The source
asserted claims for breach of contract, implied covenant of good faith, fraud, and infliction of

emotional distress.  The reporter argued that *Hustler* barred recovery of damages on any of these claims, but this Court disagreed, holding that under *Hustler* and *Cohen*:

> If a party seeks damages for harm to reputation or state of mind, the suit can only proceed if that party meets the constitutional requirements of a defamation claim. If a party seeks damages for *non-reputational harms, which include lost jobs and diminished employment prospects, then the First Amendment does not bar suit* as long as the claims are brought under generally applicable laws.

130 F.Supp.2d at 29 (emphasis added).

In this case, the Complaint alleges loss of contract revenue – that is, *non*-reputational damages – due entirely to *non*-publication conduct.  That conducts consisted of Maass' breach of client confidentiality through tortious and illegal acts, that is, violation of other legal duties and laws of general applicability. The Complaint specifically alleges that the contracts were lost as a result of "disclosures and actions" of Maass described in paragraphs 27 through 44 of the Complaint, which make no reference whatsoever to the Project Veritas videos or any other publication.  The Complaint makes clear that the loss of the contracts resulted from Mass' breach of client confidentiality—*i.e.*, that through her tortious and illegal conduct she caused Project Veritas to breach its confidentiality obligations to its clients.  For example, paragraph 64 alleges that, "[a]s a direct result of Mass' *disclosures of confidential information* that she obtained through the actions described in paragraph 27-44 above, a major labor organization canceled a contract with SCG . . . ."  (Compl. ¶ 64.) Those breaches of client confidences would have resulted in cancellation or loss of the contracts *regardless* of whether the contents materials improperly stolen were ever publicized.  That the clients may have learned about the breach through publication does not make the publication itself the cause of the lost contracts. It was not and the Complaint makes that clear.

Further, the Court in *Steele* ruled that the question of whether Plaintiffs can establish that they suffered non-reputational damages from non-publication conduct is not appropriately resolved at the motion to dismiss stage:

> Quite possibly, following discovery Defendants could demonstrate that the damages Steele seeks are all for harm to her reputation.  On a motion to dismiss, however, the Court must accept the plaintiff's version of events.  Steele has alleged she has suffered reputational and non-reputational harm as a result of Defendants' conduct. . .. To *the extent that she seeks damages for non-reputational harm, the claims survive Defendants' constitutional challenge.*

130 F.Supp.2d at 29 (emphasis added).

In addition, Defendants argue that Plaintiffs cannot recover any damages from lost contracts, under any of their claims, unless they also plead and prove the separate tort of interference with contractual relations.  (Def. Mem. at 16). Defendants cite no authority at all for this proposition, and there is none.

For these reasons, Plaintiffs have sufficiently pleaded their claims for damages arising from loss of the three contracts. Those claims are in no way barred by the First Amendment.

**C. Plaintiffs Have Sufficiently Pleaded Facts That Would Establish Defendants' Liability**

**1.   Plaintiffs Have Adequately Pleaded Their Claim For Breach Of Fiduciary Duty**

To demonstrate a breach of fiduciary duty, a plaintiff must show (1) the existence of a fiduciary relationship; (2) a breach of the duties that were associated with this fiduciary relationship; and (3) injuries resulting from the breach. *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 190-91 (D.D.C. 2009).  Defendants contend that as an unpaid intern Maass did not owe a fiduciary duty to Democracy Partners, supporting that contention only with unsubstantiated and conclusory statements that interns "perform low-level tasks" and "rarely join a particular think tank or office to further that political

19

cause." (Def Mem. at 21.)  But the Complaint alleges several facts suggesting a relationship of heightened trust and confidence between Maass and Democracy Partners, including her access to confidential and sensitive business information and participation in confidential client meetings. (Compl. ¶¶ 32-39.)  That is enough to establish a fiduciary relationship. *E.g.*, *Council on Am. Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 341 (D.D.C. 2011) ("*CAIR II*") (denying an intern's motion to dismiss an organization's breach of fiduciary duty claim "even assuming that no contractual relationship existed" between the two); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 516 (4th Cir. 1999) (affirming a district court's ruling that two undercover reporters owed a fiduciary duty to the organization they infiltrated even absent an employment contract).

### a.   A Fiduciary Relationship Existed Between Maass and Democracy Partners.

Plaintiff has alleged sufficient facts to establish a fiduciary relationship between Maass and Democracy Partners. The District of Columbia courts have rejected a stringent interpretation, "deliberately le[aving] the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances." *CAIR II*, 793 F. Supp. 2d at 341. In deciding whether a fiduciary relationship exists, courts conduct "a searching inquiry into the nature of the relationship, the promises made, the types of services given and the legitimate expectations of the parties." *Firestone v. Firestone*, 76 F. 3d 1205, 1211 (D.C. Cir. 1996). As a result of this fact-intensive inquiry, this Court has observed that "a claim for breach of fiduciary duty is generally not amenable to dismissal for failure to state a claim when the claimed ground for dismissal is absence of a fiduciary relationship." *CAIR II*, 793 F. Supp. 2d at 341; *see also Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 247 (S.D.N.Y. 2006)  (noting "a claim

alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6).").

The Complaint alleges that Maass had complete access to Democracy Partners' secure non-public building and access to its highly confidential business information, including confidential documents and emails, the identity of clients and partners, the undisclosed location and timing of Democratic bracketing events – information maintained in strict confidence, and information discussed during private in-person client meetings and conference calls, along with the private access code for these calls. (Compl. ¶¶ 31-32, 37, 39, 40.) Even if one were to accept, *arguendo*, Defendants' contention that Maass did not sign an employment contract or confidentiality agreement, Creamer explicitly alerted her to the confidential nature of the information being shared with her. (Complaint ¶ 32, 39.) Moreover, the nature of Maass' extensive access to confidential, high-stakes information about Democracy Partners' programs and strategies in the context of an immensely adversarial political election should have alerted her to the existence of a fiduciary duty of non-disclosure. *See Church of Scientology Int'l v. Eli Lilly and Co.*, 848 F. Supp. 1018, 1028 (D.D.C. 1994) (applying District of Columbia law to hold "the [fiduciary] relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exists whenever a man trusts in, and relies upon another . . ."); Restatement (Third) of Agency § 1.03 ("A person manifests assent or intention through written or spoken words *or other conduct*.") (emphasis added).

In *CAIR II*, this Court rejected the argument that an intern could *never* have a fiduciary relationship with the entity for which it worked. 793 F. Supp. 2d at 341-42. The Court concluded that an intern's access to confidential information and deployment of a false background to

induce trust from an organization "impl[ied] a relationship akin to one between employer and employee, which under some circumstances may suffice to support a claim for breach of fiduciary duty under District of Columbia law." *Id.* Here Maass, in coordination with the other Defendants, meticulously crafted a false identity as a student aligned with Democracy Partners' goals that was interested in gaining relevant work experience. (Compl. ¶¶ 22-27, 43.) In her efforts to establish a close relationship of trust and confidence with Democracy Partners, Maass used a fake name, provided false background information - including a false social security number, submitted a forged resume, and repeatedly lied to Creamer and others at the organization about her motives in obtaining the internship. (*Id.*, Compl. ¶ 41.) Even if Maass' status as an intern, alone, were not enough to establish a fiduciary relationship, the additional facts alleged in the Complaint make clear that Democracy Partners placed trust in and relied upon her.

  **b. Maass Breached Her Fiduciary Duty to Democracy Partners By Disclosing Confidential, Proprietary Information For Her Own Interest.**

  As a result of the fiduciary relationship between the two, Maass owed Democracy Partners an "undivided and unselfish loyalty . . . such that there shall be no conflict between duty and self interest." *Amtrak v. Veolia Transp. Servs.*, 791 F. Supp. 2d 33, 47 (D.D.C. 2011). However, as the Complaint alleges, Maass' loyalties were divided when she provided a number of confidential emails to Defendants despite clear instructions by Creamer that information shared with her was to remain confidential, and despite the obvious fact that these materials were to be held in confidence. (Compl. ¶¶ 32, 39, 40.) Indeed, the value of the information, and the reason that Maass disseminated it, was precisely a result of its confidential nature and the value of that information in the few weeks leading up to the presidential election. Such divided loyalties amounted to a breach of the fiduciary duty Maass owed Democracy Partners.

In *Food Lion*, the Fourth Circuit Court of Appeals considered a breach of fiduciary duty claim where two ABC employees assumed false identities to gain employment at a grocery store and secure footage of improper food handling practices, which ABC subsequently broadcasted. 194 F.3d at 505. The federal appeals court concluded that the reporters' conduct amounted to a breach of their fiduciary duty to the plaintiff-supermarket:

> What [defendants] did verges on the kind of employee activity that has already been determined to be tortious. The interest of the employer (ABC) to whom [defendants] gave complete loyalty were adverse to the interests of Food Lion, the employer to whom they were unfaithful. ABC and Food Lion were not business competitors but they were adverse in a fundamental way. ABC's interest was to expose Food Lion to the public as a food chain that engaged in unsanitary and deceptive practices . . . [Defendants] – in promoting the interest of one master, ABC, to the detriment of a second, Food Lion – committed the tort of disloyalty against Food Lion.

> *Food Lion,* 194 F.3d at 516.

Maass and the other Defendants knew that she was acting against Democracy Partners' interest by secretly recording inside the organization's non-public, highly-secured office. Indeed, Defendants' own brief acknowledges that Maass sought to "expose" the internal practices of Democracy Partners. (Def. Mem. at 25.) Moreover, Maass did not tell anyone at Democracy Partners that she was using a hidden camera or that she was recording her internship. (Compl. ¶ 33, 49, 62.) It is clear that knowing Democracy Partners would not allow her to record these conversations or share confidential documents, Maass violated her fiduciary duty to Democracy Partners by acting under the instruction of Defendants – entities and agents known to be antagonistic toward progressive organizations like that of Plaintiff.

## 2.  Plaintiffs' Fraudulent Misrepresentation Claim Adequately Alleges Proximate Cause

In order to establish a claim for fraudulent misrepresentation under District of Columbia law, a plaintiff must prove: "(1) the defendant made a false representation; (2) in reference to a material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which consequently resulted in provable damages." *C & E Servs. v. Ashland,* 498 F. Supp. 2d 242, 255 (D.D.C. 2007) (citing *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)).

Defendants do not deny that they knowingly made fraudulent representations with the intention of deceiving Plaintiffs. Instead, Defendants only take issue with Plaintiffs' ability to establish the sixth element—proximate cause. (Def. Mem. at 34.) In the District of Columbia, a "defendant's challenged conduct is the proximate cause of a plaintiff's injury only if the injury is the natural and probable consequence of the negligence or wrongful act and ought to [have been] foreseen in light of the circumstances." *C & E Servs.*, 498 F. Supp. 2d at 256 (internal citation and quotation omitted). Moreover, "[p]roximate cause is generally a factual issue to be resolved by the jury . . . ." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002) (quoting *Washington Metro. Area Transit Auth. v. Davis*, 606 A.2d 165, 170 (D. C. 1992)). "District of Columbia law is clear that only in exceptional cases will questions of . . . proximate cause pass from the realm of fact to the one of law." *C & E Servs*., 498 F. Supp. 2d at 256 (internal citation and quotation omitted).

Plaintiffs have adequately alleged facts establishing that Defendants' fraudulent misrepresentations proximately caused damages.  Specifically, the Complaint alleges that Plaintiffs suffered, and continue to suffer, injuries including lost contracts, diminishment of the economic value of confidential and proprietary information, and loss of future contracts. (*See* Complaint ¶¶ 111-112.) Defendants' disagreement as to the underlying factual causation of

Plaintiffs' damages is not a matter that can be properly resolved on a motion to dismiss. *See Majeska*, 812 A.2d at 950.

Defendants rely on two cases to support the dismissal of the fraudulent misrepresentation claim.  (Def. Mem. at 35, 36) (relying on *Food Lion v. Capital Cities*, 964 F. Supp. 956 (M.D.N.C. 1997), *aff'd on other grounds,* 194 F.3d 505 (4th Cir. 1999) and *Frome v. Renner*, No. 97 CIV 5641, 1997 WL 33308718, at *2 (C.D. Cal. Oct. 1, 1997).  Neither case supports their contentions.

In *Food Lion*, employees of ABC went undercover to secure footage of improper food handling at the plaintiff-supermarket. 964 Scup. at 956. ABC broadcasted the footage on Prime Time Live. Notably, the case was resolved by the Fourth Circuit Court of Appeals after completion of a jury trial. In review of the jury's verdict post-trial, the United District Court for Middle District of North Carolina recognized that the doctrine of "independent cause" applied under South Carolina law and "provides that an event occurring after the tortious conduct of the plaintiff may intervene to break the causal chain and cut off plaintiff's liability for the ultimate harm." *Id.* at 961. Defendants' reliance on *Food Lion* is not applicable here because questions of fact have yet to be resolved, and because *Food Lion* was governed by a stricter South Carolina standard. District of Columbia law provides that "[a]lthough [an] intervening act of another makes the causal connection between the defendant's [conduct] and the plaintiff's injury more attenuated, such an act does not *by itself* make the injury unforeseeable." *District of Columbia v. Carlson,* 793 A.2d 1285, 1290 (D.C. 2002) (emphasis added). Moreover, a defendant is still responsible for damages if the danger "should have been reasonably anticipated."  *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C.1980) (internal citation and quotation omitted).

Other Courts have also distinguished between, or declined to follow, *Food Lion*'s proximate cause analysis. In *Veilleux v. Nat'l Broad. Co.*, the First Circuit Court of Appeals rejected NBC's reliance on *Food Lion*, and declined to follow it. 206 F.3d 92, 125 (1st Cir. 2000) ("[Plaintiff] has adduced sufficient evidence of his reliance on defendants' representations as to [] permit a reasonable finding that the representations were a substantial factor in bringing about his harm."). Recently, *Planned Parenthood Federation of America* held that the plaintiff-organization properly alleged damages which resulted from fraud and deceit in an attempt to videotape and broadcast non-public conversations. 214 F. Supp. 3d at 839. Although the claim of the plaintiff organizations for damages did not clearly differentiate between non-publication and publication damages, the district court concluded upon consideration of the motion to dismiss, that "for purposes of pleading . . . plaintiffs have adequately alleged proximately-caused damages." *Id.*

In *Food Lion* and *Frome*, the undercover journalists worked for major accredited news agencies, ABC and CBS, respectively. The focus of their investigations was examining issues of public welfare; the ABC piece focused on food handling, and the CBS commentary covered health care fraud. Unlike reporting by a traditional journalist investigating public-interest stories, Project Veritas's surreptitious actions are blatantly politically and ideologically motivated. (Compl. ¶¶ 13, 53-57.) Unlike Project Veritas, accredited news networks demand journalistic integrity and do not edit footage to further a political narrative. *See, e.g.*, *PPFA*, 214 F. Supp. 3d at 849 (questioning the defense's claim to be an undercover anti-abortion journalist by noting that defendant "does not provide any explanation of her educational background, credentials, work experience, or names of outlets that have published any of her work." )

In sum, Plaintiffs have adequately alleged sufficient facts to establish that Defendants knowingly made false statements in reference to material facts with the intention of deceiving Plaintiffs, and that Plaintiffs reasonably relied upon on those representations and suffered resulting damages. Defendants' contention that Plaintiff cannot prove damages proximately caused by their fraudulent misrepresentations is premature because discovery has yet to reveal the full extent of the fraud.

### 3. Plaintiffs Have Sufficiently Pleaded Their Claim for Trespass

A claim for trespass requires "(i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest." *CAIR II*, 793 F. Supp. 2d at 344. Defendants do not dispute that the Democracy Partners office is Plaintiff's property and was private and not open to the public. (Compl. ¶¶ 21, 34.)

Rather, Defendants contend that Maass' entry was authorized because Plaintiffs consented to her physical presence in the Democracy Partners office and that Plaintiff's consent was not vitiated by Maass' fraud and misrepresentation. (Def. Mem. at 28-30).  That is not the law. "Consent 'given upon fraudulent misrepresentations' will not always defeat a claim for trespass." *CAIR II*, 793 F. Supp. 2d at 345 (citing *Dine v. Western Exterminating Co.*, 1988 WL 25511, at *9 (D.D.C. Mar. 9, 1988)). When a party gains access to private space by virtue of misrepresentation, that party is liable for trespass. "Consent may be ineffective if induced…by a substantial mistake concerning the nature of the invasion of [the owner's] interest or the extent of the harm to be expected from it and the mistake is known to the other or induced by the other's misrepresentation." *Id*. (internal quotations omitted) (citing Restatement (Second) of Torts §§ 173, 892B (2) (1965).

In *CAIR II*, Plaintiffs alleged that one of the defendants trespassed by entering Plaintiffs offices because he obtained consent through fraud and subterfuge. Defendants argued the trespass claim should be dismissed because the alleged trespasser was authorized to enter plaintiff's offices. *Id.* at 345. The Court denied Defendants' motion to dismiss the trespass claim because such consent can be ineffective if induced by the trespasser's misrepresentation, which was "precisely what Plaintiffs have alleged." *Id.*

Here, as in *CAIR II*, Plaintiff Democracy Partners' consent was ineffective because it was induced by Maass' fraud and misrepresentations. Plaintiffs were induced to believe that Maass, under the name "Angela Brandt" wanted to obtain an internship in the Democracy Partners office to gain work experience in political and advocacy work, when, in fact, her actual interest and intent was to gain the trust and confidence of Plaintiffs, access the office, and access documents, and record undercover videos of Creamer and Democracy Partners for her employers, PVAF and PV. (Compl. ¶¶ 26-27.) She deliberately and repeatedly lied to Creamer about her identity and background, all of which induced Plaintiffs to hire Maass as an intern, giving her access to the Democracy Partners private office, file cabinets and computers. (Compl. ¶31.)

Defendants cite cases from other jurisdictions that have concluded "consent to enter land, even if procured through misrepresentation, bars a later trespass claim." (Def. Mem. at 29.) These cases are clearly distinguishable. In *Desnick v. ABC*, 44 F.3d 1345 (7th Cir. 1995), the trespass claim was rejected because the alleged trespass occurred in an area that is "open to anyone expressing a desire for ophthalmic services." *Id*. at 1352. Similarly, in *Am. Transmission, Inc. v. Channel 7 of Detroit, Inc*., 609 N.W.2d 607 (Mich. Ct. App. 2000), the court upheld the dismissal of the trespass claim where the defendant entered the auto repair shop that was open to anyone seeking transmission repair services. *Id.* at 614.

Here, the trespass did not occur in a public space. The Democracy Partners office is private and not accessible to the general public. (Compl. ¶ 21.) It has 24-hour security and is only accessible if one signs into the building at the lobby security desk, provided entrance by Plaintiff's receptionist, and/or if one has an electronic pass card. (Compl.¶¶ 21, 34, 95.) Unlike ophthalmologist offices or auto-repair shops, the Democracy Partners office is not accessible to walk-ins from the public or from those seeking Democracy Partners' services. (Compl ¶ 34.)

By contrast, other courts have held as the *CAIR II* case did; that, when a party gains access to a private space by virtue of misrepresentation, the person is liable for trespass. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d at 834 (plaintiff could prove trespass where defendants obtained access to meetings by misrepresentation or exceeded the scope of consent when they secretly filmed the proceedings); *Pitts Sales, Inc. v. King World Prods., Inc,*. 383 F. Supp. 2d 1354, 1367 (S.D. Fla 2005) (trespass claim where defendant's fraud gave him access areas of plaintiff's business not open to the public).

Even if the misrepresentation did not vitiate Plaintiffs' consent, Maass exceeded that consent by recording conversations in the private office for her second employer. Defendants rely on *Baugh v. CBS, Inc*., 828 F. Supp 745, 757 (N.D. Cal. 1993).  In that case, the Court dismissed a trespass claim because the plaintiff had allowed a film crew on her property. Here, Plaintiffs never consented to Defendants' surreptitious videotaping. Plaintiffs consented to Maass' presence in the office for the sole purpose of performing her internship. She clearly exceeded the consent by recording Plaintiffs' conversations at their private office and providing these recordings to her employer, Project Veritas. *See Food Lion, Inc.*.194 F.3d at 519 (finding trespass where reporters went into areas of the store that were not open to the public and secretly videotaped an act that was directly averse to the interest of their second employer, Food Lion.).

29

Defendants appear to argue that the third element of trespass, interference with the plaintiff's possessory interest, is only met if the "peaceful, physical possession" is disrupted by the alleged trespasser. (Def. Mem. at 30.)  There is no such requirement, nor is there any requirement that the degree of the alleged intrusion into Plaintiff's possessory interest have any bearing on the validity of a trespass claim. *See e.g., Robinson v. Farley*, No. 15-CV-0803 (KBJ), 2017 WL 3841830, at *8 (D.D.C. Sept. 1, 2017) (holding plaintiff could prove trespass based on allegations that officers "intentionally entered the Robinsons' residence and thereby interfered with the Robinson's possessory interest"). By entering the Plaintiffs' office without consent, Maass interfered with Plaintiffs' possessory interest in their office.

Finally, Plaintiffs are not required to plead their damages for trespass with particularity and District of Columbia law allows Plaintiffs to recover nominal damages for trespass. *CAIR II*, 793 F. Supp. 2d. at 344-345 (citing *Decker v. Dreisen-Freedman, Inc*. 144 A.2d 108, 110 (D.C.1958)). Therefore, even if Plaintiffs cannot recover actual damages, there is no basis for dismissing the trespass claim.

### 4. The Complaint Alleges Sufficient Facts To Demonstrate That The Recordings Were Made for Tortious and Criminal Purposes, in violation of Federal and D.C. Wiretap Laws

Defendants' motion to dismiss Counts Two and Three of the Complaint—for violation of the federal and D.C. wiretapping laws – essentially rests on a misstatement of the law. Simply put, the First Amendment cannot be used as a shield to justify law-breaking.

Count Two of Plaintiffs' Complaint alleges that Defendants are liable under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Federal Wiretap Act"), codified at 18 U.S.C. §§ 2511 *et seq*., for intentionally intercepting, intentionally using, and intentionally disclosing, the contents of surreptitious recordings of oral communications. In Count Three of

the Complaint, Plaintiffs' allege that Defendants' actions also violated D.C. CODE § 23-541 *et seq*. ("D.C. Wiretap Act").  (Compl. at ¶ 87.) Both statutes proscribe the intentional interception, use, and disclosure of oral communications. *See* 18 U.S.C. §§ 2511(1)(a),  -(1)(b), -(1)(c), -(1)(d); D.C. CODE §§ 23-542(a)(1), -(a)(2), -(a)(3).

Defendants do not contest that Maass willfully intercepted oral communications by using electronic devices hidden on her person to secretly record private meetings and conversations. Instead, Defendants rely on the exception, colloquially referred to as the "one-party consent" rule, found in §2511(2)(d) of the Federal Wiretap Act and §23-542(b)(3) of the D.C. Wiretap Act. The one-party consent rule creates an exception to liability for a private party "where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception . . . ." 18 U.S.C. § 2511(2)(d); *see also*, D.C. CODE §23-542(b)(3).

The sufficiency of one-party consent, however, does *not* apply if the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any state." 18 U.S.C. § 2511(2)(d). Similarly, the D.C. Wiretap Act provides that the one-party consent rule does not apply if the "communication is intercepted for the purpose of committing any criminal or tortious act . . . or for the purpose of committing any other injurious act." D.C. CODE § 23-542(b)(3). Consequently, the Federal Wiretap Act and D.C. Wiretap Act both prohibit the use of the one-party consent rule if a defendant's "primary motivation" or a "determinative factor in the actor's motivation in intercepting the conversation was to commit a criminal or tortious act." *Council on Am. Islamic Relations Action Network v. Gaubatz* , 31 F. Supp. 3d 237, 256-57 (D.D.C. 2014) ("*CAIR IV*"),

(relying on *United States v. Dale*, 991 F.2d 819, 841 (D.C.Cir.1993) (internal quotations omitted)).

Plaintiffs allege that Defendants intercepted, used, and disclosed oral communications for the primary purpose of committing the torts of breach of fiduciary duty, fraudulent misrepresentation, trespass and other criminal or tortious acts. (Because the federal and D.C. Wiretap Acts are substantively the same, the analysis below will not distinguish between them).

> **a.  Defendants' Speech Is Not Protected By The First Amendment Because The Information Sought To Be Published Was Not Lawfully Acquired.**

As a preliminary matter, Defendants attempt to qualify the purpose of the recordings as being for use in constitutionally protected free speech. (Def. Mem. at 25.) However, it is well established that the First Amendment does not justify breaking the law.

In *Cohen*, the Supreme Court addressed the scope of constitutional protection for news gatherers when a source sued a newspaper after the newspaper's breach of its express promise to keep his identity confidential resulted in him being fired from his job. 501 U.S. 663 (1991). The Supreme Court refused to apply heightened scrutiny, concluding that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen,* 501 U.S. at 669. The Court found it to be "beyond dispute" that a newspaper publisher "has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.'" *Id.* at 670 (quoting *Associated Press v. NLRB*, 301 U.S. 103, 132-33 (1937)). Indeed, the Court reiterated that "truthful information sought to be published must have been lawfully acquired" and emphasized that "[t]he press may not with impunity break and enter an office or dwelling to gather news." *Id.* at 669.

Because breach of fiduciary duty, fraudulent misrepresentation, and trespass are laws generally applicable to all citizens and do not target or single out the press, the First Amendment does not grant the press special immunity as to their application. *See, e..g., id.; Food Lion,* 194 F.3d at 522 (rejecting the application of heightened First Amendment scrutiny to the breach of duty of loyalty and trespass claims because "the tort laws [ ] do not single out the press or have an incidental effect upon its work."); *Veilleux v. Nat'l Broad. Co*., 206 F.3d 92, 128 (1st Cir. 2000) (holding that, under free speech principles, plaintiff-employer could recover damages for common law misrepresentation from NBC after NBC broadcasted a report about the perils caused by tired long-distant truck drivers which portrayed the plaintiff and his employees in distorted and negative light); *Dietemann v. Time,* 449 F.2d 245, 249 (9th Cir. 1971) *(*"The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office."); *Planned Parenthood Federation of America v. Center for Medical Progress*, 214 F.Supp.3d 808, 841 (N.D. Cal. 2016) (distinguishing cases where plaintiff claims damages stemming from non-reputational and reputational torts, ultimately finding that only the latter requires First Amendment heightened scrutiny); *Vera v. O'Keefe*, 791 F. Supp. 2d 959, 968 (S.D. Cal. 2011) (holding that persons engaging in news gathering are not permitted to violate criminal laws in the process); *Shulman v. Group W Prod.*, 955 P.2d 469, 495 (Cal. 1998) (finding privacy torts to be generally applicable and not protected by a First Amendment defense, noting "the press in its newsgathering activities enjoys no immunity or exemption from generally applicable laws." ).

Defendants chiefly rely on two cases to support their argument that Project Veritas should be given a special privilege to break the law. (Def. Mem. at 26-27) (relying on *Desnick v.*

*Am. Broadcasting Co.*, 44 F.3d 1345 (7th Cir. 1995) and *Russell v. Am. Broadcasting Co.*, No. 94 C 5768, 1995 WL 330920, at *4 (N.D. Ill. May 31, 1995)).  That reliance is misplaced.

In both cases, the defendant was found to be protected by the First Amendment because the plaintiff failed to satisfy the applicable common law tort. For example, in *Desnick*, the plaintiff did not satisfy the elements for trespass and fraud. 44 F.3d at 1355. In *Russell*, the court rejected the wiretap claim because the plaintiff did not claim that the defendant intended to commit a common law tort when the recording was made.  1995 WL 330920, at *4. Moreover, since *Desnick* and *Russell* were decided more than twenty years ago, courts across the country have consistently held that journalists are not free to use the Constitution as a shield from law-breaking.

In conclusion, Defendants cannot use the First Amendment to justify breaking the law because they have no special immunity from the laws that apply to everyone else.

> **b.  Defendants' Primary Motivation, or a Determinative Factor in their Motivation, Was to Breach a Fiduciary Duty Owed To Plaintiffs**

This Court applies a two-factor approach in determining whether a tortious purpose negates the one-party consent exception. The first question is "whether [Defendant] had a fiduciary duty to Plaintiff." *CAIR IV*, F.Supp.3d at 257. The second question is "whether the breach of this fiduciary duty was either the primary motivation for, or at least a determinative factor motivating" the interception of the communications." *Id.*

Plaintiffs allege sufficient facts to establish the existence of a fiduciary relationship between Maass and Democracy Partners. As discussed above, *supra,* Plaintiffs' Complaint alleges several facts suggesting that a heightened fiduciary relationship of trust and confidence existed between Maass and Democracy Partners. Again, the existence of a fiduciary relationship is a question of fact not amenable for resolution at this stage in the proceedings. *See CAIR II*, 793

F. Supp. 2d at 341(affirming that "a claim for breach of fiduciary duty is generally not amenable to dismissal for failure to state a claim when the claimed ground for dismissal is absence of a fiduciary relationship."); *see also Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004) ("A court should not dismiss for failure to state a claim unless the defendant can show *beyond doubt* that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief") (emphasis added).

Plaintiffs allege sufficient facts to establish that Defendants' primary motivation or a determinative factor in Defendant's motivation, was to breach the fiduciary duty owed to Plaintiffs. Maass' motivation for surreptitiously recording oral communications was to breach her fiduciary duties by disseminating the videos to individuals outside of Democracy Partners, who then published the heavily-edited recordings to YouTube. (Compl. ¶¶ 57, 79, 81.) Indeed, O'Keefe admitted that Maass and Roth were employees of PVAF and boasted in the fourth video that "Charles Roth's niece, our journalist [Maass], got offered an internship at Creamer's firm Democracy Partners." (Compl., ¶ 59.) Furthermore, Defendants concede that the "purpose at the time of the recordings were made was to publish constitutionally-protected speech . . . ." (Def. Mem. at 25.)

The present case is both factually and procedurally similar to *CAIR IV*. In *CAIR IV*, Defendants placed an undercover agent, Chris Gaubatz, posing as an intern under a fictitious identity, in the Washington, D.C. offices of the Council on American-Islamic Relations Action Network ("CAIR"), a national Muslim advocacy group, for the purposes of producing a documentary film to expose CAIR's alleged link to the Muslim Brotherhood. 31 F. Supp. 3d at 243-45. During Gaubatz's internship he surreptitiously recorded oral conversations and provided the recordings to the other implicated defendants. This Court reasoned that if "Gaubatz

understood himself to be bound by a fiduciary duty [], then it appear[end] obvious that the breach of this fiduciary duty was the primary motivation, or at least a motivating factor, in his interception of the communication at issue" because it was undisputed that "Gaubatz's purpose when making the recordings was to provide them to individuals outside of CAIR." *Id.* at 259. This Court ultimately denied the motion to dismiss the wiretap claims, finding there to be a factual dispute as to whether Gaubatz understood himself to be bound by a fiduciary duty, an issue appropriately resolved by a jury.

Here, it is undisputed that Maass' purpose for intercepting Plaintiffs' confidential conversations was to provide the recordings to third parties in order to "publish constitutionally-protected free speech." (Def. Mem. at 25.) Whether Maass understood herself to be bound by a fiduciary duty, is a factual dispute appropriate for a jury determination. Plaintiffs have alleged sufficient facts, see *supra*, Section B.1, indicating that Maass was on notice of a duty of non-disclosure. The Court should therefore deny the motion to dismiss the wiretap claims because Plaintiffs have adequately plead the tortious motivating factor of breach of fiduciary duty.

### c. Defendants' Primary Motivation, Or A Determinative Factor In Their Motivation, Was Fraudulent Misrepresentation

Defendants broke the law because their motivation was to create a cover to gain trust and access to materials and discussions that would otherwise be out of reach.

As discussed above, *supra*, Section C.2, Plaintiffs allege sufficient facts to establish a claim for fraudulent misrepresentation. At best, Defendants' contention that their purpose was not fraudulent misrepresentation is a question of fact not appropriately resolved at this stage in litigation.

Defendants circuitously seem to argue that they did not intend to make a fraudulent misrepresentation because "after all, Maas[s] already had a cover story in place when the

36

recordings were made." (Def. Mem. at 26.) However, it cannot be disputed that when Maass and Roth fraudulently misrepresented themselves by creating false identities, at the direction of Project Veritas, Project Veritas Action Fund, and O'Keefe, they intended to garner trust and access to Democracy Partners' confidential and proprietary information. The entire scheme of intercepting the conversations was dependent on Maass and Roth maintaining their cover through fraudulent misrepresentation. (Compl. ¶ 42)("Had Creamer known that Maass was an employee of PV and PVAF; that Roth/Sandini was an agent of Project Veritas and not an interested donor . . . he never would have hired her as an intern.").

In a single cursory sentence, Defendants claim their motivation was not to fraudulently misrepresent Plaintiffs, however they provide no legal or factual basis for this assertion. (Defs.' Mot. 26.) Plaintiffs have sufficiently alleged facts to support an inference that Defendants' primary motivation, or at least a determinative factor in their motivation, in intercepting, using, and disclosing the communications was to fraudulently misrepresent themselves to gain trust and access to Plaintiffs' confidential information.

### d. Defendant's Primary Motivation, Or A Determinative Factor in their Motivation, was Trespass.

As argued at length above, Maass gained access to Plaintiffs' private offices through Defendants' misrepresentation, thereby committing trespass. Mass committed further trespass by non-consensually recording and sharing confidential materials and conversations for her secondary employer. Maass' commission of trespass was the primary motivation, or at least a determinative factor in her motivation, to surreptitiously record, use, and disclose oral communications in violation of federal and D.C. wiretap laws.

**5. All Defendants Can Be Held Liable for Maass' Action Under the Claim Of Civil Conspiracy**

As the Defendants correctly point out (Def. Mem. at 37), "[i]n the District of Columbia, civil conspiracy "'is not an independent tort but only a means for establishing vicarious liability for an underlying tort.'" *Rawlings v. Dist. of Columbia*, 820 F.Supp.2d 92, 103 (D.D.C.2011) (quoting *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C.Cir.2009)). In the Complaint, Count Six, Plaintiffs allege that Defendants combined and conspired for an unlawful purpose or for a lawful purpose by unlawful means, including to commit, trespass, fraudulent misrepresentation, unlawful wiretap and to breach fiduciary duties." (Compl. ¶114.) In other words, Plaintiffs are alleging civil conspiracy as an additional  means of holding the Defendants (and Defendant Sandini) liable for the underlying torts directly committed by Maass.

Defendants contend that "where protected First Amendment speech is in controversy, speakers are immune from civil conspiracy claims." (Def. Mem. at 37).  Here, as noted, the conduct alleged to have damaged Plaintiffs is not publication and is not protected by the First Amendment.

In any event, there is simply no such rule that  "speakers are immune from civil conspiracy claims" in any case potentially involving the First Amendment.  To the contrary, when the elements of civil conspiracy are properly pleaded, and the underlying tort is properly pleaded, a claim for civil conspiracy will lie even when the underlying tort is defamation itself. *See, e.g., Giordano v. Claudio*, 714 F.Supp.2d 508, 534 (E.D. Pa. 2010)(denying motion to dismiss claim for civil conspiracy to defame); *Pasqualini v. Mortgageit d/b/a IPI Skyscraper Mortgage*,  498 F.Supp.2d 659, 671 (S.D.N.Y. 2007)(same).

Neither of the cases cited by Defendants stands for the proposition that no action for civil conspiracy will lie for conduct implicating the First Amendment.  *NAACP v. Claiborne*

*Hardward Co.*, 458 U.S. 886, 920 (1982) held that members of an association cannot automatically be held liable for acts of violence committed by other members. *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155 (3d Cir. 1988) held that liability cannot be imposed for attempts to influence government action. Neither case is remotely relevant here. Plaintiffs have properly pleaded the basis for holding Defendants liable for Maass' actions under the theory of civil conspiracy.

## IV.     The District of Columbia Anti-SLAPP Act Cannot Be Applied To An Action In Federal Court

The District of Columbia Anti-SLAPP Act, D.C. Code §§16-5501 *et seq*., allows a moving party to make a "special motion to dismiss" by showing that a claim arises from "an act in furtherance of the right of advocacy on issues of public interest;" and the case is then dismissed unless the "responding party demonstrates that the claim is likely to succeed on the merits." D.C. Code §16-5502. Because this is a procedural rule that directly conflicts with Rules 12 and 56 of the Federal Rules of Civil Procedure, a federal court may not apply it. "Federal Rules of Civil Procedure 12 and 56 establish the standards for granting pre-trail judgment to defendants in cases in federal court. A federal court must apply those Federal Rules instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision." *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015).

Defendants acknowledge the holding in *Abbas*, but suggest that it "is not controlling where the court's jurisdiction is based on the presence of a valid federal question for this court to decide." (Def. Mem. at 38 n. 10). That makes no sense. As a general proposition, a Federal Rule of Civil Procedure that regulates procedure "is valid in all jurisdictions, *with respect to all claims,* regardless of its incidental effect upon state-created rights." *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 410 (2010) (emphasis added). "Procedural state

laws are not used in federal court if to do so would result in a 'direct collision' with a Federal Rule of Civil Procedure."   *Metabolife Inter., Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001)(citing *Walker v. Armco Steel Corp*., 446 U.S. 740, 749-50 (1980)).

This Court has subject matter jurisdiction over this case based on a federal question— the Federal Wiretapping Act, 18 U.S.C. §§2511 et seq., and pendent jurisdiction over the state law claims (breach of fiduciary duty, trespass, D.C. Wiretapping law and fraudulent misrepresentation).  (Compl. ¶9.)  By definition, an anti-SLAPP statute cannot apply to *federal* claims because of the conflict with federal substantive rights.  *E.g., Hilton v. Hallmark Cards,* 599 F.3d 894, 901 (9th Cir. 2010) ("a federal court can only entertain anti-SLAPP special motions to strike in connection with state law claims," holding California anti-SLAPP Act cannot be applied to federal claims in U.S. District Court). The situation with respect to *state law* claims in federal court is the same as in a diversity case: if the state law rule is found to contravene a Federal Rule of Civil Procedure, it cannot be applied to state law claims, regardless of the basis for subject matter jurisdiction.  In *Abbas*, the D.C. Circuit found that:

> In short, unlike the D.C. Anti-SLAPP Act, the Federal Rules do not require a plaintiff to show a likelihood of success on the merits in order to void pre-trail dismissal.  Under *Shady Grove*, therefore, we may not apply the D.C. Anti-SLAPP Act's special motion to dismiss provision.

> 783 F.3d at 1334.

The holding of *Abbas* precludes Defendants from making a special motion to strike under the D.C. Anti-SLAPP Act in this Court.  That motion should be denied.

## V.    Conclusion

In this case, a fake "intern," acting on the instructions and as the agent of Defendants, engaged in fraud and lies to get access to Plaintiffs' premises and confidential information, in breach of her fiduciary duty, and in pursuit of her illegal and tortious conduct, illegally recorded

private conversations in Plaintiffs' offices. That conduct in itself caused Plaintiffs serious injury.

Defendants are not heroic "undercover reporters." They directed and conspired to commit

tortious and criminal conduct.  Their phony videos, while false and defamatory to be sure, were

not the cause of Plaintiff's injury. Plaintiffs have sufficiently pleaded the elements of the causes

of action they assert and those claims are in no way barred by the First Amendment. Defendants'

motions to dismiss should be denied.


Dated: September 15, 2017                    Respectfully submitted,

                                              /s/ Joseph E. Sandler

                                             Joseph E. Sandler, D.C. Bar No. 255919
                                             SANDLER REIFF LAMB ROSENSTEIN &
                                             BIRKENSTOCK, P.C.
                                             1090 Vermont Ave., N.W.  Suite 750
                                             Washington, D.C.  20005
                                             Tel:  202-479-1111
                                             Fax:  202-479-1115
                                             sandler@sandlerreiff.com


                                             /s/ Yael Bromberg

                                             Yael Bromberg, D.C. Bar No. 1045569
                                             Aderson Francois, D.C. Bar No. 798544
                                             INSTITUTE FOR PUBLIC REPRESENTATION
                                             GEORGETOWN UNIVERSITY LAW CENTER
                                             600 New Jersey Avenue NW, Suite 312
                                             Washington, DC 20001
                                             Phone: (202) 662-9593
                                             Fax: (202) 662-9634
                                             Yael.bromberg@law.georgetown.edu
                                             abf48@georgetown.edu


                                             Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2017, a copy of the foregoing Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss was filed and served via the CM/ECF system, which will serve a Notice of Electronic filing upon all counsel of record, including the following:

Daniel D. Mauler
Redmon, Peyton & Braswell, LLP
510 King Street, Suite 301
Alexandria, VA 22314
DMAULER@RPB-LAW.COM

Stephen R. Klein
Law Office of Stephen R. Klein
500 Madison Street #419
Alexandria, VA 22314
Stephen.klein.eq@gmail.com

Benjamin T. Barr
The Law office of Benjamin Barr
Suite 1200
444 North Michigan Avenue
Chicago, IL 60611
b@benjaminbarr.com

                /s/  Joseph E. Sandler

Attorney for Plaintiffs

42