# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **DEMOCRACY PARTNERS,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-1047 (ESH)** |
| **PROJECT VERITAS ACTION FUND,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Democracy Partners, LLC, Strategic Consulting Group, NA, Inc., and Robert Creamer ("plaintiffs") bring this action against Project Veritas Action Fund, Project Veritas, James O'Keefe ("PV defendants"), and Allison Maass, alleging that defendants violated federal and state wiretap statutes and committed multiple common law torts in their execution of an undercover sting operation directed at plaintiffs. Before the Court are two motions to dismiss jointly filed by the PV defendants: a motion to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion to dismiss pursuant to the D.C. Anti-SLAPP Act. (*See* PV Defs.' 12(b)(6) Mot., ECF No. 14; PV Defs.' Anti-SLAPP Act Mot., ECF No. 15.) For the reasons stated herein, the motions will be denied.

# BACKGROUND

## I.    FACTUAL BACKGROUND[1]

Democracy Partners, LLC, is "a company including a number of other consultants and vendors to progressive organizations and Democratic campaigns and committees, who market their services collectively through the company." (Compl. ¶ 19.)  Strategic Consulting Group, NA, Inc. ("Strategic") is a member of Democracy Partners. (*Id.* ¶ 3.)  It "provides campaign-related services to progressive organizations and Democratic campaigns and committees." (*Id.* ¶ 18.)  Robert Creamer is the sole owner of Strategic. (*Id.* ¶ 1.)  "Democracy Partners' private offices . . . are not accessible to the general public, have 24-hour security, and are only accessible if one signs into the building at the lobby security desk, if one is provided entrance by [p]laintiffs' receptionist, and/or if one has an electronic pass card[, which] . . . is required to access the elevators to the office outside of regular business hours[,] and a key[, which] is required to enter the office when no one is present." (*Id.* ¶ 34.)

Project Veritas ("PV") and Project Veritas Action Fund ("PVAF") are both nonstock, nonprofit corporations founded by James O'Keefe. (*Id.* ¶¶ 6, 12.)  PVAF is an "arm" of PV, and O'Keefe is the President of both corporations. (*Id.*)  Allison Maass and Daniel Sandini were, at the relevant times, employees of, or contractors to, PV and PVAF. (*Id.* ¶¶ 7-8.)  Through the actions described below, they infiltrated Democracy Partners' offices, stole confidential documents and secretly recorded hours of conversation.[2]

---

[1] As the Court is ruling on a motion to dismiss, the facts set forth herein are taken from the allegations of the complaint.

[2] PVAF "has become notorious for attempted undercover 'sting' operations aimed at progressive organizations and Democratic Party campaigns and committees." (Compl. ¶ 12.) Their tactics and other actions have led to multiple civil lawsuits and a criminal judgment against O'Keefe for entry by false pretenses in violation of 18 U.S.C. § 1036(a)(1), (2). *See Wentz v. Project Veritas*, No. 6:17-cv-1164 (M.D. Fla. filed June 23, 2017); *AFT Michigan v. Project Veritas*, No. 4:17-

On or about June 24, 2016, Sandini, using the false name of Charles Roth and representing himself as a potential donor to a nonprofit organization that Creamer had worked for, was introduced to Creamer and the two men had a meeting. (*Id*. ¶ 22.) A few weeks later, on or about July 15, 2016, Sandini "told Creamer that he had a niece who wanted to volunteer to do some kind of political work for Democratic candidates or organizations while she was on a brief hiatus from college." (*Id*. ¶ 24.) Sandini told Creamer that his niece's name was "Angela Brandt." (*Id*.) In reality, no such person existed; rather, Angela Brandt was a false name used by Maass. (*Id*. ¶ 27.) Unaware of her real identity, Creamer connected Maass "with a progressive organization working in Cleveland, Ohio during the 2016 Republican National Convention," believing that Maass had performed volunteer work for that organization during the convention. (*Id*. ¶ 25.)

In late August 2016, Sandini called Creamer and told him that his niece would like to gain more experience, leading Creamer to interview Maass "for an internship with Creamer and Strategic in the Democracy Partners office." (*Id*. ¶ 26.) During the interview, Maass provided Creamer fictitious background information and falsely "told Creamer that her interest in obtaining an internship was to gain work experience in political and advocacy work." (*Id*.) Based on this false information, Creamer told her that she might qualify for an internship at Democracy Partners. (*Id*. ¶ 28.) A few days later, in early September, Maass "called Creamer and said she would like to intern at Democracy Partners and could work three days per week." (*Id*. ¶¶ 28-29.)

---

cv-13292 (E.D. Mich. filed Oct. 6, 2017); *Vera v. O'Keefe*, No. 10-cv-1422, 2012 WL 3263930 (S.D. Cal. 2012) (denying O'Keefe's motion for summary judgment); *Conway-Russell v. O'Keefe*, No. 2:10-cv-00276 (E.D. Pa. filed Jan. 21, 2010) (dismissed after settlement on May 13, 2010); Judgment in a Criminal Case, *United States v. O'Keefe*, No. 10-cr-0081 (E.D. La. May 27, 2010).

On September 21, 2016, Maass started her internship at Democracy Partners. (*Id*. ¶ 30.) She was given an electronic pass card, which allowed her access to the entire office at all times, "including areas that contained file cabinets and computers with confidential information," and an account and password allowing her to use a company computer. (*Id*. ¶ 31.) She also met with Creamer, who gave her an overview of the work Democracy Partners/Strategic was performing, and he explained "how it interacted with clients and other information that was pertinent for an intern to know in order to perform her tasks." (*Id*. ¶ 32.) The "information Creamer disclosed to Maass included confidential and sensitive business information including the identity of clients, client information and programmatic details, and the identity of partners." (*Id*.) He "explicitly told Maass that based on the confidential and sensitive nature of the mission and programming of [Democracy Partners/Strategic], the information, and any additional information she was given over the course of her internship, was confidential and not to be shared with anyone other than persons with whom she had specifically been instructed to share that information." (*Id*.) Finally, she was asked to provide a resume, so the following day she provided a fabricated resume for "Angela Brant" that omitted her current employment with Project Veritas and her past work for other conservative news outlets and provided instead "an entirely false and fabricated work history and education." (*Id*. ¶ 43.) Maass' tasks as an intern included "coordinating and joining meetings with clients about highly sensitive and confidential political programs; putting together news clips; and researching and drafting client updates." (*Id*. ¶ 36.) She was "included among the recipients of highly confidential emails and in confidential discussions in in-person meetings and on conference calls," "sent confidential documents," and "brought to confidential client meetings." (*Id*. ¶ 39.) "These calls, emails and documents all contained confidential business information which Creamer told her was confidential and not to be shared with anyone

with whom she had not been instructed to share it." (*Id.*) According to the complaint, "[t]he procedures for pulling news clips and the client update memos were proprietary to Democracy Partners and its clients." (*Id.* ¶ 36.)

In early June 2016 Strategic had entered into a subcontract with a contractor for the Democratic National Committee ("DNC"). (*Id.* ¶ 20.) Strategic's contract was "to assist the DNC in arranging events in opposition to the candidacy of Donald Trump for President, including events to take place before and/or after Trump campaign events in various cities," which were "sometimes referred to as 'bracketing' events." (*Id.*) The "bracketing program" was "[o]ne of the most important projects that Maass was involved with." (*Id.* ¶ 37.) As part of this program, Maass "coordinated press events in areas being visited by then-candidates Donald Trump and Mike Pence." (*Id.*) "Prior to the public announcement of each event, information relating to the timing, location, nature of and the program to take place during each such event, was maintained in strict confidence by the DNC, other groups directly involved in the event, and their respective consultants." (*Id.* ¶¶ 36-37.) "Maintaining that information in confidence was essential in order for each such event to be successful; otherwise the Republican Party and the Republican presidential campaign could adjust their own plans to anticipate or deflect the 'bracketing' event." (*Id.* ¶ 37.) "Maass participated in planning calls for these 'bracketing' events, sitting in on meetings, and drafting emails and reports that contained information about upcoming events and after-event reporting." (*Id.* ¶ 38.)

During her internship, unbeknownst to plaintiffs, Maass carried concealed video and audio recording devices. (*Id.* ¶ 30.) She secretly recorded her discussion with Creamer on her first day of work, along with "other confidential internal conversations with Creamer and other Democracy Partners members, as well as confidential conversations they had with [Strategic]

and Democracy Partner clients in-person and via conference call." (*Id.* ¶ 33.) She provided these unauthorized audio and video recordings to PV and PVAF. (*Id.* ¶¶ 35.) Without permission, she also provided them with a number of confidential documents and emails. (*Id.* ¶¶ 40, 60-61.)

Had Creamer known Sandini's and Maass' true identities, their connections to PV, PVAF and O'Keefe, and Maass' intentions, he never would have hired her as an intern, given her confidential documents, included her in meetings and on emails, brought her to meetings, or given her open access to the office and its computers and files. (*Id.* ¶¶ 42, 44.)

On October 14, 2016, Creamer went to lunch with Mike Carlson, whom Sandini had falsely claimed was his financial advisor. (*Id.* ¶ 45.) Just as they were finishing, Creamer was accosted by a reporter, Raffi Williams, and a film crew from Circa Media, a subsidiary of Sinclair Broadcasting, who asked him to respond to two secretly recorded video clips of Creamer.[3] (*Id.*) The reporter indicated that O'Keefe had been the one to tip him off to Creamer's whereabouts. (*Id.*) When Creamer returned to his office, Maass was no longer there, and she never returned. (*Id.* ¶ 46.)

Later that day, Williams called Creamer and told him that O'Keefe had provided his network with hundreds of hours of raw videotape and that Sinclair Media had agreed to syndicate four nightly news pieces based on the videos, which would begin the following week. (*Id.* ¶ 47.) He also asked Creamer if he would agree to an on-camera interview to respond to the videos. (*Id.*) That same evening, Creamer and his attorney met with Williams and viewed approximately three hours of videotape, much of it footage secretly recorded by Maass during her internship. (*Id.* ¶ 58.) On Monday, October 17th, 2016, Creamer and his attorney met with

---

[3] The complaint does not describe the content of these two video clips.

Sinclair Media's management and attorney, reviewed additional footage, and discussed legal and factual issues relating to the videos. (*Id*. ¶ 51.) "During that meeting, Sinclair Media's attorneys said that they would postpone the first installment of their four-part series as they reviewed the legal and factual issues surrounding their recording and release." (*Id*. ¶ 52.) Ultimately, Sinclair Media did not run any stories on the videos. (*Id*.)

On October 17, 18, 24 and 26th, however, PVAF released a series of videos to PV's YouTube channel that contained footage from Maass' recordings of Creamer, Democracy Partners, and its clients. (*Id*. ¶¶ 35, 50, 54, 56, 57.) Each was "heavily edited and contained commentary by O'Keefe that drew false conclusions."[4] (*Id*. ¶ 53; *see also id*. ¶¶ 55, 57.) On October 26, 2016, PVAF published the confidential documents and emails Maass had obtained on its website under the heading "VeritasLeaks" and described them as "supporting documents for the Democracy Partners videos we have been releasing." (*Id*. ¶ 40.)

## II. PROCEDURAL HISTORY

On June 1, 2017, plaintiffs filed suit against the PV defendants, Maass, and Sandini, alleging that various actions during the course of their undercover operation violated federal and District of Columbia law. The complaint includes claims for: (1) breach of fiduciary duty against Maass (*see* Compl. ¶¶ 69-77); (2) trespass against Maass (*id*. ¶¶ 94-101); (3) violation of

---

[4] The first video falsely "charge[d] that Plaintiffs were involved in a conspiracy to incite violence at rallies for then-candidate Donald Trump, and falsely implied that the ongoing work in planning and implementing the bracketing events was part of that conspiracy." (Compl. ¶ 53.) The second video suggested "falsely, that Plaintiffs Creamer and Democracy Partners were involved in a scheme with others to enable masses of non-citizens to vote illegally and otherwise to commit voter fraud." (Compl. ¶ 55) Finally, the third and fourth videos "falsely implied that Secretary Clinton was personally involved in unethical and/or illegal activity; that activities carried out in connection with the bracketing events had been unlawfully coordinated with the Clinton Campaign; and that a group for which Creamer worked had unlawfully accepted a foreign contribution." (Compl. ¶ 57.)

18 U.S.C. § 2511 *et seq.* ("Federal Wiretap Act") against all defendants (*id.* ¶¶ 78-85); (4) violation of D.C. Code § 23-541 *et seq.* ("D.C. Wiretap Act") against all defendants (*id.* ¶¶ 86-93); (5) fraudulent misrepresentation against all defendants (*id.* ¶¶ 102-12); and (6) civil conspiracy against all defendants (*id.* ¶¶ 113-16). For every claim except trespass, plaintiffs seek "at least $1,034,000 in actual damages[,] including $534,000 in damages from lost contracts, and $500,000 in damages from the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to reputation." (*Id.* ¶ 77 (breach of fiduciary duty); *id.* ¶¶ 84-85 (Federal Wiretap Act); *id.* ¶ 93 (D.C. Wiretap Act); *id.* ¶ 112 (fraudulent misrepresentation); *id.* ¶ 116 (civil conspiracy).) For the trespass claim, plaintiffs seek "at least $100,000 in damages" for "the diminution of the economic value of the office and the diminishment of the economic value of confidential and proprietary information." (*Id.* ¶ 101.) For the two wiretap claims, plaintiffs also seek statutory and punitive damages. (*See id.* at 25-26.)

Plaintiffs timely served the PV defendants, but failed to serve Maass or Sandini within the 90 days provided for by Federal Rule of Civil Procedure 4(m). (*See* Minute Order, Nov. 14, 2017.) As a result, they voluntarily dismissed their claims against Sandini (*see* Notice of Voluntary Dismissal of Action Against Defendant Daniel Sandini, Nov. 21, 2017, ECF No. 21), and the Court granted their motion to extend the time to serve Maass. (*See* Minute Order, Nov. 27, 2017.) Plaintiffs served Maass on January 3, 2018. (*See* Return of Service, Jan. 3, 2018, ECF No. 23.)

In the meantime, on July 28, 2017, the PV defendants filed the two pending motions to dismiss. (*See* PV Defs.' 12(b)(6) Mot.; PV Defs.' Anti-SLAPP Mot.; Mem. in Support of Mots. to Dismiss by the PV Defs., ECF No. 16 ("Mem.")). Plaintiffs filed a combined opposition to

both motions (*see* Pls.' Mem. in Opp'n of Mots. to Dismiss by the PV Defs., ECF No. 19

("Opp'n")), and the PV defendants filed a combined reply (*see* Reply in Support of Mots. to

Dismiss by PV Defs., ECF No. 20 ("Reply")).  Both motions are now ripe.

## ANALYSIS

The Court will first address the Rule 12(b)(6) motion to dismiss for failure to state a

claim and then turn to the motion to dismiss under the D.C. Anti-SLAPP Act.[5]

## I.      MOTION TO DISMISS PURSUANT TO FED. R. CIV. P 12(b)(6)

The PV defendants contend that each count of the complaint should be dismissed

pursuant to Rule 12(b)(6) for failure to state a claim.[6]  They group their arguments into two

categories: (1) problems with the legal theories of liability; and (2) problems with the claims for

damages.  The Court's analysis will also be divided into two categories.

### A.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

if it fails to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  The facts alleged must "allow the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "The court

must 'accept all the well-pleaded factual allegations of the complaint as true and draw all

---

[5] The Court has jurisdiction over the Federal Wiretap Act claim pursuant to its federal question jurisdiction, *see* 28 U.S.C. § 1331, and supplemental jurisdiction over the remaining claims, *see* 28 U.S.C. § 1367.

[6] Even though the claims for trespass and breach of fiduciary duty are brought only against Maass, the PV defendants seek their dismissal because their viability is relevant to the civil conspiracy claim against them.  (*See* Mem. at 20 n.5, 37.)

reasonable inferences from those allegations in the plaintiff's favor.'" *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)). "'In determining whether a complaint fails to state a claim, [the court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice.'" *Id.* (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

### B.    LIABILITY ARGUMENTS

As to the claims for liability, the PV defendants argue that there is at least one problem with the "legal theory of liability" for each claim in the complaint

#### 1.    Fraudulent Misrepresentation

The elements of a claim for fraudulent misrepresentation under District of Columbia law are that: "(1) the defendant made a false representation; (2) in reference to a material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which consequently resulted in provable damages." *C & E Servs. v. Ashland*, 498 F. Supp. 2d 242, 255 (D.D.C. 2007) (citing *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)); *see also Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998).

The complaint alleges that Maass made false representations during her interview with Creamer and on her resume "regarding her name, intent in securing and maintaining the internship, purpose in seeking the internship, her education, and work history"; that she made these misrepresentations knowing they were false and with an intent to deceive plaintiffs; and that the misrepresentations were material facts upon which plaintiffs relied in offering Maass an internship and giving her access to confidential information; that "as a result of Maass' fraudulent misrepresentation[s]" plaintiffs suffered actual damages, "including lost contracts, the

diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to reputation" (Compl. ¶¶ 111-12); and that the PV defendants are liable for Maass' misrepresentations because they "induced Maass" and "conspired" with her to make the fraudulent misrepresentations. (*Id*. ¶¶ 103-110.)

The PV defendants challenge only the adequacy of the complaint's allegations as to the sixth element, arguing that the complaint "fails to adequately allege the proximate cause of the supposed damages." (Mem. at 34.) According to them, even though the complaint alleges that plaintiffs have suffered injury and actual damages "as a result of Maass' fraudulent misrepresentation[s]" (Compl. ¶¶ 111-12), "the facts alleged in the Complaint demonstrate that the proximate cause of the Plaintiffs' supposed $1 million in damages was the publication of Project Veritas Action's report, not any alleged misrepresentation of Maass." (Mem. at 34.)

The most obvious problem with the PV defendants' argument is that they are asking the Court to accept as true their interpretation of the facts alleged in the complaint and to reject plaintiffs' contrary allegations. But that is precisely the opposite of what a court must do in ruling on a motion to dismiss. In addition, it is well-established that under District of Columbia law that "[p]roximate cause is generally a factual issue to be resolved by the jury . . . ." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002) (quoting *Washington Metro. Area Transit Auth. v. Davis*, 606 A.2d 165, 170 (D. C. 1992)). "[O]nly in exceptional cases will questions of . . . proximate cause pass from the realm of fact to the one of law." *C & E Servs.*, 498 F. Supp. 2d at 256 (internal citation and quotation omitted). Without a fully-developed factual record, it is impossible to say whether this might be such a case.[7]

---

[7] In arguing that the complaint fails to adequately allege that Maass' fraudulent misrepresentations were the proximate cause of any damages, the PV defendants primarily rely on the district court's decision in *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956

As plaintiffs acknowledge, "[i]n the District of Columbia, a 'defendant's challenged conduct is the proximate cause of a plaintiff's injury only if the injury is the natural and probable consequence of the negligence or wrongful act and ought to [have been] foreseen in light of the circumstances.'" (Opp'n at 24 (quoting *C & E Servs.*, 498 F. Supp. 2d at 256 (internal citation and quotation omitted)). Plaintiffs will ultimately bear the burden of proving that actual damages were proximately caused by defendants' alleged fraudulent misrepresentations, but certainly at this point it would be premature to preclude them from trying to do so. *See, e.g.*, *Planned Parenthood Fed'n v. Ctr. for Medical Progress*, 214 F. Supp. 3d 808, 839 (N.D. Cal. 2016) (in a factually similar case, proximate cause was adequately alleged where complaint alleged damages that were the "direct result" of the fraudulent misrepresentation as distinguished from the publication of videos). Accordingly, the Court will not dismiss the fraudulent representation claim for failure to adequately allege proximately caused damages.

## 2.  Trespass

In the District of Columbia, the elements of a claim for trespass are "(i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest." *Council on American-Islamic Relations Action Network, Inc. ("CAIR") v. Gaubatz*, 793 F. Supp. 2d 311, 344 (D.D.C. 2011) ("*CAIR 2011*") (citing *Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871

---

(M.D.N.C. 1997), *aff'd on other grounds*, 194 F.3d 505 (4th Cir. 1999). In *Food Lion*, two ABC News reporters had misrepresented their identities in order to obtain jobs in the meat-wrapping department at Food Lion. The reporters secretly recorded videos which were then broadcast by ABC News. Food Lion sued, *inter alia*, for fraud, claiming that the reporters' fraud had caused damages to its reputation and lost profits. The jury found for Food Lion on the fraud claim, but the district court set it aside on the ground that "under the evidence in this case," "it was the food handling practices themselves—not the method by which they were recorded—which caused the loss of consumer confidence." *Id.* at 962-63. For a district court to make this determination based on a fully-developed trial record, is far different from asking a court, as defendants do here, to ignore the allegations of the complaint and to throw out a fraud claim pre-discovery.

A.2d 480, 490 (D.C. 2005)).

The complaint alleges that Maass is liable for trespass because "Democracy Partners' office is not open to the public and may be accessed by third parties only upon invitation and authorization"; "Maass only gained access to the Democracy Partners office through the use of pretense, subterfuge, misrepresentation and/or concealment," and she "exceeded the consent she fraudulently induced from Plaintiffs by recording conversations in the Democracy Partners office without permission"; and her "intrusion invaded and disrupted Democracy Partners' possession and control over its own property." (Compl. ¶¶ 95, 97-98, 100.) The PV defendants argue that this claim should be dismissed because the complaint fails to adequate allege (1) "unauthorized entry"; (2) "interference with plaintiff's possessory interest"; and (3) proximately caused damages.

### a.     Unauthorized Entry

The PV defendants argue that the complaint fails to adequate allege an unauthorized entry because Maass "had consent to be physically present in the office," and "consent to enter land, even if procured through a misrepresentation, bars a later trespass claim." (Mem. at 29.) To support their argument, defendants rely entirely on case law from other jurisdictions, indicating in a footnote that "[b]ased upon the undersigned counsel's research, neither the D.C. Court of Appeals nor the D.C. Circuit has ruled on this question of trespass law."

Although the PV defendants are correct that there is no *controlling* precedent, the Court agrees with Judge Kollar-Kotelly's decision in *CAIR 2011*, which concluded that under District of Columbia law, "consent 'given upon fraudulent misrepresentations' will not always defeat a claim for trespass." *CAIR 2011*, 793 F. Supp. 2d at 345 (quoting *Dine v. Western Exterminating Co.*, 1988 WL 25511, at *9 (D.D.C. Mar. 9, 1988)). For example, "[c]onsent *may* be ineffective if 'induced . . . by a substantial mistake concerning the nature of the invasion of [the owner's]

interest or the extent of the harm to be expected from it and the mistake is known to the other or induced by the other's misrepresentation.'" *CAIR 2011*, 793 F. Supp. 2d at 345 (quoting Restatement (Second) of Torts §§ 173, 892B (2) (1965)). In addition, although defendants are correct that there are cases in other jurisdictions where courts have rejected trespass claims against defendants who misrepresented their identities in order to conduct surreptitious filming on business properties, a key factor in those cases is that the recordings took place in publicly accessible places. *See Planned Parenthood*, 214 F. Supp. 3d at 834 ("where defendants fraudulently gained access to places not open to the public," claims for trespass have been allowed to proceed) (citing cases).

In *CAIR 2011*, the court denied a motion to dismiss a claim of trespass brought against an intern who obtained his job – and thus his consent to enter defendants' offices – through fraud and subterfuge. *See CAIR 2011*, 793 F. Supp. 2d at 345; *see also Planned Parenthood*, 214 F. Supp. 3d at 834 (allowing trespass claim to proceed where the defendants obtained consent to enter non-publicly accessible property through misrepresentation). The situation in the present case is indistinguishable from *CAIR 2011*. The complaint alleges that Maass obtained her job – and thus the consent to enter Democracy Partners' office – through misrepresentation. Under these circumstances, plaintiffs "consent" does not bar a claim for trespass.

In the alternative, even if Maass' misrepresentation does not vitiate plaintiffs' consent to her entry, the complaint also alleges that Maass exceeded the scope of any consent by secretly recording conversations in Democracy Partners' office to turn over to the PV defendants. That allegation is also sufficient to state a claim for trespass. *See Planned Parenthood*, 214 F. Supp. 3d at 835 (complaint adequately alleged that the defendants exceeded scope of consent by secretly recording). As explained in *CAIR 2011*, "[a]s a general matter, '[a] condition or

restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with.'" *CAIR 2011*, 793 F. Supp. 2d at 345 (quoting Restatement (Second) of Torts § 168 (1965)). "Therefore, 'on-site employees may exceed the scope of their invitation to access, and so not be 'rightfully' on, the employer's property . . . at a place or time forbidden by their employer.'" *Id.* (quoting *ITT Indus., Inc. v. Nat'l Labor Relations Bd.*, 413 F.3d 64, 72 n.2 (D.C. Cir. 2005))*; see also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 518 (4th Cir. 1999) (affirming liability for trespass where "breach of duty of loyalty – triggered by the filming in non-public areas – was a wrongful act in excess of [the defendants'] authority to enter Food Lion's premises as employees").

As plaintiffs' "consent" to Maass' entry does not vitiate the allegation of unauthorized entry, the Court will not dismiss the trespass claim on that basis.

**b.      Interference with Possessory Interest**

The PV defendants next argue that that the complaint fails to adequately allege "interference with the plaintiff's possessory interest," because Maass "did not disrupt the Plaintiffs' "exclusive possession" of the property or damage the physical property in any way." (Mem. at 29.) To support this argument, the PV defendants primarily rely on a case from the Seventh Circuit in which the court found that there was no claim of trespass where "the entry was not invasive in the sense of infringing the kind of interest of the plaintiffs that the law of trespass protects; it was not an interference with the ownership or possession of land." (*Id.* (citing *Desnick v. Am. Broadcasting Cos.*, 44 F.3d 1345 (7th Cir. 1995)). However, under District of Columbia law all that is required to satisfy the third element of trespass is an allegation that the defendant "intentionally entered the [plaintiff's] residence and thereby interfered with the [plaintiff's] possessory interest." *See, e.g.*, *Robinson v. Farley*, No. 15-cv-0803, 2017 WL 3841830, at *8 (D.D.C. Sept. 1, 2017). As the court in *Robinson* observed in

refusing to dismiss a trespass claim against the District of Columbia, "[t]he District makes no attempt to explain how the degree of the alleged intrusion into the plaintiff's possessory interest has any bearing on the validity of a trespass claim, and well-settled authority indicates that it has none." *Id.*; *see also* Restatement (Second) of Torts § 158 cmt. h (1965) ("A trespass by way of an entry by the actor in person may be a mere momentary invasion[.]"). Under this rule, there is no question that the complaint adequately alleges this element of a trespass claim.

### c.     Proximate Cause

The PV defendants' final argument is that the complaint fails to allege facts to support any actual damages proximately caused by Maass' alleged trespass. However, even if that were true, it would not be a reason to dismiss the trespass claim, because a claim of trespass can proceed even if there are no actual damages. *See CAIR 2011*, 793 F. Supp. 2d. at 345 ("District of Columbia law allows a plaintiff to recover nominal damages for trespass."); *see also Planned Parenthood*, 214 F. Supp. 3d at 835 (declining to dismiss trespass claim based on challenge to availability of actual damages).

As none of the PV defendants' challenges to the trespass claim has merit, it will not be dismissed.

### 3.     Breach of Fiduciary Duty

"To make a legally cognizable claim of breach of fiduciary duty under District of Columbia law, a plaintiff 'must allege facts sufficient to show (1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the fiduciary relationship; and (3) injuries that were proximately caused by the breach of the fiduciary duties.'" *Millennium Square Residential Ass'n v. 2200 M Street LLC*, 952 F. Supp. 2d 234, 248 (D.D.C. 2013) (quoting *Armenian Genocide Museum & Memorial, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 190–191 (D.D.C. 2009)); *see also CAIR 2011*, 793 F. Supp. 2d at 341.

The complaint alleges that Maass is liable for breach of fiduciary duty because she owed fiduciary duties to Democracy Partners, including the duty of confidentiality and the duty of loyalty, based on her status as an intern with access to confidential information, which she acquired by seeking and obtaining the trust of Democracy Partners and Creamer; she breached those duties by secretly recording meetings and conversations, by removing documents or copies of documents from the premises, by providing these recordings and documents to PV and PVAF, and by publishing these recordings and documents; and that her actions caused plaintiffs injury in the form of "lost contracts, the diminishment of the economic value of confidential and proprietary information, loss of future contracts and damage to their reputations." (Compl. ¶¶ 70-73, 76.)

The PV defendants argue that the breach of fiduciary duty claim against Maass should be dismissed because the complaint fails to adequately allege that Maass "has any fiduciary duty in the first place." (Mem. at 20.) Starting from the premise that "interns are routinely understood to be entry level students seeking experience in 'real world' office settings," who "are transitory, perform low-level tasks, and are not usually entrusted with 'mission critical' or confidential operational information," they contend, pointing to "nationwide" cases and "commonsense," that an "unpaid intern, not subject to any contractual agreement, confidentiality contract, or non-disclosure provision" simply cannot owe an employer a fiduciary duty, in particular an employee who "took no steps to secure the privacy of its operations." (*Id*. at 21.)

There are two significant problems with the PV defendants' argument.

First, defendants ignore the material allegations in the complaint. While there may be plenty of interns who fit the generic description defendants put forth, the complaint alleges a much different relationship between Maass and Democracy Partners. As plaintiffs point out, the

complaint alleges that Maass "meticulously crafted a false identity" in order "to establish a close relationship of trust and confidence with Democracy Partners," with the result that she

> had complete access to Democracy Partners' secure non-public building and access to its highly confidential business information, including confidential documents and emails, the identity of clients and partners, the undisclosed location and timing of Democratic bracketing events – information maintained in strict confidence, and information discussed during private in-person client meetings and conference calls, along with the private access code for these calls.

(Opp'n at 21 (citing Compl. ¶¶ 22-27, 31-32, 37, 39, 40, 41, 43).) In addition, the complaint alleges multiple steps that Democracy Partners took to secure the privacy of its operations. (*See* Compl. ¶ 31 (computers are accessible only with account and password); *id*. ¶ 31 (office space containing file cabinets and computers with confidential information accessible only with electronic pass card); *id*. ¶ 34 (Democracy Partners has "private offices that are not accessible to the general public, have 24-hour security, and are only accessible if one signs into the building at the lobby security desk, if one is provided entrance by Plaintiffs' receptionist, and/or if one has an electronic pass card. The electronic pass card is required to access the elevators to the office outside of regular business hours and a key is required to enter the office when no one is present.").) At this stage of the proceedings, the factual allegations in the complaint must be taken as true; therefore, the contrary factual assertions in the PV defendants' memorandum cannot be credited.

Second, the PV defendants' rely on "nationwide" cases that strictly limit when a fiduciary relationship can exist, but the District of Columbia courts have "deliberately left the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances." *CAIR 2011*, 793 F. Supp. 2d at 341; *Millennium Square*, 952 F. Supp. 2d at 248 ("District of Columbia law has deliberately left the definition of 'fiduciary relationship' flexible, so that the relationship may change to fit new circumstances in which a special relationship of

18

trust may properly be implied."). Generally, "[a] fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (quoting *Gov't of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 64 (D.D.C. 2002)). In order to decide whether a fiduciary relationship exists under District of Columbia law, a court must conduct "'a searching inquiry into the nature of the relationship, the promises made, the types of services given and the legitimate expectations of the parties.'" *CAIR 2011*, 793 F. Supp. 2d at 341 (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996)). "Whether a fiduciary relationship exists is a fact-intensive question," *Millennium Square*, 952 F. Supp. 2d at 248–49, so "a claim for breach of fiduciary duty is generally not amenable to dismissal for failure to state a claim when the claimed ground for dismissal is absence of a fiduciary relationship." *CAIR 2011*, 793 F. Supp. 2d at 341. In *CAIR 2011*, a case with very similar factual allegations about an intern securing employment through false representations, the court applied these principles and denied a motion to dismiss a breach of fiduciary duty claim. *See CAIR 2011*, 793 F. Supp. 2d at 341-42; *see also Kemp v. Eiland*, 139 F. Supp. 3d 329, 343 (D.D.C. 2015) (denying motion to dismiss breach of fiduciary duty claim because determining existence of fiduciary duty would require "discovery into the existence and scope of [the plaintiff's] beliefs and [the defendant's alleged] misrepresentations").

Applying District of Columbia law to the facts as alleged in this complaint, it must be concluded that the complaint adequately alleges the existence of a fiduciary relationship between Maass and Democracy Partners. As the court in *CAIR 2011* held, "[t]o the extent [defendants] intend to suggest that a fiduciary relationship can never exist between an intern and the entity engaging the intern, [District of Columbia law] forecloses such an expansive argument." 793 F.

Supp. 2d at 341. In addition, just as was the case for the intern in *CAIR 2011*, Maass "secured h[er] internship only by making a number of affirmatively false statements and omitting material information about h[er] background, interests, and intentions with the specific intention of inducing [Democracy Partners] to repose a measure of trust and confidence in h[er]" and "as a result of the trust and confidence reposed in her, [she] was afforded access to confidential, proprietary, and privileged materials as well as non-public areas of [Democracy Partners'] offices." *Id.*; (*see also Compl.* ¶¶ 27, 31, 32, 34, 37, 39, 42-44, 72). In the District of Columbia, these allegations are sufficient to allege the existence of a fiduciary duty.

Accordingly, the Court will not dismiss the breach of fiduciary duty claim for failure to adequately allege the existence of a fiduciary relationship between Maass and Democracy Partners.

### 4. Wiretap Claims

Under both the Federal Wiretap Act and the D.C. Wiretap Act, a person may be liable if he or she

> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> . . .
>
> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; [or]
>
> (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; . . .

18 U.S.C. §§ 2511(1); *see* D.C. Code §23-541(a)(1) (similar provision).

The complaint alleges that Maass "willfully intercepted the oral communications of

Plaintiffs and their employees by using an electronic device concealed on her person to make video and audio recordings of conversations and meetings involving Plaintiffs and their employees and clients pertaining to Plaintiffs' confidential affairs and activities"; that the PV defendants "procured . . . Maass to intercept the oral communications" and "are responsible for Maass' actions . . . because those actions were undertaken within the scope of Maass' employment by PV and PVAF and at the direction of and supervision of O'Keefe, PV and PVAF"; and that the PV defendants "intentionally used and publicly disclosed the contents of the recordings taken by Maass and knew that the recordings were made through the interception of oral communications." (Compl. ¶¶ 79, 81, 83 (Federal Wiretap Claim); *id*. ¶¶ 87, 89, 91 (D.C. Wiretap Claim).)

The PV defendants do not challenge the adequacy of the above allegations, but they argue that both wiretap claims should be dismissed because there is a "one-party consent" exception to liability in both statutes that protects Maass' recordings. In the Federal Wiretap Act, that exception provides:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d). The D.C. Wiretap Act similarly provides that "[i]t shall not be unlawful under this section for—(3) a person not acting under color of law to intercept a wire or oral communication, where such person is a party to the communication . . . unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States, any State, or the District of Columbia, or for the purpose of committing any other injurious act." D.C. Code § 23–542(d)(3). The PV

defendants assert that Maass' recordings are covered by these exceptions because (1) Maass was a "party" to each recorded communication; and (2) the complaint does not plausibly allege a criminal or tortious purpose.  (Mem. at 23.)

To plausibly allege a criminal or tortious purpose requires "'either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation in intercepting the conversation was to commit' a criminal or tortious act."  *CAIR v. Gaubatz*, 31 F. Supp. 3d 237, 256–57 (D.D.C. 2014) ("*CAIR 2014*") (quoting *United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993)).  The complaint alleges that the communications were intercepted "for the primary purpose of committing trespass, breach of fiduciary duty, fraudulent misrepresentation and other criminal or tortious acts."  The PV defendants challenge the plausibility of this allegation, claiming that:

> the purpose was not to commit trespass (after all, Maas was already allowed in the Plaintiffs' offices before the recordings were made). The purpose was not to make a fraudulent misrepresentation (after all, Maas already had a cover story in place when the recordings were made).  The purpose was not to breach any fiduciary duty (the Plaintiffs never had Maas sign any confidentiality or non-disclosure agreements).

(Mem. at 26.)  They further assert that:

> the immediate purpose at the time the videos were made was to expose potential violations of federal campaign finance law (in the form of potential illegal campaign coordination) and the "bracketing" of Trump campaign events.  In other words, the purpose at the time the recordings were made was to publish constitutionally-protected speech in the form of news reporting.

(*Id*. at 25.)

The Court agrees with the PV defendants that the plaintiffs have not plausibly alleged that the "purpose" of the recordings was to commit trespass or make a fraudulent misrepresentation because both of those alleged torts took place *before* any recordings were made.  *See Planned Parenthood*, 214 F. Supp. 3d at 828 (purpose must be to commit a "further

tortious act").  But the Court does not agree that a "determinative factor" in making the recordings could not have been to commit a breach of fiduciary duty.  First, the Court has already rejected defendants' primary contention that the complaint does not adequately allege the existence of a fiduciary duty.  *See id.* (denying motion to dismiss claim under Federal Wiretap Act where complaint plausibly alleged at least one tortious act after the interception).  Second, despite the PV defendants' assertion that their "immediate purpose" at the time the recordings were made was something other than what plaintiffs allege, that is not something the Court can consider at this stage of the proceedings.  *See also CAIR 2014*, 31 F. Supp. 3d at 259 (allowing similar claim to proceed at summary judgment stage because "if [the intern] understood himself to be bound by a fiduciary duty of non-disclosure, then it appears obvious that the breach of this fiduciary duty was the primary motivation, or at least a motivating factor, in his interception of the communications at issue").

As plaintiffs have plausibly alleged at least one tortious purpose that occurred after the interception, the one-party consent defense does not provide a basis for dismissing the wiretap claims.

### 5.    Civil Conspiracy

Under District of Columbia law,

> The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.

*Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (internal citations omitted).  "In addition, civil conspiracy depends on the performance of some underlying tortious act.  It is not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort."  *Id*.

The complaint alleges that the PV defendants and Maass are liable for civil conspiracy

because they "combined and conspired" to commit the underlying torts of "trespass, fraudulent misrepresentation, unlawful wiretap, and to breach fiduciary duties." (Compl. ¶¶ 114-115.) The PV defendants' only argument for dismissing the civil conspiracy claim is that "once the [underlying tort] claims are dismissed, the civil conspiracy claim must be dismissed." (Mem. at 38.)

It is undisputed that if all of the underlying tort claims were dismissed, the civil conspiracy claim would also have to be dismissed. However, the Court has rejected the PV defendants' "liability" arguments and, as explained *infra*, their "damages" arguments are also unconvincing. Accordingly, the PV defendants' argument for dismissing the civil conspiracy claim fails.

### C. DAMAGES ARGUMENTS

The PV defendants seek dismissal of virtually all of plaintiffs' claims for damages. They argue that there are across-the-board "problems" with plaintiffs' claims for reputation damages, lost contract damages, and damages for the "diminishment of the economic value of confidential and proprietary information." (Mem. at 10-19.) In addition, they argue that "diminishment of the economic value of confidential and proprietary information" or "diminution of economic value of office" are not cognizable damages for trespass. (*Id*. at 32-33.)

#### 1. Reputation Damages

The PV defendants argue that plaintiffs' claims for reputation damages should be dismissed because the Supreme Court's ruling in *Hustler v. Falwell*, 485 U.S. 46 (1988), establishes that reputation damages are not recoverable without pleading a viable defamation claim. (Mem. at 11.) Plaintiffs do not dispute that *Hustler* establishes that a claim for reputation damages that is based on an act of expression or publication must satisfy the First Amendment standards that apply to a defamation or libel claim, but they contend that it does not bar a claim

for reputation damages caused by non-expressive conduct, which is all they are seeking.  As they explain it, they are only seeking reputation damages caused by the "disclosures and actions of Maass described in paragraphs 27-44 [of the Complaint]," which "make no reference whatsoever to the creation or posting of the Project Veritas videos or any other publication."  (Opp'n at 10 ("The clear implication of these allegations is that damage to [p]laintiffs' reputation resulted from their clients' displeasure with the breach of client confidentiality—the fact that highly sensitive client confidential information was disclosed to outsiders without the client's authorization.")

Taking plaintiffs at their word that they are not seeking damages based on the publication of the videos (*see* Opp'n at 10 ("Plaintiffs are not seeking reputational or any other damages for any act of expression or publication.")), the Court agrees that *Hustler* does not bar their claim for reputation damages.  As Judge William H. Orrick, recently explained in a case involving a similar set of allegations:

> Whether First Amendment scrutiny applies . . . does not turn on the label of the cause of action but on whether the "challenged conduct" is to some form of expression and relatedly whether the damages sought stemmed from that form of expression. . . . [*T*]*he First Amendment does not impose heightened standards on plaintiffs' tort claims as long as plaintiffs do not seek reputational damages . . . stemming from the publication conduct of defendants.*

*Planned Parenthood*, 214 F. Supp. 3d at 841 (emphasis added).[8]  Whether plaintiffs will ultimately be able to show that the PV defendants' non-expressive conduct resulted in damage to their reputation remains to be seen, but the Court cannot prematurely deprive them of that

---

[8] The Fourth Circuit's decision in *Food Lion, Inc. v. Capital Cities/ABC, Inc*., is not to the contrary.  In that case, the court held that the plaintiffs' tort claims were subjected to First Amendment standards because the record at trial established that they were seeking "publication damages," *i.e.* reputational damages *stemming* from the publication conduct of defendants.  194 F.3d at 522.

opportunity. *See id.* ("As with proximate cause, discovery will shed light on the nature of the damages for which plaintiffs seek recovery. Resolution of this issue is more appropriately addressed at summary judgment or trial."). Accordingly, the Court will not dismiss plaintiffs' claim for reputation damages.

### 2. Lost Contract Damages

The PV defendants argue that plaintiffs' claims for lost contract damages should be dismissed because lost contract damages are not recoverable without pleading a tortious interference with contract claim. (*See* Mem. at 16 ("all claims for 'lost contract' damages must be dismissed unless a proper tortious interference claim can be supported").) In the alternative, they argue that even if plaintiffs had adequately pled a claim for tortious interference, the claim would be barred by the First Amendment because the cause of the lost contracts was defendants' publication of the secretly-recorded videos. Neither argument is persuasive. First, the PV defendants' contention that plaintiffs were required to plead a tortious interference with contract claim lacks any legal support. Second, as previously discussed, plaintiffs have represented that they are not seeking any damages based on the *publication* of the videos, but rather are seeking damages for non-publication conduct. Where the underlying conduct is not expressive, and the damages sought are "non-reputational," there is no First Amendment issue. *See Steele v. Isikoff*, 130 F. Supp. 2d 223, 229 (D.D.C. 2000) ("If a party seeks damages for non-reputational harms, which include lost jobs and diminished employment prospects, then the First Amendment does not bar suit as long as the claims are brought under generally applicable laws."). Accordingly, plaintiffs' claim for lost contract damages will not be dismissed.

### 3. Diminishment of the Economic Value of Confidential and Proprietary Information

The PV defendants argue that plaintiffs' claim for damages for the "diminishment of the

economic value of confidential and proprietary information" should be dismissed either (1) because "[t]he Complaint offers no details on this theory. No specific pieces of confidential or proprietary information are identified as having been damaged, nor is a specific dollar value of damages assigned to each piece of information"; or (2) "[p]laintiffs appear to be seeking compensation for damage to intangible property without pleading the appropriate claims under D.C. law." (Mem. at 19.) Defendants, again, fail to cite any legal authority to support their arguments. In addition, the lack of detail in the complaint is not a basis for dismissing a claim for damages at this early stage of the litigation as plaintiffs are under no obligation to plead damages with particularity. *See, e.g.*, *Alemayehu v. Abere*, 199 F. Supp. 3d 74, 86 (D.D.C. 2016). Accordingly, the Court will not dismiss plaintiffs' claim for damages for the "diminishment of the economic value of confidential and proprietary information."

### 4. Diminution of the Economic Value of Office

As to the trespass claim, the PV defendants argue that the claim for damages for the "diminution of economic value of office" should be dismissed either because (1) it is effectively a claim for damage to the economic reputation of plaintiffs' office or to the prospect of future business contacts, which is not a trespass damages claim but rather a restatement of plaintiffs' claim for reputation damages; or (2) if it is something else, plaintiffs fail to explain what such damages are and why they are recoverable for trespass. The argument suffers from the same problems that have plagued defendants' other damages arguments: no citation to legal authority and no obligation to plead damages with particularity. In addition, as previously noted, there is no need to allege actual damages to state a claim for trespass. Given these considerations, whether the damages plaintiffs seek are recoverable for trespass can be more adequately addressed later in the litigation process. Accordingly, the Court will not dismiss plaintiffs' claim for damages for the "diminution of the economic value of office."

## II.  MOTION TO DISMISS UNDER D.C. ANTI-SLAPP ACT

The PV defendants have also moved to dismiss the complaint under the District of

Columbia Anti-Strategic Lawsuits Against Public Participation (Anti-SLAPP) Act of 2010, D.C.

Code §§ 16-5501-5505.  This law imposes a heightened pleading standard for claims related to

"act[s] in furtherance of the right of advocacy on issues of public interest" by requiring plaintiffs

to show that their claims are "likely to succeed on the merits."  *Id*. § 16–5502(b).

In a recent decision, this Court concluded that *Abbas v. Foreign Policy Grp.*, *LLC*, 783

F.3d 1328 (D.C. Cir. 2015), "forecloses application of D.C.'s Anti-SLAPP Act in [a] federal

court" exercising diversity jurisdiction.  *See Deripaska v. The Associated Press*, No. 17-cv-0913,

slip op. at 1-5 (D.D.C. Oct. 17, 2017).  The only distinction between *Deripaska* and the present

case is that the Court's jurisdiction over the state law claims here is based on "supplemental

jurisdiction" under 28 U.S.C. § 1367.[9]  Defendants contend that this distinction is significant,

asserting that the *Abbas* decision is "not controlling where the court's jurisdiction [over a state

law claim] is based on the presence of a valid federal question."  (Mem. at 38.)  The Court

disagrees.

The D.C. Circuit's decision in *Abbas* was based on its application of the Supreme Court's

decision in *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010),[10] which,

---

[9] Pursuant to 28 U.S.C.A. § 1367(a), a federal court has "supplemental jurisdiction" when:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise
> by Federal statute, in any civil action of which the district courts have original
> jurisdiction, the district courts shall have supplemental jurisdiction over all other
> claims that are so related to claims in the action within such original jurisdiction
> that they form part of the same case or controversy under Article III of the United
> States Constitution. Such supplemental jurisdiction shall include claims that
> involve the joinder or intervention of additional parties.

[10] In *Shady Grove*, the Supreme Court held that a New York law prohibiting class actions in suits
seeking penalties or statutory minimum damages conflicted with Federal Rule of Civil Procedure

as another judge recently noted, "contains no language suggesting that its holding is limited to diversity jurisdiction cases." *Medrano v. Flowers Foods, Inc.*, No. 16-cv-0350, 2017 WL 3052493, at *5 n.2 (D.N.M July 3, 2017). In addition, "federal courts in other districts have rejected the argument that *Shady Grove* is inapplicable where a court is exercising supplemental jurisdiction." *Id.* (citing *Morris v. Alle Processing Corp.*, No. 08-cv-4874, 2013 WL 3282948 (E.D.N.Y. June 27, 2013) (rejecting argument that the Supreme Court limited the holding of *Shady Grove* to cases of diversity jurisdiction) and *Chenensky v. New York Life Ins. Co.*, Nos. 07-cv-11504, 09-cv-3210, 2012 WL 234374, at *2 (S.D.N.Y. Jan. 10, 2012) ("The *Erie* analysis driving *Shady Grove* applies to courts exercising supplemental jurisdiction as well as those exercising diversity jurisdiction.")). Indeed, any other conclusion would create an irrational distinction in the treatment of identical state law claims. Thus, just as the *Erie* doctrine applies to a state law claim in federal court under either diversity or supplemental jurisdiction, *see, e.g.*, *Peart v. Latham & Watkins LLP*, 985 F. Supp. 2d 72, 79 (D.D.C. 2013), the same is true for the D.C. Circuit's decision in *Abbas*. Accordingly, the PV defendants' motion to dismiss pursuant to the D.C. Anti-SLAPP Act must be denied.

## CONCLUSION

Accordingly, and for the reasons stated above, the PV defendants' motions to dismiss are denied. A separate Order (ECF No. 24) accompanies this Memorandum Opinion.


/s/ *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: January 4, 2018

---

23 and could not be applied in a federal court. 559 U.S. at 399.