IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Democracy Partners, LLC,** *et al.,*<br>        Plaintiffs;<br><br>        **v.**<br><br>**Project Veritas Action Fund,** *et al.*,<br>        Defendants. | Civil Action No.: 1:17-cv-1047-ESH |

## JOINT REPORT

The Parties hereby submit the following Joint Report, pursuant to Fed. R. Civ. P. 26(f) and this Court's Order of January 4, 2018 (ECF No. 26).  Per this Court's Order, the Parties address the topics set forth in Local Civil Rule 16.3 as follows:

### Local Civil Rule 16.3 Topics

**(1)** Whether the case is likely to be disposed of by dispositive motion; and whether, if a dispositive motion has already been filed, the parties should recommend to the Court that discovery or other matters should await a decision on the motion.

**Response:**      The Court has already ruled upon motions to dismiss filed by the Defendants, and the Parties agree that discovery should commence.  After the conclusion of discovery, the Defendants intend to file summary judgment motions on parts or all of Plaintiffs' claims, and the Plaintiffs may cross-move for summary judgment on particular issues.  If those summary judgment motions are denied, then this case will proceed to trial.

**(2)** The date by which any other parties shall be joined or the pleadings amended, and

whether some or all the factual and legal issues can be agreed upon or narrowed.

**Response:**      The parties agree that no other parties are expected to be joined, nor are the

pleadings expected to be amended.  After the conclusion of discovery, the parties agree to confer

on whether a joint stipulation of facts can be adopted.  The parties anticipate, however, that the

extent of the Plaintiffs' damages and the legal issues in this case cannot be narrowed or

stipulated.

**(3)** Whether the case should be assigned to a magistrate judge for all purposes, including

trial.

**Response:**      The Plaintiffs are of the view that this case should not be assigned to a magistrate

judge.  The Defendants, however, are willing to assign this case to a magistrate judge for trial.

All parties are willing to assign discovery disputes to a magistrate judge.

**(4)** Whether there is a realistic possibility of settling the case.

**Response:**      No settlement discussions have yet occurred, but the Parties are open to

discussions at the appropriate time.  Discovery will likely need to take place on the extent of

Plaintiffs' damages before fruitful settlement discussions can occur.

**(5)** Whether the case could benefit from the Court's alternative dispute resolution (ADR)

procedures (or some other form of ADR); what related steps should be taken to facilitate

such ADR; and whether counsel have discussed ADR and their response to this provision

with their clients. In assessing the above, counsel shall consider:

(i)      the client's goals in bringing or defending the litigation;

(ii)     whether settlement talks have already occurred and, if so, why they did not

produce an agreement

(iii)    the point during the litigation when ADR would be most appropriate, with

special consideration given to:

(aa) whether ADR should take place after the informal exchange or

production through discovery of specific items of information; and

(bb) whether ADR should take place before or after the judicial resolution of

key legal issues;

(iv)    whether the parties would benefit from a neutral evaluation of their case,

which could include suggestions regarding the focus of discovery, the legal

merits of the claim, an assessment of damages and/or the potential settlement

value of the case; and

(v)     whether cost savings or any other practical advantages would flow from a stay

of discovery or of other pre-trial proceedings while an ADR process is

pending.

**Response:**     The parties believe that further development of the facts is necessary before

fruitful settlement discussions can occur.  Defendants believe that evaluation of Plaintiffs'

damages and resolution of a key legal issue (whether such damages flow from Defendants'

constitutionally-protected speech) are likely necessary before such settlement discussions can

occur.

**(6)** Whether the case can be resolved by summary judgment or motion to dismiss; dates for

filing dispositive motions and/or cross-motions, oppositions, and replies; and proposed

dates for a decision on the motions.

**Response:**       The Court has already ruled on motions to dismiss.  Defendants anticipate filing

summary judgment motions after the conclusion of discovery, and Plaintiffs may file cross-

motions for summary judgment.  The parties jointly recommend that dates for such motions be

determined in a status conference scheduled for shortly after conclusion of discovery.

(7) Whether the parties should stipulate to dispense with the initial disclosures required by

Fed. R. Civ. P. 26(a)(1), and if not, what if any changes should be made in the scope,

form or timing of those disclosures.

**Response:**       The parties believe that initial disclosures under Fed. R. Civ. P. 26(a)(1) are

useful in this case, and therefore, do not waive them.  The parties recommend that initial

disclosures be completed by February 13, 2018.  As a part of the scope of initial disclosures, the

parties agree that, 1) the Plaintiffs will specifically identify all third-parties who allegedly

canceled or terminated contracts or business relationships with any plaintiff as a result of the

Defendants' actions in this matter, and 2) the parties identify the custodians of relevant ESI for

each witness identified in the initial disclosures, and the platforms, systems and devices on which

it has been maintained and preserved and any  respective steps taken by each party to preserve

relevant documents and ESI.

(8) The anticipated extent of discovery, how long discovery should take, what limits should

be placed on discovery; whether a protective order is appropriate; and a date for the

completion of all discovery, including answers to interrogatories, document production,

requests for admissions, and depositions.

**Response:**

(i)       Discovery length:  The parties jointly agree that discovery will take 12 months

to complete in this case.

(ii)     Close of discovery: The parties jointly request that discovery close on January 18, 2019.

(iii)    Protective Order:  The parties jointly agree that a protective order is necessary and appropriate in this case, and a proposed order will be submitted to the Court.

(iv)    Scope of discovery:  Following the service of Initial Disclosures, the Parties will exchange Requests for Production of Documents.  The Parties will then negotiate custodian lists and electronic search terms to narrow the burden of discovery at that time.  The Parties each reserve the right to expand custodian lists and search terms later in discovery if new information warrants such expansion. In the event that additional discovery is required, the Parties agree to meet and confer in good faith to minimize the burden imposed by additional discovery.

(v)     Written Responses to Fed. R. Civ. P. 34 Requests for Documents or ESI:

   i.    **Defendants' View:**  Defendants request that, when providing written responses to Rule 34 Requests for Documents or ESI, each responding party shall specifically identify (by Bates number) what responsive documents correspond to each individual document or ESI request.

   ii.   **Plaintiffs' View:**  Plaintiffs believe that such identification in Rule 34 responses is extremely burdensome and not especially useful.

(vi)    Objections to Discovery Requests:  In the event that a party asserts an objection to any discovery request (including requests under Fed. R. Civ. P. 33, 34, or 36), the objecting party shall specifically state the objection in

writing and identify whether any information, documents, or ESI are being

withheld on the basis of the objection.  If any information, documents, or ESI

are being withheld, such material shall be described in the objection, including

the following information: 1) a description of the withheld materials, and 2)

the custodian of the withheld materials.

**(9)** Any issues about disclosure, discovery, or preservation of electronically stored

information, including the form or forms in which it should be produced.

**Response:**     The parties jointly agree that the vast bulk of responsive and relevant

documentary evidence is likely to be stored in electronic form.  The parties jointly agree that

responsive documents/ESI shall be produced in electronic format, with underlying metadata, and

accompanied by an electronic load file allowing for review on a Relativity-compatible platform.

For clarity, the parties agree that responsive documents/ESI shall be produced in the following

form ("Production Format"), in the following manner ("Processing Specifications"), while

identifying inaccessible data ("Inaccessible Data") and providing privilege logs ("Privilege

Logs"):

**Production Format**

A.        Document Image Format

ESI shall be produced in Tagged Image File Format ("TIFF").  Specifically,

documents shall be produced as 300 D.P.I. Group IV compression black and white

single-page TIFF images.  If any documents are unable to be produced as TIFF files (i.e.,

documents are too large or cannot be converted), the Parties will meet and confer as to

the format of production of those files.  Notwithstanding anything in this paragraph, the

Parties shall produce the following file types in native format: (1) spreadsheets (e.g., .xls,

xlsx, and .csv files); (2) image, audio, and video files (e.g., .jpg, .mp3, .mp4 files); (3)

schedule files; (4) desktop databases (such as Microsoft Access); and (5) other file

formats, files or documents that are too large to be practically converted to TIFF format

or that do not render well to TIFF format.  Documents produced in native format shall be

produced with a TIFF placeholder identifying that the document was produced natively.

     B.       Redacted Documents

Documents that require redaction will be produced in single-page TIFF images

with original unitization preserved. After redaction, the remaining, un-redacted content of

each document should be extracted by optical character recognition (OCR) or another

suitable method to a searchable text file. Redactions should not be accomplished in a

manner that serves to downgrade the ability to search the un-redacted portions of the

document.

     C.       Load File

Each Party's production shall include load files for images in .OPT files and for

Metadata in .DAT files.  The Metadata load files shall include the following Metadata

fields:

1. ProdBeg: Beginning Bates Number or Parent ID field
2. ProdEnd: Ending Bates Number or Attach ID field
3. ProdBegAttach:  Beginning Bates number of the first document in an attachment range
4. ProdEndAttach:  Ending Bates number of the last document in attachment range
5. Custodian: Name of the Custodian of the File(s) Produced – Last Name, First Name format
6. DocExt:  Document Extension is the File extension of the native file.
7. FileName:  Filename of the original digital file name
8. Filesize:   Size of native file, in bytes.
9. EmailSubject:  Subject line extracted from an email message
10. Title: Title field extracted from the metadata of a non-email document

11. Author:  Author field extracted from the metadata of a non-email document
12. From:  From field extracted from an email message
13. To: To or Recipient field extracted from an email message
14. Cc:  CC or Carbon Copy field extracted from an email message
15. BCC:  BCC or Blind Carbon Copy field extracted from an email message
16. DateRcvd:  Received date and time of an email message (mm/dd/yyyy format) or Communication Date and Time
17. DateSent:  Sent date and time of an email message  (mm/dd/yyyy format) or Communication Date and Time
18. DateCreated:  Date and time that a file was created  (mm/dd/yyyy format) or Item Date and Time
19. DateModified:  Modification date(s) and time(s) of a non-email document or Item Date and Time
20. Hash:  MD5 or SHA-1 has value generated by creating a binary stream of the file
21. ProdVolume:  Identifies production media deliverable
22. Redacted:  "Yes," for redacted documents; otherwise, blank
23. NativePath:  Path and filename to produced Native file
24. ExtractedText: File path to Extracted Text/OCR File
25. OriginalFolderPath: The original source path/folder for each native document
26. ConversationIndex: Microsoft Outlook specific email thread identification

In the event that responsive paper documents are produced in electronic format, the following Metadata fields shall be used:

1. ProdBeg: Beginning Bates Number
2. ProdEnd: Ending Bates Number
3. ProdBegAttach:  Beginning Bates number of the first document in an attachment range
4. ProdEndAttach:  Ending Bates number of the last document in attachment range
5. Custodian: Name of the Custodian of the File(s) Produced – Last Name, First Name format
6. ProdVolume:  Identifies production media deliverable
7. Pages: The number of imaged pages per document i.e. Page count
8. Redaction: "Yes," for redacted documents; otherwise, blank
9. Confidentiality: Confidentiality designation of the produced record
10. ExtractedText: File path to Extracted Text/OCR File

D. Naming of Files

Each image file shall be named with the unique Bates Number, or the unique

beginning Bates number in the case of a multi-page document.  File names should not be

more than fifteen characters long or contain embedded spaces, hyphens, commas, underscores, ampersands, slashes, back slashes, hash marks, plus signs, percent signs, exclamation marks, any character used as a delimiter in the metadata load files, or any character not allowed in Windows file-name convention.

Further, each unique Bates Number for each image shall be electronically "burned" into the image at a place on the document that does not obscure, conceal or interfere with any information originally appearing on the document.

When producing a file in native format, the Native File shall be named with the Bates number as the file name, and it shall be accompanied by a TIFF image marked with the words "File Produced Natively.".

E.      Document Unitization

If a document is more than one page, the Parties shall make reasonable efforts, consistent with reasonable production practices, to provide the logical unitization of the document and any attachments and/or affixed notes as they existed in the original document.

F.      Searchable Text

In addition to TIFF images, each production will include Document level text files corresponding to the TIFF and native files described above.  Hard copy documents shall be scanned using Optical Character Recognition ("OCR") technology, and each file shall be named with the unique Bates Number.  The full text of each electronic document shall be extracted ("Extracted Text") and produced in a text (".txt") file.  The Extracted Text shall be provided in searchable ASCII format and shall be named with the unique Bates Number of the corresponding TIFF document followed by the extension

".txt."  However, documents that were images in their native form (e.g., PDF and TIFF) or otherwise do not have searchable text in their original form will be produced as TIFF images without searchable text.  Each Party will make reasonable efforts to obtain text files via OCR if no extractable text is available.  Documents produced with redactions shall be scanned using OCR technology, and a single searchable ASCII text format file shall be produced for each document.  Each file shall be named with the unique Bates Number of the corresponding TIFF document followed by the extension ".txt."  All soft and hard returns in the native electronic or image file should be replicated as a carriage return and line feed ("CRLF") in the text file (i.e., the lines of text in the file terminate with a CRLF in correlation with the appearance of the native electronic or rendered image file).  Multi-line paragraphs of emails should not be rendered as a single, extended line of text.

       G.         Original Documents

Nothing in this ESI Protocol shall eliminate or alter any Party's obligation to retain Native Format copies, including associated metadata, of all ESI produced in this litigation and original documents produced in this litigation which originated as hard copy documents.

       H.         De-Duplication, De-NISTing, Parent/Child Integrity

A Party is only required to produce a single copy of a responsive document. Parties may de-duplicate stand-alone documents or entire document families globally using MD5 or SHA-1 Hash Value matching.  ESI that is not an exact duplicate may not be removed.   Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced.  Attachments to emails shall not be

eliminated from the parent email.  To the extent the Parties de-duplicate stand-alone electronic documents against an e-mail attachment, the attachment to the e-mail must be the document that is produced.  To the extent the document is responsive, the attachment and family will be produced.

## Processing Specifications

A.      All tracked changes shall be maintained and displayed, to the extent reasonably feasible upon collection, so that all non-privileged changes to a document are evident.

B.      To the extent practicable, consistent with reasonable production processes, attachments will be number stamped in sequence, after the document to which they were attached.

C.      To the extent it is possible under the producing Party's systems, OLE Embedded files may not be extracted as separate documents.

D.      Author comments and presenter/speaker notes shall remain or be made visible, to the extent reasonably feasible upon collection.

E.      To the extent it is feasible, auto-populated fields, with the exception of auto-populating "page-number" fields, shall be replaced with text indicating the field name.  For example, auto-populating "date" fields shall be replaced with the text "DATE" or the actual Office field code.

## Inaccessible Data

The Parties agree that the circumstances of this case do not warrant at this time the collection, review or production of ESI that is not reasonably accessible or not readily preserved, because it is unlikely that significant relevant information would be located in

those sources that is not otherwise available in readily accessible sources.  Any inaccessible data likely to contain responsive information, however, shall be identified and disclosed in responses to Requests for Documents/ESI for evaluation by the other parities who reserve the right to challenge a designation of inaccessibility.  The Parties agree that the following ESI need not be collected or reviewed for production at this time:

A.      Deleted, slack, fragmented, or other files or data only accessible by forensics;

B.      Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system;

C.      On-line access data such as temporary internet files, history, cache, cookies, and the like;

D.       Data contained on backup tapes;

E.      Encrypted data/ password-protected files, where the key or password cannot be ascertained after reasonable efforts;

F.      Social media accounts.

### Privilege Logs

The parties agree to exchange simple, computer-generated privilege logs identifying any documents or information withheld from production.  The privilege logs will provide: (1) Filename, (2) File Extension, (3) Custodian(s), (4) To, (5) From, (6) CC, (7) BCC., (8) Subject Line, (9) Date, (10) Description of Privilege, and (11) Description of the content of the document.  The parties will endeavor to prepare and produce privilege logs fourteen (14) days following the production of any discovery materials from which privileged or work product materials have been withheld from production.

Upon reasonable request of the receiving party, the producing party will provide the basis

for the claim of privilege for specific documents contained in its privilege log.  The

parties also agree that they are not required to include on their privilege logs any

protected documents or information that came into existence on or after the date of the

filing of the lawsuit in this case (June 1, 2017).

**(10)**      Any issues about claims of privilege or of protection as trial-preparation

materials, including- if the parties agree on a procedure to assert these claims after

production- whether to ask the court to include their agreement in an order under Federal

Rule of Evidence 502.

**Response:**  The parties jointly agree that an Fed. R. Evid. 502(d) Order is appropriate in this

case.  The parties agree to the following language for the Order:

<u>F.R.E. 502 Order on Inadvertent Disclosure of Privileged Information.</u>

The production or disclosure of an attorney-client privileged, attorney work

product, or other protected document or information medium shall not be deemed a

waiver of the privilege, work product, or other protection or immunity from discovery by

the producing party in this or any subsequent state or federal proceeding pursuant to

Federal Rule of Evidence 502 regardless of the circumstances of disclosure.  The parties'

agreement shall be interpreted to provide the greatest protection allowed by Federal Rule

of Evidence 502, or as otherwise permitted by law.  Resolution of any issues related to

claims that privileged documents and/or information have been inadvertently disclosed

shall be governed by the procedures set forth here: Notwithstanding the provisions of

Fed. R. Civ. P. 26(b)(5)(B), any inadvertent disclosure of a privileged document or

information protected by the Attorney-Client Privilege or by Work-Product protection,

shall not constitute a waiver of that privilege or of the subject matter of those documents. Any inadvertently disclosed privileged document or information protected by the Attorney-Client Privilege or by Work-Product protection shall not be used for any purpose in this case upon notification by the producing party to the receiving party and resolution of the matter as indicated herein.  If the producing party discovers that it produced a document or information that appears to be subject to the Attorney-Client Privilege or by Work-Product protection, the producing party must notify the receiving parties of the inadvertent disclosure or production in writing within seven (7) days after discovery of the inadvertent disclosure or production.  All receiving parties agree to return or destroy any identified privileged or work-product material inadvertently disclosed immediately upon notice of such disclosure by the producing party, including removing access to the electronic version of the material and taking reasonable efforts to retrieve the document or information if it was disclosed before notification.  If a receiving party is in receipt of a document from a producing party that the receiving party has reason to believe was inadvertently produced and contains information that the receiving party believes is subject to protection by the attorney-client or other applicable privilege and/or the work product doctrine or by another legal principle protecting such document from discovery, then the receiving party shall, in good faith, take reasonable steps to notify the producing party of the production of that document so that the producing party may make a determination of whether such document was inadvertently produced.  The party returning or destroying any inadvertently produced document(s) may move for an order compelling production of some or all of such documents, but the fact that the documents were produced inadvertently shall not be deemed to be a waiver of any

privilege or protection, and shall not be a basis for compelling production.  In addition, any motion to compel production of the documents that were inadvertently produced but then returned or destroyed as required by this Order shall not describe the specific contents of the inadvertently produced documents in a way that would diminish or destroy the privilege or protection that the producing party claims applies to the document.  If there is a dispute regarding the document or information, the receiving party may preserve—but not use in any manner—the document or information until the dispute is resolved.  Before any receiving party attempts to seek a ruling concerning whether the document and/or information is, in fact, privileged, constitutes work-product, or whether any privilege or protection has been waived, the parties shall meet and confer and engage in good faith efforts to resolve any disputes concerning the disclosed documents or produced information.  Any information presented to the Court for resolution must be submitted under seal.

**(11)**       Whether the requirement of exchange of expert witness reports and information pursuant to Fed. R. Civ. P. 26(a)(2), should be modified, and whether and when depositions of experts should occur.

**Response:**       The parties agree that the requirements of Fed. R. Civ. P. 26(a)(2) should apply to expert witnesses in this case.  The parties believe that sufficient fact discovery must occur in this case prior to the exchange of expert witness reports.  The parties jointly agree to the following schedule for expert witness reports:

(i)       Plaintiffs' Expert Witness Reports Due:  July 2, 2018.

(ii)       Defendants' Expert Witness Reports Due:  August 31, 2018.

      (iii)     Plaintiff's Rebuttal (*i.e.*, solely to rebut a Defendants' expert opinion) Expert Witness Reports Due:  October 1, 2018

      (iv)     Depositions of Expert Witnesses: Scheduled between October 1, 2018 and December 31, 2018.

**(12)**     In class actions, appropriate procedures for dealing with Rule 23, Fed. R. Civ. P. proceedings, including the need for discovery and the timing thereof, dates for filing a Rule 23 motion, and opposition and reply, and for oral argument and/or an evidentiary hearing on the motion and a proposed date for decision.

**Response:**  Not applicable in this case.

**(13)**     Whether the trial and/or discovery should be bifurcated or managed in phases, and a specific proposal for such bifurcation.

**Response:**  The parties jointly agree that no bifurcation of trial or discovery is warranted in this case.

**(14)**     The date for the pretrial conference (understanding that a trial will take place 30 to 60 days thereafter).

**Response:**  The parties jointly request that the Court set a status conference in this case for shortly after the close of discovery.  The parties recommend a status conference date of approximately January 30, 2019, to address two specific issues:

      (i)     Setting a briefing schedule for summary judgment motions.

      (ii)     Setting a date for a final pretrial conference to be held after the Court rules on any summary judgment motions.  At that final pretrial conference, a trial date would then be set.

**(15)**     Whether the Court should set a firm trial date at the first scheduling conference or should provide that a trial date will be set at the pretrial conference from 30 to 60 days after that conference.

**Response:**     As set forth above in Response 14, the parties jointly agree that a status conference should be set for shortly after the close of discovery to establish a summary judgment briefing schedule, but that a firm trial date should not be set until after the Court rules on summary judgment motions.

**(16)**     Such other matters that the parties believe may be appropriate for inclusion in a scheduling order.

**Response:**

**Defendants' View:**  The Defendants request that each side be permitted to take an early Fed. R. Civ. P. 30(b)(6) deposition of the other side focused exclusively on the responding party's information technology infrastructure.  The Plaintiffs' IT infrastructure is featured prominently in the Complaint.  The Complaint claims that Defendant Maass had access to "computers with confidential information" (Compl, ¶ 31) as well as "a company computer and an account" (*Id*.). The suggestion is that Maass may have stolen information off of these computers, or at least accessed them and exceeded her authorization as part of an alleged trespass or to breach an alleged fiduciary duty.  Additionally, the Complaint claims Maass worked on "highly sensitive political programs including planned 'bracketing' events, the existence of which was maintained in confidence by the Democratic National Committee prior to the time the events took place[.]" (*Id.* at ¶ 36.)  In the context of Paragraph 31, communications related to this job included the use of computers.  Further, there are multiple references to security at Democracy Partners in the Complaint (e.g., *Id.* at ¶¶ 31, 34), including an electronic pass card.  It is

important for the defendants to be able to establish how this is security is tracked and what evidence the Plaintiffs have or intend to gather in this regard, and how this will be accomplished. Thus, an early Rule 30(b)(6) deposition assessing the scope and accessibility of the computer systems is appropriate.  The goal of the deposition is to better focus and tailor future discovery efforts and to understand where relevant ESI is likely to reside.  These depositions would be limited to four hours per responding party, and they would not count against the number of depositions permitted to each party in this litigation set forth elsewhere.

**Plaintiffs' View:**      The Plaintiffs do not oppose a Rule 30(b)(6) deposition in which the topics include those identified by Defendants.  However, it is likely that as to certain of the issues, the person designated will be one of the parties or a key witness in the case and Plaintiff would oppose any effort to compel a witness to appear twice, as opposed to making a party or witness available to testify both in his/her individual capacity and as an organizational representative.  With respect to the timing of any Rule 30(b)(6) deposition noticed by Defendants, Defendants can begin noticing depositions as soon as the Scheduling Order is entered.

## Statement of the Case and Defenses

Per this Court's Order of January 4, 2018, the parties offer the following respective statements of the case and defenses.

**Plaintiffs' View:**      Plaintiff Democracy Partners is a group of consultants and vendors to progressive organizations and Democratic Party committees and campaigns. Plaintiff Strategic Consulting Group (SCG) is a member of Democracy Partners and provides campaign-related services; and Plaintiff Robert Creamer is sole owner of SCG. The moving Defendants are Project Veritas, Project Veritas Action Fund (PVAF), both non-profit organizations, and their head and

founder James O'Keefe. Project Veritas is a right-wing advocacy group notorious for its attempted "sting" operations in which it gains access to the offices of progressive groups and campaigns through fraud and, often, criminal conduct; secretly videotapes conversations and interactions with staff of the organizations; and then selectively edits the videotapes to misrepresent and distort what was said and to publicly release the edited tapes.

In this case, a Project Veritas agent or employee, Allison Maass (also a defendant but not yet served), used a phony name and identity, phony background information and a series of lies to obtain an internship with Democracy Partners. She used that internship to obtain access to confidential and sensitive information from Democracy Partners' clients, to disclose that information to her principals at Project Veritas and to secretly record conversations with Creamer and other Democracy Partners members, including confidential client conversations. Evidently upset with the breach of client confidences, two existing clients cancelled contracts with SCG and Democracy Partners lost a significant potential client, costing the Plaintiffs more than $500,000.

Plaintiffs assert claims for violations of the federal wiretap law, 18 U.S.C. §§ 2511(1)(A),(B); the District of Columbia wiretap law, D.C. Code § 23-542(a)(1); common law breach of fiduciary duty; common law fraudulent misrepresentation; common law trespass and civil conspiracy.

**Defendants' View:**    This case involves the time-honored practice of undercover journalism and its protection under the First Amendment. Undercover investigations advance core First Amendment values by uncovering malfeasance and initiating public dialogue on issues of public interest. The Supreme Court has placed purposeful limits on the scope of torts and civil

actions which may suppress these important investigations. Project Veritas Action Fund asks that these same protections be realized here.

In the case at hand, Democracy Partners admitted one individual as an intern in its office without any vetting. It proceeded to allow her to perform clerical tasks without placing any limits on her duties, responsibilities, or use of its information. The Plaintiffs did not even bother to have the intern sign a confidentiality agreement.  From this, the Plaintiffs would ask for over one million dollars in damages for allegedly breaching duties owed arising not out of an employment contract or company policies, but due to her simple status as an intern. Upon even a generous reading of the law, this cannot be had.

As a result of the investigation, Project Veritas Action Fund uncovered evidence of likely violations of federal election law, with two complaints having been filed with the Federal Election Commission.  It further demonstrated the complicity and reality of modern-day political campaigns and the aggressive tactics employed by those running them. All this information helped promote greater public debate about the character and fitness of a major presidential candidate, with the published videos in question receiving million views online.

Because of Project Veritas Action Fund's investigations, more information about the 2016 election was provided to the public and First Amendment interests flourished. Notably, Democracy Partners ran its operations without any discernable safeguards and freely allowed interns to use its information without limit, ensuring that no remedies are available here.

In this case, the bottom-line is that the Plaintiffs seek to punish the Defendants for core First Amendment activity.  In the interest of a free press and the preservation of the First Amendment, this case should be dismissed expediently.

Respectfully submitted,


/s/ Daniel D. Mauler

Daniel D. Mauler

(D.C. Bar No. 977757)

REDMON, PEYTON & BRASWELL, LLP

510 King Street, Suite 301

Alexandria, VA  22314

Tel: (703) 684-2000

Fax: (703) 684-1509

dmauler@rpb-law.com

*Counsel for Defendants*


/s/ Joesph E. Sandler

Joseph E. Sandler (DC Bar 255919)

SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.

1025 Vermont Ave., N.W. Suite 300

Washington, D.C. 20005

Tel: (202) 479-1111

Fax: (202) 479-1115

sandler@sandlerreiff.com


Yael Bromberg (DC Bar No. 1045569)

Alderson Francois (DC Bar 798544)

INSTITUTE FOR PUBLIC REPRESENTATION

GEORGETOWN UNIVERSITY LAW
CENTER

600 New Jersey Ave., N.W. Suite 312

Washington, D.C. 20001

Tel: (202) 662-9593

Fax: (202) 662-9634

Yael.Bromberg@law.georgetown.edu

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2018, a copy of the foregoing was filed and served via the CM/ECF system, which will serve a Notice of Electronic filing upon all counsel of record, including the following:

Joseph E. Sandler
SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.
1025 Vermont Ave., N.W. Suite 300
Washington, D.C. 20005

Yael Bromberg
Aderson Francois
INSTITUTE FOR PUBLIC REPRESENTATION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001

*Counsel for Plaintiffs*

  /s/   Daniel D. Mauler
Daniel D. Mauler (D.C. Bar No. 977757)
REDMON, PEYTON & BRASWELL LLP
510 King Street, Suite 301
Alexandria, VA  22314
Ph: (703) 684-2000
Fax: (703) 684-1509
dmauler@rpb-law.com
*Counsel for Defendants Project Veritas Action*
*Fund, Project Veritas, and James O'Keefe*