UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC,                    CASE NO.: 1:17-CV-1047-ESH
et al.,

       Plaintiffs,                                **Oral Argument Requested**

v.

PROJECT VERITAS ACTION FUND,
et al.,

       Defendants.
_____/

## PROJECT VERITAS PARTIES' MEMORANDUM
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

When Project Veritas Action Fund published its reporting on Bob Creamer, Democracy Partners, Strategic Consulting Group ("Strategic"), and their subcontractors, the public heard Plaintiffs and their subcontractor Scott Foval describe their own distasteful conduct during the 2016 Presidential campaign. They heard, for example, Foval's statement that Democracy Partners' members, including Creamer, "are all part of the old school method where, it doesn't matter what the friggin' legal and ethics people say, we need to win this motherfucker." Statement of Material Facts (SMF) ¶15. Special interest groups that paid Strategic for political consulting saw, heard, and reacted to, Plaintiffs' own offensive language and conduct.

This lawsuit against newsgathering organizations and journalists followed, alleging that Plaintiffs were damaged when two special interest groups ended their contracts with Strategic and a third special interest group canceled a meeting and ultimately did not hire Strategic. This lawsuit is nothing more than an attempt to jam a complaint about harm based on publication of the news (which Plaintiffs could never prove both because the reporting was truthful *and* because of First Amendment protections) into a legal and factual framework that does not fit. The undisputed

material facts show that Defendants Allison Maass, James O'Keefe, Project Veritas, and Project Veritas Action Fund (collectively "Project Veritas Parties") are entitled to summary judgment on all claims alleged.

One of the fatal flaws is a complete failure of the facts to demonstrate any damages caused by the non-expressive conduct of the Project Veritas Parties, or any damages proximately caused by the Project Veritas Parties at all. Another fatal flaw that runs through multiple claims is that the undisputed material facts demonstrate that investigative journalist Allison Maass owed no fiduciary duty to Plaintiffs when she was a short-term, unpaid, intern for Democracy Partners. The Project Veritas Parties also prevail on grounds specific to the individual torts Plaintiffs have alleged and no genuine dispute of material fact with respect to those individual torts exists. As such, summary judgment should be granted in favor of the Project Veritas Parties on each and every count.

## I. Overview of the Facts

Project Veritas and Project Veritas Action Fund (PVA) are press organizations. SMF ¶¶1-2, 55. Their investigative reporters seek to uncover corruption, fraud, and other misconduct in both public and private institutions. As part of PVA's newsgathering efforts during the 2016 Presidential campaign, PVA journalist Christian Hartsock encountered a political consultant named Scott Foval, who would soon become, as he described it, a subcontractor to Democracy Partners and a deputy director for Americans United for Change ("AUFC"). SMF ¶7-8. In a discussion at a bar in Wisconsin, Mr. Hartsock portrayed himself as a consultant ("Steve Packard") working for a would-be donor (another Project Veritas journalist using the undercover role of "Charles Roth"). SMF ¶8. "Packard" proposed a "re-enfranchisement" project – a scenario that amounted to voter fraud by transporting out of state residents into another state to vote illegally.

SMF ¶¶3, 8. Foval was receptive and started brainstorming ways to make the proposed fraud more effective. SMF ¶57. Foval also described other distasteful political practices, including placing activists at Trump rallies in order to provoke violence. SMF ¶¶4, 9-10. Foval told "Packard" that "Bob Creamer is diabolical and I love him for it." SMF ¶14. In a later encounter, Foval described that he, AUFC President Brad Woodhouse, a Democracy Partners member named Mike Lux, and Creamer are "all part of the old school method where it doesn't matter what the friggin' legal and ethics people say, we need to win this motherfucker." SMF ¶15. Creamer is a political consultant, spouse of a sitting Member of Congress, and a convicted felon. SMF ¶2; *see also* ¶15 (Ex. 10, phone call in which Foval noted Creamer's sentence, at 9:40-10:05).

Months later, Foval's own words from these and other encounters (as well as Creamer's words, and those of other political consultants recorded as part of the Project Veritas Parties' investigation) were published by PVA in a news story called "Rigging the Election – Video I," and further reported on by cable news. SMF ¶¶1-2. Some footage for "Rigging the Election" was recorded by investigative journalist Allison Maass, who had a short-term, unpaid internship with Democracy Partners using the name "Angela Brandt." SMF ¶5. Those who watched "Rigging the Election" heard statements like:

> - Foval: "If you're there and you're protesting and you do these actions, you will be attacked at Trump rallies. That's what we want. . . . The whole point of it is we know that Trump's people will freak the fuck out, his security team will freak out, and his supporters will lose their shit."

> - Foval: "We have mentally ill people we pay to do shit. Make no mistake."

> - Foval's surmising that Creamer must have been involved in developing the voter fraud scheme: "I know pretty closely who's advising ["Charles Roth"] on that. I work with the same person. There is somebody who hatches these ideas to people like him on an ongoing basis  . . . so Bob Creamer comes up with a lot of these ideas. I work with Bob Creamer one-to-one all the time. I'm the white hat, Democracy Partners is kind of a dark hat. I will probably end up being a partner there at some point, because our philosophy is actually the same."

SMF ¶¶9, 12.

Ms. Maass's internship lasted approximately four weeks. SMF ¶70. Plaintiffs asked for no list of references or résumé before offering Ms. Maass the internship. SMF ¶¶76-77. There was no written agreement governing the part-time, unpaid, internship. SMF ¶¶73, 84. The sole reference by Plaintiffs to confidentiality during the unpaid internship was Creamer's statement on Ms. Maass's first day that "And, uh, [Lauren Windsor] has some kind of a nondisclosure agreement to sign or something." SMF ¶¶85-86. There was no follow-up and no other discussion about confidentiality. *Id.* Importantly, Ms. Maas was never provided with a nondisclosure agreement. SMF ¶83.

Democracy Partners is a loose conglomeration of like-minded political consultants. SMF ¶87. It was co-located in an office suite with a number of other entities, including AUFC, American Family Voices, and Alliance for Citizenship. SMF ¶¶93-94, 98. Democracy Partners did not hold the lease to the space it used, and reported no rent payments during the period of Ms. Maass's internship. SMF ¶¶110. Contrary to Plaintiffs' allegations in their Complaint, the premises were not secure – Ms. Maass was never asked for identification or to check-in by the building security guard, the office suite was open during business hours, and even Democracy Partners' own Rule 30(b)(6) witness did not know if Democracy Partners takes office key cards (which are only necessary after hours) back from affiliates after their relationship ends. SMF ¶¶97, 111, 114.

During her brief unpaid internship, Ms. Maass completed tasks like counting an inventory of signs, assembling press clippings, and delivering a package like a courier. SMF ¶¶126, 128, 129. She sat at the reception desk of the office suite, which had previously been vacant. SMF ¶123. She participated on conference calls referred to by Plaintiffs as 'bracketing calls.' SMF ¶127. The

phone number and passcode for many of these conference calls was already publicly available on the internet – and known by Creamer to be so – prior to Ms. Maass's internship. *Id.*

In discovery, the Plaintiffs narrowed their claim to damages "from publication" and "following public exposure," caused by two organizations (American Federation of State, County and Municipal Employees ("AFSCME") and AUFC) terminating their contracts with Strategic and a third organization (Dialysis Patient Citizens) cancelling a meeting to talk about potential work with Strategic. SMF ¶¶6, 18. Any alleged harm was caused by the reaction of those organizations to Plaintiffs' own words and the words of Foval. SMF ¶¶25-27, 36, 44, 46, 50-51. For example, AFSCME found it inappropriate that Creamer spoke ad hoc about his ties to the Clinton campaign and believed that Plaintiffs had been indiscrete in allowing Foval into their midst. SMF ¶¶26-27. AUFC promptly fired Foval because his words in "Rigging the Election – Video I" were "so beyond the pale outrageous" and "not reflective" of AUFC's values. SMF ¶44. Dialysis Patient Citizens, which has never worked with any of the Plaintiffs, was concerned about the public relations impact of hiring Plaintiffs. SMF ¶¶50-51. There were other issues at play as well – the election of Donald Trump decreased the value of a consultant like Creamer. SMF ¶¶32, 52. Unrelated budgetary concerns came into play for AFSCME – it had financial concerns following a pair of Supreme Court decisions that weakened unions. SMF ¶¶28-30.

AFSCME was also the primary funding source for AUFC and terminated that funding at the same time AFSCME terminated its contract with Strategic. SMF ¶¶36, 38, 46. AUFC – which had been paying Strategic a monthly allowance of approximately $11,000 without a written contract – simply went out of business. SMF ¶¶36, 46. As AUFC's Rule 30(b)(6) witness summarized, AFSCME "stopped funding Americans United. Americans United ceased to exist. Bob lost his contract. It's pretty easy." SMF ¶36. None of these terminations were motivated by

the circumstances of investigative journalist Allison Maass's presence in Democracy Partners' office or her gathering of information there. SMF ¶¶34, 45; *see also* ¶51.

## II. The Legal Standard

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.  56(a). Material facts are those that may affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary do not preclude the entry of summary judgment. *Id.* A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The inferences are drawn in the light most favorable to the nonmoving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

A party moving for summary judgment may rely solely on the pleadings to satisfy its burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A non-moving party bearing the burden of proof, however, must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate specific facts indicating there is a genuine issue for trial. *Id.* at 324. If the evidence offered by the non-moving party is "merely colorable, or is not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249-50. Summary judgment is mandated against a party who fails to prove an essential element of its case "with respect to which [the party] has the burden of proof." *Celotex*, 477 U.S. at 323.

Care should be taken to note that this case finds itself in special First Amendment territory for purposes of summary judgment. Would-be journalists may be deterred from "voicing their criticism" because, even if that criticism is true, "prov[ing] it in court or fear of the expense of having to do so" may be crippling. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).

Summary judgment is crucial to the Federal Rules of Civil Procedure and designed to "secure the just, speedy, and inexpensive determination of every action." *Celotex*, 477 U.S. at 327. "That principle is all the more vital where a slow and expensive determination will result in self-censorship." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc*., 330 F.3d 1110, 1115 (9th Cir. 2003). The First Amendment favors the speedy determination of claims aimed at suppressing another's speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010).

### III. The Undisputed Material Facts Conclusively Refute Plaintiffs' Theory of Damages

The Motion to Dismiss stage of these proceedings narrowed the damages issues, and the discovery process placed the fatal flaw of Plaintiffs' lawsuit in sharp focus. In an effort to avoid the First Amendment protections of *Hustler v. Falwell*, 485 U.S. 46 (1988),[1] Plaintiffs avowed that they only sought reputation damages caused by the "disclosures and actions of Maass" in paragraphs 27-44 of the Complaint, which "make no reference whatsoever to the creation or posting of the Project Veritas videos or any other publication." Memorandum Order Denying Motion to Dismiss, Dkt. 25 at 25 (quoting Plaintiff's Opposition to Motion to Dismiss). Plaintiffs argued that "[t]he clear implication of these allegations is that damage to Plaintiffs' reputation resulted from their clients' displeasure with the breach of client confidentiality – the fact that highly sensitive client confidential information was disclosed to outsiders without the client's authorization." *Id.* The Court "t[ook] Plaintiffs at their word that they [were] not seeking damages based on the publication of the videos" and found that *Hustler* did not bar their claim for damages. *Id.* at 26. The Court concluded the same with respect to purported lost contract damages: "[P]laintiffs have represented that they are not seeking any damages based on the *publication* of

---

[1]  Holding that reputation damages based on an act of expression or publication must satisfy the First Amendment standards that apply to a defamation or libel claim.

the videos, but rather are seeking damages for non-publication conduct. When the underlying conduct is not expressive, and the damages sought are 'non-reputational,' there is no First Amendment issue." *Id.*

This case boils down to an attempt to punish the newsgathering conduct of the Project Veritas parties by doing an "end-run" around the protection of *New York Times v. Sullivan*, 376 U.S. 254 (1964). This is the lesson of *Hustler*—that plaintiffs will attempt to hide claims for reputational injury behind non-reputational torts, thus doing damage to the First Amendment. *Food Lion Inc. v. Capital Cities/ABC Inc.*, 194 F.3d 505, 522 (4th Cir. 1999). As Judge Posner made clear, courts should also work to protect the means of acquiring the content of speech if that protection is needed to prevent plaintiffs from circumventing the First Amendment. *Desnick v. ABC, Inc.*, 44 F.3d 1345 (7th Cir. 1995). This, then, leads to the conclusion that heightened First Amendment scrutiny is triggered where an end-run is detected. Courts nationwide have stringently applied this protection when addressing claims brought by embarrassed plaintiffs against speakers and publishers. *See, e.g.*, *Smithfield Foods, Inc. v. United Food and Commercial Workers Intern. Union*, 585 F.Supp.2d 815, 820-21 (E.D. Va. 2008) ("[I]f the damages sought are for injury to reputation caused by some sort of publication, the plaintiff must prove, by clear and convincing evidence, falsity of the statement and actual malice in the publication of it, even if the claim is not for defamation."); *Yohe v. Nugent*, 321 F.3d 35, 44-45 (1st Cir. 2003); *Desnick*, 44 F.3d at 1355 ("[T]arget has no legal remedy even if the investigatory tactics used by the network are surreptitious, confrontational, unscrupulous, and ungentlemanly.").

Having made their bed, Plaintiffs must lie in it. Plaintiffs' attempt to frame their claims to avoid the Project Veritas Parties' constitutional protections collapsed once discovery ensued and Plaintiffs (and the special interest groups) were forced to answer questions under oath. The position

Plaintiffs took to avoid dismissal do not survive contact with the facts. The undisputed material facts show that the only purported damages to any Plaintiff flowed from the First Amendment expressive conduct of the Project Veritas Parties (if at all), and that plaintiffs Bob Creamer and Democracy Partners were not damaged.

### III(A). Creamer and Democracy Partners Suffered No Damages and All Plaintiffs Abandoned "Reputation Damages" and "Diminishment of Economic Value" Theories.

Robert Creamer, Democracy Partners, and Strategic were all required to describe under oath "all damages supposedly suffered by any Plaintiff that are allegedly recoverable against any Defendant in this lawsuit." SMF ¶18 (Answer #3). Plaintiffs' sworn answer identified only three items of damages, all purportedly suffered by Strategic alone: 1) a terminated contract between Strategic and AFSCME; 2) a terminated contract between Strategic and AUFC; and 3) the loss of a potential contract between Dialysis Patient Citizens and Strategic. *Id*. Plaintiffs did not list any harm other than the terminated contracts or the "lost" potential contract. *Id.*

Plaintiffs explicitly abandoned any claim that they suffered damages due to the "diminishment of the economic value of confidential and proprietary information," and further abandoned any claim for "damages to reputation suffered by any Plaintiffs." SMF ¶18 (Answers #8 and #9). The sole remaining theory of injury following Plaintiffs' efforts to thread the *Hustler* needle to recover "lost contract" damages was:

> Plaintiffs **are claiming damages from the publication** by Defendant Veritas Action Fund of the videos and documents described in paragraphs 53 through 59 of the Complaint **only insofar as that publication revealed** to the clients of Democracy Partners and SCG that the confidential information and documents of those clients had been stolen, compromised and publicly disseminated as a result of defendants' actions. **The public exposure caused** the Plaintiffs to be viewed by certain clients as not capable of maintaining the confidentiality of sensitive and confidential client information.

9

> The specific damages resulting from Defendants' actions in that regard are as follows.

*Id.* (Answer #10) (emphasis added). Plaintiffs' answer goes on to list only purported "lost income" to Strategic resulting from its contracts with AFSCME, AUFC, and "the loss of the potential contract" with Dialysis Patient Citizens." *Id.*; *see infra* Section III(C).

Thus, by Plaintiffs' own sworn statements, the only alleged harm was suffered by Strategic and no other Plaintiff. Accordingly, summary judgment should be entered in the Project Veritas Parties' favor against Robert Creamer and Democracy Partners on all counts.

### III(B). Plaintiff's Sole Remaining Theory of Damages Is Based Only on the Project Veritas Parties' Expressive Conduct.

The Court's Order denying the Project Veritas Parties' Motion to Dismiss put a core issue in stark relief: "Whether plaintiffs will ultimately be able to show that the PV defendants' non-expressive conduct resulted in damage to their reputation remains to be seen . . . ." Dkt. at 25. At a stage where the Court no longer accepts Plaintiffs' well-pleaded allegations as true and must look to what the facts show, Plaintiffs' claims fail. As discussed above, Plaintiffs now swear that damages flow "from the publication" and as a result of what "public exposure caused . . . ." SMF ¶18 (Answer #10). This contradicts the grounds on which Plaintiffs asked the Court to rely, and on which the Court did rely, in denying the Project Veritas Parties' Motion to Dismiss, including the basis for denying the request to dismiss "lost contract damages." *Compare id.* to Dkt. 25 at 26.

The only purported harm actually results from "publication" and what Project Veritas's reporting "expos[ed]" to the public. Plaintiffs' sole remaining theory of damages, explicitly grounded in publication and public exposure, thus takes the case outside the realm of suing the press based on law of general applicability and into constitutionally sacrosanct territory. This is expressive conduct at the core of the First Amendment and the free press – accurate reporting by

the Project Veritas Parties of Plaintiffs' own activities. It is now clear that *Hustler* applies and Plaintiffs have not even attempted to allege or prove defamation as required. Nor could they – the undisputed material facts show that Project Veritas's reporting was truthful. Because the Plaintiffs have failed to avoid the constitutional protections, the Project Veritas parties are entitled to summary judgment on all counts.

### III(C).  The Undisputed Material Facts Demonstrate A Complete Failure of Causation.

Plaintiffs' theory that AFSCME, AUFC, and Dialysis Patient Citizens chose not to work with them because publication of Project Veritas's reporting showed that Plaintiffs could not maintain their confidences is untethered to the facts. Neither AFSCME, AUFC, nor Dialysis Patient Citizens acted on that basis. Instead, the undisputed material facts demonstrate that they acted as a result of what the truthful reporting showed and also out of concerns unconnected to the Project Veritas Parties' reporting. SMF ¶¶18-54.

As Senior United States District Judge G. Wendall Sharp observed in another recent case in which the Project Veritas Parties prevailed on summary judgment against a challenge to their investigative reporting by an individual who was recorded, what was published here are "recitations of [plaintiff's] own admitted actions and statements." *Wentz v. Project Veritas, James O'Keefe III, and Allison Maass*, 2019 WL 1716024 at *5, Case No. 6:17-cv-1164-Orl-18GJK (M.D. Fla. April 16, 2019) (granting summary judgment on all counts).[2]  *Steele v. Isikoff*, 130 F.

---

[2] Although not a fact relevant to the present legal analysis, it is noteworthy that Wentz and his lawyers strategized with Democracy Partners' lawyers, Creamer, and Lauren Windsor of Democracy Partners (in various combinations) on topics including the timing of lawsuits against James O'Keefe, Project Veritas's insurance policy, "collaboration among plaintiffs," and referring a potential "additional plaintiff," apparently to Wentz's lawyer. *See Wentz v. Project Veritas, James O'Keefe III, and Allison Maass*, Case No. 6:17-cv-1164-Orl-18GJK (M.D. Fla.) at Dkt. 135-1; *see also id.* at Dkt. 156 (4/29/19 Order requiring production of the communications with

Supp. 2d 23 (D.D.C. 2000), which this Court previously relied on at the Motion to Dismiss stage, is now apt with regard to causation. Recognizing that District of Columbia courts adhere to the fundamental principle that a tort plaintiff cannot recover without showing that defendant's challenged conduct proximately caused plaintiff's injury, the court in *Steele* held:

> [Plaintiff] has suffered because people – friends, employers, customers, and even strangers – changed their opinions of her after she was unflatteringly tied to the Clinton-Willey Saga. That link to President Clinton and Kathleen Willey, however, was not the work of [the journalist defendant]. On the contrary, [plaintiff] herself decided to fabricate her connection to Willey's accusations. While [defendant journalist] printed that fabrication and [plaintiff's] subsequent recantation, [plaintiff] herself proximately caused the harm.
>
> In short, because [plaintiff's] conduct, not [defendant journalist's] proximately caused her harm, she cannot make out claims for the torts of fraud or negligent misrepresentation. Consequently the claims will be dismissed.

*Id.* at 35.

Plaintiffs' own admitted statements and actions have consequences. As in *Steele* and *Food Lion*, it was those statements and actions – truthfully and accurately exposed to the public – that in fact caused the alleged harm.

As demonstrated below, both the loss of contracts with AFSCME and AUFC, and the failure of Dialysis Patient Citizens to execute a contract with Democracy Partners, were not a result of any non-publication conduct on the part of the Project Veritas Parties.  To the contrary, Plaintiffs' own conduct, as well as outside influences, caused the cancellations. As such, Plaintiffs' sole remaining claim for damages – two terminated contracts and one "lost" potential contract – must fail.

---

Democracy Partners and its lawyers and imposing attorneys' fees against Wentz for failing to produce them).

### III(C)(1). Plaintiffs' Conduct lead to Cancellation of AFSCME Contract

In choosing to sever ties, AFSCME had no concerns with the circumstances of investigative journalist Allison Maass's presence in the Democracy Partners office or the circumstances of her internship: "it all seemed very moot at the time" and "the circumstances of her presence there at that point seemed irrelevant." SMF ¶34. It was Plaintiffs' allowing their subcontractor "*Mr. Foval* into their midst without serious vetting" which showed "an element of indiscretion" by Plaintiffs and created a distraction "at a critical moment in time." SMF ¶ 26 (emphasis added). "[T]he broader concern was just clearly, *regardless of the circumstances that led to the video*, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it." *Id.* (emphasis added). AFSCME also had "concerns" about what Creamer said on video, and found it inappropriate that Creamer "was speaking ad hoc about his strong ties to the Clinton campaign . . . ." SMF ¶27.

Unrelated to the publication of Project Veritas's news reporting, AFSCME was motivated not to renew its contract with Strategic because of financial constraints and budgetary concerns following Supreme Court decisions such as *Friedrichs v. Cal. Teachers Ass'n*, 136 S. Ct. 1083 (2016) and *Harris v. Quinn*, 134 S. Ct. 2618 (2014). SMF ¶29. Additionally, the value of a Democratic political operative like Creamer seemed less useful to AFSCME following the result of the Presidential election. SMF ¶¶32-33. After Plaintiffs filed this lawsuit, AFSCME Director of Governmental Affairs Scott Frey told AFSCME Chief of Staff Bill Lurye, "I suspect the loss of our contract and financial support will be included in their claim for damages," and Lurye replied, "Probably. But not very smart if it is." SMF ¶35.

### III(C)(2). Plaintiffs' Conduct lead to Cancellation of AUFC Contract

AUFC stopped doing business with Plaintiffs because it lost its funding and went out of business – AFSCME was the principal funding source for AUFC, and when AFSCME ended its relationship with Strategic, it concurrently ended its relationship with AUFC. SMF ¶¶23, 46. AFSCME President Lee Saunders was "extremely angry" and "disappointed" with Creamer and AUFC President Brad Woodhouse for "allow[ing] this type of distraction to occur . . . ." SMF ¶24. Saunders was also upset that he did not get notice from Creamer or AUFC prior to the publication of the Project Veritas Parties' reporting. SMF ¶43. Moreover, following publication of "Rigging the Election – Video I," Saunders came under criticism when a Wisconsin blog post revealed that he was the Chair of AUFC's Board and "40 percent of his membership – some percentage of his membership, you know, don't support the [D]emocratic side or didn't support Hillary, and he – he couldn't take the heat, couldn't be associated with it." SMF ¶41-42.

Allison Maass's internship at Democracy Partners was not a factor in AFSCME's cutting ties with AUFC: "it never came up." SMF ¶45; *see also* ¶34 ("it all seemed very moot at the time" and "the circumstances of her presence there at that point seemed irrelevant"). Like AFSCME, AUFC was alarmed by what Plaintiffs' subcontractor Scott Foval said on camera – Foval's statements were "beyond the pale outrageous," "not reflective of us or our values or anything we would ever participate in," and terminated Foval's work. SMF ¶44.

### III(C)(3). Dialysis Patient Citizens Never Had a Contract with Plaintiffs and Merely Cancelled a Meeting

None of the Plaintiffs ever had a contract with Dialysis Patient Citizens. SMF ¶47. The only thing close to "business" between Dialysis Patient Citizens and Plaintiffs was scheduling and then canceling a meeting about potential opportunities to work together. SMF ¶53. Not only was there no contract between Dialysis Patient Citizens and Plaintiffs, but there was no agreement on

how much money Dialysis Patient Citizens might pay if they ended up working together. SMF ¶54. Plaintiffs' claim that Strategic suffered damages because Strategic was not ultimately hired is entirely speculative.

Like AFSCME and AUFC, Dialysis Patient Citizens cited no concern about Allison Maass's internship. Dialysis Patient Citizens concern was "PR. I represent a nonprofit organization, and for Dialysis Patient Citizens need to make sure that we maintain the best possible public image." SMF ¶51. Dialysis Patient Citizens Principal Hrant Jamgochian had been informed by his staff "of some of the negative publicity, which is why I decided to cancel pursuing our partnership or potential partnership." *Id.* In his email canceling the meeting, Jamgochian cited the fact that one of Dialysis Patient Citizens funders had seen reporting about Plaintiffs on Fox News "and requested that we find a firm other than Democracy Partners to help with our grassroots effort. As a result I am going to have to cancel our meeting tomorrow." SMF ¶50.

As with AFSCME, the result of the Presidential election was also an intervening event – as Creamer acknowledged in an email to Dialysis Patient Citizens, "[I]f you want contacts in the new Trump administration, I'm probably the wrong guy to give you advice anyway :-)." SMF ¶52.

Plaintiffs' sole theory of damages – that contracts with Strategic were lost when "public exposure caused the Plaintiffs to be viewed by certain clients as not capable of maintaining the confidentiality of sensitive and confidential client information" is false. The undisputed material facts show that AFSCME, AUFC, and Dialysis Patient Citizens reacted to the things Plaintiffs and their subcontractor said on camera, the reputational risk of continuing to associate with such political operatives, and wholly unrelated events like the election of President Trump or budgetary concerns. Plaintiffs' theory of damages fails completely.

**IV. The Undisputed Material Facts Demonstrate Allison Maass Owed No Fiduciary Duty to Democracy Partners as an Unpaid Intern and Any Purported Breach Did Not Proximately Cause Damages.**

Plaintiffs' fiduciary duty claim survived dismissal based on allegations about "a close relationship of trust and confidence" Allison Maass had "with Democracy Partners," and alleged "multiple steps that Democracy Partners took to secure the privacy of its operations." Order Denying Motion to Dismiss, Dkt. 25 at 17-18. But the allegations were artifice. The reality of Democracy Partners operations and Allison Maass's internship there expose the well-plead allegations that the Court had to rely upon at the motion to dismiss stage as absolutely false. The undisputed material facts show that Allison Maass had no fiduciary relationship with Democracy Partners, and no relationship whatsoever with the only Plaintiff alleged to have suffered damages (Strategic).

**IV(A). As a Short-Term, Unpaid Intern, Ms. Maass Did not Owe Democracy Partners a Fiduciary Duty, and Had No Relationship with Creamer or Strategic.**

Plaintiffs seek to hold unpaid, part time interns to the "highest order of duty imposed by law." *See e.g.*, *In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002). Allison Maass's internship with Democracy Partners is a far cry from what the Department of Labor and Courts consider as an internship requiring compliance with the Fair Labor Standards Act (i.e., payment of the minimum wage), much less the imposition of a fiduciary duty. *See* Department of Labor, Fact Sheet #71: Internship Programs under the Fair Labor Standards Act, *available at* https://www.dol.gov/whd/regs/compliance/whdfs71.htm (adopting the "primary beneficiary" test applied by the Second, Sixth, Ninth, and Eleventh Circuits).

"As a general rule, the mere existence of a contract does not create a fiduciary duty." *Paul v. Judicial Watch*, 543 F. Supp. 2d 1, 6 (D.D.C. 2008) (citations omitted); *see also AFSCME et al. v. Bristol Myers Squibb et al.*, 948 F. Supp. 2d 338, 362, n.18 (dismissing AFSCME health plan's

16

suit against drug manufacturer and noting courts do not lightly infer the existence of such fiduciary duties, which are often governed by contract). "A fiduciary relationship could exist, however, where circumstances show that the parties extended their relationship *beyond the limits of the contractual obligations to a relationship founded in trust.*" *Id.* (emphasis added) (citations omitted). "[O]ne characteristic that District of Columbia Courts have traditionally looked for is a special confidential relationship that transcends an ordinary business transaction and *requires each party to act with the interests of the other in mind.*" *Attias v. Carefirst, Inc.*, __ F. Supp. 3d ___, 2019 WL 367984 at *17, (D.D.C. 2019) (emphasis added) (quotations and citations omitted) (dismissing tort claims, including 'breach of duty of confidentiality,' by insureds against insurer in data breach case); *see also Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007) ("For a fiduciary duty to exist between the parties, there must be a special relationship of trust or confidence.").

The Court has previously emphasized the need for "a searching inquiry into the nature of the relationship, the promises made, the types of services given and the legitimate expectations of the parties." Dkt. 25 at 19 (citing *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 341 (D.D.C. 2011) ("*CAIR 2011*"). The discovery process has been a searching inquiry, one that reveals Allison Maass owed no fiduciary duty.

<u>IV(A)(1). The Nature of the Relationship.</u>

Ms. Maass had an unpaid, part-time internship at Democracy Partners that lasted from September 21, 2016 until October 14, 2016. SMF ¶70.  She interned at Democracy Partners about three days in each of those weeks. *Id.*; *see Prunte*, 484 F. Supp. 2d at 43 (emphasizing ordinary and intermittent nature of transactions over a four month period in granting motion to dismiss breach of fiduciary duty claim). Ms. Maass was not an intern for Strategic, nor Creamer in his

personal capacity. SMF ¶¶71-72. Prior to this lawsuit, she did not recall ever hearing the name "Strategic Consulting Group." SMF ¶71.

### IV(A)(2). The Promises Made (Or Not Made).

No written agreement of any kind governed the terms of Ms. Maass's internship. SMF ¶¶73, 84. Contrary to the allegations in the Complaint, she was never asked to keep information confidential and never presented with any sort of confidentiality agreement or non-disclosure agreement. SMF ¶¶83, 85-86. Only a single reference to confidentiality or non-disclosure was made during the internship, when Creamer told Ms. Maass near the end of her first day, "[a]nd, uh, [Windsor] has some kind of a nondisclosure agreement to sign or something." SMF ¶86. This was not even an *offer* to enter into a contract, merely a statement that such an offer might be forthcoming. RESTATEMENT (SECOND) OF CONTRACTS §24, Comm. A ("[T]he key concept involves giving the addressee the apparent power to conclude a contract without further action by the other party."). Regardless, no such nondisclosure agreement was ever provided to Ms. Mass. SMF ¶83.

### IV(A)(3). The Types of Services Given.

Ms. Maass's "services" were not proactive in nature – she completed tasks when assigned. SMF ¶124. She did not give advice to Democracy Partners, nor did she supervise anyone during her unpaid internship. SMF ¶125.

Her internship tasks were mundane. On her first day, she counted an inventory of political signs. SMF ¶126. She delivered a package, like a courier. SMF ¶128. She did the clerical work of setting up a phone system, including the rudimentary task of putting labels on the phones. SMF ¶130. Ms. Maass used a computer program to assemble press clippings of news coverage and also looked at YouTube clips to assemble a document about a person named Myron Ebell with public

quotes from news sources and his TV appearances. SMF ¶129. Subsequent discussion about turning these quotes into memes did not involve Ms. Maass. SMF ¶131.

Plaintiffs' allegations about conference calls that Ms. Maass participated on collapse when confronted with the facts. Those calls involved a host of people and organizations, and were referred to as "bracketing calls." SMF ¶127. They occurred every day at 1 p.m., and many of them had the call-in number 641-715-3288 with the passcode 782537. *Id*. That call-in information was already available to the public and could be found by anyone with an internet connection – a fact Creamer himself knew months before Ms. Maass's unpaid internship, and which did not cause him concern. *Id*.

Neither Ms. Maass nor Project Veritas shared information about these calls with the Republican Party or someone else who "could adjust their own plans to anticipate or deflect . . . . 'bracketing' event[s]," as Plaintiff's alleged in their complaint. *Compare* SMF ¶138 *with* Dkt. 1 at ¶37. The facts demonstrate such allegations as unfounded.

Prior to this lawsuit, the Project Veritas Parties were not aware of the details of the work performed by Plaintiffs on behalf of AFSCME and were not aware AFSCME was a funding source for AUFC. SMF ¶133. As far as Ms. Maass was aware, none of her internship duties included any work on behalf of AFSCME. *Id*. Ms. Maass was likewise not aware of her internship duties including any work on behalf of AUFC, other than the occasion on which she counted signs that indicated on their face that they had been paid for by AUFC. SMF ¶134. Potential work with Dialysis Patient Citizens was never assigned or mentioned to her. SMF ¶135.

The routine, non-sensitive nature of Ms. Maass's tasks and access were well stated by Democracy Partners member Mike Lux. After learning Ms. Maass was an investigative journalist for the Project Veritas Parties, Democracy Partners member Mike Lux informed the DNC

including then-Chair Donna Brazile, "the plant in our office didn't seem to come away with much of anything." SMF ¶139.

### IV(A)(4). The Legitimate Expectations of the Parties.

Democracy Partners did not treat Ms. Maass as though they expected she would act as a fiduciary, did not treat her as though she would have access to confidential or sensitive information, and did not treat its business operations as though they were confidential or sensitive.

No one asked for Ms. Maass's legal identification at any time prior to her unpaid internship. SMF ¶74. No one asked for a list of her references. SMF ¶76. Nor did anyone ask for her résumé prior to starting the internship (eventually she was asked for a résumé to determine what tasks might be suitable for her to perform – the résumé listed prior work as a bartender and restaurant server, with completed education only through the high school level and community college in progress). SMF ¶78.

There is "a very loose relationship between these companies that make up Democracy Partners," which is "for the most part . . . a group of people with like-minded political ideas that help each other out and try to work together when we can." SMF ¶87. As far as the Democracy Partners' Rule 30(b)(6) witness knew, it had no employees at all. SMF ¶89. Democracy Partners is so loosely organized that an entity called Mobilize, Inc. holds itself out as a member of Democracy Partners, even though it has never been a member. SMF ¶91. Democracy Partners' own Rule 30(b)(6) witness did not regard membership as a "real job" – when "members" get a "real job," they typically leave the organization. SMF ¶90.

The physical premises where Democracy Partners is located were radically different from Plaintiffs' portrayal in their Complaint.  Ms. Maass was never asked to sign in or asked for any identification from someone at the front desk of the office building. SMF ¶97. Democracy Partners was co-located in an office suite with other businesses, none of which themselves have any written

confidentiality or non-disclosure agreement with Democracy Partners, such as PictureMotion, AUFC, American Family Voices, Mike Lux Media, and Alliance for Citizenship. SMF ¶98. Signage outside the door to the shared office suite listed each of those entities except Mike Lux Media (Democracy Partners was listed second). *Id*. No signage restricts access to the office suite. SMF ¶112. None of the individual offices in the suite are labeled by occupant. SMF ¶115.

The door to the office is kept unlocked during business hours. SMF ¶111. Ms. Maass only used her key card one time – she arrived at the office approximately five minutes before others. SMF ¶113. Democracy Partners' Rule 30(b)(6) witness did not know how many key cards Democracy Partners issued to employees, guests, or affiliates, and did not know if Democracy Partners takes key cards back from its affiliates after the relationship ends. SMF ¶114.

Democracy Partners' handling of information technology matters was also inconsistent with the expectation that it had a close relationship of trust with Ms. Maass. SMF ¶¶116-122. She was given no special access. Ms. Maass used her own laptop computer for her unpaid internship tasks; Democracy Partners does not own any company computers. SMF ¶116. She was not made part of the "Democracy Partners Google Group," was not given a Democracy Partners email address, and when she communicated regarding her internship tasks, she did so with a personal Gmail account where Democracy Partners members knowingly corresponded with her. SMF ¶¶117-18.

Democracy Partners has no IT Firewall. SMF ¶120. Democracy Partners' email system was incapable of two-factor identification, even though a contract with the Democratic National Committee required it. SMF ¶122. Democracy Partners' Wi-Fi password was written on a white board in a conference room near the front door of the office. SMF ¶¶119. Democracy Partners

makes no effort to change passwords, or other efforts regarding information security, when members leave the organization. SMF ¶121.

The loosely affiliated individuals comprising Democracy Partners are before this court arguing that the "highest order of duty imposed by the law" attaches to a three-day-a-week intern whose responsibilities seemed to focus on delivering packages and counting signs. But the legal test for establishing a fiduciary theory is not open and indiscriminate. It applies in special circumstances and is not inferred lightly. Had this loosely affiliated group sought to impose fiduciary relationships with its volunteers, interns, or low-level employees, it should have taken the exceptional steps needed to make an exceptional relationship exist. The undisputed material facts demonstrate that Democracy Partners took no special steps to create a fiduciary relationship with a three-day-a-week unpaid intern. Summary judgment should be granted against this claim.

### IV(B). As a Short-Term Unpaid Intern for Democracy Partners, Ms. Maass Did Not Proximately Cause the Damages, Which are Now Claimed Only by Strategic.

For the reasons discussed in Section III(C) above, no act of the Project Veritas Parties proximately caused damages. This fatal flaw is sharply defined with respect to fiduciary duty. Allison Maass was only an intern for Democracy Partners. SMF ¶70. And by Plaintiffs' own sworn statements, only Strategic (not Democracy Partners, and not Creamer) suffered any purported harm. Ms. Maass had no fiduciary relationship – or indeed any relationship – with the only party which purportedly suffered damages. Accordingly, the undisputed material facts show that the fiduciary duty claim fails for this second, additional reason.

### V. The Project Veritas Parties Did Not Commit Unlawful Interception of Oral Communications Under Federal or D.C. Law.

The Plaintiffs alleged that the Project Veritas Parties violated the federal and D.C. interception statutes. *See* Dkt. 1 at ¶¶78–93; 18 U.S.C. §§ 2511, 2520; D.C. CODE §§ 23-541, 23-542. Their complaint alleged illegal interception of strictly oral communications. Dkt. 1 at ¶¶78–

93; *see* 18 U.S.C. § 2510(1), (2) (distinguishing between wire and oral communications), D.C.

CODE § 23-541(1), (2) (likewise). Both laws provide that it is generally lawful to intercept—that

is, secretly record[3]—oral communications so long as one party to the communication has

consented to the recording:

> It shall not be unlawful under this chapter for a person not acting under color of
> law to intercept a[n] . . . oral . . . communication where such person is a party
> to the communication . . . unless such communication is intercepted for the
> purpose of committing any criminal or tortious act in violation of the
> Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d). This provision is largely the same in D.C. law, except that it adds that

when a communication is "intercepted for the purpose of committing any criminal or tortious act

in violation of . . . laws of . . . the District of Columbia, or for the purpose of committing any other

injurious act" it is likewise not subject to the exception. D.C. CODE § 23-542(b)(3). There is no

genuine issue of material fact that the Project Veritas Parties did not commit unlawful interception

because the recordings are all subject to these single-party consent provisions.

The Project Veritas Parties did not act under the color of law. Allison Maass was a party

to every communication she recorded while interning at Democracy Partners, from a device

"concealed on her person." SMF ¶¶5, 79; *cf. Council on Am.-Islamic Relations Action Network,*

*Inc. v. Gaubatz*, 31 F. Supp. 3d 237, 255–56 (D.D.C. 2014) ("*CAIR 2014*"). The Project Veritas

Parties did not intercept oral communications at Democracy Partners for the purpose of committing

any criminal, tortious or injurious act. *See, e.g.*, SMF ¶¶1-3. The evidentiary record establishes

that the Project Veritas Parties relied in good faith on the single-party provisions in both statutes,

constituting a complete defense under both laws. SMF ¶1. If either D.C. or federal law applies to

---

[3] Neither interception statute at issue actually mentions secrecy. This is presumed based upon the
definition of "oral communication" in both statutes. 18 U.S.C. § 2510(2); D.C. CODE § 23-541(2).

the actions of the Project Veritas Parties in this matter, then the laws are unconstitutional. *See* 18 U.S.C. § 2511(4)(a); D.C. Code § 23-542(a). The Project Veritas Parties are thus entitled to judgment as a matter of law under the Plaintiffs' D.C. and federal interception claims.

### V(A). With No Breach of Fiduciary Duty, There Was No Interception Under Either Law, and the Project Veritas Parties' Purpose Was to Investigate Democracy Partners.

The Plaintiffs alleged that the Project Veritas Parties "intercepted oral communications for the primary purpose of committing trespass, breach of fiduciary duty, fraudulent misrepresentation and other criminal or tortious acts in violation of the Constitution and the laws of the United States and the District of Columbia." Dkt. 1 at ¶82; *see* also ¶90 (adding "for the purpose of committing other injurious acts."). The Court previously dismissed the Plaintiffs' contention that the recordings could have been "for the purpose of" committing trespass or fraudulent misrepresentation, allegations that would have taken place prior to recording. The only remaining exception to the single-party consent provision in either 18 U.S.C. § 2511(2)(d) or D.C. Code § 23-542(b)(3) alleged by the Plaintiffs is breach of fiduciary duty. Because Ms. Maass had no fiduciary duty to breach, or because the tort is not otherwise cognizable, the Project Veritas Parties acted lawfully when recording and publishing Ms. Maass's conversations. *See supra* Section IV.

Moreover, the record reflects that the Project Veritas Parties' purposes were lawful. "In order to prevail, [a plaintiff] must show 'either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation in intercepting the conversation was to commit' a criminal or tortious act." *CAIR 2014*, 31 F. Supp. 3d at 256–57 (citing *United States v. Dale*, 991 F.2d 819, 841 (D.C.Cir.1993)). There is no evidence of this whatsoever. To the contrary, the record proves the Project Veritas Parties recorded for the purpose of investigating and reporting one of the most important news stories in the 2016 election cycle.

24

**V(B). The Project Veritas Parties are Completely Protected by the Good Faith Defenses in Both Statutes.**

If the Court finds that there are facts at issue regarding interception, the Project Veritas Parties are still entitled to protection under provisions in both the federal and D.C. interception statutes that give complete defense to civil actions for good faith reliance.

> A good faith reliance on--
> (1) a court warrant or order, a grand jury subpoena, *a legislative authorization*, or *a statutory authorization*;
> * * *
> is a *complete defense* against any *civil* or criminal action brought under this chapter or any other law.

18 U.S.C. § 2520(d) (emphasis added). Similarly, "[g]ood faith reliance on a court order or legislative authorization shall constitute a *complete defense to an action brought under this section or any other law*." D.C. CODE § 23-554(b) (emphasis added).[4] Owing to the dearth of evidence that the Project Veritas Parties had any unlawful purpose, the First Amendment concerns detailed below, and the Project Veritas Parties' extensive successful track record (including in the District of Columbia) in lawful investigative recording, SMF ¶1, the Court should rule that good faith reliance is the only appropriate conclusion under the interception statutes.

**V(C). The Federal and D.C. Interception Statutes Are Unconstitutional.**

Whether or not the interception laws apply to the Project Veritas Parties in this case, they are unconstitutional for myriad reasons. The interception statutes regulate the recording and disclosure of speech, and thus implicate the First Amendment. "The act of *making* an audio or

---

[4] If the absence of the term "statutory authorization" in the D.C. law is of consequence, it is nevertheless irrelevant: "Section[] . . . 23-554 . . . of this subchapter shall be construed to supplement, and *not to supersede or otherwise limit*, the provisions of chapter 119 of Title 18, United States Code (relating to wire interception and interception of oral communications)." D.C. CODE § 23-556 (emphasis added).

audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). The exceptions to single-party consent in both laws are subject to and fail both strict and intermediate scrutiny. *See* 18 U.S.C. § 2511(2)(d), D.C. CODE § 23-542(b)(3). Moreover, these exceptions cannot hold up against the vagueness doctrine, which is at its most stringent in the context of the First Amendment.

Surreptitious recording implicates important First Amendment interests. Undercover reporting is uniquely situated as it provides information about scandal, corruption, waste and abuse that is difficult to obtain except through secretive means. The Project Veritas Parties are national leaders in investigative journalism, producing innovative reports about foreign interference in American elections (leading to fines being issued by the Federal Election Commission against a presidential primary campaign committee and the Australian Labor Party), the reality of American public education, and frank portrayals of how political actors operate. The public has an interest in this information since it has limited access to any of these organizations that impact their lives. The public also has an interest when undercover journalists inform the public about the behavior of others and in deterring wrongful conduct by public and private individuals. Because surreptitious recording affords a singularly powerful means of providing the public with this important information, First Amendment protection should not be overlooked.

### V(C)(1). The Exceptions to Single Party Consent Fail First Amendment Analyses.

Courts analyzing interception statutes have generally considered them content-neutral, and thus subject to intermediate scrutiny. *See, e.g.*, *Martin v. Gross*, 340 F. Supp. 3d 87, 105 (D. Mass. 2018); *Alvarez*, 679 F.3d at 603. This is questionable in light of *Reed v. Town of Gilbert*, which re-affirmed that a law is content-based when it cannot be "'justified without reference to the

content of the regulated speech[.]'" 135 S. Ct. 2218, 2227 (2015) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see* 18 U.S.C. § 2510(4), (8), D.C. CODE § 23-541(3), (6). Nevertheless, though broad secret recording provisions may be content-neutral, they must still be "'narrowly tailored to serve a significant governmental interest.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citing *Ward,* 491 U.S. at 796). But the specific provisions in the laws at issue that limit single-party consent—that is, when communications are "intercepted for the purpose of committing any criminal or tortious act"—are unequivocally content-based, and must be subjected to strict scrutiny, under which both fail.

The remaining tortious act at issue for which interception allegedly occurred, breach of fiduciary duty, could only accompany secret recording if Ms. Maass intended to record and disclose oral communications containing confidential information. *See* Dkt. 25 at 17. In order to determine whether an oral communication contains confidential information, its content must be analyzed and its substance distinguished from non-confidential information. Moreover, in order to justify *any* exception to single-party consent under either law, the law references the substance of communications, whether in regards to a breach of duty or another cognizable crime or tort. As opposed to just setting limitations on secret recording itself regardless of the content of communications, federal and D.C. law provide a single-party exception that is limited only by the content of the communications recorded, making each provision a content-based restriction on speech.[5]

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest[.]" *Reed,* 135 S. Ct. at 2231 (internal

---

[5] Even outside of the single-party consent provisions at issue, the laws are arguably content-based, particularly in regards to their publication provisions. *See* 18 U.S.C. § 2511(c), (d); D.C. CODE § 23-542(a)(2), (3).

citations omitted). It is difficult to comprehend a compelling interest that is served by the exception to single-party consent in either interception law. One might argue privacy, but both laws already recognize by permitting single-party consent that an oral communication is not private when a party to it is the one recording. *Cf.* 18 U.S.C. § 2511(2)(d) *with* 18 U.S.C. § 2510(2). Perhaps interception for the purpose of accomplishing certain criminal or tortious acts could be considered an aggravating circumstance, but this is even more nebulous than privacy—certainly some elements of some crimes or torts may be exacerbated if they are accomplished via interception, but that cannot be said of "*any* criminal or tortious act[.]" 18 U.S.C. § 2511(2)(d), D.C. CODE § 23-542(b)(3) (emphasis added); *see, e.g.*, *Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005) (interception for the purpose of creating of child pornography). Even under the standards of intermediate scrutiny, there are no significant governmental interests served by the single-party consent exceptions.

Since the laws do not serve a compelling or important governmental interest, tailoring analysis is unnecessary. Nevertheless, the tailoring of the exception to single-party consent in both laws is nearly without limit—that is, a far cry from narrow. The breadth of the law not only makes it difficult to identify a governmental interest in the first place, it proves that it is inappropriate to prohibit speech activity that is done "for the purpose of *any*" illegal act. Whether considering least restrictive means or less restrictive alternatives, the law fails to meet either standard. *See McCullen*, 573 U.S. at 494–96 (considering less restrictive alternatives under intermediate scrutiny analysis). If secret recording—an act of free speech—is to be independently prohibited because it is done for the purpose of an illegal act, said illegal act must be identified. The mere fact that if one intercepts an oral communication for purposes of committing *tort*, one may, in effect, commit a *felony*, makes both laws unsuitably tailored, or, frankly, anathemas to free speech. *See* 18 U.S.C. § 2510 *et seq.*

28

(providing no criminal statute of limitations), 18 U.S.C. § 3282(a) (establishing a general five-year statute of limitations for federal felonies); D.C. CODE § 23-541 *et seq.* (providing no criminal statute of limitations), D.C. CODE § 23-113(a)(4) (establishing a general six-year statute of limitations for D.C. felonies).[6]

The present case shows the constitutional calamity of allowing a claim to proceed under either statute: the Project Veritas Parties may engage in a wholly lawful speech activity, but then be criminally prosecuted, sued civilly, or both, with potential vindication only after a prolonged case and extensive whittling. Assuming, for but one sentence, that the Plaintiffs have a cognizable claim for breach of fiduciary duty, their case provides no basis upon which this alleged breach was exacerbated by interception, which could conceivably justify an independent cause of action. *See, e.g.*, Dkt. 19 at 14–15 ("the injury occurred the moment Maass leaked Democracy Partners' confidential information to James O'Keefe and other parties affiliated with PV and PVAF."). A breach of fiduciary duty is a breach of fiduciary duty whether or not it is accomplished by secret recording, making the tort itself a less restrictive alternative. The exceptions to single party recording in both laws are nothing more than unconstitutional speech traps, and should be stricken.

### V(C)(2). The Exceptions to Single Party Consent are Unconstitutionally Vague.

The exceptions to single party consent are also void under the First Amendment vagueness doctrine. Vagueness is fundamentally a due process concern, but "'[w]here First Amendment rights are involved, an *even "greater degree of specificity"* is required,' . . . because '[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries

---

[6] This danger cannot be underemphasized because in at least one case, a D.C. court has implied a felony could occur even if one merely has the purpose of committing a tort yet does not complete the tort. *Council on Am.-Islamic Rel. Action Network, Inc. v. Gaubatz*, 123 F. Supp. 3d 83, 85 (D.D.C. 2015).

of the forbidden areas were clearly marked[.]" *Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 33, 63 (D.D.C. 2008), *aff'd,* 582 F.3d 1 (D.C. Cir. 2009) (citing *Buckley v. Valeo,* 424 U.S. 1, 77 (1976) and *Grayned v. City of Rockford,* 408 U.S. 104, 109–10 (1972)) (emphasis added). Echoing the tailoring analysis, the reach of the exceptions to single-party consent in both statutes is wholly unmoored. If the Project Veritas Parties are required to independently analyze every federal statute along with the statutes and common law torts of a jurisdiction *and* evaluate whether single-party recording might be considered "for the purpose of" violating one of those laws before engaging in secret recording—the effect is to nullify single-party consent. "Prolix laws chill speech for the same reason that vague laws chill speech: People 'of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.'" *Citizens United*, 558 U.S. at 324 (citing *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)). Here, both laws are vague by incorporating literally every law under the sun in a given jurisdiction and, as a result, prolix.

The D.C. statute manages to be even vaguer by curtailing single party consent when it is done "for the purpose of committing . . . any other injurious act." D.C. CODE § 23-542(b)(3).[7] This provision, previously contained in the federal statute as well, was ruled unconstitutionally vague by the Sixth Circuit. *See Boddie v. Am. Broad. Companies, Inc.*, 881 F.2d 267, 271 (6th Cir. 1989). "The meaning of the term 'injurious' is far from self-evident; it is not defined by the statute; and it is not an established legal term of art. Nor can the provision be saved by a sensible narrowing construction." *Id.* The same is true under the D.C. statute. At the very least, the exception to single-party consent under D.C. law is void for vagueness, but even the "criminal or tortious act" standards fail to provide the requisite clarity required of laws that govern First Amendment

---

[7] D.C. law requires this provision be construed "to supplement" federal law. D.C. CODE § 23-556(a).

activity. *Cf. CAIR 2014*, 31 F. Supp. 3d at 256 n.7 (declining to address constitutionality owing to the plaintiff waiving the argument that recording was done for "injurious" purpose) *with* Dkt. 1 at ¶90.

The Project Veritas Parties followed federal and D.C. law in their investigation of Democracy Partners. If the Court finds there are material facts at issue in these claims (which there are not), the claims should nevertheless be foreclosed by the Project Veritas Parties' good-faith reliance on the single-party consent provisions and First Amendment bulwarks. Moreover, the interception statutes are unconstitutional facially and as applied to the Project Veritas Parties.[8]

### VI. The Project Veritas Parties Did Not Commit Trespass Against Democracy Partners.

"'[T]he tort of trespass in the District of Columbia is the intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property.'" *Robinson v. Farley*, 264 F. Supp. 3d 154, 163 (D.D.C. 2017) (quoting *Garay v. Liriano*, 943 F.Supp.2d 1, 25 (D.D.C. 2013)) (cleaned up). Trespass is defined as "(i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest." *CAIR 2011*, 793 F. Supp. 2d at 344. Democracy Partners was not the owner or possessor of the property, and it cannot maintain a claim for trespass. *See* Dkt. 1 at ¶¶ 94–101 (pleading trespass exclusively on behalf of Democracy Partners, and claiming "Maass' intrusion invaded and disrupted Democracy Partners' *possession and control* over *its own* property." (emphasis added)). For this and other reasons, the Court should rule that the Project Veritas Parties are entitled to summary judgment on the claim.

---

[8] As Plaintiffs' claims pursuant to the federal and D.C. interception statutes do not survive summary judgment, their claim for statutory and punitive damages, as well as attorney's fees, pursuant to those statutes likewise must fail.

At the time relevant to this case, the "Democracy Partners" D.C. office was at 1250 Eye Street NW, Suite 250 ("Suite 250"). *See* SMF ¶96. A sign next to the Suite 250's door listed several organizations: AUFC, Democracy Partners, American Family Voices, Picture Motion, and Alliance for Citizenship. SMF ¶98. Suite 250 was leased by AUFC in 2011, which at that time sublet space to Strategic, Progressive Strategies, and Manatt Media. SMF ¶99. AUFC moved out in early 2015, and at that time sublet Suite 250 to Mannatt Media, Mike Lux Media and Strategic while continuing to pay the largest share—between 50 and 60 percent—of rent and other costs.[9] SMF ¶100. Since then, Strategic and Democracy Partners were at times billed separately for certain office spaces. *See* SMF ¶102. Rent obligations for individual offices in Suite 250 changed informally. *See* SMF ¶103. Strategic paid a consistent amount to AUFC from early 2015 into early 2017. *See* SMF ¶104.

The Plaintiffs did not produce a copy of a lease or sublease, claimed that all documents they intended to use to support their claims were produced, and never bolstered the record prior to the close of discovery. SMF ¶105. A third-party subpoena to AUFC revealed evidence that a "Partially Executed Sublease Agreement" existed at one time with Picture Motion in 2015, but the document itself was not produced, nor any other lease or sublease. SMF ¶106.

During Ms. Maass's internship, Suite 250 was shared not only by AUFC with certain members of Democracy Partners, but another Democracy Partners client, American Family Voices. SMF ¶93. American Family Voices, though staffed then by two members of Democracy Partners, was not an arm of the organization and at least occasionally acted independently and even contrary to the goals of Strategic clients like AUFC. *See, e.g.*, *id.* (March 13, 2015 e-mail chain between Jeremy Funk of AUFC and Robert Creamer in which Funk refers to the opposition

---

[9] AUFC kept a good deal of furniture in the suite until January, 2017. SMF ¶100.

of American Family Voices to Loretta Lynch's nomination to Attorney General as "shit."). Thus, the undisputed facts demonstrate that multiple organizations shared the same space and through discovery Plaintiffs did not produce the one document that could have supported the extent of their possessory interest, if any: the lease.

Democracy Partners declared $14,000.00 in rent expenses on its 2015 tax returns. SMF ¶107. However, it did not declare any rent expenses on its 2016 returns. SMF ¶108. Strategic declared $54,494.00 and $55,336.00 in rent expenses in 2015 and 2016, respectively. SMF ¶109.

As "Angela Brandt," Ms. Maass was invited to intern at Democracy Partners. SMF ¶68. On her first day, Ms. Maass entered 1250 Eye Street NW and proceeded to Suite 250. SMF ¶123. She was not asked for identification at the front desk of the building on her first day or any day thereafter. *Id.*; SMF ¶97. Suite 250 was unlocked and the front desk unoccupied, with no posted restrictions regarding entry. SMF ¶112. None of the offices within Suite 250 were labeled by organization or individual occupant. SMF ¶¶112, 115. Within twenty minutes of her arrival, Robert Creamer and Mike Lux suggested that Ms. Maass could sit at Suite 250's front desk or in an unoccupied office, and Ms. Maass volunteered for the front desk. SMF ¶123. Lux commented Ms. Maass's place at the front desk would benefit the suite because it would "give somebody who walks in somebody to talk to." *Id.*

Ms. Maass was provided a key card to office suite which she used just once, "[o]ne morning [when she] got there five minutes before everyone else did." SMF ¶113. Key card management and tracking was haphazard, and AUFC still possessed some even after it moved out. SMF ¶100.

The facts show Democracy Partners cannot maintain an action for trespass because there is no evidence to support their "exclusive possessory interest" in Suite 250. As such, the Project Veritas Parties are entitled to summary judgment. At the very least, this Court should foreclose the

possibility that punitive damages may flow from nominal damages in this case, but the Project

Veritas Parties are entitled to judgment as a matter of law on the entire trespass claim.

### VI(A). Democracy Partners Has Established It Was Not in Possession of the Office and that the Office was Not Its Property.

The record reflects that during Ms. Maass's internship Democracy Partners was not the

owner or in sole or exclusive possession—or anything more than nominal possession—of Suite

250 or the offices therein in 2016.

> [A] person who is in possession of land includes <u>only</u> one who
> (a) is in occupancy of land with intent to control it, or
> (b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or
> (c) has the right as against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).

RESTATEMENT (SECOND) OF TORTS § 157 (emphasis added). The comments clarify that "[b]y

'occupancy' is meant such acts done upon the land as manifest a claim of *exclusive* control of the

land, and *indicate to the public that he who has done them has appropriated it*." *Id.*, comment (a)

(emphasis added). Democracy Partners did not manifest a claim of exclusive control—any

manifestation on the property itself, such as the sign on the door of the unlocked suite, included

the names of not only Democracy Partners members, but its clients, one of which was its landlord.

AUFC held the lease to the property, and in 2016 it was not subletting to Democracy

Partners. The Plaintiffs have not established the terms of AUFC's actual sublets with Strategic or

Mike Lux Media; terms between these sublessors, respectively; terms between sublessors and their

other clients who occupied Suite 250; or terms between the actual sublessors and Democracy

Partners.[10] Democracy Partners apparently did not pay rent—*anywhere*—in 2016. All evidence

---

[10] These distinctions have real consequences in trespass claims. For example, "[a] landlord who has granted [exclusive] possession to a tenant for a definite term has no immediate right of

indicates that Democracy Partners was, at most, a guest of AUFC, Strategic and/or Mike Lux Media. *Cf.* Dkt. 1 at ¶ 21 ("The office is not open to the general public; it is only open to Democracy Partners members, staff and invited guests."). Democracy Partners may not proceed with a trespass claim against the Project Veritas Parties because it was not in possession of Suite 250 in 2016.[11]

### VI(B). Allison Maass's Entry Was Authorized.

The Plaintiffs' failure to establish that Democracy Partners possessed any part of Suite 250 or the respective offices therein obviates the need to explore the other elements of trespass. However, owing to certain false representations by the Plaintiffs, these should also be addressed.

> Democracy Partners' private offices that are not accessible to the general public, have 24-hour security, and are only accessible if one signs into the building at the lobby security desk, if one is provided entrance by Plaintiffs' receptionist, and/or if one has an electronic pass card.

Dkt. 1 at ¶ 34. This may be an accurate representation of what the Plaintiffs would like their security to be, but it is not an accurate representation of reality during Ms. Maass's internship. Ms. Maass was never asked to sign in at the lobby security desk at 1250 Eye Street. SMF ¶97. The Plaintiffs did not have a receptionist in Suite 250 in September or October, 2016, and all of the tenants of that suite had Ms. Maass serve partially in that role. SMF ¶123. That is, before and during Ms. Maass's internship, visitors were allowed—and did—enter Suite 250, whether for appointments or deliveries. The lobby, hallways and elevators in the building and at least part of

---

possession and cannot maintain the action [for trespass] during such term." *Laird v. Kittrell*, 753 So. 2d 519, 520 (Ala. Civ. App. 1999) (internal citation omitted).

[11] Given the specific sublets to Mike Lux Media (a nonparty member of Democracy Partners) and Strategic at the time of Ms. Maass's internship and the establishment of no other possessory rights amongst members of Democracy Partners, Democracy Partners cannot assert organizational standing on behalf of either of those members. *See Ass'n of Merger Dealers, LLC v. Tosco Corp.*, 167 F. Supp. 2d 65, 69–71 (D.D.C. 2001).

Suite 250 were thus common areas in which neither Democracy Partners or Strategic (even if it actually pled a trespass claim) had a possessory interest.

Ms. Maass's entry was both authorized and, yet again, into areas that were not in the possession of Democracy Partners. Importantly, Ms. Maass's single use of the key card to enter Suite 250 the one morning she arrived shortly before anyone else does not transform the common area into property in the possession of Democracy Partners or even Strategic. The D.C. Court of Appeals addressed this in *Greenpeace v. Dow Chemical Company*. 97 A.3d 1053, 1060 (D.C. 2014). In that case, agents of Dow Chemical allegedly entered a locked room in Greepeace's office building and removed documents from a recycling bin. *Id.* at 1058. The court upheld the dismissal of Greenpeace's trespass claim, ruling that "the mere fact that a tenant may have the 'authority' to permit access into the common areas does not confer onto the tenant a legally recognized possessory interest in those areas." *Id.* at 1060. The evidence indicates that the leaseholder, AUFC, maintained authority to issue key cards—and may have still had cards of its own—in 2016. Based on the foregoing, the undisputed facts require Summary Judgment in favor of the Project Veritas Parties on the trespass claim.

### VI(C). Democracy Partners Disclaimed All Alleged Damages from Trespass, and this Court Should Rule that Any Punitive Damages are Unsupportable.

In the complaint Democracy Partners asserted that damages for trespass "include[ed] the diminution of the economic value of the office and the diminishment of the economic value of confidential and proprietary information, in the amount of at least $100,000." Dkt. 1 at ¶101; *see also* Dkt. 25 at 8. In discovery, the Plaintiffs disclaimed these damages. SMF ¶18 (Answers #3, #8, #9, #10). Moreover, the Plaintiffs made no effort in discovery to establish the value of the office or allegedly confidential information, or to establish any other actual damages relating to trespass. Thus, even if the Democracy Partners trespass claim is cognizable, it has asserted no

damages and, on the basis of this record, is thus foreclosed from seeking punitive damages. *See Feld v. Feld*, 783 F. Supp. 2d 76, 77 (D.D.C. 2011).

At the motion to dismiss stage, this Court ruled the trespass claim cognizable; at summary judgment, it must be supported by specific facts and it is not. There is no genuine issue of material fact that Democracy Partners was not the owner or possessor of Suite 250, and the Project Veritas Parties are entitled to summary judgment for trespass.

## VII. The Project Veritas Parties Did Not Commit Fraudulent Misrepresentation.

In the District of Columbia, fraudulent misrepresentation is defined by six factors:

> "(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) and with the intent to deceive, (5) with action taken in reliance upon the representation." . . . In addition, plaintiff must show [6] that she suffered some injury *as a consequence of her reliance* on the misrepresentation.

*Parham v. CIH Properties, Inc.*, 148 F. Supp. 3d 5, 9 (D.D.C. 2015) (internal citations omitted) (emphasis added); *see also* Dkt. 25 at 10. The Plaintiffs' case amounts to an argument that any deception, or misrepresentation, supports a cause of action for fraudulent misrepresentation. Fatal to the Plaintiffs' claim is the fact that they have not established damages or injuries that relate to any transactions that they engaged in with Allison Maass or the other Project Veritas Parties. Thus, the fraudulent misrepresentation claim must fail.

There is no genuine issue of material fact that the actual transactions with Allison Maass— that is, granting her an unpaid internship and providing her with information relating to their operations throughout her internship—damaged the plaintiffs. They did not. Quite the contrary: Ms. Maass performed her duties as an unpaid intern to the benefit of the Plaintiffs, SMF ¶124, and their interactions with Ms. Maass did not otherwise harm them but for revealing certain truths about their political operation. SMF ¶¶1-54; *see supra* Section III(C). The damages presented by the Plaintiffs – lost contracts that neither Ms. Maass nor the other Project Veritas Parties were

involved with – do not meet the transactional or proximate cause requirements of fraudulent misrepresentation; otherwise, the tort is unconstitutional under the First Amendment as applied to all of the Project Veritas Parties. The Court should grant summary judgment for the Project Veritas Parties on the claim of fraudulent misrepresentation.

### VII(A). The Plaintiffs Have Failed to Establish the Requisite Damages for Fraudulent Misrepresentation.

The Plaintiffs allege that Ms. Maass, conspiring with the other Project Veritas Parties, "made false representations regarding her name, intent in securing and maintaining the internship, purpose in seeking the internship, her education, and work history, among other representations." Dkt. 1 at ¶103. As a result, the Plaintiffs argued, they were entitled to damages for "lost contracts and the diminishment of the economic value of confidential and proprietary information." Dkt. 1 at ¶¶112–113. But these contracts were lost strictly as a result of publication and the Plaintiffs' other actions. *See supra* Section III(C)(1)-(3). Moreover, the Plaintiffs have disclaimed "any specific damages due to diminishment of the economic value of confidential and proprietary information." SMF ¶18 (Answer #8). As such, there is no genuine issue of material fact that the Plaintiffs' have cognizable damages and the Court should grant summary judgment in favor of the Project Veritas Parties on the count of fraudulent misrepresentation.

### VII(B). The Cancelled Contracts Are Not Cognizable Damages Under Fraudulent Misrepresentation.

The fraudulent misrepresentation count fails for the separate reason that the undisputed facts demonstrate that Plaintiffs fail to meet the transactional or proximate cause requirements of the tort. Fraudulent misrepresentation, as described consistently throughout the Second Restatement, must relate to a specific transaction in which a plaintiff engages in reliance on a false representation.

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them *through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced*.

RESTATEMENT (SECOND) OF TORTS § 531 (emphasis added). As clarified in the comments of Section 531, "[t]he liability under this Section of the maker of a fraudulent misrepresentation is also *limited to pecuniary losses suffered in the type of transaction* in which he intends or has reason to expect the conduct of others to be influenced." *Id.*, comment (g) (emphasis added). By disclaiming any specific damages that relate to allegedly confidential information provided to Allison Maass and, through her, to the other Project Veritas Parties, the Plaintiffs move beyond the requirement of the tort that the damages were suffered in a transaction with the Project Veritas Parties. *See* SMF ¶18 (Answer #8).

As a consequence of the Plaintiffs' reliance on the representations of the Project Veritas Parties, they gave Allison Maass an internship. This is the transaction the Project Veritas Parties intended to influence. *See, e.g.*, SMF ¶8. In that transaction and those that followed, Ms. Maass was paid nothing by the Plaintiffs in salary, contractual wage or fringe benefits. She completed every task assigned to her as part of the internship. SMF ¶124. Lauren Windsor even used Ms. Maass's work product after it was revealed she was a Project Veritas journalist. *Id.* Beyond Allison Maass, the Plaintiffs' transactions with the other Project Veritas Parties, specifically Project Veritas Action Fund, actually yielded a $20,000 donation to AUFC. SMF ¶65. This money was later returned by AUFC, despite no request by the Project Veritas Parties. *Id.* Ultimately, the undisputed facts demonstrate that Plaintiffs have not established any damages that actually arose within the confines of their transactions with the Project Veritas Parties. Moreover, and it bears

repeating: the Plaintiffs have not established—and have, in fact, *disclaimed*—the value of any information provided to Allison Maass or the Veritas parties. SMF ¶18 (Answer #8).

The transactional factor of fraudulent misrepresentation is bolstered by the doctrine of proximate cause.

> Under D.C. law, a plaintiff seeking recovery for fraudulent misrepresentation must prove "that the defendant[s'] challenged conduct proximately caused [the] plaintiff[s'] injury." . . . A defendant's challenged conduct is the proximate cause of a plaintiff's injury "only if 'the injury is the natural and probable consequence of the . . . wrongful act and ought to [have been] foreseen in light of the circumstances.'"

*Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of United States*, 258 F. Supp. 3d 1, 19 (D.D.C. 2017), *citing Steele v. Isikoff*, 130 F.Supp.2d 23, 34 (D.D.C. 2000) (other citations omitted). There is no factual dispute that Allison Maass—nor any other Project Veritas Party—could foresee that disclosure of information that the Plaintiffs provided here, some created as part of a contract with the Democratic National Committee, would cause the termination of a wholly separate contract and other work paid for by AFSCME. Other than possessing the extensive client list of Democracy Partners, there was nary a reference to AFSCME throughout Veritas's investigation. *See, e.g.*, SMF ¶133. The Project Veritas Parties were unaware that AUFC was but a conduit by which AFSCME paid the Plaintiffs more money. *Id.*; ¶39. This is a determinative fact: the withdrawal of AFSCME's funding was fundamental to the termination of AUFC's contract, making the Project Veritas Parties' knowledge of AUFC irrelevant. SMF ¶36 ("They stopped funding Americans United. Americans United ceased to exist. Bob lost his contract. It's pretty easy."); ¶46. Finally, as admitted by the Plaintiffs, Allison Maass—and thus the other Project Veritas Parties—had little-to-no knowledge about the Plaintiffs' patch-through call services for any of their clients, and such work was not in Allison Maass's orbit during the internship. SMF ¶136. The Plaintiffs' transactions with the Project Veritas Parties had nothing to do with patch-through calls, and thus

the Project Veritas Parties could not reasonably foresee cancellation of those services arising from their interactions with the Plaintiffs.

A plaintiff may recover damages for fraudulent misrepresentation that foreseeably affects contracts or future contracts with third parties. *See, e.g.*, *Int'l Totalizing Sys., Inc. v. PepsiCo, Inc.*, 560 N.E.2d 749, 753–56 (Mass. App. Ct. 1990); *Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 823 F. Supp. 2d 786, 814 (W.D. Tenn. 2011). If, for example, Ms. Maass had compromised confidential material from AFSCME or AUFC while working for the Plaintiffs, then the cancellation of those contracts would be reasonably foreseeable. But Ms. Maass's work barely—if ever—touched upon the work either organization paid the Plaintiffs to do, most certainly not AFSCME. *See* SMF ¶¶133-34. The Project Veritas Parties reiterate that there was no proprietary or confidential material viewed or shared by Ms. Maass in the first place. *See supra* Section IV(A).

The result of the Project Veritas Parties' representations to the Plaintiffs is, at worst, reputational harm resulting not from any transaction with the Project Veritas Parties, but from the publication of certain interactions. These publications were not misrepresented: even if the Plaintiffs are now "viewed by certain clients as not capable of maintaining the confidentiality of sensitive and confidential client information[,]" the information in question was unconnected with those clients. *See supra* Section IV. Without fraud, there is no fraudulent misrepresentation, and the Plaintiffs have failed to establish an issue of material fact that they were, in fact, defrauded. Without this, the tort is left as just "misrepresentation," and to apply it this way to the Project Veritas Parties would violate the First Amendment.

**VII(C). If the Cancelled Contracts are Cognizable Damages under Fraudulent Misrepresentation, Then the Tort Violates the First Amendment as Applied to the Veritas Parties.**

The fraudulent misrepresentation allegations by the Plaintiffs all arise out of the Project Veritas Parties' speech. *See Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812, 821 (S.D. Iowa 2019) ("The speech implicated is false statements and misrepresentations."). Ms. Maass's pseudonym "Angela Brandt," and her intentions at Democracy Partners, whether spoken or written in her résumé and e-mails, are all functions of speech or the press. *See, e.g.*, SMF ¶¶1-6. Supreme Court decisions such as *United States v. Alvarez* have affirmed that First Amendment strict scrutiny applies to laws that punish false speech, and such laws must punish something more than misrepresentation to survive. 567 U.S. 709, 718 (2012) ("Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements."). Thus, the Stolen Valor Act, which simply punished a citizen for misrepresenting that he was awarded military decorations, was unconstitutional. *Id.* at 723. If damages such as the Plaintiffs' lost contracts are cognizable under the tort of fraudulent misrepresentation, then it is unconstitutional as applied.

Lower courts have adhered to *Alvarez* by striking down laws that outlaw investigative reporting. A recent decision in Iowa overturned a law that prohibited "[o]btain[ing] access to an agricultural production facility by false pretenses[, or] . . . [m]ak[ing] a false statement or representation as part of an application or agreement to be employed at an agricultural production facility[.]" *Reynolds*, 353 F. Supp. 3d at 818, *citing* Iowa Code § 717A.3A (2012). Applying strict scrutiny, the court found that the governmental interests behind the law—property protection and biosecurity—were important but not compelling. *Reynolds*, 353 F. Supp. 3d at 824. Moreover, even assuming these interests were compelling, the law was not narrowly tailored, in part because

its lack of limitations, "allowing it to apply even to the most innocent of circumstances." *Id.* at 824–26.[12]

The Project Veritas Parties do not suggest that this Court strike down the tort of fraudulent misrepresentation, but "[i]t is axiomatic that '[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits. . . .'" *Thompson v. Armstrong*, 134 A.3d 305, 310 (D.C. 2016), *citing Snyder v. Phelps*, 562 U.S. 443, 451 (2011). To allow the Plaintiffs' fraudulent misrepresentation claim to proceed on their anemic theory would effectively outlaw investigative journalism in the District of Columbia, and perhaps beyond. This is not hypothetical, and the Court may consider an unrelated investigation by an unrelated journalist to reach the conclusion. In 2007, writing for *Harper's* magazine, journalist Ken Silverstein presented himself to several D.C. lobbying firms, utilizing myriad misrepresentations that echo in this case:

> Before approaching the lobbying firms, I made a few minimal preparations. I printed up some Maldon Group business cards, giving myself the name "Kenneth Case" and giving the firm an address at a large office building in London, on Cavendish Square. I purchased a cell phone with a London number. I had a website created for The Maldon Group—just a home page with contact information—and an email account for myself. Then . . . I began contacting various lobbying firms by email, introducing my firm and explaining that we were eager to improve relations between the "newly elected government of Turkmenistan" and the United States. We required the services of a firm, I said, that could quickly enact a "strategic communications" plan to help us.

*See* Ken Silverstein, *Their Men in Washington: Undercover with D.C.'s lobbyists for hire*, Harper's, July 1, 2007, at 53–61. The results were telling, and would only be more disturbing if these firms or lobbyists could have claimed Silverstein committed fraudulent misrepresentation simply because they lost or missed out on other business opportunities. Yet this is precisely what

---

[12] The court noted the law would fail even the lesser demands of intermediate scrutiny. *Reynolds*, 353 F. Supp. 3d at 826–27.

the Plaintiffs propose to do here. The nature of their asserted damages also walks a line too closely to reputational harm, harms already dispelled above. *See supra* Section III.

The Plaintiffs' alleged damages here are so tenuous, or so far removed from the Project Veritas Parties' misrepresentations, that if they pass muster under the transactional or proximate cause requirements of the tort itself, the tort is unconstitutional as applied. The Court need not reach this issue, because the Plaintiffs did not suffer any damages and their claims do not raise an issue of material fact under the tort of fraudulent misrepresentation: the lost contracts were not part of a transaction with Allison Maass or the Project Veritas Parties, and in any event were not reasonably foreseeable in any of their interactions. As such, the Court should respectfully grant summary judgment in favor of the Project Veritas Parties on the count of fraudulent misrepresentation.

## VIII. The Project Veritas Parties Are Not Liable for
## Conspiracy to Investigative and Report the News

Under D.C. Law, vicarious liability attaches to torts for civil conspiracy. As this Court previously recognized in this case, "civil conspiracy depends on the performance of some underlying tortious act[.]" Dkt. 25 at 23 (citing *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994)). Because the Project Veritas Parties are entitled to judgment as a matter of law on all underlying tort claims, the civil conspiracy allegation is moot. *See* Dkt. 25 at 24. The only agreement here was one to investigate and report the news.

[Remainder of Page Intentionally Left Blank]

44

## IX. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted in its entirety.

Respectfully submitted,

By:      /s/ Paul A. Calli
Paul A. Calli
Florida Bar No. 994121
Chas Short
Florida Bar No. 70633
CALLI LAW, LLC
14 NE 1st Ave, Suite 1100
Miami, FL 33132
Telephone: (786) 504-0911
Facsimile (786) 504-0912
PCalli@Calli-Law.com
CShort@Calli-Law.com
*Admitted pro hac vice*

/s/ Kerry Brainard Verdi
Kerry Brainard Verdi, Esq.
Bar No. 478486
Benjamin R. Ogletree
Bar No. 475094
VERDI & OGLETREE PLLC
1325 G Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 449-7703
Facsimile: (202) 449-7701
kverdi@verdiogletree.com

/s/ Michael J. Madigan
Michael J. Madigan
Bar No. 71183
LAW OFFICES OF MIKE MADIGAN PLLC
3910 Hillandale Court NW
Washington DC 20007
Telephone: (202) 255-2055
Mjm20@mac.com

/s/ Benjamin T. Barr
Benjamin Barr (Pro Hac Vice)
STATECRAFT PLLC
444 N. Michigan Ave. #1200
Chicago, Illinois 60611
Telephone: 202-595-4671
ben@statecraftlaw.com
*admitted pro hac vice*

/s/ Stephen R. Klein
Stephen R. Klein
Bar No. 177056
STATECRAFT PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@statecraftlaw.com

*Counsel for Defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maass*

## **CERTIFICATE OF SERVICE**

I CERTIFY that on May 6, 2019, I served the foregoing through the Court's electronic filing system which served a copy on all counsel of record.


*/s/ Paul A. Calli*
Paul A. Calli, Esq.