UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC,
et al.,

       Plaintiffs,

v.

PROJECT VERITAS ACTION FUND,
et al.,

       Defendants.

_____/

CASE NO.: 1:17-CV-1047-ESH

## PROJECT VERITAS PARTIES' STATEMENT OF MATERIAL FACTS

### I. Misconduct by Plaintiffs Bob Creamer, Strategic Consulting Group, Democracy Partners, and Subcontractor Scott Foval is Exposed by the Reporting of the Project Veritas Parties.

1.    Project Veritas Action Fund, Inc. ("PVA") performed journalistic investigations leading up to the 2016 Presidential Election, resulting in video news reporting that was viewed over 10 million times on YouTube alone and widely reported on or republished by other media outlets. (*See* Affidavit of James O'Keefe ("O'Keefe Aff."), attached hereto as Ex. A at ¶¶ 7, 10). PVA is a 501(c)(4) organization that focuses on newsgathering investigations of election issues and political campaigns. (O'Keefe Aff. ¶ 3). Project Veritas, PVA, and their journalists have routinely engaged in undercover news investigations utilizing secret recording, including in the District of Columbia, and, before the start of the "Rigging the Election" news investigation, knew that D.C. was a one party consent jurisdiction and relied on that fact. (O'Keefe Aff. ¶ 5; Affidavit of Allison Maas ("Maass Aff.") attached hereto as Ex. B at ¶ 3).

2.      In October 2016, PVA published "Rigging the Election" – a four-part video series in which the conduct of Plaintiffs and their subcontractor Scott Foval, often described in their own, unedited, raw, accurate words, featured prominently. *Project Veritas Action: Democracy Partners Investigation*, YOUTUBE, https://www.youtube.com/playlist?list=PLXvy1DRoSfZlzszVv2sw3-IUPL6YlER6_ (all four parts ("Video I", "Video II", "Video III", and "Video IV", respectively) included as Exhibit 1 to the Affidavit of Stephen Klein ("Klein Aff.")), attached hereto as Ex. C). Plaintiff Democracy Partners is a political consulting firm. Dkt. 1 at ¶19. Plaintiff Strategic Consulting Group is an entity wholly owned and operated by Plaintiff Bob Creamer and used for his political consulting work. Dkt. 1 at ¶18.  Creamer is a political consultant and the spouse of a sitting Member of Congress; he is a felon who was convicted of bank fraud and failure to pay withholding taxes in 2005. (Klein Aff. Ex. 2 at 8:17-10:2). Those convictions were discussed in "Rigging the Election." (Klein Aff. Ex. 1 at Video I at 4:08-4:17).

3.      As part of the "Rigging the Election" video series, Project Veritas investigative journalists discussed with Creamer, Foval, and others, a proposed voter fraud scenario in which voters would be transported across state lines to vote illegally in states in which the voters were not residents, and obtained their reactions to the proposed scheme. (Klein Aff. Ex. 1 at Video II at 3:33-8:58). The project was referred to as "re-enfranchisement." (*Id.* at Video II at 12:11-13:47).

4.      Project Veritas journalists were also solicited by Scott Foval for funding that would support aggressive "bird-dogging" operations at Donald Trump events, drawing the attention of the press by getting Trump supports to "pop off." (*See id.* at (Video I at 7:09-9:11; 11:16-13:48). Foval took credit for instigating such incidents, with help from Creamer. (*See* Klein Aff. Ex. 3 at PVA00013718 at 27:11 to 29:10).

5.      Some of the footage used in "Rigging the Election" was gathered by Project Veritas investigative journalist Allison Maass, who interned at Democracy Partners under the pseudonym "Angela Brandt." (Maass Aff.  ¶¶ 4, 20); *see, e.g.,* Klein Aff. Ex. 1 at Video I 03:37–4:00; 4:21-4:38; 9:10-10:14; 10:51-10:59). She was a party to every conversation she recorded. (Maass Aff. ¶ 20).

6.      Following the publication of PVA's "Rigging the Election" reporting, Creamer cancelled his contract with the Democratic National Committee, Foval was fired, two special interest groups (including one, Americans United for Change ("AUFC"), for which Foval was a deputy director) stopped doing business with Strategic Consulting Group ("Strategic"), and a prospective special interest group client cancelled a meeting with Creamer. (Klein Aff. Ex. 4; Ex. 5  at 68:14-71:22;  126:1-127:8; Ex. 6 at 75:1-9; Ex. 7).

**I(A). Scott Foval: "Brad [Woodhouse], Bob [Creamer], [Mike] Lux and myself are all part of the old school method where it doesn't matter what the friggin' legal or ethics people say, we need to win this motherfucker."**

7.      Scott Foval was a political consultant and subcontractor to Mobilize, Inc., which is essentially Democracy Partners. (*See* Klein Aff. Ex. 8). Foval summarized his subcontractor work on behalf of Democracy Partners, and his work for the Clinton Presidential Campaign and the Democratic National Committee, as follows: "The campaign pays DNC, DNC pays Democracy Partners, Democracy Partners pays the Foval Group, the Foval Group goes and executes the shit on the ground." (Klein Aff. Ex. 1 at Video I 3:11-3:21). Foval was also a director for AUFC, a special interest group which paid Strategic for consulting work. (Klein Aff. Ex. 5 at 52:9-53:9).

8.      Foval met on several occasions with Project Veritas investigative journalist Christian Hartsock. The journalist used the assumed identity of "Steve Packard," a junior consultant in a firm called "Breakthrough Development Group" which represented a wealthy

individual who could fund the proposed voter fraud scenario. (Klein Aff. Ex. 9 at 45:15-47:9 & Depo. Ex. 5).

9.      Foval also spoke with the Project Veritas investigative journalist regarding Foval's use of a technique called "bird-dogging," both historically and at Donald Trump campaign rallies. (Klein Aff. Ex. 1 at Video I at 11:50-13:15). As Foval described it, bird-dogging is the placement of individuals at political rallies with the goal of provoking conflict, including violence. (*Id.* at Video I at 13:15-14:40). "Rigging the Election" published Foval's own, unedited, raw, accurate words on this subject, including:

        a.      "Conflict engagement in the lines at Trump rallies. We're starting anarchy here." (*Id.* at Video I at 0:30-0:39).

        b.      "The key is initiating the conflict by having leading conversations with people who are naturally psychotic." (*Id.* at Video I at 7:47-7:57).

        c.      "If you're there and you're protesting and you do these actions, you will be attacked at Trump rallies. That's what we want . . . . The whole point of it is that Trump's people will freak the fuck out, his security team will freak out, and his supporters will lose their shit." (*Id.* at Video I at 2:18-2:37).

        d.      "We have people prepared to go wherever these events are, which means we have to have a central kind of agitator training." (*Id.* at Video I at 8:46-8:58).

        e.      "We have mentally ill people that we pay to do shit. Make no mistake." (*Id.* at Video I at 13:48-13:55).

10.      Foval also offered distasteful and condescending views of voters and the American political system, including describing Iowa as "a fifty-fifty state and honestly half the state is racist as fuck," and adding, "Wisconsin is just as bad." (*Id.* at Video I at 15:09-15:22; 15:40-15:43).

**I(B). "Bob Creamer is diabolical."**

11.     The first time the Project Veritas Parties became aware of Bob Creamer was when Foval explained his belief that Creamer must have been the one advising the investigative journalist's "client" on how to execute the proposed voter fraud scenario. (*Id.* at Video II at 8:58-9:23).

12.     Foval opined to the Project Veritas Journalist, "I know pretty closely who's advising [the investigative journalist's client] on that. I work with the same person. There is somebody who hatches these ideas to people like him on an ongoing basis  . . . so Bob Creamer comes up with a lot of these ideas. I work with Bob Creamer one-to-one all the time. I'm the white hat, Democracy Partners is kind of a dark hat. I will probably end up being a partner there at some point, because our philosophy is actually the same." (Klein Aff. at Ex. 3 at PVA00013718 at 23:59-24:38; *see also* Ex. 1 at Video I at 4:37-48 (publication of Foval's white hat/dark hat analogy)).

13.     Foval explained, "We are contracted directly with the DNC and the [Clinton] campaign both . . . . I am contracted to him [Creamer]. But I answer to the head of special events for the DNC and the head of special events and political for the campaign." (Klein Aff. Ex. 1 at Video I at 2:54-3:11).

14.     Foval was also recorded (and subsequently also broadcast) elaborating on his close working relationship with Creamer, "Bob Creamer is diabolical. And I love him for it." (Klein Aff. Ex. 1 at Video I at 4:46-4:49).

15.     In a phone call, Foval explained that Creamer shares Foval's philosophy: "Brad [Woodhouse, President of AUFC],  Bob [Creamer], [Democracy Partners Member Mike] Lux and myself are all part of the old school method where it doesn't matter what the friggin' legal or ethics

people say, we need to win this motherfucker." (Klein Aff. Ex. 1 at Video I at 1:40-1:50; Ex. 10 at 11:50-12:05).

16.     Foval also explained, in video released as part of the "Rigging the Election" series, Creamer's connection to the practice of birddogging: "the guy who got roughed up [at a speech by then-Wisconsin Governor Scott Walker at the Iowa State fair] is my counterpart who works for Bob." (Klein Aff. Ex. 1 at Video I at 12:15-12:23; *see also* Ex. 2 at 161:18-162:12).

17.     Project Veritas's reporting also included Foval's description of how information travels between political consultants and the Clinton campaign as they coordinate efforts. "The campaign pays DNC, DNC pays Democracy Partners, Democracy Partners pays the Foval Group, the Foval Group goes and executes the shit on the ground."  (Klein Aff. Ex. 1 at Video I at 3:12-3:21). Foval also described Democracy Partners as "the tip of the spear. . . ." (*Id.* at Video I at 3:30-3:37). According to Foval, coordination between the campaign and the Super PACs is "less of a Morse code than it is a text conversation that never ends. It's like that. It's kind of an ongoing pony express." (*Id.* at Video I at 6:30-6:43).

## II. Special Interest Groups Stop Doing Business with Creamer's Entity, Strategic Consulting Group.

18.     Plaintiffs admit that the only alleged damages are those purportedly suffered by Strategic when, following the publication of "Rigging the Election," two special interest group clients – American Federation of State, County, and Municipal Employees ("AFSCME") and AUFC – stopped doing business with it, and a potential special interest group client, Dialysis Patient Citizens, canceled a meeting with Creamer.   (Klein Aff. Ex. 11 at Answers to Interrogatories #3, #8-#10). Plaintiffs explicitly abandoned any claim they suffered damages due to "diminishment of the economic value of confidential and proprietary information," or "damages to reputation suffered by any Plaintiff." (*Id.).*

19.    Plaintiff Democracy Partners did not suffer damages. (*See id.*).

20.    Plaintiff Bob Creamer did not suffer damages. (*See id.*).

**II(A). AFSCME: "I suspect the loss of our contract and financial support will be included in their claim for damages."; "Probably, but not very smart if it is."**

21.    In 2016, AFSCME had written contracts with Strategic for $3,000 per month. (Klein Aff. Ex. 12 at DP_0000050). The contract was for a period of one year. (*See id. at* DP_0000050-0000051).

22.    Strategic provided "automated telephone calls and other specific services" to AFSCME. (Klein Aff. Ex. 11 at Answers to Interrogatories #3). From 2007 through 2016, plaintiffs allege income to Strategic Consulting Group from these services totaled $1,508,359.00. (*Id.*).

23.    Upon learning of Video I on October 17, 2016, AFSCME Director of Governmental Affairs Scott Frey discussed the video with AFSCME Chief of Staff Bill Lurye.  (Klein Aff. Ex. 6 at75:1-9). At that point, "we just mutually agreed that we should end the relationship." (*Id.*) AFSCME concurrently decided to terminate its relationship with Strategic and AUFC. (*Id.* at 91:15-92:1).

24.    AFSCME President Lee Saunders was "extremely angry" and "disappointed" with Creamer and AUFC President Brad Woodhouse for "allow[ing] this type of distraction to occur . . . ." (Klein Aff. Ex. 6 at 74:8-20).

25.    Saunders was concerned that AFSCME's financial relationship implied AFSCME's involvement with the conduct by Plaintiffs reported on in the "Rigging the Election" video. (*Id.*).

26.    AFSCME terminated its relationship with Plaintiffs because there was "an element of indiscretion" in Plaintiffs allowing "*Mr. Foval* into their midst without serious vetting" and

creating the opportunity for a major, unwelcome, distraction "at a critical moment in time." (*Id.* at 77:1-14) (emphasis added); *see also id.* at 77:15-20 ("We felt like that was carelessness on their part.")). "[T]he broader concern was just clearly, *regardless of the circumstances that led to the video*, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it." (*Id.* at 78:22-79:5 (emphasis added)).

27.     AFSCME had "concerns" with what Creamer said on video, and found it inappropriate that Creamer "was speaking ad hoc about his strong ties to the Clinton campaign . . . ." (Klein Aff. Ex. 6 at 78:10-16).

28.     AFSCME's decision not to renew its contract with Strategic was also motivated by financial concerns that pre-dated the publication of Project Veritas's reporting in the "Rigging the Election" series. (*See* Klein Aff. Ex. 6 at 30:11-14).

29.     AFSCME sought to conserve resources following the United States Supreme Court decisions in *Friedrichs v. Cal. Teachers Ass'n*, 136 S. Ct. 1083 (2016) and *Harris v. Quinn*, 134 S. Ct. 2618 (2014). (*Id.* at 28:16-29:15 ("given the financial constraints, I decided there was little justification for" the contract)).

30.     AFSCME has "not renewed a contract with anyone because of those concerns about our, our budget." (*Id.* at 28:2-4).

31.     AFSCME decided to terminate its relationship with AUFC and Democracy Partners prior to the publication of "Rigging the Election" Video II on October 18, 2016. (*See id.* at 90:10-92:1).

32.     Following the result of the Presidential election, the value of a consultant "like Mr. Creamer" seemed less useful in a Trump White House. (*Id.* at 30:15-22).

33.     Although AFSCME considered finding a consultant who might help open doors with Republican offices, when it was apparent this would increase the cost to AFSCME, AFSCME felt like it could do the work itself. (*See id.* at 31:1-7).

34.     AFSCME had no concerns with the circumstances of investigative journalist Allison Maass's presence in the Democracy Partners office or the circumstances of her internship: "it all seemed very moot at the time" and "the circumstances of her presence there at that point seemed irrelevant." (*Id.* at 85:22-86:7).

35.     After Plaintiffs filed this lawsuit, Frey told Lurye "I suspect the loss of our contract and financial support will be included in their claim for damages."  (Klein Aff. Ex. 13). Lurye replied, "Probably. But not very smart if it is." (*Id.*).

**II(B). AUFC shuts down because its principal funder AFSCME "Couldn't take the heat" given that a substantial portion of its membership "do[es]n't support the Democratic side or didn't support Hillary."**

36.     Strategic provided "automated telephone calling and other specific services" to AUFC. (Klein Aff. Ex. 11 at Plaintiffs' Answers to Interrogatories #3). In 2016, AUFC had an unwritten contract with Strategic Consulting Group for $11,000 per month. (*See, e.g.*, Klein Aff. Ex. 14). The funding to pay for this contract was dependent on AFSCME.  (Klein Aff. Ex. 5 at 126:1–27:8) ("They stopped funding Americans United. Americans United ceased to exist. Bob lost his contract. It's pretty easy.")).  AUFC had no formal budget. (*See id.* at 93:1-4).

37.     AUFC was not contractually obligated to pay the amount which Plaintiffs have identified as their damages relating to AUFC.  (*See id.* at 93:8-16).

38.     AUFC's principal funder was AFSCME.  (*See id.* at 26:5-11).

39.     The Project Veritas Parties were unaware of the fact that AUFC was principally funded by AFSCME.  (O'Keefe Affidavit ¶ 11).

40. AFSCME decided to terminate its relationship with AUFC prior to the publication of Video II on October 18, 2016. (Klein Aff. Ex. 6 at 90:10-92:1).

41. Following publication of Video I, AFSCME President Lee Saunders came under criticism for his role as Chair of AUFC's board, a fact revealed in a Wisconsin blog post. (Klein Aff. Ex. 5 at 67:16-68:1).

42. In a meeting with AUFC, Saunders explained that following the publication of Video I by Project Veritas,

> 40 percent of his membership – some percentage of his membership, you know, don't support the democratic side or didn't support Hillary, and he – he couldn't take the heat, couldn't be associated with it. Even if he didn't believe any of the, you know, the stuff alleged occurred, he couldn't be – he couldn't be associated with it.

(Klein Aff. Ex. 5 at at 79:19-80:20; *see also* 82:8-11 ("Can't take the heat.")).

43. Saunders was also upset that he did not get prior notice from Creamer or AUFC prior to the reporting being published. (*See id.* at 68:2-4).

44. AUFC fired Foval because "he allowed himself to be compromised," and the things that Foval said

> [w]ere so beyond the pale outrageous that it was – it was clear that he was, for whatever reason, saying things that were – that were not reflective of us or our values or anything that we would ever participate in and, you know, he was – [. . . ] going to be employed at that point only for another two weeks. So we terminated him.

(Klein Aff. Ex. 5 at 70:8-22; 72:7-20).

45. AUFC had no knowledge that Allison Maass's internship work at Democracy Partners led to AFSCME cutting ties with AUFC, and it "never came up." (*Id.* at 114:13-22).

46. AUFC shut down in February 2017. (*See id.* at 12:7-9). According to its Rule 30(b)(6) designee,

> We had no more sources of funding. I mean, our primary – like I said, our primary source of funding was or significant source of funding had been AFSCME, and that relationship was severed.

(*Id.* at 75:5-12).

**II(C). Dialysis Patient Citizens: "After the video that was leaked of you on Fox News, one of my funders requested that we find another firm other than Democracy Partners to help with our grassroots efforts. As a result, I am going to have to cancel our meeting tomorrow."**

47.     Dialysis Patient Citizens has never contracted with Strategic Consulting Group, Democracy Partners or Robert Creamer and has never engaged them in any business capacity. (*See Klein* Aff. Ex. 15 at 9:18-10:20).

48.     Hrant Jamgochian is the CEO of Dialysis Patient Citizens. (*See id.* at 9:6-9).

49.     Dialysis Patient Citizens had scheduled a meeting with Robert Creamer on November 10, 2016. (Klein Aff. Ex. 7).

50.     In an email dated the previous day, Jamgochian canceled the meeting:

> After the video that was leaked of you on Fox News, one of my funders requested that we find another firm other than Democracy Partners to help with our grassroots efforts. As a result I am going to have to cancel our meeting tomorrow.

(*Id*.).

51.     Jamgochian had been informed by his staff "of some of the negative publicity, which is why I decided to cancel pursuing our partnership or potential partnership." (Klein Aff. Ex. 15 at 11:5-11.) His concern was "PR. I represent a nonprofit organization, and for Dialysis Patient Citizens need to make sure that we maintain the best possible public image." (*Id.* at 11:12-17).

52.     In an email the day after the election, Creamer acknowledged to Jamgochian, "[I]f you want contacts in the new Trump administration, Im [sic] probably the wrong guy to give you advice anyway :-)". (Klein Aff. Ex. 16).

53.     The only thing close to "business" between Dialysis Patient Citizens and Plaintiffs was scheduling and then canceling a meeting about potential opportunities to work together. (Klein Aff. Ex. 15 at 10:14-20).

54.     Not only was there no contract between Dialysis Patient Citizens and Plaintiffs, but there was also no agreement on how much money Dialysis Patient Citizens might pay to Plaintiffs. (*See id.* at 10:5-13).

**III. The Project Veritas Parties' Investigative Journalism in "Rigging the Election."**

55.     Founded in 2010, Project Veritas, Inc. ("Project Veritas") is a newsgathering organization that primarily utilizes secret recording and undercover investigative reporting. (O'Keefe Aff. ¶¶ 1, 5). It is organized as a 501(c)(3) tax-exempt organization. (O'Keefe Aff. ¶ 2).

**III(A). Foval's Statements about Creamer Lead the Project Veritas Parties to Creamer and Democracy Partners.**

56.     In his cover identity as "Steve Packard" of "Breakthrough Development Group," investigative journalist Christian Hartsock met Foval in April 2016 in Harbock, Wisconsin. (Klein Aff. Ex. 9 at35:6-38:12.) They met again at a bar that evening. (*See* Klein Aff. Ex. 3 at PVA00013717-PVA00013719).

57.     On that date, Foval entertained the scenario proposed by the investigative journalist that would enable nonresidents to vote illegally in Wisconsin, suggesting ways to make the voter fraud scheme more effective. (*See generally* Klein Aff. Ex. 3 at PVA00013717- PVA00013719).

58.     This meeting – in which Foval described Creamer as "diabolical" and as the possible source of the voter fraud scenario, -- was the first time the Project Veritas Parties became aware of Creamer. (Klein Aff. Ex. 17 at 100:2-7).

59.     Project Veritas journalists researched Robert Creamer. In this process they came across e-mails from the Clinton Campaign released by WikiLeaks.  (*See* Klein Aff. Ex. 18 at

PVA00000906). These e-mails included one from Robert Creamer on May 17, 2016 advising recipients of a "Trump Rapid Response/Bracketing Call" at 1:00 P.M., including the call-in number 641-715-3288, and passcode 782537. (*Id.* at PVA00000920).

60.     As the investigation continued, Project Veritas journalist Dan Sandini, whose cover identity was "Breakthrough Development" client "Charles Roth," was referred by Foval to Creamer. In an e-mail beginning this introduction on July 16, 2016, Foval noted that "I have not yet vetted him, and think it would be best to have your help on this first one." (Klein Aff. Ex. 19).

61.     Foval arranged a phone call between Mr. Sandini and Creamer in June 2016. (*See* Klein Aff. Ex. 20). It was their first phone call.

62.     Foval also arranged for Mr. Sandini and Creamer to meet in a hotel lobby on July 15, 2016. (Klein Aff. Ex. 21; *see* Klein Aff. Ex. 1 at Video II at 9:42-11:37).

63.     Mr. Sandini met with Creamer again for dinner on August 17, 2016. During this dinner, Creamer announced that the DNC would be launching an initiative known as "Donald Ducks" at Trump Tower in New York City the following morning. (Klein Aff. Ex. 1 at Video III at 2:02-2:29). The effort involved bracketing Donald Trump and Mike Pence appearances with events featuring a contractor dressed as Donald Duck and holding a sign that says "Donald Ducks Releasing His Tax Returns." (*Id*).

64.     Mr. Sandini's third and final meeting with Creamer was with Brad Woodhouse and Caroline Ciccone at AUFC on August 18, 2016. (*See* Klein Aff. Ex. 1 at Video III at 12:42-13:11). Prior to this meeting, Brad Woodhouse requested that Emili Jack at AUFC "pull everything you can on this Charles Roth guy – bio, giving history, etc." The only thing Jack could locate six hours later was a Facebook profile. (Klein Aff. Ex. 22).

65.     As part of investigating the news story published as "Rigging the Election," Project Veritas Action Fund caused a $20,000 donation to be made to AUFC. (*See* Klein Aff. Ex. 1 at Video IV at 5:55-6:52). This money was later returned by AUFC, despite no request from the Project Veritas Parties. (*See id.* at Video IV at 17:09-17:38; O'Keefe Aff. ¶14).

**III(B). Allison Maas's Four Week, Unpaid, Internship at Democracy Partners Begins.**

66.     Allison Maass was an investigative journalist. In the "Rigging the Election" investigation, her cover identity was "Angela Brandt," niece of "Charles Roth." Maass Aff. ¶ 4).

67.     Mr. Sandini told Creamer that Ms. Maass was interested in an internship in the field of political work. (*See* Klein Aff. Ex. 23).

68.     Ms. Maass called Creamer in August 2016 and Creamer offered her an internship with Democracy Partners. (*See* Klein Aff. Ex. 24 at PVA00013183 at 0:35-1:25).

69.     Ms. Maass accepted the internship knowing it was unpaid. (*See id.* at PVA00013183 at 6:21-7:03).

70.     The unpaid internship for Democracy Partners began on September 21, 2016. (Maas Aff. ¶ 5). She interned at Democracy Partners about three days per week until October 14, 2016.  (*Id.*).

71.     Ms. Maass was never an intern for Strategic. (*Id.* ¶ 6). Prior to this lawsuit, she did not recall hearing the name Strategic Consulting Group.

72.     Ms. Maass was never an intern for Creamer in Creamer's personal capacity. (*Id.*).

73.     No written agreement between Ms. Maass and Democracy Partners – or any other Plaintiff – governed her unpaid internship. (Klein Aff. Ex. 11 at Plaintiffs' Answers to Interrogatories #6).

74.     No one at Democracy Partners asked Ms. Maass for legal identification before beginning her unpaid internship. (Klein Aff. Ex. 25 at Plaintiffs' Answers to RFA #7).

75.     No one at Democracy Partners asked Ms. Maass for legal identification prior to beginning her unpaid internship.  (*See* Klein Aff. Ex. 26 at 155:6-10).

76.     No one at Democracy Partners asked Ms. Maass for references before beginning her unpaid internship or at any time during her unpaid internship. (Maass Aff. ¶ 7).

77.     No one at Democracy Partners asked Ms. Maass for a résumé before beginning her unpaid internship.  (Klein Aff. Ex. 27).

78.     After the unpaid internship began, Lauren Windsor asked Ms. Maass for a résumé for use in "determining projects" to assign to her.  (Klein Aff. Exs. 28, 29, 25 at Plaintiffs' Answers to RFA #6). Ms. Maass provided a résumé for "Angela Brandt" on the third day of her unpaid internship, September 23, 2016.  (Klein Aff. Ex. 29; *cf.* Dkt. 1 ¶45). The resume identified prior work as a waitress and bartender, and education completed through the high school level with community college in progress.  (Klein Aff. Ex. 29).

79.     Ms. Maass was a party to every conversation she recorded while interning at Democracy Partners. (Maass Aff.¶ 20).

**III(C). Plaintiffs Chose Not to Present Allison Maass with a Confidentiality or Non-Disclosure Agreement.**

80.     Windsor told Creamer that the timing of Maass's internship was suspicious, but Creamer told her "don't worry about it; it's a friend's niece." (Klein Aff. Ex. 30 at 23:57-24:04).

81.     Windsor also

> . . . went to Bob [Creamer], I said, you know, "Who is this person? You should be, uh, you know, getting an NDA from them, getting their ID." And, you know, he told me again that, uh, it was covered, don't worry about it. Um, "if you want to do that, then that's up to you, but, uh, it's covered."

(*Id.* at 24:51-25:19.).

82.     Creamer mentioned to Ms. Maass near the end of the first day of the unpaid internship, "And, uh, [Windsor] has some kind of a nondisclosure agreement to sign or something." (Klein Aff. Ex. 31 at PVA00013211 at 02:21 to 02:38).

83.     None of the Plaintiffs ever provided a confidentiality agreement or a non-disclosure agreement to Ms. Maass. (*See* Klein Aff. Ex. 11Plaintiffs' Answers to Interrogatories #6).

84.     In fact, none of the Plaintiffs had any written agreements with Ms. Maass whatsoever. (*Id.*).

85.     Creamer never "explicitly told Maass that based on the confidential and sensitive nature of the mission and programming of Plaintiffs SCG and Democracy Partners, the information, and any additional information she was given over the course of her internship, was confidential and not to be shared with anyone other than persons with whom she had specifically been instructed to share that information." (Maass Aff. ¶ 13; *cf.* Dkt. 1 ¶32 and ¶39).

86.     Creamer's statement "And, uh, [Windsor] has some kind of a nondisclosure agreement to sign or something." was the sole reference by Plaintiffs a non-disclosure agreement, NDA, or any other sort of confidentiality agreement during the time of Ms. Maass's unpaid internship. (Maass Aff. ¶ 14).

**III(D). The Informal Nature of Democracy Partners.**

87.     There is "a very loose relationship between these companies that make up Democracy Partners." (Klein Aff. Ex. 32 at 74:5-7.) "[F]or the most part we are a group of people with like-minded political ideas that help each other out and try to work together when we can." (*Id.* at 74:7-11.)

88.     Members of Democracy Partners generally pay yearly "dues," "to cover legal fees and host events and that sort of thing."  (*Id.* at 81:16-20). At least one member provides in-kind technology services and pays no dues.  (*Id.* at 81:15-82:5).

89.     Democracy Partners' Rule 30(b)(6) witness testified that as far as he knew Democracy Partners never had any employees. (*Id.* at 31:5-7).

90.     Democracy Partners' Rule 30(b)(6) witness, whose entity is a member of Democracy Partners, does not regard membership as a "real job."  (*Id.* at 148:18-20) ("That's a common reason why people leave the firm, because they take a real job and don't want to be a part of it anymore.")).

91.     An entity called Mobilize, Inc. ("Mobilize") holds itself out as a member of Democracy Partners on certain invoices, even though it has never been a member of Democracy Partners. (*Cf.* Klein Aff. Ex. 33 at Answer to O'Keefe Interrogatory #10) *with* Klein Aff. Ex. 34). According to Creamer, there is no difference between the activities of Mobilize, Inc. and Strategic Consulting Group. (Klein Aff. Ex. 2 at 142:3–145:10).

92.     Mike Lux Media is a member of Democracy Partners. (Klein Aff. Ex. 11 at Plaintiffs' Answers to Interrogatories #4). Mike Lux is the sole member of Mike Lux Media. (*Id.*).

93.     American Family Voices is an entity which was located in the same office suite as Democracy Partners. (Klein Aff. Ex. 26 at 95:19-96:2). Although staffed by Mike Lux and with Lauren Windsor as its Executive Director, it was not a member of Democracy Partners and at least occasionally acted independently and even contrary to the goals of Strategic clients like AUFC. (*See* Klein Aff. Ex. 35 (March 13, 2015 e-mail chain between Jeremy Funk of AUFC and Robert Creamer in which Funk refers to the opposition of American Family Voices to Loretta Lynch's

nomination to Attorney General as "shit."); Ex. 11 at Plaintiff's Answers to Interrogatories #4; Ex.

27 (Windsor's "Executive Director" Title)).

94.     Like American Family Voices, Strategic and Mike Lux Media, also shared office

space with Democracy Partners. (Klein Aff. Ex. 25 at Plaintiffs' Answers to RFA at ¶1).

95.     None of those entities has a written confidentiality or non-disclosure agreement

with Democracy Partners. (*See id.* at Plaintiffs' Answers to RFA at ¶¶2-3).

96.     The Democracy Partners office was at 1250 Eye Street NW, Suite 250 ("Suite

250"). (*See* Klein Aff. Ex. 31 at PVA00013195 at 07:35–08:05).

97.     Ms. Maass was never asked to sign in or asked for identification by anyone at the

front desk of the office building where Suite 250 was located. (Maass Aff. ¶ 8).

98.     A sign next to the Suite 250's door listed several organizations: AUFC, Democracy

Partners, American Family Voices, Picture Motion, and Alliance for Citizenship. (Klein Aff. Ex.

31 at PVA00013195 at 08:43; *see also* Ex. 36).

99.     Suite 250 was leased by AUFC in 2011, which at that time sublet space to Strategic,

Progressive Strategies, and Manatt Media.  (*See* Klein Aff. Ex. 37).

100.    AUFC moved out in early 2015, although it continued to possess key cards to the

suite and left a good deal of furniture in the suite.  (Klein Aff. Ex. 39, 40, 38, 46).

101.     At that time AUFC sublet Suite 250 to Mannatt Media, Mike Lux Media and

Strategic while continuing to pay the largest share—between 50 and 60 percent—of rent and other

costs. (Klein Aff. Ex. 39 & 40).

102.    Since then, Strategic and Democracy Partners were at times billed separately for

certain office spaces.  (*See* Klein Aff. Ex. 41).

103.    Rent obligations for individual offices in Suite 250 c.\hanged informally.  (*See* Klein Aff. Ex. 42).

104.    Strategic was charged a consistent amount by AUFC from early 2015 into early 2017. (*See* Klein Aff. Exs. 43 & 44).

105.    The Plaintiffs did not produce a copy of a lease or sublease, claimed that all documents they intended to use to support their claims were produced, and never bolstered the record prior to the close of discovery. (*See* Klein Aff. Ex. 45).

106.    A third-party subpoena to AUFC revealed evidence that a "Partially Executed Sublease Agreement" existed at one time with Picture Motion in 2015, but the document itself was not produced, nor any other lease or sublease.  (*See* Klein Aff. Ex. 46).

107.    Democracy Partners declared $14,000.00 in rent expenses on its 2015 tax returns. (*See* Klein Aff. Ex. 47 at Stipulation # 1).

108.    Democracy Partners did not declare any rent expenses on its 2016 returns. (*Id.* at Stipulation # 2).

109.    Strategic declared $54,494.00 and $55,336.00 in rent expenses in 2015 and 2016, respectively. (*Id.* at Stipulations #3 & #4).

110.    Democracy Partners did not hold the lease to the office space it used. (Klein Aff. Ex. 45 & 37).

111.    The doors to Suite 250 were unlocked during business hours from September 21, 2016 to October 14, 2016. (*See* Klein Aff. Ex. 48 at PVA00013283 at 1:28–1:38; Ex. 49 at PVA00013386 at 1:04–1:12).

112.    No signage restricts access to the office suite. (*See id.*; Ex. 36).

113.    Ms. Maass was provided a key card to be used during off hours. She only used the card once. (*See* Klein Aff. Ex. 50 at 72:1-3). She had arrived at the office five minutes before everyone else. (*Id.* at 72:1-6).

114.    Democracy Partners' Rule 30(b)(6) witness did not know how many key cards Democracy Partners issued to its employees, guests, or affiliates, and did not know if Democracy Partners takes key cards back from its affiliates after the relationship ends. (Klein Aff. Ex. 32 at 30:14-22; 32:7-11).

115.    None of the individual offices within the suite were labeled by occupant. (Klein Aff. Ex. 31 at PVA00013195 at 08:53–09:40).

116.    Ms. Maass used her own laptop computer for her unpaid internship tasks; Democracy Partners never gave her access to a company computer and does not own any company computers.  (Klein Aff. Ex. 32 at 102:20-103:8; Ex. 51; *cf.* Dkt. 1 ¶31).

117.    Ms. Maass was not a part of the Democracy Partners Google Group. (*See* Klein Aff. Ex. 11 at 1/18/2019 Plaintiffs' Answers to Interrogatories #1 & 3/15/18 Plaintiffs' Answers to Interrogatories #4.) The Democracy Partners Google Group is the primary way Democracy Partners communicates about its business. (Klein Aff. Ex. 32 at 39:20-40:5).

118.    Ms. Maass used an outside email address, angelabrandt@gmail.com, for her unpaid internship work, and Plaintiffs knowingly emailed her at that outside email address. (*See* Klein Aff. Ex. 52).

119.    Democracy Partners wrote its Wi-Fi password on a white board in a conference room near the front door of the office.  (Klein Aff. Ex. 32 at at 142:1-9).

120.    Democracy Partners does not have an IT Firewall.  (*Id.* at 140:13-20).

121.    Democracy Partners makes no effort to change passwords, or regarding information security, when Democracy Partners members leave Democracy Partners. (*Id.* at 149:5-150:8).

122.    The Democracy Partners e-mail system was incapable of two-factor authentication. (*Id.* at 42:14-22, 43:1). The Mobilize / Democracy Partners contract with the DNC required two-factor authentication on the e-mail system. (Klein Aff. Ex. 53).

**III(E).  Routine, Clerical Nature of Allison Maas's Tasks During her Unpaid Internship at Democracy Partners.**

123.    When Ms. Maass arrived for the first day of her internship, Creamer and Lux suggested that Maass could sit at Suite 250's front desk or in an unoccupied office, and Maass volunteered for the front desk. (Klein Aff. Ex. 31 at PVA00013195 at 24:55–25:45.) Lux commented Maass's place at the front desk would benefit the suite because it would "give somebody who walks in somebody to talk to." (*Id.* at PVA00013195 at 25:20–25:30).

124.    Ms. Maass's tasks were not proactive in nature; she completed tasks when assigned. (Maass Aff. ¶¶ 10, 12). Ms. Maass completed each of these tasks and some of her work was even used by Windsor after it was revealed she was an investigative journalist. (Klein Aff. Ex. 26 at 169:17-170:2).

125.    She did not give advice to Democracy Partners, nor supervise anyone else during the unpaid internship. (Maass Aff.¶ 10).

126.    On the first day of her unpaid internship at Democracy Partners, Ms. Maass counted an inventory of political signs. (*See* Klein Aff. at Ex. 54).

127.    Maass participated on a number of conference calls. The bracketing calls occurred every day at 1 p.m., and many of them had the call in number 641-715-3288 with the passcode 782537. (*See* Klein Aff. at Ex. 55; *cf.* Dkt 1 ¶36, 39). That phone number was already available to the public on the WikiLeaks website, and Plaintiffs knew information about their bracketing calls

were available on WikiLeaks.  (*See* Klein Aff. Ex. 56) ("Dem partners is in the wiki dump. Nothing bad just showing the coordinating on protest events," Creamer: "Bracketing calls.").

128.  On October 6, 2016, Ms. Maass delivered a package on behalf of Democracy Partners. (*See* Klein Aff. Ex. 57).

129.  Ms. Maass used a program called TVEyes to assemble clips of news coverage. (*See* Klein Aff. Ex. 2 at 215:14-216:6).

130.  Ms. Maass did the clerical work of setting up an office phone system, which included putting labels on the phone.  (*See* Klein Aff. Ex. 58).

131.  Ms. Maass looked at YouTube clips regarding a person named Myron Ebell and assembling a document with public quotes from news sources and TV appearances. (*See* Klein Aff. Ex. 59). There was subsequent discussion not involving Ms. Maass about using quotes from Myron Ebell in making memes.  (*See* Klein Aff. Ex. 60).

132.  Ms. Maass accomplished every activity she was assigned. (Maass Aff. ¶ 12; *see, e.g.*, Klein Aff. Ex. 61 (package delivery)).

133.  Prior to this lawsuit, the Project Veritas Parties were not aware of the details of the work performed by Creamer, Strategic or Democracy Partners on behalf of AFSCME, nor were they aware that AFSCME was a funding source for AUFC. (O'Keefe Aff. ¶¶10-11).  As far as Ms. Maass was aware none of the duties at her internship included any work on behalf of AFSCME. (Maass Aff. ¶ 15).

134.  Ms. Maas was likewise not aware that any of her duties included work for AUFC, other than the fact that on one occasion she counted signs that indicated they were paid for by AUFC.  (*Id.* at ¶ 16).

135.     Potential work with Dialysis Patient Citizens was never assigned or mentioned to Ms. Maass during her internship. (Maass Aff. ¶ 17).

136.     Maass gained no knowledge of patch-through calling for AFSCME or AUFC during her internship. (Klein Aff. Ex. 25 at Plaintiffs' Answers to RFA ¶¶10-12).

137.     Ms. Maass never communicated with Foval. (Maass Aff.¶ 22).

138.     Neither Ms. Maass nor Project Veritas shared information related to her unpaid internship assignments or investigation with the Republican Party or anyone else who "could adjust their own plans to anticipate or deflect . . . . 'bracketing' event[s]," as Plaintiffs alleged in their Complaint. (Maass Aff. ¶ 19; *see also* Klein Aff. Ex. 17 at 78:8-11; *cf.* Dkt. 1 ¶37).

139.     After Plaintiffs learned Ms. Maass was an investigative journalist for Project Veritas Parties, Democracy Partners member Mike Lux informed the Democratic National Committee, including then-Chair Donna Brazile, "[T]he plant in our office didn't seem to come away with much of anything." (*See* Klein Aff. Ex. 62).

Respectfully submitted,

By:     /s/ Paul A. Calli
    Paul A. Calli
    Florida Bar No. 994121
    Chas Short
    Florida Bar No. 70633
    CALLI LAW, LLC
    14 NE 1st Ave, Suite 1100
    Miami, FL 33132
    Telephone: (786) 504-0911
    Facsimile (786) 504-0912
    PCalli@Calli-Law.com
    CShort@Calli-Law.com
    *Admitted pro hac vice*

/s/ Kerry Brainard Verdi
Kerry Brainard Verdi, Esq.
Bar No. 478486
Benjamin R. Ogletree
Bar No. 475094
VERDI & OGLETREE PLLC
1325 G Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 449-7703
Facsimile: (202) 449-7701
kverdi@verdiogletree.com


/s/ Benjamin T. Barr
Benjamin Barr (Pro Hac Vice)
STATECRAFT PLLC
444 N. Michigan Ave. #1200
Chicago, Illinois 60611
Telephone: 202-595-4671
ben@statecraftlaw.com
*admitted pro hac vice*

/s/ Michael J. Madigan
Michael J. Madigan
Bar No. 71183
LAW OFFICES OF MIKE MADIGAN PLLC
3910 Hillandale Court NW
Washington DC 20007
Telephone: (202) 255-2055
Mjm20@mac.com


/s/ Stephen R. Klein
Stephen R. Klein
Bar No. 177056
STATECRAFT PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@statecraftlaw.com


*Counsel for Defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maass*

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on May 6, 2019, I served the foregoing through the Court's electronic filing system which served a copy on all counsel of record.


*/s/ Paul A. Calli*
Paul A. Calli, Esq.