# **EXHIBIT 6**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------X
DEMOCRACY PARTNERS, LLC, et      :
al.,                             :
                                 : Case No:
        Plaintiffs               : 1:17-CV-1047-ESH
                                 :
            -vs-                 : Pages 1 - 107
                                 :
PROJECT VERITAS ACTION FUND,     :
et al.,                          :
                                 :
        Defendants               :
---------------------------------X

Videotape Deposition of Scott Frey
Washington, D.C.
Tuesday, November 27, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR
Job No:  443993

MAGNA LEGAL SERVICES
(866) 624-6221



```
 1
 2
 3
 4
 5
 6                      Tuesday, November 27, 2018
 7                           (9:35 a.m.)
 8
 9   Videotape Deposition of Scott Frey, held at the
10   offices of:
11
12        Verdi & Ogletree PLLC
13        1325 G Street, N.W.
14        Suite 500
15        Washington, D.C.  20005
16
17
18   Pursuant to notice, before Kathleen M. Vaglica, RPR,
19   RMR, a Notary Public in and for the District of
20   Columbia.
21
22
```



Page 26

1        MR. CALLI:  Yes.

2        THE WITNESS:  Not that I'm aware of.

3  BY MR. CALLI:

4     Q.  Since July 31 of 2018, so this past

5  summer, have you communicated in any manner with

6  Mr. Creamer?

7     A.  As a matter of course, he continues his

8  work on coalition activities.  So, yes.  The answer

9  is yes.

10     Q.  Okay.  I'll be more specific.  I

11  apologize.  Since July 31 of 2018, have you

12  communicated with Mr. Creamer in any way about the

13  termination by AFSCME of its relationship with him

14  and Democracy Partners?

15     A.  Not that I can recall, no.

16     Q.  Are you aware if -- and let me stop.  Who

17  is the president of the union currently?

18     A.  Lee Saunders.

19     Q.  Was he president from 2014 to the

20  termination of AFSCME's relationship with

21  Mr. Creamer?

22     A.  Yes, he was.



MAGNA LEGAL SERVICES

1        Q.    Are you aware if Mr. Saunders has
2   communicated with Bob Creamer since July 31 of 2018
3   about Mr. Creamer's prior relationship with AFSCME?
4        A.    Not to my knowledge.
5        Q.    About AFSCME's termination of Mr. Creamer?
6        A.    If, if that occurred, I'm not aware of it.
7        Q.    About any desire by Mr. Creamer to renew
8   the relationship with AFSCME?
9        A.    Again, if that occurred, I'm not aware of
10  it.
11       Q.    And that last question I didn't ask about
12  you.  You've had no discussions with Mr. Creamer
13  since July 31, 2018, about potentially renewing the
14  relationship between him and AFSCME?
15       A.    Not that I recall.
16       Q.    After AFSCME had a professional
17  relationship with Mr. Creamer for so long in
18  different capacities, why hasn't the union initiated
19  those discussions with him subsequent to the
20  termination?
21       A.    First of all, we, we're in a new era in
22  terms of our fiscal concerns.  We just came through



1  a Supreme Court decision that, with potential
2  effects to our bottom line, and I have not renewed a
3  contract for consulting with anyone because of those
4  concerns about our, our budget.
5         So we've acquired a new vendor for the
6  patch-through call service that Mr. Creamer
7  provided, and it seemed to be working fine, so we
8  saw no reason to reenter any kind of discussion with
9  him about consulting.
10     Q.   Consulting or the calls?
11     A.   Or the calls, right.
12     Q.   When in your -- the new era budgetary-wise
13  that you just testified about, when do you define
14  the start of that new era budgetwise?  When do you
15  pinpoint that generally?
16     A.   Well, I think the concern about the future
17  of the union was impressed upon me the day I walked
18  in the door.  We had come through a Supreme Court
19  decision, Harris v Quinn, that signaled more threats
20  to come, which subsequently came in the form of
21  Friedrichs V California Teachers Association.
22         During that course, it became increasingly



1  apparent to the union that the Supreme Court may
2  decide the decision on our ability to collect
3  fair-share fees, and we were looking for savings in
4  our budget and ways to conserve resources, and we
5  were all asked to contribute, we, all the directors
6  of the various departments in the union, were asked
7  to find ways to be more cost effective.
8              When the contract ended, I felt, unless I
9  had a very good reason for replacing that role, I
10 would need to justify it, and at that point, given
11 the fiscal constraints, I decided there was little
12 justification for it.
13      Q.   When you say the contract ended, are you
14 referring to the contract with Mr. Creamer?
15      A.   Yes, that's right.
16      Q.   You started this aspect of your testimony
17 that you just concluded with the word "first," and
18 then you discussed the budgetary concerns and the
19 Supreme Court decisions.  Is there additional
20 reasons that you intended to testify about when you
21 said "first"?
22              You said -- I asked you a question, and



1  you started your answer by saying "first."  So what
2  I'm asking is --
3      A.   No, I was just trying to establish that it
4  was when I came in the door was the answer to the
5  question.  To me I assumed that these discussions
6  were occurring before I came in about these external
7  threats and what they meant to the union and the
8  need to find budget savings and be more responsible,
9  well, just heighten our sense of responsibility of
10 our fiduciary obligations.
11     Q.   I understand.  So these, for clarification
12 of the record, these concerns preceded the
13 termination of the relationship with Mr. Creamer?
14     A.   Yes, definitely.
15     Q.   And they, as you testified to, they
16 impacted a decision not to renew or not to have
17 discussions about renewal?
18     A.   They did.  Not -- they weren't the sole
19 consideration was the election, the election of
20 President Trump, and the value that a consultant
21 like Mr. Creamer brought to me seemed less useful in
22 a Trump White House.



1 So we had considered a consultant that
2 might help us open doors with Republican offices,
3 but when it became apparent that the price tag for
4 someone like that would actually increase my budget,
5 we decided to drop that idea and felt like we could
6 do that work on our own anyway, which we, which we
7 did.
8     Q. Do you know approximately how long after
9 the termination of AFSCME's relationship with Bob
10 Creamer on October 21 of 2016 the union engaged a
11 substitute vendor to handle the robocalls and
12 calling?
13     A. I think we began to think about it right
14 away. I had a discussion with Ms. Coufal so she
15 understood that we had terminated the agreement, and
16 I think that moment we said we got to find someone
17 else, so she set about at my direction inquiring
18 within the organization of vendors that people might
19 be using that would provide that service.
20     MR. CALLI: May I please have exhibit
21 stickers for Exhibits 2, 3 and 4.
22     (Frey Exhibit No. 2, AFSCME Expense



Page 74

1  the subsequent day.
2      Q.   Tuesday?
3      A.   I believe so.  It was a phone call.  I
4  don't recall the exact time.  It might have been two
5  days.  As I said, I don't recall if he was traveling
6  or out of pocket, but he called me as soon as he was
7  able to, I believe.
8      Q.   Tell me, if you would, what you remember
9  about your conversation with President Saunders.
10     A.   He was extremely angry.  He was
11 disappointed with both Mr. Woodhouse and
12 Mr. Creamer, that they could allow this type of
13 distraction to occur and that there was a concern
14 that somehow by implication AFSCME had something to
15 do with this because of our financial relationship,
16 and he didn't want any part of it, and he was
17 concerned about why they hadn't notified him
18 directly or at least why Brad had not notified him
19 directly.  That was a pretty short conversation,
20 actually.
21     Q.   Was there a decision made -- let me back
22 up.



Page 75

1         Whose decision was it to terminate the
2    contract and relationship with Bob Creamer's
3    Strategic Consulting Group and Democracy Partners?
4         A.    I went up to discuss this, as I said, with
5    the chief of staff on the, I believe it was the
6    17th, and we just mutually agreed that we should end
7    the relationship.
8         Q.    At that time?
9         A.    At that time.
10        Q.    That first meeting that you, conversation
11   you had with the chief of staff of AFSCME?
12        A.    That's correct.  I mean, that would be a
13   recommendation to the president, which we felt he
14   would not disagree with.
15        Q.    Did you communicate that recommendation to
16   the president in the short call that you just
17   testified about that you had with Mr. Saunders the
18   day after or two days after the release of the
19   video?  Or did you have to?
20        A.    I didn't have to, no.
21        Q.    Tell me why.
22        A.    Because, again, I don't recall the



1    A.   Again, we felt there was -- understanding
2  what we knew about this organization, Project
3  Veritas, and their representation, their reputation
4  for misrepresenting the facts and doing these types
5  of videos, we did feel that there was an element of
6  indiscretion that they'd allowed Mr. Foval into
7  their midst without serious vetting, that they
8  created a, it was the view at the time that they had
9  created the opportunity for this, for this operation
10  to occur, and it had become a major distraction to,
11  and an unnecessary one at a critical moment in time.
12       We did not want, we did not, we did not
13  want to, we did not welcome the distraction that it
14  had created.
15    Q.   When you say they had let Mr. Foval out
16  into their midst without proper vetting, you're
17  referring to Mr. Creamer, Democracy Partners, and
18  Strategic Consulting Group?
19    A.   That's correct, yes. We felt like that it
20  was carelessness on their part.
21    Q.   And when you say they created an
22  environment where this could occur, whatever you



1  testified to, you're referring to Creamer, Democracy
2  Partners, Strategic Consulting Group, not to Project
3  Veritas?
4      A.   I'm referring particularly to Mr. Creamer
5  and Mr. Woodhouse in whatever capacity they were in.
6      Q.   Prior to the letter -- let me back up.
7  Did AFSCME have concerns about anything Mr. Creamer
8  said on the video that was released?
9      A.   I am trying to remember what he said in
10 the video.  My recollection is that we did.  We did
11 have concerns with what he said.  What specifically
12 those were without reviewing the video again I
13 wouldn't, wouldn't recall specifically what those
14 concerns were, but that he was speaking ad hoc about
15 his strong ties to the Clinton Campaign, and it
16 seemed a bit inappropriate, but then, again, we also
17 were aware that, of the view that the video had been
18 highly selectively edited, and, likely, those words
19 were taken out of context.
20           I think it was the overall sense that they
21 allowed this to occur, they invited this opportunity
22 into their midst, but I think the broader concern



1  was just clearly, regardless of the circumstances
2  that led to the video, the video in itself and the
3  way it was released and the timing was a very
4  unfortunate distraction, and we didn't want to be
5  party to it.
6        Q.   The termination letter that I've marked as
7  an exhibit and provided you a copy with, did you
8  inform Mr. Creamer verbally that AFSCME was
9  terminating its relationship with him and his entity
10 and Democracy Partners before that letter was
11 transmitted to him?
12       A.   My recollection was I called him and told
13 him the letter was coming.
14       Q.   Do you know, do you remember what day that
15 week in relation to the letter -- the letter is on
16 Friday.  The letter, the day of the letter is Friday
17 of that week.  The first Veritas video was released
18 Monday.  Do you remember what day you had the call
19 with Mr. Creamer?
20       A.   I think it was the day the letter was
21 dated, the day we released it to him.
22       Q.   Did he attempt to explain or dissuade the



Page 85

1  discussing them with Mr. Creamer.  Okay?
2       A.   Okay.
3       Q.   Did Mr. Creamer inform you whether or not
4  he or Strategic Consulting Group or Democracy
5  Partners had the intern sign a nondisclosure or
6  Confidentiality Agreement?  All these questions for
7  time frame are Monday, the release of the video, to
8  the termination letter on Friday of that week.
9       A.   I don't recall that, any conversation
10  about that.
11       Q.   Do you recall if you ever asked him?
12       A.   I did not ask him.
13       Q.   Did Mr. Creamer inform you -- again, all
14  these questions are that week; okay?  I'm asking you
15  about October 17 to October 21 in any of the calls
16  you might have had with Mr. Creamer or meetings or
17  e-mails, any communication.
18            Did he ever inform you whether he had
19  asked the intern for identification before her first
20  day at Democracy Partners?
21       A.   I don't recall such a discussion.
22       Q.   Did you ever ask him that?



1    A.   I did not.  It all seemed very moot at the
2  time.
3    Q.   Did you discuss with Mr. Creamer whether
4  he had asked the intern for a resume before her
5  first day at Democracy Partners before being hired?
6    A.   Again, the circumstances of her presence
7  there at that point seemed irrelevant, so I don't
8  recall having that conversation with him.
9    Q.   You don't recall or you didn't, just so
10 the record is clear?
11   A.   I don't recall.  I suspect I did not.
12   Q.   Okay.  You understand I have to ask these
13 questions, so --
14   A.   I understand.  That's fine.
15   Q.   So I do appreciate your statement that it
16 seemed to you to be moot, but I have to go through
17 these questions.
18   A.   Understood.
19   Q.   Did Mr. Creamer disclose to you that he
20 came to hire the intern through a donor who had sent
21 $20,000, I believe, that amount or had sent money to
22 contribute to Democracy Partners and the causes on



Page 91

1  question.
2       MR. CALLI:  Okay.
3       THE WITNESS:  Yeah, we didn't have a
4  contract with that organization.
5  BY MR. CALLI:
6     Q.  I'm just a small-town, country lawyer, so
7  I'm not being specific enough for the fancy
8  Washington lawyers for whom I have great respect and
9  admiration.
10       So the relationship I'm referring to is
11  the one about which you testified to that your
12  lawyer now gives me the opportunity to highlight,
13  again, which was the financial relationship.
14     A.  Mm-hmm.
15     Q.  So what I'm asking about is who, what,
16  when, where, and why did AFSCME decide to end or did
17  it decide to end its, did AFSCME decide to end its
18  financial contributions and support to AUFC?
19     A.  Yes.
20     Q.  When did that recommendation or decision
21  get made?
22     A.  It was concurrent with the decision about



1  Mr. Creamer.
2      Q.  You were going to say something.
3      A.  No.
4      Q.  You looked like you were going to say
5  something.  The video is going to capture that you
6  look like you were going to say something.
7      A.  I think I answered your question.
8      Q.  You did.
9          MR. CALLI:  I recommend we move forward
10 and not take a lunch break, and I doubt I will go
11 past 1 o'clock.  I doubt I will go close to
12 1 o'clock, but I reserve the right to go to one and
13 be done.
14         MS. KELLER:  I'm okay with that.  Is our
15 reporter and videographer?
16         MR. CALLI:  Really.  Okay.  If we need a
17 little break, though, please let us know.
18 BY MR. CALLI:
19     Q.  Let me show you Frey 8 for the deposition
20 and a copy to your counsel and to Mr. Sandler.
21         MS. KELLER:  Thank you.
22         (Frey Exhibit No. 8, June 1, 2017, E-mail



Page 107

```
 1              CERTIFICATE OF NOTARY PUBLIC
 2              I, Kathleen M. Vaglica, the officer before
 3   whom the foregoing deposition was taken, do hereby
 4   certify that the witness whose testimony appears in
 5   the foregoing deposition was duly sworn by me; that
 6   the testimony of said witness was taken by me in
 7   stenotype and thereafter reduced to typewriting
 8   under my direction; that said deposition is a true
 9   record of the testimony given by said witness; that
10   I am neither counsel for, related to, nor employed
11   by any of the parties to the action in which this
12   deposition was taken; and, further, that I am not a
13   relative or employee of any attorney or counsel
14   employed by the parties hereto, nor financially or
15   otherwise interested in the outcome of the action.
16
17
18                              Notary Public in and for
19                              District of Columbia
20
21   My Commission Expires:
22   February 28, 2021
```

