# EXHIBIT 32

In the Matter Of:

*DEMOCRACY PARTNERS, LLC, ET AL*

*v.*

*PROJECT VERITAS ACTION FUND, ET AL*

———————————————————————————

*MARC CERABONA*

*March 14, 2018*

———————————————————————————



1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3

4    - - - - - - - - - - - - - x

5    DEMOCRACY PARTNERS, LLC,  :

6    et al.,                   :

7              Plaintiffs,    : Civil Action

8        v.                   : No. 1:17-cv-1047-ESH

9    PROJECT VERITAS ACTION    :

10   FUND, et al.,             :

11             Defendants.    :

12   - - - - - - - - - - - - - x

13      Rule 30(b)(6) Deposition of MARC CERABONA

14               Alexandria, Virginia

15                 March 14, 2018

16                 10 o'clock a.m.

17

18

19

20   Job No.: WDC-167286

21   Pages: 1 through 169

22   Reported by: Sandria L. Cox

1            Deposition of MARC CERABONA, a 30(b)(6)

2    witness, held at the offices of:

3                 Redmon Peyton & Brasswell, LLP

4                 510 King Street, Suite 301

5                 Alexandria, Virginia  22314

6

7

8

9

10               Pursuant to notice and/or agreement,

11   before Sandria L. Cox, Court Reporter and Notary

12   Public in and for the Commonwealth of Virginia.

13

14

15

16

17

18

19

20

21

22

1    to take the elevator up to the second floor?

2          A.    Also correct.

3          Q.    Let's talk about accessing the

4    physical Democracy Partners office.  Once

5    somebody takes the elevator up to the second

6    floor -- and we're assuming this is between

7    normal business hours -- does somebody need that

8    passkey to physically walk into the Democracy

9    Partners office suite?

10         A.    In my experience, no.

11         Q.    But if you're outside business hours,

12   you would need that passkey?

13         A     Yes.

14         Q.    Does Democracy Partners know how many

15   passkeys it has issued to employees, guests and

16   affiliates?

17         A.    I do not know.

18         Q.    Does Democracy Partners track the

19   number of passkeys that it issues to its

20   employees?

21         A.    I do not know.

22         Q.    In your experience, when somebody --

1   an employee -- leaves Democracy Partners,

2   terminates their affiliation with Democracy

3   Partners, does that employee normally turn in

4   the passkey to Democracy Partners?

5        A.   So Democracy Partners doesn't have

6   any employees.  As far as I know, it never has

7   had any employees.

8        Q.   Okay.

9        A.   So, I guess that's my answer.

10       Q.   I appreciate that.  I plan on asking

11  some questions specifically about the

12  organizational arrangement to understand how IT

13  resources are allocated.  So you've hit on that

14  and we'll cover that in just a little bit.

15       A.   Sure.

16       Q.   Let me back up.  And when I use the

17  term "employees," I mean more generally

18  affiliates or anybody who's working with

19  Democracy Partners.

20            Is that a fair way to describe it?

21       A.   Yes.

22       Q.   So I understand this, my

```
 1   understanding is that it's Democracy Partners as

 2   a tenant of this office building that assigns or

 3   issues passkeys to its affiliates.

 4          A.   Yes.

 5          Q.   Is that correct?

 6          A.   That's correct.

 7          Q.   Does Democracy Partners receive or

 8   get passkeys returned to it once affiliates

 9   cease their relationship with Democracy

10   Partners?

11          A.   I do not know.

12          Q.   Okay.  Are you aware if there's any

13   kind of logging system for the passkeys that are

14   issued by Democracy Partners?

15          A.   I am aware, because I've seen a

16   logging system.  So, yes.

17          Q.   Let's describe that logging system.

18   What have you seen?

19          A.   I have seen a document, which

20   actually I did not say when I said what I had

21   reviewed for this, if you want to go back and

22   say that.
```

1    Let's talk about that for a moment.

2             What did you and Ms. Windsor discuss

3    regarding that particular issue?

4         A.   In reviewing the e-mail addresses

5    that were relevant to this proceeding, I

6    realized that she did not have one, did not have

7    a Democracy Partners e-mail, and so I was -- I

8    brought that up to her to confirm that that was

9    indeed accurate and -- yeah.

10        Q.   Okay.  Now, Ms. Windsor is a partner

11   of Democracy Partners; is that correct?

12        A.   That is correct.

13        Q.   What e-mail address does she use when

14   she communicates with other Democracy Partners

15   individuals?

16        A.   It is her personal gmail account.  I

17   don't recall if it's laurenwindsor@gmail, or

18   "windsor" or something.  I'm sure that could be

19   found out.

20        Q.   You had mentioned a Google Group

21   earlier that is the -- correct me if my

22   characterization is wrong here, but it sounds

1   like the Google Group is the primary way that

2   members or affiliates of Democracy Partners use

3   to communicate about Democracy Partners'

4   business.  Is that correct?

5        A.   That's correct.

6        Q.   At least as far as e-mail

7   communications.

8        A    Yes.

9        Q.   All right.  In this Google Group, in

10  this Google Group list serve, is it accurate to

11  say that Ms. Windsor uses that personal gmail

12  address that you just mentioned a moment ago as

13  a part of this list serve?

14       A    Yes, it is.

15       Q.   Any idea why Ms. Windsor does not

16  have a formal Democracy Partners e-mail

17  account?

18            MS. LINDENBAUM:  Objection.  Calls

19  for speculation.  You can answer.

20       A.   So she didn't have one before she was

21  a partner, because mostly we only have partners

22  have them.  Afterwards, she never requested one

1    Foundation.  Calls for speculation.

2          A.   I believe she worked for one of

3    another partner's companies, so she was employed

4    by one of the partners.

5               BY MR. MAULER:

6          Q.   Okay.  Who was that partner?

7          A.   Mike Lux.

8          Q.   Mike Lux?  And which company of Mr.

9    Lux's did Ms. Windsor work for?

10         A.   I believe it's Mike Lux Media.

11         Q.   Mike Lux Media, LLC?

12         A    Yes.

13         Q.   Do you remember when or do you know

14   when Ms. Windsor first started to work with

15   Democracy Partners in any capacity?

16              MS. LINDENBAUM:  Objection.  Outside

17   the scope.  I'm going to let you go with this

18   because this appears to lead to questions in

19   30(b)(6).

20              MR. MAULER:  Thank you.

21         A.   I honestly don't remember when she

22   came on my radar screen as being a part of the

 1   larger group.

 2            BY MR. MAULER:

 3        Q.   We got off on a little bit of a

 4   tangent, which will happen throughout this

 5   deposition, so I appreciate your patience and

 6   flexibility.

 7            Let me close a loop on your

 8   preparation for this deposition.

 9            You had exchanged some voicemails

10   with Mr. Creamer.

11        A.   Yes.

12        Q.   Approximately how many voicemails did

13   you exchange with him?

14        A.   I think I left two and he left one.

15        Q.   Can you describe the substance of the

16   voicemails you left, the first voicemail you

17   left for him?

18        A    Yes.  The first voicemail I left for

19   him was, 'Hey, Bob, I would like to chat with

20   you.  I'm coming down for a deposition and I

21   just want to check some things and make sure

22   that you and I have the same information or that

1  agreement back in 2011.  I do not know what the

2  process is as we brought in newer partners,

3  whether or not they revised the operating

4  agreement in some way.

5           But the relationship is very -- it's

6  a very loose relationship between these

7  companies.  There is a legal structure that we

8  have, but for the most part we are a group of

9  people with like-minded political ideas that

10 help each other out and try to work together

11 when we can.

12      Q.   So is it fair to say that these

13 people shown on pages 1 and 2 of Exhibit 5, they

14 have companies that in turn have a legal

15 relationship with Democracy Partners, LLC?

16      A    Yes.

17      Q.   And so it's those companies that are

18 the members of Democracy Partners, LLC?

19      A    Yes.

20      Q.   Looking at your bio, which is set

21 forth on Exhibit 5, I believe that that text is

22 identical to the text that we saw on the Digital

```
 1          Q.    And to be technical, he's an employee

 2    of Digital Turf; correct?

 3          A.    Yes.

 4          Q.    And not an employee of Democracy

 5    Partners.

 6          A.    Yes.

 7          Q.    Because Democracy Partners, LLC, does

 8    not have any employees.

 9          A     Yes.

10          Q.    Then when Digital Turf provides

11    services to Democracy Partners, LLC, I assume

12    that Digital Turf sends an invoice to Democracy

13    Partners or bills Democracy Partners?

14          A.    We do not.

15          Q.    You do not?  Why is that?

16          A.    We joined the group as an exchange of

17    services.  We do not pay the dues that other

18    organizations pay in order to cover legal fees

19    and host events and that sort of thing.  So

20    other partners pay a fee.

21                So we have that fee waived, and, in

22    turn, we provide them the in-kind service of the
```

1   website.

2        Q.   Got it.  So you provide in-kind

3   services instead of paying a membership fee, so

4   to speak?

5        A    Yes.

6        Q.   Are those fees paid monthly?

7        A.   No.  I believe they're paid yearly.

8        Q.   Paid yearly.  Other than Mr. Bryant,

9   does anyone report to you regarding dealing with

10  IT issues at Democracy Partners?

11       A.   I have other employees that from

12  time-to-time work on Democracy Partners things,

13  but typically our structure is that they report

14  to Dallas and Dallas reports to me.

15       Q.   And when you say "our" here --

16       A.   That would be digital Turf.

17       Q.   Digital Turf.

18       A.   Yes.  If you would just quickly list

19  the name of those employees.

20       A.   Sure.  Austin Kowitz, and Darikka

21  Scollard.  I think that's probably it.

22       Q.   Anyone else that you can think of?

1        A.   The Google e-mail system and the

2   Google Groups are the only two shared systems.

3        Q.   Okay.  When people are physically

4   working in the Democracy Partners office, they

5   have internet access, I assume; correct?

6        A.   Yes.

7        Q.   Is there a wireless network provided

8   by Democracy Partners?

9        A    Yes.

10       Q.   Managed by Digital Turf?

11       A.   No.  I believe it is managed and paid

12   for by one of the partner companies, although

13   I'm not sure which one does it.  One of the

14   partner companies that physically resides in

15   that building does it.

16       Q.   When Allison Maass was working at

17   Democracy Partners, she was issued a computer by

18   Democracy Partners; is that correct?

19       A.   I don't believe that is correct.

20       Q.   Is it your understanding then that

21   the computer that Allison Maass used while she

22   was working at Democracy Partners was her own

1  computer that she brought to the office?

2       A.   I actually don't know.  I don't

3  actually know where the computer came from.  I

4  just know that Democracy Partners doesn't own

5  any.

6            So if she was given one, it had to

7  have been given to her by one of the partner

8  companies, not by Democracy Partners itself.

9       Q.   But as you sit here today, you don't

10  know what computer she used or where it came

11  from?

12       A.   I do not.

13       Q.   And is it fair to say that as of

14  today you don't know where that computer is?

15       A.   I certainly don't.

16       Q.   Let's go back to the e-mail settings

17  that we were describing.  We were discussing the

18  e-mail settings for Mr. Black and we were

19  discussing the Google e-mail settings when

20  counsel very accurately pointed out that there's

21  a difference between the pre-October 2016 Newtek

22  e-mail system and the post-October 2016 Google

1    think every company has its own backup and

2    storage systems.

3         Q.    Every partner?

4         A.    Every partner, yes.  But I'm not

5    aware of how any of them manage that.

6         Q.    And you don't have any access into

7    any of those other storage accounts or devices

8    because they're run privately by the partners.

9         A.    That is correct.

10        Q.    Is there any intranet within

11   Democracy Partners?

12        A.    No.

13        Q.    Do you have a firewall that protects

14   internet access into and out of Democracy

15   Partners there in the office?

16        A.    I do -- and I say this only from

17   logging onto their wi-fi periodically from being

18   there -- I do not believe there is a firewall at

19   all.  At least there wasn't the last time I used

20   their wi-fi.

21        Q.    And that's your recollection for the

22   entire time that you've been at Democracy

 1    Partners?

 2         A    Yes.

 3         Q.   Are there any special or unique

 4    proprietary computer systems used by Democracy

 5    Partners that we haven't talked about yet?

 6         A.   No.

 7         Q.   Any chat programs used by the

 8    partners to talk to each other outside of

 9    e-mail?

10         A.   Some partners will text.  Again, to

11    my knowledge there are no like Slack or those

12    kinds of things aren't used.  Again, some of the

13    partner companies may use those, but nothing

14    that Democracy Partners uses as a whole.

15         Q.   When you say "text," I assume you're

16    referring to text applications on a smart phone?

17         A.   Correct.

18         Q.   But you're not aware that there's a

19    computer-based chat program such as Slack Chat

20    or Rocket Chat that's used within the office?

21         A.   There is not.

22         Q.   You mentioned the wi-fi network at

 1    Democracy Partners.  Is that a

 2    password-protected wi-fi network?

 3          A    It is.

 4          Q.   How often has that password been

 5    changed?

 6          A.   I don't know how often the password

 7    is changed.  I believe the password is written

 8    on the wall in the conference room.

 9          Q.   In the conference room.  Okay.

10          A.   It's fairly publicly-available to

11    people working in that office.

12          Q.   Got it.  Okay.

13               Backup systems.  I assume it's fair

14    to say that there is no centrally-organized

15    backup system for computers within Democracy

16    Partners?

17          A.   That is safe to say.

18          Q.   Let's get to some text messages.

19               Are you aware that text messages are

20    sent amongst partners within Democracy

21    Partners?

22          A    Yes.

```
 1   Marilyn Katz might as well.

 2        Q.   Mr. Creamer?

 3        A.   I don't think Bob has access to the

 4   Twitter account.

 5        Q.   You mentioned a former partner, Ms.

 6   Pelosi.  When did Ms. Pelosi depart from

 7   Democracy Partners?

 8        A.   Early 2017.

 9        Q.   2017.  Okay.  Were there any other

10   partners who departed Democracy Partners between

11   say in either 2016 or 2017 other than Ms.

12   Pelosi?

13        A.   To be completely accurate, I would

14   have to look at some records to make sure.  But,

15   yes, I think there was at least one partner who

16   was with us for a short period of time who left

17   to take a full-time job.

18             That's a common reason why people

19   leave the firm, because they take a real job and

20   don't want to be part of it anymore.

21             I can't think of anyone else leaving

22   in that timeframe you have mentioned.
```

1          Q.    Okay.  Is it just Ms. Pelosi or is it

2     Ms. Pelosi and this --

3          A.    Ms. Pelosi and one other, whose name

4     I'm blanking on.

5          Q.    Is there a process within Democracy

6     Partners for after an employee leaves regarding

7     information security or changing of passwords or

8     along those lines?

9          A.    There really isn't, and typically

10    when the partners leave, we take their

11    information off the website and we remove them

12    -- remove their e-mail from the G Suite, we

13    remove their e-mail from the Google Group.  And

14    that's about all we do.

15          Whether or not there's any sort of

16    effort to change a Twitter account or change the

17    password for the wi-fi or any of those kinds of

18    things, I'm not aware of that.

19          Q.    But there's no central policy

20    regarding when an employee leaves, you rotate

21    e-mail passwords?

22          A.    No.

1          Q.   And you don't rotate the wi-fi

2   password when a partner leaves?

3               MS. LINDENBAUM:  Objection.

4   Mischaracterizes the testimony.

5               BY MR. MAULER:

6          Q.   Well, let me ask you.  Is the wi-fi

7   password changed when a partner departs?

8          A.   Not to my knowledge.

9          Q.   Following up on that vein, I'm going

10  to ask a series of questions about centralized

11  policies.  This may be another section that we

12  go quickly through.

13              Is it fair to say that there's no

14  central written backup policy at Democracy

15  Partners?

16         A.   That's safe to say.

17         Q.   No written data retention policy?

18         A.   That's safe to say.

19         Q.   And no written document destruction

20  policy?

21         A.   That is safe to say.

22         Q.   Is there a personnel manual that's

```
 1            CERTIFICATE OF NOTARY PUBLIC/REPORTER

 2          I, Sandria L. Cox, the officer before whom

 3    the foregoing proceedings were taken, do hereby

 4    certify that the witness whose testimony appears

 5    in the foregoing examination was duly sworn;

 6    that the testimony of said witness was taken by

 7    me in stenotype and thereafter reduced to

 8    transcript form under my direction to the best

 9    of my ability; that said examination is a true

10    record of the testimony given by said witness;

11    that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in

13    which these deposition was taken; and further,

14    that I am not a relative or employee of any

15    attorney or counsel employed by the parties

16    hereto, nor financially or otherwise interested

17    in the outcome of the action.

18          Given under my hand this 27th day of
      March, 2018.
19
                 _____
20                 Sandria L. Cox, Notary Public
                   Commonwealth of Virginia
21
      Notary No. 132746
22    My Commission expires: May 31, 2019
```