**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

DEMOCRACY PARTNERS, LLC, *et al.,*            )
                                             )
         Plaintiffs,                          )
                                             ) Civ. No. 1:17-cv-1047-ESH
         v.                                   )
                                             )
PROJECT VERITAS ACTION FUND, LLC, *et al.*,   )
                                             )
         Defendants.                          )
_____)


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

About a year after the incidents giving rise to this lawsuit took place, Defendant James

O'Keefe, founder and president of Defendant Project Veritas Action Fund,  "posted photos on

Instagram and Twitter ... of himself holding a handgun with a silencer attached and wearing

pseudo-military clothing.  He described [his whereabouts] as a 'classified location' where he was

learning 'spying and self-defense,' in an effort to make Project Veritas 'the next great

intelligence agency.'"  M. Cole, "The Improbable Comeback of Erik Prince," *The Intercept*

(May 3, 2019), located at https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-

veritas/. In his book, AMERICAN PRAVDA: MY FIGHT FOR TRUTH IN THE ERA OF FAKE NEWS

(2017),  O'Keefe compared Defendant Allison Maass, in undertaking the very operation that

gave rise to this lawsuit, to American spies in Moscow during the Cold War (*id*. at 116) and

compared her accessing the headquarters of the Democratic National Committee, as part of the

same operation, to the Watergate burglary.  (*Id*. at 117).

In this lawsuit, O'Keefe testified that he believes it is ethical and appropriate for his

agents secretly tape "targets"  who are not actually suspected of any improper, illegal or

inappropriate behavior of any kind, just to see if they will say something of interest, since people are more truthful if they do not know they are being taped.  (Excerpts of Deposition of James O'Keefe, Feb. 12, 2019, attached as Ex. 1 to Declaration of Joseph E. Sandler ("Sandler Decl.") attached as Ex. A to Plaintiffs' Statement of Material Facts ("PSMF") at 183:12–185:18). O'Keefe regards Alex Jones—of the "Infowars" website that promulgated the "Pizzagate" conspiracy theory—as an "ally" in "fighting for truth and justice" in this lawsuit.  (*Id*. at 106:19–208:10).  The record in this case and O'Keefe's public pronouncements, in short, demonstrate that Project Veritas is not, as defendants would have it, a "newsgathering organization," but a political spying operation.

The record in this case shows that Project Veritas Action Fund ("Project Veritas") and its operatives engaged in unlawful political spying that directly caused serious damages to Plaintiff Robert Creamer and his company, Plaintiff Strategic Consulting Group.  Project Veritas constructed an elaborate web of lies and deceit in order to gain the trust and confidence of Creamer, a Democratic political consultant who owns Strategic Consulting Group, a member of the limited liability company Democracy Partners, LLC, also a plaintiff.  The deceit featured creation of two fictitious characters—a wealthy individual named Charles Roth interested in supporting progressive causes,  and his "niece" "Angela Brandt," a character played by Defendant Allison Maass.  Each fictitious character was given an extensive fake backstory that was communicated to Creamer.

Through that series of lies and deceptions, Maass was able to obtain an internship with Creamer, at the offices of Democracy Partners, and thereby infiltrate those offices; and, after presenting a fake resume, creating a fake email account and fake identification,  to continue her infiltration of those offices and gain access to the premises of clients and groups with whom

Strategic Consulting worked, including the Democratic National Committee and the Communications Workers of America.  Maass was given access to confidential and sensitive information, to private conference calls planning future political events and to confidential polling briefings. She secretly taped every individual she encountered in every office to which she had access, including the DNC.  She rummaged through trash in the DP offices and took photographs of documents lying on desks in private offices there. Her tapes and daily written summaries were immediately conveyed to her superiors at Project Veritas, with no restrictions imposed by the organization on their further use or dissemination.

As soon as Project Veritas publicly distributed the first of a series of videos based on the undercover operation, including Maass' secret tapes, Strategic Consulting's client, American United for Change (AUFC)  disclosed the existence of the operation and infiltration to its principal funder, the American Federation of State, County and Municipal Employees ("AFSCME"),  also a client of Strategic Consulting.  AFSCME immediately canceled an ongoing contract with Strategic Consulting for phone banking and patch-through call services that had generated more than $1.5 million in revenue to Strategic Consulting; and led to the resignation of the union's president from the board of AUFC,  causing AUFC to go out of business.  The record makes clear that AFSCME did not believe the content of the selectively edited videos—specifically, the accusations about Creamer—but were concerned about the controversy created by the infiltration and the fact that Creamer and Strategic Consulting had allowed it to occur, especially Maass' infiltration.

In these circumstances, the Plaintiffs have adduced more than sufficient evidence to allow a jury to find the existence and breach of fiduciary duty and fraudulent misrepresentation by Maass.  This tortious conduct was a proximate cause of the damages suffered by Strategic

Consulting and Creamer—the loss of business.  That loss was not due to any reputational damage caused by publication of the videos.  It was caused by clients' alarm that the operation had taken place and was allowed to occur.

Plaintiffs' evidence is also more than enough to establish that Maass' entry into the offices of Democracy Partners and Strategic Consulting was unauthorized and deliberate, and therefore an actionable trespass.  The evidence further demonstrates that Maass' secret taping and disclosure of her interactions with Creamer and everyone else she encountered violated the federal and District of Columbia wiretapping statutes.  And because Maass' secret taping and disclosure were carried out for the express purpose of committing the tortious act of breach of fiduciary duty, Defendants cannot rely on the one-party consent exception to those statutes. There is no authority to support Defendants' convoluted argument that these statutes should be subject to strict scrutiny as "content-based" and declared unconstitutional.  Moreover, the argument is nonsensical.  Neither statute favors or disfavors any particular viewpoint or message.

For these reasons, Defendants have failed to show that they are entitled to judgment as a matter of law on any of these counts.  Their motion for summary judgment should be denied.

## OVERVIEW OF FACTS SUPPORTED BY THE RECORD

Defendants assert that Project Veritas is a "press organization."  (Project Veritas Parties' Memorandum in Support of Motion for Summary Judgment, ECF No. 63-1 ("Def. Mem') at 2). To the contrary, O'Keefe has boasted about Project Veritas being an "intelligence operation," M. Cole, *Intercept, supra*, and has compared the actions of  Project Veritas operative Allison Maass, in carrying out the infiltration giving rise to this lawsuit, to Cold War spying and Watergate. (Sandler Decl. Ex. 8 at 116-117). In this case, he testified that Project Veritas has not adopted any code of journalistic ethics or any rule restricting its "journalists" from participating in

political events as supporters of a candidate.  Plaintiffs' Statement of Material Facts ("PSMF")
No. 1. He does not agree that an ethical journalist should report a story rather than create one,
and in this very case Project Veritas offered bonuses to its "reporters" if they got their "targets"
to say specific things while being secretly recorded.  (*Id.*).

In April 2016, Project Veritas senior producer Christian Hartsock volunteered to work for
a nonpartisan voter registration and mobilization group working in the Latino community in
Wisconsin.  (PSMF No. 56). He obtained that position by lying about his identity. (*Id.*).  He then
volunteered for a voter mobilization effort sponsored by a labor union; was invited to primary
election viewing party at a bar; and there encountered Scott Foval, a Democratic political
operative who was not then employed or contracted by Strategic Consulting or its client AUFC
or anyone else connected to Plaintiffs.  (PSMF No. 56).  Hartsock  lied again about his identify,
representing himself as "Steve Packard" of a "Breakthrough Development Group," a fictitious
consulting firm given a fake website with fake contact information.  (PSMF No. 8).  During that
encounter, Foval mentioned,  that he worked with Creamer. (PSMF No. 58).

Hartsock had concocted a complicated "surrogate voting" scheme in which groups
engaged in voter registration efforts would be tricked into providing addresses from foreclosed
and abandoned homes; that information would then be used to generate phony identifications and
paycheck stubs for out-of-state voters and non-citizens that would supposedly allow them to
register to vote illegally.  (PSMF No. 3).  At the bar, Hartsock discussed the proposal with Foval,
who expressed interest in it but raised legal concerns. Foval later testified under oath that in his
initial discussion with Hartsock at the bar, Foval "spent a lot of time pushing back on that
explaining that that was illegal and that was not something I did or any of my associates did."
(Sandler Decl. Ex. 11 at 38:10–39:7).

5

Using the emails illegally hacked from the DNC by Russian intelligence operatives, Project Veritas researched Creamer and learned he was a Democratic political consultant who had been involved with the DNC.  (PSMF 59). Hartsock told Foval that a client of Hartsock's fictitious firm ("Breakthrough Development") was a wealthy donor named "Charles Roth" who had come up with the illegal surrogate voting scheme and wanted to pursue it.  (PSMF No. 60). A Project Veritas  operative named Daniel Sandini was picked to play "Roth."  Project Veritas went to great  lengths to create the fake and fraudulent backstory for Roth: that he was a wealthy Northern California real estate millionaire whose father emigrated from Hungary, became a developer, regretting displacing low-income and minority resident and out of liberal guilt, became an "active donor to liberal causes and candidates;" and wanted to circumvent the law to help minorities be able to vote.  (O'Keefe, American Pravda, Sandler Decl. Ex. 8 at 106). Project Veritas created a phony Facebook page and a phony telephone number for Roth, that was from a "burner" phone specially purchased for the sole purpose of making it appear a call was coming to Foval from Sausalito, California where Roth supposedly lived.  (PSMF No. 64).

After hearing from "Roth," Foval  told Creamer that "Roth" was a donor who wanted to support progressive political work during the election cycle.  At Foval's suggestion, Creamer met with Roth in Washington, D.C.  (PSMF No. 62).  At that first meeting,  Creamer tried to interest Roth in financing non-partisan voter registration and non-partisan voter mobilization operations engaging Latino voters, and in financing a potential AUFC bus tour to promote progressive policies.  (PSMF No. 62).

In July, "Roth" told Creamer that his niece, one "Angela Brandt," wanted to volunteer for some Democratic political work.  (PSMF No. 66).  Maass, lying about her true identity and posing as "Brandt," then spoke to Creamer on the telephone, expressing interest in such work.

(PSMF No. 66). Creamer put her in touch with a Democratic worker involved in planning demonstrations at the Republican National Convention in Cleveland. (*Id.*). On the strength of that initial series of lies and misrepresentations, Brandt worked for a Democratic group at the Republican Convention, was accepted into the group and helped with a public demonstration against then-candidate Donald Trump. (PSMF No. 68).

Sandini, posing as "Roth," met Creamer for dinner again in August 2016. This time Sandini proposed the illegal voter registration scheme and Creamer rejected it outright as illegal. (PSMF No. 63). Sandini again secretly taped the conversation, including Creamer explicitly telling "Roth" "that what he is talking about would probably be voter fraud. Would need to be run by the legal team and it wouldn't pass ... Foval tells us that Bob 'wouldn't touch this with a ten foot pole." (Sandler Decl. Ex. 10; PSMF No. 63). In fact, Project Veritas never uncovered *anyone* associated with any of the Plaintiffs planning or engaging in any voter fraud. (PSMF No. 3).

That same month, Roth met with AUFC staff to discuss the proposed bus tour. Roth then called Creamer and told him he was not interested in funding that proposal but would contribute $20,000 to support AUFC. (Defendants' Statement of Material Facts, ECF No. 63-1 ("DSMF") No. 65; PSMF Nos. 64 and 65). Funds were then wired to AUFC. (DSMF No. 65).

In early September, 2016, Roth called Creamer and told him that Roth's niece, Angela Brandt, had a good experience in Cleveland and would like to become involved in further political work; and Creamer agreed to talk to her again. (PSMF No. 68). In early September, Creamer spoke with Maass on the telephone and suggested she might be good fit as an intern at Democracy Partners' Washington, D.C. office. (*Id.*).

On the first day of her internship, Creamer told Maass (posing as Brandt) that she would be asked to sign a non-disclosure agreement, which she noted in her daily summary of tapes that she faithfully delivered to her superiors at Project Veritas.  No such agreement was ever signed. (PSMF No. 82; PSMF No. 83). On the third day of her internship, Maass presented a fake resume on which virtually everything about her background was false.  (PSMF No. 77).  Maass created a fake email account in the name of Angela Brandt, specifically for use in her work with Plaintiffs.  (PSMF No. 74) and a fake id. (PSMF No. 74)..   She was given a key card that allowed her to gain access to the building and Democracy Partners' offices after hours, but only used it on one occasion because she normally worked during regular business hours.  (PSMF No. 97). Maass secretly recorded everything she saw and heard during her internship, except when she was going to the restroom or changing out a battery on her recording device.   (PSMF No. 79).

Through her internship, and in some cases by presenting her fake id,   Maass was able to obtain entry into the Democratic National Committee.  (PSMF No. 74).  Buy presenting her fake id, she was able to enter the headquarters of a major labor union, the Communications Workers of America.  (PSMF No. 74). In those offices,  she secretly taped a confidential polling briefing given by a leading Democratic pollster on the state of the general election.  (PSMF 97). Maass was explicitly told on several occasions that information that was being shared with her was to be kept confidential.  (PSMF No. 85).  She was on conference calls discussing "bracketing" events—public events staged where then-candidate Trump was holding campaign events—which had not yet taken place, and the existence of which was not yet public, and was provided lists including confidential future events.  (PSMF No. 85).  She even rummaged through the trash in

Creamer's private office and took photographs of any documents laying on his desk and on the desk of another member of Democracy Partners, also in their private offices.  (PSMF No. 85).

Strategic Consulting, Creamer's company, had two contracts with a major labor union, the American Federation of State, County and Municipal Employees.  One was a consulting contract, for $36,00 per year; the contact had been renewed every year for the prior ten years, from 2007 to 2016.  (PSMF No. 21).  The other was an ongoing agreement for Strategic Consulting to provide the service of making automated calls to union members and, if the recipient agreed, connecting or "patching through," the recipient of the call with their Member of Congress to express a view about legislation or policy. (PSMF No. 28).  From 2007 to 2016, Strategic Consulting received $1,508,359 from AFSCME for these services.  (PSMF No. 22).

On October 14, 2016, Creamer was abruptly confronted with a film crew from a subsidiary of Sinclair Broadcasting, asking him to respond to two video clips making it clear that Creamer and others were victims of a political spying operation.  (Sandler Decl.Ex 14). Attorneys for Strategic Consulting and AUFC met with the Sinclair reporter to view the videos. On October 17, 2016, after additional correspondence between Creamer's lawyer and Sinclair, Sinclair decided to postpone broadcasting any of the videos.  (*Id*.).  That day, Project Veritas released on its own, the first of the video series. (Defendants' Statement of Material Facts, ECF No. 63-2 ("DSMF") No.23).  Within an hour of the first video's release, Brad Woodhouse, head of Creamer's client AUFC, disclosed to AFSCME the infiltration of the Democracy Partners offices and other facts about the political spying operation. (Sandler Decl. Ex. 14 at p. 12).

At that point, the AFSCME director of government affairs, Scott Frey, and chief of staff Bill Lurye, decided to recommend to AFSCME's President, Lee Saunders, that the relationship with Strategic Consulting and with AUFC be terminated.  (PSMF No. 23).  At the same time,

Saunders decided to resign from the board of AUFC.  (PSMF No. 45). In his deposition, Frey testified that there were several factors behind their recommendation to terminate the business relationships with Strategic Consulting, including that Democracy Partners had allowed the undercover operation to occur—and specifically including the deceptive infiltration of its offices by Maass and the secret taping there.  (PSMF No. 26). And Frey made clear that none of the factors in that decision (to terminate the business relationship) had anything to do with any concern about the content of the Project Veritas videos being true, *i.e.*, that it was in any way true that Creamer or Democracy Partners had actually done anything wrong as portrayed in the videos:

> Again, we felt there was—***understanding what we knew about this organization, Project Veritas, and their representation, their reputation for misrepresenting the facts*** and doing these types of videos, we did feel that there was an element of indiscretion that they'd allowed Mr. Foval into their midst without serious vetting, that they created a***, it was the view at the time that they had created the opportunity for this, for this operation to occur, and it had become a major distraction to, and an unnecessary one*** at a critical moment in time.

(Sandler Decl. Ex.12 at 77:1–11 (emphasis added)).  Frey further testified that AFSCME was concerned that on the video, Creamer:

> was speaking ad hoc about his strong ties to the Clinton Campaign and it seemed a bit inappropriate, but then again, ***we also were aware that, of the view that the video had been highly selectively edited and likely, those words were taken out of content.  I think it was the overall sense that they had allowed this to occur, they invited this opportunity into their midst,*** but I think the broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it.

 (*Id.* 78:14–79:5 (emphasis added)).  Mr. Frey further testified that:

> Q. …Mr. Frey you had testified that AFSCME was concerned that Mr. Creamer, Strategic Consulting Group, had created the opportunity for this to occur.  ***Was part of your concern that they had allowed their offices to be infiltrated by a Project Veritas operative?***

### A. Yes.

(*Id*. at 102:13–19 (emphasis added)).

While Frey indicated the consulting contract may have been terminated anyway because of lack of resources and other factors, he confirmed that the more lucrative arrangement for the patch-through calls would have continued but for these factors.  (PSMF No. 28).  In fact, after AFSCME terminated its business relationships with Strategic Consulting, AFSCME retained *another* vendor to provide this service. (Sandler Dec. Ex. 12 at 12:3–13:3;  15:4–17:16; 27:16–29).  And the volume of business given to this new vendor was more than double (in 2017 and 2018 ) than the volume given to Strategic Consulting in 2016.  (*Id*. at 103:5–104:4).

Strategic Consulting had also provided consulting services to AUFC for $11,000 per month.  (DSMF No. 36), and from 2007 through 2016 had been paid more than $467,000 by AUFC for patch through calling services (PSMF No. 37).   After Saunders resigned from the board of directors of  AUFC, AFSCME cut its funding, AUFC ceased to exist and Strategic Consulting lost  this business as well.  (DSMF No. 36). AUFC chief executive Brad Woodhouse testified that but for the Project Veritas spying operation, AUFC would have continued to get contributions from AFSCME and Strategic Consulting would have continued to receive fees from AUFC.  (PSMF No. 37).

A potential client, Dialysis Patient Citizens, also cancelled a meeting with Creamer to discuss a business relationship; they had worked together previously.  (PSMF No. 47)  The principal of that potential client cancelled the meeting after the dissemination of the videos, which he had not viewed.  (DSMF No. 50).

## ARGUMENT

### I.  LEGAL STANDARD

"Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law."  *Niles v. U.S. Capitol Police*, Case No. 16-cv-1209, 2019 WL 1858503 (April 25, 2019) at *3.  "A 'genuine issue' is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the actions."  *Bouknight v. District of Columbia*, 680 F. Supp. 2d 96, 101 (D.D.C. 2010).

"In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true." *Bouknight*, 680 F. Supp. 2d at 101 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).  "'[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Niles*, 2019 WL 1858503 at *3 (quoting *Anderson*, 477 U.S. at 249)).

### II.  THE PROXIMATE CAUSE OF PLAINTIFFS' DAMAGES WAS THE POLITICAL SPYING OPERATION, NOT ANY "EXPRESSIVE CONDUCT" PROTECTED BY THE FIRST AMENDMENT

In seeking summary judgment, Defendants rely principally on the doctrine that that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publication ... without showing in addition that the publication contains a false statement of fact which was made with 'actual malice'…" *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).  As a more general rule, when a plaintiff is seeking "publication damages … for items relating to its reputation …" that plaintiff may not "avoid the First Amendment limitations on defamation claims by seeking publication damages under non-

reputational tort claims, while holding to the normal state law proof standards for these torts."

*Food Lion v. Capital Cities*, 194 F.3d 505, 522 (4th Cir. 1999).  *See* Def. Mem. at 7–8.

Leaving aside that Project Veritas does not remotely resemble a "newsgathering organization," see PSMF No. 1, "the protections afforded by the First Amendment, far reaching as they may be, do not place the unlawful acquisition of information beyond the reach of judicial review."  *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 330 (D.D.C. 2011) ("*CAIR*").  Thus, as the Court explained in *Steele v. Isikoff*, 130 F. Supp. 2d 23 (D.D.C. 2000):

> If a party seeks damages for harm to reputation or state of mind, the suit can only proceed if that party meets the constitutional requirements of a defamation claim.  If a party seeks damages for non-reputational harms, which include lost jobs and diminished employment prospects, then  the First Amendment does not bar suit as long as the claims are brought under generally applicable laws.

*Steele*, 130 F. Supp. 2d at 29.

In this case, two of the Plaintiffs' claims—trespass and violation of the federal wiretap statute—do not require proof of actual damages at all,  A plaintiff my recover nominal damages for trespass, see CAIR, 793 F. Supp. 2d at 344-345, and the federal wiretap statute allows a plaintiff to recover the greater of actual damages or specified statutory damages.  18 U.S.C. sec. 2520(c)(2).  As to the other counts requiring proof of actual damages, the Plaintiffs seek only *non*-reputational damages—the loss of the contracts with AFSCME and AUFC and the potential contract with Dialysis Patient.  There is significant evidence in the record that the fact that the videos made Creamer look bad—that is, their "reputational" harm—played *no* role in the decisions by AFSMCE to terminate their business relationships with Creamer and Strategic Consulting.  (PSMF No. 26).  Rather, a substantial factor in those decisions was actually that Creamer and Strategic Consulting/Democracy Partners had allowed the infiltration and

compromise of their premises and confidential conversations and information to take place. (PSMF No. 25; PSMF No. 26). For that reason, Plaintiffs seek only damages for non-reputational harm and the First Amendment does not bar their ability to pursue these claims under "generally applicable laws" governing the torts of breach of fiduciary duty and fraudulent misrepresentation; the wiretapping statutes; and trespass.

### A.  All Plaintiffs Suffered Damages

Defendants correctly identify the three items of damages claimed by Plaintiffs: (1) the terminated consulting contract and patch-through calling arrangement between Strategic Consulting and AFSCME; (2) the termination of the contract between AUFC and Strategic consulting; and (3) the loss of a potential contract between Strategic Consulting and Dialysis Patient Citizens.  (Def. Mem. at 9). Creamer is the sole owner of Strategic Consulting.  It is a single member limited liability company in which profits and losses flow through to the owner. Accordingly, Creamer personally suffered the loss of income due to the loss of these contracts by Strategic Consulting.  (PSMF No. 20).

Strategic Consulting is member of the limited liability company Democracy Partners. The loss of income to Strategic Consulting affected Democracy Partners as well by impacting the ability of Strategic Consulting to invest in and support Democracy Partners.  (PSMF No. 19).

### B.  A Proximate Cause of Plaintiffs' Damages Was the Spying Operation, Not Expressive Conduct

In the District of Columbia, a defendant's conduct is the proximate cause of a plaintiff's injury when the injury is the "natural and probable consequence of those wrongful acts and ought to have been foreseen in light of the circumstances." *C&E Servs., Inc. v. Ashland, Inc.*, 498 F.

14

Supp. 2d 242, 256 (D.D.C. 2007) (citations omitted). Proximate cause has two components—cause-in-fact and a "policy element," which only limits a defendant's liability when the chain of events leading to the injury is "highly extraordinary in retrospect." *Id.* (quoting *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002)).

The first component, cause-in-fact, does not require absolute proof of causation, but only requires that a defendant's conduct is a "substantial factor" in bringing about the harm. *Id.* As long as a defendant's conduct was a substantial factor in causing the harm, it is irrelevant that there may be other legal or proximate causes of the injury. *See, e.g.*, *Estate of Kurstin v. Lordan*, 25 A.3d 54, 69 (D.C. 2011).

Proximate cause is almost always a factual issue for the jury. Only in "exceptional cases" should questions of proximate cause be decided at the summary judgment stage. *C&E Servs.*, 498 F. Supp. 2d at 256 (quoting *Majeska*, 812 A.2d at 951).

1. **That the Infiltration and Compromise of Confidential Conversations and Information Had Taken Place, Was a Cause in Fact of Plaintiffs' Damages**

In this case, Plaintiffs have developed more than enough evidence to establish that Defendants' tortious conduct meets both elements of proximate cause.  First, the infiltration and spying operation, including the secret taping and disclosure of private and confidential information and conversations, was clearly a "cause in fact":  but for those activities by Maass, AFSCME would not have terminated its business relationships with Creamer and its support for AUFC.  The key issue is precisely what, in relation to the infiltration and undercover operation, led to AFSCME's decisions?  Was it that AFSCME saw the videos and believed their message that Creamer was a shady operator who planned or engaged in wrongdoing?  Or was it that the infiltration and undercover operation had taken place?

The evidence in the record is that  the "expressive conduct"—the actual content of the videos—played *no* role in AFSCME's decisions to terminate its relationship with Strategic Consulting, Creamer and AUFC; and that, instead, the fact that the infiltration, the political spying operation, had taken place and that Plaintiffs had allowed it to take place, was a "substantial factor" in AFSCME's decisions.  While Creamer was certainly portrayed a in negative light in the videos, that fact played *no* role in AFSCME's decisions.  AFSCME director of government relations Frey testified as to AFSCME's "***understanding what we knew about this organization, Project Veritas, and their representation, their reputation for misrepresenting the facts*** and doing these types of videos."  (Sandler Decl. Ex.12 at 77:1—11 (emphasis added)).  He further testified that, "***we also were aware that, of the view that the video had been highly selectively edited and likely, those words were taken out of context.***"  ((*Id.* 78:14—79:5 (emphasis added)). Woodhouse confirmed that Frey "understood what the source of this was, how suspect that was."  (Sandler Decl. Ex. 13 at 59:22—60:1).

Rather, although there were several factors involved, what clearly bothered AFSCME officials was the fact  that the political spying operation had taken place and Creamer and his company had allowed it to take place.  As Frey explained,

> ***I think it was the overall sense that they had allowed this to  occur, they invited this opportunity into their midst,*** but I think the broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it.

(*Id*. 78:14—79:5 (emphasis added)).  Mr. Frey further testified that:

> Q. …Mr. Frey you had testified that AFSCME was concerned that Mr. Creamer, Strategic Consulting Group, had created the opportunity for this to occur.  ***Was part of your concern that they had allowed their offices to be infiltrated by a Project Veritas operative?***
> ***A. Yes.***

(*Id*. at 102:13–19 (emphasis added)).

Indeed, the record makes clear that AFSCME's decision to terminate its business relationships with Strategic Consulting was made on October 17, 2016 (DSMF No. 23); and that AFSCME had been informed about the political spying operation within an hour of the release of the first video.  That was well *before* there was any opportunity for any  significant publicity about the video.  (Sandler Decl. Ex 12 at 58:21–59:13; Sandler Decl. Ex. 14 at p. 13 ("Monday October 17, 2016—Woodhouse takes a call from AFSCME about the videos within an hour of the first release and discusses in detail: What we knew about the O'Keefe operations …")).  Thus the infiltration and undercover operation itself, as distinct from any "expressive" conduct, was clearly a substantial factor in causing the damages to Plaintiffs.

Defendants  contend that AFSCME's decision not to renew its consulting contract with Strategic Consulting was motivated by financial constraints, not by the infiltration. (Def. Mem at 13).  But  those constraints played no role in AFSCME's decision to terminate the much more lucrative arrangement for Strategic Consulting to provide "patch-through" calls.  (PSMF No. 28).  In fact, after that arrangement was terminated, AFSMCE retained another vendor to provide this service and volume of business given to that new vendor was more than double (in 2017 and 2018) the volume that had been given to Strategic Consulting in 2016.  (*Id*.).

Defendants also contend that AFSCME was concerned about Creamer's ties to the Clinton campaign being associated with AUFC (Def Mem. at 13) and as lack of timely notification to President Saunders about the Project Veritas operation.   (DSMF No. 43). Those factors may have played a role; but it is not necessary for Plaintiffs to prove that the existence that fact of the infiltration and undercover operation was the only factor in AFSCME's decisions. It is sufficient that Plaintiffs have adduced sufficient evidence to show that it was a "substantial"

factor in those decisions. *See Estate of Kurstin*, 25 A.3d at 69 (finding that complainant is not required to establish that tortfeasor is only cause of the injury); *District of Columbia v. Zukerberg*, 880 A.2d 276, 283 (D.C. 2005) (finding that the plaintiff was not required to show that defendant's tortious conduct was the "only possible cause" of the injury).

### 2.  <u>The Damages to Plaintiffs Were Foreseeable</u>

The second component of proximate cause, the "policy element," merely limits a defendant's liability when the chain of events leading to the injury could not have been anticipated. *See Majeska*, 812 A.2d at 951 (citing *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980)).  However, the intervening acts of a third party do not by themselves make the injury unforeseeable so as to sever proximate cause. *Id.* A defendant is still responsible for damages when the possibility of an intervening act causing damages should have reasonably been foreseen. *Id.*

In this case, it was entirely foreseeable that the political spying operation—constituting the breach of fiduciary duty and fraudulent misrepresentations—would lead to a loss of business for Creamer and his company.  Defendants' emphasize that Maass was not aware of the Creamer's specific work for AFSCME.  (Def. Mem. at 19).  It makes no difference, however, whether Maass (or anyone at Project Veritas) knew the specific contracts that Creamer had with particular clients. It is sufficient that it was foreseeable that the spying operation would lead to a loss of business for Creamer and his company.

And Project Veritas certainly was aware of Creamer's work for AUFC.  It was entirely natural and foreseeable that association of AUFC with the spying operation would likely lead to loss of donations and support.  Indeed, that was particularly foreseeable in light of the results of Defendants' past schemes. *See, e.g.*, Compl. ECF No. 1, ¶¶ 14–15 (describing videos released

about community organizing group ACORN that resulted in $100,000 settlement); John Atlas, *ACORN Closes its Last Door, Filing for Bankruptcy*, Huffington Post (Nov. 3, 2010, 1:48 AM), https://www.huffpost.com/entry/acorn-closes-its-last-doo_b_778047 (noting that ACORN was forced to close after Project Veritas sting operation because financial contributors terminated support).

For these reasons,  there are, at the least, genuine issues of material fact as to whether the tortious conduct of Defendants—not the expressive content of the videos—was the proximate cause of Plaintiffs' damages.  Accordingly Defendants are not entitled to judgment as a matter of law on that issue.

## III.    THE RECORD SUPPORTS THE EXISTENCE OF A FIDUCIARY DUTY AND BREACH OF THAT DUTY BY DEFENDANT MAASS

To establish a breach of fiduciary duty, a plaintiff must prove "(1) there was a fiduciary relationship, (2) the fiduciary duty was breached, and (3) there was injury that was proximately caused by the breach." *Armenian Genocide Museum & Memorial, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 190–191 (D.D.C. 2009) (citing *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 5–6 (D.D.C. 2008)).  In this case, there is more than enough evidence in the record to support each element..

### A.     Maass Owed a Fiduciary Duty to Plaintiffs

Courts in the District of Columbia have "deliberately left the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances." *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 341 (D.D.C. 2011) (*"CAIR"*).  "Because the inquiry is fact-intensive, it is often inappropriate to

decide whether a fiduciary relationship existed even in the context of a motion for summary judgment. " *Id*.; *see also Firestone*, 76 F.3d at 1211; *Eli Lilly*, 848 F. Supp. at 1028.

" "A fiduciary relationship exists when one party 'is under a duty to act or give advice for the benefit of another upon matters within the scope of the relation.'" *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 64 (D.D.C. 2002) (quoting the Restatement (Second) of Torts § 874 cmt. a (1977)). "[A] fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (quoting *Rwanda Working Grp.*, 227 F. Supp. 2d at 64).

To determine whether a fiduciary relationship exists, courts conduct "'a searching inquiry into the nature of the relationships, the promises made, the types of services rendered and the legitimate expectations of the parties.'" *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996) (quoting *Church of Scientology Int'l v. Eli Lilly & Co*., 848 F. Supp. 1018, 1028 (D.D.C. 1994)).  As a fiduciary duty arises out of an agency relationship, *see, e.g.*, *Jenkins v. Strauss*, 931 A.2d 1026, 1032–33 (D.C. 2007), courts consider a number of factors, including (1) the selection and engagement of the agent, (2) the payment of wages, (3) the power to discharge, (4) the power to control the agent's conduct, (5) and whether the work is part of the regular business of the employer. *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (internal citations omitted). "Of these factors, the determinative one is usually 'whether the employer has the right to control and direct the [agent] in the performance of his work and the manner in which the work is to be done.'" *Id.* (quoting *LeGrand v. Insurance Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968)) (internal citations omitted).

In applying these factors, the courts have found the existence of a fiduciary relationship, outside the context of an employer-employee context, where a person represents to his or her

principal that he or she is someone to be trusted and as a result, the principal actually does shows trust in that person by providing access to confidential or private information. In *CAIR*, it was alleged that one of the defendants obtained an unpaid internship with CAIR, a Muslim rights advocacy group, under an assumed identity; in applying for the internship "made false statements and omitted important facts about his background, interests and intentions;" and made these false representations "in order to induce Plaintiffs to repose trust and confidence in him so that he might obtain an internship with CAIR-AN." *CAIR*, 793 F. Supp. 2d at 317. The defendants moved to dismiss a claim of breach of fiduciary duty on the grounds that the former intern had no contractual relationship with CIAR and was merely an intern. The Court denied the motion, ruling that:

> To the extent the ... Defendants intent to suggest that a fiduciary relationship can never exist between an intern and the entity engaging the intern, the aforementioned authorities [D.C. cases] foreclose such an expansive argument. Meanwhile, Plaintiffs allege that [the intern] ***secured his internship only by making a number of affirmatively false statements and omitting material information about his background, interests and intentions with the specific intention of inducing Plaintiffs to repose a measure of trust and confidence in him, and that as a result of the trust and confidence reposed in him, [the intern] was afforded access to confidential, proprietary and privileged materials*** as well as non-public areas of Plaintiffs' offices…..These allegations imply a relationship akin to one between employer and employee, which under some circumstances may suffice to support a claim for breach of fiduciary duty under District of Columbia law.

*Id*. at 341 (emphasis added).

In *Firestone,* the Court found that the existence of a fiduciary relationship was adequately alleged when the defendant represented himself as someone who plaintiffs should trust; "encouraged them to ask him for advice and tell him confidential information; … and that they relied on his representations." *Firestone*, 76 F.3d at 1211.

In this case, there can be no serious dispute that Maass obtained her internship through secured his internship only by "making a number of affirmatively false statement and omitting

material information about [her] background, interests and intentions with the specific intention of inducing Plaintiffs to repose a measure of trust and confidence in [her]." *CAIR,* 793 F. Supp. 2d at 341.  Project Veritas first created the fictitious "Charles Roth," a would-be donor to progressive causes, with an extensive false backstory that was communicated to Foval, and by him to Creamer. (PSMF No. 60); and had that fake character actually make a contribution to one of Creamer's major clients, AUFC, to make the false story all the more credible.  (DSMF No. 65). "Roth" then suggested that his "niece,"  Angela Brandt," was interested in engaging in Democratic/progressive political work, leading to a volunteer position with a group staging a demonstration against Trump at the Republican National Convention .  (PSMF No. 68).  All of the information presented to Creamer, by Maass and from Hartsock, was of course, entirely false.

To obtain her internship, Maass again lied to Creamer about her identity.  (PSMF No. 68).  She created a fake e-mail account and fake id. . (PSMF No. 74).   On the third day of her internship, to sustain the deception, she turned in a fake resume  in which virtually everything she stated about her background was false.  (PSMF No. 77). Had her true background and identity been disclosed at that point, of course, Creamer would have immediately. terminated her internship and access to Plaintiffs' offices, personnel and information.  (PSMF No. 77).

As a result of gaining the trust and confidence of Creamer, Maass was then provided access to confidential information.   She was given a key card that allowed her to gain access to the building and Democracy Partners/Strategic Consulting offices after hours, but only used it on one occasion because she normally worked only during regular business hours.  (PSMF No. 97). Maass secretly recorded every minute of her internship.  (PSMF No. 79)

Maass used her internship, and her fake id,  to obtain entry into the Democratic National Committee and to the offices of the Communications Workers of America, where she secretly

taped a confidential polling briefing given by a leading Democratic pollster.  (PSMF No. 74, PSMF No. 97). Maass was explicitly told on several occasions that information that was being shared with her was to be kept confidential.  (PSMF No. 85).  She was on conference calls discussing "bracketing" events—public events staged where then-candidate Trump was holding campaign events—which had not yet taken place, and the existence of which was not yet public, and was provided lists including such future events.  (PSMF No. 85).  She rummaged through the trash in Creamer's private office and took photographs of documents lying on his desk and on the desk of another member of Democracy Partners, in their offices.  (PSMF No. 85). Thus, exactly as in *CAIR*, "as a result of the trust and confidence reposed in [her]," the intern "was afforded access to confidential, proprietary and privileged materials as well as non-public areas of Plaintiffs' offices.  *CAIR*, 793 F.Supp.2d at 341.

In addition, during her time at Democracy Partners, Maass operated directly underneath Robert Creamer, who had "the right to control and direct [her] in the performance of [her] work and the manner in which the work is to be done," which is generally the determinative factor in deciding whether or not a fiduciary relationship exists. *Judah*, 744 A.2d at 1040.

Defendants argue that there was no written agreement of any kind between Maass and the Defendants, and in particular, that she never signed a non-disclosure agreement. (Def Mem. at 18). But District of Columbia courts have never held a nondisclosure agreement is required to establish a fiduciary duty—or that it would be dispositive of the inquiry. Rather, they have held that "the parties' actual relationship, in spite of contractual language, may be the conclusive factor." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).  In *Food Lion, Inc. v. Capital Cities/ABC Inc.*, 194 F.3d 505, 516 (4th Cir. 1999), the Court  held that two undercover reporters

owed a fiduciary duty to the organization they infiltrated even absent an employment contract or nondisclosure agreement.

Defendants further contend that Mass' services were "not proactive in nature," but the ability to direct the person is a sign that a fiduciary relationship does exist—not the opposite. *Judah*, 744 A.2d at 1040. Nor does the allegedly "mundane" nature of her tasks bear on the analysis, given that she did in fact knowingly obtain and then disclose confidential information. That Maass was not asked to sign in or asked for id at the Democracy Partners offices (Def. Mem. at 21) is irrelevant given that she worked only during working hours when some other authorized employee was present in the office.  (PSMF No. 97).

For these reasons, the evidence in the record is more than sufficient for Plaintiffs to be able to establish the existence of a fiduciary duty between Maass on the one hand, and Creamer and his company, Strategic Consulting, on the other.

### 2. <u>The Evidence Demonstrates that Maass Breached Her Fiduciary Duty</u>

When a fiduciary duty is established, the agent owes the principal "undivided and unselfish loyalty … such that there shall be no conflict between duty and self-interest." *Nat'l R.R. Passenger Corp.  v. Veolia Transp. Servs.,* 791 F. Supp. 2d 33, 47 (D.D.C. 2011). "An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship." Restatement (Third) of Agency § 8.01.  In *Food Lion*, two undercover ABC reporters infiltrated a grocery store to gather information about rumored unsanitary meat-handling practices. *Food Lion,* 194 F.3d at  510. The reporters created fake identities, obtained trainee level positions, and did not sign a nondisclosure agreement. *Id*. Over three weeks, the two reporters secretly recorded 45 hours of footage, some of which was eventually used in an ABC broadcast. *Id*. at 511. Food Lion sued, and the "suit focused not on the broadcast, as a

defamation suit would, but on the methods ABC used to obtain the video footage." *Id*. On the question of breach of duty of loyalty, the Court held that both reporters breached their fiduciary duty to the store, especially because they offered complete loyalty to ABC, whose interests were averse to Food Lion's.  *Id*. at 516. In this case, the factors weigh even more heavily towards finding that a fiduciary duty both existed and was breached. As in *Food Lion*, Maass breached her duty by serving a third party's interest –that of Project Veritas-- over the interests of her principal, Creamer (and by extension his companies, Strategic Consulting and Democracy Partners). By secretly recording and transmitting confidential information, she clearly breached her fiduciary duty to Plaintiffs.

For these reasons, as to the count of breach of fiduciary duty, summary judgment is clearly inappropriate and should be denied.

## IV. THE EVIDENCE IN THE RECORD IS SUFFICIENT TO DEMONSTRATE THAT DEFENDANTS VIOLATED THE FEDERAL AND D.C. WIRETAPPING STATUTES

Count Two of Plaintiffs' Complaint alleges that Defendants are liable under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Federal Wiretap Act"), codified at 18 U.S.C. §§ 2511 *et seq*., for intentionally intercepting, intentionally using, and intentionally disclosing, the contents of surreptitious recordings of oral communications. In Count Three of the Complaint, Plaintiffs' allege that Defendants' actions also violated D.C. CODE § 23-541 *et seq*. ("D.C. Wiretap Act").  (Compl. at ¶ 87.) Both statutes proscribe the intentional interception, use, and disclosure of oral communications. *See* 18 U.S.C. §§ 2511(1)(a),  -(1)(b), -(1)(c), -(1)(d); D.C. CODE §§ 23-542(a)(1), -(a)(2), -(a)(3).

Defendants concede that Maass willfully intercepted oral communications by using electronic devices hidden on her person to secretly record private meetings and conversations.

(Def. Mem. at 23).   But they contend that Maass' conduct was protected by the "one party consent provision"  which, under the federal law, makes an intercepted communication lawful where the person doing the recording "is a party to the communication unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any state."  18 U.S.C. §2511(2)(d).  The D.C. statute includes a similar provision.  D.C. Code §23-542(b)(3).

The evidence in the record is more than enough to establish that this "one-party consent" exception is inapplicable.  First, contrary to Defendants' claim Maass was not a party to every communication she recorded while interning at Democracy Partners.  (Def. Mem. at 23).  On at least one occasion, Maass eavesdropped on a meeting to which she had not been invited, between two members of Democracy Partners and the person who served as campaign manager for Bernie Sanders' presidential campaign in 2016. (PSMF No. 79).

Second, Maass clearly recorded the conversations, conference calls and meetings to which she had access an intern, precisely  for the purpose of committing a tort—breach of fiduciary duty—by disclosing confidential communications to her superiors at Project Veritas. (PSMF No. 79).  As discussed above, her conduct constituted a breach of her fiduciary duty by disclosing confidential information to Project Veritas—a third party whose interests obviously conflicted with those of Plaintiffs.  And it is indisputable that the entire purpose of the recording was precisely to transmit the recordings so they could be used by Project Veritas in their videos.  That is, the entire purpose of the recording was to accomplish the disclosure of the footage to the third party—the breach of fiduciary duty.  For these reasons the one party consent exception does not apply and the evidence is enough to establish violation by Defendants of the federal and D.C. wiretap statutes.

## V.        THE WIRETAP STATUTES ARE CONSTITUTIONAL

As the Defendants correctly note, "[c]ourts analyzing interception statutes have generally considered them content-neutral and thus subject to intermediate  scrutiny." (Def. Mem. at 26, citing *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 603 (7th Cir. 2012) and *Martin v. Gross*, 340 F. Supp. 3d 87, 105 (D. Mass. 2018). Defendants do not argue that the federal and D.C. wiretap statutes could be found unconstitutional under intermediate scrutiny.  Rather, they contend that these statutes should be subject to strict scrutiny.  (Def. Mem. at 26–29). Defendants cite no authority for the proposition that a wiretap/interception statute should be subject to strict scrutiny and, to our knowledge, there is none.  And with good reason.

On their face, the wiretap statutes are entirely content neutral; neither makes liability turn in any way whatsoever on the content of which is being recorded or disclosed. Defendants, using a convoluted and tortured logic, argue that somehow the limitation in the one-party consent exception—for a recording made for the purpose of committing a tortious act—is "content based" because the content of the recording must in some way be considered to determine that purpose. (Def. Mem at 27). That Maass recorded for the purpose of breaching a fiduciary duty can only be established, Defendants argue, if the contents of what she disclosed consisted of confidential information, requiring examination of the "content" of the communications. (*Id*. at 27-29).

The argument is specious.  Content neutrality is aimed at ensuring that the government does not disfavor certain ideas or messages.  "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it

conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  A government regulation of a communication "is content based, rather than content neutral, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'"  *March v. Mills*, 867 F.3d 46,54 (1st Cir. 2017) (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)). Clearly neither the federal nor D.C. wiretap statute makes applicability of the one-party consent exception depend, in any way, on the topic discussed or idea or message expressed in a recording. In *March v. Mills*, a noise ordinance made it unlawful for a person to create noise outside a building with the intent to "jeopardize the health of persons receiving health services within the building or to interfere with the safe and effective delivery of those services within the building."  Me. Rev. Stat. Ann. Tit, 5 §4684-(B)(2)(D).  A protestor challenging the ordinance argued that this intent requirement made the ordinance effectively content- based, because it required an analysis of the content of the noise to determine the intent.  The Court of Appeals rejected that argument, holding that the ordinance "says not a word about the relevance—if any—of the content of the noise that person makes to the determination of whether that person has the requisite disruptive intent."  *March*, 867 F.3d at 56.

Here too, the federal and D.C. wiretap statues say not a word about the relevance of the content of any recording to the determination of whether the recording and disclosure were undertaken for the purpose of committing a tortious act.  There is no basis for deviating from precedent and applying strict scrutiny to assess the constitutionality of these statutes.

Finally Defendants content that the exceptions to the single party consent rule are unconstitutionally vague, because persons engaged in secret recording would have to analyze every possible federal and state law to determine if they are recording for the purpose of committing a tortious act or violating a statute. (Def. Mem. at 29-30).  There is no authority for

the proposition that the terms "criminal or tortious act" are unconstitutionally vague. Indeed the Court implied the contrary in the very case cited by Defendants, in which the term "any other injurious act" was held to be unconstitutionally vague *by contrast* with the terms "criminal or tortious act." *Boddie v. Am. Broadcast Cos., Inc.*, 881 F.2d 267, 271 (6th Cir. 1989) ("The logical narrowing construction of 'injurious' purpose is 'criminal' or 'unlawful' purpose, but these alternatives are foreclosed by the statute. Under the pre–1986 [law], 'injurious' is obviously different from and broader than 'tortious' or 'criminal'" since the statute premised liability on either a 'criminal' or 'tortious;" purpose *or* an 'injurious' purpose.").  To be sure, the term "injurious act" as used in the D.C. statute may well be unconstitutionally vague.  But Plaintiffs are in no way relying on that provision here. They are relying solely on the fact that Maass' recording and disclosure were undertaken for the purpose of committing breach of fiduciary duty, a tortious act.  For that reason the one party consent exception does not apply. Defendants are not entitled to summary judgment on Plaintiffs' claim for violation of the wiretap statutes.

## VI.   THE RECORD EVIDENCE IS SUFFICIENT TO ESTABLISH A CLAIM OF TRESPASS

As Defendants correctly note, Def. Mem. at 31,  the elements of a claim for trespass in the District of Columbia are "(i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest."  *CAIR*, 293 F. Supp.2 d at 344.  Defendants contend they are entitled to summary judgment for three reasons.

First , Defendants argue that Democracy Partners itself had no possessory interest in the offices infiltrated by Maass. (Def. Mem. at 34-35).  However, Defendants concede that Strategic Consulting used the space and paid its share of rent for the space.  (DSMF Nos. 99 through 102,

104).  Thus, at a minimum,. Strategic Consulting, one of the Plaintiffs, had a possessory interest

in the office—and Defendants do not contend otherwise.

Second, Defendants contend that Maass' entry was authorized because the doors were

unlocked during business hours and Maass herself sometimes served as the receptionist for

tenants (including Strategic Consulting) during those hours.  (DSMF No. 123).  But there is no

evidence that unauthorized visitors were ever able to gain access to the Democracy Partners suite

(including the space subleased by Strategic Consulting). And it is indisputable that Maass gained

access to the office only because of her lies and misrepresentations to Creamer, through which

she obtained the internship.  (PSMF Nos. 66; 68.) "Consent 'given upon fraudulent

misrepresentations' will not always defeat a claim for trespass." *CAIR*, 793 F. Supp. 2d at 345

(citing *Dine v. Western Exterminating Co.*, 1988 WL 25511, at *9 (D.D.C. Mar. 9, 1988)). When

a party gains access to private space by virtue of misrepresentation, that party is liable for

trespass. "Consent may be ineffective if induced…by a substantial mistake concerning the nature

of the invasion of [the owner's] interest or the extent of the harm to be expected from it and the

mistake is known to the other or induced by the other's misrepresentation." *Id.* (internal

quotations omitted) (citing Restatement (Second) of Torts §§ 173, 892B (2) (1965). *See  Planned

Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d at 834 (plaintiff could

prove trespass where defendants obtained access to meetings by misrepresentation or exceeded

the scope of consent when they secretly filmed the proceedings); *Pitts Sales, Inc. v. King World

Prods., Inc,.* 383 F. Supp. 2d 1354, 1367 (S.D. Fla 2005) (trespass claim where defendant's fraud

gave him access areas of plaintiff's business not open to the public).

Finally, Defendants argue that Plaintiffs suffered no damages because there was no

diminution of the economic value of the office or information in the office.  There is no such

requirement in order to establish a claim of trespass, nor is there any requirement to show any particular degree of the alleged intrusion into Plaintiff's possessory interest. *See, e.g.*, *Robinson v. Farley*, No. 15-CV-0803 (KBJ), 2017 WL 3841830, at *8 (D.D.C. Sept. 1, 2017) (holding plaintiff could prove trespass based on allegations that officers "intentionally entered the Robinsons' residence and thereby interfered with the Robinson's possessory interest"). By entering the Plaintiffs' office without consent, Maass interfered with Plaintiffs' possessory interest in their office.  Plaintiffs are not required to plead their damages for trespass with particularity and District of Columbia law allows Plaintiffs to recover nominal damages for trespass. *CAIR* , 793 F. Supp. 2d. at 344-345 (citing *Decker v. Dreisen-Freedman, Inc*. 144 A.2d 108, 110 (D.C.1958)). Therefore, even if Plaintiffs have not adduced evidence of actual damages, there is no basis for granting summary judgment for Defendants on the trespass claim.

### VII.    THE RECORD EVIDENCE IS SUFFICIENT TO ESTALBISH A CLAIM FOR FRAUDULENT MISREPESENTATION

In order to establish a claim for fraudulent misrepresentation under District of Columbia law, a plaintiff must prove: "(1) the defendant made a false representation; (2) in reference to a material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which *consequently* resulted in provable damages." *C & E Servs. v. Ashland,* 498 F. Supp. 2d 242, 255 (D.D.C. 2007) (citing *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)). *See Parham v. CIH Properties, Inc*., 148 F.Supp.3d 5, 9 (D.D.C. 2015) (same).

Defendants do not contest that Plaintiffs have adduced evidence sufficient to establish the first four elements; they contend only that Plaintiffs "have not established damages or injuries that relate to any transactions that they engaged in with Allison Maass or the other Project Veritas parties."  (Def. Mem. at 37).  Defendants argue that fraudulent misrepresentation "must

relate to a specific transaction in which a plaintiff engages in reliance on a false representation." (*Id.* at 38).

In this case, the "transaction" in which the plaintiff engaged, in reliance on Maass' indisputably false representations, was giving Maass an internship. Creamer and Strategic Consulting suffered pecuniary losses directly resulting from Creamer's giving Maass the internship, as discussed above.

Defendants contend that the loss of contracts by Strategic Consulting was not a natural or foreseeable consequence of the internship—the transaction at issued. Defendants concede they knew AUFC was a client of Democracy Partners. While Maass and Project Veritas may not have foreseen exactly which client or clients would terminate their business relationships with Creamer and his companies, they could certainly foresee that the compromise of their offices and their clients' confidential information through the spying operation was likely to cause a loss of business. Defendants again contend that the only damage Plaintiffs suffered was reputational; the evidence in the record is more than adequate to rebut that, for the reasons set forth in section II above.

Finally, it is simply untrue that the fraudulent misrepresentation allegations arise out of the "speech" of the Project Veritas parties. Maass' lies and deceit were not the "message" of the Project Veritas videos and are not are not themselves protected by the First Amendment. "[T]he protections afforded by the First Amendment, far reaching as they may be, do not place the unlawful acquisition of information beyond the reach of judicial review." *CAIR*, 793 F. Supp. 2d at 330.

For these reasons, Defendants are not entitled to summary judgment on the count of fraudulent misrepresentation.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment should be denied.

Dated:  June 3, 2019                                Respectfully submitted,

 _/s/ Joseph E. Sandler

 Joseph E. Sandler, D.C. Bar No. 255919                         Heather Abraham, *pro hac vice*
 Dara Lindenbaum, D.C. Bar No. 1026799                         Aderson Francois, D.C. Bar No. 798544
 SANDLER REIFF LAMB ROSENSTEIN &                               INSTITUTE FOR PUBLIC REPRESENTATION
 BIRKENSTOCK, P.C.                                             Georgetown University Law Center
 1090 Vermont Ave., N.W.  Suite 750                            600 New Jersey Avenue NW, Suite 312
 Washington, D.C.  20005                                       Washington, DC 20001
 Tel:  202-479-1111                                            Phone: (202) 662-9593
 Fax:  202-479-1115                                            Fax: (202) 662-9634
 sandler@sandlerreiff.com                                      abf48@georgetown.edu
 lindenbaum@sandlerreiff.com                                   heather.abraham@georgetown.edu

                                                              Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2019, I served the foregoing Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment  through the Court's electronic filing system which served a copy on all counsel of record.


                        /s/  Joseph E. Sandler

                        Joseph E. Sandler
                        Counsel for Plaintiffs