## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
DEMOCRACY PARTNERS, LLC, *et al.*,      )
                                     )
     Plaintiffs,                 )
                                     ) Civ. No. 1:17-cv-1047-ESH
        v.                      )
                                     )
PROJECT VERITAS ACTION FUND, LLC, *et al.*,   )
                                     )
     Defendants.               )
_____)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule LCvR 7(b), Plaintiffs Democracy Partners, LLC, Strategic Consulting Group and Robert Creamer hereby submit their Statement of Material Facts indicating those material facts asserted by Defendants in their Statement of Material Facts (ECF No. 63-2) as to which it is contended by Plaintiffs that there exists a genuine issue necessary to be litigated; and additional material facts not included in Defendants' Statement, that preclude a grant of summary judgment to Defendants.

**Defendants' Statement of Material Fact ("Def. SMF") No. 1.** "Project Veritas Action Fund, Inc. ("PVA") performed journalistic investigations leading up to the 2016 Presidential Election, resulting in video news reporting that was viewed over 10 million times on YouTube alone and widely reported on or republished by other media outlets. (*See* Affidavit of James O'Keefe ("O'Keefe Aff."), attached hereto as Ex. A at ¶¶ 7, 10). PVA is a 501(c)(4) organization that focuses on newsgathering investigations of election issues and political campaigns. (O'Keefe Aff. ¶ 3). Project Veritas, PVA, and their journalists have routinely engaged in undercover news investigations utilizing secret recording, including in the District of Columbia, and, before the start of the "Rigging the Election" news investigation, knew that D.C. was a one party consent jurisdiction and relied on that fact. (O'Keefe Aff. ¶ 5; Affidavit of Allison Maas ("Maass Aff.") attached hereto as Ex. B at ¶ 3)."

**Plaintiffs' Statement of Material Fact in Response ("Pl. SMF") No. 1**    Disputed that PVA "performed journalistic investigations," focuses on "newsgathering investigations: or

that PVA employs "journalists."   PVA founder and president, Defendant James O'Keefe, pleaded guilty to a criminal charge of entry on federal property on false premises and characterized his criminal activity in that case as no different than what PVA does in all of its investigations. (Excerpts of Transcript of Deposition of James O'Keefe, Feb. 12, 2019, attached as Ex. 1 to Declaration of Joseph E. Sandler attached as Exhibit B hereto ("Sandler Decl.") at 14:9-12).   PVA has not adopted any code of journalistic ethics. (*Id*. at 40:18-21). Unlike other recognized media outlets, including Fox News, PVA has not adopted any rule restricting its "journalists" from participating in political events and rallies as supporters of a candidate (rather than as a journalist) (*Id*. at 64:16-65).

In his 2017 book, *American Pravda: My Fight for Truth in the Era of Fake News* (2017), O'Keefe compares the activities of Defendant Allison Maass in the very undercover operations that gave rise to this lawsuit, to Cold War spying and the Watergate break-in.  (Excerpts of O'Keefe book, Sandler Decl. Ex. 8 at 116-117).

O'Keefe does not agree that an ethical journalist should report a story rather than creating one.  (*Id*. at 91:15—19). Indeed, in this very case PVA offered to give bonuses to its "reporters" if they got their "targets" to say specific things that PVA believed would create a good story. (Sandler Decl. Ex. 2, Ex. 3; O'Keefe Depo. (Sandler Decl. Ex. 1) at  95:4—22).

O'Keefe believes it is ethical and appropriate for his employees or agents secretly to tape people who are not suspected of any improper, illegal or inappropriate behavior of any kind, just to see if they will say something of interest because the person will be more truthful if they do not know they are being taped. (Sandler Decl. Ex. 1 at  183:12—185:18).

O'Keefe regards Alex Jones—the founder and head of the Infowars website who developed and promulgated the "Pizzagate" conspiracy theory, among others--as an "ally" in the fight against

a "complacent and corrupt media"  (Sandler Decl. Ex. 4) and as an ally "in fighting for the truth

and for justice" in this lawsuit.  (Sandler Decl. Ex. 1 at 206:19—208:10).

    In the winter of 2017, Erik Prince, the founder of the Blackwater mercenary company,

"arranged for a former British M16 officer to provide more surveillance and elicitation training for

[Project] Veritas at his family's Wyoming ranch…."  M. Cole, "The Improbable Comeback of

Erik Prince," *The Intercept (*May 3, 2019) located at https://theintercept.com/2019/05/03/erik-

prince-trump-uae-projectveritas/.  "Prince was trying to turn O'Keefe and his group into domestic

spies.  For his part, O'Keefe posted photos on Instagram and Twitter from the Prince family ranch

of himself holding a handgun with a silencer attached and wearing pseudo-military clothing.  He

described the ranch as a 'classified location' where he was learning 'spying and self-defense,' in

an effort to make Project Veritas 'the next great intelligence agency.'" (*Id*.).

    The remaining assertions are undisputed.

    **Def. SMF No. 2:**  "In October 2016, PVA published "Rigging the Election" – a four-
part video series in which the conduct of Plaintiffs and their subcontractor Scott Foval, often
described in their own, unedited, raw, accurate words, featured prominently. *Project Veritas Action:
Democracy            Partners            Investigation*,            Y-OUTUBE,
https://www.youtube.com/playlist?list=PLXvy1DRoSfZlzszVv2sw3-
IUPL6YlER6_ (all four parts ("Video I", "Video II", "Video III", and "Video IV", respectively)

included as Exhibit 1 to the Affidavit of Stephen Klein ("Klein Aff.")), attached hereto as Ex. C).
Plaintiff Democracy Partners is a political consulting firm. Dkt. 1 at ¶19. Plaintiff Strategic
Consulting Group is an entity wholly owned and operated by Plaintiff Bob Creamer and used for
his political consulting work. Dkt. 1 at ¶18. Creamer is a political consultant and the spouse of a
sitting Member of Congress; he is a felon who was convicted of bank fraud and failure to pay
withholding taxes in 2005. (Klein Aff. Ex. 2 at 8:17-10:2). Those convictions were discussed in
"Rigging the Election." (Klein Aff. Ex. 1 at Video I at 4:08-4:17)."

    **Plaintiffs' SMF No. 2:**  Disputed that any "conduct" of Plaintiffs was "featured" in the

"Rigging the Election" video series. Ex. 1 to Affidavit of  Stephen Klein, ECF No. 63-6

(submitted by Defendants on disc—YouTube publication of video series). The remaining

assertions are not disputed.

**Def. SMF. No. 3.** "As part of the "Rigging the Election" video series, Project Veritas investigative journalists discussed with Creamer, Foval, and others, a proposed voter fraud scenario in which voters would be transported across state lines to vote illegally in states in which the voters were not residents, and obtained their reactions to the proposed scheme. (Klein Aff. Ex. 1 at Video II at 3:33-8:58). The project was referred to as "re-enfranchisement." (*Id.* at Video II at 12:11-13:47)."

**Plaintiffs' SMF No. 3.** Disputed.   The only voter fraud scheme ever discussed was one developed and proposed by Project Veritas itself.  The "surrogate voter scheme" was concocted by Project Veritas *itself.* As Project Veritas senior journalist and production associate Christian Hartsock testified, ""the surrogate voting option was a scenario that I created…." (Excerpts of Transcript of Deposition of Christian Hartsock, Aug. 9, 2018, Sandler Decl. Ex. 5 at 124:4-5). Project Veritas operatives then tried (unsuccessfully)  to persuade their "targets," including Foval and Creamer to adopt it or accept funding to implement it.  (Sandler Decl. Ex. 6) ("Desired Content" is that Creamer "expresses moral approval of the scheme…"); Sandler Decl. Ex. 7 (Project Veritas memo setting out in detail the illegal scheme developed by Project Veritas itself)).

The scheme devised by Project Veritas proposed getting groups engaged in voter registration efforts to obtain addresses from foreclosed and abandoned homes during canvasses, be tricked into recording those addresses without being told why, then used to generate phony id's and paychecks for noncitizens, undocumented immigrants and out of state voters hired to register illegally. (Sandler Decl. Ex. 5 at  54:6—58:9).  The nonpartisan voter registration groups would not be told why the addresses were being recorded; Hartsock admitted the scheme was for Veritas to trick these groups to participate in an illegal voting scheme inadvertently.  (*Id*. at 57:22—58:9).

Project Veritas operative Daniel Sandini, posing as wealthy donor named "Charles Roth," tried to entice Creamer into presenting a version of that plan  (Excerpts from James O'Keefe, *American Pravda: My Fight for Truth in the Era of Fake News* (2017), Sandler Decl. Ex. 8 at  104-113). After a second meeting with Roth, Creamer came back with a proposal, but by

O'Keefe's own admission, "None of his ideas were on the face of things, illegal." (*Id.* at 113). Project Veritas officials were disappointed that Creamer was a "white hat" because he was "trying to keep things above board." –that is, Creamer was not willing to do anything illegal.(Sandler Decl. Ex. 9; Sandler Decl. Ex. 5 at 96:4-11). In fact, Project Veritas secretly taped Creamer telling "Roth" "that what he is talking about would probably be voter fraud. Would need to be run by the legal team and it wouldn't pass… Foval tells us that Bob 'wouldn't touch this with a ten foot pole." (Sandler Decl. Ex. 10).

O'Keefe conceded that Creamer—while being secretly taped-- *never* admitted to engaging in any conduct that would constitute voter fraud. (Sandler Decl. Ex. 1 at 124:-14). In fact, O'Keefe conceded that Project Veritas never uncovered *anyone* associated with any of the Plaintiffs planning or engaging in voter fraud (*Id.* at 129:5—130:15). Hartsock agreed. (Sandler Decl. Ex. 5 at 150:6-10).

Nor did Foval ever adopt or act on the illegal scheme proposed by Project Veritas. (Sandler Decl. Ex. 5 at 99:1-100:3). Indeed, Project Veritas' excerpts of Foval's initial discussion with Hartsock (playing "Steve Packard") at a bar in Wisconsin conveniently omitted Foval's expressed concerns about the legality of what was being proposed. (Tape of Foval discussion with Hartsock in the bar, Ex. 3 to Klein Affidavit filed by Defendants with their Statement of Material Facts (ECF No. 63-8) ("Foval Tape") File 1 at 40 minutes, 14 seconds (the voter surrogates" would likely be "brought up on felony charges"); File 2 at 2 minutes, 8 second "(I would want to make sure there's a lawyer andain investigator there playing devil's advocate"). In the case of *Teter v. Project Veritas Action Fund*, No. 1:17-cv-00256 (W.D. N.C.), plaintiff took the deposition of Scott Foval on April 5, 2019. Attorneys for Project Veritas Action were present and had the opportunity to cross-examine. Portions of the transcript of that deposition were filed in connection with a motion. (*Id.* ECF No. 94-6, attached to Sandler Decl. as Ex. 11). In his

deposition, Foval testified under oath that:

> The issues that they were .. representing that Charles Roth wanted to invest in activities that American United for Change and/or Democracy Partners were involved in, and they— so backing up, the initial conversations with Christian Hartsock/Steve Packard centered around a scheme called voter re-enfranchisement that I was not familiar with, where I was asked a lot of questions on how it would be possible to, quote, re-enfranchise voters in order to be able to vote in the presidential elections.  So in the initial bar conversations I was asked a lot of questions on how it would be possible to make it legal for people to vote in someone else's place, and I spent a lot of time pushing back on that explaining that that was illegal and that was not something I did or any of my associates did and that it wasn't possible to make it legal because of the way the election laws work.

(Sandler Decl. Ex.11 at 38:10-39:7).

**Def. SMF No. 4**. "Project Veritas journalists were also solicited by Scott Foval for funding that would support aggressive "bird-dogging" operations at Donald Trump events, drawing the attention of the press by getting Trump supports to "pop off." (*See id.* at (Video I at 7:09-9:11; 11:16-13:48). Foval took credit for instigating such incidents, with help from Creamer. (*See* Klein Aff. Ex. 3 at PVA00013718 at 27:11 to 29:10)."

**Plaintiffs' SMF No. 4.**   Disputed.  In his conversation with Hartsock at the bar, Foval was asked if the assailants at Trump events were being provoked. He replied, "They weren't being provoked.  We were just standing there."  (Foval Tape, File 2 at 29 minutes, 15 seconds).  In his deposition in the *Teter* case, Foval testified that:

> Q. And did Americans United for Change train people to incite violence at rallies for Mr. Trump?..
> BY MR. FOVAL:
> A. No…. Absolutely not.  We did not do that.
> Q. And again—
>      BY MR.. FOVAL: A That's not part of our training program. Our training program was not about even disrupting.  It was about asking questions.

(Foval Deposition Transcript (Sandler Decl. Ex. 11) at 31:2-15).

Foval further testified under oath that:

> The ideas of voter re-enfranchisement—so—was the first one.  The second one was disrupting Trump's rallies.  They wanted to disrupt Trump rallies, or they said Mr. Roth

wanted to do that specifically, and that's what he was interested in funding, and in conversations leading up to ***this I had presented to them multiple drafts of proposals of activities that we could participate in. They did not contain either of those two things. We, we were—in Americans United For Change and Democracy Partners, we were doing bird-dogging, we were doing protest. We were not doing disruption and we were not doing violence and we not doing voter re-enfranchisement in the way that they wanted to do it.*** And so lot of the questioning was how to make that work and I had to spend lot of time in all of these conversations explain that, you know, ***what they were proposing was not legal; what they were proposing was not safe; what they were proposing was against the values of the organization and me personally….*** [T]he idea they want to push for on behalf of Mr. Roth were ideas that were off the table, that I have reviewed with my superiors, and it had been determined that they were very, highly risky, dubious in their intention, and that was just not something we were going to do.

(Foval Deposition Transcript (Sandler Decl. Ex 11) at 39:11-40:23) (emphasis added)).

Nor did Creamer ever "help" with "instigating such incidents." To the contrary, neither Creamer, nor his company Strategic Consulting, nor Mobilize, nor any of their employees or contractors has ever been involved in any effort to instigate confrontations or violence at Trump rallies or events or any other kind of event. Declaration of Robert Creamer attached hereto as Exhibit A ("Creamer Decl.") ¶14.

**Def. SMF. No. 5.** "Some of the footage used in "Rigging the Election" was gathered by Project Veritas investigative journalist Allison Maass, who interned at Democracy Partners under the pseudonym "Angela Brandt." (Maass Aff. ¶¶ 4, 20); *see, e.g.,* Klein Aff. Ex. 1 at Video I 03:37–4:00; 4:21- 4:38; 9:10-10:14; 10:51-10:59). She was a party to every conversation she recorded." (Maass Aff. ¶ 20)".

**Plaintiffs' SMF**: Undisputed except for the assertion that "Angela Brandt" was a "pseudonym." Maass created and implemented an elaborate scheme to deceive Creamer and Democracy Partners into believing she was "Angela Brandt" including creating and providing a fake resume and creating and displaying a fake id. *See* Plaintiffs' SMF No. 74, *infra*.

**Def. SMF No. 6**. "Following the publication of PVA's "Rigging the Election" reporting, Creamer cancelled his contract with the Democratic National Committee, Foval was fired, two special interest groups (including one, Americans United for Change ("AUFC"), for which Foval was a deputy director) stopped doing business with Strategic Consulting Group ("Strategic"), and a prospective special interest group client cancelled a meeting with Creamer. (Klein Aff. Ex. 4;

Ex. 5 at 68:14-71:22; 126:1-127:8; Ex. 6 at 75:1-9; Ex. 7).”

**Plaintiffs' SMF**. Plaintiffs dispute the characterization of AFSCME and American

United for Change as “special interest groups” and dispute any implication that because these

events “followed” publication, that the publication was the cause.  *See* ¶¶ 24-34, *infra*.  Foval was

not a deputy director of AUFC, but rather a field director.  (Sandler Decl. Ex. 13 at 52:17—53:9).

Plaintiffs do not dispute the remaining assertions

**Def. SMF No. 7**.  “Scott Foval was a political consultant and subcontractor to Mobilize,
Inc., which is essentially Democracy Partners. (*See* Klein Aff. Ex. 8). Foval summarized his
subcontractor work on behalf of Democracy Partners, and his work for the Clinton Presidential
Campaign and the Democratic National Committee, as follows: “The campaign pays DNC, DNC
pays Democracy Partners, Democracy Partners pays the Foval Group, the Foval Group goes and
executes the shit on the ground.” (Klein Aff. Ex. 1 at Video I 3:11-3:21). Foval was also a director
for AUFC, a special interest group which paid Strategic for consulting work. (Klein Aff. Ex. 5 at
52:9-53:9).”

**Plaintiffs' SMF**:  Disputed in part.  At the time of the conversation with Hartsock

recorded at the bar in April 2016, Foval was not an employee of or contractor to Mobilize, AUFC,

Strategic Consulting ,Democracy partners or any other entity associated with Plaintiffs.  (Creamer

Decl. ¶8).  Foval was a subcontractor to Mobilize.  Mobilize is not a member of Democracy

Partners; it is  a corporation of which Linda Saucedo, an employee of Strategic Consulting is the

sole shareholder.  (Creamer Decl. ¶6).  Creamer owns another limited liability company, Strategic

Consulting Group, which is a plaintiff in this lawsuit.   (*Id*. ¶¶ 2-3). There is no evidence that the

Hillary for America campaign “paid” the DNC for anything and it would make no sense.  The

DNC had a contract with Mobilize—not with Democracy Partners, although it is undisputed that

the two companies work closely together.  (*Id*. ¶¶6, 9, 11).  Mobilize had a contract with Foval;

Democracy Partners did not.  (*Id.*  ¶¶6, 9). Foval was not a “director” of AUFC, but a “field

director, an employee hired to carry out certain limited, specific tasks.  (Excerpts of Transcript of

Deposition of Bradley Woodhouse, Dec. 18, 2018, Sandler Decl. Ex. 13 at  52:17—53:9). AUFC

did pay Strategic Consulting  for both consulting services and patch-through mass telephone calls.

(*Id.* at 37:9—38:5; Creamer Decl. ¶35)..

**Def. SMF No. 8:** "Foval met on several occasions with Project Veritas investigative journalist Christian Hartsock. The journalist used the assumed identity of "Steve Packard," a junior consultant in a firm called "Breakthrough Development Group" which represented a wealthy individual who could fund the proposed voter fraud scenario. (Klein Aff. Ex. 9 at 45:15-47:9 & Depo. Ex. 5)."

**Plaintiffs' SMF**:  Undisputed, except that the material cited actually evidences that the

entire cover story recited here was fabricated by Project Veritas.  To support the deception of

Foval and Creamer about the existence of "Breakthrough Development," Project Veritas created a

fake website with fake information about the company's business and fake contact information.

(Sandler Decl. Ex. 16; Sandler Decl. Ex. 5 at 46:10-48:7).

**Def. SMF No. 9.**   "Foval also spoke with the Project Veritas investigative journalist regarding Foval's use of a technique called "bird-dogging," both historically and at Donald Trump campaign rallies. (Klein Aff. Ex. 1 at Video I at 11:50-13:15). As Foval described it, bird-dogging is the placement of individuals at political rallies with the goal of provoking conflict, including violence. (*Id.* at Video I at 13:15-14:40). "Rigging the Election" published Foval's own, unedited, raw, accurate words on this subject, including:
     a.     "Conflict engagement in the lines at Trump rallies. We're starting anarchy here." (*Id.* at Video I at 0:30-0:39).
     b.     "The key is initiating the conflict by having leading conversations with people who are naturally psychotic." (*Id.* at Video I at 7:47-7:57).
     c.     "If you're there and you're protesting and you do these actions, you will be attacked at Trump rallies. That's what we want . . . . The whole point of it is that Trump's people will freak the fuck out, his security team will freak out, and his supporters will lose their shit." (*Id.* at Video I at 2:18-2:37).
     d.     "We have people prepared to go wherever these events are, which means we have to have a central kind of agitator training." (*Id.* at Video I at 8:46-8:58).
     e.     "We have mentally ill people that we pay to do shit. Make no mistake." (*Id.* at Video I at 13:48-13:55).

**Plaintiffs' SMF**:  Disputed.  These are quotes taken entirely out of context and

the video series was selectively edited to completely distort what Foval said. *See* Plaintiffs' SMF

No. 4 *supra*.

**Def. SMF No. 10**. "Foval also offered distasteful and condescending views of voters and the American political system, including describing Iowa as "a fifty-fifty state and honestly half the

state is racist as fuck," and adding, "Wisconsin is just as bad." (*Id.* at Video I at 15:09-15:22; 15:40-15:43)."

**Plaintiffs' SMF**.  Not disputed; not material.

**Def. SMF No. 11.**  "The first time the Project Veritas Parties became aware of Bob Creamer was when Foval explained his belief that Creamer must have been the one advising the investigative journalist's "client" on how to execute the proposed voter fraud scenario. (*Id.* at Video II at 8:58- 9:23)."

**Plaintiffs' SMF No. 11**.  Not disputed that the first time the Project Veritas Parties became aware of Bob Creamer was the referenced conversation with Foval.  However, the person talking to Foval (Hartsock posing as "Steve Packard") is not an "investigative journalist" (See Plaintiffs' SMF No. 1) and Creamer never advised anyone on how to execute any voter fraud scheme.  *See* Plaintiffs' SMF Nos. 3 & 4; Creamer Decl. ¶12.

**Def. SMF No. 12**: "Foval opined to the Project Veritas Journalist, "I know pretty closely who's advising [the investigative journalist's client] on that. I work with the same person. There is somebody who hatches these ideas to people like him on an ongoing basis . . . so Bob Creamer comes up with a lot of these ideas. I work with Bob Creamer one-to-one all the time. I'm the white hat, Democracy Partners is kind of a dark hat. I will probably end up being a partner there at some point, because our philosophy is actually the same." (Klein Aff. at Ex. 3 at PVA00013718 at 23:59-24:38; *see also* Ex. 1 at Video I at 4:37-48 (publication of Foval's white hat/dark hat analogy))."

**Plaintiffs' SMF**: Partly disputed.  Foval made the quoted statements but they were entirely false.  Creamer never advised the fictitious client of Hartsock (the so-called "investigative journalist.")  (Creamer Decl. ¶12).  Foval was never an employee of or contractor to Democracy Partners at any time and, at the time of this discussion, he was neither an employee of or contractor to Democracy Partners, Strategic Consulting, Mobilize or any other entity associated with Creamer in any way.  (*Id*. ¶8).  There was never any discussion, at any time, about his becoming a member of Democracy Partners.  (*Id*. ¶10).

**Def. SMF No. 13**. "Foval explained, "We are contracted directly with the DNC and the [Clinton] campaign both . . . . I am contracted to him [Creamer]. But I answer to the head of special events for the DNC and the head of special events and political for the campaign." (Klein Aff. Ex. 1 at Video I at 2:54-3:11)."

**Plaintiffs' SMF**: Disputed in part. Mobilize, a limited liability company of which Linda Saucedo is the sole member, had a contract with the DNC.  (Creamer Decl. ¶9).  Foval did report to Creamer for the Mobilize project, not  directly to any official of the DNC or the Hillary for America presidential campaign.

**Def. SMF No. 14**.  "Foval was also recorded (and subsequently also broadcast) elaborating on his close working relationship with Creamer, "Bob Creamer is diabolical. And I love him for it." (Klein Aff. Ex. 1 at Video I at 4:46-4:49)."

**Plaintiffs' SMF No. 14**;  Disputed as out of context.   At the conversation in the bar, Hartsock (posing as "Packard") asks Foval if a voter fraud scheme "is the brainchild of Creamer?" Foval replied, "*No idea.*  I'm saying it would make sense. . . . because Bob is diabolical." (Foval Tape, ECF No. 63-8, File 2 at 25 minutes, 50 seconds (emphasis added)). In fact at the time of the conversation in the bar, Foval was not an employee of or contractor to Creamer, Strategic, Democracy Partners, Mobilize or any other entity associated with Plaintiffs.  (Creamer Decl. ¶8).

**Def. SMF No. 15**.  "In a phone call, Foval explained that Creamer shares Foval's philosophy: "Brad [Woodhouse, President of AUFC], Bob [Creamer], [Democracy Partners Member Mike] Lux and myself are all part of the old school method where it doesn't matter what the friggin' legal or ethics people say, we need to win this motherfucker." (Klein Aff. Ex. 1 at Video I at 1:40-1:50; Ex. 10 at 11:50-12:05)."

**Plaintiffs' SMF**:  Undisputed that Foval made this false statement at some point during his exchange with Hartsock in a bar. Creamer does not in any way subscribe to the views set out by Foval and has never suggested to Foval that he or any other member of Democracy Partners do not care what the "legal or ethics people say."  (Creamer Decl. ¶13).

**Def. SMF No. 16.**  "Foval also explained, in video released as part of the "Rigging the Election" series, Creamer's connection to the practice of birddogging: "the guy who got roughed up [at a speech by then-Wisconsin Governor Scott Walker at the Iowa State fair] is my counterpart who works for Bob." (Klein Aff. Ex. 1 at Video I at 12:15-12:23; *see also* Ex. 2 at 161:18-162:12)."

**Plaintiffs' SMF**:  Undisputed but misleading and out of context.  Aaron Black, who worked with Strategic Consulting and Creamer, was attacked at this event while carrying an anti-Walker sign.  This had nothing to do with "birddogging" and there was certainly no effort being made to invite such an attack.  (Creamer Decl. ¶14).

**Def. SMF. No. 17**.  "Project Veritas's reporting also included Foval's description of how information travels between political consultants and the Clinton campaign as they coordinate efforts. "The campaign pays DNC, DNC pays Democracy Partners, Democracy Partners pays the Foval Group, the Foval Group goes and executes the shit on the ground." (Klein Aff. Ex. 1 at Video I at 3:12- 3:21). Foval also described Democracy Partners as "the tip of the spear. . . ." (*Id.* at Video I at 3:30-3:37). According to Foval, coordination between the campaign and the Super PACs is "less of a Morse code than it is a text conversation that never ends. It's like that. It's kind of an ongoing pony express." (*Id.* at Video I at 6:30-6:43)."

**Plaintiffs' SMF**:  Disputed in part. . The Hillary for America presidential campaign did not make any payment to the DNC for any work related to Plaintiffs. (Creamer Decl. ¶11). Foval was a subcontractor to Mobilize.  (*Id.* ¶9).  Mobilize is not a member of Democracy Partners; it is a corporation of which Linda Saucedo, who works for Strategic Consulting,  is the sole shareholder.  (Creamer Decl. ¶6).  Creamer owns another limited liability company, Strategic Consulting Group, which is a plaintiff in this lawsuit.   (*Id*. ¶¶2-3). The DNC had a contract with Mobilize. (*Id*. ¶9).

**Def. SMF. No. 18**.  Plaintiffs admit that the only alleged damages are those purportedly suffered by Strategic when, following the publication of "Rigging the Election," two special interest group clients – American Federation of State, County, and Municipal Employees ("AFSCME") and AUFC – stopped doing business with it, and a potential special interest group client, Dialysis Patient Citizens, canceled a meeting with Creamer. (Klein Aff. Ex. 11 at Answers to Interrogatories #3, #8-#10). Plaintiffs explicitly abandoned any claim they suffered damages due to "diminishment of the economic value of confidential and proprietary information," or "damages to reputation suffered by any Plaintiff."  (*Id.)*.

**Plaintiffs' SMF**:  Disputed in part.  It is undisputed that Plaintiffs do not claim damages for diminution of the value of any information or for damages to reputation. It is undisputed that the two clients referenced stopped doing business with Strategic Consulting Group and that the

termination of those relationships occurred after publication of the video series; but is not true that

the publication itself was the cause. *See* PSMF Nos. 24-34, *infra*.

**Def. SMF. No. 19**.  "Plaintiff Democracy Partners did not suffer damages. (*See id.*)."

**Plaintiffs' SMF**: Disputed.    Strategic Consulting Group is a member of the limited

liability company Democracy Partners. (Creamer Decl. ¶3).   The loss of income to Strategic

Consulting thus necessarily impacted Democracy Partners.

**Def. SMF No. 20.**  "Plaintiff Bob Creamer did not suffer damages. (*See  id.*)."

**Plaintiffs' SMF:**  Disputed.  Because Creamer is the sole member of Strategic Consulting

Group, the loss of income to SCG from loss of the contracts with and ongoing work for Americans

United for Change and AFSCME, and the prospective contract with Dialysis Citizens, directly

reduced the profits of the company that would have otherwise flowed through to Creamer.

**Def. SMF No. 21:**  "In 2016, AFSCME had written contracts with Strategic for $3,000 per
month. (Klein Aff. Ex. 12 at DP_0000050). The contract was for a period of one year. (*See id. at*
DP_0000050-0000051)."

**Plaintiffs' SMF**:  Disputed in part.  Although the consulting contract was for one year,

Strategic Consulting Group had had its contract for consulting services renewed every year for the

previous ten years; from 2007 to 2016, until termination of the contract by AFSCME, SCG

received $383,000 from AFSCME for consulting services. (Creamer Decl. ¶33).


**Def. SMF No. 22**.  "Strategic provided "automated telephone calls and other specific
services" to AFSCME. (Klein Aff. Ex. 11 at Answers to Interrogatories #3). From 2007 through
2016, plaintiffs allege income to Strategic Consulting Group from these services totaled
$1,508,359.00. (*Id.*)"

**Plaintiffs' SMF**:  Undisputed.  See Creamer Decl. ¶35.

**Def. SMF. No. 23**.  "Upon learning of Video I on October 17, 2016, AFSCME Director of
Governmental Affairs Scott Frey discussed the video with AFSCME Chief of Staff Bill Lurye.
(Klein Aff. Ex. 6 at75:1-9). At that point, "we just mutually agreed that we should end the
relationship." (*Id.*) AFSCME concurrently decided to terminate its relationship with Strategic and
AUFC. (*Id.* at 91:15-92:1)."

**Plaintiffs' SMF No. 23**.  Disputed in part.  Within an hour of the release of Video I, Woodhouse spoke to Frey and disclosed the existence of the undercover operations and the infiltration of Democracy Partners.  (Sandler Decl. Ex. 14 at p. 12).  The "mutual agreement" to "end the relationship" was a recommendation that Frey and Lurye decided to make to the president of AFSCME, Lee Saunders.  (Excerpts of Deposition of Scott Frey, Nov. 27, 2018, Sandler Decl. Ex. 12 at 75:4—14).

**Def.  SMF No. 24**.  "AFSCME President Lee Saunders was "extremely angry" and "disappointed" with Creamer and AUFC President Brad Woodhouse for "allow[ing] this type of distraction to occur .. . ." (Klein Aff. Ex. 6 at 74:8-20)."

**Plaintiffs' SMF No. 24.** :  Undisputed.

**Def. DMF. No. 25**.  "Saunders was concerned that AFSCME's financial relationship implied AFSCME's involvement with the conduct by Plaintiffs reported on in the "Rigging the Election" video. (*Id.*)."

**Plaintiffs' SMF No. 25**:  Disputed. This is an incomplete and distorted account of what Frey said was actually President Saunders' reaction.  Frey testified that, Saunders "was disappointed with both Mr. Woodhouse and Mr. Creamer that they could allow this type of distraction to occur and that there was a concern that somehow by implication AFSME had something to do with this because of our financial relationship…."  (Sandler Del. Ex. 12 at 74:10-16).

**Def. SMF No. 26**. "AFSCME terminated its relationship with Plaintiffs because there was "an element of indiscretion" in Plaintiffs allowing "*Mr. Foval* into their midst without serious vetting" and creating the opportunity for a major, unwelcome, distraction "at a critical moment in time." (*Id.* at 77:1-14) (emphasis added); *see also id.* at 77:15-20 ("We felt like that was carelessness on their part.")). "[T]he broader concern was just clearly, *regardless of the circumstances that led to the video*, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it." (*Id.* at 78:22-79:5 (emphasis added))."

**Plaintiffs' SMF No. 26**:  Disputed.  This is a selectively edited and distorted account of

Frey's testimony.   Frey testified that there were several inter-related factors behind the recommendation of Mr. Lurye and himself to terminate the business relationships with Strategic Consulting Group, including that Democracy Partners had allowed the undercover operation to occur-- deceptive infiltration of its offices and the secret taping there.   And Frey made clear that none of the factors in that decision (to terminate the business relationship) had anything to do with any concern about the content of the Project Veritas videos being true, *i.e.*, that it was in any way true that Creamer or Democracy Partners had actually done anything wrong as portrayed in the videos:

> Again, we felt there was—**understanding what we knew about this organization, Project Veritas, and their representation, their reputation for misrepresenting the facts** and doing these types of videos, we did feel that there was an element of indiscretion that they'd allowed Mr. Foval into their midst without serious vetting, that they created a**, it was the view at the time that they had created the opportunity for this, for this operation to occur, and it had become a major distraction to, and an unnecessary one** at a critical moment in time.

(Sandler Decl. Ex.12 at 77:1—11 (emphasis added)).   Frey further testified that AFSCME was concerned that on the video, Creamer :

> was speaking ad hoc about his strong ties to the Clinton Campaign and it seemed a bit inappropriate, but then again, **we also were aware that, of the view that the video had been highly selectively edited and likely, those words were taken out of content.  I think it was the overall sense that they had allowed this to  occur, they invited this opportunity into their midst,** but I think the broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it.

(*Id*. 78:14—79:5 (emphasis added)).   Mr. Frey further testified that:

> Q. …Mr. Frey you had testified that AFSCME was concerned that Mr. Creamer, Strategic Consulting Group, had created the opportunity for this to occur.  **Was part of your concern that they had allowed their offices to be infiltrated by a Project Veritas operative?**
> **A. Yes.**

(*Id*. at 102:13—19 (emphasis added)).

**Def. SMF No. 27.**   "AFSCME had "concerns" with what Creamer said on video, and found it inappropriate that Creamer "was speaking ad hoc about his strong ties to the Clinton campaign . . ." (Klein Aff. Ex. 6 at 78:10-16)."

**Plaintiffs' SMF No. 27**.   Undisputed that this was one of the concerns of AFSCME; there were others of equal or greater importance.  *See* Plaintiffs' SMF No. 26.

**Def. SMF No. 28**.  "AFSCME's decision not to renew its contract with Strategic was also motivated by financial concerns that pre-dated the publication of Project Veritas's reporting in the "Rigging the Election" series. (*See* Klein Aff. Ex. 6 at 30:11-14)."

**Plaintiffs' SMF No. 28**.  Disputed.  This was a factor in the decision not to renew the Strategic *consulting* contract; it played no role, however, in the decision by AFSCME not to renew Strategic Consulting's  more lucrative ongoing arrangement, over many years, for placement of "patch through" calls, mass telephone calls to constituents in which the recipient is given the opportunity to be connected with the office of their Member of Congress. (Creamer Decl. ¶ 35). In fact, after Strategic Consulting was terminated, AFSCME retained another vendor to provide this service. (Sandler Dec. Ex. 12 at 12:3—13:3;  15:4—17:16; 27:16—29).  And the volume of business given to this new vendor was more than double (in 2017 and 2018 ) than the volume given to Strategic Consulting in 2016.  (*Id*. at 103:5—104:4).

**Def. SMF. No. 29**.   "AFSCME sought to conserve resources following the United States Supreme Court decisions in *Friedrichs v. Cal. Teachers Ass'n*, 136 S. Ct. 1083 (2016) and *Harris v. Quinn*, 134 S. Ct. 2618 (2014). (*Id.* at 28:16-29:15 ("given the financial constraints, I decided there was little justification for" the contract))."

**Plaintiffs' SMF No.  29**.  Disputed.   This assertion relates only to the consulting contract between Strategic Consulting and AFSCME,  not to AFSCME's decision not to renew Strategic Consulting's  much more lucrative ongoing arrangement, over many years, for placement of "patch through" calls.  *See* Plaintiffs' SMF No. 28.

16

**Def. SMF  No. 30**.  "AFSCME has "not renewed a contract with anyone because of those concerns about our, our budget." (*Id.* at 28:2-4)."

**Plaintiffs' SMF No. 30**.  Disputed. This assertion relates only to the consulting contract between Strategic Consulting and AFSCME, not to the decision by AFSCME not to renew Strategic Consulting's  more lucrative ongoing arrangement, over many years, for placement of "patch through" calls.  (*See* Plaintiffs' SMF No. 28; Sandler Decl. Ex.12 at 27:16—28-9).

**Def. SMF No. 31**.  "AFSCME decided to terminate its relationship with AUFC and Democracy Partners prior to the publication of "Rigging the Election" Video II on October 18, 2016. (*See id.* at 90:10- 92:1)."

**Plaintiffs' SMF No. 31**.  Undisputed. But AFSCME had been told about the infiltration of Democracy Partners' offices before release of Video II.  (Sandler Decl. Ex. 14 at p. 12) (Memo from Woodhouse to Loveless (AFSME): "Monday October 17, 2016—Woodhouse takes a call from AFSCME about the videos within an hour of the first release and discussed in detail: What we knew about the O'Keefe operation…")/

**Def. SMF No. 32**.  "Following the result of the Presidential election, the value of a consultant "like Mr.  Creamer" seemed less useful in a Trump White House. (*Id.* at 30:15-22)."

**Plaintiffs' SMF No. 32**.  Disputed.  The consulting contract was terminated before the date of the general election, which most people in the Democratic Party and progressive movement thought Secretary Clinton would win.  (Creamer Decl. ¶34). In addition, the value of a Democratic consultant played no role whatsoever  in termination of the ongoing arrangement for patch-through calls.  *See* Plaintiffs' SMF Nos. 28 & 29.

**Def. SMF No. 33**.  "Although AFSCME considered finding a consultant who might help open doors with Republican offices, when it was apparent this would increase the cost to AFSCME, AFSCME felt like it could do the work itself. (*See id.* at 31:1-7)."

**Plaintiffs' SMF No. 33.**  Disputed. See Plaintiffs' SMF No. 32.

**Def. SMF  No. 34.**  "AFSCME had no concerns with the circumstances of investigative

journalist Allison Maass's presence in the Democracy Partners office or the circumstances of her internship: "it all seemed very moot at the time" and "the circumstances of her presence there at that point seemed irrelevant." (*Id.* at 85:22-86:7)."

**Plaintiffs' SMF No. 34.**  Disputed.   This is a complete mischaracterization of Frey's

testimony. Frey was asked specifically about whether Creamer had told Frey whether Creamer

had asked Maass for identification or for a resume before she started work.  Frey testified that

*those* specific questions "seemed very moot at the time."  (Sandler Decl. Ex. 12 at  85:22—86:8).

Frey then testified, however, that AFSCME's concern was that  Democracy Partners and Strategic

Consulting "had allowed this to occur, they invited this opportunity into their midst. …. " (Sandler

Decl. Ex 12 at 78:20-22).  Frey then testified:

>  Q. …Mr. Frey you had testified that AFSCME was concerned that Mr. Creamer, Strategic Consulting Group, had created the opportunity for this to occur.  ***Was part of your concern that they had allowed their offices to be infiltrated by a Project Veritas operative?***
> ***A. Yes.***

(*Id.* at 102:13-19).

**Def. SMF No. 35**.  "After Plaintiffs filed this lawsuit, Frey told Lurye "I suspect the loss of our contract and financial support will be included in their claim for damages." (Klein Aff. Ex. 13). Lurye replied, "Probably. But not very smart if it is." (*Id.*)."

**Plaintiffs' SMF No. 35**.  Not disputed that Fey and Lurye had this e-mail exchange; but

not material.

**Def. SMF No. 36**.  "Strategic provided "automated telephone calling and other specific services" to AUFC. (Klein Aff. Ex. 11 at Plaintiffs' Answers to Interrogatories #3). In 2016, AUFC had an unwritten contract with Strategic Consulting Group for $11,000 per month. (*See, e.g.*, Klein Aff. Ex. 14). The funding to pay for this contract was dependent on AFSCME. (Klein Aff. Ex. 5 at 126:1–27:8) ("They stopped funding Americans United. Americans United ceased to exist. Bob lost his contract. It's pretty easy.")). AUFC had no formal budget. (*See id.* at 93:1-4)".

**Plaintiffs' SMF No. 36.**  Undisputed.

**Def. SMF No. 37**.  "AUFC was not contractually obligated to pay the amount which Plaintiffs have identified as their damages relating to AUFC. (*See id.* at 93:8-16)"

**Plaintiffs' SMF No. 37**.  Disputed.  This assertion is a complete distortion of the nature of the arrangement as explained by Brad Woodhouse, who headed AUFC while it existed.  First, Woodhouse testified that, although there was no written contract, Creamer's "agreement was for.. was $11,000 a month," from 2013 through 2016.  (Excerpts of Deposition of Wilson Bradley Woodhouse, Sandler Decl. Ex. 13 at 37:13—38:19).  In addition, Strategic Consulting was paid by AUFC for patch through calls, on top of the $11,000 per month.  (*Id*. at 37:16—38:5).  From 2007 through 2016, Strategic Consulting received $467,651 from AUFC for these patch through calling services.  (Creamer Decl. ¶35). Woodhouse was clear that, "but you know, if not for this [Project Veritas] operating, we would have, you know, we would continued, we would have continued to get contributions from AFSCME and he would have continued to get a consulting fee from us." (Sandler Decl. Ex. 13 at 39:22—40:4).

**Def. SMF No. 38**. "AUFC's principal funder was AFSCME. (*See id.* at 26:5-11)."

**Plaintiffs' SMF No. 38**.  Undisputed.

**Def. SMF No. 39.**  "The Project Veritas Parties were unaware of the fact that AUFC was principally funded by AFSCME. (O'Keefe Affidavit ¶ 11)."

**Plaintiffs' SMF No. 39.**   Undisputed but not material.

**Def. SMF No. 40**. "AFSCME decided to terminate its relationship with AUFC prior to the publication of Video II on October 18, 2016. (Klein Aff. Ex. 6 at 90:10-92:1)."

**Plaintiffs' SMF No. 40.**  Undisputed but incomplete and out of context.  AFSCME was aware of the infiltration of Democracy Partners' offices at least as of October 14, 2016-- well prior to the publication of Video II.  (Sandler Ex.14).

**Def. SMF No. 41.**  "Following publication of Video I, AFSCME President Lee Saunders came under criticism for his role as Chair of AUFC's board, a fact revealed in a Wisconsin blog post. (Klein Aff. Ex. 5 at 67:16-68:1)."

**Plaintiffs' SMF No. 41.**  Undisputed.

**Def. SMF No. 42**. In a meeting with AUFC, Saunders explained that following the

publication of Video I by Project Veritas,

> 40 percent of his membership – some percentage of his membership, you know, don't support the democratic side or didn't support Hillary, and he – he couldn't take the heat, couldn't be associated with it. Even if he didn't believe any of the, you know, the stuff alleged occurred, he couldn't be – he couldn't be associated with it.

(Klein Aff. Ex. 5 at 79:19-80:20; *see also* 82:8-11 ("Can't take the heat.")).

**Plaintiffs' SMF No. 42**.  Disputed.  Woodhouse testified that at a December 2016 meeting-- well after the termination of the relationship had occurred--Saunders told Woodhouse that even if he "didn't believe any of the, you, stuff alleged occurred, he couldn't be associated with it," and when asked what he meant by "it" he stated he was not referring to Foval's statements in the video but "he was referring to the project in general."  (Sandler Decl. Ex. 13 at 80:7-18).

**Def. SMF No. 43.**  "Saunders was also upset that he did not get prior notice from Creamer or AUFC prior to the reporting being published. (*See id.* at 68:2-4)."

**Plaintiffs' SMF No. 43**.  Disputed.  In the first call from Frey at the time the first video was released in October 2016, Woodhouse testified:

> Q.  Do you have a recollection if during that call Mr. Frey expressed concern in any form for the lack of AUFC having kept ASFSCME abreast of the weekend's events?
> A.  Not in –I don't—I don't recall that it—that it came—that it came up in that call. My general recollection is that Scott understood what the source of this was, how suspect that was.  And when we got off the phone, I don't remember him expressing any concern that we had not given him—you know, because I told him, you know, how fast this all moved
>      I don't remember at that stage expressing any concern about not betting an earlier—an earlier heads up.

(Sandler Decl. Ex. 13 at 59:14—60:7). Nor was the lack of notice raised in the second call with Frey in which Frey told Woodhouse that President Saunders was going to resign from AUFC Board.  (*Id.* 62:19—64:21).

**Def. SMF No. 44**.  "AUFC fired Foval because "he allowed himself to be compromised," and the things that Foval said

> [w]ere so beyond the pale outrageous that it was – it was clear that he was, for

whatever reason, saying things that were – that were not reflective of us or our values or anything that we would ever participate in and, you know, he was – [. . . ] going to be employed at that point only for another two weeks. So we terminated him.

(Klein Aff. Ex. 5 at 70:8-22; 72:7-20).”

**Plaintiffs' SMF No.  44**.   Undisputed that Woodhouse provided this explanation of why AUFC ended its relationship with Foval.  Not material.

**Def. SMF No.45**.     "AUFC had no knowledge that Allison Maass's internship work at Democracy Partners led to AFSCME cutting ties with AUFC, and it "never came up." (*Id.* at 114:13-22).”

**Plaintiffs' SMF No. 45**.   Disputed.  Woodhouse testified only that he did not recall that coming up in the *first* conversation with Frey, in October 2016, in which Frey told Woodhouse that President Saunders was resigning from the Board of AUFC. Woodhouse testified that he did not recall Mass' presence in the Democracy Partners offices "it did not come up—I can tell you it did not come up in my conversation with Scott [Frey] when he told me.  Because the conversation with Scott around Lee is going to resign from the board was basically he said that and I said, 'Are you fucking kidding me?'  And that was really bout the content of that conversation."  (Sandler Decl. 13 at 117:17—118:1).

**Def. SMF No. 46**. "AUFC shut down in February 2017. (*See id.* at 12:7-9). According to its Rule 30(b)(6) designee,

We had no more sources of funding. I mean, our primary – like I said, our primary source of funding was or significant source of funding had been AFSCME, and that relationship was severed.

(*Id.* at 75:5-12).”

**Plaintiffs' SMF No. 46**.   Undisputed.

**Def. SMF No. 47**. "Dialysis Patient Citizens has never contracted with Strategic Consulting Group, Democracy Partners or Robert Creamer and has never engaged them in any

business capacity. (*See* Klein Aff. Ex. 15 at 9:18-10:20)."

**Plaintiffs' SMF No. 47** .  Disputed.  Creamer previously provided services to the CEO of

Dialysis Patient Citizens, Hrant Jamgochian, when he served as a candidate for Maryland House

of Delegates.  Jamgochian testified that his organization would have continued to [pursue a

relationship with Strategic consulting had it not been for the actions of Project Veritas: "I was

interested in seeing what they were going to propose absolutely  I'd worked with him in a

personal capacity, . . . "  (Transcript of Deposition of Hrant Jamgochian, Feb. 22, 2019, Sandler

Decl. Ex. 15 at  11:18—12:3).

**Def. SMF No. 48**.  "Hrant Jamgochian is the CEO of Dialysis Patient Citizens. (*See id.* at
9:6-9)."

**Plaintiffs' SMF No. 48**.  Undisputed.

**Def. SMF No. 49**.  "Dialysis Patient Citizens had scheduled a meeting with Robert
Creamer on November 10, 2016. (Klein Aff. Ex. 7)."

**Plaintiffs' SMF No. 49**.  Disputed.  Jamgochian had contacted Creamer to set up this

meeting.  (Sandler Decl. Ex. 15 at  10:14-20). Jamgochian had been a prior client of Creamer's in

another capacity.   (*Id*. at 11:18—12:6).

**Def. SMF No. 50.**  " In an email dated the previous day, Jamgochian canceled the

meeting:

> After the video that was leaked of you on Fox News, one of my funders requested
> that we find another firm other than Democracy Partners to help with our grassroots
> efforts. As a result I am going to have to cancel our meeting tomorrow.

 (*Id*.)."

**Plaintiffs' SMF No. 50.**   Undisputed.

**Def. SMF No. 51**.   "Jamgochian had been informed by his staff "of some of the negative
publicity, which is why I decided to cancel pursuing our partnership or potential partnership."
(Klein Aff. Ex. 15 at 11:5-11.) His concern was "PR. I represent a nonprofit organization, and for
Dialysis Patient Citizens need to make sure that we maintain the best possible public image." (*Id.* at

11:12- 17).”

**Plaintiffs' SMF  No. 52**.  Disputed, to the extent this statement taken out of context implies that the content of the videos was a factor in Jamgochian's decision not to purse a business relationship with Strategic Consulting.  Jamgochian testified that, in fact, he did not watch *any* of the videos, and that his staff informed him only of "some of the negative publicity.  (Sandler Decl. Ex. 15 at  11:5—11).

**Def. SMF. No. 52**.   In an email the day after the election, Creamer acknowledged to Jamgochian, "[I]f you want contacts in the new Trump administration, Im [sic] probably the wrong guy to give you advice anyway :-)". (Klein Aff. Ex. 16).

**Plaintiffs' SMF No. 52**. Undisputed.

**Def. SMF No. 53**.    "The only thing close to "business" between Dialysis Patient Citizens and Plaintiffs was scheduling and then canceling a meeting about potential opportunities to work together. (Klein Aff. Ex. 15 at 10:14-20)."

**Plaintiffs' SMF No. 53**.  Disputed; mischaracterizes the potential relationship and the extent to which Jamgochian had intended to pursue it.  Jamgochian testified that:

> Q.  Would you have continued to pursue the relationship with Bob Creamer in either Strategic Partners—Strategic Consulting or Democracy Partners had it not been for  the actions of Project Veritas?
>
> A.  I was interested in seeing what they were going to propose, absolutely.  I'd worked with him in a personal capacity, but never, you know Dialysis Patient citizens and, at the same time, could not risk, you know, any harm to the organization.

(Sandler Decl. Ex. 15 at 11:18—12:6).  Ultimately the organization did hire another firm to do the work that Jamgochian had planned to pursue with Strategic Consulting, and paid that firm a fee of $40,000 a year ($2,500 per month plus an additional $10,000 commission on paid digital advertising). (*Id*. at 12:14—13:6).

**Def. SMF No. 54**. "Not only was there no contract between Dialysis Patient Citizens and Plaintiffs, but there was also no agreement on how much money Dialysis Patient Citizens might pay to Plaintiffs. (*See id.* at 10:5-13)."

**Plaintiffs' SMF. No. 54**.  Disputed as a mischaracterization of the potential relationship and the extent to which Jamgochian had intended to pursue it.  *See* Plaintiffs' SMF No. 53. Ultimately the organization did hire another firm to do the work that Jamgochian had planned to pursue with Strategic Consulting, and paid that firm a fee of $40,000 a year ($2,500 per month plus an additional $10,000 commission on paid digital advertising). (Sandler Decl. Ex. 15 at 12:14—13:6).

**Defendants' SMF No. 55**.  "Founded in 2010, Project Veritas, Inc. ("Project Veritas") is a newsgathering organization that primarily utilizes secret recording and undercover investigative reporting. (O'Keefe Aff. ¶¶ 1, 5). It is organized as a 501(c)(3) tax-exempt organization. (O'Keefe Aff. ¶ 2)."

**Plaintiffs' SMF No. 55**.  Undisputed that Project Veritas, Inc. was founded in 2010 and claims exemption from taxation as a charitable or educational organization under section 501(c)(3) of the Internal Revenue Code and undisputed that the organization primarily utilizes secret recording techniques.  Disputed that Project Veritas is a "newsgathering organization " or that it engages in "investigative reporting,"  for the reasons set forth in Plaintiffs' SMF No. 1.

**Defendants' SMF No. 56**.  "In his cover identity as "Steve Packard" of "Breakthrough Development Group," investigative journalist Christian Hartsock met Foval in April 2016 in Harbock, Wisconsin. (Klein Aff. Ex. 9 at 35:6-38:12.) They met again at a bar that evening. (*See* Klein Aff. Ex. 3 at PVA00013717-PVA00013719)."

**Plaintiffs' SMF No. 56**.  Disputed in part.  Hartsock did not randomly "meet" Foval. Rather, Hartsock, lying about his true identity,  "volunteered" to work for a nonpartisan voter registration and mobilization group working in the Latino community, in the spring of 2016., and first met Foval  at the group's headquarters in the spring of 2016. (Sandler Decl. Ex. 5 at  35:6— 36:11). Hartsock, lying about his true identity, "volunteered" for a get out the vote effort sponsored by a major labor union in Milwaukee in 2016.  (*Id*. at 37:20--38:12).  An activist he met

during this effort invited him to a primary election viewing party at a bar; Foval happened to be

there.  (*Id*. 37:2—19).  At the time, Foval was not an employee of or contractor to Creamer,

Strategic, Mobilize or any other entity associated with Plaintiffs.  (Creamer Decl. ¶8). Hartsock

testified that had Foval not been at the bar, Hartsock would have presented the Project Veritas-

developed voter fraud scheme to some other random person he might have run into at the same

party at the bar.  (*Id*. at 44:6—10).

**Defendants' SMF No. 57.**  "On that date, Foval entertained the scenario proposed by the
investigative journalist that would enable nonresidents to vote illegally in Wisconsin, suggesting
ways to make the voter fraud scheme more effective. (*See generally* Klein Aff. Ex. 3 at
PVA00013717-PVA00013719)."

**Plaintiffs' SMF No. 57.**   Disputed.   *See* PSMF No. 3, supra, The only voter fraud

scheme ever discussed was one developed and proposed by Project Veritas itself.  The "surrogate

voter scheme" was concocted by Project Veritas *itself.* As Project Veritas senior journalist and

production associated Christian Hartsock testified, ""the surrogate voting option was a scenario

that I created…."   (Sandler Decl. Ex. 5 at 124:4-5). Project Veritas operatives then tried

(unsuccessfully)  to persuade their "targets," including Foval and Creamer to adopt it or accept

funding to implement it.  (Sandler Decl. Ex. 6 ("Desired Content" is that "Creamer "expresses

moral approval of the scheme…"); Sandler Decl. Ex. 7 (Project Veritas memo setting out in detail

the illegal scheme developed by Project Veritas itself).

    In his deposition in the *Teter* case, Foval testified under oath that:

  The issues that they were .. representing that Charles Roth wanted to invest in activities
  that American United for change and/or Democracy partners were involved in, and they—
  so backing up, the initial conversations with Christian Hartsock/Steve Packard centered
  around a scheme called voter re-enfranchisement that I was not familiar with, where I was
  asked a lot of questions on how it would be possible to, quote, re-enfranchise voters in
  order to be able to vote in the presidential elections. ***So in the initial bar conversations I
  was asked a lot of questions on how it would be possible to make it legal for people to
  vote in someone else's place, and I spent a lot of time pushing back on that explaining
  that that was illegal and that was not something I did or any of my associates did and***

***that it wasn't possible to make it legal because of the way the election laws work.***

(Sandler Decl. Ex.11 at 38:10-39:7) (emphasis added)).

**Defendants' SMF No. 58 "**This meeting – in which Foval described Creamer as "diabolical" and as the possible source of the voter fraud scenario, -- was the first time the Project Veritas Parties became aware of Creamer. (Klein Aff. Ex. 17 at 100:2-7)."

**Plaintiffs' SMF No. 58**.   Undisputed that the meeting was the first time the Project Veritas Parties became aware of Creamer.  Disputed that Creamer had ever suggested any voter fraud scenario to anyone, at any time.  Project Veritas operative Daniel Sandini, posing as wealthy donor named "Charles Roth," tried to entice Creamer into presenting a plan for an illegal voting scheme. (Sandler Decl. Ex. 8 at  104-113). After a second meeting with Roth, Creamer came back with a proposal, but by O'Keefe's own admission, "None of his ideas were on the face of things, illegal." (*Id*. at 13).  Project Veritas officials were disappointed that Creamer was a "white hat" because he was "trying to keep things above board."--not willing to do anything illegal  (Sandler Decl. Ex. 9; Sandler Decl. Ex. 5 at 96 :4-11).

In fact, Project Veritas secretly taped Creamer telling "Roth" "that what he is talking about would probably be voter fraud.  Would need to be run by the legal team and it wouldn't pass… Foval tells us that Bob 'wouldn't touch this with a ten foot pole." (Sandler Decl. Ex. 10).

O'Keefe conceded that Creamer—while being secretly taped--  *never* admitted to engaging in any conduct that would constitute voter fraud. (Sandler Decl. Ex. 1 at  124:-14). In fact, O'Keefe conceded that Project Veritas never uncovered *anyone* associated with any of the Plaintiffs planning or engaging in voter fraud.  (*Id* . at 129:5—130:15; see Sandler Ex. 5 at  150:6-10).

**Defendants' SMF No. 59.**  "Project Veritas journalists researched Robert Creamer. In this process they came across e-mails from the Clinton Campaign released by WikiLeaks. (*See*

Klein Aff. Ex. 18 at PVA00000906). These e-mails included one from Robert Creamer on May 17, 2016 advising recipients of a "Trump Rapid Response/Bracketing Call" at 1:00 P.M., including the call-in number 641-715-3288, and passcode 782537. (*Id.* at PVA00000920)."

**Plaintiffs' SMF No. 59**.  Undisputed that Project Veritas Parties deliberately and

knowingly utilized and relied on e-mails from the Clinton Campaign released by Wikileaks.

These e-mails had been obtained through a criminal conspiracy of  Russian intelligence

operatives. *See* Indictment, *United States v. Netyksho et al*. Case No. 18-cr-0215-ABJ  (D.D.C.,

filed July 13, 2018).

**Defendants' SMF No. 60.**  "As the investigation continued, Project Veritas journalist Dan Sandini, whose cover identity was "Breakthrough Development" client "Charles Roth," was referred by Foval to Creamer. In an e-mail beginning this introduction on July 16, 2016, Foval noted that "I have not yet vetted him, and think it would be best to have your help on this first one." (Klein Aff. Ex. 19)."

**Plaintiffs' SMF No. 60.**  Disputed that Daniel Sandini was a "journalist."  See Plaintiff's

SMF No. 1.  Disputed that Sandini's "cover identity" was "Breakthrough Development" client

Charles Roth.  In fact, Veritas had made up an elaborate back story about the character who

became "Roth," and who had come up with the fraudulent "surrogate voting" plan.  Roth, which

was communicated to Foval by Hartsock, before anyone had been identified to play the role of

"Roth."  (Sandler Decl. Ex. 5 at 39:16—41:16).  To support their deception of Foval and Creamer

about the existence of "Breakthrough Development," Project Veritas created a fake website with

fake information about the company's business, and fake contact information.  (Sandler Decl. Ex.

16; Sandler Decl. Ex. 5 at 46:10—48:7).   The elaborate fake back story was communicated by

"Roth" himself to Creamer at their first meeting at a hotel in Washington, D.C. in June 2016.

(Creamer Decl. ¶16).

**Defendants' SMF No. 61.**  "Foval arranged a phone call between Mr. Sandini and Creamer in June 2016. (*See* Klein Aff. Ex. 20). It was their first phone call."

**Plaintiffs' SMF No. 61**.  Undisputed.

**Defendants' SMF No. 62**.  "Foval also arranged for Mr. Sandini and Creamer to meet in a hotel lobby on July 15, 2016. (Klein Aff. Ex. 21; *see* Klein Aff. Ex. 1 at Video II at 9:42-11:37)."

**Plaintiffs' SMF No. 62**.  Disputed.  The meeting was on June 24, 2016.  The elaborate fake back story of "Roth" was communicated by "Roth" himself to Creamer at this first meeting. (Creamer Decl. ¶16).

Creamer tried to interest "Roth" in financing non-partisan voter registration and non-partisan GOTV operations engaging Latino voters; and in financing a potential AUFC bus tour to promote a progressive economic and immigration agenda in press events around the country. (Creamer Decl. ¶16).  Roth then tried to interest Creamer in the idea of increasing voter registration by using businesses to provide potential voters with paycheck stubs and corporate id's.  Although that idea was perfectly legal , Creamer rejected it as impractical and suggested Roth contact established voter registration  groups (*Id*. ¶17).

**Defendants' SMF No. 63  "**Mr. Sandini met with Creamer again for dinner on August 17, 2016. During this dinner, Creamer announced that the DNC would be launching an initiative known as "Donald Ducks" at Trump Tower in New York City the following morning. (Klein Aff. Ex. 1 at Video III at 2:02-2:29). The effort involved bracketing Donald Trump and Mike Pence appearances with events featuring a contractor dressed as Donald Duck and holding a sign that says "Donald Ducks Releasing His Tax Returns." (*Id*)."

**Plaintiffs' SMF No. 63**.  Undisputed that at this dinner Creamer discussed a plan for public demonstrations including a contractor dressed as Donald Duck.  Otherwise disputed as incomplete and out of context.  At this dinner "Roth" proposed the illegal voter registration scheme and Creamer immediately rejected it as illegal.  (Creamer Decl. ¶20).  In fact, Project Veritas secretly taped Creamer telling "Roth" "that what he is talking about would probably be voter fraud.  Would need to be run by the legal team and it wouldn't pass… Foval tells us that Bob 'wouldn't touch this with a ten foot pole."  (Sandler Decl. Ex. 10).

O'Keefe conceded that Creamer—while being secretly taped-- *never* admitted to engaging in any conduct that would constitute voter fraud. (Sandler Decl. Ex. 1 at  124::-14). In fact, O'Keefe conceded that Project Veritas never uncovered *anyone* associated with any of the Plaintiffs planning or engaging in voter fraud. (*Id*. at 129:5—130:15).

**Defendants' SMF No. 64.   "**Mr. Sandini's third and final meeting with Creamer was with Brad Woodhouse and Caroline Ciccone at AUFC on August 18, 2016. (*See* Klein Aff. Ex. 1 at Video III at 12:42-13:11). Prior to this meeting, Brad Woodhouse requested that Emili Jack at AUFC "pull everything you can on this Charles Roth guy – bio, giving history, etc." The only thing Jack could locate six hours later was a Facebook profile. (Klein Aff. Ex. 22)."

**Plaintiffs' SMF No. 64**.        Undisputed that "Roth" met with Creamer and Ciccone at AUFC on August 18, 2016 and that Woodhouse requested information on "Roth."  However the implication that Creamer and Woodhouse should have seen through the deception is misplaced. Project Veritas went to some lengths to create the fake and fraudulent backstory for "Roth," which was communicated to Foval and Creamer  (Sandler Decl. Ex. 17; Sandler Decl. Ex. 2; Sandler Decl. Ex. 5 at 71:22—73:1), including creating a phony Facebook page  and, a phony telephone number that was from a "burner" phone specially purchased for the sole purpose of making it appear a call was coming to Foval from Sausalito California where "Roth"  supposedly lived. (Sandler Decl. Ex. 5 at 69:7—71:10;  Sandler Decl. Ex. 18).

**Def. SMF No. 65**.   "As part of investigating the news story published as "Rigging the Election," Project Veritas Action Fund caused a $20,000 donation to be made to AUFC. (*See* Klein Aff. Ex. 1 at Video IV at 5:55-6:52). This money was later returned by AUFC, despite no request from the Project Veritas Parties. (*See id.* at Video IV at 17:09-17:38; O'Keefe Aff. ¶14)."

**Plaintiffs' SMF No. 65**.   Disputed as incomplete and out of context.  "Roth" told Creamer in a telephone call in late August 2016 that "Roth" was not interesting in funding the proposal Creamer had presented for AUFC, but would make a $20,000 donation to support AUFC's work. (Creamer Decl. ¶21). He indicated that the money would be wired. Funds were wired from an

account in Belize. (*Id*.).   It would have been perfectly legal for AUFC to accept a foreign contribution, but in any event the wire information showed the funds had been sent from a bank in New York and Roth had stated it was his own money.

**Defendants' SMF No. 66.  "**Allison Maass was an investigative journalist. In the "Rigging the Election" investigation, her cover identity was "Angela Brandt," niece of "Charles Roth." Maass Aff. ¶4)."

**Plaintiffs' SMF No. 66**.  Disputed that Maass was a journalist of any kind.  *See* Plaintiffs' SMF No. 1.  "Roth," for whom Project Veritas had created a fake elaborate backstory, fake Facebook page and a fake phone number, told Creamer that his "niece," one "Angela Brandt" wanted to volunteer for some political work.  (Creamer Decl. ¶¶16, 18). Creamer and Maass (posing as "Brandt") then spoke on the telephone and lied to Creamer, representing that she was "Angela Brandt," Roth's niece.  (*Id*. ¶18). Creamer then put her in touch with an individual involved in planning demonstrations at the Republican National Convention.  (Excerpts of the Deposition of Allison Maass, Aug. 10, 2018, Sandler Decl. Ex. 19 at  23:18—25:24).

**Defendants' SMF No. 67.  "**Mr. Sandini told Creamer that Ms. Maass was interested in an internship in the field of political work. (*See* Klein Aff. Ex. 23)".

**Plaintiffs' SMF No. 67.**  Undisputed.

**Defendants' SMF No. 68.  "**Ms. Maass called Creamer in August 2016 and Creamer offered her an internship with Democracy Partners. (*See* Klein Aff. Ex. 24 at PVA00013183 at 0:35-1:25)."

**Plaintiffs' SMF No. 68**. Disputed—incomplete and misleading.  Prior to that offer, Maass lied her way into a volunteer position with a group staging a public demonstration protesting then-candidate Donald Trump at the 2016 Republican National Convention in Cleveland.  (Sandler Decl. Ex. 19 at  25:22- 26:21; 29:20—31:3). Maass had no reason to believe the group was engaged in any kind of unlawful activity but still believed it should be "investigated."  (*Id*.  at 27:13—28:11).  Project Veritas was pleased that Maass' lies and deception

had been so effective in this instance—that she had been so effective in embedding herself with the group working at the Convention—that she was pictured in a newspaper article building the demonstration "wall."  (Sandler Decl. Ex. 20).

Sandini (posing as "Roth") then called Creamer late in August 2016 and told Creamer his "niece" "Angela Brandt" had a good experience in Cleveland  and would like to become involved in some further political work for progressive organization; and Creamer agreed to talk to her again.  (Creamer Decl. ¶22;  Sandler Decl. Ex. 19 at 31:19—32:2).  In early September, Creamer spoke with Maass on the telephone and suggested that she might fit as an intern in the Democracy Partners Washington D.C. office and suggested she talk with a former intern, which she did. (Creamer Decl. ¶23; Sandler Decl. Ex. 19 at 32:7—33:10; 33:18—14). During her discussion with Creamer, Maass (posing as "Brandt") again lied and misrepresented everything about her true identify, background and interests.  (Creamer Decl. ¶24). Had she been truthful, and identified herself as an  employee of Project Veritas, Creamer never would have offered her an internship. (*Id.*).

**Defendants' SMF No. 69.**  "Ms. Maass accepted the internship knowing it was unpaid. (*See id.* at PVA00013183 at 6:21-7:03)."

**Plaintiffs' SMF No. 69.**  Undisputed that the internship was unpaid.

**Defendants' SMF No. 70.**  "The unpaid internship for Democracy Partners began on September 21, 2016. (Maas Aff. ¶ 5). She interned at Democracy Partners about three days per week until October 14, 2016. (*Id.*)."

**Plaintiffs' SMF No. 70.**  Undisputed.

**Defendants' SMF No. 71.**  "Ms. Maass was never an intern for Strategic. (*Id.* ¶ 6). Prior to this lawsuit, she did not recall hearing the name Strategic Consulting Group."

**Plaintiffs' SMF No. 71**  Disputed.  Maass was considered Creamer's intern; she knew she was working for Creamer's company, whether she knew the name or not, and was not working for any other companies that were members of Democracy Partners.  (Creamer Decl.

¶25).

**Defendants' SMF No. 72.** "Ms. Maass was never an intern for Creamer in Creamer's personal capacity. (*Id.*)."

**Plaintiffs' SMF No. 72**.  Undisputed but not material.  Creamer was injured because he is the sole owner of Strategic Consulting Group. See Creamer Decl. ¶2.

**Defendants' SMF No. 73.** "No written agreement between Ms. Maass and Democracy Partners – or any other Plaintiff – governed her unpaid internship. (Klein Aff. Ex. 11 at Plaintiffs' Answers to Interrogatories #6)."

**Plaintiffs' SMF No. 73.**   Undisputed but immaterial.

**Defendants' SMF No. 74.**   "No one at Democracy Partners asked Ms. Maass for legal identification before beginning her unpaid internship. (Klein Aff. Ex. 25 at Plaintiffs' Answers to RFA #7)."

**Plaintiffs' SMF No. 74**.   Undisputed but incomplete and out of context.  Project Veritas created a phony identity and back story (Sandler Decl. Ex. 19 at  32:13—21).  Maass created a fake e-mail account in the name of "Angela Brandt"  account specifically for her work with Democracy Partners (*Id*. at 34:18—35:8).  Project Veritas also created a fake id for her (Sandler Decl. Ex. 21) which she carried during her internship and presented on a number of occasions during her internship, including at the front desk of the Communications Workers of America and at the security desk of the Democratic National Committee.  (Sandler Decl. Ex. 19 at  61:9—62:20; 94:19—95:10).

**Defendants' SMF No. 75.** "No one at Democracy Partners asked Ms. Maass for legal identification prior to beginning her unpaid internship. (*See* Klein Aff. Ex. 26 at 155:6-10)."

**Plaintiffs' SMF No. 75**.  Same as SMF 74.

**Defendants' SMF No. 76.** "No one at Democracy Partners asked Ms. Maass for references before beginning her unpaid internship or at any time during her unpaid internship. (Maass Aff. ¶ 7)."

**Plaintiffs' SMF No. 76**.  Undisputed.  However, Maass had been referred by her "uncle,"

"Roth," and had successfully completed volunteer work for the group to whom she had been referred by Creamer, that was staging a public demonstration at the Republican National Convention.  See Plaintiffs' SMF No. 68.

**Defendants' SMF No. 77.  "**No one at Democracy Partners asked Ms. Maass for a résumé before beginning her unpaid internship. (Klein Aff.  Ex. 27)."

**Plaintiffs' SMF No. 77.**   Undisputed, but  incomplete and out of context. Maass *did* present a fake resume on the third day of her internship.  Everything on the resume was false except for showing work she did at some point as a waitress.  (Sandler Decl. Ex. 22; Sandler Decl. Ex. 19 at 59:8—60:8).  Had a resume been presented the third day of her internship that reflected her real identity and background, she would have been immediately ejected from the Democracy Partners' offices and steps would have been taken to ensure that no repeat or further infiltration could take place.  (Creamer Decl. 26).

**Defendants' SMF No. 78.  "**After the unpaid internship began, Lauren Windsor asked Ms. Maass for a résumé for use in "determining projects" to assign to her.  (Klein Aff. Exs. 28, 29, 25 at Plaintiffs' Answers to RFA #6). Ms. Maass provided a résumé for "Angela Brandt" on the third day of her unpaid internship, September 23, 2016. (Klein Aff. Ex. 29; *cf.* Dkt. 1 ¶45). The resume identified prior work as a waitress and bartender, and education completed through the high school level with community college in progress. (Klein Aff. Ex. 29)."

**Plaintiffs' SMF No. 78.**   Undisputed but incomplete.  *See* Plaintiffs' SMF No. 77.

**Defendants' SMF No. 79.  "**Ms. Maass was a party to every conversation she recorded while interning at Democracy Partners. (Maass Aff.¶ 20)."

**Plaintiffs' SMF No. 79.**   Disputed.  Maass secretly recorded everything she saw and heard during her internship (other than possibly when she was going to the restroom or changing out a battery.  (Sandler Decl. Ex. 19 at  63:2—64:5).   She provided, to her superiors at Project Veritas, detailed daily written summaries of all the key events, calls and conversations she had secretly recorded each day that were "relevant" to her work as an intern.  (Sandler Dec. Ex. 19 at 56:17—58:4). And Maass attempted (successfully) to eavesdrop on conversations to which she

was not a party.  For example, October 12, 2016, Maass eavesdropped on a meeting to which she

not been invited, between Mike Lux and Lauren Windsor of Democracy Partners, and the person

who had served as campaign manager for the campaign of  Sen. Bernie Sanders for the

Democratic nomination, Jeff Weaver. (Sandler Decl. Ex. 23).  Maass reported that "I wasn't

invited into the meeting but I pretended to be working and tried to listen to what they were

saying."  (*Id*.)

> **Defendants' SMF No. 80**. "Windsor told Creamer that the timing of Maass's internship was suspicious, but Creamer told her "don't worry about it; it's a friend's niece." (Klein Aff. Ex. 30 at 23:57-24:04)."

> **Plaintiffs' SMF No. 80**.  Undisputed that the phony backstory advanced by Sandi and

Hartsock about "Roth," followed by the serial lies and deception of Maass, successfully convinced

Creamer that she was the person she said she was. See Plaintiffs' SMF No. 68.

> **Defendants' SMF No. 81**. Windsor also

> . . . went to Bob [Creamer], I said, you know, "Who is this person? You should be, uh, you know, getting an NDA from them, getting their ID." And, you know, he told me again that, uh, it was covered, don't worry about it. Um, "if you want to do that, then that's up to you, but, uh, it's covered."

(*Id.* at 24:51-25:19.).

**Plaintiffs' SMF No. 81**.  Undisputed but not material  See Plaintiffs' SMF Nos. 66, 68.

**Defendants' SMF No. 82.**  "Creamer mentioned to Ms. Maass near the end of the first day of the unpaid internship, "And, uh, [Windsor] has some kind of a nondisclosure agreement to sign or something." (Klein Aff. Ex. 31 at PVA00013211 at 02:21 to 02:38)."

**Plaintiffs' SMF No. 82**. Disputed.  On the tape  recorded by Maass' covering her first day, Creamer is heard to tell Maass, "By the way, Lauren [Windsor, a principal of another Democratic Partners company] is going to get you a card and *she has some kind of non-disclosure agreement for you to sign….*"  (Def. Mot. for Sanctions filed June 22, 2018, ECF No. 46-2,  Exhibit B, Bates numbered PVA 13211 at 2 minutes, 26 seconds, originally filed under seal but de-designated—cited by Defendants above, Def. SMF No. 82 (emphasis added)).  That statement by Creamer made a sufficient impression on Maass that Maass put down in her own written notes, summarizing that recording of her first day, that: "at the end of the day Bob [Creamer] said Lauren would be giving me an NDA to sign."  (Sandler Decl. Ex. 30 at PVA 000554).

**Defendants' SMF No. 83.**   "None of the Plaintiffs ever provided a confidentiality agreement or a non-disclosure agreement to Ms. Maass. (*See* Klein Aff. Ex. 11Plaintiffs' Answers to Interrogatories #6)."

**Plaintiffs' SMF No. 83**.  Undisputed.

**Defendants' SMF No. 84.**  "In fact, none of the Plaintiffs had any written agreements with Ms. Maass whatsoever. (*Id.*)."

**Plaintiffs' SMF No. 84.**  Undisputed.

**Defendants' SMF No. 85.**  "Creamer never "explicitly told Maass that based on the confidential and sensitive nature of the mission and programming of Plaintiffs SCG and Democracy Partners, the information, and any additional information she was given over the course of her internship, was confidential and not to be shared with anyone other than persons with whom she had specifically been instructed to share that information." (Maass Aff. ¶ 13; *cf.* Dkt. 1 ¶32 and ¶39)."

**Plaintiffs' SMF No. 85**.  Disputed.  Creamer indicated that Maass would be asked to sign a non-disclosure agreement, Plaintiffs' SMF No. 82, which only makes sense as way of informing Maass that she would be exposed to confidential information.  Indeed, Maass testified that she understood that being asked to sign a non-disclosure agreement would mean "you are agreeing not to give any information about, I guess, the company."  (Sandler Decl. Ex. 19 at 77:12-15).  In addition, Maass was explicitly told or was clearly aware, on multiple occasions, that information she was being provided as part of her internship was confidential and not to be shared with any unauthorized persons.  For example:

- Maass reported that on September 26, 2016, she was on a conference call discussing a "secret war room" in which the campaign social media narrative was discussed by the DNC with other organizations.  (Sandler Decl. Ex. 24). Maass understood that the DNC wanted to keep the existence of this forum ("secret war room") confidential.  (Sandler Decl. Ex. 19 at  92:14—93:7).

- Maass reported that she secretly taped a communications staff member of the DNC, at the DNC, named Jenna Price; and that Price informed Maass about a bus program "the DNC is doing that is a secret until Sunday when they start." (Sandler Decl. Ex. 25).  Mass understood that the DNC wanted to keep confidential the information Price had just disclosed to her.  (Sandler Decl. Ex. 19 at 98:2----99:19)

- Maass knew that she was disclosing to her superiors at Project Veritas a schedule of future Democratic "bracketing" events—events to be staged at the same time and location as Trump campaign events—the existence of which was

maintained in strict confidence and had not yet been made public.  (Creamer

Decl. ¶27;  Sandler Decl. Ex. 26; Ex. 27; Sandler Decl. Ex. 19 at 113:15—

114;12; 116:5—118:17)

- Maass secretly eavesdropped on a conversation between senior Democracy

   Partners members and Sen. Bernie Sanders' campaign manager. See Plaintiffs'

   SMF No. 79.

In addition, Maass recorded and misappropriated information she knew was private

and confidential.  Maass was told to take documents out of the trash at Democracy Partners'

office.  (Sandler Decl. Ex. 28).  She admitted to sorting through the trash in Creamer's office,

finding nothing, but then taking photographs of documents lying on his desk; and of documents

lying on top of the desk of Aaron Black, another member of Democracy Partners.  (Sandler

Decl. Ex. 28; Sandler Decl. Ex. 19 at 130:9—133:3).


**Defendants' SMF No. 86.**  "Creamer's statement "And, uh, [Windsor] has some kind
of a nondisclosure agreement to sign or something." was the sole reference by Plaintiffs a non-
disclosure agreement, NDA, or any other sort of confidentiality agreement during the time of
Ms. Maass's unpaid internship. (Maass Aff. ¶ 14)."

**Plaintiffs' SMF No.  86.**     Disputed.  *See* Plaintiffs' SMF No. 85.


**Defendants' SMF No. 87.**   "There is "a very loose relationship between these
companies that make up Democracy Partners." (Klein Aff. Ex. 32 at 74:5-7.) "[F]or the most
part we are a group of people with like-minded political ideas that help each other out and try to
work together when we can." (*Id.* at 74:7-11)."


**Plaintiffs' SMF No. 87**.  Disputed.  Democracy Partners is a limited liability company

to which a number of companies and sole proprietorships belong as members.  There is a

formal operating agreement among the members of Democracy Partners. (Creamer Decl. ¶3).

**Defendants' SMF No. 88**.  "Members of Democracy Partners generally pay yearly

"dues," "to cover legal fees and host events and that sort of thing." (*Id.* at 81:16-20). At least one member provides in-kind technology services and pays no dues. (*Id.* at 81:15-82:5)."

**Plaintiffs' SMF No. 88**.  Disputed.  Members of Democracy Partners do contribute to some of the shared costs of the limited liability company.  (Creamer Decl. ¶4). Undisputed that the company recognizes in-kind contributions for this purpose on occasion.

**Defendants' SMF No. 89**.   Democracy Partners' Rule 30(b)(6) witness testified that as far as he knew Democracy Partners never had any employees. (*Id.* at 31:5-7).

**Plaintiffs' SMF No. 89.**  Disputed that the witness referenced, Marc Cerabona, was a Rule 30(b)(6) witness as to the operation of Democracy Partners generally.  He was noticed as a 30(b)(6) witness solely as to the information technology systems and document retention and search procedures of Democracy Partners.  (Notice of Deposition, Schedule A, Sandler Decl. Ex. 29).  Democracy Partners did not have employees but retained marketing and other consultants to serve the common interests of its member companies.  (Creamer Decl. ¶5).

**Defendants' SMF No. 90.**  "Democracy Partners' Rule 30(b)(6) witness, whose entity is a member of Democracy Partners, does not regard membership as a "real job." (*Id.* at 148:18-20) ("That's a common reason why people leave the firm, because they take a real job and don't want to be a part of it anymore.")."

**Plaintiffs' SMF No. 90**.  Disputed.  The witness referenced was not a Rule 30(b)(6) witness as to the structure or operations of Democracy Partners generally.  See Plaintiffs' SMF No. 89.  The company serves as a common marketing vehicle for its member companies.  It retains consultants to help provide that service.  (Cramer Decl.  ¶5). Thus, there are no employees of any kind and thus none who have "left the firm" for a "real job" or any kind of job.  (*Id.*).

**Defendants' SMF No. 91**. "An entity called Mobilize, Inc. ("Mobilize") holds itself out

as a member of Democracy Partners on certain invoices, even though it has never been a member of Democracy Partners. (*Cf.* Klein Aff. Ex. 33 at Answer to O'Keefe Interrogatory #10) *with* Klein Aff. Ex. 34). According to Creamer, there is no difference between the activities of Mobilize, Inc. and Strategic Consulting Group. (Klein Aff. Ex. 2 at 142:3–145:10)."

**Plaintiffs' SMF No. 91**.  Disputed.  Mobilize is a limited liability company of which

Linda Saucedo, an employee of Strategic consulting, is the sole member.  Mobilize paid

Strategic Consulting for certain services.  (Cramer Decl. ¶6). Creamer never testified that "there

is no difference between the activities" of Mobilize and Democracy Partners.  See Klein Aff.

Ex. 2 at 142:3—145:10.

**Defendants' SMF No. 92.**  "Mike Lux Media is a member of Democracy Partners. (Klein Aff. Ex. 11 at Plaintiffs' Answers to Interrogatories #4). Mike Lux is the sole member of Mike Lux Media. (*Id.*)."

**Plaintiffs' SMF No. 92**.  Undisputed.

**Defendants' SMF No. 93.**  **"**American Family Voices is an entity which was located in the same office suite as Democracy Partners. (Klein Aff. Ex. 26 at 95:19-96:2). Although staffed by Mike Lux and with Lauren Windsor as its Executive Director, it was not a member of Democracy Partners and at least occasionally acted independently and even contrary to the goals of Strategic clients like AUFC. (*See* Klein Aff. Ex. 35 (March 13, 2015 e-mail chain between Jeremy Funk of AUFC and Robert Creamer in which Funk refers to the opposition of American Family Voices to Loretta Lynch's nomination to Attorney General as "shit."); Ex. 11 at Plaintiff's Answers to Interrogatories #4; Ex. 27 (Windsor's "Executive Director" Title))."

**Plaintiffs' SMF No. 93**.  Undisputed but not material. American Family Voices is a

nonprofit corporation, so would have no occasion to be a member of Democracy Partners.

**Def. SMF. No. 94**.  "Like American Family Voices, Strategic and Mike Lux Media, also shared office space with Democracy Partners. (Klein Aff. Ex. 25 at Plaintiffs' Answers to RFA at ¶1)."

**Plaintiffs' SMF No. 94**.  Undisputed.

**Defendants' SMF No. 95**.  "None of those entities has a written confidentiality or non-disclosure agreement with Democracy Partners. (*See id.* at Plaintiffs' Answers to RFA at ¶¶2-3)."

**Plaintiffs' SMF No. 95**.  Undisputed but misleading and immaterial.  As members of a limited liability company, the members of Democracy Partners owed each other a fiduciary duty and duty of confidentiality as a matter of law.

**Def. SMF No. 96**.  "The Democracy Partners office was at 1250 Eye Street NW, Suite 250 ("Suite 250"). (*See* Klein Aff. Ex. 31 at PVA00013195 at 07:35–08:05)."

**Plaintiffs' SMF No. 96**.  Undisputed.

**Def. SMF No. 97**.  "Ms. Maass was never asked to sign in or asked for identification by anyone at the front desk of the office building where Suite 250 was located. (Maass Aff. ¶ 8)."

**Plaintiffs' SMF No. 97.**  Undisputed but misleading and out of context.  Maass was given a key card for access to the Democracy Partners' suite and the building in which it was located, after hours; but had only one occasion to use it.  That is because the doors to the suite were generally unlocked during working hours and Maass generally worked only during working hours; although someone else was usually present in the office when Maass arrived. (Sandler Decl. Ex. 19 at 71:13--19). The one occasion when she had to use it was when she arrived a few minutes before regular working hours.  (Sandler Decl. Ex. 19 at 71:10—19).

Maass had to show her fake id in order to gain access to the offices of the Communication Workers of America (a meeting she attended as part of her internship) and, on one or more occasions,  at the security desk of the Democratic National Committee.   (Sandler Decl. Ex. 19 at  61:15—63:1; 94:19—95:10).

At the headquarters of the Communications Workers of America, Maass secretly recorded a private polling briefing from a top Democratic party pollster about a poll commissioned by that union on the state of the general election; and that tape was provided to her superiors at Project Veritas.  (Sandler Decl. Ex. 31; Sandler Decl. Ex. 19 at 119:19—

122:18).

**Def. SMF No. 98**.  "A sign next to the Suite 250's door listed several organizations: AUFC, Democracy Partners, American Family Voices, Picture Motion, and Alliance for Citizenship. (Klein Aff. Ex. 31 at PVA00013195 at 08:43; *see also* Ex. 36)."

**Plaintiffs' SMF No. 98**:  Undisputed.

**Def. SMF No. 99**.  "Suite 250 was leased by AUFC in 2011, which at that time sublet space to Strategic, Progressive Strategies, and Manatt Media. (*See* Klein Aff. Ex. 37)."

**Plaintiffs' SMF No. 99.**  Undisputed.

**Def. SMF No. 100**.  "AUFC moved out in early 2015, although it continued to possess key cards to the suite and left a good deal of furniture in the suite. (Klein Aff. Ex. 39, 40, 38, 46)."

**Plaintiffs' SMF No. 100**.  Undisputed.

**Def. SMF No. 101**.  "At that time AUFC sublet Suite 250 to Mannatt Media, Mike Lux Media and Strategic while continuing to pay the largest share—between 50 and 60 percent—of rent and other costs. (Klein Aff. Ex. 39 & 40)."

**Plaintiffs' SMF No. 101**.  Undisputed.

**Def. SMF. No. 102**.  "Since then, Strategic and Democracy Partners were at times billed separately for certain office spaces. (*See* Klein Aff. Ex. 41)."

**Plaintiffs' SMF No. 102**.  Undisputed.

**Def. SMF No. 103.**  "Rent obligations for individual offices in Suite 250 changed informally. (*See* Klein Aff. Ex. 42)."

**Plaintiffs' SMF No. 103**.  Disputed.  Office space was used by any entity not party to the sublease only with express permission of the lessees and each entity paid its fair share in rent based on the space used.  (Creamer Decl. ¶7).

**Def. SMF No. 104**.  "Strategic was charged a consistent amount by AUFC from early 2015 into early 2017. (*See* Klein Aff. Exs. 43 & 44)."

**Plaintiffs' SMF No. 104**.  Undisputed.

**Def. SMF No. 105.**  "The Plaintiffs did not produce a copy of a lease or sublease, claimed that all documents they intended to use to support their claims were produced, and never bolstered the record prior to the close of discovery. (*See* Klein Aff. Ex. 45)."

**Plaintiffs' SMF No. 105**.  Undisputed.

**Def. SMF  No. 106**. "A third-party subpoena to AUFC revealed evidence that a "Partially Executed Sublease Agreement" existed at one time with Picture Motion in 2015, but the document itself was not produced, nor any other lease or sublease. (*See* Klein Aff. Ex. 46)."

**Plaintiffs' SMF No. 106**.   Undisputed but not material.

**Def. SMF No. 107.** "Democracy Partners declared $14,000.00 in rent expenses on its 2015 tax returns. (*See* Klein Aff. Ex. 47 at Stipulation # 1)."

**Plaintiffs' SMF No. 107**.  Undisputed.

**Def. SMF No. 108**. " Democracy Partners did not declare any rent expenses on its 2016 returns. (*Id.* at Stipulation # 2)."

**Plaintiffs' SMF No. 108**.  Undisputed.

**Def. SMF No. 109**. "Strategic declared $54,494.00 and $55,336.00 in rent expenses in 2015 and 2016, respectively. (*Id.* at Stipulations #3 & #4)."

**Plaintiffs' SMF No. 109**.  Undisputed. )

**Def. SMF No. 110.**  Democracy Partners did not hold the lease to the office space it used. (Klein Aff.  Ex. 45 & 37).

**Plaintiffs' SMF No. 110**.  Undisputed.

**Def. SMF No. 111.**  The doors to Suite 250 were unlocked during business hours from September 21, 2016 to October 14, 2016. (*See* Klein Aff. Ex. 48 at PVA00013283 at 1:28–1:38; Ex. 49 at PVA00013386 at 1:04–1:12).

**Plaintiffs' SMF No. 111**.   Undisputed but misleading and out of context.  An employee of a Democracy Partners member company was present during business hours when Maass was present in the office. (Sandler Decl. Ex 19 at  71:10—22).  She had been introduced to all the

people who worked in that office regularly (*id*.) so they knew who she was.

**Def. SMF No. 112**.  No signage restricts access to the office suite. (*See id.*; Ex. 36).

**Plaintiffs' SMF No. 111**.   The meaning of this assertion is unclear.  Most commercial office spaces do not have a no-trespassing or "authorized employees only" sign outside the door to their suite.

**Def. SMF No. 113**. Ms. Maass was provided a key card to be used during off hours. She only used the card once. (*See* Klein Aff. Ex. 50 at 72:1-3). She had arrived at the office five minutes before everyone else. (*Id.* at 72:1-6).

**Plaintiffs'  SMF No. 113**.   Undisputed, because Maass only worked during regular office hours —not unusual for an intern.

**Def. SMF No. 114**.   Democracy Partners' Rule 30(b)(6) witness did not know how many key cards Democracy Partners issued to its employees, guests, or affiliates, and did not know if Democracy Partners takes key cards back from its affiliates after the relationship ends. (Klein Aff. Ex. 32 at 30:14-22; 32:7-11).

**Plaintiffs' SMF No. 114.**  Disputed.  The witness referred to, Marc Cerabona, was not called as a 30(b)(6) witness on these issues.  His deposition was noticed only on issues of information systems technology and document retention and search.  See Sandler Decl. Ex.29, Schedule A. Democracy Partners does take key cards back from employees of its members after the relationship ends.  (Creamer Decl. ¶29).

\

**Def. SMF. No. 115**. "None of the individual offices within the suite were labeled by occupant. (Klein Aff. Ex. 31 at PVA00013195 at 08:53–09:40)."

**Plaintiffs' SMF No. 115**.   Undisputed.

**Def. SMF No. 116.**  Ms. Maass used her own laptop computer for her unpaid internship tasks; Democracy Partners never gave her access to a company computer and does not own any company computers. (Klein Aff. Ex. 32 at 102:20-103:8; Ex. 51; *cf.* Dkt. 1 ¶31).

**Plaintiffs' SMF No. 116.**  Undisputed.

**Def. SMF No. 117**.     "Ms. Maass was not a part of the Democracy Partners Google

Group. (*See* Klein Aff. Ex. 11 at 1/18/2019 Plaintiffs' Answers to Interrogatories #1 & 3/15/18 Plaintiffs' Answers to Interrogatories #4.) The Democracy Partners Google Group is the primary way Democracy Partners communicates about its business. (Klein Aff. Ex. 32 at 39:20-40:5)."

**Plaintiffs' SMF No. 117**.   Undisputed that Maass was not part of the Democracy Partners Google Group.

**Def. SMF No. 118**.   "Ms. Maass used an outside email address, angelabrandt@gmail.com, for her unpaid internship work, and Plaintiffs knowingly emailed her at that outside email address. (*See* Klein Aff. Ex. 52)."

**Plaintiffs' SMF No. 118**.   Undisputed that Project Veritas created a fake e-mail address, angelabrandt@gmail.com for Maass in a deliberate effort to lie about and conceal her true identity from Creamer, Strategic Consulting and Democracy Partners and everyone who worked for and with them.  (Creamer Decl. ¶30).   Disputed that "Plaintiffs knowingly emailed her at that" e-mail address.  Plaintiffs believed in good faith that they were emailing Angela Brandt, the niece of Charles Roth.  Because of Maass' suffocating fabric of interrelated lies and deceptions, Plaintiffs had no idea they were dealing with an undercover political spy in the employ of a notorious extreme right-wing organization.  (Creamer Decl. ¶30).

**Def. SMF No. 119**.   "Democracy Partners wrote its Wi-Fi password on a white board in a conference room near the front door of the office. (Klein Aff. Ex. 32 at 142:1-9)."

**Plaintiffs' SMF No. 119.**  Disputed to the extent this assertion implies that the password was or is visible outside the offices of Democracy Partners.  (Creamer Decl. ¶31).

**Def. SMF No. 120.** "Democracy Partners does not have an IT Firewall. (*Id.* at 140:13-20)."

**Plaintiffs' SMF No. 120.**  Disputed.  Mr. Cerabona testified that access to the Wi-Fi is password protected.

**Def. SMF  No. 121**. "Democracy Partners makes no effort to change passwords, or regarding information security, when Democracy Partners members leave Democracy

Partners. (*Id.* at 149:5-150:8)."

       **Plaintiffs' SMF No. 121**.  Disputed; distorts and misrepresents the cited

testimony.  The witness testified, "typically when the partners leave, we take their information

off the website and we remove them—remove their e-mail from the G Suite, we remove their e-

mail from the Google Group."  Klein Aff. Ex. 32 at 149:9-13.  He testified that email passwords

are not "rotated" when an employee leaves. ( *Id*. at 149:19-20).

       **Def. SMF No. 122.**  "The Democracy Partners e-mail system was incapable of
two-factor authentication. (*Id.* at 42:14-22, 43:1). The Mobilize / Democracy Partners contract
with the DNC required two- factor authentication on the e-mail system. (Klein Aff. Ex. 53)."

       **Plaintiffs' SMF No. 12**2.  Disputed. There is no reference to two factor

authentication in the portion of the Cerabona deposition cited in this paragraph.

       **Def. SMF No. 123**.  "When Ms. Maass arrived for the first day of her
internship, Creamer and Lux suggested that Maass could sit at Suite 250's front desk or in an
unoccupied office, and Maass volunteered for the front desk. (Klein Aff. Ex. 31 at
PVA00013195 at 24:55–25:45.) Lux commented Maass's place at the front desk would benefit
the suite because it would "give somebody who walks in somebody to talk to." (*Id.* at
PVA00013195 at 25:20–25:30)."

       **Plaintiffs' SMF No. 123**. Undisputed but immaterial and out of context.  An

employee of Democratic Partners member company was present during business hours when

Maass was in the office. (Creamer Decl. ¶28).

       **Def. SMF No. 124.** " Ms. Maass's tasks were not proactive in nature; she
completed tasks when assigned. (Maass Aff. ¶¶ 10, 12). Ms. Maass completed each of these
tasks and some of her work was even used by Windsor after it was revealed she was an
investigative journalist. (Klein Aff. Ex. 26 at 169:17-170:2)."

       **Plaintiffs' SMF No. 124.**  Disputed that her tasks were not "proactive" in nature.  It

was true her work was assigned to her, as would be expected for an intern.  She was given

access to confidential meetings and briefings (see Plaintiffs' SMF No. 85); and she received

training on how to curate video and other  clippings fusing a process proprietary to Democracy

Partners and its clients.  (Sandler Decl. Ex. 19 at 95:16—97:19).

**Def. SMF No. 125.**  "She did not give advice to Democracy Partners, nor supervise anyone else during the unpaid internship. (Maass Aff.¶ 10). "

**Plaintiffs' SMF No. 125.**  Undisputed.

**Def. SMF No. 126**.  "On the first day of her unpaid internship at Democracy Partners, Ms. Maass counted an inventory of political signs. (*See* Klein Aff. at Ex. 54)."

**Plaintiffs' SMF No. 126.**  Disputed as incomplete and misleading.  During her first day, Maass learned she would be on a daily call with the Clinton Campaign and the DNC, about both current and future "bracketing" events—the existence of the future ones not having been made public.  (Sandler Decl. Ex. 19 at  77:16—78:14).

**Def. SMF No. 127.**  "Maass participated on a number of conference calls. The bracketing calls occurred every day at 1 p.m., and many of them had the call in number 641-715-3288 with the passcode 782537. (*See* Klein Aff. at Ex. 55; *cf.* Dkt 1 ¶36, 39). That phone number was already available to the public on the WikiLeaks website, and Plaintiffs knew information about their bracketing calls were available on WikiLeaks. (*See* Klein Aff. Ex. 56) ("Dem partners is in the wiki dump. Nothing bad just showing the coordinating on protest events," Creamer: "Bracketing calls.")."

**Plaintiffs' SMF No. 127**.  Disputed in part.  Defendants evidently availed themselves of private e-mails that had been illegally hacked in the course of a criminal conspiracy of Russian intelligence operatives; Plaintiffs do not dispute that.    Leaving aside the disclosure through the hacked e-mails, however,  the passcode was kept confidential the group of people authorized to be on the call.  (Creamer Decl. ¶27).  Further, Maass did *not* obtain access to all of these calls through the call- in number; in some cases she obtained access by listening in with Creamer on a speakerphone (Sandler Decl. Ex. 19 at 78:18—79:3).  And she obtained the passcode from an email sent to her by someone in the group-- *not* from Wikileaks or any other public source. (*Id*. at 79:4—11).   Hartsock testified that a major advantage of Maass' deceptive infiltration of Democracy Partners' offices was that "[s]he had a front row seat to the

conference calls…" (Sandler Decl. Ex. 5 at 132:17—133:8) and Hartsock could not think of

any other way that Project Veritas could get access to those conference calls. (*Id*. at 133:14—

134:6).

**Def. SMF No. 128**.  "On October 6, 2016, Ms. Maass delivered a package on behalf of Democracy Partners. (*See* Klein Aff. Ex. 57)."

**Plaintiffs' SMF No. 128**.  Undisputed but immaterial.

**Def. SMF No. 129**.  "Ms. Maass used a program called TVEyes to assemble clips of news coverage. (*See* Klein Aff. Ex. 2 at 215:14-216:6)."

**Plaintiffs' SMF No. 129**.  Undisputed.

**Def. SMF No. 130**.  "Ms. Maass did the clerical work of setting up an office phone system, which included putting labels on the phone. (*See* Klein Aff. Ex. 58)."

**Plaintiffs' SMF No. 130**.  Undisputed but incomplete and misleading: Maass' work

was not at all limited to clerical work.  See Plaintiffs' SMF No. 85.

**Def. SMF No. 131**.  "Ms. Maass looked at YouTube clips regarding a person named Myron Ebell and assembling a document with public quotes from news sources and TV appearances. (*See* Klein Aff. Ex. 59). There was subsequent discussion not involving Ms. Maass about using quotes from Myron Ebell in making memes. (*See* Klein Aff. Ex. 60)."

**Plaintiffs' SMF No. 131.**  Undisputed but not material.

**Def. SMF No. 132**.  "Ms. Maass accomplished every activity she was assigned.

(Maass Aff. ¶ 12; *see, e.g.*, Klein Aff. Ex. 61 (package delivery))."

**Plaintiffs' SMF No. 133**.  Undisputed but immaterial.

**Def. SMF No. 134.**  "Prior to this lawsuit, the Project Veritas Parties were not aware of the details of the work performed by Creamer, Strategic or Democracy Partners on behalf of AFSCME, nor were they aware that AFSCME was a funding source for AUFC. (O'Keefe Aff. ¶¶10-11).  As far as Ms. Maass was aware none of the duties at her internship included any work on behalf of AFSCME. (Maass Aff. ¶ 15)."

**Plaintiffs' SMF No. l34**.  Disputed.   That Democracy Partners companies and

Creamer's company, in particular, would lose business as a result of Maass infiltration was

entirely foreseeable regardless of whether Maass knew of specific clients.

**Def. SMF No. 134**.   "Ms. Maass was likewise not aware that any of her duties included work for AUFC, other than the fact that on one occasion she counted signs that indicated they were paid for by AUFC. (*Id.* at ¶ 16)."

**Plaintiffs' SMF No. 134**.  Disputed.  As a result of her work, Maass knew AUFC was a client of Strategic Consulting.  (Creamer Decl. ¶32).

**Def. SMF No. 135**. "Potential work with Dialysis Patient Citizens was never assigned or mentioned to Ms. Maass during her internship. (Maass Aff. ¶ 17)."

**Plaintiffs' SMF No. 135**.  Undisputed but not material.

**Def SMF No. 136**.  "Maass gained no knowledge of patch-through calling for AFSCME or AUFC during her internship. (Klein Aff. Ex. 25 at Plaintiffs' Answers to RFA ¶¶10-12)."

**Plaintiffs' SMF No. 136**.  Undisputed but not material.

**Def SMF No. 137**.  "Ms. Maass never communicated with Foval. (Maass Aff.¶ 22)."

**Plaintiffs' SMF No. 137**.   Undisputed but not material

**Def. SMF No. 138**.  "Neither Ms. Maass nor Project Veritas shared information related to her unpaid internship assignments or investigation with the Republican Party or anyone else who "could adjust their own plans to anticipate or deflect . . . . 'bracketing' event[s]," as Plaintiffs alleged in their Complaint. (Maass Aff. ¶ 19; *see also* Klein Aff. Ex. 17 at 78:8-11; *cf.* Dkt. 1 ¶37)."

**Plaintiffs' SMF No. 138**.  Disputed. Every day of her internship Maass prepared a written report summarizing what she had recorded, and that report went to the entire production team at project Veritas.  (Sandler Decl. Ex. 1 at 171:14—172:13), including O Keefe and senior Project Veritas officials Russell Verney,  Laura Loomer, and Joe Halderman.  (*Id.*). Project Veritas imposed no restrictions whatsoever on the use that could be made by these officials of the summaries and issued no  guidelines of any kind as to the persons or organizations to whom the summaries could be disclosed. (*Id.* at  172:18—173:6). O'Keefe claimed that could not recall whether he transmitted information from the reports to individuals outside Project Veritas. (*id*. at

173:16—174 1) although he "did not think" he had transmitted the information to the Trump

campaign or Republican Party.  (*Id*.).

**Def. SMF 139**.  "After Plaintiffs learned Ms. Maass was an investigative journalist for
Project Veritas Parties, Democracy Partners member Mike Lux informed the Democratic
National Committee, including then-Chair Donna Brazile, "[T]he plant in our office didn't
seem to come away with much of anything." (*See* Klein Aff. Ex. 62)."

**Plaintiffs' SMF No. 139.**   Disputed that Plaintiffs ever learned that Maass was an

investigative journalist for anyone; she was not a journalist.  *See* Plaintiffs' SMF No. 1.

Undisputed that the damage was done by the infiltration itself, not the contents of the

information stolen by Maass.

Dated:  June 3, 2019                                        Respectfully submitted,


 _/s/ Joseph E. Sandler

Joseph E. Sandler, D.C. Bar No.                    Heather Abraham, *pro hac vice*
255919                                             Aderson Francois, D.C. Bar No. 798544
 Dara Lindenbaum, D.C. Bar No.                     INSTITUTE FOR PUBLIC REPRESENTATION
1026799                                            Georgetown University Law Center
SANDLER REIFF LAMB ROSENSTEIN &                    600 New Jersey Avenue NW, Suite 312
BIRKENSTOCK, P.C.                                  Washington, DC 20001
1090 Vermont Ave., N.W.  Suite 750                 Phone: (202) 662-9593
Washington, D.C.  20005                            Fax: (202) 662-9634
Tel:  202-479-1111                                 abf48@georgetown.edu
Fax:  202-479-1115                                 heather.abraham@georgetown.edu
sandler@sandlerreiff.com
lindenbaum@sandlerreiff.com                        Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2019, I served the foregoing Plaintiffs' Statement of Material Facts, and the Exhibits thereto, through the Court's electronic filing system which served a copy on all counsel of record.

/s/  Joseph E. Sandler

Joseph E. Sandler
Counsel for Plaintiffs