EXHIBIT

1

1    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

2              UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF COLUMBIA

4

5    --------------------------------
                                      :
6    DEMOCRACY PARTNERS, et al.,      :
                                      :
7            Plaintiffs,              :
                                      :
8       v.                           :   Civil Action No.
                                      :
9    PROJECT VERITAS ACTION FUND,     :   1:17-CV-1047-ESH
                                      :
10   et al.,                          :
                                      :
11           Defendants.              :
                                      :
12   --------------------------------

13

14       Video Deposition of JAMES E. O'KEEFE, III, a

15   witness herein, at the law offices of , Reiff,

16   Lamb, Rosenstein & Birkenstock, P.C., 1090 Vermont

17   Avenue, N.W., Suite 750, Washington, D.C., commencing

18   at 9:41 a.m. on Tuesday, February 12, 2019 and the

19   proceedings being taken down by stenotype and

20   transcribed by Catherine B. Crump, a Notary Public in

21   and for the District of Columbia.

22

```
 1   Voting Scheme"?

 2        A.    I believe it was Scott Foval, the

 3   individual with ties to Mr. Robert Creamer.

 4        Q.    You believe that Scott Foval -- well,

 5   let's go through this.  It says, the first thing:

 6   "The scheme involves a left-wing political

 7   philanthropist who is convinced that both voter ID

 8   laws as well as a Donald Trump presidency are the

 9   death knell of the progressive movement and has a

10   plan to circumvent them on a mass scale."

11        Do you see that?

12        A.    Yes.

13        Q.    That political philanthropist didn't

14   exist, did he or she?

15        A.    He existed insofar as we were a reporter

16   being that individual.

17        Q.    The left-wing political philanthropist

18   was going to be a Project Veritas journalist posing

19   as the left-wing philanthropist.  Right?

20        A.    Correct.

21        Q.    Okay.  So and then the -- if you go to

22   the second sentence:  "The surrogate voters are doing
```

1    a mitzvah; they're voting on behalf of minorities and

2    undocumented immigrants who have been unjustly

3    disenfranchised by voter ID laws, the latter of whom

4    have the most to lose under a Trump administration."

5         Do you see that?

6         A.    Yes.

7         Q.    And you're saying that Scott Foval

8    proposed this plan?

9         A.    Well, you asked me to review the three

10   paragraphs and your question was who came up with

11   this.  This plan was based upon what Scott Foval told

12   Christian Hartsock in a restaurant.  He made some

13   outrageously and potentially illegal comments about

14   voting fraud that shocked the conscience.

15        So this, my reading of this, was based in the

16   information that Scott Foval told us.  We were

17   following up with various investigative journalism

18   plans, that this is what -- Scott Foval was the one

19   who gave us the idea, not us.

20        Q.    Did you review the video of the

21   conversation that Mr. Foval had in a restaurant with

22   your journalist pseudonym Steve Packard?

1          A.      I believe so.

2          Q.      And do you -- and let me ask you to look

3    at the beginning of the second paragraph there:  "The

4    plan, at least as far as Wisconsin goes, is to use

5    the allowance the employer-issued IDs and the

6    existence of foreclosed and abandoned home addresses

7    to skirt the law.  The philanthropist has created a

8    fully-funded shell company with which to hire a

9    legion of out-of-county and even out-of-state voters

10   as well as illegal immigrants, issue them IDs that

11   can be used at the polls and paychecks which are both

12   proof of employment with the stubs as well as the

13   actual compensation for participating in the scheme."

14          Do you see that?

15          A.      Yes.

16          Q.      And is it your recollection that Scott

17   Foval proposed this plan?

18          A.      He -- well, I'd like to have the chance

19   to read from the transcript of what Mr. Foval said,

20   because I don't have it memorized, but it was

21   unconscionable what he proposed.

22          Q.      Was it this plan?

1          A.     It was something similar.  It was -- he

2    was driving rental cars, busing people around.  It

3    was riddled with illegal suggestions on voting

4    illegalities.

5          So our -- not only it's our responsibility to

6    follow up, it's our duty as investigative reporters.

7          Q.     Did Mr. Foval propose that a

8    philanthropist create a shell company to hire a

9    legion of out-of-county and out-of-state voters?

10          A.     I'd like the opportunity to read the

11    transcript of what Mr. Foval proposed so that I can

12    properly answer your question.

13          Q.     Okay.  So you don't recall if that's

14    what he actually proposed.  Right?

15          A.     I do recall that he proposed bringing

16    people from out of state, using rental cars and this

17    sort of thing, hiding license plates.  I recall lots

18    of things, but I'd like to review the transcript so I

19    could properly articulate all of the illegal

20    propositions that Mr. Foval gave Christian.

21          Q.     Did he propose issuing them fake IDs?

22          A.     He may have.  I'd have to look at the

1    transcript.

2           Q.    Do you remember one way or the other?

3           A.    I remember a lot of illegal things.  I

4    remember him saying something to the effect of we've

5    been bussing people around for 50 years and we're not

6    going to stop now, and there was a need to

7    corroborate and to follow up with what he proposed.

8           Q.    Let me ask you to look at page 3 of

9    O'Keefe Exhibit 10 and I'm going to ask you to read

10   from the word "Targets" through the end of that

11   section before it begins "Democracy Partners (DP)".

12          A.    Okay.  You'd like me to read what?

13          Q.    The top part, top half of the page.

14          A.    Okay.

15          MR. SANDLER:  It relates to Bob Creamer.

16          [Witness peruses exhibit.]

17          THE WITNESS:  Okay.

18   BY MR. SANDLER:

19          Q.    Okay.  Let me ask you first about the

20   top line.  It says:  "Bob Creamer:  Value:  Referred

21   by Foval.  Described him as 'diabolical'."

22          Who described him as diabolical?

```
 1          A.     Mr. Scott Foval.

 2          Q.     "Head of Democracy Partners.  Married to

 3     sitting congresswoman Jan Schakowsky, (D-IL)."

 4          Why was his marriage relevant?

 5          A.     Well, he's -- well, he's the head of an

 6     organization, works with -- let me answer your

 7     question by saying he's related, involved with a

 8     sitting member of Congress and he works with or

 9     alongside an individual who is proposing all types of

10     illegal activities and this man is describing him as

11     the dark hat, as diabolical.

12          MR. CALLI:  For purposes of clarity, if the

13     witness could use names, not "this man is describing

14     him".  So use names so the record is clear, please.

15          THE WITNESS:  Yes.  Scott Foval is describing

16     Mr. Creamer as diabolical, as the dark hat, and we

17     think it's newsworthy that he's the husband of a

18     sitting member of Congress.

19     BY MR. SANDLER:

20          Q.     Now, you said -- at the time of the

21     restaurant conversation where Scott Foval said the

22     things that you describe, was Mr. Foval working for
```

1    Mr. Creamer at that time?

2           A.    Just to clarify, it wasn't my

3    description.  These comments did, indeed, occur, and

4    I would like the opportunity to review them to

5    properly and accurately answer your questions that

6    you've been asking me and will ask me.

7           Q.    Was it your understanding that Mr. Foval

8    worked for Mr. Creamer or his organization at the

9    time of that conversation in the restaurant?

10          A.    Well, it became my understanding when

11   Mr. Foval stated that that was the case.  Again, I

12   would have to look at the transcript to properly

13   answer the questions, because it's all in the

14   transcript of the remarks made by Mr. Foval.

15          Q.    Okay.

16          A.    I can testify to the authenticity of

17   that.

18          Q.    So let me ask you, going down to the

19   fourth bullet, do you see where it says "Desired

20   Content" and there's five bullets under that?

21          A.    Yes.

22          Q.    What does "desired content" mean?

 1          A.     That means the investigation objective.

 2          Q.     The investigation objective is to get

 3   Mr. Creamer to say what's in those five bullets

 4   underneath.  Right?

 5          A.     We can't get people to say things.  It's

 6   ultimately our responsibility to determine -- to

 7   follow the -- where the path that Mr. Foval leads

 8   down.  Yes.  So this would be the goal.

 9          Q.     The goal was to get Mr. Creamer to

10   reiterate the Foval transcript first.  Right?

11          A.     To investigate and determine if he would

12   do that.

13          Q.     But that was the -- it's desired that he

14   would do that; that's what "desired content" means.

15   Right?

16          A.     I believe I've answered the question.

17          Q.     And then it says "Bonus:  Reveals -- the

18   fourth bullet says:  "Bonus:  Reveals additional

19   inside information on his operations and those of the

20   organized left/admits to previous activities of

21   similar nature."

22          What did you mean by bonus?

1          A.    I don't know.  I would have to check

2     with Christian to determine what he means by that.

3          Q.    Did you have an understanding of what he

4     meant by that when you read the document?

5          A.    I don't recall reading this part of the

6     document.

7          Q.    Okay.  Is it fair to say that a real

8     journalist reports on a story rather than creating

9     it?

10          MR. CALLI:  Objection to the form of the

11     question as well as the characterization of "real

12     journalist".

13          THE WITNESS:  Can you repeat the question?

14     BY MR. SANDLER:

15          Q.    I said is it fair to say that a real


17          Is it fair to say that an ethical journalist

18     reports on a story rather than creating a story?

19          A.    I don't think that's a fair assertion.

20          Q.    Okay.  Is it ethical journalist practice

21     for a news organization to pay an employee a bonus if

22     they can get an interview subject to say something

```
 1   specific?

 2          A.    Is it -- repeat the --

 3          Q.    Sure.  Is it ethical journalist practice

 4   for a news organization to pay an employee a bonus if

 5   they get an interview subject to say some desired

 6   content?

 7          A.    What do you mean by bonus?

 8          Q.    I mean a salary bonus, money.

 9          A.    I don't -- I'd have to understand the

10   specific incident or instance in question.

11          MR. SANDLER:  Sure.  Okay.  Let me ask that

12   this be marked as the next exhibit.

13                          [O'Keefe Exhibit No. 11 was

14                          marked for identification.]

15          [Witness peruses exhibit.]

16          THE WITNESS:  Okay.

17   BY MR. SANDLER:

18          Q.    I'm showing you what's been marked as

19   O'Keefe Exhibit 11.  Can you identify this document?

20          A.    Yes.

21          Q.    What is it?

22          A.    It's an E-mail written from me.
```

1          Q.    Okay.  And it looks like -- I mean,

2     there's a forwarded E-mail, but directing your

3     attention to the E-mail sent on October 3, 2016 at

4     1:03 p.m. that begins "Dear Staff", do you see that?

5          A.    Yes.

6          Q.    Then the second paragraph says:  "With

7     the knowledge that content is king, I've decided to

8     challenge the organization with a rallying focus.

9     I've laid out below specific goals that, when

10    achieved, will reward each and every full-time

11    employee and several others intimately involved in

12    the investigations."

13         Do you see that?

14         A.    Yes.

15         Q.    Then paragraph 1 under that says:

16    "$1,000 bonus to every qualified participant if we

17    get the content we need on Democracy Partners."

18         Underneath that, it says:  "Objective:  Prior

19    to October 14th, PV obtains video and audio or

20    written collaboration where individuals directly

21    connected to the Creamer-Foval element or some

22    derivative directly connected to same state that they

1    participate in some form of voter fraud."

2          Do you see that?

3          A.    Yes.

4          Q.    What did you mean the Creamer-Foval

5    element?

6          A.    I don't recall what I meant by that

7    wording.

8          Q.    How about "some derivative directly

9    connected to same"; what does that mean?

10         A.    I'm not sure what I meant by that.

11         Q.    Okay.  And underneath it, it says:  "If

12   Christian meets this objective tomorrow afternoon in

13   New York -- which would have been October 4th -- "you

14   all get $1,000 immediately.  He can get it through

15   our folks or on encrypted texting with the subject."

16         What was happening that afternoon in New York,

17   the afternoon of October 4th?

18         A.    I can't say with certainty here what was

19   going on that day.

20         Q.    Okay.  Do you know -- was this bonus

21   paid?

22         A.    I don't recall.

 1          Q.    You don't recall whether it was paid or

 2    not?

 3          A.    No.

 4          Q.    Is it ethical journalistic practice to

 5    pay reporters if they get specific individuals to

 6    state something to be set out in advance like this?

 7          A.    Is it ethical to do what?

 8          Q.    To give -- to offer a bonus to

 9    reporters, to a reporter, if they get a source or

10    interviewee to state something specific that's set

11    out in advance as this is?

12          A.    I think it depends upon the situation.

13          Q.    You thought this was ethical in this

14    situation?

15          A.    Yes.  I believe it's not unethical.

16          Q.    Okay.  Can you explain -- well, let me

17    ask you this:  Doesn't offering such a bonus create

18    an incentive for the employee or the journalist to go

19    out of his or her way to pressure or trick the

20    subject in saying something they wouldn't have

21    otherwise said?

22          A.    No.

1          Q.     Explain.  Why don't you think so?

2          A.     Because our techniques and methodologies

3    are -- we didn't trick or convince Mr. Creamer to say

4    that it's Hilary's idea to put ducks on the ground.

5    We didn't make his lips move.  We didn't make his --

6    I mean, it's Mr. Creamer who made the statements that

7    Hilary knows through the chain of command what's

8    going on.  We can't manufacture that statement, sir.

9          So that was a statement made by Mr. Creamer

10   that led to his resignation, and it was one of the

11   most successful stories and one of the biggest

12   stories in the history of our organization.  The

13   reason it's not unethical is because these people

14   did, indeed, say these things and they did, indeed,

15   occur and it was, indeed, Mr. Creamer who -- not me

16   and not my reporter that made the statement that it

17   was Hilary's idea.

18         Q.     I'm not talking about ducks on the

19   ground.

20         A.     Okay.

21         Q.     This bonus is being offered if

22   individuals connected to the Creamer-Foval element or

```
 1    some derivative directly connected to the same --

 2         A.    Okay.

 3         Q.    -- state that they participate in some

 4    form of voter fraud.  Right?

 5         A.    Right, but we can't get people to say

 6    things.

 7         Q.    Well, you never got Mr. Creamer to say

 8    that, did you?

 9         A.    We got him to say, perhaps, things that

10    were even worse.

11         Q.    But nothing -- but you didn't get him to

12    say that he participated in some form of voter fraud?

13         A.    I would have to check the tapes and the

14    stories to get --

15         Q.    Well, we'll get to that.

16         A.    I can't wait.

17         Q.    But you offered thousands of dollars in

18    bonuses, but you don't remember what you wanted them

19    to do?  I mean you don't know what individuals

20    directly connected to the Creamer-Foval element you

21    were looking for?

22         A.    No.  I don't think there's anything
```

1    unethical to providing an incentive for reporters to

2    go get a story, which is essentially what our

3    reporters did, and the story they got was huge.

4          We can't make people say things, and the

5    things that Mr. Creamer and Mr. Foval were saying, it

6    shocked the conscience.  We can't make people -- I

7    really take issue with your characterization of we

8    trick people to say things.  We can't.  That's just

9    not a possibility in our line of work.

10          Q.    What did Mr. Creamer say that shocked

11   the conscience?

12          A.    Well, I think the thing that he said to

13   Allison in his office about, for example, Hilary

14   knows through the chain of command what was going on,

15   I think that was an extraordinary statement.  I think

16   that really made the story.  He said it more than

17   once when he said don't repeat this to anybody, his

18   words not mine.  He said don't repeat this to

19   anybody, but it was Hilary's idea to put these ducks

20   on the ground at these rallies.

21          He was testifying and he, apparently, didn't

22   want people to know it.  This is the -- these are not

1    just shenanigans.  This is the dark operations in our

2    political system for all the world to see.

3           Q.    Okay.

4           A.    Our reporters did not trick him into

5    saying that.  It was, indeed, true what he said.

6           Q.    That Hilary knew about the ducks on the

7    ground?

8           A.    That's what he stated.

9           Q.    Did you know Mr. Creamer was a

10   contractor to the Democracy National Committee?

11          A.    I'm sorry?

12          Q.    Mr. Creamer was a contractor to the

13   Democratic National Committee?

14          A.    He was?

15          Q.    He was.  Right?

16          A.    Okay.

17          Q.    Did it shock the conscience that the

18   candidate knew what the Democracy National

19   Committee's contractors were doing?

20          A.    Apparently, it did, because the videos

21   got tens of millions of views and he offered his --

22   he tendered his resignation for his own behavior and

1    apologized for his behavior.

2         Q.    When did you first become aware of Bob

3    Creamer?

4         A.    I first became aware of Mr. Creamer when

5    Mr. Foval referred to him as the dark hat or the --

6    sort of the references that he made to Mr. Creamer at

7    Garfield in Wisconsin in 2016.

8         MR. SANDLER:  Okay.  Let me ask that this be

9    marked as the next exhibit.

10                       [O'Keefe Exhibit No. 12 was

11                       marked for identification.]

12        [Witness peruses exhibit.]

13        THE WITNESS:  Okay.

14   BY MR. SANDLER:

15        Q.    I'm showing you what's been marked as

16   Exhibit 12, O'Keefe Exhibit 12.  Can you -- actually,

17   I want to call your attention to the E-mail beginning

18   in the middle of the first page of Exhibit 12 from

19   James O'Keefe dated Friday, June 24, 2016, Subject:

20   Archive Files on Bob Creamer.

21        A.    Okay.

22        Q.    Is that an E-mail that you sent on or

1    about June 24, 2016?

2          A.    Yes.

3          Q.    Then it says:  "See attached.  Note

4    language:  Reclaim our country.  We already knew

5    this, but the periodicals show Creamer is no

6    shrinking violet.  He makes other organizers look

7    like the Cub Scouts."

8          And then there's some material below it.  Do

9    you see that?

10          A.    Yes.

11          Q.    What did you mean by saying -- first of

12    all, why was the language "reclaim our country"

13    noteworthy in your view?

14          A.    Let me have a chance to review the

15    material here.

16          MR. SANDLER:  Sure.  Yes.  Please.

17          [Witness peruses exhibit.]

18          THE WITNESS:  Okay.  I've reviewed it.

19    BY MR. SANDLER:

20          Q.    Why was the language "reclaim our

21    country" noteworthy?

22          A.    I don't recall what I meant by that.

1          Q.    What did you mean by saying "the

2    periodicals show Creamer is no shrinking violet"?

3          A.    I think he's an -- he was an impressive

4    operative.   History showed that to be true.

5          Q.    Okay.   And you say he makes other

6    organizers look like the Cub Scouts.   What did you

7    mean be that?

8          A.    He's an impressive -- impressive in his

9    techniques.

10         Q.    Okay.   And at some point, a decision was

11   made that this philanthropist referred to earlier in

12   a memo would be an individual with the pseudonym

13   Charles Roth.   Right?

14         A.    Yes.

15         Q.    Okay.   Let me read from your book

16   "American Pravda", page 106:   "We decided that -- the

17   second full paragraph.

18         "We decided that Roth III would be a wealthy

19   but reclusive Northern California real estate

20   millionaire.   In the way of back story, Roth's father

21   emigrated from Hungary and made a fortune doing

22   development deals in and around San Francisco.   Many

1    of these deals displaced poor minorities.  As he grew

2    older and wiser, this wealthy immigrant came to

3    regret his actions and became a philanthropist,

4    quietly helping liberal causes."

5           This Charles Roth, III never existed.  Right?

6           A.    I don't believe so.

7           Q.    And who came up with the name Charles

8    Roth?

9           A.    I don't recall.

10          Q.    Okay.  And who decided that he should

11   come from Hungary, that the father should come from

12   Hungary?

13          A.    I don't remember.

14          Q.    Is there any particular reason why

15   Project Veritas' donor pseudonyms are all Jewish

16   surnames?

17          A.    I don't know.  I don't even know if

18   that's true.

19          Q.    Okay.  And then it says, the next

20   paragraph says:  "His son, Charles III, followed in

21   the old man's footsteps even more aggressively.  He

22   became an active donor to liberal causes and

1  candidates, but of late had grown frustrated by the

2  lack of results.  Given the way his father displaced

3  the poor, Charles III was particularly sensitive to

4  the disenfranchised minorities by Republican voting

5  laws.  Convinced as he was that both voter ID laws as

6  well as a Donald Trump presidency are the death knell

7  of the progressive movement, Roth III was prepared to

8  circumvent the laws that would lead to the lost

9  votes."

10         Now, this Roth III described in this paragraph

11  never existed either.  Right?

12         A.    Correct.

13         Q.    This was a story that Project Veritas

14  made up.  Right?

15         A.    Yes.

16         Q.    And that person was ultimately played by

17  a Project Veritas journalist by the name of Daniel

18  Sandini.  Right?

19         A.    Yes.

20         Q.    Let me ask you to -- the other thing --

21  oh.  At the bottom of the page, it says "the meeting

22  took time to arrange -- the meeting between Roth and

1    Creamer -- "but in July, Roth met Creamer in the

2    lobby of a Washington hotel."

3         Wasn't the first meeting between Roth and

4    Creamer in June?

5         A.    Those are -- I would have to look into

6    these facts.

7         Q.    Okay.  I'm just having trouble tracking

8    some of that.

9         Let me ask -- oh, yes.  Let me continue with

10   that regardless of when it took place.

11        "In July, Roth met Creamer in the lobby of a

12   posh Washington hotel.  Roth recorded the

13   conversation up close, but another one of our people

14   recorded the meeting from across the room.  The

15   meeting lasted more than an hour with Roth leading

16   the way through the conversation.  Roth promised

17   money if he could be assured of real -- in italics --

18   "real action in return.  He wanted Creamer to spell

19   out what form this action might take."

20        What did you mean by "real action"?

21        A.    I'm not sure what I meant.  I haven't

22   reviewed those materials today.  So I'd need to

1    review the materials to articulately answer that,

2    properly answer that.

3           Q.    You mean the book?

4           A.    Sure.  Even the book.  I haven't read

5    that recently.

6           Q.    Okay.  I'm happy to show you.

7           MR. CALLI:  What page are we reading from

8    now?

9           MR. SANDLER:  Well, the chapter is very short

10   and it begins on page 104.

11          MR. CALLI:  Page 104 to what page, please.

12          MR. SANDLER:  I'm asking about a passage on

13   page 107.

14          MR. CALLI:  All right.  Just read it.  It's

15   an exhibit.  You're going to be asked questions.

16   Just read it.

17          THE WITNESS:  Sure.

18          MR. SANDLER:  Well, I didn't make it an

19   exhibit, but it's all right for him to read it.

20          MR. CALLI:  He's going to read it

21   deliberately, not in any unnecessary length of time.

22          MR. SANDLER:  Absolutely fine.

```
 1              [Witness peruses document.]

 2              MR. CALLI:  Are you still going to ask him

 3    about Exhibit 12 or are you done with 12, Mr.

 4    Sandler?

 5              MR. SANDLER:  I'm done with 12.

 6              THE WITNESS:  Okay.  I've reviewed it.

 7    BY MR. SANDLER:

 8         Q.   Okay.  So let me ask you again what did

 9    you mean by Roth promised money if he could be

10    assured of real action in return?

11         A.   Well, we were trying to investigate and

12    follow up with the comments made by Mr. Foval about

13    this -- what Mr. Foval told us was this so-called

14    surrogate voter scheme and some of these illegal,

15    highly unethical, illegal, just awful things that

16    Foval was saying that they do.  I mean, they hire

17    mentally ill -- this is Foval's words, not mine.

18    They hire mentally ill people to do shit, is what

19    Foval said, to stir up violence and incite issues at

20    rallies.

21              So all of these activities and just illegal

22    and just fraudulent behaviors, we were -- Foval led
```

1    us to Mr. Creamer.  Foval introduced us to Mr.

2    Creamer.  So we were just doing our investigative

3    duty to follow up to see what these actions are.

4          Q.    Well, Mr. Roth, Mr. Sandini posing as

5    Mr. Roth, was offering Mr. Creamer money if he would

6    propose something illegal that you were looking for.

7    Right?

8          A.    Well, it was Mr. Foval that proposed the

9    illegal and awful conduct.  We were just following up

10   with Mr. Foval saying that he had a relationship with

11   Mr. Creamer.

12         Q.    But why would Roth promise money if he

13   could be assured of real action in return?

14         A.    Well, we're trying to investigate the

15   story that Mr. Foval told us was true.  Mr. Creamer

16   was the so-called dark hat, quote-unquote, diabolical

17   individual.

18         So our journalist was simply asking the

19   question to get -- to document the story that would

20   unfold.

21         Q.    So the journalist was hoping that by

22   promising Mr. Creamer money, Mr. Creamer would offer

1    to engage in an illegal plan.  Right?

2         A.    I wouldn't characterize it like that.

3         Q.    How would you characterize it?

4         A.    I would characterize it we're trying to

5    uncover what Mr. Creamer was actually doing.

6         Q.    By promising him money?

7         A.    By obtaining access, by gaining the

8    trust of a source in order to uncover evil dirty

9    deeds.  That's our responsibility.  That's what we

10   did.  That's what we do and we did it well, because

11   we found a story that definitely made its mark.

12        MR. SANDLER:  Let me ask that this be marked

13   as the next exhibit.

14                      [O'Keefe Exhibit No. 13 was

15                      marked for identification.]

16        [Witness peruses exhibit.]

17        THE WITNESS:  Okay.

18   BY MR. SANDLER:

19        Q.    I'm showing you what's been marked as

20   O'Keefe Exhibit 13.  I think this is -- I'm trying to

21   figure out if this, chronologically, is from the

22   bottom up or top down.  It looks like -- it's a

```
 1    little hard to tell.  Anyway, it looks like it's from

 2    the bottom up, and it begins with an E-mail that says

 3    on July 5, 2016 at 2:56 p.m. at James O'Keefe, III:

 4    This is a donor template for Bob Creamer.  This is a

 5    donor of ours, who sent in a small 1,000 or $2,000

 6    contribution to gain credibility for a larger 25,000

 7    and 50,000 contributions.

 8         Do you see that?

 9         A.    Yes.

10         Q.    What did you mean by "this is a donor

11    who sent in a small 1K or 2K contribution to gain

12    credibility for larger 25K and 50K contributions"?

13         A.    I believe -- honestly, I can't say with

14    certainty, what I was referring to here.  I don't

15    recall what I meant.

16         Q.    Okay.  Then your next paragraph says:

17    "Keep in mind, you can literally send a similar

18    E-mail to Bob, create a paragraph profile with

19    Sandini's picture in it, and use similar language in

20    a followup E-mail where you say to Bob 'attached

21    you'll find my brief profile; of course, you can find

22    out more about me by looking me up on FEC."
```

```
 1            Do you see that?

 2            A.    I do.  I see that.

 3            Q.    What did you mean by similar E-mail and

 4     create -- let me ask you piece by piece.

 5            What did you mean by literally send a similar

 6     E-mail to Bob?

 7            A.    I don't know what E-mail that refers to.

 8            Q.    Okay.

 9            A.    Similar E-mail.

10            Q.    And "create a paragraph profile with

11     Sandini's picture in it", what does that mean?

12            A.    I don't know what that refers to.

13            Q.    Okay.  Then it says:  "Follow-up E-mail

14     where you say to Bob 'attached you'll find my brief

15     profile; of course, you can find out more about me by

16     looking me at up on the FEC'."

17            What did that mean?

18            A.    I'm not sure here what that refers to.

19            Q.    Was the idea to use somebody who was

20     already a donor listed in FEC records?

21            A.    I don't know if that was the plan.  I'm

22     not certain.
```

1          Q.    Let me look -- direct your attention

2    then to the top E-mail, James O'Keefe, III, sent July

3    5, 2016 at 20:38, which I guess is 8:38 p.m., and it

4    says:  "Christian, why don't you take the lead in

5    giving that a shot.  Create a profile.  The heavy

6    lifting will be researching the correct donor name

7    that is a common one on the FEC website."

8          Do you see that?

9          A.    Okay.

10         Q.    And what did you mean by that?

11         A.    "Common one on the FEC website."  I'm

12   trying to remember what exactly I intended to say

13   here.

14         Well, I think in this case, the individual

15   would be someone who there are multiple people with

16   the same name, providing credibility to the

17   assignment.

18         Q.    So that if somebody looked up the name,

19   the pseudonym for your journalist, they would find it

20   on the FEC website as a donor.  Right?

21         A.    Correct.

22         MR. CALLI:  Which name?  Did you specify

```
 1   which name?

 2          MR. SANDLER:  The correct donor name that is

 3   a common one on the FEC website that Mr. O'Keefe is

 4   referring to in this E-mail.

 5          THE WITNESS:  Okay.  Yes.

 6   BY MR. SANDLER:

 7          Q.    All right.  Let me refer back again to

 8   your book.  You may need to look.  It's the following

 9   chapter.

10          On page 112, at the bottom, it says:  "After

11   the Republican Convention in mid-July, we went

12   several weeks without hearing from Creamer.  In due

13   time, we had Charles Roth, III E-mail Creamer and ask

14   for another D.C. meeting.  Creamer agreed, and this

15   time, he came with a proposal in hand as to how Roth

16   might invest his money.  None of his ideas were on

17   the face of things illegal.  The meeting lasted two

18   hours and it went well enough that Creamer felt

19   comfortable inviting Roth's niece to come work for

20   him as an intern."

21          Do you see that?

22          A.    I would like to review that.
```

1          MR. SANDLER:  Yeah.  Please.

2          [Witness peruses document.]

3          MR. CALLI:  Which page is that chapter,

4   please, Mr. O'Keefe?

5          THE WITNESS:  The chapter begin on page 108.

6   He's reading from 115.

7          MR. CALLI:  Thank you.

8          [Witness further peruses document.]

9          THE WITNESS:  Okay.  I've reviewed the

10  material.  If I can, I'd like to have the book here

11  just to reference while I answer your questions.

12  BY MR. SANDLER:

13          Q.   Sure.  So I'm asking about this

14  statement at the top of page 113:  "Creamer agreed.

15  This time, he came with a proposal in hand as to how

16  Roth might invest his money.  None of his ideas were

17  on the face of things illegal."

18          Do you see that?

19          A.   Yes.

20          MR. SANDLER:  Now I actually want to ask you

21  about a document in relation to that.  We'll have

22  this marked as the next exhibit.

```
 1                          [O'Keefe Exhibit No. 14 was

 2                          marked for identification.]

 3          [Witness peruses exhibit.]

 4          THE WITNESS:  Okay.

 5   BY MR. SANDLER:

 6          Q.    I'm showing you what's been marked as

 7   O'Keefe Exhibit 14.  At the bottom, there is an

 8   E-mail from Robert Creamer to Charles Roth.

 9          A.    Okay.

10          Q.    Do you see that?

11          A.    Yes.

12          Q.    And there, underneath that, it says:

13   "Charles, great seeing you again this weekend."

14          Then the E-mail says:  "I have attached a

15   modified plan that includes the earned media bus tour

16   we discussed that will focus on economic and

17   immigration issues and a voter mobilization program

18   in Milwaukee, Wisconsin."

19          Do you see that?

20          A.    Yes.

21          Q.    Is that the plan that you're talking

22   about in the book where you say none of the ideas
```

1    were on the face illegal?

2         A.    I'm not sure if that sentence in the

3    book refers to this particular plan or which portion

4    of the plan it refers to.

5         Q.    Okay.  If I could ask you to look at the

6    summary of the plan that's laid out by Mr. Creamer in

7    this E-mail, I'd like to ask you if, in fact, Mr.

8    Creamer is proposing anything illegal here.

9         A.    I would say it's unclear.

10        Q.    Is it -- okay.  Tell me what part of

11   this plan as summarized here in Mr. Creamer's E-mail

12   could be illegal?

13        A.    Well, Mr. Creamer references that the

14   voter mobilization program conducted by Voce de

15   Frontera works, quote, closely with Scott Foval, who

16   is also national field director for Americans United

17   for Change.  Americans United for Change will monitor

18   progress of that program, and based upon our -- the

19   testimony of Mr. Foval to Christian, talking about

20   all the illegal things that they intend to do, that's

21   a huge, huge -- where there's smoke, there's usually

22   fire.

1        The fact that Mr. Creamer is bragging about

2    how Foval, who was later terminated by Americans

3    United for Change, is the one who's leading and

4    responsible for monitoring the progress is a really

5    potentially big deal, and who knows all the, I mean,

6    unethical, illegal -- I mean, just reading this

7    chapter, I'm reminded of Zulema Rodriguez gloating

8    about how she is contracted with the campaign to do

9    disruptions and planned diversion.  I don't know if

10   that's illegal, but it's unethical and it's a big

11   story.

12        Q.   But is there anything that -- apart from

13   the fact that Foval is supposed to have a role in

14   this, is there anything in Creamer's plan that was,

15   in fact -- he's proposing here that would be illegal?

16        A.    There's no specific plan.  He's just

17   detailing the fact that Mr. Foval, Scott Foval, who

18   conveniently cannot be located for a deposition in

19   this case, that's pretty unbelievable in my opinion.

20   Mr. Foval is responsible for overseeing the voter

21   mobilization program.

22        Everything that Mr. Foval described and

1   discussed with us in that videotaped encounter in the

2   restaurant is 100 percent illegal.

3        Q.    You said there was no plan, but, in

4   fact, Creamer did propose a plan to be funded by Mr.

5   Roth.  Right?

6        A.    Are you asking about this document?

7        Q.    Yes.

8        A.    Or a different document?

9        Q.    This document.

10       A.    This document has a voter mobilization

11  program overseen by Mr. Foval.  Mr. Foval in the bar

12  was describing all these illegal things that he was

13  going to do.  Mr. Foval was terminated for his

14  unethical conduct and now, conveniently, cannot be

15  located for a deposition.

16            You don't have to be an investigative

17  reporter.  This is outrageous.

18       Q.    Okay.  But --

19       A.    It's my job to follow up on it and

20  continue on with the investigation, which is what we

21  did.

22       Q.    Okay.  But there was nothing illegal

 1    that Creamer proposed?

 2         A.    There's nothing proposed in this

 3    document.  It's just Mr. Foval is going to oversee a

 4    voter mobilization program.  That's what I read.

 5         MR. SANDLER:  All right.  Let me ask that this

 6    be marked as the next document.

 7                        [O'Keefe Exhibit No. 15 was

 8                        marked for identification.]

 9         THE WITNESS:  I have to use the bathroom very

10    quickly.

11         MR. SANDLER:  Sure.

12         VIDEOGRAPHER:  We'll go off the record at

13    12:14 p.m.

14         [Discussion held off the record; whereupon,

15    at 12:14 p.m., a lunch recess was taken, to reconvene

16    at 1:15 p.m. this same day.]

17

18

19

20

21

22

1        A F T E R N O O N    S E S S I O N

2        VIDEOGRAPHER:  We are on the record at 1:14

3    p.m.

4        FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

5        MR. SANDLER:  Okay.  Before the lunch break,

6    Mr. O'Keefe, I handed you a document marked as

7    O'Keefe Exhibit 15, which is an E-mail from Christian

8    Hartsock dated 26 August 2016 to Mr. Halderman and a

9    number of people copied on it, including you.

10        MR. CALLI:  Mr. Sandler, may I have a copy?

11        MR. SANDLER:  Oh, sorry.

12        MR. CALLI:  Thank you.

13    BY MR. SANDLER:

14        Q.    And it says:  "Can everyone please

15    review this and have it handy for a group call at 4

16    p.m. EST?"

17        Then there's a document attached to it

18    entitled "Democracy Partners/Americans United for

19    Change Next Steps".  Do you see that?

20        A.    Yes.

21        Q.    Do you recall receiving this document?

22        A.    I believe -- I don't recall the

1  document, but based upon the affidavit, I know I

2  received it.

3      Q.    And do you recall the group call that

4  took place that Mr. Hartsock is referring to?

5      A.    I don't.

6      Q.    If I could ask you to look at the first

7  page -- the second page of O'Keefe Exhibit 15.  Under

8  the first heading, it says:  "Roth goes to Foval to

9  reengage him on implementing surrogate voting and

10  Trump rally tactics and, but extension, AUFC."

11      Do you see that?

12      A.    Yes.

13      Q.    And then there's Reasons A, B, C, D, and

14  Reason B says:  "Contrary to Foval's

15  characterization, it appears Foval is the dark hat

16  and Creamer is the white hat.  This is likely because

17  of Creamer's ex-convict status."

18      Did you have any understanding of what Mr. --

19  first of all, who wrote this document?

20      A.    It appears to be Hartsock.

21      Q.    Okay.  Did you have any understanding of

22  what Mr. Hartsock meant by saying it appears Foval is

1    the dark hat and Creamer is the white hat?

2         A.    Let me just review this for a minute.

3    Let me just review the document.

4         MR. SANDLER:  Sure.

5         [Witness peruses exhibit.]

6         THE WITNESS:  Well, while I'm not certain

7    what Christian means exactly, I can say with

8    confidence that Foval talked about this -- how

9    Creamer is this -- wears the hat.  It appears to me,

10   based upon everything that's occurred, that Foval has

11   people do his dirty work for him, like Scott Foval,

12   Lauren Windsor, Zulema Rodriguez.  All of these

13   people, he has them do all of these activities,

14   including Mr. Foval himself.

15        MR. CALLI:  You said Foval has people.

16        THE WITNESS:  I'm sorry.  Creamer has people

17   do it.  I misspoke.

18        Creamer has all of these other people, these

19   minions, these people that he delegates this conduct

20   to, Foval supervising the voting efforts, Zulema

21   Rodriguez bragging about disrupting, causing

22   diversions and disrupting events, and Windsor, who

1    chased Allison Maass down the street, saying that she

2    has been creamed -- creamed -- that Foval himself

3    supervised this and came up with the ideas, but he

4    had these minions execute these plans.

5    BY MR. SANDLER:

6           Q.    And what --

7           A.    That's what we discovered, and not only

8    did we discover it, it was discovered through the

9    discovery process in this lawsuit.

10          Q.    And what voter fraud plans did Scott

11   Foval execute at the direction of Mr. Creamer?

12          A.    What voter fraud plans did Scott --

13   Scott Foval discussed in that Garfield meeting, you

14   know, not just a surrogate voter fraud plan, but how

15   they hired and what Foval said they hired mentally

16   ill people to disrupt campaign rallies.  He described

17   very unethical activities.

18          Q.    And you had -- you recorded Mr. Creamer

19   directing Mr. Foval to do those activities?

20          A.    No.  No, because Mr. Creamer is not

21   going to admit this in a document.  He's not going to

22   say it on the record.  This belies the very purpose

```
1    of Project Veritas' existence.

2           Q.    Well, Mr. Creamer, you taped Mr. Creamer

3    surreptitiously.  Rightly?

4           A.    Absolutely.

5           Q.    And he didn't admit it on the undercover

6    tapes, did he?

7           A.    He did admit to certain things.

8           Q.    Did he admit to engaging in voter fraud?

9           A.    No.  He admitted that Hilary knew about

10   the plans to put ducks on the ground, and it was her

11   idea.  Creamer admitted that it was -- that what was

12   then considered to be the favored candidate for

13   president of the United States' idea to put ducks on

14   the ground, which was a very big story.

15          Q.    But I'm not talking about the ducks

16   right now.  We'll get to that.

17          A.    Okay.

18          Q.    I'm talking about voter fraud.

19                Let me refer you to page 116 of your book.

20          A.    Okay.

21          Q.    Oh, no.  Wait a minute.  I'm sorry.

22                Okay.  Page 131 of your book.  It's the fourth
```

1   full paragraph.  You can look at it.

2        "As a general understanding, we try to get

3   information out of the person with whom we are

4   speaking without giving away the game.  In this one

5   particular case, we were trying to extract a key bit

6   of data from the usually gregarious Scott Foval.

7   Back in Wisconsin, he had told Steve about his

8   conversation with Creamer in regards to Steve's

9   surrogate voter plan.  The first 'he' in the passage

10  that follows refers to our imaginary donor, Charles

11  Roth.  Bob is Creamer.  Here is what we recorded

12  Scott Foval saying:

13       Bob came back to me and asked me what is he,

14  Roth, talking about.  I told him what we were talking

15  about.  He said I'm not going to touch that with a

16  10-foot pole, nor should you, nor should you.  He

17  goes, Good, glad we're on the same page there;

18  however, other people can make things happen you

19  don't need to know about.  'Other people', those are

20  the magic words, the key to the next level of

21  information."

22       Do you want to look at this?

1          A.     Sure.

2                [Witness peruses document.]

3                THE WITNESS:  Okay.  I've reviewed the

4     passage in question.

5                MR. SANDLER:  Okay.  Let me ask that this be

6     marked as the next exhibit.

7                               [O'Keefe Exhibit No. 16 was

8                               marked for identification.]

9                THE WITNESS:  Okay.

10    BY MR. SANDLER:

11         Q.     This appears -- again, if you look at

12    the first E-mail listed, it says from Christian

13    Hartsock and there's some attachment, which is

14    unclear.  The second E-mail is from Russell Verney to

15    a number of individuals, including you, or to

16    Brittney Rivera, copied to a number of individuals,

17    including you, Subject:  Re:  Foval AAR.

18                Then it has -- if you look at the -- it says:

19    "Sounds like Foval admits that Creamer was just

20    playing Dan for money and Creamer was not going to

21    provide Dan with a plan that Dan would actually like.

22    Russ."

1          Then it has the same language that's in the

2     book:  "Bob came back to me and asked me what is he

3     talking about."

4          Do you see that?

5          A.    Yes.

6          Q.    What did Mr. Verney mean by saying it

7     sounds like Foval admits Creamer was just playing Dan

8     for money and Creamer was not going to provide Dan

9     with a plan Dan would actually like?

10         MR. CALLI:  Objection to what somebody else

11    meant.

12    BY MR. SANDLER:

13         Q.    What did you understand Mr. Verney to

14    mean by that?

15         A.    I don't understand what he means.

16         Q.    Okay.  Then you say in the E-mail above

17    that from yourself to Mr. Verney and Brittney Rivera

18    dated September 16th at 9:22 a.m.:  "Can we find the

19    other people?"

20         Do you see that?

21         A.    Yes.

22         Q.    And does that refer to other people that

1    Mr. Foval was quoting Mr. Creamer is talking about?

2         A.    Yes.

3         Q.    Okay.  Now, the quoted language here and

4    in the book that starts "Bob came back to me and

5    asked me what is he talking about", that was Mr.

6    Foval talking.  Right?

7         A.    That was Mr. Foval quoting Creamer in a

8    conversation with Charles Roth.

9         Q.    But you --

10        A.    I'm sorry.  In a conversation with Mr.

11   Packard, Christian Hartsock.

12        Q.    Right.  Between Foval and Packard?

13        A.    Correct.

14        Q.    And you never recorded Mr. Creamer

15   saying other people can make things happen.  Right?

16        A.    No, because Creamer had a bunch of

17   minions, Scott Foval, Lauren Windsor, and Zulema

18   Rodriguez, who did all his dirty work.

19        Q.    Okay.  And with respect to dirty work in

20   regard to voter fraud, what other people did you

21   discover carrying out -- if any, carrying out Mr.

22   Creamer's vote fraud plans?

1        A.      According to the exhibit that you

2   previously showed me in this deposition, it was Mr.

3   Foval who was, apparently, supervising, said voter

4   fraud mobilization efforts.

5        Q.      And did you discover any fraud in the

6   mobilization efforts that Mr. Creamer described in

7   that plan, any actual voter fraud taking place?

8        A.      No.  That was not the subject of the

9   investigation.  No.

10       Q.      Okay.  And did you ever find these other

11  people?

12       A.      I'd have to review the rest of this to

13  refresh my memory.

14       Q.      You don't recall one way or the other

15  whether you found -- this is one of the most

16  important stories Project Veritas ever did.  Right?

17       A.      Right.

18       Q.      Did you uncover any actual voter fraud

19  taking place?

20       A.      We -- I can speak to the facts of what

21  Mr. Foval stated in that Garfield's restaurant.  I

22  can speak to what he said, and we attempted to

1    corroborate it.  We attempted to go and get the other

2    people through -- I believe it was Mr. Vargas is one

3    of the individuals we spoke to, Voces de la Frontera.

4    It's all documented here.

5            Q.    And did you find any such corroboration?

6            A.    Well, you have to -- well, let me put it

7    this way:  Often times, the story is not what you

8    think the story is going to be.  I think we found a

9    bigger story.  I think the story about the president

10   of the United States knowing about ducks on the

11   ground and Creamer saying that no one is supposed to

12   know about that is a bigger story, as far as I'm

13   concerned.

14           Q.    Okay.  Bigger than voter fraud?

15           A.    Yes.

16           Q.    Okay.

17           A.    Because it involves Hilary Clinton,

18   potentially president of the United States, future

19   president of the United States.

20           MR. SANDLER:  Before we leave the voter fraud,

21   let me ask that this be marked as the next exhibit.

22                           [O'Keefe Exhibit No. 17 was

```
 1                    marked for identification.]

 2   BY MR. SANDLER:

 3        Q.   I'm showing you what's been marked as

 4   O'Keefe Exhibit 17.  This is two E-mails.  The bottom

 5   E-mail is from John Solomon, 12:51 p.m., who writes:

 6   "Joe, I know we asked this before, but want to check

 7   one more time.  Are there any videos in which Foval,

 8   Creamer, or Vargas ever state they don't want to

 9   commit voter fraud?  Just want to triple check we

10   haven't missed anything."

11        Do you see that?

12        A.   Yes.

13        Q.   And Joe is Joe Halderman.  Right?

14        A.   Yes.

15        Q.   And John Solomon, is he the reporter

16   that used to be with the Associated Press?

17        A.   I don't know if he was with the

18   Associated Press.

19        Q.   But he was a reporter for Circa News at

20   the time this was --

21        A.   Yes.

22        Q.   Okay.  And then it says:  "Second check.
```

1    Want to make sure I have the sequence right.  PV

2    started with Foval who hooked you up to Creamer who

3    took the 20,000 and then you kept working both.  How

4    soon after the Creamer conversation about helping you

5    with voter fraud did Foval hook you up with Vargas?"

6         Do you see that?

7         A.    Yeah.  Yes.

8         Q.    What Creamer conversation took place

9    about helping Project Veritas with voter fraud or any

10   of its journalists?

11        A.    I'd have to go back and check the book

12   and read thoroughly the events that transpired.  I

13   did not read the book in preparation for this

14   deposition.  So I would have to go back and check the

15   notes there.

16        Q.    Okay.  Up at the top, then Joe Halderman

17   responds to Mr. Solomon with an E-mail, October 15,

18   2016.  It says:  "John, Creamer says to Roth in one

19   meeting that what he's talking about would probably

20   be voter fraud.  Would need to run it by the legal

21   team and it wouldn't pass."

22        Do you see that?

1          [Witness peruses exhibit.]

2          THE WITNESS:  Okay.  I see it.

3   BY MR. SANDLER:

4          Q.   That conversation which Creamer says to

5   Roth, that what he's talking about would be voter

6   fraud and wouldn't pass the legal team, did you

7   include that in the video that you broadcasted for

8   the -- posted for the public?

9          A.   I would have to check to see that

10  reporting, if I could watch that part of the

11  recording.  I can't confirm if that was part of the

12  recording unless I can see it.

13         Q.   Do you have any reason to believe that

14  Halderman isn't telling the truth to Mr. Solomon?

15         A.   No.  I have no reason to believe that.

16         MR. SANDLER:  Okay.  Let me ask that this be

17  marked as the next exhibit.

18                        [O'Keefe Exhibit No. 18 was

19                        marked for identification.]

20  BY MR. SANDLER:

21         Q.   I'm showing you what's been marked as

22  O'Keefe Exhibit 18.  This appears to be an E-mail

Case 1:17-cv-01047-ESH   Document 68-4   Filed 06/03/19   Page 54 of 109

1    from Mr. Konstanzer to you dated September 19, 2016.

2    Do you see that?

3            A.    Yes.

4            Q.    Then it's forwarding an E-mail from

5    Christian Hartsock to Mr. Konstanzer dated September

6    17th.  Do you see that?

7            A.    Yes.

8            Q.    Okay.  This -- do you want to take a

9    minute to look at this?

10           A.    Yes.

11           MR. SANDLER:  Okay.

12           [Witness peruses exhibit.]

13           THE WITNESS:  Is there a particular issue or

14   question I should be considering while I'm reviewing

15   this?

16           MR. SANDLER:  Yes.  Well, I'm trying to

17   understand two things.  I'm trying to understand the

18   nature of the dispute about strategy and then I'm

19   going to ask you about the top of the second page.

20           THE WITNESS:  Okay.

21           [Witness further peruses exhibit.]

22           THE WITNESS:  Okay.  I've reviewed the

1    document.

2    BY MR. SANDLER:

3         Q.    Okay.  If you could look at the bottom

4    of the first page of O'Keefe Exhibit 18.

5         A.    Okay.

6         Q.    It says:  "The strategy in question was

7    repeated on the call three times before I had a

8    chance edgewise to express my concerns about it."

9         Do you know -- of course, this was not

10   originally to you, but did you have an understanding

11   of what strategy Mr. Hartsock is talking about in the

12   E-mail to Mr. Konstanzer?

13        A.    I do not.

14        Q.    You do not, okay.  Was there some kind

15   of a dispute about strategy on which Mr. Hartsock was

16   advocating one view and others were advocating

17   another view?

18        A.    I don't recall what that is here.

19        Q.    You don't recall such a dispute?

20        A.    I don't recall that, no.

21        Q.    At the top of the second page, it says:

22   "The basis is that Charles Roth, reasonably

1    disgruntled with the thanks shown him for his 20,000

2    donation and reasonably disappointed with the

3    ill-communicated resistance to his surrogate voter

4    strategy, now offers a last chance donation, but on

5    the condition that Steve Packard be deputized as a

6    birddogger or observe the training process for

7    birddoggers."

8           First of all, did you understand what Mr.

9    Hartsock was talking about, using the term

10   "birddoggers"?

11          Did the term mean anything to you when you

12   read that?

13          A.    I don't recall if the term meant

14   something to me at the time of this document, but I

15   know the term means something to me now.

16          Q.    What does it mean to you now?

17          A.    Well, again, I'd have to check the

18   entirety of the story, because I didn't get into the

19   details.  I would be speaking not fully accurately,

20   but I can attempt to answer your question.

21          What Scott Foval said in his meetings with

22   Christian Hartsock was something to the effect of you

1   will be attacked at Trump rallies; that's what we

2   want, is what he said.  He said we want you to be

3   attacked and this process was something called

4   bracketing, is another term.  There's a term

5   "birddogging".  These are all terms used.

6        You seem confused, but these are terms used by

7   your client, not me, and Mr. Foval used these terms,

8   "birddogging" and "bracketing", and Mr. Foval would

9   talk about how they want people to get punched and

10  attacked.  He was taking credit for this behavior,

11  and Mr. Creamer said that Hilary Clinton knew about

12  it.

13       So this term "birddogging" was central to the

14  investigation, this idea of inciting or planting,

15  fomenting violence at rallies.  So that's the term in

16  question and I assume that's what it means by

17  bringing it up.

18       Q.   You taped Mr. Creamer saying that Hilary

19  Clinton knew about operatives fomenting violence at

20  Trump rallies?  That's what you just said?

21       A.   Well, he said that Hilary knows about

22  the ducks on the ground.  Actually, he said it was

1    her idea.  He went a step further.

2            Q.    And the ducks on the ground relate to --

3    I'm sorry.  Finish your answer.

4            A.    He went a step further.  He said it was

5    actually Hilary Clinton's idea and then he said don't

6    repeat that to anybody.  I don't know why he wouldn't

7    want that repeated.  What wrong with what he said?

8    Why would he want to keep that secret?

9            Q.    Sure.  We'll get to that in a minute.

10           What is the relation between the ducks and

11   fomenting violence at Trump rallies?

12           A.    Well, Scott Foval makes it clear --

13   again, Mr. Creamer is -- to, you know, answer the

14   question, he is getting all of his people, Scott

15   Foval, Zulema Rodriguez, Lauren Windsor, to carry out

16   these operations.  He's deputized these people to do

17   this for him, and they are describing situations

18   where they are creating a disruption, and Scott Foval

19   makes it clear that these disruptions have, indeed,

20   resulted in violence.  In fact, that's what Scott

21   Foval said he wants to have happen.

22           Q.    The demonstrations involving the people

1    dressed as ducks --

2            A.    Mr. Creamer doesn't --

3            Q.    -- resulted in violence?

4            A.    Mr. Creamer doesn't do it himself.

5    He's, I guess, the director or the overseer of these

6    activities.

7            Q.    And the demonstrations involving the

8    duck -- people dressed in duck costumes resulted in

9    violence?

10           A.    Potentially, yes.

11           Q.    Well, potentially?  There was lots of

12   demonstrations with the ducks.  Right?

13           A.    I'd have to check the book and read all

14   the facts to get -- to refresh myself on all the

15   specifics, but that is, indeed, what Scott Foval

16   stated in his transcripts.  I can only speak to the

17   transcripts, the facts that are part of the

18   investigation.

19           Q.    Yeah, but these duck demonstrations took

20   place in public.  Right?

21           A.    I'd have to check my notes.  I'd have to

22   check the book and review all the facts.

1          Q.    To know whether the duck demonstration,

2    the most important things that Project Veritas ever

3    revealed, you would have to check your notes to know

4    if they resulted, actually resulted, in violence?

5          A.    I believe they did.  I would have to

6    check those notes.

7          Q.    You believe they did?

8          A.    I'd have to check my -- the records

9    there.

10         Q.    Okay.  And you said that -- you made a

11   big deal of the fact or you emphasized the fact that

12   Mr. Creamer didn't want anyone to know that Hilary

13   Clinton was behind the duck demonstrations and you

14   didn't know why that would be?

15         MR. CALLI:  I'm sorry.  I don't understand

16   the question.

17   BY MR. SANDLER:

18         Q.    What was your understanding of why Mr.

19   Creamer wanted to keep that a secret?

20         A.    I think that it's very interesting that

21   he would want to keep it a secret.

22         Q.    Wasn't there a -- didn't he offer an

1   explanation for that?

2        A.    I don't think Mr. Creamer is the type of

3   man who's going to -- I think Mr. Creamer is rather

4   sophisticated and I don't think he's the type of man

5   that would say here's all the fraud that we're going

6   to commit.  I don't think he speaks the way that Mr.

7   Foval and Lauren Windsor and Zulema Rodriguez do.

8        All of these individuals -- I mean, Zulema

9   Rodriguez admitted to disrupting the highway event.

10  Again, I'd have to read the facts to provide you with

11  specific details, but Lauren Windsor admitted to

12  creaming this girl and chasing her down the street

13  and calling her a bitch.

14       Q.    That was --

15       A.    This is not behavior that Mr. Creamer

16  does, but he's the director, and when he said the

17  term -- that, you know, Hilary knows the chain of

18  command and he also said something to the effect of

19  it was Hilary's idea to put ducks on the ground, that

20  was shorthand for taking credit for all of these

21  activities and he was admitting it.

22       Q.    It's shorthand for taking credit for

 1    disruption caused by Zulema Rodriguez?  I don't

 2    understand what --

 3         A.    Ms. Rodriguez --

 4         Q.    Did you -- let me rephrase the question.

 5         MR. CALLI:  Wait.  Wait.  First, before the

 6    court reporter says it, she can only take down one of

 7    you.  On her behalf, I'll say that.

 8         Second, please let the witness finish his

 9    answer.  I think it's ironic that you and your client

10    want to accuse, falsely, Mr. O'Keefe of manipulating

11    videotape and not publishing and, yet, you don't want

12    him to finish his answers on the record on videotape.

13         MR. SANDLER:  No.  Of course I want him to

14    finish his answers.

15         MR. CALLI:  Well, then let him.

16         THE WITNESS:  I would love the opportunity to

17    read the transcripts and review the facts, because --

18         MR. CALLI:  Let's just testify about your

19    memory and not about the book.

20         THE WITNESS:  Sure.

21         MR. CALLI:  Okay?

22         THE WITNESS:  Sure.  My memory is Zulema

1    Rodriguez told us that he's working with Mr. Creamer.

2    That's what she said.  That's what -- that's in the

3    videotape.  That's part of what she stated.  She said

4    that she's causing disruptions.

5         Mr. Foval said that he works with Mr.

6    Creamer.  Mr. Creamer stated that he has Foval manage

7    these operations.  Mr. Creamer then stated that it

8    was Hilary's idea, Hilary Clinton, the candidate for

9    president, that it was her idea to put these ducks on

10   the ground.  That's a big story.  That's a huge

11   story.

12   BY MR. SANDLER:

13        Q.    Okay.  Why is it a huge story?

14        A.    To admit that don't tell anybody, that

15   it was Hilary's idea.  He's contracted with the

16   Hilary Clinton campaign to, I guess, dress people up

17   in Donald Duck costumes and his minions would say

18   that we do this at events to cause disruptions.

19        The public thinks that these things are

20   organic.  The public thinks that this violence is

21   caused by something else, and for this man to admit

22   that it was the future president -- this is his words

```
1    -- the future president of the United States' idea to

2    dress people in such a manner and describes the

3    relationship -- his colleague does -- the financial

4    fiduciary relationship through a series of

5    subcontracting groups, which the discovery process in

6    this litigation has corroborated and revealed the

7    names of those subcontractors, the names of which I

8    can't recall here right now, but my attorney has it.

9         The money went from the Hilary Clinton

10   campaign through Democracy Partners through a

11   subcontractor group to, quote, go and execute the

12   shit on the ground, closed quote.  That's a big

13   story.

14        Q.   Who told you that there was money from

15   the Hilary Clinton campaign?

16        A.   Scott Foval did.

17        Q.   But you're claiming that there's

18   documents that were discovered in this case that

19   corroborate that?

20        A.   Yes.

21        Q.   Okay.  And the reason that Mr. Creamer

22   didn't -- going back to the reason Mr. Creamer didn't
```

1    want this ducks operation associated with the DNC,

2    you, yourself, identified the reason for that in your

3    book.  Right?

4           A.     Remind me.

5           Q.     All right.  At the bottom of page 114,

6    it says:  "Here's Creamer explaining how the whole

7    process worked.  The duck has to be an American

8    United for Change entity.  This has to do only with

9    the problem between Donna Brazile and ABC, which is

10   owned by Disney, because there was a trademark issue.

11          That's why it's really silly.  We originally

12   launched this duck because Hilary Clinton wants the

13   duck.  In any case, she really wanted this duck

14   figure doing this stuff.  So that was fine.  So we

15   put all these ducks out there and got a lot of

16   coverage and Trump taxes and then ABC Disney --

17          MR. CALLI:  Slow down.

18   BY MR. SANDLER:

19          Q.     I'm sorry.

20          "And then ABC Disney went crazy, because

21   our original slogan was Donald Duck's taxes,

22   releasing his tax returns.  They said it was a

```
 1   trademark issue.  It's not, but anyway, Donna Brazile

 2   had a connection with them and she didn't want to get

 3   sued.  So we switched the ownership of the duck to

 4   Americans United for Change."

 5        Isn't that the explanation why he didn't want

 6   it known?

 7        A.   May I see that, please?

 8        MR. SANDLER:  Sure.

 9        [Witness peruses document.]

10        THE WITNESS:  So I would add to what you

11   commented on here that the direct involvement of the

12   Clinton campaign and the DNC with American United for

13   Change, the entity that Scott Foval was in charge of,

14   working with Bob Creamer --

15        MR. CALLI:  Slow down.

16        THE WITNESS:  -- smacked of illegally

17   coordinated campaign expenditures.  Federal campaign

18   law experts told us the ducks on the ground are

19   likely public communications for purposes of the law.

20   Its political activity opposing Trump paid for by a

21   C-3, Americans United for Change, but controlled by

22   the campaign, this was a violation of the law.
```

1    Representatives of the campaign participated in

2    conference calls with Creamer and their operatives.

3    They were talking about where to send the duck and

4    the duck's messages.  The DNC participated as well.

5    This is not hearsay.  Our people witnessed the calls.

6        Donna Brazile, then head of the DNC, would

7    say in her book about this incident, quote, I watched

8    O'Keefe's video with a sinking heart, knowing this is

9    something we could not fight back against.  Scott

10   Foval told Christian Hartsock about the duck

11   campaign; we have to clear this with the DNC; we have

12   to clear which message we're going to be targeting at

13   which event.

14       Foval and Creamer told our people that the

15   DNC didn't just help place Donald Duck at protests.

16   They were in charge of the duck.  For all their

17   indiscretion, these guys really wanted to keep a

18   secret, but what we didn't know until we met with Mr.

19   Foval was it was, according to Mr. Creamer, Hilary

20   Clinton's idea and he did not want people to know

21   that for, apparently, at least one of the reasons was

22   all the aforementioned facts that I just stated.

1   BY MR. SANDLER:

2        Q.    Okay.  Let me ask you this since it's

3   obviously -- you know, you put it in a book.  It's a

4   waiver of the attorney-client privilege.

5        What campaign finance experts told you that

6   demonstrations were -- the duck demonstrations were

7   public communications under the Federal Election

8   Commission rules?

9        MR. CALLI:  What was the question?  You keep

10  staring at Mr. Klein.

11       MR. SANDLER:  Well, I know it wasn't Mr.

12  Klein because it's so off base.

13       MR. CALLI:  What was the question?

14  BY MR. SANDLER:

15       Q.    The question is what federal campaign

16  finance experts -- the book says:  "Federal campaign

17  law experts told us specifically, quote, the ducks on

18  the ground are likely public communications for

19  purposes of the law.  It's political activity

20  opposing Trump paid for Americans United for Change

21  funds, but controlled by Clinton, her campaign, end

22  quotes.

```
 1              I want to know what federal campaign experts

 2    told you that.

 3         A.    I would have to speak with those

 4    attorneys and review these memorandums to answer that

 5    question.

 6         Q.    Did they put that in writing?

 7         A.    I believe at least on one occasion, yes.

 8         Q.    Okay.  Apart from the supposed illegal

 9    coordination -- and let me go back and say it was

10    your recollection that the duck demonstrations

11    fomented violence; is that what you testified to?

12         A.    Yes, and I'd have to go back and look at

13    the facts.  From memory, it's -- I did not read all

14    of the facts in preparation for this deposition.  So

15    my memory does not fully serve me on all of the facts

16    of this investigation.  As big of an investigation as

17    this is, as consequential as this is, I just don't

18    recall the specifics involved.

19              I can review those and answer your questions,

20    but to the best of my memory, Scott Foval stating

21    that if you're there and protesting at Trump rallies,

22    you will be attacked and that's what we want, that's
```

1    what Mr. Foval stated.

2         Q.    But the duck -- my question is did the

3    duck demonstrations, did they either -- did they

4    result in people being attacked at Trump rallies?

5         A.    I believe there was some discussions

6    with a man named Aaron Black or Aaron Minzer inside

7    -- who worked alongside Creamer.  There was some

8    additional corroboration about that.  There was some

9    additional recordings and reporting done on that.

10        Aaron Black was his, I guess pseudonym, or nom

11   de plume that Allison spoke with about that.

12        Q.    And what did Mr. Black corroborate?

13        A.    I'd have to check the story.

14        Q.    Okay.  Do you think that if the duck

15   demonstrations actually resulted in violence that

16   that would have been reported by the media at the

17   time?

18        A.    Well, a lot of these rallies, they did

19   result in violence, the Chicago rally.  Foval

20   mentioned some of the rallies.  Zulema Rodriguez

21   mentioned the disruptions.  I believe it was Arizona.

22   She specifically said that we caused this diversion.

1    It's all here.

2         Q.    And did they use ducks, people dressed

3    as --

4         MR. CALLI:  James, why don't you listen to

5    the question instead of trying to copy Mr. Sandler's

6    review of your book.

7         THE WITNESS:  Sure.

8         MR. CALLI:  If he wants to review your book,

9    that's his prerogative.  You need to listen to the

10   question.  Keep your nose out of the book.

11        Fair enough?

12   BY MR. SANDLER:

13        Q.    I'm asking -- yeah.  I'm just asking

14   whether Project Veritas discovered, whether through

15   surreptitious taping or any other means, that the

16   disruption in Arizona involved people dressed, any of

17   the people dressed, in duck costumes?

18        A.    I don't recall.

19        Q.    Okay.  Now, there came a time when

20   Allison Maass was offered an internship at Democracy

21   Partners.  Right?

22        A.    Yes.

```
1          Q.    And she misrepresented herself as Angela

2     Brant to Mr. Creamer in obtaining that internship.

3     Right?

4          A.    Yes.  She went by Angela Brant.

5          Q.    And she had a fake ID.  Right?

6          A.    Yes.

7          Q.    And handed in a fake resume to Democracy

8     Partners?

9          A.    Well, let me go back and clarify.  I'm

10    not sure if she had a fake ID.  I don't know if

11    that's accurate.

12         Q.    Okay.  Let me again refer to your book,

13    and I'm not reviewing it, but since you said it, I

14    think it's fair to ask whether some things you say in

15    there are true.

16         MR. CALLI:  I didn't say it wasn't fair.  I

17    just said if you wanted to spend your time on a book

18    review, that's your prerogative.

19    BY MR. SANDLER:

20         Q.    At the bottom of page 115, it says --

21    it's talking about Angela Brant going into Democracy

22    Partners:  "There was a security desk with a sign
```

1    saying 'Visitors must sign in'.  That was not so

2    good.  Angela had no Angela Brant identification

3    beyond a fake college ID."

4           So she did have a fake college ID.  Right?

5           A.    I apologize.  Earlier, you said fake ID.

6    I didn't know what you were referring to.

7           Q.    I'm sorry.

8           A.    There's a difference between a fake ID

9    and college badge of some type.

10          Q.    Well, she had a fake college ID.  Right?

11          A.    Okay.  There's a difference between a

12   fake driver's license and a fake college badge.

13          Q.    Okay.  Then on page 116 -- let me just

14   see.

15          Actually, let me ask you what -- I'm

16   interested in the distinction you drew between a fake

17   college ID and a fake driver's license.  What's the

18   -- why is the difference between those important?

19          A.    Well, they're not the same.

20          Q.    They're both intended to deceive though.

21   Right?

22          A.    Well, it depends upon what the purpose

1   of this is, what the purpose of the activity would

2   be; but in our cases, we're actually intending not to

3   deceive.  We're intending to illuminate and expose

4   truth.

5           Q.    Well, it was intended to deceive Mr.

6   Creamer.  Right?

7           A.    I suppose.

8           Q.    At the bottom of page 116 of your book,

9   it talks about Ms. Maass at -- her internship with

10  Democracy Partners.

11          It says:  "The life of an undercover

12  journalist is, I repeat, not an easy one.  Angela

13  would work throughout the day and return after work

14  alone to her Air B&B, there to review her footage and

15  communicate with the office.  Staying in character

16  was hard enough during the work day.  She did not

17  want to jeopardize her mission by partying at night.

18  Other journalists have lost their jobs at Project

19  Veritas for doing that.

20          In the morning, she would take the Metro into

21  the office, living the life not of a well-paid

22  professional reporter, but of an intern scraping by.

1    Her daily movements had to reflect her assigned role.

2    She was literally living out her character in

3    American's capital city, much as Americans overseas

4    did in Moscow during the Cold War."

5         Did you write that?

6         A.    Yes.

7         Q.    And the Americans overseas, living in

8    Moscow during the Cold War, were spies.  Right?  Not

9    journalists?

10        A.    Yes.

11        Q.    And then the next sentence says:

12   "Angela disciplined herself to be the person Creamer

13   thought she was."

14        So she was -- again, she was playing a role in

15   order to deceive Mr. Creamer.  Right?

16        A.    Okay.

17        Q.    And is the answer to that yes?  You say

18   said "okay".

19        A.    Right.  I take issue with the

20   characterization of the focus on the deception, but

21   we use undercover techniques and we don't intend to

22   deceive the public.  We're trying to get to the

 1   truth, essentially.

 2          Q.    Okay.  Over the top of the next -- then

 3   it says:  "Angela disciplined herself to be the

 4   person Creamer thought she was.  He liked that person

 5   well enough to take her with him when he visited the

 6   Democracy National Committee Headquarters, a few

 7   blocks south of the Capitol.  The last time

 8   operatives got caught stealthily entering the DNC

 9   Headquarters, those headquarters were in the

10   Watergate complex."

11          So, I mean, you believe that Ms. Maass entered

12   the DNC Headquarters in the same way that the

13   Watergate burglars did?

14          A.    No.

15          Q.    Because -- and explain the difference to

16   me.

17          A.    Let me review the passage you just read

18   --

19          Q.    Sure.

20          A.    -- since you're referring to the book.

21          MR. SANDLER:  Um-hum.

22          [Witness peruses document.]

1              THE WITNESS:  Okay.  It was, obviously, a

2     different circumstance.  The Watergate matter was

3     also involving the DNC, which is an historically

4     interesting parallel.  Bob Woodward, actually, was

5     eventually asked about this investigation, I believe,

6     on Fox News Channel, not for that particular

7     anecdote, but just that it was an interesting

8     historical parallel involving two investigative

9     journalists and potentially the president.

10    BY MR. SANDLER:

11             Q.    Well, the journalists didn't break into

12    the DNC in the case of Mr. Woodward.  Right?

13             A.    No.  In the case of Mr. Woodward, he was

14    not asked anything about us breaking into anything.

15    He was asked about the substance of Mr. Creamer's

16    remarks and Mr. Foval's remarks.  So it was just an

17    interesting parallel to the shoe leather

18    investigative reporters of old.

19             That's how I see the argument, by analogy.

20             Q.    And was Mr. Foval ever inside the

21    Democracy National Committee?  Do you know, to your

22    knowledge?  Did you catch him there?

1        A.    I assume he was, but I don't think that

2   we filmed him there.

3        Q.    Okay.  So when you talked earlier about

4   the qualifications for someone to be a good Project

5   Veritas journalist, again, not the identity, but the

6   activity, you talked about the abilities you were

7   looking for.  Ms. Maass had those abilities.  Right?

8        A.    Yes.

9        Q.    She was really good at deception.

10   Right?

11        A.    I don't think that that's what -- I

12   wouldn't characterize it that way.  No.

13        Q.    Well, it says:  "Angela disciplined

14   herself to be the person Creamer thought she was."

15        You don't understand that to mean -- when you

16   wrote those words, you didn't mean that she was good

17   at deception?

18        A.    I wouldn't -- I've never -- I don't

19   think I've ever characterized it that way internally

20   or externally, no.  I think it's the -- my answer on

21   the record previously would testify to the

22   characteristics that would make someone a great

1    reporter.

2            Q.    But in this case, Ms. Maass was good at

3    being a person Creamer thought she was, but not the

4    person she really was.  Right?

5            A.    Are you asking about the passage in the

6    book?

7            Q.    Yeah.  I'm asking what you meant when

8    you wrote that passage.

9            A.    That Allison exhibited all the

10   characteristics of a good shoe leather journalist.

11   She was morally courageous, that she was dedicated,

12   that she was determined to see this story through,

13   that she was unafraid.  I would say that those are

14   the top -- and then some.  Those are the top

15   characteristics that I would testify would make great

16   -- she just didn't give up, didn't quit.  I'm very

17   proud of her for her work.

18           Q.    But she deceived Mr. Creamer and the

19   others at Democracy Partners with the full authority

20   of Project Veritas.  Right?

21           A.    She deceived -- again, I take issue with

22   the characterization of it, but she did do the

1    assignment and she did it well.

2         Q.    Was she authorized by Project Veritas to

3    provide a fake resume to Democracy Partners?

4         A.    I don't recall.

5         Q.    Was that done without the authorization

6    of Project Veritas?

7         A.    I don't recall the specifics.

8         Q.    Was she authorized by Project Veritas to

9    lie about her identity?

10        A.    Well, yes.  Our undercover people use

11   covers and identities all the time.

12        Q.    Were there any guidelines provided to

13   her about -- other than recording every minute when

14   she was inside Democracy Partners, was there any

15   guidelines provided to her about what she should do

16   during her internship?

17        A.    Guidelines?  There's a lot of things

18   discussed.  I don't recall the exact guidelines.

19        Q.    Actually, I'm not talking about what

20   subjects she should investigate, but guidelines in

21   terms of her conduct while inside the Democracy

22   Partners offices.

1          A.    I believe Joe Halderman was responsible

2    for providing a lot of those oversight and

3    guidelines.

4          Q.    Do you know what guidelines he did

5    provide to her?

6          A.    I don't recall.

7          Q.    Was she authorized or was she given any

8    guidance by Project Veritas as to whether it was okay

9    to rummage through people's trash while she was in

10   the Democracy Partners offices?

11         A.    I don't recall that.

12         Q.    Would that be authorized by Democracy

13   Partners?  I mean by Project Veritas.

14         A.    I don't recall ever authorizing that.

15         Q.    Was she authorized to take pictures of

16   documents lying on the desks of Democracy Partners

17   officers or employees while in -- the desks in the

18   private offices of those officers and employees?

19         A.    I don't recall any such authorizations.

20         Q.    Do you know if anybody at Project

21   Veritas encouraged her to take pictures of documents

22   lying on the desks of Democracy Partners officers or

```
1    employees?

2         A.    I don't recall any such encouragement.

3         Q.    Would it have been consistent with the

4    Democracy -- the Project Veritas code of conduct, the

5    unwritten code of conduct in effect at that time, to

6    encourage her to do so?

7         A.    I don't recall any such encouragement of

8    said conduct.

9         Q.    Would it have been consistent with the

10   internal code of conduct at Democracy Partners for

11   her to do so?

12        A.    I don't know.

13        Q.    Of Project Veritas, rather?

14        A.    I don't know.

15        Q.    You don't know whether it would be

16   consistent with the internal code of conduct of

17   Project Veritas for her to take pictures of documents

18   lying on people's desks?

19        A.    Correct.  I'm not -- I don't think

20   there's any such issue, because I don't think there

21   was any such encouragement.  I haven't fully thought

22   out whether it would or would not be consistent with
```

1    something.  I'd have to go -- I don't think there's

2    any inconsistency.

3         Q.    So it wouldn't be prohibited by the

4    internal code of conduct of Project Veritas?

5         A.    I don't think it would, but I can't be

6    certain.

7         Q.    Well, who else would know better than

8    you what the internal code of conduct of Project

9    Veritas prohibits and allows?

10        A.    It depends upon the situation.

11        Q.    Well, who would be in charge of

12   determining, in this situation, Ms. Maass wandering

13   around the offices of Democracy Partners; who would

14   be in charge of determining whether her conduct was

15   consistent with the code of conduct of Project

16   Veritas?

17        A.    Well, that would probably be Mr.

18   Halderman, Russell Verney as our executive director

19   and chief compliance officer, our attorneys doing a

20   legal review process.  A lot of that is privileged,

21   but the journalistic -- you're asking me journalistic

22   or are you asking me a legal question?

1         Q.    No.  I'm not asking a legal question.

2    I'm asking you a question about whether -- you

3    previously testified that there was no written code

4    of conduct in effect at Project Veritas in 2016, but

5    that there were ethical or conduct strictures that

6    you expected people to abide by.

7         A.    Yes.

8         Q.    And I'm asking you whether it was

9    consistent with those standards of conduct and ethics

10   for Ms. Maass to take pictures of documents lying on

11   people's desks?

12        A.    I don't recall the specific situation,

13   but I don't see any general inconsistency, albeit it

14   does depend upon the circumstance.  We go through

15   legal reviews before we go out to determine rules and

16   boundary areas as they see fit in the situational

17   context.

18        Q.    Well, I'm not asking you for any

19   specific legal advice given in this situation, but

20   I'd like to know what circumstances under the

21   internal code of conduct at Project Veritas would

22   justify a journalist taking pictures of documents

1    lying on the desks of people in private offices?

2         A.    Well, investigative reporters get leaked

3    documents all of the time.  Some of the most

4    legendary investigative reporters of the twentieth

5    century were sent, leaked like Pentagon papers, these

6    papers, those papers, secret sources, anonymous

7    source documents.

8         This is not inconsistent with any general

9    understood definition of investigative reporting that

10   I'm aware of, but it, of course, depends upon

11   specific situations; but, generally speaking, I do

12   not see any ethical inconsistency with a source

13   getting or reviewing or looking at documents.  That's

14   sort of, again, the raison d'etre of investigative

15   reporters.

16        Q.    But if you walked down the other end of

17   the hall and took pictures of documents lying on my

18   desk, those wouldn't be leaked documents.  Right?

19        A.    It depends upon the -- how -- I mean, I

20   suppose it depends.

21        Q.    What does it depend on?

22        A.    A lot of factors.

1          Q.     Well, give me some examples.

2          A.     I mean, if your client is gloating in a

3     bar to someone that he just met about Hilary

4     Clinton's intentions to put ducks on the ground and

5     it's her idea, I mean, that -- there is no duty to

6     keep confidential information that this guy tells my

7     person, the person that works with me.  He's bragging

8     about the fact that it's Hilary's idea, and he's

9     saying that no one should know this.

10          This is -- in this particular situation, it's

11     my responsibility to publish this information because

12     it's of vital profound public importance that the

13     people know what is going on.

14          Q.     And so you're saying that in a situation

15     -- the example you described, it would be justified

16     to take a picture of a document on a person's desk if

17     it related to the ducks?

18          A.     Possibly, conceivably.

19          Q.     Suppose it related to some other subject

20     matter.

21          A.     It depends upon the situation.

22          Q.     Well, under what --

 1          A.     Is there a specific exhibit or example

 2    that you're referring to?

 3          Q.     No.   I'm referring to the fact that Ms.

 4    Maass testified that she randomly took pictures of

 5    documents lying on people's desks.

 6          MR. CALLI:   I'm going to have to object to

 7    mischaracterization, gross mischaracterization of her

 8    testimony.   Do you have her --

 9          MR. SANDLER:   That's exactly what she

10    testified to, but he asked me what the basis for it

11    was, and that's the basis.   I have the transcript

12    here.

13    BY MR. SANDLER:

14          Q.     Now let me just ask you what was the

15    purpose of having -- Ms. Maass was instructed to

16    videotape every minute of her internship at Democracy

17    Partners.   Right?

18          A.     I can't -- I don't recall exactly what

19    the instruction was.

20          Q.     Were there guidelines provided to her

21    about who to surreptitiously tape at Democracy

22    Partners?

1          A.     I'm sorry?

2          Q.     Were there guidelines to her about who

3    she should surreptitiously tape at Democracy Partners

4    while inside Democracy Partners?

5          A.     I don't recall the exact guidelines

6    given, instructions or guidelines given to her about

7    that.

8          Q.     Do you recall any general guidelines

9    that were given?

10         A.     Unless you have an exhibit that can

11   refresh my memory, I remember there was discussions,

12   conversations, but I don't recall exactly.

13         Q.     What was the purpose of her taking a

14   hidden camera into Democracy Partners during her

15   internship?

16         A.     The purpose was to continue following

17   the story, this whole story, the story that was being

18   unmasked as it relates to Mr. Creamer's relationship

19   with Mr. Foval and the things that were discussed.

20         Q.     Were there any limitations placed on who

21   she could tape while -- during her internship at

22   Democracy Partners?

1          A.     I'd have to check with Mr. Verney and

2    Mr. Halderman to go back and figure out what those

3    were.  I don't know right now.

4          MR. SANDLER:  Okay.  Let me ask that this be

5    marked as the next exhibit.

6                          [O'Keefe Exhibit No. 19 was

7                          marked for identification.]

8          [Witness peruses exhibit.]

9          THE WITNESS:  Okay.

10   BY MR. SANDLER:

11         Q.     I've handed you what's been marked as

12   O'Keefe Exhibit 19.  This is a series of text

13   messages that were provided to us in discovery by

14   Project Veritas, and let me ask you are you any of

15   the people in this text message exchange?

16         A.     I'm not sure these are text messages.

17         Q.     Are these Slack messages?

18         A.     Yes.

19         Q.     Okay.  Were you any of the people

20   identified as a user in this Slack exchange?

21         A.     I don't know, because the user names

22   have been changed to a series of symbols and letters.

1  I'm not sure I recognize anything here that would be

2  me.

3          Q.    Okay.  If you go down to line 16,

4  there's a user U1U9VHW8Z.  It says to another user:

5  "Very interesting.  Keep your eyes on the trash bins,

6  especially around Creamer."

7          Do you know who sent that Slack message?

8          A.    I do not.

9          Q.    Okay.  User U1U7KPP9R is the name "Pizza

10 Queen".  Is that Allison Maass?

11         A.    I believe that Pizza Queen was her --

12 was associated with her, yes.

13         Q.    Okay.  And then she says at line 19:

14 "Can I take things out of the trash?"

15         And line 20 is another user, U2ERXJRF1, who

16 says:  "From my 10-minute Google search, it appears

17 to be legal once the trash is discarded to the public

18 street."

19         Do you know who that is who's advising her?

20         A.    I do not.

21         Q.    Okay.  Let me ask that this be -- no.

22 Wait a minute.  Wrong one.

1          I'll ask this be marked as the next exhibit.

2                          [O'Keefe Exhibit No. 20 was

3                          marked for identification.]

4          [Witness peruses exhibit.]

5          THE WITNESS:  Okay.

6      BY MR. SANDLER:

7          Q.    I'm showing you what's been marked as

8      O'Keefe Exhibit 20.  Looking not at the first E-mail

9      that is from you to ProjectVeritasAction.com, but

10     from Allison Maass to Project Veritas Production and

11     it's entitled "PV Video Summary Form".

12         Do you see that?

13         A.    Yes.

14         Q.    What was the purpose of this document?

15         A.    This document was to update the staff

16     about the activities during an investigation.

17         Q.    Okay.  And who received -- and was

18     Ms. Maass instructed to prepare such a written

19     document summary on her videos every day?

20         A.    Yes.

21         Q.    And who were the recipients of that

22     document, of this document, the video summary form?

1      A.    The production team at Project Veritas.

2      Q.    Did a copy of this go every day to you?

3      A.    Yes.

4      Q.    How about Mr. Konstanzer?

5      A.    I don't recall.

6      Q.    How about Mr. Verney?

7      A.    I believe that he's part of this

8    production@Project Veritas list serve.

9      Q.    And Mr. Halderman, I assume would be on

10   it.

11     A.    Yes.

12     Q.    And how about Ms. Loomer?

13     A.    Yes.

14     Q.    And were the recipients of this document

15   given any guidelines about what they could or could

16   not do with the information contained in it?

17     A.    Can you repeat that again?

18     Q.    Were the recipients of this daily video

19   summary form given any guidelines or instructions

20   about what they could do with this information when

21   they received it?

22     A.    What "they"?  Who is "they"?

```
1          Q.    The recipients.

2          A.    Guidelines about what the recipients

3    could do with the video summary forms?

4          Q.    Um-hum.

5          A.    I don't think that there was a -- I

6    don't believe so, no.  I don't think so.

7          Q.    Did you also view the raw tapes,

8    videotape that Ms. Maass took each day after it was

9    recorded?

10         A.    I don't think that I --

11         Q.    You personally.

12         A.    I don't believe I reviewed it each day,

13   no.

14         Q.    How often did you review it?

15         A.    Once in a while.

16         Q.    Okay.  Did you personally transmit any

17   information from these summaries to anyone who was

18   not an employee of Project Veritas?  This is prior to

19   the public release, you know, of the videos.

20         A.    I don't recall.

21         Q.    You might have?

22         A.    I may have.  I don't recall specifically
```

```
 1    if I did or did not, but I may have.

 2           Q.    Did you transmit any information in

 3    these summaries to any officials or employee of the

 4    Trump campaign?

 5           A.    I don't believe so, no.

 6           Q.    How about the Republic National

 7    Committee?

 8           A.    I don't think so, no.

 9           Q.    Any member of the Trump family?

10           A.    No.  I don't think so.

11           Q.    Okay.  I think I already asked you this,

12    but I'm trying to understand what guidance was given

13    to Ms. Maass about who to tape surreptitiously during

14    the course of her internship, which individuals to

15    tape.

16           A.    I don't recall the guidance that was

17    given to her.

18           Q.    Do you know what guidance would have

19    been given to her in the normal course about an

20    investigation of this nature?

21           MR. CALLI:  Objection, speculation.

22           You can answer.
```

1          THE WITNESS:  I don't.

2     BY MR. SANDLER:

3          Q.    Well, when a Project Veritas journalist

4     surreptitiously records someone, does there have to

5     be some reason to believe that that specific

6     individual has engaged in or is planning to engage in

7     some illegal or improper activity?

8          A.    I would say, generally speaking, yes.

9          MR. SANDLER:  Okay.  Let me ask the next

10    exhibit to be marked and this is 21.

11                         [O'Keefe Exhibit No. 21 was

12                         marked for identification.]

13    [Witness peruses exhibit.]

14         THE WITNESS:  Okay.

15    BY MR. SANDLER:

16         Q.    I'm showing you what's been marked as

17    O'Keefe Exhibit 21.  This is a PV Video Summary Form.

18    It says date video was obtained -- I'm sorry.  It

19    says journalist name, Allison Maass, date video was

20    obtained, 9-22, and then the date of upload, 9-22.

21    Do you see that?

22         A.    Yes.

1          Q.    And then it says target name, slash,

2    location, slash, contact info, Eric Walker, DNC

3    deputy communications director.  Do you see that?

4          A.    Yes.

5          Q.    What improper illegal activity was Eric

6    Walker involved in that justified surreptitious

7    taping of him, targeting him for surreptitious

8    taping?

9          A.    Let me review the document.

10          MR. SANDLER:

11          [Witness peruses exhibit.]

12          THE WITNESS:  Well, Eric Walker, DNC deputy

13    communications director, describes to Allison that he

14    has been doing this work for over a year with Bob

15    Creamer and Aaron Black on a bracketing program.  He

16    states that the primaries started in February.  So

17    they were chasing Rubio around and Jeb around Scott

18    Walker.

19          So he's part of this program.  That's what

20    Walker is -- Eric Walker is describing here.

21    BY MR. SANDLER:

22          Q.    And you believe that there was something

```
1    illegal and improper about the bracketing program?

2          A.    There could be.

3          Q.    Well, was there?

4          A.    We were attempting to investigate that.

5          Q.    And did you find that there was anything

6    illegal or improper about it?

7          A.    Well, I think that the story, the

8    ultimate story, we found a lot of improprieties.

9    Whether it's bracketing or birddogging, these are --

10   I'm a little myself confused about the nomenclature

11   of these things, but the actual activities that were

12   done by Aaron and Bob Creamer and Scott Foval were

13   concerning, and Mr. Eric Walker worked amongst them.

14   So --

15         Q.    Does this say that -- did you find some

16   evidence in here that Eric Walker worked with Scott

17   Foval?

18         A.    It says from 21:41:59 to 21:42:31,

19   journalist, colon:  So do you work with Bob Creamer

20   and Aaron Black on this bracketing program?

21         Eric Walker responds:  "Yeah.  Been doing it

22   for over a year."
```

1          Q.    But that's not Scott Foval.  Right?

2          A.    I mean, come on.  That's a distinction

3   without a difference.  Mr. Foval and Mr. Creamer --

4   Mr. Foval carries out everything that Mr. Creamer

5   actually -- all of his ideas.  Mr. Foval says Bob and

6   me and all the other individuals he references.  This

7   is clearly a coordinated effort and this individual

8   works amongst them.

9          Q.    Eric Walker works amongst -- you believe

10  this implies that Eric Walker worked directly with

11  Scott Foval?

12         MR. CALLI:  No.  The DNC and Democracy

13  Partners immobilized.  They're all completely

14  separate, i.e., Bob Creamer.

15         THE WITNESS:  Yes.  It's self-evident,

16  because Bob Creamer and Aaron Black and Scott Foval

17  work closely together, according to Bob Creamer.  Bob

18  Creamer commissioned Scott Foval to carry out these

19  various initiatives.

20         So when Eric Walker states, quote, yeah, been

21  doing it over a year in response to the question do

22  you work with Bob and Aaron on the bracketing

1   program, I would deduce, using logic, that they

2   worked together.

3   BY MR. SANDLER:

4           Q.   Okay.  They worked -- you would deduce

5   from that that Eric Walker is somehow admitting that

6   he's worked with Scott Foval?

7           A.   Yes.

8           Q.   Do you even know if Eric Walker has ever

9   met Scott Foval?

10          A.   I don't.

11          Q.   Looking at the bottom of the first page

12  of O'Keefe Exhibit 21, you see the relevant time

13  stamp begins FNOJ069, the very last line, 2015082 --

14  the very last line of the page, of the first page.

15          A.   Okay.

16          Q.   Then going on to the -- I'm sorry.  The

17  top of the second page, it says:  "From 19:29:23 to

18  19:41:42, I listened in to a call between Bob,

19  Christine Pelosi, and American United for Change.

20  They talk about what they are going to do with the

21  people in Congress and Nancy Pelosi concerning guns,

22  women's health, Supreme Court, and Zika issues.  Just

```
 1    kind of interesting listening to the

 2    behind-the-scenes strategy sessions from the Dems."

 3         Do you see that?

 4         A.    Yes.

 5         Q.    Was it appropriate to listen in and tape

 6    that phone call, for Ms. Maass to do that?

 7         A.    Yeah.  I don't see why not.

 8         Q.    Was there anything illegal or improper

 9    suspected about Bob, Christine Pelosi, and Americans

10    United for Change discussing these issues?

11         A.    Well, the whole story here is the

12    impropriety conducted by this Democracy Partners

13    organization, Bob Creamer, and Scott Foval working

14    together.  It's certainly improper, but I don't --

15    let me clarify.  I don't see any problem with taping

16    as long as there's one party present to the

17    conversation.

18         I don't see any problem with that, any ethical

19    issue with that.  I don't have an issue with that.  I

20    don't have a problem with that.  That's what we do at

21    Project Veritas.

22         Q.    She wasn't a party to that discussion,
```

1    was she?  She was just listening in on a phone call.

2    Right?

3         A.    I believe that constitutes being a

4    party.

5         Q.    For legal purposes?

6         MR. CALLI:  Objection.  He's not a lawyer.

7         MR. SANDLER:  No.  I'm not asking about

8    whether it's legal.  I'm asking about --

9         THE WITNESS:  From an ethical perspective, I

10   see nothing wrong.  She's participating.  She's party

11   to.  She's witness to this, and if she was not

12   recording, she could write down everything and no one

13   would have a problem with that.

14        I am proud of our methods that we use and I

15   think it does more justice to people if we record

16   them than merely to write down to the best of our

17   memory something that may or may not be a hundred

18   percent accurate.  I am not ashamed of the methods

19   that we use or the recordings that we use.

20   BY MR. SANDLER:

21        Q.    No ethical problem with obtaining access

22   to behind-the-scenes strategy sessions from the Dems

1    through deception and recording it?

2         A.    I think that the -- repeat the question

3    again.

4         Q.    No ethical problem with obtaining access

5    to a behind-the-scenes strategy session from the

6    Dems, in the word of Ms. Maass, and surreptitiously

7    recording?

8         A.    It was Mr. Creamer that offered this to

9    Ms. Maass.  If there's a problem, the problem lies

10   with Mr. Creamer for offering this opportunity to

11   someone, and that's his issue, not mine.  My job as

12   an investigative reporter is to get the story.

13        Q.    Right.  He offered it her based on her

14   deception though.  Right?

15        A.    That's a characterization.

16        Q.    Okay.

17        MR. CALLI:  Joe, as we often ask each other,

18   do you have a sense of how many hours more you're

19   likely to go?

20        MR. SANDLER:  A half-hour.  Do you want a

21   break?

22        MR. CALLI:  No.  You get all your time and

1    you certainly have way more than that.  I was just

2    trying to get an understanding.

3          MR. SANDLER:  Okay.  Let me ask that this be

4    marked as the next exhibit.

5                      [O'Keefe Exhibit No. 22 was

6                      marked for identification.]

7          MR. CALLI:  Do you have an extra copy?

8          [Mr. Sandler presents document.]

9          [Witness peruses exhibit.]

10         THE WITNESS:  Okay.

11   BY MR. SANDLER:

12         Q.   I'm showing you what's been marked as

13   O'Keefe Exhibit 22.  This is another PV Video Summary

14   Form.  It says journalist name, Allison Maass, date

15   video was obtained, 10-12, date of upload, 10-12,

16   target name, location, contact info, Bob Creamer,

17   Aaron Black (Minter), Karen Marangi, The Raben Group.

18         What illegal or improper activity was Karen

19   Marangi of the Raben Group suspected of engaging in

20   or planning?

21         A.   I have to review this document.

22         MR. SANDLER:  Sure.  Please do.

```
1              [Witness peruses exhibit.]

2              THE WITNESS:  I see something about Karen

3     Marangi in the document.

4     BY MR. SANDLER:

5              Q.    What was the justification for targeting

6     Karen Marangi for surreptitious taping?

7              A.    I don't believe we published any of this

8     in our report.  Reporters can be witness to things

9     and capture notes of things without including it in

10    the final story.  I believe that is a distinction.

11             I disagree with your characterization that we

12    targeted her.

13             Q.    Well, Ms. Maass says she's a target.

14    Target name, there's three names listed and the third

15    with a picture is Ms. Marangi.

16             A.    Okay.  I think that's just nomenclature.

17    I think that's been updated.  That's called a subject

18    name or -- subject name.

19             Again, whether she recorded this or not, this

20    is an accurate depiction of what was said and what

21    Ms. Maass was witness to.  Recording or no recording,

22    I don't understand the ethical issue with accurately
```

1    capturing what somebody said.  There's no moral

2    quandary, from my perspective, with recording

3    something.  She could write what the person said

4    down.

5         As far as I'm concerned, that's exactly what

6    the investigative reporter is supposed to do and to

7    inform -- who knows?  Maybe this story goes in this

8    direction or that direction, but no.  I don't see she

9    did anything wrong here.

10        Q.   You don't see anything wrong with the

11   fact that Karen Marangi was surreptitiously taped

12   even though she was suspected of no illegal or

13   improper planning or activity?

14        A.   I don't see any problem with taping,

15   with a reporter taping, a conversation like this.

16   There's nothing wrong with that from my perspective.

17   I think it does a lot more justice to the subject to

18   accurately capture what they say.

19        Q.   Well, this was not a -- this was a

20   private conversation Ms. Maass was taping.  Right?

21        A.   I'm not exactly -- how many people were

22   in the room?

1   that is a claim made here, that there are different

2   rules for people -- apparently, for people like me,

3   and it's that inconsistency that's wholly unjust.

4   That's an unjust inconsistency.

5        That's an absurdity that we would go through

6   reporters' notebooks and challenge why we captured

7   information and why we wrote that down.  That, to me,

8   is an example of a paradigm that is -- and they do

9   want to stop us with these lawsuits.

10        I would submit to you that that's the reason

11   why this is all happening to us.

12        MR. CALLI:  Are you saying you agree with

13   what Alex Jones says in every instance?

14        MR. SANDLER:  Excuse me, Mr. Calli.

15        MR. CALLI:  I'm trying to save us time.  I'll

16   ask him the question when you're done if you want,

17   but that's okay.  Go ahead.  Go ahead.  Go ahead.

18   BY MR. SANDLER:

19        Q.    Why do you consider Alex Jones an ally

20   in that fight?

21        A.    Because I believe what is being done to

22   Project Veritas in -- I'm not a lawyer, but I believe

```
 1   that what is being done to us is, in many ways, a

 2   violation of my rights as a journalist to report

 3   these stories, efforts to suppress, to shut us down

 4   with this -- with this -- something that's

 5   inconsistent with the First Amendment, and it goes

 6   back to the question that I've been asked here about

 7   what amounts to reporter notebooks and why those

 8   quotes didn't make the story.  It's an attempt to

 9   hold us to an impossible and ridiculous standard.

10        So I don't agree with everything that Alex

11   Jones says or does, but I think that in this

12   particular case, he's an ally in fighting for the

13   truth and for justice in the particular case, and I

14   didn't want to say anything negative about him

15   because I think that's one of the things the press

16   likes to do.

17        Q.    When you say "in this particular case",

18   what do you mean, that Alex Jones is an ally in this

19   particular case?

20        A.    Well, I mean, in many ways, quite

21   literally, in this particular lawsuit even.  He is an

22   ally in that fight.
```

1          Q.    How is he an ally in this lawsuit?  What

2    has he done related to this lawsuit?

3          A.    Well, I've been on his program to

4    discuss what Mr. Creamer was exposed doing.  I've

5    been on his program to discuss what Mr. Foval caught

6    saying and doing.

7          Q.    After this lawsuit was filed, you've

8    been on Mr. Jones' program?

9          A.    I believe I have been on his program

10   after this lawsuit was filed?

11          MR. SANDLER:  Okay.

12          All right.  I think I have no further

13   questions.

14          MR. CALLI:  We will, under the -- before the

15   deposition terminates, under the terms of the

16   protective order designate it as highly confidential,

17   the maximum designation.  We'll give us 30 days after

18   receipt to, with any more requisite specificity,

19   identify to you those portions which we wish to

20   continue that designation.

21          MR. SANDLER:  Understood, but except to the

22   extent there's a summary judgment scheduled.  It

CERTIFICATE OF NOTARY PUBLIC


        I, CATHERINE B. CRUMP, the officer before
whom the foregoing deposition was taken, do hereby
testify that the witness whose testimony appears in the
foregoing deposition was duly sworn by me; that the
testimony of said witness was taken by me
stenographically and thereafter reduced to typewriting
under my direction; that said deposition is a true
record of the testimony given by said witness; that I am
neither counsel for, related to, nor employed by any of
the parties to the action in which this deposition was
taken; and further, that I am not a relative or employee
of any attorney or counsel employed by the parties
hereto nor financially or otherwise interested in the
outcome of the action.


_____

CATHERINE B. CRUMP

Notary Public in and for the

District of Columbia



My Commission Expires:  October 31, 2022