EXHIBIT

5

1            IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF COLUMBIA

3     - - - - - - - - - - - - - - - X

4     DEMOCRACY PARTNERS, ET AL.,      :

5          Plaintiffs,                 :

6              v.                      :   Case No.

7     PROJECT VERITAS ACTION FUND,    :   1:17-cv-1047-ESH

8     ET AL.,                          :

9          Defendants.                 :

10    - - - - - - - - - - - - - - - X

11                          Washington, D.C.

12                          Thursday, August 9, 2018

13          Highly Confidential - Attorneys' Eyes Only

14          Deposition of CHRISTIAN HARTSOCK, a

15    witness herein, called for examination by counsel for

16    Plaintiffs in the above-entitled matter, pursuant to

17    notice, the witness being duly sworn by

18    JESSICA CROXFORD, a Notary Public in and for the

19    District of Columbia, taken at the offices of Sandler

20    Reiff Lamb Rosenstein & Birkenstock, PC, 1090 Vermont

21    Avenue, NW, Suite 750, Washington, D.C., at

22    9:40 a.m., Thursday, August 9, 2018, and the

 1    answer -- same question for consultants.  During

 2    2016, did you have any communication with any

 3    consultant to the Donald Trump for President

 4    campaign?

 5         A.    Not that I recall.

 6         Q.    Okay.  All right.  You have met

 7    Scott Foval, right?

 8         A.    Yes.

 9         Q.    Where did you first meet him?  Where did

10    you first meet him?

11         A.    In Milwaukee.

12         Q.    At a particular place in Milwaukee?

13         A.    Yes.

14         Q.    And what was that place?

15         A.    The headquarters for Voces de la Frontera.

16         Q.    And when was that first meeting?

17         A.    The spring.

18         Q.    Of -- of what year?

19         A.    2016.

20         Q.    Okay.  And was this a meeting that you had

21    arranged with him?

22         A.    No.

1      Q.    How did the meeting come about?

2      A.    I went into the headquarters to volunteer,

3  and he was standing in one of the rooms on his iPad.

4  And he said hello and we chatted for a minute.

5      Q.    And when you say you went into the

6  headquarters to volunteer, the headquarters of what

7  organization?

8      A.    The Voces de la Frontera.

9      Q.    And when you went to volunteer for them,

10  who did you say you were?

11      A.    Steve Packard.

12      Q.    And did you know of Mr. Foval before this

13  first conversation?

14      A.    No.

15      Q.    Okay.  When was the next time that you

16  spoke to him after this initial meeting at Voces?

17          THE REPORTER:  I'm sorry?

18          MR. SANDLER:  Initial meeting at Voces,

19  V-O-C-E-S.

20          THE WITNESS:  The following week.

21  BY MR. SANDLER:

22      Q.    Okay.  And how did that meeting come

Christian Hartsock
Case 1:17-cv-01047-ESH  Document 68-8  Filed 06/03/19  Page 5 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 39

1    get away with a massive voter fraud scheme was much

2    appreciated because I had related to my client -- to

3    my company's client and that my company's client was

4    so impressed that he wanted to speak with me

5    directly.

6           And when he spoke with me directly, I told

7    him that I wished I could take credit for all those

8    ideas, but that I had to give the credit to

9    Scott Foval, and that when he asked me who

10   Scott Foval was and where Scott Foval was getting all

11   this expertise on how to -- how to get away with

12   massive voter fraud, that Scott Foval was a protege

13   by his own admission of Robert Creamer and that my

14   company's client thenceforth wanted to meet

15   Robert Creamer.

16       Q.    Your company's client --

17       A.    My company's client, Breakthrough

18   Development Groups' client, Charles Roth, would come

19   to Breakthrough Development Group with the idea of

20   the surrogate voter plan that Scott Foval had advised

21   me on, and would Scott Foval make an introduction

22   between Mr. Creamer and Mr. Roth.

Christian Hartsock
Case 1:17-cv-01047-ESH  Document 68-8  Filed 06/03/19  Page 6 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 40

1      Q.     And what did you -- so just to back up

2   because it was a little bit tough to follow the

3   answer.  You told me Scott Foval that Charles Roth

4   had come to you with his voter fraud plan and it was

5   the same one that Foval had advised on?

6      A.     So I told Scott Foval that I was a junior

7   consultant for Breakthrough Development Group and

8   that my senior colleagues were advising a progressive

9   philanthropist who had come to them with a deep

10  enmity for the voter ID laws and for the Trump

11  campaign's alleged hatred for immigrants and that he

12  had come up with a way to offset the voter turnout

13  loss inflicted by voter ID and voter suppression and

14  that my company was trying to advise him on that, and

15  that's when Scott Foval started offering his ideas on

16  how to get away with it.

17      Q.     Scott Foval started off with those ideas

18  in this telephone --

19      A.     No, no, no.  In the bar.

20      Q.     Okay.  But what -- you're relating all of

21  this that you just said to Scott Foval in this

22  follow-up call, right?

1      A.    I'm providing context --

2      Q.    I see.

3      A.    -- for what preceded the call.

4      Q.    And what did you tell Mr. Foval in the

5  call about Charles Roth other than he was a

6  progressive philanthropist that had this plan?

7      A.    Well, I didn't tell him that because I had

8  already told him that at the bar.

9      Q.    Well, let's go back.  What did you tell

10  him, Scott Foval, about Charles Roth, first of all,

11  at the bar?

12      A.    Well, I didn't say it was Charles Roth.  I

13  didn't name the client.  I just told him that a

14  client had come to our company with this idea.  And I

15  explained the idea.  And Scott Foval said he believed

16  he knew who my client was.

17          And I asked him who he thought -- who he

18  assumed my client -- not my client; Breakthrough's

19  client.  I asked him who he suspected was this

20  client, and he said Robert Creamer.  He said

21  Bob Creamer comes up with a lot of these things.

22      Q.    But he thought Bob Creamer was the client?

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 8 of 26
Highly Confidential – Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 46

1    BY MR. SANDLER:

2         Q.    Just let me know when you're finished

3    reading it.

4         A.    I'm finished.

5         Q.    Okay.  Showing you what's been marked for

6    identification as Hartsock Exhibit 5.  It appears to

7    be an email from Steve Packard to James O'Keefe.

8              Did you send this email?

9         A.    Yes.

10        Q.    And it says, Subject:  Foval letter.  And

11   it's addressed to Scott.

12             Was this a draft of a proposed email to

13   Scott Foval?

14        A.    Yes.

15        Q.    Okay.  And why -- for what purpose were

16   you sending it to Mr. O'Keefe?

17        A.    To get his evaluation of it.

18        Q.    So he was reviewing it in draft form, in

19   effect, before you sent it to Mr. Foval?

20        A.    Yes.

21        Q.    And at the bottom, the signature line

22   says:  Best, Steve Packard, Breakthrough Development

1    Group.   There's a phone number, and then there's a

2    website, breakthroughdevgroup.com.

3              Was that a -- did that website exist at or

4    about the time of this email, April 18, 2016?

5         A.    Yes.

6         Q.    And who created that website?

7         A.    I don't know.

8         Q.    Was it an employee of Project Veritas?

9         A.    Yes.

10        Q.    And do you recall what -- the website no

11   longer exists, so if I could ask, do you recall what

12   content was on it at the time, the nature of the

13   content as best you can recall?

14        A.    Some stock images.

15        Q.    Of?

16        A.    People walking into a building, I believe.

17   We call it the gif -- or a simulation -- a simulation

18   or a photograph and contact information and some

19   generic-sounding text.

20        Q.    Did the text describe in some way the

21   nature of the company's business?

22        A.    I believe vaguely.

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 10 of 26
Highly Confidential Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 48

1          Q.    Okay.  Can you tell me -- and I understand

2    this is a website that's gone.  Can you tell me

3    generally what you recall about what the text said?

4          A.    I don't recall.

5          Q.    Okay.  But it was -- it was some kind of a

6    generic description of the company's business?

7          A.    Yes.

8          Q.    And what contacts were listed, if you

9    recall?

10         A.    I don't recall.

11               MR. SANDLER:  Let me -- let me ask that

12   this be marked as the next exhibit.  So Exhibit 6.

13                    (Hartsock Exhibit No. 6 was marked

14                    for identification.)

15   BY MR. SANDLER:

16         Q.    And let me know when you finish reading

17   this.

18         A.    Finished.

19         Q.    Showing you what's been marked as Hartsock

20   Exhibit 6.  It appears to be a email from

21   Joe Halderman to you and Mr. O'Keefe.  Well, it's an

22   email chain that -- and correct me if I'm wrong, I

Christian Hartsock
Case 1:17-cv-01047-ESH  Document 68-8  Filed 06/03/19  Page 11 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 54

1      Q.    That's right.  The top says Surrogate

2    Voter Scheme, and the number at the bottom is 119 --

3    PVA11938.  Do you see that?  In the bottom right-hand

4    corner.

5      A.    Oh, yeah, yeah.

6      Q.    Okay.  If I can ask you to turn to the

7    second paragraph of this page, it says, "The plan, at

8    least as far as Wisconsin goes, is to use the

9    allowance of employer-issued IDs and the existence of

10   foreclosed and abandoned home addresses to skirt the

11   law.  The philanthropist has created a fully funded

12   shell company with which to 'hire' a legion of

13   out-of-county and even out-of-state voters as well as

14   illegal immigrants, issue them IDs that can be used

15   at the polls, and paychecks which are both proof of

16   employment with the stubs as well the actual

17   compensation for participating in the scheme."

18          Do you see that?  And who was the

19   philanthropist you referred to here?

20     A.    Charles Roth.

21     Q.    Okay.  And at this point, had you

22   communicated -- communicated with Bob Creamer

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 12 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 55

1    yourself?

2         A.    No.

3         Q.    Okay.  And had somebody been identified to

4    play the role of Charles Roth?

5         A.    Not that I know of.  In fact, I don't know

6    if the name Charles Roth by this time had been

7    termed.

8         Q.    Okay.  Who came up with the name

9    Charles Roth?

10        A.    I did.

11        Q.    Let me ask you.  With respect to the names

12   Charles Roth and Lester Rosen, was there any

13   particular reason that you chose Jewish surnames for

14   those aliases?

15        A.    No.

16        Q.    The next paragraph -- and I'm sorry.

17   This -- this is back on this second paragraph.

18   That's the scheme that you described to Scott Foval

19   in the bar, right?

20        A.    Yes.

21        Q.    Okay.  The next paragraph says, if I

22   could -- "The only missing ingredients are the

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 13 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 56

1    addresses to postmark on the pay stubs to demonstrate

2    residency.  And that is half of where the targets

3    come in.  Since progressive GOTV organizations (many

4    of which DP clients and PFAW affiliates) canvass

5    primarily in poor and inner-city neighborhoods,

6    canvassers will find many foreclosed and abandoned

7    homes.  If they can be instructed to log all

8    addresses to those (they needn't be told why), the

9    addresses can be used to corroborate our surrogate

10   voters' residencies on their pay stubs, check

11   envelopes or earning statements."

12           Do you see that?

13      A.    Yes.

14      Q.    Do I understand correctly that the scheme,

15   then, was to assign addresses to people at which they

16   didn't actually live?

17      A.    Yes.

18      Q.    And use those addresses to register and

19   then vote?

20      A.    Yes.

21      Q.    And you -- the plan was to ask clients of

22   Democracy Partners to obtain those addresses from

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 14 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 57

1    foreclosed and abandoned homes during canvasses?

2         A.    Can you repeat that question?

3         Q.    Yes.  The plan was to ask clients of

4    Democracy Partners to obtain those addresses from

5    foreclosed and abandoned homes during canvasses?

6         A.    I don't know that it was to ask Democracy

7    Partners for those addresses.

8         Q.    Who was going to obtain the addresses from

9    the foreclosed and abandoned homes?

10        A.    As I recall, the idea was open-ended, but

11   it involved the groups that I had been canvassing

12   within Wisconsin that Scott Foval -- that I met

13   Scott Foval through.  It was open-ended as to who

14   precisely would be obtaining the addresses.

15        Q.    But you thought those groups would

16   include, what, Voces in Milwaukee?

17        A.    GOTV campaigns.

18        Q.    And, for example, what groups did you have

19   in mind?

20        A.    Voces de la Frontera, SEIU.  It was

21   open-ended.

22        Q.    Okay.  And the plan was to ask them to log

 1    addresses during these canvasses, but not tell them

 2    for what purpose the addresses were going to be used,

 3    right?

 4         A.    To not necessarily tell them.  Scott Foval

 5    emphasized not telling them.

 6         Q.    Okay.  So your proposed scheme was to

 7    induce these groups to participate in an illegal

 8    scheme inadvertently, right?

 9         A.    Yes.

10         Q.    Now, the next paragraph, it says,

11    Undercover Identities and Backgrounds.  It's titled

12    Undercover Identities and Backgrounds.  And the first

13    paragraph begins, "As with the Common Core

14    investigation, we are junior consultants with the

15    Breakthrough Development Group, a bicoastal lobbying

16    and consulting firm which helps candidates and

17    legislators locate their donor bases," and it goes

18    on.

19              In that sentence, who are "we"?  Who does

20    "we" refer to?

21         A.    Steve Packard and whomever my sidekick

22    would be.

```
 1   Ken Konstanzer on May 26th to some name that's been

 2   redacted with copies to Ms. Maass, Mr. O'Keefe, and

 3   yourself.

 4             Do you know -- did you receive this email

 5   on or about May 26, 2016?

 6        A.   Yes.

 7        Q.   Okay.  And then it's forwarding an email

 8   from -- first of all, who was Mr. Konstanzer, if you

 9   know?

10        A.   He was the chief of staff for

11   Project Veritas.

12        Q.   Okay.  And below it is an email from

13   Allison blocked out to Mr. Konstanzer.  It says,

14   burner phone for today:  Hey, Ken.  Just to eliminate

15   one more explanation to have to make to Foval.  The

16   number "Roth" should be calling from needs to have a

17   415 area code.

18             First of all, at this point, the name of

19   the philanthropist had been changed from Sabatka to

20   Roth; is that right?

21        A.   Yes.

22        Q.   And you came up with the name
```

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 17 of 26

Highly Confidential - Attorneys' Eyes Only
Washington, DC

8/9/2018
Page 70

1    Charles Roth?

2        A.    I proposed that we use it.

3        Q.    And why did you change the name from

4    Sabatka to Roth?

5        A.    I believe the name Sabatka, I was using

6    that when I wrote that original dossier.  The name

7    Terry Sabatka had come to me.  But then I realized

8    afterwards that that was the name of a character in

9    season 2 of the show The Wire.  And that's how it had

10   come to me.

11       Q.    So that would be -- it would be obvious

12   that that's a fake name if you used it, right?

13       A.    Yes.

14       Q.    Now, it says, "One more explanation to

15   have to make to Foval.  The number Roth should be

16   calling from needs to have a 415 area code."

17             Is this in reference to a planned call

18   from Roth to Foval?

19       A.    Yes.

20       Q.    Okay.  And why did it need -- the number

21   that showed on the phone have to have a 415 area

22   code?

Christian Hartsock
Case 1:17-cv-01047-ESH  Document 68-8  Filed 06/03/19  Page 18 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 71

1        A.    Because, according to the dossier I have

2   written, Mr. Roth was to be based in Sausalito,

3   California.

4        Q.    Okay.  But, in fact, Mr. Roth was not

5   going to be calling from California, right?

6        A.    No.

7        Q.    So the point was to deceive Foval into

8   thinking he was getting a call from someone in the

9   San Francisco area, right?

10       A.    Yes.

11       Q.    Okay.  All right.  I'm going to ask that

12   this be marked as the next exhibit.  I only have one

13   quick question on it.

14                 (Hartsock Exhibit No. 10 was marked

15                 for identification.)

16                 MR. CALLI:  Are you done with 8 and 9,

17   Mr. Sandler?

18                 MR. SANDLER:  Yes.

19   BY MR. SANDLER:

20       Q.    Just let me know when you're finished.

21       A.    I'm finished.

22       Q.    Okay.  The second and third pages of this

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 19 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 72

```
 1    are a document headed The Target:  Robert Creamer,

 2    Community Organizer, Democracy Partners.

 3              Did you write this document?

 4       A.    Yes.

 5       Q.    Okay.  And on the second page, the third

 6    full paragraph begins, "Charles Roth's father,

 7    Clayton Roth, was an immigrant."

 8              Do you see that?

 9       A.    Yes.

10       Q.    The -- the background information about

11    Mr. Roth in this paragraph, did you communicate that

12    to Mr. Foval?

13       A.    I believe at some point, I did.

14       Q.    Did you communicate it to Mr. Creamer?

15       A.    Not personally.

16       Q.    Okay.  And you say "not personally."  Do

17    you know if anybody else communicated it to

18    Mr. Creamer?

19       A.    I believe so.

20       Q.    Do you know who it was?

21       A.    It would have been Daniel Sandini.

22       Q.    Posing as Mr. Roth himself?
```

Christian Hartsock
Case 1:17-cv-01047-ESH  Document 68-8  Filed 06/03/19  Page 20 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 73

1       A.    Yes.

2       Q.    And did you ever speak with Bob Creamer

3   personally?

4       A.    Yes.

5       Q.    How many occasions?

6       A.    Once.

7       Q.    Okay.  And when was that approximately?

8       A.    At some point, summer of 2016.

9       Q.    Was that before his meeting with Sandini

10  posing as Roth in Washington, D.C., the first

11  meeting?

12      A.    I believe it was after.

13      Q.    Okay.  What was -- and did you meet with

14  Mr. Creamer or speak by phone?

15      A.    Spoke -- I spoke by Skype.  He, I believe,

16  spoke by phone.

17      Q.    And what happened in that conversation?

18      A.    Mr. Creamer called, I answered, and

19  Mr. Creamer asked for Charles Roth.  I said he was

20  not available.  Mr. Creamer asked that I relay a

21  message to Mr. Roth, and the message was to thank him

22  for the bottle of wine that Mr. Roth had sent.

Christian Hartsock
Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 21 of 26
Highly Confidential-Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 96

1        This is language that Mr. Roth was

2   supposed to convey to Mr. Foval, right?

3        A.   Yes.

4        Q.   And Steve refers to you -- Steve -- posing

5   as Steve Packard, right?

6        A.   Yes.

7        Q.   And Roth is -- do I understand this, Roth

8   is telling Foval that Creamer is trying to keep

9   things above the board, i.e., he's not willing to do

10  anything illegal?

11       A.   Yes.

12       Q.   Okay.  But -- but Roth is suggesting to

13  Foval that "We cannot win by staying above the board

14  because the opposition is not."  What does that mean?

15       A.   So this was an interview question designed

16  to find out the answer to my aforementioned question,

17  which is, what is going on in the subtext of these

18  conversations with Mr. Creamer and Mr. Roth?  There

19  could have been a number of different -- we were

20  prepared for a number of different answers.  One

21  being, oh, yeah, no, no, don't worry.  He knows what

22  you're talking about, in so many words.  He just

Christian Hartsock Highly Confidential - Attorneys' Eyes Only 8/9/2018
Case 1:17-cv-01047-ESH  Document 68-8  Filed 06/03/19  Page 22 of 26
Washington, DC                  Page 99

1  Q.  And did you see a tape -- was that meeting

2 secretly recorded, the meeting between Roth and

3 officials at Americans United for Change?

4  A.  At least one of them was.  By this time,

5 we seem to know the name Woodhouse, and that was

6 subsequent that he met Mr. Woodhouse I believe at

7 that meeting that was recorded.

8  Q.  And then over on the next page of this

9 memo, it says -- there's a subheading, Goals.  It

10 says -- and there's A, B, C, D, and E.

11    It says, "D, Get Foval blessing surrogate

12 voter operation in an official AUFC capacity."

13    Do you see that?

14  A.  Yes.  Yes.

15  Q.  Did Foval ever bless the surrogate voter

16 operation under official AUFC capacity?

17  A.  There were our meetings with -- there were

18 our meetings on the 16th and the 23rd of September.

19 I do recall him expressing that, by that time, we

20 were so close to the election that the opportunity to

21 do that would have -- was not feasible.  We didn't

22 have enough time to fully execute that.  But had

Christian Hartsock

Case 1:17-cv-01047-ESH   Document 68-8   Filed 06/03/19   Page 23 of 26

Highly Confidential Attorneys' Eyes Only
Washington, DC

8/9/2018
Page 100

1    we -- had we executed it in the summer -- earlier in

2    the summer, then it would have been doable, the

3    surrogate voter.

4        Q.    And when did Foval tell you this?

5        A.    I believe on the 16th.

6        Q.    Of September?

7        A.    Yeah, the 16th of September.

8        Q.    Okay.  And was that a taped --

9        A.    Yes.

10       Q.    -- meeting?  Telephone conversation?

11       A.    That was an in-person meeting.

12       Q.    And then E under Goal, it says, "Get AUFC

13   associates' hands dirty by engaging them on it too,

14   especially Brad Woodhouse."

15             How were you going to go about achieving

16   that goal?

17       A.    The same way I originally did in Wisconsin

18   five months prior, by running it by a number of

19   subjects -- potential subjects and determining

20   whether or not they were corruptible or honest

21   people.

22       Q.    Okay.  Then over on page 3, under -- this

```
 1         A.     No.

 2         Q.     What's the double-blind have to do with

 3    the surrogate voter operation?

 4         A.     The surrogate voter -- the surrogate

 5    voting option was a scenario that I created in order

 6    to create an environment -- in order to curate an

 7    environment in which our subjects would feel

 8    comfortable sharing their skeletons, telling us where

 9    the bodies are buried, so to speak, just as Mr. Foval

10    is -- typically when you're -- typically someone is

11    not -- does not feel safe revealing their dirty

12    secrets to someone who has not already revealed their

13    dirty secrets.  It's an initiation of mutually

14    assured destruction.

15              The -- the goal was to find out what was

16    being done within these operations, not to -- the --

17    the surrogate voting -- it seems -- you seem to be

18    citing it as a -- as a straw man.  That was our

19    icebreaker.  That was an icebreaker that I came up

20    with to take the moral temperature of Scott Foval,

21    and then by extension, Mr. Creamer.

22         Q.     And when you say "these operations," what
```

Christian Hartsock
Case 1:17-cv-01047-ESH  Document 68-8  Filed 06/03/19  Page 25 of 26
Highly Confidential - Attorneys' Eyes Only
Washington, DC
8/9/2018
Page 150

1    the video summary form or after action report?

2         A.    Anything of interest.

3         Q.    Interest from what standpoint?

4         A.    Relevance to the investigation, leads

5    worth investigating, highlights.

6         Q.    Okay.  Okay.  Did you -- in the course of

7    the Veritas -- I mean, the Democracy Partners

8    investigation, did you discover any instance in which

9    any individual actually engaged in voter fraud?

10        A.    No.

11             MR. SANDLER:  Give us a minute.  You can

12   sit here.

13             (A recess was taken.)

14             MR. SANDLER:  No further questions of this

15   witness.

16             MR. CALLI:  He'll reserve his right to

17   read.  Thank you.

18             THE REPORTER:  And did you need a copy,

19   Mr. Calli?

20             MR. CALLI:  Yeah, we'll order.

21             (Whereupon, at 3:14 p.m., the taking of

22   the instant deposition ceased.)

```
 1                CERTIFICATE OF REPORTER

 2   UNITED STATES OF AMERICA ) ss.:

 3   DISTRICT OF COLUMBIA      )

 4        I, JESSICA CROXFORD, RPR, the officer before

 5   whom the foregoing proceedings were taken, do hereby

 6   certify that the foregoing transcript is a true and

 7   correct record of the proceedings; that said

 8   proceedings were taken by me stenographically to the

 9   best of my ability and thereafter reduced to

10   typewriting under my supervision; and that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14

15

16

17   ----------------------------------------

18                  Notary Public in and for

19                  The District of Columbia

20

21   My commission expires: May 14, 2022

22
```