# EXHIBIT
# 12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------X

DEMOCRACY PARTNERS, LLC, et       :

al.,                              :

                                  :  Case No:

         Plaintiffs               :  1:17-CV-1047-ESH

                                  :

         -vs-                     :  Pages 1 - 107

                                  :

PROJECT VERITAS ACTION FUND,      :

et al.,                           :

                                  :

         Defendants               :

------------------------------X


Videotape Deposition of Scott Frey

Washington, D.C.

Tuesday, November 27, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  443993


MAGNA LEGAL SERVICES

(866) 624-6221



Page 2

1

2

3

4

5

6                          Tuesday, November 27, 2018

7                          (9:35 a.m.)

8

9    Videotape Deposition of Scott Frey, held at the

10   offices of:

11

12        Verdi & Ogletree PLLC

13        1325 G Street, N.W.

14        Suite 500

15        Washington, D.C.  20005

16

17

18   Pursuant to notice, before Kathleen M. Vaglica, RPR,

19   RMR, a Notary Public in and for the District of

20   Columbia.

21

22



```
 1                  A P P E A R A N C E S

 2

 3

 4    COUNSEL FOR DEFENDANTS

 5         PAUL A. CALLI, ESQUIRE

 6         Calli Law, LLC

 7         One Flagler Building

 8         14 Northeast 1st Avenue, Suite 1100

 9         Miami, FL  33132

10         (786) 504-0911

11         pcalli@calli-law.com

12

13         STEPHEN R. KLEIN, ESQUIRE

14         Statecraft PLLC

15         1629 K Street, N.W., Suite 300

16         Washington, D.C.  20006

17         (202) 804-6676

18         steve@statecraftlaw.com

19

20

21

22
```



```
 1   COUNSEL FOR PLAINTIFFS

 2        JOSEPH E. SANDLER, ESQUIRE

 3        Sandler Reiff Lamb Rosenstein & Birkenstock,

 4        P.C.

 5        1090 Vermont Avenue, N.W., Suite 750

 6        Washington, D.C.  20005

 7        (202) 479-1111

 8        sandler@sandlerreiff.com

 9

10   COUNSEL FOR THE WITNESS

11        KATHLEEN KELLER, ESQUIRE

12        Bredhoff & Kaiser, P.L.L.C.

13        805 15th Street, N.W.

14        Washington, D.C.  20005

15        (202) 842-2600

16        kkeller@bredhoff.com

17

18   ALSO PRESENT

19        David Campbell, Videographer

20

21

22
```



1    affairs.

2         Q.   For the Presidential election cycle of

3    2016, were you employed with that union, and did you

4    have the same title?

5         A.   Yes, I was, and yes.

6         Q.   I don't want to know any discussions that

7    you had with your lawyer or any members of your

8    lawyer's law firm or her legal staff when I ask you

9    the following question.  Do you understand?

10        A.   Yes.

11        Q.   Outside of conversations with your lawyer,

12   but including any conversations with other persons

13   at the union or any lawyers outside of your lawyer's

14   office, who did you speak to to prepare for this

15   deposition, if anyone?

16        A.   No one.  Correction.  I did do some

17   research with some of my staff who handled some

18   aspects of our work with Mr. Creamer to refresh my

19   memory as to certain issues, so --

20        Q.   Did you do that after you had an

21   opportunity to review the Attachment A on Exhibit 1

22   that I gave you today?



1        A.    I did, yes.

2        Q.    When you say with members of your staff,

3   with whom did you consult and refresh your

4   recollection?

5        A.    There was a person on my staff who was our

6   director of grass roots.  She's since retired.  Her

7   name is Barbara Coufal.  I called her yesterday to

8   clarify some of the, some of the issues that were

9   cloudy in my memory.

10        Q.    How do you spell Coufal, please?

11        A.    It's C-O-U-F-A-L.

12        Q.    Was she employed during the 2016

13   Presidential election cycle?

14        A.    She was.

15        Q.    When you say the issues, this is what

16   we'll get into today, but what issues were you

17   seeking clarification from her on yesterday?

18        A.    She handled the issues of when we parted

19   ways with Mr. Creamer's services for the

20   patch-through calling work he did for us, our grass

21   roots effort.  She had the detailed knowledge of our

22   search for other vendors, and in the event that came



1   up in the discussion, I wanted to make sure I was

2   able to remember that correctly.

3        Q.   Did search for other vendors that you just

4   articulated, to your knowledge, did that search

5   occur before or after AFSCME terminated its contract

6   with Mr. Creamer?

7        A.   After.

8        Q.   Is there -- I think what the court

9   reporter is going to ask both of us -- she's being

10  gracious to me and to you -- is that we, even if we

11  think we know what the other is asking or answering,

12  that we wait -- I'll wait until you stop talking

13  because she can only take down one of us.

14       A.   Sure.

15       Q.   Are you aware if any -- remind me

16  Barbara's last name.

17       A.   Coufal.

18       Q.   Are you aware if Ms. Coufal conducted any,

19  made any efforts to search for other vendors prior

20  to AFSCME terminating --

21       A.   I am not aware of that, no.  We had been

22  working with Mr. Creamer's firm for a number of



1    years, and the decision -- once the, once our

2    relationship was terminated, we needed to find an

3    alternative.

4        Q.    I'm smiling only 'cause you're speaking in

5    the past tense or passively.  You're testifying

6    before congress, but we'll get to those issues.  Was

7    AFSCME working with Bob Creamer when you started in

8    2014 already?

9        A.    Yes.

10       Q.    And so that just continued?

11       A.    That's right.

12       Q.    Did you -- was working with him as a

13   vendor sort of year in and year out for that first

14   couple years, was that under your responsibility?

15   Was it your decision making or did it just happen or

16   was it somebody else's?

17           MS. KELLER:  I'm going to object.  Just

18   compound and vague.  Maybe you could specify the

19   question and ask just one question.

20   BY MR. CALLI:

21       Q.    Do you understand my question?

22       A.    If you could clarify, it would be helpful.



1      Q.   Was it within your review to determine to

2  continue to work with Mr. Creamer the first year

3  that you were employed?

4      A.   We had established relations with

5  Mr. Creamer that went back before my time.  I knew

6  him from previous work.  I was familiar with his

7  work.  My staff assured me, because I had asked

8  about it when I came in, about all of the

9  arrangements we had, that, that he did good work and

10  it was a good value, and there was no reason to

11  consider it a change at that time.

12         So we did not, but yes, it was under my

13  authority as director of government relations to

14  recommend a change if, if I felt that was necessary.

15      Q.   Did you execute new contracts with

16  Mr. Creamer at any time subsequent to you starting

17  with AFSCME?  Did you, personally, sign any

18  contracts with Mr. Creamer that you remember?

19      A.   We did, we had an annual consulting

20  contract with him.  I'm struggling to recollect

21  whether I was the signator of those contracts.  I

22  don't believe -- I believe it was our chief of staff



1  who signed those contracts, but they were renewed

2  annually.  That does not relate to the patch-through

3  calling work as --

4      Q.   What's the distinction between the two?

5      A.   The consulting work was for support for

6  our legislative efforts, and our grass roots efforts

7  related to our legislative program.  The

8  patch-through calls were not under the contract

9  agreement for his work on that front.  He had a

10  business where he provided that service, and we, we,

11  we paid him for those services as a side agreement.

12      Q.   Do you remember the name of his business

13  for the --

14      A.   Strategic Consulting Group.

15      Q.   Okay.  And was the consulting work, do you

16  remember if it was with Bob Creamer or if it was

17  with Democracy Partners?

18      A.   I believe the contract -- I'm not quite

19  clear on the corporate structure there, but I

20  believe that the contract clearly states that it was

21  with his firm, and then it's an NA/Democracy

22  Partners.



1      Q.   When you mentioned a moment ago

2   distinguishing between the patch-through calls and

3   the consulting work and you stated that there was a,

4   for a side agreement I believe is the phrase you

5   used, was there a written contract with regard to

6   that?

7      A.   There was not.  He was a vendor, and so we

8   treated him as a vendor.  We, we could have utilized

9   any service under that type of -- we weren't under

10  contract to deal with him exclusively, but we chose

11  to because we had been, we had that arrangement for

12  some time.  It was -- it began long before I came to

13  AFSCME.

14     Q.   And I understand that.  I'm just trying to

15  understand --

16     A.   Sure.

17     Q.   -- if there was anything memorialized in

18  writing with him that defined the scope of the work

19  or the manner in which he would be paid or what

20  AFSCME was utilizing him as a vendor for.

21         MS. KELLER:  I'm sorry.  I'm going to

22  object only 'cause that's a little vague.  Are you



1    referring to with respect to the patch-through

2    calling?

3            MR. CALLI:  That's what we're talking

4    about right now, so --

5            MS. KELLER:  Okay.

6            THE WITNESS:  I don't recall ever seeing

7    anything that, any document of that nature.  As I

8    said, we'd been, we've been using him as a vendor

9    for this service for quite a few years I think

10   dating back to 2009.  I think the terms are well

11   understood.  It was managed by the same staff

12   person, the one I mentioned earlier, during that

13   entire time.  And it, it was, you know, from our

14   assessments later talking to other vendors, it was

15   in the, in the range of what the market for that

16   service bore, so --

17   BY MR. CALLI:

18       Q.   At any time since you started with AFSCME

19   to when AFSCME terminated its relationship with

20   Mr. Creamer for these calls that we're discussing,

21   do you know where the calls originated?  Where the

22   call center was that you were utilizing?



1          MS. KELLER:  I'm going to object.  Assumes

2   facts not in evidence because it's not clear to me

3   that there's a call center.

4          MR. CALLI:  Okay.

5          MS. KELLER:  May imply something different

6   than what it was.

7   BY MR. CALLI:

8      Q.   Where did the calls, the robocalls that

9   you contracted with Mr. Creamer originate from; do

10  you know?

11     A.   I do not know, no.

12     Q.   Where were you employed immediately prior

13  to AFSCME?

14     A.   I was at the U.S. Social Security

15  Administration.

16     Q.   Just generally, what did you do for them?

17     A.   I was the deputy commissioner for

18  legislative and congressional affairs, essentially a

19  similar role.  I represented the agency before

20  congress.

21     Q.   How long did you hold that position for?

22     A.   Four years and seven months,



1          MR. CALLI:  Yes.

2          THE WITNESS:  Not that I'm aware of.

3     BY MR. CALLI:

4     Q.   Since July 31 of 2018, so this past

5     summer, have you communicated in any manner with

6     Mr. Creamer?

7     A.   As a matter of course, he continues his

8     work on coalition activities.  So, yes.  The answer

9     is yes.

10    Q.   Okay.  I'll be more specific.  I

11    apologize.  Since July 31 of 2018, have you

12    communicated with Mr. Creamer in any way about the

13    termination by AFSCME of its relationship with him

14    and Democracy Partners?

15    A.   Not that I can recall, no.

16    Q.   Are you aware if -- and let me stop.  Who

17    is the president of the union currently?

18    A.   Lee Saunders.

19    Q.   Was he president from 2014 to the

20    termination of AFSCME's relationship with

21    Mr. Creamer?

22    A.   Yes, he was.



1      Q.   Are you aware if Mr. Saunders has

2  communicated with Bob Creamer since July 31 of 2018

3  about Mr. Creamer's prior relationship with AFSCME?

4      A.   Not to my knowledge.

5      Q.   About AFSCME's termination of Mr. Creamer?

6      A.   If, if that occurred, I'm not aware of it.

7      Q.   About any desire by Mr. Creamer to renew

8  the relationship with AFSCME?

9      A.   Again, if that occurred, I'm not aware of

10  it.

11      Q.   And that last question I didn't ask about

12  you.  You've had no discussions with Mr. Creamer

13  since July 31, 2018, about potentially renewing the

14  relationship between him and AFSCME?

15      A.   Not that I recall.

16      Q.   After AFSCME had a professional

17  relationship with Mr. Creamer for so long in

18  different capacities, why hasn't the union initiated

19  those discussions with him subsequent to the

20  termination?

21      A.   First of all, we, we're in a new era in

22  terms of our fiscal concerns.  We just came through



1    a Supreme Court decision that, with potential

2    effects to our bottom line, and I have not renewed a

3    contract for consulting with anyone because of those

4    concerns about our, our budget.

5         So we've acquired a new vendor for the

6    patch-through call service that Mr. Creamer

7    provided, and it seemed to be working fine, so we

8    saw no reason to reenter any kind of discussion with

9    him about consulting.

10        Q.   Consulting or the calls?

11        A.   Or the calls, right.

12        Q.   When in your -- the new era budgetary-wise

13   that you just testified about, when do you define

14   the start of that new era budgetwise?  When do you

15   pinpoint that generally?

16        A.   Well, I think the concern about the future

17   of the union was impressed upon me the day I walked

18   in the door.  We had come through a Supreme Court

19   decision, Harris v Quinn, that signaled more threats

20   to come, which subsequently came in the form of

21   Friedrichs V California Teachers Association.

22             During that course, it became increasingly



1   apparent to the union that the Supreme Court may

2   decide the decision on our ability to collect

3   fair-share fees, and we were looking for savings in

4   our budget and ways to conserve resources, and we

5   were all asked to contribute, we, all the directors

6   of the various departments in the union, were asked

7   to find ways to be more cost effective.

8            When the contract ended, I felt, unless I

9   had a very good reason for replacing that role, I

10  would need to justify it, and at that point, given

11  the fiscal constraints, I decided there was little

12  justification for it.

13       Q.   When you say the contract ended, are you

14  referring to the contract with Mr. Creamer?

15       A.   Yes, that's right.

16       Q.   You started this aspect of your testimony

17  that you just concluded with the word "first," and

18  then you discussed the budgetary concerns and the

19  Supreme Court decisions.  Is there additional

20  reasons that you intended to testify about when you

21  said "first"?

22            You said -- I asked you a question, and



1  before or after Woodhouse and got notice from

2  Creamer before -- what I'm trying to ask is why

3  would you have called him to find out, as you

4  testified what happened, if Creamer had already

5  called you and said, hey, we got, whatever he told

6  you?

7      A.   I felt I deserved an explanation from both

8  of them.

9      Q.   Okay.  What did Creamer say in the first

10  phone call you had with Mr. Creamer, regardless of

11  when it occurred?  What do you remember he informed

12  you in your capacity at AFSCME?

13      A.   I can give you, to the best of my

14  recollection, the gist of that conversation, not --

15      Q.   That would be fine.

16      A.   Not verbatim.

17      Q.   Of course.

18      A.   But it's similar to the arguments put

19  forth in this memo that you've shared with me that

20  indicate that, you know, they were set up, that

21  their words were edited out of context, that the

22  video was falsifying what actually occurred, and it



1    wasn't what it appeared to be, and these are the

2    standard operating tactics of Project Veritas, and

3    we've seen their work before, and you, and that was

4    the gist of the conversation.  I mean, it was the

5    same explanation that you see laid out in general in

6    this document.

7         Q.   But do I understand your testimony

8    correctly that he was, Creamer was concerned with

9    the publication of this video?

10        A.   Without a doubt.

11        Q.   Do you --

12        A.   I'd say he felt he was maligned and

13   Mr. Woodhouse felt the same.

14        Q.   Do you know if you spoke with President

15   Saunders on Monday, October 17, 2016, the date of

16   release of the video?  If you, personally.

17        A.   I don't recall speaking with him on that

18   date, no.

19        Q.   Do you remember when the first time that

20   week is you communicated with the president of the

21   union regarding the release of the video?

22        A.   So, to the best of my recollection, it was



Page 74

1    the subsequent day.

2         Q.    Tuesday?

3         A.    I believe so.  It was a phone call.  I

4    don't recall the exact time.  It might have been two

5    days.  As I said, I don't recall if he was traveling

6    or out of pocket, but he called me as soon as he was

7    able to, I believe.

8         Q.    Tell me, if you would, what you remember

9    about your conversation with President Saunders.

10        A.    He was extremely angry.  He was

11   disappointed with both Mr. Woodhouse and

12   Mr. Creamer, that they could allow this type of

13   distraction to occur and that there was a concern

14   that somehow by implication AFSCME had something to

15   do with this because of our financial relationship,

16   and he didn't want any part of it, and he was

17   concerned about why they hadn't notified him

18   directly or at least why Brad had not notified him

19   directly.  That was a pretty short conversation,

20   actually.

21        Q.    Was there a decision made -- let me back

22   up.



1          Whose decision was it to terminate the

2    contract and relationship with Bob Creamer's

3    Strategic Consulting Group and Democracy Partners?

4          A.    I went up to discuss this, as I said, with

5    the chief of staff on the, I believe it was the

6    17th, and we just mutually agreed that we should end

7    the relationship.

8          Q.    At that time?

9          A.    At that time.

10         Q.    That first meeting that you, conversation

11   you had with the chief of staff of AFSCME?

12         A.    That's correct.  I mean, that would be a

13   recommendation to the president, which we felt he

14   would not disagree with.

15         Q.    Did you communicate that recommendation to

16   the president in the short call that you just

17   testified about that you had with Mr. Saunders the

18   day after or two days after the release of the

19   video?  Or did you have to?

20         A.    I didn't have to, no.

21         Q.    Tell me why.

22         A.    Because, again, I don't recall the



1    specifics of the call.  My impression was that

2    Mr. Lurye, the chief of staff, had already discussed

3    it with him and he was onboard with the

4    recommendation.

5         Q.   So, before you communicated to President

6    Saunders, Mr. Lurye and I have met and we believe we

7    should recommend the termination of the services,

8    President Saunders said something to you?

9         A.   I don't recall him saying that.

10        Q.   No, no.  What I'm asking -- did he, how

11   did you arrive at the conclusion in the call that

12   you didn't have to tell the president of your

13   recommendation and that of the chief of staff?  What

14   did the president say that you remember that

15   indicated to you he was on the same page and wanted

16   to terminate the relationship?

17        A.   I don't recall that he mentioned

18   termination of the relationship.  I seem to recall a

19   subsequent conversation with Mr. Lurye that he was

20   onboard with that, so we proceeded.

21        Q.   Okay.  Okay.  Why did he make that

22   recommendation?



1      A.    Again, we felt there was -- understanding

2    what we knew about this organization, Project

3    Veritas, and their representation, their reputation

4    for misrepresenting the facts and doing these types

5    of videos, we did feel that there was an element of

6    indiscretion that they'd allowed Mr. Foval into

7    their midst without serious vetting, that they

8    created a, it was the view at the time that they had

9    created the opportunity for this, for this operation

10   to occur, and it had become a major distraction to,

11   and an unnecessary one at a critical moment in time.

12          We did not want, we did not, we did not

13   want to, we did not welcome the distraction that it

14   had created.

15     Q.    When you say they had let Mr. Foval out

16   into their midst without proper vetting, you're

17   referring to Mr. Creamer, Democracy Partners, and

18   Strategic Consulting Group?

19     A.    That's correct, yes.  We felt like that it

20   was carelessness on their part.

21     Q.    And when you say they created an

22   environment where this could occur, whatever you



1   testified to, you're referring to Creamer, Democracy

2   Partners, Strategic Consulting Group, not to Project

3   Veritas?

4        A.   I'm referring particularly to Mr. Creamer

5   and Mr. Woodhouse in whatever capacity they were in.

6        Q.   Prior to the letter -- let me back up.

7   Did AFSCME have concerns about anything Mr. Creamer

8   said on the video that was released?

9        A.   I am trying to remember what he said in

10  the video.  My recollection is that we did.  We did

11  have concerns with what he said.  What specifically

12  those were without reviewing the video again I

13  wouldn't, wouldn't recall specifically what those

14  concerns were, but that he was speaking ad hoc about

15  his strong ties to the Clinton Campaign, and it

16  seemed a bit inappropriate, but then, again, we also

17  were aware that, of the view that the video had been

18  highly selectively edited, and, likely, those words

19  were taken out of context.

20            I think it was the overall sense that they

21  allowed this to occur, they invited this opportunity

22  into their midst, but I think the broader concern



1   was just clearly, regardless of the circumstances

2   that led to the video, the video in itself and the

3   way it was released and the timing was a very

4   unfortunate distraction, and we didn't want to be

5   party to it.

6        Q.   The termination letter that I've marked as

7   an exhibit and provided you a copy with, did you

8   inform Mr. Creamer verbally that AFSCME was

9   terminating its relationship with him and his entity

10  and Democracy Partners before that letter was

11  transmitted to him?

12       A.   My recollection was I called him and told

13  him the letter was coming.

14       Q.   Do you know, do you remember what day that

15  week in relation to the letter -- the letter is on

16  Friday.  The letter, the day of the letter is Friday

17  of that week.  The first Veritas video was released

18  Monday.  Do you remember what day you had the call

19  with Mr. Creamer?

20       A.   I think it was the day the letter was

21  dated, the day we released it to him.

22       Q.   Did he attempt to explain or dissuade the



Page 80

1   decision or reconcile as he had in a prior call that

2   you testified to or not?

3        A.   He did plead his case that he felt that

4   they were dealt with unfairly and inappropriately in

5   the video and that, yes, he did plead his case.

6        Q.   Did -- in any of the calls that you had

7   with Mr. Creamer, whether it was the call we just

8   discussed notifying him the letter was coming or the

9   earlier call that week -- and, by the way, do you

10  have a recollection of how many calls you had with

11  Mr. Creamer that week on behalf of AFSCME?

12       A.   I don't.  There were several.

13       Q.   Do you think it was more than the first

14  call and the, hey, the letter is coming call with

15  specifically Mr. Creamer?

16       A.   Yes, because they subsequently came up

17  with a list of talking points that explained their

18  side of the story that they were trying to get

19  around to people, and he shared those with me over

20  the phone and, you know, several attempts to explain

21  their side of the story.

22       Q.   Did -- in any of those calls with



1   Mr. Creamer, did he ever inform you that, whether or

2   not he had -- well, let me back up for a second

3   'cause I don't want to assume facts not in evidence.

4           Did you become familiar, prior to your

5   discussion with the chief of staff wherein you

6   testified you decided the recommendation was to

7   terminate AFSCME's relationship with Creamer,

8   Strategic Consulting Group, and Democracy Partners,

9   before that meeting with the chief of staff where

10  you arrived at that mutual recommendation, did you

11  learn from Mr. Creamer the specifics of Veritas's

12  undercover operation, investigation of Democracy

13  Partners, the granular -- what, if anything, did you

14  learn about how the investigation was executed

15  before the meeting with the chief of staff?

16      A.   I believe it was that first call was with

17  Mr. Creamer where he went through the litany of

18  arguments, again, that you see in this memo as to

19  how they felt like they were, and this is a Brad

20  Woodhouse memo, but I think they were both making

21  the same case, that pretty much spells out -- I

22  don't remember the details of any of the



1   conversations.

2          I remember generally that, you know, I

3   think there was a discussion of Mr. Foval and how he

4   came into the organization and how they regretted,

5   you know, hiring him and that -- so, I mean, it was,

6   again, basically making the case that they were

7   victims of an undercover operation that was, that

8   was biased and underhanded and maliciously edited

9   their own statements to appear to be something that

10  was not proper.

11      Q.   Did you discuss with Mr. Creamer any time

12  that week -- let me back up.

13         Before the release of that video, did you

14  know who Scott Foval was?

15      A.   Yes.

16      Q.   Who did you know him to be before the

17  release of that video?

18      A.   He was announced via e-mail to a large

19  group of coalition advocates at the time of his

20  hiring that he was being hired as national field

21  director.

22      Q.   For or by?  Hired by?



Page 83

1          A.    By Americans United For Change.  And I

2     believe that was his title, national field director.

3     I don't recall if I had any, any direct contact with

4     him.  It's possible.  I don't recall.  I was aware

5     that he was a staff there.

6          Q.    Okay.  Did you know, prior to the release

7     of the video, if Mr. Creamer or Democracy Partners

8     or Strategic Consulting Group had worked with Foval

9     previously?

10              MR. SANDLER:  Worked with what?

11              MR. CALLI:  Mr. Foval previously.

12              THE WITNESS:  You mean prior to his hiring

13    by Americans United For Change?

14    BY MR. CALLI:

15         Q.    Yes.  In fact, to clarify, whether he had

16    ever been an employee or a contractor or anything to

17    Democracy Partners, Creamer, or SCG.

18         A.    No, I have no knowledge of any of that,

19    no.

20         Q.    Did you learn what AUFC did to vet Foval

21    before hiring him in that position?

22         A.    I did not, no.



Page 84

1      Q.   Did you ever discuss with Mr. Creamer,

2   whether he offered it or you asked it, the details

3   surrounding the Veritas journalist embedding herself

4   in Democracy Partners?

5      A.   I --

6      Q.   In that week of the release and the

7   termination.

8           MS. KELLER:  I'm objecting.  Assumes facts

9   on the journalist, but go ahead and answer.

10          THE WITNESS:  I, I am certain that that

11   was -- I don't have a specific recollection of a

12   discussion of her, but I generally recollect that

13   that was part of his plea, that this person had

14   infiltrated and was, you know, standard operating

15   procedure, as far as I could see, from the past and

16   current work of Project Veritas.  Embedding people

17   in these types of operations was standard operating

18   procedure, so yes, there was a discussion of this

19   person.  The specifics I don't recall.

20   BY MR. CALLI:

21      Q.   Okay.  I'm going to ask you a series of

22   questions and see if you have a recollection of



Page 85

1   discussing them with Mr. Creamer.  Okay?

2       A.   Okay.

3       Q.   Did Mr. Creamer inform you whether or not

4   he or Strategic Consulting Group or Democracy

5   Partners had the intern sign a nondisclosure or

6   Confidentiality Agreement?  All these questions for

7   time frame are Monday, the release of the video, to

8   the termination letter on Friday of that week.

9       A.   I don't recall that, any conversation

10  about that.

11      Q.   Do you recall if you ever asked him?

12      A.   I did not ask him.

13      Q.   Did Mr. Creamer inform you -- again, all

14  these questions are that week; okay?  I'm asking you

15  about October 17 to October 21 in any of the calls

16  you might have had with Mr. Creamer or meetings or

17  e-mails, any communication.

18           Did he ever inform you whether he had

19  asked the intern for identification before her first

20  day at Democracy Partners?

21      A.   I don't recall such a discussion.

22      Q.   Did you ever ask him that?



Page 86

1      A.   I did not.  It all seemed very moot at the

2    time.

3      Q.   Did you discuss with Mr. Creamer whether

4    he had asked the intern for a resume before her

5    first day at Democracy Partners before being hired?

6      A.   Again, the circumstances of her presence

7    there at that point seemed irrelevant, so I don't

8    recall having that conversation with him.

9      Q.   You don't recall or you didn't, just so

10   the record is clear?

11     A.   I don't recall.  I suspect I did not.

12     Q.   Okay.  You understand I have to ask these

13   questions, so --

14     A.   I understand.  That's fine.

15     Q.   So I do appreciate your statement that it

16   seemed to you to be moot, but I have to go through

17   these questions.

18     A.   Understood.

19     Q.   Did Mr. Creamer disclose to you that he

20   came to hire the intern through a donor who had sent

21   $20,000, I believe, that amount or had sent money to

22   contribute to Democracy Partners and the causes on



1   which Mr. Creamer was working?

2          MR. SANDLER:  I'll object to that as

3   assuming facts not in evidence.

4   BY MR. CALLI:

5       Q.   Or to AUFC.  Pardon me.  There's a lot of

6   information, and I don't mean to inadvertently

7   misspeak, so Mr., I believe the money was to AUFC,

8   but did Mr. Creamer ever tell you that he came to

9   hire the intern, turned out to be a journalist for

10  Project Veritas, from his efforts to seek political

11  donations from her uncle?

12      A.   I don't recall that conversation.

13         MS. KELLER:  Standing objection to the use

14  of the term "journalist."

15         MR. CALLI:  That's fine.  We'll just stick

16  to the facts and keep our ideology separate because

17  it's really got no bearing on your client's

18  deposition.

19  BY MR. CALLI:

20      Q.   Did Mr. Creamer ever explain to you what

21  work he, Strategic Consulting Group or Democracy

22  Partners tasked the intern with performing?  The



1        Q.    So it was not anything Creamer had told

2    you?

3        A.    No, it was not based on any conversation

4    that I had with him.

5        Q.    Did you have a discussion with Mr. Creamer

6    any time on or after the date you received that

7    e-mail about the lawsuit?  In other words, you get

8    this heads up.  Did you call him and say what's

9    going on?  Did he call you and try to advance

10   reconciliation efforts?  Or did you take no action

11   in response to the e-mail?

12       A.    There was a conversation, and I do not

13   recall the timing of it, where he indicated to me

14   that AFSCME might be deposed in this case.  It could

15   have been around this time.  I suspect it was -- I

16   don't know -- at which point I said then I prefer

17   not to discuss this with you anymore.  And I, and

18   that's the standard I've set since.  It was my

19   decision that it would be better I did not have any

20   conversation with him about this.

21       Q.    Did he endeavor to speak to you about it

22   on any occasion other than the one you just



1   articulated on more than one occasion?

2       A.   I bumped into him a couple weeks ago, and

3   I told him that I was being deposed and that we had

4   a date.  He did not press me to discuss it, and I

5   didn't care to.

6       Q.   Did he say anything to you in response to

7   that?

8       A.   No.  He said, oh, good, I guess is what he

9   said.

10      Q.   That e-mail chain seems to end with a

11  response from the chief of staff to yourself where

12  Mr. Lurye -- Lurye?

13      A.   Yes.

14      Q.   Mr. Lurye writes, probably, but not very

15  smart if it is.  What does that mean?  What does

16  that mean?

17      A.   I don't know.  We ended the conversation

18  there.  I don't know what his view of this is.  He

19  is an attorney.  He was our general counsel prior to

20  taking this job.  I don't know if that's a legal

21  opinion or if that's a personal opinion, but I don't

22  know.  I'd be guessing as to what his thinking was.



1      Q.   Was AFSCME's financial support of AUFC

2   earmarked for any specific purpose?

3      A.   No.  I mean -- well, I'm sorry.  Can you

4   repeat that?

5      Q.   Was AFSCME's support, the financial

6   support you've indicated in your testimony AFSCME

7   provided to AUFC, was that ear, was the financial

8   contribution earmarked, restricted, designated?

9      A.   The general contribution that we made on

10  an annual basis was presumed to be general operating

11  funds for the organization.  However, there were

12  occasions where we provided, I think the last

13  instance was $150,000 contribution to them for their

14  efforts in support of the nomination of Merrick

15  Garland to the Supreme Court.

16          They were going to do a grass roots

17  campaign and targeted states to hold events to

18  support that nomination, so we gave them $150,000 in

19  that last year to do that.  There may have been

20  other occasions over the lifetime of our

21  relationship where those types of additional funds

22  were provided.  They were prior to my being at



1    AFSCME, so I don't have a direct knowledge of that,

2    if they were, but generally, the annual

3    contributions were, were for general operating funds

4    for the staff, offices, whatever they needed to

5    support their existence.

6          They would frequently do work on an ad hoc

7    basis at our request as a result of that, but there

8    was no money tied to any specific project.

9        Q.   Okay.  Did you inform AUFC that AFSCME was

10   terminating its relationship with AUFC?

11       A.   I did.

12       Q.   Who did you inform at AUFC?

13       A.   Mr. Woodhouse.

14       Q.   How did you inform him?  In what manner?

15       A.   It was the same way, a phone conversation.

16       Q.   And a letter coming or no letter for AUFC?

17       A.   I believe a letter was -- I'm not sure.  I

18   recall being notified that Mr., President Saunders

19   was terminating his relationship with the board.

20       Q.   Okay.

21            MR. CALLI:  Can I take five minutes to

22   figure out where we're at?



1          MS. KELLER:  Sure.

2          THE VIDEOGRAPHER:  Going off the record at

3     12:21 p.m.

4          (Whereupon, a short recess was taken.)

5          THE VIDEOGRAPHER:  We are back on the

6     record at 12:28 p.m.

7          MR. CALLI:  Mr. Frey, I don't have any

8     additional questions for you.  I may have one or two

9     after Mr. Sandler asks you questions, but that ends

10    my examination on direct.

11         EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

12    BY MR. SANDLER:

13         Q.   Okay.  Thank you.  Mr. Frey, you had

14    testified that AFSCME was concerned that

15    Mr. Creamer, Strategic Consulting Group, had created

16    the opportunity for this to occur.  Was part of your

17    concern that they had allowed their offices to be

18    infiltrated by a Project Veritas operative?

19         A.   Yes.

20         Q.   You talked about the fact that with

21    respect to the patch-through calls AFSCME hired

22    another vendor to replace Mr. Creamer; right?



1     A.    That's right.

2     Q.    In 2017 did AFSCME continue to make

3   patch-through calls for legislative campaigns?

4     A.    Yes, we did.

5     Q.    And do you have a sense of how the volume

6   of calls in 2017 compared with that of 2016?  More?

7   Less?  About the same?  Given the --

8           MR. CALLI:  Objection to the leading

9   nature of the questions.  I've given some leeway,

10  but --

11          MR. SANDLER:  I'll rephrase it.

12  BY MR. SANDLER:

13    Q.    Do you have a sense of how the volume of

14  calls in, patch-through calls in 2017 compared to

15  the volume in 2016?

16    A.    I am not recalling the exact numbers, but

17  I know that we outspent our budgeted amount in 2017

18  and, again, this year simply because of the

19  incredible amount of disagreements we've had with

20  the current administration and the congress.  I

21  would say that, I'm guessing, but a guesstimate

22  would be that the volume has at least more than



Page 104

1  doubled.  We, we were allowed to overspend our

2  budget two years in a row.

3      Q.    In 2017?

4      A.    2017 and 2018, yes.

5           MR. SANDLER:  No further questions.

6           MR. CALLI:  One moment, please.

7           (Discussion held off the record.)

8           MR. CALLI:  Okay.  I don't have anything

9  else for you.  You're going to have the opportunity

10  to read your deposition in an allotted period of

11  time to be explained by your lawyer and, if you

12  contest or think anything was inaccurately recorded,

13  to submit an errata sheet, and your lawyer will tell

14  you all that.

15           She'll or you will put on the record now

16  whether you wish to exercise that right or waive it.

17           MS. KELLER:  Read and sign.

18           MR. CALLI:  All right.  Thanks for your

19  time.

20           THE WITNESS:  Thank you.

21           THE VIDEOGRAPHER:  If that is everything,

22  we are going off the record on November 27, 2018, at



Page 105

1   12:32 p.m.

2              (Whereupon, signature not having been

3   waived, the taking of the deposition concluded at

4   12:32 p.m.)

5                           *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

