# EXHIBIT
# 13

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------X

DEMOCRACY PARTNERS, LLC,        Case No:

et al.,                         1:17-CV-1047-ESH

        Plaintiffs,       Pages 1 - 135

V.

PROJECT VERITAS ACTION FUND,

et al.,

        Defendants.

--------------------------X

 Videotaped Deposition of WILSON BRADLEY WOODHOUSE

On Behalf of

AMERICANS UNITED FOR CHANGE

Washington, DC 20005

Tuesday, December 18, 2018


Reported by: Denise D. Vickery, CRR, RMR

Job No: 444000


MAGNA LEGAL SERVICES

866.624.6221

www.MagnaLS.com



Page 2

1

2

3

4

5

6

7                              Tuesday, December 18, 2018

8                              9:13 a.m.

9

10      Videotaped Deposition of WILSON BRADLEY

11   WOODHOUSE, held at the offices of:

12

13           VERDI & OGLETREE PLLC

14           1325 G Street NW

15           Suite 500

16           Washington, DC 20005

17

18

19      Pursuant to notice, before Denise Dobner

20   Vickery, Certified Realtime Reporter, Registered

21   Merit Reporter, and Notary Public in and for the

22   District of Columbia.



Page 3

1      A P P E A R A N C E S

2

3  ON BEHALF OF PLAINTIFFS:

4      DARA LINDENBAUM, ESQ.

5      Sandler Reiff Lamb Rosenstein & Birkenstock, PC

6      1090 Vermont Avenue NW, Suite 750

7      Washington, DC 20005

8      lindenbaum@sandlerreiff.com

9      202.479.1111

10

11  ON BEHALF OF DEFENDANTS:

12     PAUL A. CALLI, ESQ.

13     Calli Law LLC

14     One Flagler Building

15     14 Northeast 1st Avenue, Suite 1100

16     Miami, FL 33132

17     pcalli@calli-law.com

18     786.504.0911

19

20

21

22



1       A P P E A R A N C E S   (CONTINUED)

2

3    ON BEHALF OF DEFENDANTS:

4        STEPHEN R. KLEIN, ESQ.

5        Statecraft PLLC

6        1629 K Street NW, Suite 300

7        Washington, DC 20006

8        steve@statecraftlaw.com

9        202.804.6676

10

11   Also Present:

12       Randall Short, Videographer

13

14

15

16

17

18

19

20

21

22



1          A.   He was not -- yeah, I was just trying

2     to remember.  He was not.  If memory serves, I don't

3     think he was a consultant.  I think he came on as a

4     W-2 employee.

5               So I am sure we had -- I'm sure we had

6     other consulting contracts, but they would have been

7     these kind of ad hoc, do a -- do a poll for a

8     particular issue.  Or I don't think we had any ads

9     made that we didn't make in-house.  So, frankly, I

10    don't remember -- I don't remember many other

11    consultants besides Bob.

12         Q.   Do you recall how much AUFC paid

13    Mr. Creamer to -- let me back up.

14         A.   Uh-huh.

15         Q.   Do you recall when AUFC paid

16    Mr. Creamer for his consulting work in 2016 whether

17    it was literally a check payable to Bob Creamer or

18    Strategic Consulting Group, Democracy Partners?

19    What -- what do you remember?

20         A.   I believe it was -- I believe it was

21    Strategic Consulting Group, but I didn't make the

22    checks out.



1        Q.   Okay.

2        A.   I literally just signed them, but it

3   was, yeah.

4        Q.   Would you see invoices that Creamer or

5   his entity sent?

6        A.   I mean, he sent them to Shannon and, I

7   mean, this was just, you know, it was just almost

8   pro forma, I mean.

9        Q.   Okay.

10        A.   You know, I didn't even -- wouldn't

11   even needed an invoice except for recordkeeping to

12   pay him because he was always there.

13        Q.   Do you have a recollection of generally

14   the total amount that AUFC would have paid Creamer

15   or Strategic Consulting Group in 2016?

16        A.   I mean, Creamer's consulting --

17   Creamer's consulting contract was -- or not

18   contract -- agreement was for, if memory serves, was

19   $11,000 a month.  And then there were other -- there

20   were other -- there were other things we paid

21   Strategic Consulting Group for.  Like he does

22   patch-through calls and so there were -- there were



1   patch-through calls that often, often -- often it

2   was a group -- it was a group that wanted us to do

3   the patch-through calls so that there would be a

4   contribution made to Americans United, and then we

5   would -- we would pay Creamer to do the calls.

6           But his -- but his consulting fee was

7   my recollection at the end was $11,000 a month.

8       Q.   Did that over the -- let's talk about

9   just three or four years leading up to 2016 --

10      A.   Uh-huh.

11      Q.   -- and including 2016.

12          Was it static or did it fluctuate based

13  on an election cycle, a campaign?

14      A.   I think from -- from roughly the time I

15  got there in 2013 or at least late 2013 until I

16  left, it was $11,000 a month.  It -- it had been --

17  when I had been there before the DNC, it was

18  somewhere in the magnitude of $8,000 a month and

19  then I -- I increased it sometime after I got back.

20      Q.   Did you have any discussions or

21  communications in 2016 with Mr. Creamer before

22  November 1st of '16 about his continued --



1    specifically about his continued consulting work for

2    AUFC in 2017, 2018, 2019?

3         A.   Before November 1st?  No, I don't.

4    Well, I don't -- I mean, I actually don't recall.  I

5    mean, during that period of time, as a result of

6    this operation, we were, you know, at that point,

7    we -- AFSCME had expressed its displeasure.

8              I think by that time, I think by

9    November 1st, Lee Saunders had come off the board

10   and we had been, you know, we had been told or

11   implied that we wouldn't get any financial support

12   from AFSCME anymore.

13             So, you know, I think we were all

14   trying to figure out if there was any future for

15   Americans United, but I don't think we had -- so,

16   you know, I mean, at some point after November 1st,

17   you know, I told Bob, you know, I couldn't pay him

18   anymore because we were -- we were shutting down.  I

19   don't -- but I don't remember.  Before November 1st,

20   we were scrambling to see if we could survive.

21        Q.   But before --

22        A.   But -- but, you know, if not for this



Page 40

1    operation, we would have, you know, we would

2    continued, we would have continued to get

3    contributions from AFSCME, and he would have

4    continued to get a consulting fee from us.

5         Q.   Did you -- before this -- these issues

6    came up --

7         A.   Uh-huh.

8         Q.   -- which bring us here today, did you

9    have -- specifically did you have discussions with

10   him about continuing to provide consulting services?

11        A.   No, but it was -- but we had done it

12   for 11 years together on and off.  It wasn't going

13   to stop.

14        Q.   If you want to take off your mic and

15   get some more water there?

16        A.   I'm fine for right now.

17        Q.   Are you sure?

18        A.   Yeah, I'm good.

19                  MR. CALLI:  Thank you.

20                  THE WITNESS:   Thank you.

21   BY MR. CALLI:

22        Q.   Did --



1          A.    I appreciate that.  That's good.  Thank

2    you so much.

3          Q.    Were campaigns, you know --

4          A.    Uh-huh.

5          Q.    -- contributors to AUFC?  Did campaigns

6    contribute?

7          A.    We -- we got a regular contribution for

8    a couple of -- a couple of years from Nancy Pelosi's

9    campaign or her PAC and I -- and it may have been

10   both at different times, but it was -- that -- that

11   is -- and we may have gotten a random -- we may have

12   gotten a random contribution over the course of 11

13   years from somebody else's PAC, but I don't recall

14   any other than -- than Pelosi's.

15         Q.    In '15, 2015 or 2016 --

16         A.    Uh-huh.

17         Q.    -- did the Hillary for America campaign

18   or any PAC associated with that give any funding to

19   AUFC?

20         A.    No.  No.  No.  No.

21         Q.    How about in the same period '15/16,

22   did the DNC provide any funding?



1    doing, who Foval was?

2         A.   I -- I don't recall specifically, but

3    it almost certainly -- almost certainly would have.

4    Because like I said, this, you know, Social Security

5    is an important issue to AFSCME.

6              It was why they originally invested in

7    Americans United in its previous incarnation and,

8    you know, it was not their -- it was not their money

9    being spent, but I would have certainly gone to my

10   biggest donor, I think told them that we were doing

11   -- that we were doing this work, but I -- but I

12   don't recall specifically.

13        Q.   I'm not being disrespectful in any way.

14        A.   Uh-huh.

15        Q.   But telling him we're -- here's our --

16   here's our agenda currently on Social Security --

17        A.   Uh-huh.

18        Q.   -- may not include and here's the guy

19   who's doing a discrete piece in Wisconsin.  That's

20   kind of what I'm focused on is the Foval, not the --

21        A.   Uh-huh.

22        Q.   -- not the general reporting by AUFC to



1  its big donor of what its --

2       A.   I don't -- I don't remember

3  specifically telling Scott that.  I just am saying

4  that --

5       Q.   Scott Frey?

6       A.   Scott Frey.

7            It's I'm just saying that it would have

8  been par for the course if I had.  It would have...

9       Q.   Generally, when did AUFC hire Foval as

10  an employee to work on this pieces of work involving

11  Social Security?

12       A.   It must have been -- it must have been

13  late August or early September.  I mean, it was not

14  a work that I had anticipated doing.  It was a grant

15  that came in -- that came into us relatively --

16  relatively late in the cycle.

17       Q.   How did it come to pass that you or

18  AUFC hired Foval?

19       A.   I don't actually -- I mean, he -- he

20  was just -- I was just aware.  He had been -- I had

21  been casually aware of him as a result of all the

22  communication that goes around -- goes around this



```
1    LISTSERV, and I don't remember whose idea it was,

2    but I just knew he was -- I actually don't remember.

3    It may have been Bob.  It may have been someone

4    else.

5              We had a -- we had a field director

6    that was leaving Americans United, which basically

7    this was going to help fill for the purposes of this

8    Social Security campaign, and so it may have been

9    that individual, but I don't remember.

10        Q.   Did you ever have an in-person meeting

11   with Foval before you brought him on?

12        A.   No.  Huh-uh.

13        Q.   Had you ever --

14        A.   We did it on the -- interviewed him on

15   the phone.

16        Q.   You say "we."  Who's that?

17        A.   Caroline Ciccone.

18        Q.   Had you -- had AUFC or you --

19        A.   Uh-huh.

20        Q.   -- in any capacity other than AUFC ever

21   done work with Foval?

22        A.   No.  I appeared at a press conference
```



1    with him, not -- not AF -- not AUFC related, I don't

2    think, at the first Republican debate in 2015 in

3    Cleveland.  But, I mean, it was just he was

4    representing PFAL or somebody at the time.

5           Q.   I'm going to -- I'm sorry I'm jumping

6    around a little bit.

7           A.   No, that's fine.

8           Q.   Going back to the call from Scott Frey

9    --

10          A.   Uh-huh.

11          Q.   -- on the day the first video was

12   released, prior to that communication with Mr. Frey,

13   had you had any communication with Lee Saunders

14   about -- about the videotape?

15          A.   No, huh-uh.

16          Q.   About the Veritas --

17          A.   Huh-uh.  Huh-uh.

18          Q.   -- investigation?

19          A.   No.  Our -- no, and I explained this to

20   Scott at the time was that our focus from Friday

21   afternoon and through the weekend was to prevent

22   Sinclair from publishing this material, which we



Page 55

1    were successful in, but that was -- that was my

2    total -- my total focus was on -- was on that over

3    that -- that over that weekend and up to that Monday

4    morning.

5         Q.   Did he --

6         A.   Monday afternoon.

7         Q.   Sorry.

8              Did AUFC engage counsel?  You mentioned

9    earlier that --

10        A.   Uh-huh.

11        Q.   -- there was local DC counsel engaged?

12        A.   Uh-huh.  Yeah.  Yes.

13        Q.   Did that counsel ever reach out to --

14   to Veritas to -- for the same kind of efforts it was

15   utilizing with regard to Sinclair?

16        A.   No.  They said it would have been a

17   waste of time.

18        Q.   Who said that?

19        A.   It was --

20             MS. LINDENBAUM:  I'm going to --

21             MR. CALLI:  Sure.  Sure.

22             MS. LINDENBAUM:  -- object here



Page 56

1   and just --

2                       MR. CALLI:  Yeah.

3                       MS. LINDENBAUM:  -- have you keep

4   in mind that you don't need to answer any

5   questions --

6                       MR. CALLI:  Yeah.  That wasn't

7   what I was after.

8                       THE WITNESS:  Uh-huh.  Right.

9                       MS. LINDENBAUM:  -- yeah, that --

10  that are discussing what are discussions with

11  counsel.

12                      MR. CALLI:  Yeah.

13                      THE WITNESS:  Right.

14  BY MR. CALLI:

15         Q.   I never -- I never want to know --

16         A.   Yeah.  Yeah.

17         Q.   -- what your lawyers told you.

18         A.   Okay.

19         Q.   I never would ask that.

20         A.   Okay.

21         Q.   And I'm sorry I didn't make that more

22  clear.



Page 57

```
 1          A.   Yeah.

 2          Q.   It was less --

 3          A.   But the answer did they engage Project

 4   Veritas?

 5          Q.   Yeah.  That I -- that was what I --

 6          A.   No.  No.

 7          Q.   I didn't ask you whether --

 8          A.   The only --

 9          Q.   In fairness, I didn't --

10          A.   Yeah.  Yeah.  Yeah, yeah, yeah.  Right.

11   Right.  Right.

12                    MS. LINDENBAUM:  I just wanted to

13   make sure --

14   BY MR. CALLI:

15          Q.   I wanted to be fair on you, not --

16          A.   Yeah, yeah, yeah.  No, no, no.

17   You're -- you're right.  You're right.

18                    No, they -- they only engaged Sinclair.

19          Q.   And I'm not asking about your lawyers

20   now.

21          A.   Uh-huh.

22          Q.   I'm asking about -- about you or AUFC.
```



1        A.    Uh-huh.

2        Q.    Were you aware prior to the publication

3    of the first videotape of who -- of what Project

4    Veritas was and who James O'Keefe was?

5        A.    Sure.

6        Q.    So was at the time 2016 --

7        A.    Uh-huh.

8        Q.    -- is it your testimony that you

9    believed if you were successful in preventing

10   Sinclair that videos would never be -- content would

11   never be released?

12       A.    No.  I think it was just our first --

13   it was our first step in the -- step in the process.

14   I mean, the, you know, we -- I mean, I think we -- I

15   think we definitely figured that they would -- that

16   they would be released, but that they would -- they

17   would seem less credible if, you know, basically the

18   Donald Trump news network wouldn't publish them,

19   that they would seem less -- that they would seem

20   less credible.

21       Q.    In the call from Mr. Frey, that first

22   call on Monday -- by the way, how would you -- can



1  you estimate for me how long that call lasted?

2      A.   15 minutes or less.

3      Q.   Did -- did AFSCME through Mr. Frey

4  terminate its relationship with AUFC at that time?

5      A.   Not on that call.

6      Q.   Did Mr. Frey give you any indication on

7  that call specifically that that was where it was

8  headed?

9      A.   He did -- my recollection is he -- he

10  did not because he did not discuss this with any --

11  with anyone else or with -- or at that point had not

12  discussed it with Lee Saunders was my understanding

13  at the time.

14      Q.   Do you have -- understanding your prior

15  testimony, my specific question is:  Do you have a

16  recollection if during that call Mr. Frey expressed

17  concern in any form for the lack of AUFC having kept

18  AFSCME abreast of the weekend's events?

19      A.   Not in -- I don't -- I don't -- I don't

20  recall that it -- that it came -- that it came up in

21  that call.  My general recollection is, is that

22  Scott understood what the source of this was, how



1   suspect that was.  And when we got off the phone, I

2   don't remember him expressing any concern that we

3   had not given him -- you know, because I told him,

4   you know, how fast this all moved.

5            I don't remember at that stage him

6   expressing any concern about not getting an earlier

7   -- an earlier heads-up.

8        Q.   What was the next communication you had

9   with AFSCME, when was it, and from whom?

10       A.   I feel like that it was later -- it was

11  later that week from Scott.

12       Q.   Frey?

13       A.   Frey.

14            And it would have -- I'm -- this is my

15  recollection.  That sometime later that week, I

16  would have heard from him that I was going to get a

17  memo, a letter, from -- from Lee resigning from the

18  board and that that occurred -- that occurred -- my

19  recollection is -- and you have the letter, I'm

20  sure, but my recollection is, is that that occurred

21  later that week.

22       Q.   That being the call that the letter is



1   coming?

2          A.   Well, yeah, and the -- and the letter I

3   think came.

4          Q.   All in the same week?

5          A.   I believe.  It may have spilled -- it

6   may have spilled in -- it may have spilled into the

7   next week, and -- and I got a call -- and I don't

8   remember the sequence here.  I got a call from AFT

9   at the same time from Michelle Ringuette with the

10  American Federation of Teachers saying that Randi

11  Weingarten also was going to come -- to come off the

12  board.

13              And I may -- I may have gotten the call

14  from her first, which would have -- so my

15  recollection now is, I got the call from her, which

16  prompted me to call Scott to then get, you know,

17  which I'm sure he was preparing to call me to tell

18  me that the same was going to occur with Lee

19  Saunders.

20              That's generally my recollection, but

21  it was -- it was within that first week or so, and

22  it was communication from Scott to me on the phone,



1    it may have been a phone call that I made, and that

2    Lee was coming off the board.  And then the later

3    may have come the next week, but I don't -- I don't

4    recall exactly when the letter came.

5         Q.   Did you have any communications with

6    Mr. Saunders, President Saunders, during that time

7    period?

8         A.   No.  No, and -- and to be clear, my --

9    the relationship with AFSCME, even when Lee -- even

10   when the president had taken the chairmanship of the

11   board, routine relationship had always been with the

12   legislative director or -- or the legislative team.

13        Q.   And Frey's predecessor in that role at

14   AFSCME was?

15        A.   Chuck Loveless.

16        Q.   Okay.  In the call you had with

17   Mr. Frey, second call --

18        A.   Uh-huh.

19        Q.   Whether he initiated or you did is not

20   important for this question.

21        A.   Right.

22        Q.   His statement, Mr. Frey's statement



1    that President Saunders' letter of resignation from

2    the board of AUFC would be forthcoming.

3            A.    Uh-huh.

4            Q.    Was there a discussion of a severing of

5    the relationship between the two entities, not just

6    the board seat?

7            A.    Uh-huh.  I mean, that was -- that -- I

8    don't know if we got that specific because it was --

9    I mean, it was pretty obvious.  I mean, it was, you

10   know, the -- you know, we weren't -- we weren't --

11   2016 we weren't expecting any more money from them

12   anyway.  But it was clear that if he was taking the

13   extraordinary step of going off the board that that

14   was severing the relationship.

15           Q.    I understand your testimony.  I'm just

16   trying to figure out --

17           A.    Yeah.

18           Q.    -- factually if --

19           A.    Yeah.

20           Q.    -- if you have a recollection.  We do

21   understand each other.

22           A.    Yeah.  Yeah.



1          Q.   But I want the record to be clear.

2          A.   Yeah.

3          Q.   What I'm trying to figure out is if you

4   remember if Mr. Frey said, you know, we're not going

5   to work with AUFC in 2017, that's the end of the

6   relationship, or whether it was just a scenario

7   where you say I understood that to be the case?

8          A.   I don't remember -- I don't remember us

9   getting that far because the most part of my

10  conversation was, this is -- "This is bullshit.  Why

11  would you do this?  Why would you lend credence to

12  this," you know, "provocateur and video terrorist?"

13  I mean, those were -- that's what I, you know, what

14  I -- what I said at the time.  I mean, this was

15  fraudulent.  "It's spliced.  It's bullshit."  We

16  didn't do any of the things, you know, alleged in

17  these -- in these videos.

18              That was pretty much, you know, pretty

19  much the conversation, and Scott was just, you know,

20  "I'm just telling you the -- just telling you the

21  facts."

22         Q.   Did he respond to what you say you were



Page 65

1   telling him in, for lack of a better phrase, in your

2   defense, in AUFC's defense?  Did Mr. Frey --

3       A.    I mean --

4       Q.    -- respond?

5       A.    -- "I know.  I understand.  My hands

6   are tied."  It was that kind of thing.

7       Q.    Okay.  Did you have any other verbal

8   communications with Mr. Frey, other than the two

9   you've described, either before or after the

10  resignation letter --

11      A.    Uh-huh.

12      Q.    -- from President Saunders was

13  delivered to you?

14      A.    I'm sure I did.  I don't recall when or

15  how or how many because, you know, eventually, you

16  know, eventually it resulted in a meeting with --

17  with Lee Saunders in December.

18      Q.    You met with Mr. Saunders --

19      A.    Uh-huh.

20      Q.    -- in December?

21      A.    Yeah.

22      Q.    Okay.  But during the week after the



1    terminated at the time we're now discussing

2    together, were you -- were you aware at that time

3    whether Creamer had ever worked with Foval before in

4    any capacity?  Were you aware of why Creamer -- he

5    came down?

6         A.   I was -- I was -- I was aware at the

7    time that we hired Foval that he was also working on

8    a project with Bob related to the DNC and the

9    bracketing operation.

10        Q.   Did you ever do any independent check

11   of Foval, other than your in-phone interview before

12   you brought him on at AUFC?

13        A.   What do you mean?  You mean like --

14        Q.   Internet search, a resume?

15        A.   No.  No, because I had -- like I said,

16   I had -- I participated in a press conference with

17   him.  He had been on -- he had been on calls.  I

18   thought, you know, representing him in whatever

19   organization he was working for at the time pretty

20   well around the Garland Supreme Court fight, which

21   we were -- which we were involved in, and he had

22   worked for an organization, People for the American



1    Way, that I admire.

2         And he came with -- he came with Bob's

3    recommendation, and I trust Bob with my life and

4    have.  So...

5         Q.   Why did AUFC -- why was the decision

6    made for AUFC to no longer exist in or about

7    February of 2017?

8         A.   We -- we had no more sources of

9    funding.  I mean, our primary -- like I said, our --

10   our primary -- our primary source of funding was or

11   significant source of our funding had been AFSCME,

12   and that relationship had been severed.

13        Q.   You had mentioned a board member who

14   had a prominent role at AFT.

15        A.   Randi Weingarten, American Federation

16   of Teachers.

17        Q.   Did AFT provide funding?

18        A.   They were not -- no, they were not

19   regular.  They were not regular donors anywhere like

20   what -- what AFSCME had -- had contributed.  My

21   recollection is they -- I mean, it was a few

22   thousand here or there and usually it was for



1    projects that we were raising money for.  So the

2    money was not -- the money wasn't helping us sustain

3    the organization.  It was going into projects.

4         Q.    So when -- is it a fair statement when

5    AFT would provide funding it would be on a

6    project-by-project basis?

7         A.    I -- that's my general -- now, you

8    know, you can go back many years.  They may have

9    provided more regular funding before I ran Americans

10   United, but in those last few years it was -- I

11   don't think they gave a sustaining contribution each

12   year.

13        Q.    If they did give a contribution, was it

14   -- did they earmark it?

15        A.    No.

16        Q.    Or was it the treatment -- let me

17   finish my question.

18        A.    Yeah.  I'm sorry.

19        Q.    That's okay.  It's human nature, so

20   don't apologize.

21              But when they would give a sustaining

22   contribution, not a contribution for a specific



1   project --

2          A.   Uh-huh.  Right.

3          Q.   -- was it treated the same way as the

4   AFSCME's, meaning it wasn't earmarked and it was at

5   your discretion how to manage that sustaining

6   contribution?

7          A.   Yeah.  I just don't remember if they --

8   I don't remember -- I don't remember if they gave

9   sustaining contributions.

10         Q.   Okay.

11         A.   And if they did, they didn't do it with

12  any -- any regularity.

13         Q.   All right.

14         A.   But in our business, you have to -- you

15  don't -- you can't exist if you don't do the work.

16  So when they funded projects, I mean, that was, you

17  know, important.

18         Q.   Have you had any communication with

19  Scott Foval between the time you say he was

20  terminated from AUFC by Bob Creamer and today?

21         A.   No.

22         Q.   Do you know of anybody who has?  Have



Page 78

1   you been made aware of anybody who has communicated

2   with Foval for any reason in that time frame?

3                   MS. LINDENBAUM:  Objection.

4   Outside the scope.

5   BY MR. CALLI:

6           Q.   You can answer.

7                The only thing she can and I can tell

8   you not to answer is questions about communications

9   with your lawyer.  So, again, place marker and we

10  move on.

11          A.   Not -- not that I'm -- not that I'm

12  aware of, no.

13          Q.   Okay.  This will be the last topic and

14  we'll take a break.  After the break, we'll talk

15  about a memo you prepared to Mr. Loveless.

16          A.   Uh-huh.

17          Q.   How did the meeting with President

18  Saunders come about in December that you said you

19  had?

20          A.   At some point, I asked Scott to set it

21  up.

22          Q.   Frey?



1          A.    Frey, yeah.

2          Q.    I keep saying that obviously because

3    Foval's first name is Scott.

4          A.    Right.  Right.  I got you.  I got you.

5          Q.    Who attended besides you and President

6    Saunders?

7          A.    Scott Frey.

8          Q.    And where was that meeting?

9          A.    It was in his office.

10          Q.    Mr. Saunders?

11          A.    Saunders' office, yeah.

12          Q.    Was the purpose of that meeting to try

13    and resume the relationship with AFSCME?

14          A.    Uh-huh.  Yes.  Yes, it was.

15          Q.    What did -- what do you remember

16    Mr. Saunders saying to you during that meeting?

17                Did -- let me back up.

18          A.    Uh-huh.

19          Q.    Did he decide to renew the relationship

20    or decline to do so after that meeting?

21          A.    He declined.

22          Q.    What did he say to you during the



1   meeting?

2        A.   I mean, he was -- he mentioned that his

3   name had come up.  He mentioned that irrespective of

4   the veracity of the videos, that 40 percent of his

5   membership -- some percentage of his membership, you

6   know, don't support the Democratic side or didn't

7   support Hillary, and he -- he couldn't take the

8   heat, couldn't be associated with it.  Even if he

9   didn't believe any of the, you know, the stuff

10  alleged occurred, he couldn't be -- he couldn't be

11  associated with it.

12       Q.   Was he referring to Foval?

13       A.   No.  He was just referring --

14       Q.   Foval's statement, the video with

15  Foval.

16       A.   No, he was -- he was referring to the

17  -- we were not -- he was not that specific.  I mean,

18  he was referring to the project in general.

19       Q.   Meaning Veritas's publication?

20       A.   Yeah.

21            I don't -- I don't recall.  I don't --

22  I don't recall us talking about Foval specifically,



1    but I'm not saying it didn't occur.  I just don't

2    remember that.

3           Q.    What other aspects -- in other words,

4    Mr. Frey on behalf of AFSCME terminates -- calls you

5    first --

6           A.    Uh-huh.

7           Q.    -- pretty soon after the release of the

8    first video.

9           A.    Uh-huh.

10          Q.    And -- and then later that week or

11   thereabouts AFSCME terminates its relationship --

12          A.    Uh-huh.

13          Q.    -- and Mr. Saunders resigns --

14   President Saunders resigns from AUFC's board?

15          A.    That's correct.

16          Q.    What about the rest?  What -- what

17   concern does President Saunders have about any other

18   aspect of the Project Veritas investigation that was

19   published, other than Foval and yourself, that

20   caused him to terminate the relationship?  The

21   things that were not Foval/AUFC specific.  What --

22          A.    You mean what other reasons he gave?



Page 115

1     in front of you?

2            A.   Okay.

3            Q.   If you could do a quick scan of the

4     first page of this memo, do you see Bob Creamer's

5     name anywhere?

6            A.   I mean -- (reviews document).  I don't.

7            Q.   Okay.  Or Democracy Partners?

8            A.   I don't.

9            Q.   Same with the second page.

10           A.   (Reviews document).  I don't.

11           Q.   Okay.  I'm not going to have you go

12    through the rest of the pages.  The document speaks

13    for itself.  Unless you saw his name somewhere in

14    here.

15                Was there a reason why Bob Creamer's

16    name was left out of this memo and Democracy

17    Partners' name?

18           A.   I mean -- I mean, this was about

19    Americans United's relationship with -- with AFSCME

20    and trying to rekindle that.  I mean, that -- that's

21    really what, you know, what this memo is about.

22           Q.   If you had Bob Creamer's or Democracy



1    Partners' name here -- let me rephrase this.

2              In writing this memo, did you think

3    about whether having his name in here would help or

4    would hurt your cause?

5         A.   I -- no.

6         Q.   Okay.

7         A.   That -- I don't think that occurred to

8    me.

9         Q.   Okay.  Okay.  You had mentioned that

10   you didn't have any conversations with Robert

11   Creamer about continuing services after 2016.

12        A.   Uh-huh.

13        Q.   Had you ever had any of those

14   conversations with -- did you have any of those

15   conversations with him in 2015?

16        A.   No.

17        Q.   What about 2014?

18        A.   No.

19        Q.   2013?

20        A.   Nope.

21        Q.   Okay.  So that would not be any

22   different?



1          A.    No, huh-uh.

2          Q.    All right.  All right.

3          A.    We just thought we would go on forever

4    together.

5                    MR. CALLI:  That's a tale of many

6    relationships, my friend.

7                    THE WITNESS:  Well, yeah.

8                    MR. CALLI:  Best-laid plans.

9                    THE WITNESS:  Yeah.

10   BY MS. LINDENBAUM:

11         Q.    You, again, I believe said that

12   something along -- I'm not quoting you directly --

13   that you didn't feel like Allison Maass's presence

14   had anything to do with cutting ties with AFSCME; is

15   that correct?

16         A.    It -- I don't recall it -- I don't

17   recall it ever coming up in my -- it did not come up

18   -- I can tell you it did not come up in my

19   conversation with Scott when he told me.  Because

20   the conversation with Scott around Lee is going to

21   resign from the board was basically he said that,

22   and I said, "Are you fucking kidding me?"  And that



1    was really about the content of that conversation.

2          Q.    Okay.  I just wanted to make sure that

3    we were clear here.

4          A.    Right.

5          Q.    So you're talking there about the

6    conversation.

7          A.    Well --

8          Q.    The fact --

9                MR. CALLI:  I'm going to object to

10   the mischaracterization of what his testimony was --

11               MS. LINDENBAUM:  Right.

12               MR. CALLI:  -- but I'll get back

13   into it on redirect.

14   BY MS. LINDENBAUM:

15         Q.    Were you discussing the -- let me go

16   back here.

17               Had Allison Maass never infiltrated,

18   Project Veritas, the Democracy Partners office --

19         A.    Uh-huh.

20         Q.    -- would Bob Creamer have been on those

21   videos?

22               MR. CALLI:  Objection.  That's



1   speculation.

2                    THE WITNESS:  Well, he wouldn't

3   have been on -- wouldn't have been on the ones that

4   she filmed.  I mean, that's not speculation.

5   BY MS. LINDENBAUM:

6        Q.   Okay.  My last question to you is:  You

7   don't have counsel present?

8        A.   Right.

9                    MS. LINDENBAUM:  And, Mr. Calli, I

10  think we have to figure out --

11                   MR. CALLI:  No, he'll read.

12                   MS. LINDENBAUM:  What?

13                   MR. CALLI:  Are you getting at

14  reading or waiving?

15                   MS. LINDENBAUM:  No.  I'm getting

16  at protective order.

17                   MR. CALLI:  Well, he can

18  communicate with his lawyer.

19                   THE WITNESS:  She said I should

20  say on the record that this is supposed to be

21  confidential vis-a-vis a protective order.

22                   MR. CALLI:  Fine.



```
 1                      MS. LINDENBAUM:  All right.

 2                      MR. CALLI:  There's a time period

 3   that governs that, and she'll -- being at Perkins,

 4   she'll know better than anybody how to read it and

 5   deal with it.  So that's accepted --

 6                      THE WITNESS:   Okay.

 7                      MR. CALLI:  -- on her behalf.

 8                      THE WITNESS:   Okay.  Thank you.

 9                      MR. CALLI:  Thank you for

10   communicating it.

11                      THE WITNESS:   Thank you.

12   BY MS. LINDENBAUM:

13        Q.   Great.  One final question.

14             Did you have any conversation with Paul

15   Booth about continuing the relationship with AFSCME?

16        A.   Yeah, I think -- I think so.

17        Q.   Okay.  Can you tell me when

18   approximately that may have occurred?

19        A.   God.  I really don't recall but, you

20   know, and I hadn't even thought about Paul --

21        Q.   Okay.

22        A.   -- other than the unfortunate.
```



Page 133

1                    CERTIFICATE OF REPORTER

2     DISTRICT OF COLUMBIA      )

3            I, DENISE DOBNER VICKERY, CRR/RMR and

4     Notary Public, hereby certify the witness was by me

5     first duly sworn to testify to the truth; that the

6     said deposition was recorded stenographically by me

7     and thereafter reduced to printing under my

8     direction; and that said deposition is a true record

9     of the testimony given by said witness.

10            I certify the inspection, reading and

11    signing of said deposition were NOT waived by

12    counsel for the respective parties and by the

13    witness; and that I am not a relative or employee of

14    any of the parties, or a relative or employee of

15    either counsel, and I am in no way interested

16    directly or indirectly in this action.

17

18

19                    Denise Dobner Vickery, CRR/RMR

                      Notary Public in and for the

20                    District of Columbia

21

22    My Commission expires:  February 28, 2023

