# EXHIBIT
# 19

**Highly Confidential - Attorneys' Eyes Only - Pursuant to Confidentiality Order**



Transcript of **Allison Marie Maass**

Friday, August 10, 2018

*Democracy Partners et al. v. Project Veritas Action Fund, et al.*

Alderson Court Reporting
1-800-FOR-DEPO (367-9976)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 80136

Allison Maass HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Washington, DC

```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3     - - - - - - - - - - - - - - - X

 4     DEMOCRACY PARTNERS, et al.,      :

 5          Plaintiffs,                 :

 6              v.                      :  Civil Action No.

 7     PROJECT VERITAS ACTION FUND,     :  17-1047 (ESH)

 8     et al.,                          :

 9          Defendants.                 :

10     - - - - - - - - - - - - - - - X

11                              Washington, DC

12                              Friday, August 10, 2018

13          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14              PURSUANT TO CONFIDENTIALITY ORDER

15              Videotaped Deposition of ALLISON MARIE

16     MAASS, a defendant herein, called for examination by

17     counsel for Plaintiffs in the above-entitled matter,

18     pursuant to notice, the witness being duly sworn by

19     Rebecca L. Stonerock, a Notary Public in and for the

20     District of Columbia, taken at the offices of

21     Sandler, Reiff, Lamb, Rosenstein & Birkenstock, 1090

22     Vermont Avenue NW, Washington, DC, at 9:38 a.m.,
```

1    Friday, August 10, 2018, and the proceedings being

2    taken down by Stenotype by Rebecca L. Stonerock, RPR,

3    and transcribed under her direction.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1   APPEARANCES:

 2

 3        On behalf of the Plaintiffs:

 4              JOSEPH E. SANDLER, ESQ.

 5              DARA LINDENBAUM, ESQ.

 6              Sandler, Reiff, Lamb,

 7                 Rosenstein & Birkenstock

 8              1090 Vermont Avenue NW, Suite 750

 9              Washington, DC  2005

10              (202 479-1111

11              sandler@sandlerreiff.com

12              lindenbaum@sandlerreiff.com

13

14        On behalf of the Defendants:

15              PAUL A. CALLI, ESQ.

16              Calli Law

17              One Flagler Building, Suite 1100

18              14 Northeast First Avenue

19              Miami, Florida  33132

20              (786)504-0911

21              paul-calli@callilaw.com

22
```

```
 1   video.

 2               THE WITNESS:  Okay.

 3               MS. LINDENBAUM:  Play it?

 4               MR. SANDLER:  Mm-hmm.

 5               MR. CALLI:  Is this marked as an exhibit?

 6               MR. SANDLER:  Yes.

 7               (Video played.)

 8   BY MR. SANDLER:

 9       Q.    Okay.  My question is, did you believe

10   that it was consistent with journalistic ethics to

11   promise that particular source that his statement

12   would be off the record and then to secretly record

13   it and post it publicly?

14       A.    Well, based on my previous answer, I said

15   if I thought it was important for the general public

16   to know, then I think it's okay and --

17       Q.    And that was the case in this situation,

18   you thought it was sufficiently important for the

19   public to know what he told you?

20       A.    Yes.

21       Q.    Okay.  And have you done that with other

22   sources; that is, told them it's off the record --
```

```
 1    your interview with them is off the record and then

 2    secretly recorded them?

 3        A.    No.

 4        Q.    Okay.  Just to confirm -- and this may be

 5    repetitive.  I apologize.

 6              During your internship at Democracy

 7    Partners, you were paid as a full-time employee of

 8    Project Veritas, right?

 9        A.    Yes.

10        Q.    By Project Veritas.

11              When did you first become aware that there

12    would be a plan to investigate Democracy Partners?

13        A.    I guess it would have been after we were

14    made aware of Bob Creamer by Scott Foval.

15        Q.    Okay.  And how did you personally become

16    aware of the -- first become aware of a potential

17    plan to investigate Democracy Partners?

18        A.    How did I become aware?

19        Q.    Yeah.

20        A.    It's hard to know exactly when and how.

21        Q.    Sure.  Okay.  Can you tell us -- tell me

22    generally when you first got pulled into this, in
```

1    effect?

2        A.    Like I said, after that first conversation

3    with Scott Foval, I mean, probably just evaluated

4    that information and went from there.

5        Q.    Okay.  And who -- who provided you that --

6    with that information; that is, the contents of the

7    conversation between Scott Foval and Mr. Hartsock?

8        A.    I'm sure I just saw a videotape.

9        Q.    Okay.  Who came up with the idea that you

10   would assume the persona of the niece of Charles

11   Roth?

12       A.    I don't remember exactly.  I don't

13   remember.

14       Q.    And Charles Roth was ultimately -- the

15   role of Charles Roth was ultimately played by Daniel

16   Sandini, right?

17       A.    Yes.

18       Q.    And at some point in the summer of 2016,

19   Sandini posing as Roth called Mr. Creamer and

20   indicated that his niece wanted to volunteer for some

21   political work, right?  Is that what happened?

22       A.    Can you repeat that?

```
 1        Q.    Sure.  At some point in the summer of

 2   2016, Sandini posing as Roth called Mr. Creamer and

 3   said his niece, Angela Brandt, wanted to volunteer

 4   for some political work, right?

 5        A.    I mean, I don't remember if it was a phone

 6   call or in person.  I don't remember exactly when it

 7   was.

 8        Q.    Okay.  At some point you were put in touch

 9   with an organization claiming to do some kind of

10   demonstration or activity at the Republican National

11   Convention in Cleveland, right?

12        A.    Well, a person.

13        Q.    Okay.  Who was that person?

14        A.    Zulema Rodriguez --

15        Q.    Okay.  And --

16        A.    -- I think was her name.

17        Q.    -- who put you in touch with

18   Ms. Rodriguez?

19        A.    Bob Creamer.

20        Q.    Did you speak to Bob -- had you spoken to

21   Bob Creamer at that point when you were put in touch

22   with -- with her?
```

Allied Security Operations Group - Confidential and Proprietary
Washington, DC

```
 1        A.    Before I spoke to her?

 2        Q.    Yes.

 3        A.    I think I spoke to him on the phone.  I

 4   did, yes.  I spoke to him on the phone.

 5        Q.    Okay.  And what did you tell him in that

 6   phone call?

 7              Before I get there, when did that -- do

 8   you remember approximately when that call took place?

 9        A.    Before the Republican Convention.

10        Q.    Okay.  What did you tell him on that phone

11   call?

12        A.    I can't remember exactly because that was

13   two years ago.

14        Q.    And do you remember generally what you

15   told him about who you were?

16        A.    I'm sure I told him my name was Angela

17   Brandt.  I don't remember exactly.

18        Q.    Do you remember anything else you told him

19   on that call?

20        A.    As I have said several times now, I don't

21   really remember the phone call.

22        Q.    Okay.  And Ms.  Rodriguez, what
```

Allied Educational Foundation, et al. v. Project Veritas, et al.
Washington, DC
8/10/2018
Page 26

```
 1   organization was she associated with?

 2        A.    I can't remember now.

 3        Q.    And you got in touch with Ms. Rodriguez?

 4        A.    I did.

 5        Q.    And how did you get in touch with her?  By

 6   phone?

 7        A.    I probably called.

 8        Q.    Okay.  And what did you tell her?

 9        A.    Probably that I wanted to volunteer.

10        Q.    Okay.  Do you remember telling her

11   anything about yourself or your background?

12        A.    Probably that my name was Angela Brandt,

13   but beyond that I don't remember.

14        Q.    Okay.  And why did you offer to volunteer

15   with this group in Cleveland, the name of which you

16   don't recall now?

17        A.    Just to collect more information.

18        Q.    About what?

19        A.    Well, it was an investigation into what

20   was going on with Democracy Partners and the DNC.  So

21   I probably saw this as, you know, a way in.

22        Q.    And was it -- was it your belief that
```

```
 1     Democracy Partners was involved in some way with this

 2     group that Ms. Rodriguez was associated with?

 3          A.    Well, Bob Creamer introduced me.

 4          Q.    Did he tell you that -- that he -- that

 5     his -- any of his companies or Democracy Partners had

 6     something to do with her organization?

 7          A.    I can't remember the exact conversation,

 8     but I know they were involved because Zuli -- yeah,

 9     Zuli is what she went by.  Pretty sure -- she was

10     involved in phone calls with Bob Creamer, if I

11     remember correctly, every day.  So they were

12     obviously involved with each other.

13          Q.    And did you have some basis to believe at

14     the time you volunteered with this group in Cleveland

15     at the Republican Convention, that this group would

16     be engaged in some kind of unlawful activity that

17     should be exposed and reported on?

18          A.    The point of an investigation is to see

19     what they're doing.  So I guess that was the point,

20     see what -- what was going on, legal or not.

21          Q.    Before you began your volunteer work with

22     this group -- my question is before you began your
```

1    volunteer work with this group, did you have some

2    basis to believe that they were planning to engage in

3    some unlawful activity?

4         A.    And that's what I'm saying, I was there

5    to -- to investigate whether they were or not.

6         Q.    Okay.  But you didn't have any reason to

7    believe that they were going to do that before you

8    began your volunteer work.

9         A.    Zuli, just her and her group, if they were

10   going to be doing anything illegal?

11        Q.    Right.

12        A.    I guess what we had is just what Scott

13   Foval and Bob Creamer had told us before.

14        Q.    And had Mr. -- do you recall if Mr. Foval

15   had said anything about Ms. Rodriguez's group in his

16   discussions with Christian Hartsock?

17        A.    Scott Foval hadn't.

18        Q.    And you didn't have any other basis other

19   than Scott Foval's conversation with Mr. Hartsock to

20   believe that this group might be engaged in any

21   unlawful activity in Cleveland?

22        A.    Well, they're all connected.

```
 1        Q.    How is Mr. Foval connected with

 2   Ms. Rodriguez?

 3        A.    Bob Creamer.

 4        Q.    You mean they both know him?

 5        A.    Well, they both of course are involved on

 6   the same side of this election.  They both had

 7   similar goals.

 8        Q.    Any other connections between Mr. Foval

 9   and Ms. Rodriguez?

10        A.    Other than they were both in our videos.

11        Q.    In the same video?

12        A.    No, but they were both part of the

13   investigation.

14        Q.    During what time period did you volunteer

15   for this group in Cleveland?

16        A.    At the Republican National Convention,

17   during that --

18        Q.    How many days were you out there?

19        A.    A couple.  I can't remember exactly.

20        Q.    And what did you do as a volunteer for

21   this group?

22        A.    I painted bricks on fabric.
```

1    Q.    Sorry?

2    A.    I painted bricks on fabric.

3    Q.    And for what purpose were you asked to do

4    that work?

5    A.    For a -- for a protest.

6    Q.    What was the nature of that protest?

7    A.    Against building the wall.

8    Q.    Okay.  And what was done with the bricks

9    that you helped create --

10   A.    They turned into ponchos.  We turned them

11   into ponchos.

12   Q.    Okay.  But were they -- were the bricks

13   used in a -- in a mock wall of some sort out there?

14   A.    They were painted on the ponchos.

15   Q.    I see.  Okay.  And then it was -- they

16   were used in some kind of demonstration?

17   A.    And then I wore it.

18   Q.    At the demonstration?

19   A.    Mm-hmm.

20   Q.    And was the demonstration out in

21   public -- --

22   A.    Yep.

1      Q.     -- public view?  Was it covered by the

2  press?

3      A.     Yes.

4      Q.     And while you were volunteering for this

5  group, you wore a recording device and secretly

6  recorded your interactions with members of the group,

7  right?

8      A.     Yes.

9      Q.     Okay.  And did you uncover any illegal

10 activity that this group was engaged in?

11     A.     That specific group, no.

12     Q.     While you were at the Republican National

13 Convention in Cleveland, did you uncover any illegal

14 activity by any other group?

15     A.     No.  I don't think we ever -- never mind.

16 Nothing.

17     Q.     Hmm?

18     A.     Continue.

19     Q.     Okay.  And then after the convention,

20 Sandini posing as Roth called Mr. Creamer and

21 suggested that his niece Angela wanted to be involved

22 in some further activity with the progressive

```
 1    guidance on nonlegal matters that you were given,

 2    sort of general instructions or guidance, other than

 3    in terms of avoiding anything illegal that you were

 4    given about your internship?

 5         A.    I guess just the typical discussion we

 6    have before an investigation.

 7         Q.    And tell me about what that would involve.

 8         A.    You know, just talk about what we're going

 9    to do, how we're going to do it.

10         Q.    Okay.  And what -- what was the discussion

11    about what you were going to do and how you were

12    going to do it?

13         A.    So I would be an intern at Democracy

14    Partners and I would try to collect as much

15    information as possible.

16         Q.    And you were given a recording device to

17    wear during your internship with Democracy Partners,

18    right?

19         A.    Yes.

20         Q.    And were you given instructions about how

21    to affix that device, you know, to your clothing,

22    like how you would wear it?  How and where you wear
```

Allison Maass July 18, 2017 Highly Confidential Pursuant to Protective Order Democracy Partners v. Project Veritas
Washington, DC

```
 1   the device?

 2       A.    I was shown how to use it.

 3       Q.    Okay.  And were you given instructions

 4   about how to operate it?

 5       A.    In order to know how to use it, yeah.

 6       Q.    Okay.  And was there a system for -- some

 7   kind of system for regular reporting or debriefing on

 8   your activity during your internship?  In other

 9   words, was there -- was there a system set up for

10   some kind of regular reporting by you about your

11   activities?

12       A.    Reporting how?

13       Q.    Orally, written to other -- to any --

14   somebody in Project Veritas.

15       A.    You mean relaying the information to

16   someone at Project Veritas?

17       Q.    Yes.

18       A.    Yes.

19       Q.    Okay.  And first of all, was there a --

20   was there a particular individual at Veritas who

21   oversaw or supervised your activities as an intern at

22   Democracy Partners?
```

```
 1        A.     It was kind of a little bit of a group

 2   effort.

 3        Q.     Okay.  And who were the members of that

 4   group?

 5        A.     Joe Halderman was involved, the other

 6   journalist involved.

 7        Q.     Who's the other journalist you're

 8   referring to?

 9        A.     Well, like Roth.

10        Q.     Okay.

11        A.     I guess James would have been involved

12   with some of it.

13        Q.     How about Mr. Hartsock?

14        A.     He would be involved.

15        Q.     Anyone else you can think of?

16        A.     And that would have been the main group.

17        Q.     Okay.  Were you asked to prepare regular

18   written reports of your activities?

19        A.     Yes.

20        Q.     And were you given guidance about -- let

21   me ask you first how -- how often you should prepare

22   them?
```

Allison Rosati, Hidden Investigation of Activity Group
Washington, DC

```
 1        A.    We did it after every day.

 2        Q.    Okay.  And were you given guidance on what

 3   format those reports should be prepared in?

 4        A.    Yes.

 5        Q.    And what was that guidance?

 6        A.    There was a template.

 7        Q.    And you were -- you were provided a

 8   written template for it?  For those reports?

 9        A.    Yes.

10        Q.    Okay.  And were you given guidance about

11   what to put down in those reports?  What information

12   you should write down?

13        A.    I guess, yes.  Write down all relevant

14   information.

15        Q.    And relevant to -- to what?  What was --

16        A.    To the investigation.

17        Q.    Okay.  I mean, obviously, you didn't --

18   you didn't write down everything -- every single

19   thing that happened each day in those reports, right?

20        A.    I wrote down everything that would have

21   been relevant.

22        Q.    Everything you believe was relevant to the
```

1   investigation --

2       A.   Yes.

3       Q.   -- to your work as an intern.

4       A.   Yes.

5            MR. SANDLER:  All right.  Let's take --

6   let's take a ten-minute break if we could.

7            THE VIDEOGRAPHER:  Off the record.  The

8   time is 10:36.

9            (Recess.)

10           THE VIDEOGRAPHER:  On the record.  The

11  time is 10:47.

12  BY MR. SANDLER:

13      Q.   Okay.  After you started your -- at some

14  point after you started your internship at Democracy

15  Partners, Lauren Windsor asked you for a resume,

16  right?

17      A.   Yes.

18      Q.   And you provided her a resume?

19      A.   Yep.

20      Q.   Did you create that resume before or after

21  she asked for one?

22      A.   Probably after.

1     Q.    You don't remember one way or the other?

2     A.    No.  I do not.

3     Q.    Let me ask that this be marked as the next

4  exhibit.

5              (Maass Exhibit No. 8 was marked for

6              identification.)

7  BY MR. SANDLER:

8     Q.    Showing you what's been marked as Maass

9  Exhibit 8, the first page is an e-mail from Angela

10 Brandt sent September 23rd, 2016, to Lauren Windsor,

11 subject:  Resume.  And it says, "Attached is my

12 resume."

13             Did you send that e-mail to Lauren

14 Windsor?

15    A.    It looks like it.

16    Q.    And is the second page the resume that was

17 attached to that e-mail?

18    A.    Must be.

19    Q.    Did you create this resume?

20    A.    Yes.

21    Q.    And is anything on this resume true?

22    A.    I think some of my skills are accurate.

Allison Maass - Confidential - Subject to Protective Order
Washington, DC

1    Q.    Okay.  What about the experience listed

2  under the subtitle "Experience," the stints at

3  Applebee's and 1020?

4    A.    Is that accurate?

5    Q.    Yeah.

6    A.    No.

7    Q.    How about the education?

8    A.    No.

9    Q.    Where did you in fact go to high school?

10    A.    Big Lake High School.

11    Q.    In Minnesota?

12    A.    Yeah.

13          MR. SANDLER:  I ask that this be marked as

14  the next exhibit.

15                (Maass Exhibit No. 9 was marked for

16                identification.)

17  BY MR. SANDLER:

18    Q.    Referring -- showing you what's been

19  marked as Maass Exhibit 9.  Just so you know, this

20  was produced to us by Project Veritas and the page --

21  order of the pages is as they were produced to us.

22                It says -- it's an e-mail from somebody

Allison Maass — Confidential — Alderson Court Reporting — Veritas — Liberty Plan
Washington, DC

```
 1   blacked out, redacted, sent September 14th, 2016 to

 2   Allison Maass, subject:  Angela Brandt, attachment

 3   student ID.  And then under it says, "How's this" and

 4   then there's an e-mail from you to somebody whose

 5   name is redacted, subject:  Angela Brandt.

 6            Do you recall these -- this exchange of

 7   e-mails?

 8       A.   I mean, it must have happened.

 9       Q.   Looking at the second page, this is a --

10   appears to be an ID card or a picture of an ID card

11   for Angela Brandt from Kingsborough Community

12   College.

13            Have you seen this before?

14       A.   Yes.

15       Q.   Who created this fake ID?

16       A.   Someone at Project Veritas.

17       Q.   Not you?

18       A.   No.

19       Q.   Did you ask that person to create it?

20       A.   Probably.

21       Q.   And for what purpose did you ask that it

22   be created?
```

1      A.      Supporting documentation of my alias.

2      Q.      Okay.  And did you carry that ID on your

3   person during your internship?

4      A.      Yes.

5      Q.      Did you have occasion to present this ID

6   during your internship?

7      A.      Yes.

8      Q.      Okay.  Do you remember approximately how

9   many times you presented it?  I understand this is --

10      A.      Yeah.  It's hard to remember, but I do

11   know I for sure used it at a building I went to, like

12   a union building.

13      Q.      Was it Communication Workers of America?

14      A.      Must have been.

15      Q.      Okay.  Did you ever -- do you recall

16   presenting it at the front desk of any other

17   building?

18      A.      Yeah, that's -- I don't remember exactly.

19   I do know I never presented it at the front desk of

20   the Democracy Partners building, though.

21      Q.      Okay.  And did you ever present it at the

22   Democratic National Committee, do you remember?

```
 1        A.    I don't -- I might have.

 2        Q.    Okay.  With respect to the recording

 3   device that you wore during your internship, did you

 4   have that on continuously during the workday, each

 5   workday that you were there at Democracy Partners?

 6        A.    Yeah, pretty much.

 7        Q.    Did you ever turn it off during the

 8   workday?

 9        A.    Sometimes, when I went to the bathroom.

10        Q.    Okay.  Any other times you remember?

11        A.    If I was changing out a battery.  I mean,

12   there would be small moments, but I almost

13   continuously had it on the entire time.

14        Q.    Okay.  Did you ever turn it off to engage

15   in discussions with officials at Project Veritas

16   during the workday?

17        A.    I didn't -- you know, I really didn't talk

18   to them that much --

19        Q.    During the workday?

20        A.    -- over the phone that it would be

21   recorded, but I might have.

22        Q.    Okay.  Did it ever break down and stop
```

```
1    recording when you -- you know, you hadn't meant to

2    turn it off?

3         A.    No.

4         Q.    Would you have known if that had happened?

5         A.    Probably.

6         Q.    Apart from turning in the written reports

7    that you referred to, and we'll talk about those, was

8    there some kind of regular oral debriefing in person

9    or on the phone about your -- to -- to officials at

10   Project Veritas about your activities during the days

11   you interned?

12        A.    I did talk to them other than the reports.

13        Q.    Was it a regular -- regularly scheduled

14   debriefing call for that?

15        A.    Not that I remember.

16        Q.    Did you -- when you say you talked to

17   them, was that mostly on the telephone?

18        A.    Sometimes it would be on the telephone.

19        Q.    Were there debriefing meetings in person

20   at their headquarters in New York?

21        A.    Sometimes.

22        Q.    Okay.  Does that mean you would -- in some
```

```
 1    cases you traveled back between Washington and

 2    New York during your internship?

 3         A.   I did.

 4         Q.   All right.  On the debriefing calls, who

 5    was on those calls?

 6         A.   It would vary.

 7         Q.   All right.

 8              MR. SANDLER:  Let me ask that this be

 9    marked as the --

10    BY MR. SANDLER:

11         Q.   Oh, actually -- yeah, let me ask about --

12    do you recall if you had the recording device on --

13    well, you mentioned this meeting you went to at the

14    union, the Communication Workers.  Do you remember --

15    do you know if you had the recording device on during

16    the entire time you were at that meeting?

17         A.   Probably.

18         Q.   Okay.  And what about the Center for

19    American Progress?

20         A.   Probably.

21         Q.   And did you have it on all -- during the

22    times you were at the Democratic National Committee?
```

Allied Education Corp. v. Maddux, et al., Confidential, Under the Protective Order, Lauren Windsor, Liberty Chen
Washington, DC

```
 1        A.     Probably.

 2        Q.     Did you -- when you entered -- because we

 3   talked -- I had asked you about showing the ID and so

 4   forth.  Did you have the recording device on when you

 5   walked into the Democratic National Committee, do you

 6   remember?

 7        A.     No.

 8        Q.     And -- okay.

 9        A.     Well, one time I did.

10        Q.     How about the other times?

11        A.     No.

12               MR. SANDLER:  Let me ask that this be

13   marked as the next exhibit.

14                    (Maass Exhibit No. 10 was marked for

15                    identification.)

16   BY MR. SANDLER:

17        Q.     Showing you what's been marked as Maass

18   Exhibit 10, it's an e-mail from Angela Brandt to

19   Lauren Windsor dated September 21st, 2016.

20               Did you send this e-mail to Ms. Windsor?

21        A.     Must have.

22        Q.     Okay.  And it says, "Emergency contact
```

Alliance for Good Government vs Halderman - Property City Charles

Washington, DC

8/10/2018

1   Charles Roth," with a (415) phone number.  Why were

2   you sending emergency contact information to

3   Ms. Windsor?

4       A.    She asked me to.

5       Q.    Okay.  And you provided this -- the name

6   of Charles Roth at this phone number, right?

7       A.    Yep.

8       Q.    And if somebody called this -- that phone

9   number, who would have answered?

10      A.    Well, Lauren did call that phone number.

11      Q.    And who answered?

12      A.    Joe Halderman.

13      Q.    Okay.  And was that -- did Joe Halderman

14  have that phone with him that was assigned to that

15  number in case someone had to use it?

16      A.    Yeah, must have.

17      Q.    Okay.  And this -- underneath that it

18  says -- there's an e-mail address,

19  angelabrandt94@gmail.com.  That's the e-mail address

20  you created?

21      A.    Well, this is the e-mail that I got at

22  that address.

1       Q.    But that's the e-mail address you created

2   to use as Angela Brandt, right?

3       A.    Yes.

4       Q.    And were you -- is that the e-mail you

5   used during your -- for all your work e-mail during

6   your internship at Democracy Partners?

7       A.    Yes.

8       Q.    They didn't assign you a Democracy

9   Partners e-mail?

10      A.    No.

11      Q.    Going back to -- you said you didn't have

12  the recording device turned in when you walked into

13  the DNC in most of the cases.  Why was that?

14      A.    There was a metal detector.

15      Q.    I see.  Okay.  So how would you -- you had

16  to take it -- you basically had to take it off to get

17  in the building?  I don't -- what --

18      A.    Well, do you know what the camera looks

19  like?

20      Q.    I do not.  Why don't you tell us what the

21  camera looks like.

22      A.    It's a regular camera with a wire that

Allison Maass — Confidential — Subject to the Protective Order

Washington, DC

8/10/2018
Page 69

```
 1   connects to a button.

 2        Q.    How did you smuggle that into the DNC?

 3        A.    I mean, I really wouldn't call it

 4   smuggling.  I put it in my bag.

 5        Q.    I see.  Okay.  So you put it in your bag

 6   so that it wouldn't -- it wouldn't be triggered by

 7   the metal director.

 8        A.    On my body, yes.

 9        Q.    All right.  And what about the

10   Communication Workers.  Why would you not have had it

11   turned on when you walked into the Communication

12   Workers?

13        A.    Because in case there was a metal

14   detector.

15             MR. SANDLER:  Okay.  Let me ask that this

16   be marked as the next exhibit.

17                  (Maass Exhibit No. 11 was marked for

18                  identification.)

19   BY MR. SANDLER:

20        Q.    This is -- showing you what's been marked

21   as Maass Exhibit 11, this appears to be an e-mail

22   from Lauren Windsor to Angela Brandt dated
```

1  September 21st, 2016, subject:  Phone system

2  information.

3          Do you remember what this information was

4  that she was sending you?

5      A.    Yeah, it was their phone system.

6      Q.    What do you mean?  What about their phone

7  system was she sending you?

8      A.    It -- it was their phone system.  So if

9  somebody called these -- they'd call the main number

10  and these were the extensions to their offices.

11     Q.    And was it -- I see.  Was it part of your

12  responsibility to answer the phones in the office?

13     A.    I was never specifically told to.

14  Sometimes I would if I was there.

15     Q.    Okay.  And what -- this PIN number at the

16  bottom, 1234, what was that to get into?

17     A.    The -- just the phone system.

18     Q.    You mean, like, to retrieve voice mails?

19     A.    No.

20     Q.    You said "get into."  Just what do you

21  mean?  I don't --

22     A.    Just their phone system was messed up kind

Allied Security v. Alderson, Charles Brady Video Deposition of Robert Creamer, Party Opp.
Washington, DC

1  of, so the extensions weren't working.  So she asked

2  me to fix that.

3      Q.    I see.  Okay.  And what did you do to fix

4  it?

5      A.    I just fixed it so when somebody called, I

6  could pass it on to their extension, because that

7  wasn't working before.

8      Q.    Okay.

9      A.    It was very -- very basic.

10     Q.    Okay.  You were given a keycard for access

11 to the Democracy Partners' suite, right?

12     A.    Yep.

13     Q.    And during the day -- on the days when you

14 interned at Democracy Partners, were the doors to the

15 suite generally open at the time you arrived?

16     A.    Yep.

17     Q.    And was somebody else in the office

18 generally when you arrived?

19     A.    Yep.

20     Q.    Okay.  Had you been introduced to

21 everybody in the office?

22     A.    The people who worked there continuously.

```
 1       Q.    Okay.  Was there ever a time when you

 2   needed to use your keycard to get into the office?

 3       A.    Once.

 4       Q.    And when was that?

 5       A.    One morning I got there five minutes

 6   before everyone else did.

 7       Q.    Okay.  And you needed your keycard to get

 8   in?

 9       A.    Yes.

10       Q.    All right.  At the front desk -- and this

11   was at 1250 I Street, right?  You don't remember the

12   address?

13       A.    I'm sure you know the address.

14       Q.    Okay.  The building in which the Democracy

15   Partners' suite was located, was there a desk in the

16   lobby there that you had to check in with?

17       A.    Well, there was a desk, not that you had

18   to check in with.

19       Q.    Okay.  Did anybody introduce you to the

20   security guard there at that desk?

21       A.    No.

22       Q.    Okay.  All right.
```

Allison Maass - Confidential - Subject to Protective Order
Washington, DC

```
 1                 MR. SANDLER:  Let me ask that this be

 2    marked as the next exhibit.

 3                   (Maass Exhibit No. 12 was marked for

 4                    identification.)

 5    BY MR. SANDLER:

 6         Q.    And take a look at it and let me know when

 7    you're finished.

 8         A.    (Witness complies.)

 9         Q.    Okay.  Showing you what's been marked as

10    Maass Exhibit 12, can you identify this document?

11         A.    One of my reports.

12         Q.    And this was a written report you did of

13    your -- what happened during the first day of your

14    internship at Democracy Partners, right?

15         A.    That's what it says.

16         Q.    Well, was it?

17         A.    Must have been.  I said this was my first

18    day.

19         Q.    Okay.  And at the top there's an e-mail

20    from James O'Keefe to unidentified individuals at

21    Project Veritas dated September 21st, and it says,

22    "Let's make sure we discuss Allison's progress every
```

```
 1   day in the meeting from her daily activities the day

 2   before so we can help her strategize."

 3            Do you see that?

 4       A.   Mm-hmm.

 5       Q.   Was there a daily meeting that you

 6   personally participated in to review your activities

 7   from the prior day?

 8       A.   I don't remember a daily meeting.

 9       Q.   There wasn't, like, a nightly conference

10   call about it?

11       A.   I don't remember there being a scheduled

12   daily conference call.

13       Q.   Okay.  Were there -- were there conference

14   calls that were just kind of scheduled as you went --

15   as they went along?

16       A.   We did talk sometimes, yeah.

17       Q.   Okay.  If you look down at the PV video

18   summary form, the first block of text, it says,

19   "Script/operation:  Bracketing, surrogate voters and

20   find and follow any other leads."

21            Do you see that?

22       A.   Mm-hmm.
```

1      Q.     What does "surrogate voters" refer to

2    there?

3      A.     I think it refers to what Scott Foval had

4    said.

5      Q.     Okay.  And what had Scott Foval said that

6    made you think that you would find some activity

7    related to surrogate voters at Democracy Partners?

8      A.     Well, I mean, he talked about, if I

9    remember correctly, bussing voters, surrogate voters.

10   So we were investigating to see if we could find any

11   more information.

12     Q.     Had he indicated, do you recall, that Bob

13   Creamer had been involved in planning a surrogate

14   voter scheme?

15     A.     Well, Scott Foval said that he had.

16     Q.     That Creamer had been involved in planning

17   one?

18     A.     That's what I remember, yeah.

19     Q.     And that was your understanding when you

20   went into this first day of your internship?

21     A.     Yeah, just to find out any more

22   information.

1    Q.    And what does "bracketing" refer to?

2    A.    Yeah.  Some of this terminology -- that

3    was the kind of fake protests that they set up.

4    Q.    Okay.  And what was the -- what, in your

5    understanding -- and I'm referring to this time, not

6    necessarily anything you learned since.  What was

7    your understanding of what was fake about it exactly,

8    about the protests?

9    A.    When I first started?

10    Q.    Yes.

11    A.    Well, we knew that they were involved

12    in -- like I had said earlier, that there were these

13    grassroot protests, but they were involved in setting

14    all of them up.  It's hard to remember exactly what I

15    knew two years ago at this moment after knowing

16    everything now.

17    Q.    Okay.  Sure.  Okay.  It says, if you look

18    at the -- beginning of the text, "This was my first

19    day at Democracy Partners as an intern.  There is

20    only four people who work in the office, Bob, Aaron

21    Black, Mike Lux and Lauren Windsor."

22          Were -- were you introduced to all of them

1    the first day, do you remember?

2        A.    Yes.

3        Q.    "Bob and Aaron do the bracketing program

4    and Aaron said he works for the DNC.  I wasn't asked

5    for any information, but at the end of the day, Bob

6    said Lauren would be giving me an NDA to sign.  I'll

7    also be getting a key to the office tomorrow."

8            What did you -- what were you referring to

9    when you used the term "NDA"?

10        A.    Well, typically NDA means nondisclosure

11    agreement.

12        Q.    And what is a non -- what is your

13    understanding of a nondisclosure agreement?

14        A.    When you sign an NDA, you are agreeing not

15    to give any information about, I guess, the company.

16        Q.    Okay.  If you look -- turn to the third

17    page of the -- of this document.  It's a little hard

18    to follow because it's not -- oh, I'll give you --

19    the timestamp says from 5:08 to 24:22.  It's about 12

20    lines down.

21            It says, "I am on the daily call with the

22    Clinton campaign and the DNC.  I suggest at least one

1    person listen to this phone call to listen for

2    anything I might have missed."

3            What was the daily call with the Clinton

4    and the DNC about?

5        A.    About bracketing and their activities.

6        Q.    Okay.  And on those calls about

7    bracketing -- and again, bracketing refers to these

8    protests at Trump and Republican events?

9        A.    That they set up.

10       Q.    Okay.  That they set up.  And on the

11   calls, did they discuss plans for future events or

12   just debrief from past events, both?  What was the

13   discussion?

14       A.    Both.

15       Q.    All right.  And how many people were on

16   the calls, do you know?

17       A.    A lot.

18       Q.    All right.  And how did you happen to be

19   put on the call?  Did you call a dial-in?  Were you

20   on a speakerphone at Democracy Partners of other

21   people or how did you typically --

22       A.    Well, I think on this day I was -- might

```
 1    have listened with Bob.

 2         Q.    So the call was on a speakerphone?

 3         A.    Sometimes it was, yeah.

 4         Q.    Were there times when you used a pass code

 5    to call in yourself?

 6         A.    Yeah.  But it was given out to a lot of

 7    people.  It was like a mass e-mail with information.

 8         Q.    Okay.  Do you -- do you know exactly how

 9    many people?

10         A.    No.  But there was a lot from all over the

11    country.

12         Q.    Okay.  And when you say "from all over the

13    country," let me ask you about that.  You -- while

14    you were on these calls, you recorded what was taking

15    place on the call itself, right?

16         A.    Well, my camera was on on my body.

17         Q.    But could the recording -- did the

18    recording device pick up other participants in the

19    call or just your end?

20         A.    If I had it on speakerphone, it would pick

21    up.

22         Q.    Okay.  And what happens when you dialed
```

Allison Marie Sandza - Confidential - Subject to Protective Order
Washington, DC

```
 1   this number that was given -- that wasn't on

 2   speakerphone?  Your recording device didn't pick up

 3   the actual contents of other participants in the

 4   call?

 5       A.    I guess it wouldn't have because it was

 6   just recording what I could hear.

 7       Q.    Okay.  And when you had it on the -- on

 8   the speakerphone, you said there -- there was often

 9   people there from all over the country?

10       A.    Yes.

11       Q.    Do you know if there were people there

12   from California?

13       A.    I couldn't remember exactly who was on the

14   call each day when these phone calls happened daily.

15       Q.    Okay.  Did you take any steps to determine

16   where the other participants in the call were located

17   when the call was going on?

18       A.    I think they would usually say where they

19   were coming from at the beginning.  But like I said,

20   these were -- I mean, these were big phone calls, big

21   conferences.

22       Q.    Okay.
```

1          MR. SANDLER:  I'd ask that this be marked

2     as the next one.

3               (Maass Exhibit No. 15 was marked for

4               identification.)

5     BY MR. SANDLER:

6          Q.    Showing you what's been marked as

7     Exhibit 15, was this the report you did of your

8     activities as an intern at Democracy Partners on

9     September 26th, 2016?

10         A.    Yeah, must have been.

11         Q.    Okay.  And again, under target name,

12    location, contact info, it says, "Daily bracketing

13    phone call with DP, HFA and DNC.  Mike Lux, founder

14    of Progressive Strategies and political consultant

15    for DNC."

16              Do you see that?

17         A.    I do.

18         Q.    And when it says "target name Mike Lux,"

19    you're saying Mike Lux wasn't -- wasn't targeted for

20    your investigation, you just happened to be able to

21    speak with him?

22         A.    Yeah.

Allison Maass, Hidden Felony [?] Washington, DC

1       Q.    Did you have any reason to believe when

2  you secretly recorded Mike Lux that he was planning

3  any unlawful activities?

4       A.    I hadn't heard of him before and --

5  really, so -- I mean, like I said before, I was just

6  there to get information.  I don't -- guess I don't

7  know what I knew before.  I don't know what I knew

8  before, what I thought.

9       Q.    You didn't have any reason to believe that

10  he had engaged in any unlawful activity?

11       A.    I don't remember if I thought he was

12  involved or not before I started my internship.

13       Q.    Did you -- during your internship, did you

14  discover Mr. Lux engaging in -- planning in or

15  engaging in any unlawful activities?

16       A.    No, Mike wasn't involved in a lot.

17       Q.    Okay.  Let me -- let me get into the text

18  of your report here.

19       A.    Is that the same report?

20       Q.    Yes, it's Maass Exhibit 15, September

21  26th.

22       A.    That looks different.

```
 1        Q.    No, it's the same -- the form I gave it to

 2   you in is the one we're working off of.  It's the

 3   same.

 4             MR. CALLI:  Objection.

 5             THE WITNESS:  Why is there a picture on

 6   yours and not on ours?

 7             MR. SANDLER:  I have -- this is PVA 6308.

 8   This is a different one?

 9             MR. CALLI:  Yes.

10             MR. SANDLER:  What do you have, 1181?

11             MR. CALLI:  Yes.

12             MR. SANDLER:  Okay.  I'll use that one.

13   Sorry about that.  All right.

14   BY MR. SANDLER:

15        Q.    Let me go to -- ask you to look, then, at

16   the second page, which has PVA 11882 at the bottom.

17   If you look at the first full paragraph, it says, "I

18   was able to listen to the 1:00 p.m. call still and

19   they said a couple of interesting things."

20             And that was the -- was that the day's

21   bracketing call?

22        A.    Yeah.
```

```
 1        Q.    And it says, "They have weekly calls about

 2   social media with the Hillary campaign where they

 3   talk about how to control the narrative of social

 4   media, and they mentioned a 'secret war room' where

 5   they discuss these things with other organizations

 6   like Planned Parenthood."

 7             Do you see that?

 8        A.    Mm-hmm.

 9        Q.    And when you -- did you understand the

10   term "secret war room" to mean a war room, the

11   existence of which the DNC wanted to keep

12   confidential?

13        A.    Sorry, can you say that again or explain?

14        Q.    Did you understand the term "secret" to

15   mean that -- to refer to the existence of a war --

16   "secret war room" to refer to the existence of a war

17   room, the existence of which the DNC wanted to keep

18   confidential?

19        A.    Yeah.  But I don't know -- it's hard to

20   say if they meant an actual location or if that was

21   just what they were saying.

22        Q.    Right.  But I didn't ask you about a
```

```
 1    location, I'm asking if you thought that the

 2    existence of the war room was going to be secret when

 3    they said "secret war room."

 4        A.    I guess this they labeled it secret, they

 5    probably meant secret.

 6        Q.    And secret is confidential, right?

 7        A.    I mean, similar.

 8            MR. SANDLER:  Let me ask that this be

 9    marked as the next exhibit.

10                (Maass Exhibit No. 16 was marked for

11                identification.)

12    BY MR. SANDLER:

13        Q.    Let me know when you've finished looking

14    at this.

15        A.    Okay.

16        Q.    And now just -- it looks like this --

17    these e-mails are in kind of reverse, you know,

18    chronological order so that the first one is actually

19    on the third page.

20        A.    Yeah, that's how it works.

21        Q.    Right.  Okay.  So looking at the third

22    page, the first e-mail is then from Robert Creamer,
```

Allied Services & Intuition — Alderson Reporting — Experts in the Industry Offices
Washington, DC

```
 1    September 28th, to Jenna Price, Eric Walker and

 2    Angela Brandt, subject:  Wanted to loop you guys in

 3    together.

 4            It says, "Angela is a new intern at our

 5    office.  Please be in touch with her to let her know

 6    how she could be useful with press calls or clips."

 7            Do you see that?

 8    A.    Uh-huh.

 9    Q.    And who is Eric Walker?

10    A.    Worked for the DNC.

11    Q.    And how about Jenna Price?

12    A.    Also worked for the DNC.

13    Q.    Okay.  And then did you wind up actually

14    meeting with either of them at the DNC?

15    A.    I remember meeting with Jenna Price.

16    Q.    Okay.  And when was the first time you met

17    with Jenna Price?

18    A.    I don't know the first time.

19    Q.    Okay.  And when -- the first time you went

20    to the DNC, was Bob Creamer with you?

21    A.    Yes.

22    Q.    And did he introduce you to the -- how did
```

Allison Jaslow Confidential Videotaped Deposition of Aaron Patrick Charley Obama

Washington, DC

```
1    you get in the building, the security guard?

2         A.    He brought me in and around security.

3         Q.    Okay.  All right.  And were there times

4    that you went to the DNC without Mr. Creamer?

5         A.    Yes.

6         Q.    And did they let you in because they

7    recognized you?

8         A.    No.

9         Q.    You had to present an ID?

10        A.    Like everyone mostly did.

11        Q.    Okay.  And -- let me see.  Did you wind up

12   doing -- what work did you wind up doing physically

13   at the DNC, if any?

14        A.    Well, the first day I counted signs.

15        Q.    Okay.

16        A.    And after that, as is laid out in this

17   e-mail, I did help pull clips of the bracketing.

18        Q.    Okay.  And those were clips of -- in that

19   case, those were clips of events that had already

20   taken place, right?

21        A.    Yes.

22        Q.    Because they were -- they were reported on
```

1    in the press.

2        A.    They weren't clips of things that hadn't

3    happened yet.

4        Q.    Okay.  All right.

5              MR. SANDLER:  Now, let me ask that this be

6    marked as the next exhibit.

7                   (Maass Exhibit No. 17 was marked for

8                   identification.)

9    BY MR. SANDLER:

10        Q.    Let me know -- this is 17.  Let me know

11    when you are finished with this.

12              Showing you what's been marked as Maass

13    Exhibit 17, again, it says, "Target name/location/

14    contact info:  Jenna Price, press for DNC."

15              "Target" means you just happened to be

16    talking to her that day, right?

17        A.    Yes.

18        Q.    She hadn't done anything wrong that you

19    knew about, right?

20        A.    What do you mean by that?

21        Q.    Ever engaged in any illegal activities

22    that you were aware of?

Allison Price - Confidential - Subject to Further Confidentiality Order
Washington, DC

```
 1          A.      Not that I knew of.

 2          Q.      How about planning illegal activities?

 3          A.      Not planning illegal activities that I

 4     knew of.

 5          Q.      Okay.  And if you -- if you go down to

 6     the -- the text, the second paragraph says, "I then

 7     worked with the DNC."

 8                  Is that -- were you over at the DNC that

 9     day physically?

10          A.      I think so, yes.

11          Q.      Okay.  And if you look at the third

12     paragraph of the text, the summary, it says, "I then

13     went to the DNC so Jenna Price could show me how to

14     use the programs.  An intern named Ross Terry, who

15     was probably the most clueless intern I've ever met,

16     showed me how to use the tracking program and I sat

17     down and spoke with Jennifer a little bit."

18                  What was the tracking program?

19          A.      That -- that's the -- grabbing the clips.

20          Q.      So it's an application that compiles press

21     clips?

22          A.      Well, it's -- yeah, yeah.  It's used by a
```

```
 1   lot of people.

 2        Q.    Okay.  The next line says, "She told me

 3   about the bus program the DNC is doing that is a

 4   secret until Sunday when they start."

 5             What did she tell you about the bus

 6   program?

 7        A.    I mean, I assume that it was what my next

 8   line is, that they'll be sending out buses of

 9   staffers to events to help coordinate the protests

10   and press conferences.

11        Q.    And when you wrote that she told you it's

12   a secret until Sunday when they start, you understood

13   that she meant that it would be confidential until it

14   actually happened, right?

15        A.    That nobody knew about it until it

16   actually happened.

17        Q.    And if you go over to the next page, the

18   timestamp 8:00 --

19        A.    Okay.

20        Q.    -- "Jenna Price, DNC:  We're actually

21   launching a bus tour.  It's kind of a secret, so

22   don't tell anybody about it.  Bob is aware of it, but
```

 1   I don't know how much he knows about it, so I

 2   wouldn't bring it up to him either.  But we're going

 3   to have two buses going across the country for three

 4   weeks and our team is going to be on the bus.  So

 5   we're going to be doing standup pressers and protests

 6   at all these stops around the country."

 7            When she told you that you shouldn't even

 8   tell Bob about -- Bob Creamer about this bus tour,

 9   you understood she meant to keep it confidential

10   until it started, right?

11        A.    I mean, I think she meant until it starts

12   and then everyone's going to know about it when it

13   starts.

14        Q.    Okay.  But until it starts,

15   keep confidential.

16        A.    Until it starts that week it looks like.

17   So, I mean, this is just something that they didn't

18   want it to be announced until it happened, and it was

19   not announced until it happened.

20        Q.    Okay.

21            MR. SANDLER:  Let me ask that this be

22   marked as the next exhibit.

```
 1   saying."

 2              Did you -- when you tried to listen to

 3   what they were saying, was it your understanding that

 4   they intended to keep that meeting confidential?

 5         A.    I mean, they were sitting in a glass

 6   conference room that anybody could have seen.

 7         Q.    Anybody walking in off the street?

 8         A.    Anybody walking through the office, and

 9   there were people who would walk in and out of the

10   office.

11         Q.    And do you believe there were people

12   walking in and out of the office who weren't

13   authorized to be there by somebody who was already

14   working there?

15         A.    I guess -- it would be hard for me to say.

16   I didn't know everybody who walked in and out.

17         Q.    Okay.  You didn't have any reason to

18   believe that strangers had walked in off the street

19   and saw what was going on in that conference room,

20   right?

21         A.    I -- like I said, I don't know who would

22   have seen that.
```

```
 1        Q.    And do you think it's reasonable to

 2  believe that a conversation between the campaign

 3  manager for one of the leading candidates and a

 4  senior consultant to the DNC was intended to be

 5  confidential?

 6              MR. CALLI:  You know, I think -- I'm just

 7  going to object to the form of the question.  I think

 8  what you're dancing around is whether anybody told

 9  her anything, not -- not some fictitious implied

10  duty.

11              MR. SANDLER:  I'm not asking whether

12  anybody told her anything.  I'm asking --

13              MR. CALLI:  I know you're not.

14              MR. SANDLER:  She said she wasn't invited

15  into the meeting, "but I pretended to be working and

16  tried to listen to what they were saying."  And I

17  was -- I'm just trying to get her understanding of

18  the nature of the conversation that she was

19  eavesdropping on.  That's all.  I'm not asking what

20  anybody told her.

21              THE WITNESS:  Well, you can see what I

22  heard written down.
```

Alliance for Retired Americans, et al. v. President Donald J. Trump, et al.
Washington, DC

```
 1   BY MR. SANDLER:

 2       Q.    Okay.  All right.

 3             MR. CALLI:  I meant told her with regard

 4   to her duty of confidentiality, not told her as part

 5   of the meeting.  I'm sorry.

 6             MR. SANDLER:  Excuse me?

 7             MR. CALLI:  I was clarifying.  I meant

 8   what anyone told her from Democracy Partners as far

 9   as her duty of confidentiality, not what anyone in

10   the meeting told her.  I was clarifying my objection.

11             MR. SANDLER:  All right.  Let me ask that

12   this be marked as the next exhibit.

13                    (Maass Exhibit No. 21 was marked for

14                     identification.)

15   BY MR. SANDLER:

16       Q.    Okay.  Showing you -- have you had a

17   chance to look at this?

18       A.    Yeah.

19       Q.    Okay.  Showing you what's been marked as

20   Maass Exhibit 21, it is a -- it is from Angela

21   Brandt -- e-mail from Angela Brandt, October 14th,

22   2016, to Joe Halderman, subject:  Bracketing update
```

Allison Maass v. Robert Halderman, et al. Confidential - Subject to Protective Order
Washington, DC

```
 1   with attachment.  And it says, "Attachments:  Update

 2   9-21 docx."

 3            Joe Halderman is who?

 4       A.   He works at Project Veritas.

 5       Q.   What's his position and title?

 6       A.   Producer.  I think he's a producer is his

 7   title.

 8       Q.   Was he your immediate supervisor at

 9   Project Veritas?

10       A.   I worked with Joe full time.

11       Q.   Okay.  And you're forwarding a message

12   from Robert Creamer to you, which says, "Subject:

13   Bracketing update - with attachment," right?

14       A.   Yeah.

15       Q.   And then if you look at the document

16   behind it, do you recall if that was the attachment

17   to this e-mail that -- that you sent to

18   Mr. Halderman?

19       A.   Yeah, it must be.

20       Q.   Okay.  And the -- you sent this on --

21   okay.  9/21.  All right.  I see.  You sent this on

22   the 14th.  And you received this on September 21st,
```

```
 1   right?

 2        A.    Looks like it.

 3        Q.    Okay.  And on September -- the memo is

 4   dated September 21st, 2016?

 5        A.    Mm-hmm.

 6        Q.    And it's the -- this memo discusses not

 7   only past bracketing events, but future bracketing

 8   events; that is, events that had to take place after

 9   September 21st, 2016, right?

10        A.    I don't see anything for after.

11        Q.    After September 21st?

12        A.    Oh, there is, yeah.  It looks like there

13   is.

14             MR. SANDLER:  Okay.  All right.  Let me

15   ask that this be marked as the next one.  Or

16   actually, if you want to take -- we can take a lunch

17   break.  I don't have a lot more, but if you want to

18   break now, this is fine.

19             MR. CALLI:  Do you want to discuss -- in

20   other words, if you have -- well, we need a break.

21             THE VIDEOGRAPHER:  Off the record.  The

22   time is 11:57.
```

Case 1:17-cv-01047-ESH Document 68-22 Filed 06/03/19 Page 60 of 69

Alliance Defending Freedom v. Superior Court of the District of Columbia, et al.
Washington, DC

8/10/2018
Page 115

```
 1                (Recess.)

 2                    (Maass Exhibit No. 22 was marked for

 3                    identification.)

 4                THE VIDEOGRAPHER:  On the record.  The

 5      time is 12:08.

 6      BY MR. SANDLER:

 7          Q.    Okay.  I think that she had marked this as

 8      22.  Yeah, that's it.  Okay.

 9                Yeah.  If you would take a look at this

10      and let me know when you've had a chance to look at

11      it.

12                MR. CALLI:  Mr. Sandler, while she reads

13      that, I have given a copy of the relevant page to the

14      reporter on the designation of the deposition we

15      discussed.  So I've requested that she add just on

16      the first page of this the "Highly confidential -

17      attorneys' eyes only."  And then we have 30 days to

18      reach an agreement with you to release that or which

19      exact pages we want to apply it.

20                MR. SANDLER:  Understood.  Agreed.

21                MR. CALLI:  Twenty-one you said, ma'am?

22                THE REPORTER:  Twenty-two.
```

Allison Maass - Highly Confidential Pursuant to Protective Order
Washington, DC

8/10/2018
Page 116

 1                  MR. CALLI:  Twenty-two.  Thank you.

 2       Sorry.

 3                  THE WITNESS:  Okay.

 4       BY MR. SANDLER:

 5            Q.    Okay.  Showing you what's been marked as

 6       Maass Exhibit 22, this is a -- the bottom or first

 7       e-mail -- actually, it's at the end from Eric

 8       Black -- from Aaron Black on October 13th, subject:

 9       Re:  Trump offices in battlegrounds.

10                  And then if you go to the first page,

11       there's an e-mail from Aaron Black to Angela Brandt,

12       Friday, October 14th at 11:38 a.m., subject:  Re:

13       Trump offices in battlegrounds," and then there's --

14       under it is, "List of counter-Trump dates/locations

15       activity."

16                  Do you see that?

17            A.    Mm-hmm.

18            Q.    And did you receive this e-mail from Aaron

19       Black on October 14th?

20            A.    Looks like it.

21            Q.    And why would you have been receiving a

22       list of counter-Trump dates and locations?  Why would

Allison Nichols Halderman Confidentiality Custody Order
Washington, DC

```
 1    Aaron Black be sending that to you?

 2         A.    I don't know exactly.  Maybe he wanted me

 3    to help with research.

 4         Q.    You don't remember for what purpose he

 5    sent it to you?

 6         A.    No.

 7         Q.    Okay.  And if you look at the second page,

 8    you see under the -- at the top of the page it says

 9    "Tampa"?

10         A.    Yeah.

11         Q.    And then it says "Orlando"?

12         A.    Yep.

13         Q.    And under that it says, "Visibility in

14    press conference 10/15/2016 9:30 a.m."

15               Do you see that?

16         A.    Yes.

17         Q.    Do you know, had the -- had that been --

18    that press conference and event been announced yet on

19    October 14th publicly?

20         A.    I don't know.

21         Q.    Okay.  And at the top of the first page is

22    an e-mail from Angela Brandt to Joe Halderman,
```

Allison Maass / Julie Thibault and Hidden Dividends Property Company
Washington, DC
8/10/2018
Page 118

```
 1    forward:  Trump offices in battlegrounds.

 2              You forwarded this list of counter-Trump

 3    dates/locations activity to Mr. Halderman on October

 4    14th, right?

 5         A.    Yes.

 6         Q.    For what purpose did you forward him this

 7    information from Mr. Black?

 8         A.    I'm pretty sure I forwarded every single

 9    e-mail from the investigation on that day just so we

10    would have copies of it.

11         Q.    Okay.  And was there some particular

12    reason that you thought Project Veritas should have a

13    copy of a list of future counter-protests?

14         A.    Just every single thing that I had been

15    given I passed along.  I'm pretty sure we didn't have

16    anything to do with this press conference.  It was

17    just part of the information we had gathered.

18              MR. SANDLER:  Okay.  Let me ask that this

19    be marked as the next exhibit.

20              (Maass Exhibit No. 23 was marked for

21              identification.)

22              THE WITNESS:  Okay.
```

Allied Security and Confidential Property Group
Washington, DC

1    BY MR. SANDLER:

2        Q.    Okay.  This video summary -- showing you

3    what's been marked as Maass Exhibit 23, this is a PV

4    video summary form, but under "Date video was

5    obtained" there's no date.

6            Do you know what date this was for?

7        A.    No, sorry, I don't remember.

8        Q.    And if you look at the second page,

9    it's -- under "Summary" -- "Script/operation,"

10   "Summary/screenshots," the second full paragraph on

11   that page says, "I went to a meeting that Laura

12   called TOW at the Communication Workers of America

13   HQ."

14           Is Laura -- is that supposed to be Lauren

15   Windsor?

16       A.    I think so.

17       Q.    And what's TOW?

18       A.    I don't know.

19       Q.    Okay.  And does -- does this indicate that

20   this was the day you went to the meeting at the

21   Communication Workers headquarters?

22       A.    I'm going to say it is because I said I

 1   went to a meeting at the Communication Workers of

 2   America.

 3        Q.    And when you -- before you went to this

 4   meeting, were you told what the meeting was about?

 5        A.    I don't remember what Lauren told me about

 6   the meeting.

 7        Q.    Did Lauren tell you that Celinda Lake

 8   would be presenting a polling briefing?

 9        A.    I don't think so.

10        Q.    Did you know you were going to listen to a

11   polling briefing from Celinda Lake before you went to

12   the meeting?

13        A.    I don't think so.

14        Q.    Did -- did you know who Celinda Lake was

15   before you went to the meeting?

16        A.    Nope.

17        Q.    What did you learn about who Celinda Lake

18   was?

19        A.    I learned her name and her title.  Her

20   name and her title.

21        Q.    Oh, okay.  And you taped the briefing --

22   the polling briefing that Celinda Lake gave, right?

Allison Maass v. Julie Snyder Engelbracht & Democracy Partners et al.
Washington, DC

```
 1        A.    I was recording during the conversation --

 2   during the meeting.

 3        Q.    And for what purpose were you recording

 4   the conversation of a polling briefing about Wall

 5   Street issues and how they were playing in various

 6   races?

 7        A.    Yeah.  I mean, I had my camera running for

 8   just about everything.

 9        Q.    You indicated before that you had turned

10   off the camera when you first went in there, right?

11        A.    Yes.

12        Q.    Okay.  And I guess my question is why did

13   you turn it back on?

14        A.    Because it was part of the investigation.

15        Q.    And why was a polling briefing by Celinda

16   Lake of the -- to the Communications Workers -- or I

17   guess to a union group about a poll commissioned by

18   the Communication Workers a subject of the

19   investigation?

20        A.    I didn't know what was going to be said or

21   when it was going to be said.  And I was with Lauren

22   Windsor, who was part of the investigation.  So I
```

Allie Francie M. Brown Phillip - Confidential - Contains Confidentiality Obligation

Washington, DC

8/10/2018
Page 122

```
 1   just had my camera running at all times just in case.

 2        Q.    And so the -- it's okay to -- in your

 3   view, it was okay to secretly tape a polling briefing

 4   commissioned by a union -- a briefing of the people

 5   who commissioned it because Lauren Windsor was with

 6   you?

 7        A.    I was just recording what I was doing.  I

 8   don't really think I cared that much about the

 9   polling briefing.  It just happened to be going on

10   while I was with Lauren Windsor.

11        Q.    And was this tape provided to Project

12   Veritas the same -- the night of the day that you

13   took it?

14        A.    I don't know if it was the day of.

15        Q.    Would it have been at the latest the day

16   after?

17        A.    It would have been when I got back to

18   New York and gave them the tape.

19        Q.    Didn't you provide the tapes to them every

20   day after you took the tape?

21        A.    Some -- I usually just handed it to them.

22        Q.    Okay.  Have you had a chance to look
```

```
1    through this -- this document?

2         A.    Yes.

3         Q.    Is there anything that you see in this

4    document that you believe should be reported or

5    exposed that is -- you know, what would be the basis

6    for secretly recording a polling briefing?

7              MR. CALLI:  Objection as to the form of

8    the question.

9              THE WITNESS:  Can you rephrase?

10   BY MR. SANDLER:

11        Q.    Sure.  I want to know what you discovered

12   in recording this meeting -- this briefing -- polling

13   briefing at the Communication Workers of America that

14   you believed justified secretly recording it.  That's

15   my question.

16        A.    So I recorded everything that I did during

17   this investigation.  I just happened to be invited to

18   this meeting and I was rolling.  And if you go

19   through, you see they talk about being a little

20   dishonest about the facts of the poll, if you read my

21   summary.  I talk about how they say they're going to

22   change the numbers or, you know, they should phrase
```

```
 1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2       I, Rebecca L. Stonerock, Registered Professional

 3   Reporter, the officer before whom the foregoing

 4   proceedings were taken, do hereby certify that the

 5   foregoing transcript is a true and correct record of

 6   the proceedings; that said proceedings were taken by

 7   me stenographically and thereafter reduced to

 8   typewriting under my supervision; and that I am

 9   neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12

13   My commission expires:

14   October 14, 2022

15

16

17

18                       NOTARY PUBLIC IN AND FOR

19                       THE DISTRICT OF COLUMBIA

20

21

22
```