UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DEMOCRACY PARTNERS, LLC,                   CASE NO.: 1:17-CV-1047-ESH
et al.,

      Plaintiffs,                          **Oral Argument Requested**

v.

PROJECT VERITAS ACTION FUND,
et al.,

      Defendants.

_____/


**<u>PROJECT VERITAS ACTION FUND,
PROJECT VERITAS, JAMES O'KEEFE AND ALLISON MAASS'S
REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Journalists gather and report the news for the public interest. Sometimes, the truth hurts. And it has consequences. Such is the case here for Robert Creamer, Democracy Partners, and Strategic Consulting Group, and the reported truth about their words and conduct. Plaintiffs attempt to make this case politically charged in an effort to obfuscate the core First Amendment issues. If 60 Minutes Investigative Reporter Mike Wallace went undercover to report about XYZ Corporation, he would not become liable if his reporting caused XYZ stock to drop or XYZ suffered businesses losses. Likewise, the Project Veritas Parties are not liable for Plaintiffs' lost contracts.

Due to a complete failure of damages and fatal flaws with individual torts, the Project Veritas Parties' Motion for Summary Judgment should be granted. As United States District Judge Martin Reidinger put it in rejecting a recent challenge to Project Veritas's journalism, "[I]f citizens and the media are handcuffed by a fear of liability, that's detrimental to society as a whole, and it is detrimental, really, to our fundamental freedom." Second Declaration of Stephen Klein ("Klein Decl. 2") at ¶ 4, Ex. 1, 9:3-7.

## I. Plaintiffs' Maligning of Project Veritas With Internet Articles and the Like Does Not Create an Issue of Material Fact

Plaintiffs begin their Opposition by citing a 2019 article from an internet blog called "The Intercept" unrelated to the facts in an attempt to malign Project Veritas amounts to an unsupportable political hit-job. Plaintiffs' citation of the unauthenticated article not attached to their Opposition, not related to the facts of this case, not related to the time period at issue, and containing numerous layers of hearsay is inadmissible and cannot create a genuine issue of material fact. *See, e.g.*, *Farkarlun v. Hanning*, 855 F. Supp. 2d 906, 921–22 (D. Minn. 2012).

That Plaintiffs chose to highlight an article from "The Intercept" is also revealing – Plaintiffs have coordinated litigation with other plaintiffs as part of a "legal counterattack" on

1

Project Veritas, and used their media allies, including at "The Intercept," as part of that effort. *See* Klein Decl. 2 at ¶¶ 5-6, Ex. 2 ("Post-Election Democracy Partners and [AUFC] plan legal counter attack on O'Keefe in coordination with other groups that have been attacked in the past."), Ex. 3. (recommending "Ryan Grim, The Intercept" as a "favorite reporter" to whom Wentz's lawyer should send filed complaint.).

Windsor gave an "exclusive" "teaser" of Plaintiffs' early 2017 "countersting" of Allison Maass to Grim, who gave Windsor feedback and revisions to the "teaser," and which Grim used to draft an article favorable to Plaintiffs. Klein Decl. 2 ¶ 7, Ex. 4. That self-described "countersting," planned with the assistance of Plaintiffs' counsel Joseph Sandler, involved Windsor and a male accomplice screaming at Ms. Maass about a "rape barn," chasing Ms. Maass down the street screaming, "you got Creamed," and ultimately the male accomplice forcing his way into Ms. Maass's taxi. *Id.* ¶ 8, Ex. 5 at 15:14-16:22; 91:3-7, 44:16-45:4, and 42:7-14.

Windsor titled the "countersting" teaser, "Is Project Veritas Conducting Political Hit Jobs for Donald Trump?" *Id.* ¶ 9, Ex. 6; *see also id.* ¶ 7, Ex. 4 (Creamer: "If I were going to tease this I would do what O'Keefe does: a tweet that says something like: **We've turned the Tables: Undercurrent to release results of investigation of James O'Keefe spy operations tomorrow AM – Stay Tuned.**") (emphasis original). Having fed allied reporters a false narrative that Project Veritas conducts political hit jobs, Plaintiffs now cite a "favorite" publication's article in support of their false theme that Project Veritas is a "political spying operation." This is an echo chamber. Beginning their Opposition in this manner, instead of focusing on the factual and legal analysis, betrays the weakness of Plaintiffs' case. And it does not create any issue of material fact.

Plaintiffs' argument that Project Veritas is a "political spying agency" is absurd and false. At summary judgment, Plaintiffs must point to specific facts based on the admissible evidence;

rhetoric does not suffice. An investigative press organization, Project Veritas is not unaccustomed to arguments by those appearing in its reporting who would impose a different First Amendment standard on Project Veritas. As Judge Martin Reidinger recently put it, "I keep running that Mike Wallace analogy through my mind. If you made this argument against Mike Wallace, would everybody in the room laugh?" Klein Decl. 2 ¶ 10, Ex. 7 at 59:14-17. Judge Reidinger concluded, "If I've gotten this wrong, and the Fourth Circuit says that this is not what the law is, I hesitate to think where the First Amendment is going in this country." *Id.* at ¶ 4, Ex. 1 at 15:23-16:1. *See also Teter v. Project Veritas*, 2019 WL 2423294, *4 (W.D. N.C. June 7, 2019) (granting Project Veritas Parties' Motion for Directed Verdict).

As part of their effort to malign Project Veritas, Plaintiffs repeatedly claim Project Veritas reviewed emails hacked by "Russian intelligence operatives" or "a criminal conspiracy of Russian intelligence operatives." *See* Dkt. 68 at 6; PSMF ¶¶59, 127. This is nonsense. What Plaintiffs are actually referencing is the fact that Project Veritas journalists read Democratic National Committee emails available publicly on WikiLeaks, just as other news organizations and individuals did. Any person with an internet connection can still visit the WikiLeaks website today, search the database, and read emails. WIKILEAKS, "Search the DNC Email Database," *available at* https://wikileaks.org//dnc-emails/ (last visited June 6, 2019). That includes emails by or about Plaintiffs and the "bracketing program" they continue to argue is confidential. Creamer himself was aware of as of at least July 23, 2016 (months before Ms. Maass's internship) that emails about Democracy Partners and the "bracketing program" were available to the public on the WikiLeaks website. SMF ¶127; Klein Aff. Ex. 56, Dkt. 63-61 ("Dem Partners is in the wiki dump. Nothing bad per se just showing the coordinating on protest events." Creamer: "Bracketing calls."). The publicly available emails list the phone number and passcode for participating in the bracketing

call. SMF ¶127. Plaintiffs and others of the many participants on bracketing calls continued to use the call-in number and passcode even after it was available to the public. *Id.* Plaintiffs do not dispute any of these facts. PSMF ¶59; PSMF ¶127.

There is no link between Project Veritas and "Russian intelligence operatives." The notion is false, Plaintiffs' lawyers know it is false, and yet try to fabricate it any way, perhaps in the hope that one of their media allies will write about it so that Plaintiffs can cite it in the future. It is a cowardly distraction that ultimately highlights the weakness of Plaintiffs' Opposition.

## II. The Undisputed Material Facts Conclusively Refute Plaintiffs' Theory of Damages.

### II(A). Plaintiffs' Only Theory of Damages is Based on Expressive Conduct, and Plaintiffs Fail to Overcome First Amendment Protections.

Stuck with the fact that Project Veritas's reporting was truthful and without malice, Plaintiffs attempt to recast a claim about reputational harm stemming from publication into a "laws of general applicability" framework to avoid First Amendment protections. Plaintiffs argue in their brief that the harm – two lost contracts and one lost potential contract – was caused by non-expressive conduct. However, under oath during discovery, they said the exact opposite:

> Plaintiffs <u>are claiming damages from the publication</u> by Defendant Project Veritas Action Fund <u>of the videos and documents</u> described in paragraphs 53 through 59 of the Complaint <u>only insofar as that publication revealed</u> to the clients of Democracy Partners and [Strategic] that the confidential information and documents of those clients has been stolen, compromised and publicly disseminated as a result of Defendants' actions. <u>The public exposure caused the Plaintiffs to be viewed by certain clients</u> as not capable of maintaining the confidentiality of sensitive and confidential client information. <u>The specific damages resulting from Defendants' actions in that regard are as follows</u> [Plaintiffs go on to list the AFSCME and AUFC contracts and the potential Dialysis Patient Citizens work].

Klein Aff. Ex. 12, Dkt. 63-16 at 10–11 (emphasis added).

This is summary judgment, and no amount of assertions in Plaintiffs' legal briefing can undo the testimony and evidence obtained through discovery. In Plaintiffs' own sworn words,

"damages from the publication" caused harm because of what "that publication revealed" and how "[t]he public exposure caused Plaintiffs to be viewed by certain clients[.]" Damages from what a "publication revealed" and what "public exposure caused" are clearly damages caused by expressive conduct. *See, e.g.*, SMF ¶26, Dkt. 63-2 at 7–8 (quoting AFSCME R. 30(b)(6) witness: "[T]he broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it." (emphasis added)).

Moreover, when Plaintiffs say the injury resulted from how "certain clients" now "viewed" Plaintiffs, they concede the harm is reputational. According to Plaintiffs, publication caused the people who paid Strategic for political consulting work to *re-evaluate and change their minds about Plaintiffs.* That is the essence of reputational harm. The undisputed material facts show that Plaintiffs' claims fail to overcome First Amendment protections.

**II(B). The Undisputed Material Facts Demonstrate a Complete Failure of Causation.**

Plaintiffs' own conduct – exposed to its special interest customers, potential customer, and the world – caused the alleged damages here. The facts demonstrate that AFSCME and Dialysis Patient Citizens acted as a result of what the Project Veritas Parties' truthful and accurate reporting revealed, as well as some unrelated matters, and AUFC went out of business because it was funded by AFSCME, which withdrew support following publication of Video I. SMF ¶¶18–54, Dkt. 63-2 at 6–12. There is no genuine issue of material fact otherwise.

Plaintiffs rely on hornbook law that cause-in-fact requires that a defendant's conduct is a "substantial factor." Dkt. 68 at 15. They ignore how that principle intersects with the summary judgment standard. For a dispute of material fact to be a genuine one, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986). Plaintiffs must point to evidence that is more than "merely colorable" or "not significantly probative." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986). "The mere existence of a scintilla of evidence in support of [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for [non-movant]." *Id.* at 252. So too, Plaintiffs argue, "Proximate cause is almost always a factual issue for the jury." Dkt. 68 at 15. But as the D.C. Court of Appeals recognizes,

> Although it is often said that proximate cause is an issue for the jury, it can also be a question of law for the court to consider in the first instance, before the case even goes to the jury . . . . If there is insufficient evidence for a reasonable jury to find that the defendant's conduct caused harm to the plaintiff, the court must direct a verdict for the defendant. *See District of Columbia v. Freeman*, 477 A.2d at 716 (the question "becomes one of law . . . when the evidence . . . will not support a rational finding of proximate cause."). In addition, if the court determines that a certain "chain of events appears highly extraordinary in retrospect," the case should also be taken from the jury."

*Claytor v. Owens-Corning Fiberglas Corporation*, 662 A.2d 1374, 1382 (D.C. 1995) (footnote omitted).

Plaintiffs effort to distort the testimony of AFSCME's Rule 30(b)(6) witness fails. Dkt. 68 at 16–17. At deposition, the witness explicitly rejected the theory of causation Plaintiffs ask this Court to accept and he did so over the course of multiple pages of testimony. Dkt. 68-15 at 23–25 (AFSCME 30(b)(6) depo. at 76:21–79:5). Plaintiffs selectively quote, and selectively bold only the first clause in the following:

> I think it was the overall sense that they allowed this to occur, they invited this opportunity into their midst, but I think the broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the timing was a very unfortunate distraction, and we didn't want to be party to it.

*Id.* at 78:20–79:5. There are two problems with Plaintiffs' selective editing. First, they ignore that the second clause demonstrates that the damages allegations strike at First Amendment protected

activities: AFSCME's "broader concern" "regardless of the circumstances that led to the video," was "the video in itself and the timing . . . ." *Id.*

Second, Plaintiffs falsely imply that the first clause relates to Ms. Maass's internship. In fact, the AFSCME witness testified moments earlier that this related to Plaintiffs' allowing *Scott Foval* into their midst without seriously vetting him. *Id.* at 77:1-14. Asked why there was a recommendation to terminate the relationship with Strategic, AFSCME's witness testified:

> A.      Again, we felt there was – understanding what we knew about this organization, Project Veritas, and their representation, their reputation for misrepresenting the facts[1] and doing these types of videos, <u>we did feel that there was an element of indiscretion that they'd allowed Mr. Foval into their midst without serious vetting</u>, that they created a, it was the view at the time that they had created an opportunity for this, for this operation to occur, and it had become a major distraction to, and an unnecessary one at a critical moment in time.
> We did not want, we did not, we did not want to, we did not welcome the distraction that it had created.
> Q.      When you say they had let out Mr. Foval into their midst without proper vetting, you're referring to Creamer, Democracy Partners, and Strategic Consulting Group?
> A.      That's correct, yes. We felt like that it was carelessness on their part.

*Id.* at 77:1–77:20 (emphasis added). AFSCME's witness then cited the concern that Creamer "was speaking ad hoc about his strong ties to the Clinton Campaign, and it seemed a bit inappropriate," before giving the selectively edited quote Plaintiffs provide, Dkt. 68 at 16, and concluding, "I think the broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it." Dkt. 68-15 at 25–26 (78:6-79:5).

---

[1] The videos are not deceptively edited. One court has had the opportunity to confirm the accuracy of "Rigging the Election" Video I and directed verdict for the Project Veritas parties: "[t]hus, the Plaintiff's contention that the Defendants concocted a storyline (Video I) and then consciously set out to create the 'evidence' (Foval's statements) to conform to that storyline is simply unsupported by Plaintiff's own evidence." *Teter*, 2019 WL 2423294 at *3.

Ms. Maass had no interaction with Foval and never met with or recorded him. Foval was recorded by another Project Veritas investigative journalist. Footage of Foval is 59% of the Video that AFSCME and Strategic's other customers reacted to (in contrast, footage taken by Ms. Maass is about 13%). Dkt. 63-6 ("Video I"). Plaintiffs' claims are based only on Ms. Maass's internship. Moreover, asked later in his deposition about whether he had any discussion with Creamer about what Creamer had asked her for before she started interning at Democracy Partners, AFSCME's Rule 30(b)(6) witness recalled no such details and did not ask about them: "[i]t all seemed very moot at the time[,]" and "Again, the circumstances of her presence there at that point seemed irrelevant[.]" Dkt. 63-2 at 9; SMF ¶¶ 33–34. And elsewhere in his testimony, AFSCME's Rule 30(b)(6) witness cited a multitude of additional concerns or intervening factors. *See, e.g.*, *id.* at 8, SMF ¶¶28–30, 32.

In this context, Plaintiffs point to a single affirmative answer on cross examination, to the question, "[Y]ou had testified that AFSCME was concerned that <u>Mr. Creamer, Strategic Consulting Group, had created the opportunity for this to occur</u>. Was part of your concern that they had allowed their offices to be infiltrated by a Project Veritas operative?" Dkt. 68 at 16 (emphasis added). This does not even rise to the "metaphysical," the "merely colorable," or the "scintilla of evidence." Plaintiffs' sole theory of causation is flat out wrong.

Plaintiffs' damages argument does not meaningfully address the "lost" work from AUFC and does not address Dialysis Patient Citizens at all. Dkt. 68 at 12–19. As to AUFC, Plaintiffs simply assert that it was foreseeable that a loss of donations and support to AUFC would result and was "particularly foreseeable" in light of the fact that years ago, a group called ACORN closed after Project Veritas exposed its activities. *Id.* at 18–19. Plaintiffs cite no record evidence here, just the allegations in their Complaint. *Id.* (citing Dkt. 1 at ¶¶14–15).

As detailed in the Project Veritas Parties' Memorandum, none of these cancellations were caused by the circumstances of Ms. Maass's internship with Democracy Partners. Dkt. 63-1 at 13–15. Plaintiffs have failed to raise a genuine dispute of material fact to the contrary.

**II(C). Plaintiffs Disclaimed All Other Theories of Damages.**

Attempting to avoid applicability of First Amendment protections, Plaintiffs chose to structure their theory of harm only around Strategic's "lost" contracts. Plaintiffs were required to describe under oath, "all damages supposedly suffered by any Plaintiff that are allegedly recoverable against any Defendant in this lawsuit." SMF ¶ 18, Dkt. 63-2 at 6 (emphasis added). They listed only the Strategic-AFSCME work, the Strategic-AUFC work, and the Strategic-Dialysis Patient Citizens potential work. *Id.*

Accordingly, Democracy Partners and Creamer have not been injured and have suffered no damages. Democracy Partners has no standing to complain about a purported injury to Strategic, one of its members. That is highlighted by the fact of its loose organization. *See* SMF ¶¶87–91; *see also* Klein Decl. 2 ¶ 8, Ex. 5 at 78:10-19 ("Democracy Partners is more of a network of progressive political consultants around the country. Each of these political consultants has their own entities that they derive their income from."); 116:7-12 ("members" of Democracy Partners pay $500 in annual dues). Nor does Creamer have some separate standing to complain about an injury the entity he owned allegedly suffered. Plaintiffs' effort to blur the lines fails.

Plaintiffs cannot now elect to pursue nominal damages for trespass and statutory damages for interception claims, having not asserted them when asked. SMF ¶18 (Answer #3). "All damages" means all damages. "Any Plaintiff" means "any Plaintiff." Sworn answers matter.

### III. Plaintiffs' Fiduciary Duty Claim Fails.

Plaintiffs allege a fiduciary duty claim against Ms. Maass, arguing that her unpaid, part-time, four-week internship with Democracy Partners gave rise to a fiduciary duty she owed to Democracy Partners. The claim fails for two reasons. First, the undisputed material facts show that Ms. Maass did not owe a fiduciary duty to Democracy Partners. Second, Democracy Partners suffered no injury from the alleged breach – only Strategic purportedly did. On either basis, the Project Veritas Parties are entitled to summary judgment on the breach of fiduciary duty count.

### III(A). Allison Maass Owed No Fiduciary Duty to Democracy Partners.

Counsel's research has revealed no case in which a fiduciary duty claim against an unpaid intern survived summary judgment. Plaintiffs do not cite such a case. This case should not be the first. It is true that D.C. case law adopts a "flexible" and fact-intensive analysis with regard to the existence of a fiduciary duty. Dkt. 25 at 18–19. But the test is not so amorphous as to permit Plaintiffs' claim to proceed to trial. That is especially critical given the First Amendment interests and chilling effect of allowing such a claim to proceed against investigative journalists.

The Court's Order at the motion to dismiss stage puts a fine point on the failure of the facts to match what Plaintiffs pled in their Complaint. At that time, the Court observed, "While there may be plenty of interns who fit the generic description defendants put forth, the complaint alleges a much different relationship between [Ms.] Maass and Democracy Partners." Dkt. 25 at 17. Following a searching discovery process, there are no facts which take this relationship outside the "generic" internship and into the highest order of duty under the law.

### III(A)(1). Plaintiffs Rely on Motion to Dismiss Cases.

Plaintiffs' discussion of the law regarding whether a fiduciary duty exists highlights cases where plaintiffs survived motions to dismiss based on what was "adequately alleged." *See, e.g.*,

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996) (alleged duty of "trust advisor"/family patriarch); *Armenian Genocide Museum and Memorial Inc. v. Cafesjian Family Foundation et al.*, 607 F. Supp. 2d 185 (D.D.C. 2009) (alleged duty of former lawyer to former client). But the analysis at this stage focuses on facts and evidence, not Plaintiffs' tautological restatements of their Complaint.

In particular, Plaintiffs rely heavily on the *CAIR* order denying a motion to dismiss, *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 341 (D.D.C. 2011). But the *CAIR* plaintiffs <u>lost</u> their fiduciary duty claim once the case reached summary judgment stage. *CAIR – Renewed SJ*, 82 F. Supp. 3d 344, 355 (D.D.C. 2015). The *CAIR* court held that having disclaimed reputational damages and having not demonstrated that plaintiffs suffered damage to the economic value of specific confidential and proprietary information, "Plaintiffs have not shown, based on evidence in the record, that they have an injury as a result of Defendants' alleged breach of fiduciary duty claim. Therefore, the Court need not address Defendants' other arguments for summary judgment regarding this count." *Id.* at 353–55.

> III(A)(2). The Undisputed Material Facts Show that Ms. Maass's Unpaid, Part-Time, Four Week Internship Did Not Rise to the "Much Different" "Special Relationship of Trust and Confidence" Required for a Fiduciary Duty Claim.

The approach in Plaintiffs' Opposition is to throw out numerous claims about the facts in the hope that something will give the appearance of a genuine issue of material fact. In doing so, they ignore whether and how their assertions fit into the fiduciary duty factors the Court has previously articulated – "the nature of the relationship, the promises made, the types of services given and the legitimate expectations of the parties." Dkt. 25 at 19. Plaintiffs simply ignore and fail to respond to most of the facts discussed in the Project Veritas Parties' Memorandum. Dkt. 63-

1 at 17–22. The Project Veritas Parties and the Court are left to speculate what factors Plaintiffs believe each of their scattershot arguments relate to.

Plaintiffs focus their factual argument on the fictitious elements of Ms. Maass's "Angela Brandt" role. Dkt. 68 at 21–22. Some[2] of these facts *do* speak to how Ms. Maass came to have an unpaid, part-time internship with Democracy Partners. But Plaintiffs fail to cite facts and evidence to show how these fictitious elements create the "special relationship of trust and confidence" emphasized in D.C. case law. *See, e.g.*, *Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007). Ms. Maass did not present herself as an archetypal fiduciary – her role was not a lawyer, trustee, or the like – but as a community college student interested in politics. This was the basis on which she was offered an unpaid internship with Democracy Partners.

The fact that Ms. Maass was a three-day-a-week unpaid intern at Democracy Partners for slightly less than four weeks speaks powerfully to the factors of "the nature of the relationship" and what the "legitimate expectations" of the parties are. If Plaintiffs wanted to hold an unpaid intern to the highest duty under the law – a duty through which an unpaid intern should, like a lawyer, put a business's interest ahead of her own – Plaintiffs should have taken special steps to create the characteristic "special relationship of trust and confidence." They did not.

---

[2] Others are simply not relevant to any material issue at all. For example, Plaintiffs cite the "Angela Brandt" résumé, but they did not ask for a résumé until days after Ms. Maass had started the unpaid internship. SMF ¶78. Plaintiffs also cite identification presented to the offices of the Democratic National Committee and the Communications Workers of America. Dkt. 68 at 22. But this does not relate to any claim by *Plaintiffs*. And Plaintiffs did not ask Ms. Maass for identification. SMF ¶74. On a related note, Plaintiffs argue that Ms. Maass attended a Communications Workers of America polling meeting. Her attendance at someone else's meeting does not bear on whether a duty to Plaintiffs exist. The attempt by Plaintiffs to loop into the analysis things said by people other than Ms. Maass before the internship, *see* Dkt. 68 at 22, things shown by Ms. Maass to others, and a résumé Ms. Maass sent to Windsor after the internship began is symptomatic of Plaintiffs' efforts to treat the fiduciary duty analysis as completely amorphous. And it calls attention to the unanswered question -- when exactly do Plaintiffs argue the relationship was created? The undisputed material facts show that the true answer is "never."

It is undisputed that no written agreement governed the Democracy Partners internship (the terms of the internship – meaning that it was unpaid and part-time – were set orally). And there was no agreement of any kind regarding nondisclosure or confidentiality. Plaintiffs' argue, "District of Columbia courts have never held a nondisclosure agreement is required to establish a fiduciary duty – or that it would be dispositive of the inquiry." Dkt. 68 at 23. That misconstrues the point. The Court's analysis considers "the promises made." In this case, there were no promises *proposed*, much less *made*, regarding confidentiality or non-disclosure. No one even drafted a proposed non-disclosure agreement. Klein Decl. 2 ¶ 8, Ex. 5 at 82:9-17. Choosing not to take any steps to create a special relationship of trust and confidence is consistent with Democracy Partners' practice – there is no evidence it previously gave its prior unpaid interns such agreements.

The only time Plaintiffs even mentioned nondisclosure or confidentiality in the entirety of the internship was Creamer's statement, "And, uh, [Lauren Windsor] has some kind of a nondisclosure agreement to sign or something." SMF ¶¶85–86. It is undisputed that Plaintiffs never again (and had never before) raised the notion of non-disclosure or confidentiality.

Plaintiffs point to *two* times over the entire course of the internship that people said the word "secret." Those stray references do not create an issue of material fact as to the existence of a fiduciary duty, or any other claim:

> (1) On one conference call, there was a reference to a "digital war room." Klein Decl. 2 ¶ 11, Ex. 8 at 10:36-13:22. In discussing a social media "umbrella group," Aaron Black told an unknown individual, "[Y]ou've been added to the digital war room. It's a secret based group where we can communicate in real time. Anybody who wants to be in there as well. It's folks like Planned Parenthood and a, you know, bunch of grass roots folks. You know. Like Being Liberal and Occupy Democrats and Addicting Info and people with large Twitter accounts." *Id.* Ms. Maass was never part of the referenced "digital war room" and there is no evidence relating to how her presence for the mention of a "digital war room" could give rise to a fiduciary duty on behalf of Ms. Maass.
>
> (2) She also had a conversation at the Democratic National Committee's office with DNC staff member Jenna Price and a DNC intern in which Price referred to a bus tour. Klein

Decl. 2 ¶ 12, Ex. 9 at 8:00–8:30. Although Price did refer to it being "kind of a secret," she asked Ms. Maass not to tell <u>Bob Creamer</u> about it. That someone at the DNC told Ms. Maass and a DNC intern this "kind of a secret" does not suggest a fiduciary duty to Plaintiffs. Ms. Maass was asked to keep it secret <u>from Creamer</u>.

Aside from the above stray comments picked from over 40 hours of recordings, Plaintiffs point to Ms. Maass disclosing bracketing information to Project Veritas (not to anyone else). Plaintiffs did not treat this information as confidential or do anything to suggest Ms. Maass should treat it that way. The information about bracketing calls was available to the public on WikiLeaks months before Ms. Maass's internship, and Creamer knew it. SMF ¶127. Information available to the public included the call-in information and passcode. *Id.* Plaintiffs and the many participants on these calls continued using the same call-in information and passcode. *Id.*

Before both the beginning of the bracketing program and before Ms. Maass's internship itself, Creamer discussed the bracketing program in detail with the Project Veritas investigative journalist who adopted the role of prospective donor "Charles Roth." While drinking wine and amaretto in a crowded restaurant, Creamer detailed the bracketing plans at length, including incorporating the theme of "Donald Ducks" his taxes. Klein Decl. 2 ¶ 13, Ex. 10 at 71:21-74:13; 134:11-135:5. Creamer conceded the "Charles Roth" journalist he discussed the bracketing program with owed no fiduciary duty. *Id.* at 109:14-20. And in his second meeting with the "Charles Roth" journalist, Creamer discussed the plans to have the duck at all future Trump/Pence events. *Id.* at 92:11-21. Creamer's willingness to spill bracketing details in a public place with an outsider he had only met once before exposes the fallacy of Plaintiffs' argument that Ms. Maass's presence on bracketing calls converts her unpaid internship into a fiduciary relationship.

As with each of Plaintiffs' invocations of "confidential" information, Plaintiffs fail to go beyond tautological labels and point to facts and evidence. Plaintiffs do not, and cannot, point to the terms of any purported "confidentiality," who was authorized to see or hear the information,

or even the identity of all participants on any particular phone call. The Court is left with the argument that it is confidential if Creamer says it is confidential, even if he is spilling the details over a bottle of wine to a virtual stranger.

Plaintiffs claim Ms. Maass "rummaged" through a trashcan (the evidence actually is that Ms. Maass looked and saw "nothing in the trash," Sandler Aff. Ex. 28; Dkt. 68-31 at 3) and took photographs of a typed letter on Creamer's desk (which said only, "It was nice to see you last week") and a notepad on Aaron Black's desk (Ms. Maass indicated contemporaneously she was "not sure it's of any use."). *Id.* This relates only to the breach of an alleged duty, not whether a duty exists.

A fiduciary duty is perhaps the highest standard of care. It is not created out of thin air. It cannot be inferred, because the expectations, understandings, and agreements would then be blurred. It does not grow on trees. There must be clear, mutually understood obligations and responsibilities. There may be contracts to sign, where the terms are defined. Unpaid, short term interns performing menial tasks owe a fiduciary duty? That is hooey. When Creamer mumbled, "Uh, [Windsor] has some kind of a nondisclosure agreement to sign or something," that alone amounts to nothing. In fact, since Windsor never presented any document, Plaintiffs' claim to a fiduciary duty is but a sad lament.

**III(B). The Purported Duty Does Not Match the Purported Injury.**

In their Complaint, Plaintiffs alleged a fiduciary duty owed by Ms. Maass to Democracy Partners, not a fiduciary duty owed to Creamer or Strategic. Dkt. 1 at 17-19; *see also* SMF ¶¶ 68, 70. Discovery revealed, and Plaintiffs conceded, that the only items of damages were the two "lost" contracts and the "lost" "potential contract" for Strategic. Dkt. 68 at 14; *see* Section II(C) above. Setting aside the first two elements of fiduciary duty, the fiduciary duty claim fails on the

lack of any injury. Democracy Partners has no right to complain about an alleged breach of fiduciary duty owed only to it, which only purportedly harmed a different Plaintiff, Strategic.

Plaintiffs claim that Ms. Maass "breached her duty by serving a third party's interest – that of Project Veritas – over the interests of her principal, Creamer (and by extension his companies, Strategic [] and Democracy Partners)." Dkt. 68 at 25. This notion is contrary to how Plaintiffs pled the fiduciary duty count. And it is made without any citation to the record or to any case law. This is not surprising since, quite simply, there are no facts or law that support the proposition.

Fiduciary duties are relationship-dependent. They do not 'flow through' entities or owners. *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1 (D.D.C. 2008) addressed the issue from the other end and dismissed a breach of fiduciary duty claim against the President of a non-profit that provided legal representation to plaintiff. *Id.* at 4-6. The court noted, "Throughout his relationship with plaintiff, [the non-profit President] acted solely on behalf of [non-profit], rather than in any personal or individual capacity." *Id.* at 6.  Ms. Maass did not become a fiduciary to Strategic just by virtue of her unpaid internship with Democracy Partners, much less a fiduciary to Creamer.

Thus, even if the Court were to accept Plaintiffs' argument there as a genuine issue of material fact as to whether Ms. Maass owed a fiduciary duty to Democracy Partners, the fiduciary duty claim would still fail because Democracy Partners did not suffer the alleged injury. Even if the Court were to accept Plaintiffs' argument that Strategic suffered an injury, Plaintiffs neither pled nor pointed to any evidence that Ms. Maass owed Strategic any kind of duty.

### IV. The Project Veritas Parties Are Entitled to Summary Judgment on the Plaintiffs' Interception Claims.

Plaintiffs fail to establish an issue of material fact under the federal and D.C. interception statutes and, moreover, the exceptions to the single-party consent provisions in each law are

unconstitutional, foreclosing the Plaintiffs' claims entirely. The Project Veritas Parties are entitled to summary judgment on all interception claims.

### IV(A). Plaintiffs Have Not Presented a Non-Party Interception Claim.

Plaintiffs claim that when Ms. Maass overheard a meeting while sitting at her desk, she violated the federal and D.C. interception statutes. The statutes do not provide a cause of action in such circumstances. In order to present a viable claim under the interception statutes, the Plaintiffs must show that their oral communications were actually intercepted, that is, aurally acquired on a device. *See* 18 U.S.C. §2510(4); D.C. CODE § 23-541(3).

Oral communications are those communications uttered by a person [1] exhibiting an expectation that such communication is not subject to interception [2] under circumstances justifying such expectation[.] 18 U.S.C. § 2510(2); *see* D.C. CODE § 23-541(2). Interception is also precisely defined: "'intercept' means the aural or other acquisition of the contents of any . . . oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4); *see* D.C. CODE § 23-541(3). For interception itself, the civil statutes require:

> [A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a) (emphasis added); *see* D.C. CODE § 23-554(a). Based on the plain language of these statutes, it is clear that non-party interception did not occur in this case.

The only instance in which the Plaintiffs claim non-party interception occurred is when Ms. "Maass eavesdropped on a meeting to which she had not been invited between two members of Democracy Partners and the person who served as campaign manager for Bernie Sanders' presidential campaign in 2016." Dkt. 68 at 26 (citing PSMF ¶79, Dkt. 68-1 at 33). But

"eavesdropping" *per se* is not relevant to a civil interception claim: the oral communications must actually be aurally acquired on a device, and Ms. Maass's ears are not a device.

The document on which the Plaintiffs rely notes the raw video of the event in question, file FN0J0694_20161012014012. Dkt. 68-26 at 4. That file was disclosed to the Plaintiffs in discovery as PVA00013411, and is now presented to this Court. Klein Decl. 2 ¶ 14, Ex. 11. The video shows the meeting in question occurred in the conference room a few feet from Ms. Maass's seat at the front desk of the office, with Ms. Maass clearly visible through the glass wall between them. *Id.* at 17:30-27:32. The attendees left the conference room door open. *Id.* Ms. Maass did not move beyond her desk for the portion of the meeting that was recorded. *Id.* Under these circumstances, Maass was legally a party to the communications. *See CAIR – First SJ*, 31 F. Supp. 3d 237, 255 (D.D.C. 2014). But the analysis need not go this far: outside of minor fragments wholly void of context, Maass did not intercept a single oral communication from the meeting, that is, aurally acquire one on the device she was using. The voices are inaudible and sound like mumbling. Klein Decl. 2 ¶ 14, Ex. 11 at 17:30-27:32. And though the few fragments sound like a male voice, one cannot readily determine whether it is Mike Lux, Jeff Weaver, or <u>the unknown man who attended the meeting along with Mr. Weaver</u>, the latter two of whom are not parties to this case individually or institutionally. The Plaintiffs cannot base an interception claim on this meeting.[3]

Having had more than a year to review and analyze copious raw video provided in discovery, the Plaintiffs' sole claim of non-party interception is not supported in law or fact. The Plaintiffs' remaining interception claims relate to the exceptions to the laws' single party consent provisions, which the Plaintiffs cannot establish and are in any event unconstitutional.

---

[3] If the law may be applied in this fashion, then the definition of "oral communication" is unconstitutional, because nonparties could bring civil lawsuits for the recording of indecipherable background noise.

**IV(B). Maass Did Not Intercept for the Purpose of Breaching a Fiduciary Duty to the Plaintiffs, and the Good-Faith Exception in Both Laws is Applicable.**

Plaintiffs make the conclusory statement that Ms. "Maass clearly recorded . . . for the purpose of committing a tort—breach of fiduciary duty—by disclosing <u>confidential communications</u> to her superiors at Project Veritas." Dkt. 68 at 26 (emphasis added). Ms. Maass had no such duty, and Plaintiffs cite no evidence that this was her primary motivation or a determinative factor. *Id.*; *see CAIR – First SJ*, 31 F. Supp. 3d at 256–57 (citing *United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993)); *see also Vazquez-Santos v. El Mundo Broad. Corp.*, 283 F. Supp. 2d 561, 566–69 (D.P.R. 2003). Moreover, given that the Plaintiffs now attempt to establish Ms. Maass's alleged duty with an amalgamation of innuendo that occurred <u>throughout</u> her internship—all after she began recording—it cannot even be said exactly when she acquired the duty she supposedly had the purpose to breach. *See* PSMF ¶85, Dkt. 68-1 at 36–37. Quite the contrary, the undisputed facts demonstrate that Ms. Maass was out to determine the involvement of Robert Creamer and his associates in shady political practices, the results of which speak for themselves. *See, e.g.*, Klein Aff. Ex. 1, Dkt. 63-6 (Video 1 at 9:11–10:14). [4]

Plaintiffs did not address the Project Veritas Parties' reliance on the good faith exceptions in both statutes in any meaningful way. *See* Dkt. 63-1 at 25. But this exception is a "complete defense" under both federal and D.C. law and should closely track the purpose examination for single-party consent. Not only was Ms. Maass's primary motivation to record and disseminate the truth, protecting her under the single party consent provision; this also supports the finding that

---

[4] Notably, with the exception of less than 20 seconds out of 986, the portions of Video I from Ms. Maass's internship were recorded prior to Creamer's utterance about "some kind of a nondisclosure agreement to sign or something." *Compare* Klein Aff. Ex. 1, Dkt. 63-6 (Video 1 at 1:18-1:28, 3:38-4:02, 4:20-4:37, 9:11-10:14) *with* Klein Aff. Ex. 31, Dkt. 63-36 (PVA00013195 at 10:35-23:30), Mot. for Sanctions Ex. B, Dkt. 46-2 (PVA00013196 at 13:44-27:32).

she and all of the Project Veritas Parties relied in good faith on the single party provisions. *See* 18 U.S.C. § 2520(d); D.C. CODE § 23-554(b). The Project Veritas Parties are entitled to judgment as a matter of law under both the federal and D.C. interception statutes.

**IV(C). The Unlawful Purpose Exceptions to the Single Party Consent Provisions in Each Law Violate the First Amendment.**

Plaintiffs claim that "[the Project Veritas Parties] do not argue that the federal and D.C. wiretap statutes could be found unconstitutional under intermediate scrutiny." Dkt. 68 at 27. This is not true: the Project Veritas Parties undertook both tailoring analyses concurrently in their opening memorandum, and the exceptions to single-party consent fail both strict and intermediate scrutiny. Dkt. 63-1 at 26–29. However, strict scrutiny must apply, and the Plaintiffs' arguments only confirm that the exceptions to single party consent in both laws are unconstitutional.

The freedom provided by single-party consent is simple: "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a[n] . . . oral . . . communication where such person is a party to the communication . . ." 18 U.S.C. § 2511(2)(d); D.C. CODE § 23-542(b)(3). If the interceptor is a party to an oral communication, he or she may intercept it, regardless of the other content-neutral circumstances surrounding the communications. *Cf.* 18 U.S.C. § 2510(2); D.C. CODE § 23-541(2). The <u>only</u> exceptions to single-party consent are the challenged provisions: one may secretly record as a party "unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d); D.C. CODE § 23-542(b)(3).

The practical and legal complexity arises in just how far the freedom retracts if one is not entitled to single-party consent. If the provision does not apply, then all of one's intercepted oral communications will be subject to the stricter provisions in each law. For example, one

intercepting oral communications as a party to a private conversation in his neighbor's house is perfectly legal, but if the exception to single-party consent is triggered, it likely becomes a felony and cause for a successful civil lawsuit. 18 U.S.C. § 2511(4)(a); D.C. CODE § 23-542(a). The terms that turn an activity that implicates free speech from wholly legal to illegal must be both appropriately tailored and clear, and the terms under both interception statutes are neither.

The Plaintiffs disagree that the exceptions to single-party consent are content-based, and rest their counter-argument almost entirely on a decision from the First Circuit, *March v. Mills*. 867 F.3d 46 (1st Cir. 2017). The case is inapplicable. It addressed a challenge to one prong of a three-prong noise provision. In upholding the third prong, the court emphasized how the first two prongs, which were content neutral, informed the third. *Id.* at 57, 61, 63. Critically, the court also correctly noted that noise has many factors distinct from its content that may be used to inform one's intent in making it. *Id.* at 56.

In the exceptions to single party consent, the laws offer only the "for the purpose of" analyses, and no other factors. The circumstances of the recording itself have no effect on the analysis so long as the interceptor is a party. A case from this district has shown the lengths to which the law goes on its face: in *CAIR – Renewed SJ*, the court declined to rule for summary judgment against secret recording claims for the purpose of breaching a fiduciary duty even after ruling the claim itself was not cognizable due to lack of damages. 123 F.Supp. 3d at 85–86. "Whether the tortious purpose exception to the one-party consent rule is applicable rightfully depends on the interceptor's intentions *ex ante*—not on whether, *ex post,* any injury actually occurred." *Id.* at 86; *see supra* Section IV(B). Left with only intentions, or the interceptor's purpose, the exception to single-party consent is a content-based restriction on speech.

Plaintiffs claim that "neither the federal nor D.C. wiretap statute makes applicability of the one-party consent exception depend, <u>in any way</u>, on the topic discussed or idea or message expressed in a recording." Dkt. 68 at 28 (emphasis added). Yet their evidence relating to Ms. Maass's alleged fiduciary duty and breach is rife with references to the content of her recordings. *See, e.g.*, Dkt. 68 at 2, 8, 22–23. Ms. "Maass clearly recorded . . . for the purpose of committing a tort—breach of fiduciary duty—by disclosing <u>confidential communications</u> to her superiors at Project Veritas." Dkt. 68 at 26 (emphasis added). How this purpose can be established without showing Ms. Maass sought out confidential content when recording, as opposed to non-confidential content, the Plaintiffs do not say. At the very least, as applied to the alleged breach of fiduciary duty, the exception analysis is content-based and cannot possibly be divorced from content sought or actually recorded.

Rather than arguing that a compelling governmental interest justifies felony exposure for tortiously recording certain content, Plaintiffs assert the exception may be left at what amounts to a thought crime. If the contents of the recording do not matter, Ms. Maass could be sued even if she had recorded no confidential information whatsoever. Even assuming this is true, purpose analyses are widely disfavored in First Amendment law, and just as dangerous as content-based restrictions. *See generally* Eugene Volokh, *The Freedom of Speech and Bad Purposes*, 63 UCLA L. REV. 1366 (2016). Indeed, bolstered by the vagueness problems in the exceptions, the chill of the illegal purpose analysis is facially apparent and perfectly established by the Plaintiffs' case. *See also Grayned v. City of Rockford*, 408 U.S. 104, 108–10 (1972). There must be a compelling governmental interest in prohibiting the expression <u>or recording</u> of certain content, and even laws that forgo content but <u>restrict creating speech for the wrong reason</u> must be subjected to strict

scrutiny analysis. *See generally Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 465–69 (2007). Here the laws fail.

## V. The Project Veritas Parties Are Entitled to Summary Judgment on the Plaintiffs' Actual and Phantom Trespass Claims.

Of the three plaintiffs, only Democracy Partners asserted a trespass claim. *See* Dkt. 1 at 22 (¶¶94–101). The Plaintiffs attempt to amend their complaint to bring a trespass claim by Strategic. *See* Dkt. 68 at 29. This is not appropriate via a response to a summary judgment motion. *See* FED. R. CIV. P. 15(a). Moreover, there is nothing for the Project Veritas Parties to "concede" or reason to "not contend otherwise" regarding a claim that was never asserted. *See* Dkt. 68 at 29–30. There is no genuine issue of material fact that Democracy Partners was not in exclusive possession of the office suite and it may not maintain an action for trespass. *See* Dkt. 63-1 at 34–35.

If Strategic is allowed to now assert a trespass claim, it is of no consequence, because Strategic was not in exclusive possession of the office suite or any part of it. Occupants may not be phantoms and bring a trespass claim: of the five names next to the door of the suite, Strategic was not one. *See* Klein Aff. Ex. 36, Dkt. 63-41. The Plaintiffs concede there was no signage within the suite differentiating space amongst the numerous occupants. PSMF ¶115, Dkt. 68-1 at 43. Strategic did not demonstrate "such acts done . . . as [to] manifest a claim of exclusive control of the land, and indicate to the public that [it had] appropriated" the office. RESTATEMENT (SECOND) OF TORTS § 157, comment (a).

Democracy Partners was not on the lease for the office suite, paid no rent to the leaseholder, and used the office space for free. Klein Decl, 2, ¶ 9, Ex. 7 at 77:3-10. The Plaintiffs concede that AUFC continued to hold key cards to the office suite after it moved out. PSMF ¶100, Dkt. 68-1 at 41. The evidence indicates AUFC did not grant anyone exclusive possession via sublease. When AUFC liquidated in early 2017, it did not seek permission to enter the suite, as landlords who have

23

granted exclusive possession routinely do, but rather announced it would be doing so. *See* Klein Aff. Ex. 38, Dkt. 63-43. These factors have been construed by D.C. courts as dispositive against a grant of exclusive possession for purposes of establishing a lease, as opposed to a license. *See Union Travel Assocs., Inc. v. Int'l Assocs., Inc.*, 401 A.2d 105, 108 (D.C. 1979).

The Plaintiffs have failed to establish the terms of possession under any sublease for any party, and whether AUFC even had exclusive possession to bestow under its original lease in the first place. Trespass is a broad tort in the District of Columbia, but plaintiffs must establish a minimum threshold of possession to bring a claim. Here, no Plaintiff has done so, and the record only indicates that the Plaintiffs were all licensees of AUFC and cannot bring an action for trespass.

## VI. The Project Veritas Parties are Not Liable for Fraudulent Misrepresentation.

This Court is expected to conclude that if someone lies to Creamer, and he believes it, the liar must pay Creamer the difference when others decline to do business with him because he believed the lie. Dkt. 68 at 4 ("It was caused by clients' alarm that the operation had taken place and was allowed to occur."). Such an outcome is contrary to the law, is unworkable and unconstitutional.  Even assuming the Plaintiffs were defrauded—that is, that the information Ms. Maass acquired had independent value, like a trade secret (an argument wholly disclaimed by Plaintiffs)—to argue that the cancellation of contracts and business so far removed from the Plaintiffs' transactions with Ms. Maass constitutes damages is but a poorly disguised claim for reputational harm. *See Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 523 (4th Cir. 1999) ("[I]n seeking compensation for matters such as loss of good will and lost sales, [plaintiff] is claiming reputational damages from publication[.]"). This is what the Plaintiffs' arguments amount to, and they do not support a claim for fraudulent misrepresentation.

Plaintiffs declined to seriously address the proximate cause and First Amendment issues of this claim, suggesting only that "lies and deceit . . . are not themselves protected by the First

Amendment." Dkt. 68 at 32. Actually, they are. *See United States v. Alvarez*, 567 U.S. 709, 718 (2012); *see also* Dkt. 63-1 at 42–44. One needs to do something more than lie, such as improperly influence a specific transaction, for a fraudulent misrepresentation claim to pass strict scrutiny. *See Alvarez*, 567 U.S. at 723. Moreover, the damages must be confined to those incurred in the transaction itself or, at their most extreme, as a foreseeable consequence. The Plaintiffs ably prove the point:

> While Maass and Project Veritas may not have foreseen exactly which client or clients would terminate their business relationships with Creamer and his companies, they could certainly foresee that the compromise of their offices and their clients' confidential information through the spying operation was likely to cause a loss of business.

Dkt. 68 at 32; *see also id.* at 18. This concedes that investigative journalism—even by people the Plaintiffs might acknowledge are journalists—would be outlawed in D.C. by the Plaintiffs' theory. *See* Dkt. 63-1 at 43–44. If one makes a misrepresentation to a subject who is in business, and obtains and publishes information that reflects poorly on the business, one is liable for the subject's business losses even if those relationships have nothing to do with the information acquired. *See, e.g.*, Dkt. 68 at 2–3, 8 (repeated references to the Democratic National Committee and the Communications Workers of America); PSMF ¶136, Dkt. 68-1 at 48 (calling it "undisputed[,] but[,]" somehow "not material" that Ms. Maass "gained no knowledge of patch-through calling for AFSCME or AUFC during her internship[,]" the business that makes up the overwhelming majority of the Plaintiffs' damages claim). If Plaintiffs have established a claim for fraudulent misrepresentation, and they have not, the application of the tort is unconstitutional as applied.

## VII. The Project Veritas Parties are Entitled to Summary Judgment

For the reasons discussed in their Memorandum and this Reply, the Project Veritas Parties' Motion should be granted.

Respectfully submitted,

By:   /s/ Paul A. Calli
    Paul A. Calli
    Florida Bar No. 994121
    Chas Short
    Florida Bar No. 70633
    CALLI LAW, LLC
    14 NE 1st Ave, Suite 1100
    Miami, FL 33132
    Telephone: (786) 504-0911
    Facsimile (786) 504-0912
    PCalli@Calli-Law.com
    CShort@Calli-Law.com
    *Admitted pro hac vice*

/s/ Kerry Brainard Verdi
Kerry Brainard Verdi, Esq.
Bar No. 478486
Benjamin R. Ogletree
Bar No. 475094
VERDI & OGLETREE PLLC
1325 G Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 449-7703
Facsimile: (202) 449-7701
kverdi@verdiogletree.com

/s/ Michael J. Madigan
Michael J. Madigan
Bar No. 71183
LAW OFFICES OF MIKE MADIGAN PLLC
3910 Hillandale Court NW
Washington DC 20007
Telephone: (202) 255-2055
Mjm20@mac.com

/s/ Benjamin T. Barr
Benjamin Barr (Pro Hac Vice)
STATECRAFT PLLC
444 N. Michigan Ave. #1200
Chicago, Illinois 60611
Telephone: 202-595-4671
ben@statecraftlaw.com
*admitted pro hac vice*

/s/ Stephen R. Klein
Stephen R. Klein
Bar No. 177056
STATECRAFT PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@statecraftlaw.com

*Counsel for Defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maass*

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on June 17, 2019, I served the foregoing through the Court's electronic filing system which served a copy on all counsel of record.


*/s/ Paul A. Calli*
Paul A. Calli, Esq.
