# **EXHIBIT 5**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------X

DEMOCRACY PARTNERS, LLC, et    :
al.,                           :
                               :  Case No:
        Plaintiffs             :  1:17-CV-1047-ESH
                               :
            -vs-               :  Pages 1 - 248
                               :
PROJECT VERITAS ACTION FUND,   :
et al.,                        :
                               :
         Defendants            :
---------------------------------X

Videotape Deposition of Lauren Windsor

Washington, D.C.

Wednesday, July 18, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  413863

MAGNA LEGAL SERVICES

(866) 624-6221



Page 2

1
2
3
4
5
6                         Wednesday, July 18, 2018
7                              (9:02 a.m.)
8
9   Videotape Deposition of Lauren Windsor, held at the
10  offices of:
11
12       Verdi & Ogletree PLLC
13       1325 G Street, N.W.
14       Suite 500
15       Washington, D.C.  20005
16
17
18  Pursuant to notice, before Kathleen M. Vaglica, RPR,
19  RMR, a Notary Public in and for the District of
20  Columbia.
21
22



Page 15

1   we're watching. This wasn't planned. I had no idea
2   that he would get into a car with her. This was not
3   planned.
4       Q.   Why -- did you get into the car with her?
5       A.   I did not.
6       Q.   Why not?
7       A.   Because I'm not as aggressive as Ryan is.
8       Q.   The overall confrontation of Ms. Maass,
9   including, but not limited to, the few segments
10  we've watched, who planned that?
11           MR. SANDLER:  Objection. You can answer
12  the question, if you understand it.
13  BY MR. CALLI:
14      Q.   The sting, who planned the sting?
15      A.   I did with Ryan.
16      Q.   And who else?
17      A.   Pete Callahan, Trevor Davis, Robert
18  Creamer.
19      Q.   Anybody else? And let me, just to be
20  clear 'cause Mr. Sandler has reminded me to be clear
21  so you understand the question, when I say "plan," I
22  mean, like, reviewed scripts, approved things, these



Page 16

1  sort of things, anybody who touched the planning
2  stage of it, no matter whether they handled planning
3  the whole thing or whether they just touched a
4  little portion.  Who had their fingerprints on this
5  so called sting, this sting, this bar confrontation?
6  Who beside Peter Callahan, Ryan Clayton, Trevor
7  Davis, yourself, and Mr. Creamer?
8       A.   Mike Lux.
9       Q.   Anybody else?
10      A.   You're specifically asking for planning?
11      Q.   No.  That's not what I clarified a moment
12 ago.  Anybody who touched it, anybody who approved
13 it, anybody who had input, any part of it, had
14 knowledge of it.
15      A.   Andrea Haverdink.  We sought legal counsel
16 from Joe Sandler.
17      Q.   I asked you about Ryan Clayton, whether he
18 was a partner, an employee or part of Democracy
19 Partners, and he was not.  Do you know, aside from
20 legal issues, if Mr. Sandler is a member of
21 Democracy Partners?
22      A.   Yes, he is.



Page 42

1   permission.  I mean, I'm asking you why you keep
2   saying that's not planned.  Do you think his actions
3   were illegal?  Were they too much?  Were they
4   harmful?  Why have you said it's not part of the
5   planning and I didn't get in and I didn't discuss
6   it?
7       A.   In your questions to me on multiple
8   occasions you've characterized this treatment of
9   Allison, and so I'm responding to your questioning.
10  If you want some further explanation, you're going
11  to have to be more specific, but also not
12  characterize actions in a way that I disagree with.
13  I'm not going to go along with your supposition just
14  because you keep repeating it.
15      Q.   Is there anything else you'd like to add?
16      A.   I don't think so.  Not at this time.
17      Q.   Why do you keep distancing yourself from
18  Clayton jumping in the occupied cab without
19  permission?
20      A.   You keep asking me about it, and I'm
21  telling you it's not planned.
22      Q.   But you're not answering the questions.



Page 43

1   You're just being obstructive.  Why, why do you, why
2   did you volunteer twice -- we didn't, Creamer didn't
3   plan it.  I didn't plan it, and I didn't get in.
4   Why is that important to you to say that?
5       A.   I didn't volunteer it.  You keep saying
6   and characterizing actions in a certain way that I
7   disagree with, so I'm disagreeing with your
8   supposition.
9       Q.   I've asked you three times the straight
10  question.  Why do you keep distancing yourself from
11  Clayton getting in the cab and saying it was
12  unplanned?  I'm asking you just about the cab and
13  why twice --
14      A.   Just about the cab.
15      Q.   Wait, wait, wait.  Why twice you've said I
16  didn't get in the cab.  Once you answer that, we can
17  move on.  My question is why twice have you denied
18  that getting in the cab was planned and that you
19  didn't get in the cab?
20      A.   I answered it the first time you asked it.
21      Q.   You did not.
22      A.   I did.  I said that I'm not as aggressive



Page 44

1  as Mr. Clayton.  Can we review the record?  I said
2  I'm not as aggressive as Mr. Clayton.  I answered it
3  the first time.  You are continuing to ask me about
4  the abhorrent harassment of your client, and so I'm
5  disagreeing with your supposition.
6      Q.   I know, but anybody who watches that video
7  would really think you were a little bit off base by
8  denying that.  Have you ever heard of the Me, Too,
9  Movement?  Do you know what that is?
10     A.   I do.
11     Q.   All right.  Do you remember when, like,
12 Chicago mob bosses you and Clayton yelled at Ms.
13 Maass, "You got creamed"?
14          MR. SANDLER:  Objection.
15 BY MR. CALLI:
16     Q.   Do you remember yelling at Ms. Maass, "You
17 got creamed"?  Do you remember that?
18          MR. SANDLER:  Objection.
19          THE WITNESS:  I do.
20 BY MR. CALLI:
21     Q.   Was that planned?
22     A.   We had joked about it.



1    Q.    Who's we?

2    A.    He and I in the office.

3    Q.    He being?

4    A.    Ryan.

5    Q.    Oh.  Did Mr. Creamer have any knowledge
6    that you were going to yell at this 20-year-old
7    woman, "You got creamed"?  Did you ever joke about
8    it in front of Mr. Creamer?

9    A.    I believe that he was standing there when
10   we joked about it, and he expressly said don't say
11   it.

12   Q.    Why didn't Mr. Creamer come with you to,
13   when you confronted Ms. Maass and the sting was up,
14   you know, when you first, when you, personally,
15   first appeared, why didn't Mr. Creamer come, too?

16   A.    There was no reason for him to come.

17   Q.    What do you mean by that, there was no
18   reason for him to come?

19   A.    There was no role that he was playing in
20   the actual production of the sting on the ground.

21   Q.    Did you ever discuss with Mr. Creamer that
22   it would be bad for him as sort of the head of



Page 77

```
 1   same office space.  We're both on the lease for our
 2   office.
 3        Q.   Is Democracy on the lease?
 4        A.   No.
 5        Q.   Does Democracy pay rent to the people on
 6   the lease?
 7        A.   No.
 8        Q.   Democracy gets the office space for free?
 9        A.   I guess if you want to frame it in that
10   way.
11        Q.   Well, how would you frame it?  How would
12   you frame it?  Democracy -- you know, Mike Lux pays
13   rent.  Democracy Partners has space in the office
14   where Mike Lux Media pays rent.  How do you describe
15   then what the arrangement is with Democracy Partners
16   in your words?
17        A.   SCG and MLM are both member entities of
18   Democracy Partners, but Democracy Partners doesn't
19   cut checks for rent.
20        Q.   When did you -- are you a member or
21   partner?  What is the correct terminology?
22        A.   I'm a partner.
```



Page 78

```
 1       Q.   Is there a difference between a member and
 2   a partner?
 3       A.   I guess the membership entities are the
 4   technical partners, but we are referred to as
 5   partners under that, under the firm.
 6       Q.   When you say we, you mean anybody who's a
 7   partner?
 8       A.   Anybody that's listed as a partner has
 9   their own member entities.
10       Q.   All right.  So explain that structure to
11   me 'cause you said earlier that you didn't think I
12   understood the structure of Democracy Partners based
13   on the way I was asking questions, so why don't you
14   explain that to me.
15       A.   Democracy Partners is more of a network of
16   progressive political consultants around the
17   country.  Each of these political consultants has
18   their own entities that they derive their income
19   from.
20       Q.   What benefit in the broadest sense, not
21   the monetary sense, what benefit flows to the member
22   entities from being part of that group?
```



Page 82

```
 1      Q.   What's a bracketing event?
 2      A.   Rallies, protests outside of opposition
 3  events on an issue or a candidate.  He's an
 4  organizer, a political organizer.
 5      Q.   Did you -- do you recall for how many
 6  weeks Allison Maass was an intern at Democracy
 7  Partners?
 8      A.   I believe it was three weeks.
 9      Q.   Did you ever give her a written
10  nondisclosure agreement or confidentiality
11  agreement?
12      A.   I did not.
13      Q.   On e-mail or in person?
14      A.   I did not.
15      Q.   Did you ever draft one to give her, but
16  never wound up giving it to her?  Did you draft one?
17      A.   I did not.
18      Q.   Is there an agreement in the folder you
19  testified about earlier that contains other NDA or
20  non or confidentiality agreements from Allison Maass
21  on it?
22      A.   No.
```



```
                                                    Page 91
 1        A.   It was not.  I wasn't thinking about that
 2   that hard.
 3        Q.   When y'all planned to yell at her if she'd
 4   been to the rape barn, was that an intimidation
 5   tactic?
 6        A.   I don't think it was intimidation as much
 7   as amusement.
 8        Q.   Oh, that's rich.  When y'all planned and
 9   yelled at her as part of the overall sting asking if
10   she'd been sexually molested by Mr. O'Keefe, was
11   that an intimidation tactic?
12        A.   No, it was more amusement.
13        Q.   When y'all planned and had a participant
14   ask if, what it was like to work for a serial
15   molester, was that an intimidation tactic?
16        A.   No.  Again, I think it was amusement.
17        Q.   When you say Ryan Clayton jump in a cab
18   that Mr. Maass was trying to lock him out of, did
19   you perceive that to be an intimidation tactic by
20   Mr. Clayton?
21        A.   I didn't perceive it to be something that
22   he did.
```



Page 116

1  the day you say they came to the office space that
2  nobody wanted to, that either Mr. Creamer or any of
3  the entities or yourself did not want to prosecute?
4  Did you communicate that to the police authorities?
5      A.   I don't think so.  I think we just didn't
6  follow up.
7      Q.   Back to the structure.  Do any of the
8  member entities of Democracy Partners pay money to
9  Democracy Partners?
10     A.   There's membership dues.
11     Q.   What are those?
12     A.   I think it's $500 per member entity.
13     Q.   For what period?
14     A.   For a year.  It's annual dues.
15     Q.   Okay.
16          MR. CALLI:  We're going to break in
17  11 minutes for lunch.
18          MR. SANDLER:  Okay.
19          MR. CALLI:  We can take an hour and still
20  conclude today's session of seven hours at a
21  reasonable time with an hour.
22          MR. SANDLER:  That's fine.



Page 248

1      CERTIFICATE OF NOTARY PUBLIC

2              I, Kathleen M. Vaglica, the officer before
3      whom the foregoing deposition was taken, do hereby
4      certify that the witness whose testimony appears in
5      the foregoing deposition was duly sworn by me; that
6      the testimony of said witness was taken by me in
7      stenotype and thereafter reduced to typewriting
8      under my direction; that said deposition is a true
9      record of the testimony given by said witness; that
10     I am neither counsel for, related to, nor employed
11     by any of the parties to the action in which this
12     deposition was taken; and, further, that I am not a
13     relative or employee of any attorney or counsel
14     employed by the parties hereto, nor financially or
15     otherwise interested in the outcome of the action.
16
17
18                              Notary Public in and for
19                              District of Columbia
20
21     My Commission Expires:
22     February 28, 2021

