# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **DEMOCRACY PARTNERS**, *et al.*, | |
| **Plaintiffs**, | |
| **v.** | **Civil Action No. 17-1047 (ESH)** |
| **PROJECT VERITAS ACTION FUND**, *et al.*, | |
| **Defendants**. | |

## <u>MEMORANDUM OPINION</u>

This case arises from an undercover operation conducted in 2016 by Project Veritas to infiltrate the Washington, D.C. office of Democracy Partners, LLC. Project Veritas' goal was to secretly record conversations and gain access to confidential information about work by Democracy Partners related to the 2016 Presidential election. Project Veritas accomplished its goal by having one of its employees, Allison Maass, use a false identity and obtain an unpaid internship with Democracy Partners and then secretly record every minute of her internship. Project Veritas used the recordings, along with other materials, in a four-part series it published on YouTube entitled "Rigging the Election."

In 2017, Democracy Partners; Robert Creamer, its president; and Strategic Consulting Group, NA, Inc. ("Strategic Consulting"), a member of Democracy Partners owned and operated by Creamer, filed this lawsuit against Project Veritas; Project Veritas Action Fund; James O'Keefe, the founder and president of both Project Veritas organizations; and Maass, claiming that defendants had violated the federal and District of Columbia wiretap statutes and committed the common law torts of trespass, breach of fiduciary duty, fraudulent misrepresentation, and

civil conspiracy. Before the Court is defendants' motion for summary judgment (ECF No. 63). For the reasons stated herein, the motion is granted in part and denied in part.

## BACKGROUND

### I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts are either undisputed or established by uncontroverted evidence.

Plaintiff Democracy Partners is a limited liability company to which a number of companies and sole proprietorships belong as members. (Pls.' Statement of Material Facts ¶ 87, ECF No. 68-1 ("Pls.' Facts").) The members include a number of consultants and vendors to progressive organizations and Democratic campaigns and committees. (Compl. ¶ 19.) Democracy Partners itself does not have employees, but it serves as a common marketing vehicle for its members, in which capacity it retains various consultants to serve the members' common interests. (Pls.' Facts ¶¶ 89, 90.) Membership is governed by a formal operating agreement, and members contribute to cover some of the shared costs through modest annual dues or in-kind services. (Defs.' Statement of Material Facts ¶ 88, ECF No. 63-2 ("Defs.' Facts"); Pls.' Facts ¶¶ 87, 88.) Plaintiff Robert Creamer, a political consultant, is the sole owner and operator of plaintiff Strategic Consulting, a corporate member of Democracy Partners. (Defs.' Facts ¶ 2.) Strategic Consulting "provides campaign-related services to progressive organizations and Democratic campaigns and committees." (Compl. ¶ 18.)

In 2016, Democracy Partners and Strategic Consulting both operated out of Suite 250 at 1250 Eye Street, NW, in Washington, D.C. (Defs.' Facts ¶¶ 94, 96.) They shared the suite with Mike Lux Media, American Family Voices, and Aaron Black. (Defs.' Facts ¶ 94.) Mike Lux Media was a member of Democracy Partners; it was solely owned and operated by Mike Lux.

(Defs.' Facts ¶ 92.) Aaron Black was an individual member of Democracy Partners. (Pls.' Facts ¶ 85.) He had a desk in Suite 250, and he worked with Strategic Consulting and Creamer. (Pls.' Facts ¶ 85.) American Family Voices was not a member of Democracy Partners, but Mike Lux was on its staff and Lauren Windsor, its Executive Director, also worked out of Suite 250. (Defs.' Facts ¶ 93.) However, the lease for Suite 250 was held by Americans United for Change ("AUFC").[1] (Defs.' Facts ¶ 99.) Democracy Partners did not have a sublease, and it paid no rent in 2016. (Defs.' Facts ¶¶ 105, 108, 110.) Strategic Consulting had a sublease, and it paid rent in 2016. (Defs.' Facts ¶¶ 104, 109.)

In addition to holding the lease for Suite 250, AUFC was client of Strategic Consulting. (Defs.' Facts ¶ 36.) It had an oral contract with Strategic Consulting to pay it $11,000 per month for consulting services, and it paid an additional amount for automated telephone calls and other specific services. (Defs.' Facts ¶ 36; Pls.' Facts ¶ 37.) Brad Woodhouse was the head of AUFC. (Pls.' Facts ¶ 37.)

A second client of Strategic Consulting in 2016 with relevance to this litigation was the American Federation of State, County and Municipal Employees ("AFSCME"). (Defs.' Facts ¶ 21.) Pursuant to its contract with Strategic Consulting, AFSCME paid Strategic Consulting $3,000 per month for consulting services plus an additional amount to provide "automated telephone calls and other specific services." (Defs.' Facts ¶¶ 21, 22; Pls.' Facts ¶ 21.) Lee Saunders was the president of AFSCME, Scott Frey was its director of government affairs. and Bill Lurye was its chief of staff. (Defs.' Facts ¶¶ 23, 24; Pls.' Facts ¶ 23.) AFSCME was

---

[1] AUFC first leased Suite 250 in 2011, and it used the office space, along with several sublessees, including Strategic Consulting, from 2011 until 2015. (Defs.' Facts ¶¶ 99, 100.) It moved out in 2015, but it remained the leaseholder and continued to possess key cards to the suite. (Defs.' Facts ¶ 100.)

AUFC's principal funder.  (Defs.' Facts ¶ 38.)

Several other individuals and entities had relationships with plaintiffs in 2016 that are relevant to this litigation.  Mobilize, Inc., was a limited liability corporation solely owned by Linda Saucedo.  (Pls.' Facts ¶ 13.)  Saucedo was also employed by Strategic Consulting.  (Pls.' Facts ¶ 7.)  Mobilize had a contract with the Democratic National Committee ("DNC") to manage its "bracketing" program, the purpose of which was to present counter-messaging wherever candidate Trump or his running mate held events.  (Pls.' Facts ¶ 13; Creamer Decl. ¶ 9.)  Mobilize hired Strategic Consulting to provide the core services required under the contract.  (Pls.' Facts ¶ 91; Creamer Decl. ¶ 9.)  Strategic Consulting hired Scott Foval to serve as one of the consultants for the DNC contract with Mobilize.  (Defs.' Facts ¶ 7; Pls.' Facts ¶ 7; Creamer Decl. ¶ 9.)  For that job, he reported to Creamer.  (Pls.' Facts ¶ 13.)  Foval was also hired by AUFC as a field director.  (Pls.' Facts ¶ 6.)

Defendant Project Veritas, Inc., is a § 501(c)(3) organization that conducts investigations into a wide range of matters it considers to be of public interest.  (Defs.' Facts ¶¶ 1, 55.)  Defendant Project Veritas Action Fund is a § 501(c)(4) organization that investigates election issues and political campaigns.[2]  (Defs.' Facts ¶ 1.)  Defendant James O'Keefe is the founder and President of both Project Veritas and Project Veritas Action Fund.  (Pls.' Facts ¶ 1; O'Keefe Aff. ¶¶ 2-3.)  Defendant Allison Maass was, at all relevant times, an employee of Project Veritas.  (*See* Maass Dep. at 22:6-9 (Sandler Decl. Ex. 19).)  Two other Project Veritas employees played roles in the undercover investigation that led to the present litigation -- Daniel Sandini[3] and

_____

[2] Both § 501(c)(3) and § 501(c)(4) organizations are tax-exempt.  *See* 26 U.S.C. § 501(c)(3), (4).  They differ in that a § 501(c)(4) organization can engage in advocacy and lobbying, but its contributions are not tax-deductible.  *See* 26 U.S.C. § 501(c)(3), (4), & § 170.

[3] Sandini was named as a defendant in the complaint, but plaintiffs never served him and have

Christian Hartsock. (Defs.' Facts ¶¶ 56, 60; Pls.' Facts ¶¶ 3, 56, 58.) Project Veritas, Project Veritas Action Fund, and their employees routinely conduct undercover investigations utilizing secret recordings.[4] (Defs.' Facts ¶¶ 1, 55.)

### A. Events Leading Up to Project Veritas' Undercover Operation[5]

Project Veritas employee Hartsock first heard Creamer's name in the spring of 2016, when he introduced himself (using the fake name of "Steve Packard") to Foval, who was not then working for Strategic Consulting or AUFC. (Defs.' Facts ¶¶ 8, 56, 58; Pls.' Facts ¶¶ 7, 12.) What Hartsock heard about Creamer from Foval led Project Veritas to research Creamer and, ultimately, to target him and Democracy Partners as part of their purported investigation into

---

now dismissed their claims against him. (*See* Notice of Voluntary Dismissal, ECF No. 21.)

[4] Project Veritas' investigative methods have spawned multiple civil lawsuits and a criminal judgment against O'Keefe. *See AFT Michigan v. Project Veritas*, 397 F. Supp. 3d 981 (E.D. Mich. 2019) (Project Veritas employee allegedly obtained internship at a labor union using false identity and credentials and secretly recorded private conversations and accessed confidential documents, which Project Veritas then published; court denied motion to dismiss claims for breach of the duty of loyalty, fraudulent misrepresentation, trespass, and unlawful interception of conversations under state and federal law); *Wentz v. Project Veritas*, No. 6:17-cv-1164, 2019 WL 1716024 (M.D. Fla. Apr. 16, 2019) (Project Veritas employees (Maass and Sandini) secretly recorded conversations with the plaintiff in public locations (a hotel bar and a sandwich shop), which Project Veritas then published; court granted summary judgment for defendants on plaintiff's claims for defamation and unlawful wiretapping); *Vera v. O'Keefe*, No. 10-cv-1422, 2012 WL 3263930 (S.D. Cal. 2012) (O'Keefe and another individual secretly videotaped and recorded the plaintiff at his place of work; court denied the defendants' motion for summary judgment on plaintiff's claim for invasion of privacy; case settled before trial); *Conway-Russell v. O'Keefe*, No. 2:10-cv-00276 (E.D. Pa. filed Jan. 21, 2010) (O'Keefe and another individual secretly recorded conversations and then publicly disseminated the video and audio recordings; case settled and was dismissed before any legal rulings); Judgment, *United States v. O'Keefe*, No. 10-cr-0081 (E.D. La. May 27, 2010) (convicted of entry by false pretenses in violation of 18 U.S.C. § 1036(a)(1), (2)).

[5] A more detailed description of Project Veritas and the chain of events leading up to Democracy Partners offering Maass an internship can be found in this Court's prior opinion. *See Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 112-13 (D.D.C. 2018).

potential "voter fraud" in the 2016 election.[6]  (Defs.' Facts ¶¶ 11, 12, 58, 59.)

In June 2016, Project Veritas' began investigating Creamer by having Project Veritas employee Sandini (using the fake name of "Charles Roth") use Hartsock/Packard's connection to Foval to arrange a phone call between himself (as "Roth") and Creamer, where Sandini/Roth represented himself as a potential donor to AUFC.  (Defs.' Facts ¶¶ 60, 61; Pls.' Facts ¶¶ 3, 58.) After that call, on June 24, 2016,[7] Creamer and Sandini/Roth met in person, ostensibly to discuss specific projects that Sandini/Roth might be interested in supporting.  (Defs.' Facts ¶ 62; Pls.' Facts ¶ 62.)  During this meeting, Sandini/Roth told Creamer that he had a niece, "Angela Brandt," who was interested in an internship in political work.  (Defs.' Facts ¶ 67; Pls.' Facts ¶¶ 66.)  No such person actually existed, but Project Veritas employee Maass was tapped to play the role of "Angela Brandt."  (Defs.' Facts ¶ 66.)  Creamer then spoke to Maass/Brandt on the phone, which led him to arrange for her to contact an individual who was involved in planning demonstrations at the Republican National Convention.  (Defs.' Facts ¶ 68; Pls.' Facts ¶¶ 66.) Maass/Brandt then participated in a demonstration at the Convention in Cleveland.  (Pls.' Facts ¶ 68.)

In August 2016, after the end of the Convention, Project Veritas directed Sandini/Roth to call Creamer to tell him that Maass/Brandt had had a good experience and that she would like to

---

[6] Defendants claim that they had a legitimate belief that schemes for voter fraud were being hatched by Creamer and his associates.  (Defs.' Facts ¶¶ 11, 58.)  Plaintiffs strongly dispute this assertion, maintaining that Project Veritas operatives initiated any discussions about voter fraud and their attempts to get plaintiffs to participate in a voter fraud scheme completely failed.  (Pls.' Facts ¶¶ 3, 11, 57, 58, 63)  It is undisputed that Project Veritas never uncovered anyone associated with any of the plaintiffs who was involved in planning or engaging in voter fraud. (O'Keefe Dep. at 129:5-130:15 (Sandler Decl. Ex. 1); Hartsock Dep. at 150:6-10 (Sandler Decl. Ex. 5).)

[7] Defendants date the meeting on July 15, 2016,  (Defs.' Facts ¶ 62.)

become involved in further political work for progressive organizations.  (Defs.' Facts ¶ 67; Pls.' Facts ¶ 68.)  Sandini/Roth also told Creamer that he would make a $20,000 donation to AUFC.  (Defs.' Facts ¶ 65.)  Creamer agreed to talk to her again.  (Pls.' Facts ¶ 68.)  When they next spoke, Creamer offered Maass/Brandt an unpaid internship at Democracy Partners, which Maass/Brandt accepted.  (Defs.' Facts ¶¶ 68, 69; Pls.' Facts 68.)

### B.    The Undercover Operation

Maass/Brandt started work as an intern for Democracy Partners on September 21, 2016.[8] (Defs.' Facts ¶ 70.)  She interned at Democracy Partners for about three days per week until October 14, 2016.  (Defs.' Facts ¶ 70.)

No one asked Maass/Brandt for legal identification, a résumé or references before she began her internship.  (Defs.' Facts ¶¶ 74, 76, 77.)  Creamer didn't see the need, as Maass/Brandt had been referred by his "friend" Sandini/Roth and proved herself by demonstrating at the Republican National Convention.  (*See* Pls.' Facts ¶ 76; *see also* Defs.' Facts ¶ 80 (Windsor told Creamer that she thought the timing of Maass' internship was suspicious; Creamer replied: "don't worry about it; it's a friend's niece.").)  In any event, Maass/Brandt had a fake identification, which she used on multiple occasions during her internship.  (Pls.' Facts ¶ 74.)  And, when Maass/Brandt was asked for a résumé after starting her internship, she created and produced a fake one within a few days.  (Pls.' Facts ¶ 77.)  She also had an outside email account in the name of "angela brandt@gmail.com," which she created specifically to match her fake

---

[8] The parties dispute whether Maass was also an intern for Strategic Consulting.  (Defs.' Facts ¶ 71; Pls.' Facts ¶ 71.)  Defendants point out that Maass had never even heard the name Strategic Consulting before this lawsuit.  (Defs.' Facts ¶¶ 71, 72.)  Plaintiffs contend that Maass knew she was working for Creamer and Creamer's company (Strategic Consulting), whether she knew the name or not.  (Pls.' Facts ¶ 71.)  It is undisputed that she was not an intern for Creamer in his personal capacity.  (Defs.' Facts ¶ 72.)

identity for her work at Democracy Partners.  (Defs.' Facts ¶ 118; Pls.' Facts ¶¶ 74, 118.)

When Maass/Brandt arrived for her first day, Creamer and Lux suggested that she could sit at Suite 250's front desk in the shared common area or in an unoccupied office.  Maass opted for the front desk.  (Defs.' Facts ¶ 123.)  Also on her first day, Creamer told Maass, "By the way, Lauren [Windsor], is going to get you a [key] card and she has some kind of nondisclosure agreement for you to sign . . . ."  (Defs.' Facts ¶ 82; Pls.' Facts ¶ 82.)  Maass/Brandt was issued a key card, which gave her unrestricted access to the office.[9]  (Defs.' Facts ¶ 113; Pls.' Facts ¶ 97.) However, she was never given a nondisclosure agreement to sign.  (Defs.' Facts ¶ 83.)  She used her personal laptop computer and her personal email account (angelabrandt@gmail.com) for internship work.  (Defs.' Facts ¶¶ 116, 118.)

Maass/Brandt performed a number of mundane tasks during her internship at Democracy Partners,[10] but the parties dispute whether her tasks were limited to clerical work or whether she was also given access to confidential meetings and briefings,.  (Defs.' Facts ¶¶ 124-130; Pls.' Facts ¶¶ 85, 86, 124, 126, 127, 130.)  The parties also dispute whether Maass/Brandt was or should have been aware that the information she was being provided was confidential and not to be shared with any unauthorized persons.  (Defs.' Facts ¶¶ 85, 86, 127; Pls.' Facts ¶¶ 85, 127.) What is undisputed is that Maass/Brandt secretly recorded *everything* she saw and heard during her internship (other than possibly when she was going to the restroom or changing out a battery), and that she provided her superiors at Project Veritas detailed daily written summaries

---

[9] Ultimately, she used her key card only once, as she generally worked during normal business hours when the doors were unlocked and an employee of a Democracy Partners member company was present.  (Defs.' Facts ¶ 113; Pls.' Facts ¶¶ 97, 113.)

[10] For example, her tasks included counting an inventory of political signs, delivering a package, and helping to set up an office phone system by putting labels on a phone.  (Defs.' Facts ¶¶ 126, 128, 130.)

of all the key events, calls, and conversations she had secretly recorded that day.  (Pls.' Facts ¶ 79.)

### C.     The Fallout

On October 14, 2016, Maass/Brandt's false identity was exposed, and her internship ended.[11]  (Defs.' Facts ¶ 70; Compl. ¶¶ 45-46.)

On October 17, 2016, Project Veritas published on YouTube the first part of its four-part video series entitled "Rigging the Election."[12]  (Defs.' Facts ¶¶ 2, 23.)  Some of the footage used in "Rigging the Election" had been secretly recorded by Maass/Brandt while she was an intern at Democracy Partners, including conversations with Creamer.  (Defs.' Facts ¶ 5; Compl. ¶ 54.) Other footage came from secretly recorded conversations Project Veritas employees had had with Foval, both before and during his employment with AUFC.  (Defs.' Facts ¶ 2.)  The remaining parts of the series were published on October 18, 24, and 26, 2016.  (Compl. ¶¶ 55, 57.)  The videos were viewed over 10 million times on YouTube and widely reported on or republished by other media outlets.  (Defs.' Facts ¶ 1.)

Within an hour of the first video's release, AFSCME learned about the infiltration from AUFC.  (Pls.' Facts ¶¶ 23, 31.)  Before the second part was published, AFSCME terminated its contract with Strategic Consulting and its funding relationship with AUFC.  (Defs.' Facts ¶¶ 6, 23, 31, 40; Pls.' Facts ¶ 23, 31.)  AFSCME President Saunders later testified that he was "extremely angry" and "disappointed" with Creamer and AUFC President Brad Woodhouse for

---

[11] On that day, Creamer was confronted with a film crew from a subsidiary of Sinclair Broadcasting, asking him to respond to two video clips that made it clear that Creamer had been secretly recorded by Maass/Brandt.  (Compl. ¶¶ 45-46.)

[12] Project Veritas self-published its video series on YouTube because after a meeting and correspondence with attorneys for Strategic Consulting and AUFC, Sinclair decided to postpone broadcasting any of the videos.  (Compl. ¶¶ 52-53.)

"allow[ing] this type of distraction to occur . . . ."  (Defs.' Facts ¶ 24.)

AUFC also took quick action, firing Foval and terminating its consulting relationship with Strategic Consulting.  (Defs.' Facts ¶ 6.)  Having lost its primary funder, AFSCME, AUFC had to shut down in February 2017.  (Defs.' Facts ¶ 46.)  In addition, on November 9, 2016, a potential client of Strategic Consulting, Dialysis Patient Citizens, canceled a meeting with Creamer that had been scheduled for November 10, 2016.  (Defs.' Facts ¶¶ 6, 50.)  Ultimately, Dialysis Patient hired another firm to do the work that it had planned to pursue with Strategic Consulting, and it paid that firm a fee of $40,000 a year ($2,500 per month plus an additional $10,000 commission for paid digital advertising).  (Pls.' Facts ¶ 53.)

The parties dispute whether the actions of AUFC, AFSCME, and Dialysis Patient Citizens were caused solely by the publication of the Rigging the Election video series or other considerations unrelated to the Project Veritas operation (e.g., financial resources) or were caused, at least in part, by the fact of Maass' successful infiltration of Democracy Partners, thus giving her the access she needed to secretly record private conversations or to view other confidential information and then share that information with her true employer, Project Veritas. (Defs.' Facts ¶¶ 6, 18, 25, 26, 27, 28-30, 34, 42-45, 51, 139; Pls.' Facts ¶¶ 6, 18, 25, 26, 27, 28-30, 34, 42-45, 51,[13] 139.)

## II.    PROCEDURAL HISTORY

Plaintiffs commenced this action on June 1, 2017.  The complaint included (1) common law tort claims for trespass and breach of fiduciary duty against Maass and for fraudulent misrepresentation and civil conspiracy against all defendants (Compl. ¶¶ 69-77, 94-116); and (2)

---

[13] In plaintiffs' filing, ¶ 51 is mislabeled as ¶ 52.  (*See* Pls.' Facts at 23.)

statutory claims against all defendants for unlawful wiretapping in violation of the federal and D.C wiretap statutes, *see* 18 U.S.C. § 2511, *et seq*. ("Federal Wiretap Act"); D.C. Code § 23-542, *et seq*. ("D.C. Wiretap Act") (Compl. ¶¶ 78-93). Plaintiffs sought (1) actual damages for Strategic Consulting's lost contracts (existing and future), the diminishment of the economic value of the office space and of confidential and proprietary information, and damage to reputation; and (2) statutory and punitive damages for the two wiretap claims.[14] (Compl. at 25 ("Relief Requested"); *see also* Compl. ¶¶ 76-77, 84-85, 92-93, 101, 111-12, 116.)

Defendants filed a motion to dismiss all counts of the complaint for failure to state a claim. (Mot. to Dismiss, ECF No. 14.) The motion was denied as to all claims.[15] *See Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 125 (D.D.C. 2018). Subsequently, plaintiffs limited their claim for actual damages to Strategic Consulting's lost contracts (its existing contracts with AUFC and AFSCME and its potential contract with Dialysis Patient Citizens), abandoning any claim for actual damages based on the diminishment of the economic value of the office space or confidential and proprietary information or damage to reputation. (*See* Defs.' Facts ¶ 18; Pls.' Facts ¶ 18.)

After discovery was completed, defendants filed the pending motion for summary judgment, plaintiffs filed an opposition, and defendants filed a reply. (*See* Defs.' Mot. for Summary Judgment, ECF No. 63 ("Mot."); Pls.' Opp'n to Defs.' Mot., ECF No. 68 ("Opp.");

---

[14] As an alternative to actual damages, the Federal Wiretap Act provides for statutory damages of $100 a day, for each day of violation, or $10,000, whichever is greater. *See* 18 U.S.C. § 2520(c)(2)(B). The D.C. Wiretap Act provides, as an alternative to actual damages, for liquidated damages at the rate of $100 a day, for each day of violation, or $1,000, whichever is higher. *See* D.C. Code § 23-554(a)(2)(A). Both statutes also allow for the recovery of punitive damages. *See* 18 U.S.C. § 2520(b)(2); D.C. Code § 23-554(a)(2)(B).

[15] The Court rejected several of plaintiffs' theories of liability with respect to the wiretap claims. *Democracy Partners*, 285 F. Supp. 3d at 124; *see also infra* note 24.

Defs.' Reply, ECF Nos. 71 & 72 ("Reply").)  Because defendants' motion challenges the constitutionality of the Federal Wiretap Act and the District of Columbia Wiretap Act, the Court notified both the United States and the District of Columbia pursuant to Federal Rule of Civil Procedure 5.1(b) and 28 U.S.C. § 2403(b).  (*See* Defendants' Notice of Constitutional Questions, ECF No. 65; Certification, ECF No. 67.)  The United States declined to file a response, but the District of Columbia has done so, and defendants have responded to the District's filing.  (*See* United States' Notice of Decision Not To Intervene, ECF No. 78; District of Columbia's Notice of Intervention Under Rule 5.1 To Defend the Constitutionality of a District of Columbia Statute, ECF No. 76 ("DC Filing"); Defs.' Resp. to the District Notice of Intervention, ECF No. 80 ("Resp. to DC Filing").)  In addition, defendants have filed several notices advising the Court of decisions in cases brought against Project Veritas in other jurisdictions.  (*See* Defs.' Notices of Filing Status Update of Similar Litigation, ECF Nos. 69 & 70.)

## LEGAL STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248.  A dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).

"When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in its favor." *Sloan v. Urban Title Servs.*, 770 F. Supp. 2d 227, 233 (D.D.C. 2011); *see also Liberty Lobby*, 477 U.S. at 255. The non-movant's opposition, however, must consist of more than mere denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). If the non-movant's evidence is "merely colorable" and "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50.

## ANALYSIS

Defendants seek summary judgment as to all of plaintiffs' claims. The Court will first address defendants' First Amendment challenge to plaintiffs' theory of causation and damages, which is relevant to several of plaintiffs' claims, before turning to defendants' claim-specific arguments.

## I.     DAMAGES/FIRST AMENDMENT

From the outset of this litigation, plaintiffs have maintained that they are seeking only damages proximately caused by defendants' non-expressive conduct. In ruling on defendants' motion to dismiss, the Court agreed that plaintiffs could, at least in theory, recover for such damages without raising any First Amendment concerns, although it noted that discovery would likely shed light on whether this was a viable theory. *See Democracy Partners*, 285 F. Supp. 3d at 125-27.

During the course of discovery, defendants asked plaintiffs to "[d]escribe and itemize (including specifying dollar amounts) all damages supposedly suffered by any Plaintiff that are

allegedly recoverable against any Defendant in this lawsuit." (*See* Pls.' Resp. to Defs.' Interrogatory No. 3 (Klein Decl. Ex. 11).) Plaintiffs' response claimed damages based on three items: (1) the loss of Strategic Consulting's contract with AUFC (lost income to Strategic Consulting of $567,408); (2) the loss of Strategic Consulting's contract with AFSCME (lost income to Strategic Consulting of $546,765); and (3) the loss of Strategic Consulting's potential contract with Dialysis Patient Citizens (lost income to Strategic Consulting of at least $30,000).[16] (*See id*.)

Defendants now argue that, with respect to each of plaintiffs' claims that require proof of damages proximately caused by defendants' actions, "[p]laintiffs' theory that AFSCME, AUFC, and Dialysis Patient Citizens chose not to work with them because publication of Project Veritas' reporting showed that Plaintiffs could not maintain their confidences is untethered to the facts." (Mot. at 11.) Rather, defendants contend, "the undisputed material facts demonstrate that [AUFC, AFSCME and Dialysis Patient Citizens] acted as a result of what the truthful reporting showed [in the "Rigging the Election" video series] and also out of concerns unconnected to the Project Veritas Parties' reporting." (*Id*..) According to defendants, plaintiffs' damages were not proximately caused by defendants' non-expressive conduct and, thus, are not recoverable in this action.

Plaintiffs do not dispute that the damages they seek to recover were caused in part by the content of the "Rigging the Election" videos. (*See* Pls.' Facts ¶ 27.) But they maintain that there

---

[16] Plaintiffs arrive at the figures for AUFA and AFSCME by looking at the total amounts AUFC and AFSCME paid Strategic Consulting from 2007 to until the contracts were terminated in October 2016, then calculating an annual average and assuming that the contracts would have been renewed for at least another three years.

"were other[] [concerns] of equal or greater importance." (*Id*.) Specifically, they argue that another proximate cause of plaintiffs' damages was the fact that the publication "revealed to the clients of Democracy Partners and [Strategic Consulting] that the confidential information and documents of those clients had been stolen, compromised and publicly disseminated as a result of defendants' action" and that this "public exposure caused the Plaintiffs to be viewed by certain clients as not capable of maintaining the confidentiality of sensitive and confidential client information." (Answer to Interrogatory #10 (Klein Decl. Ex. 11).)

In the District of Columbia, proximate cause has two elements: "a cause-in-fact (causation) element and a policy element." *Lacy v. District of Columbia,* 424 A.2d 317, 320 (D.C. 1980). "Thus a defendant cannot be held liable unless that defendant has in fact caused the plaintiff's harm, and then only if certain 'liability-limiting considerations which relieve the defendant of liability for the harm he actually caused' are not applicable." *Claytor v. Owens-Corning Fiberglas Corp.*, 662 A.2d 1374, 1381-82 (D.C. 1995) (quoting *Lacy*, 424 A.2d at 320-21). The first component, cause-in-fact, does not require that a defendant's conduct be the sole cause of the harm, only that it be a "substantial factor in bringing about the harm." *District of Columbia v. Carlson*, 793 A.2d 1285, 1288 (D.C. 2002); *see also Murphy v. United States*, 653 F.2d 637, 648 (D.C. Cir. 1981). So, as long as a defendant's conduct was a substantial factor in causing the harm, it is irrelevant that there may be other legal or proximate causes of the injury. *See Estate of Kurstin v. Lordan*, 25 A.3d 54, 69 (D.C. 2011) ("More than one person can be a legal or proximate cause of an injury."); *District of Columbia v. Zukerberg*, 880 A.2d 276, 283 (D.C. 2005) ("[f]rom the mere fact that the evidence permits two or more possible inferences, it does not necessarily follow that the evidence is not substantial and is not sufficient to sustain a jury's finding" (internal quotation marks omitted)). The second component of proximate cause

only limits a defendant's liability when the chain of events leading to the injury is "highly extraordinary in retrospect." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002)). Proximate cause is generally a factual issue for the jury, although in "exceptional cases" the question of proximate cause can be decided at the summary judgment stage. *C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 256 (D.D.C. 2007) (quoting *Majeska*, 812 A.2d at 951); *see also District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C. 1984) (the question "becomes one of law . . . when the evidence . . . will not support a rational finding of proximate cause"). Thus, "if there is insufficient evidence for a reasonable jury to find that the defendant's conduct caused harm to the plaintiff, the court must direct a verdict for the defendant." *Claytor*, 662 A.2d at 1382. "In addition, if the court determines that a certain 'chain of events appears highly extraordinary in retrospect,' the case should also be taken from the jury." *Id.* (quoting *Lacy*, 424 A.2d at 321)

    As explained below, the Court concludes that it is sufficient to survive summary judgment on plaintiffs' claim that defendants' non-expressive conduct was a substantial factor in the decisions by AFCSME and AUFC to terminate their contracts with Strategic Consulting. However, the evidence is insufficient to sustain plaintiffs' claim as to the loss of a potential contract with Dialysis Patient Citizens.

    ***AFSCME's cancellation of its contract with Strategic Consulting***:  Defendants argue that the evidence shows that either plaintiffs' conduct (as displayed on the videos) or considerations unrelated to Project Veritas, such as a lack of resources, were the *only* reasons behind AFSCME's decision to cancel its contract with Strategic Consulting.  But while the evidence shows that these considerations played a part in AFSCME's decision, there is sufficient evidence to support plaintiffs' view that AFSCME was also concerned about the infiltration itself

and the fact that Creamer and Strategic Consulting had allowed it to occur. Most notably, Scott

Frey, AFSCME's director of government affairs, testified that, among AFCSME's other

concerns, "part of [his] concern [was] that [plaintiffs] had allowed their offices to be infiltrated

by a Project Veritas operative." (Frey Dep. at 102:16-19 (Sandler Decl. Ex. 12); se*e also* Frey

Dep. at 77:8-11 ("[I]t was the view at the time that [plaintiffs] had created the opportunity for

this operation to occur, and it had become a major distraction to, and an unnecessary one at a

critical moment in time."); Frey Dep. at 78:20-22 ("I think it was the overall sense that they had

allowed this to occur, they invited this opportunity into their midst . . . .").) In addition, although

a lack of resources may have contributed to AFSCME's decision to terminate the consulting

contract, the evidence shows that it would not have played a role in AFSCME's decision to

terminate Strategic Consulting's contract to provide patch-through calls, as AFSCME promptly

retained a new vendor to provide that service. (*See* Pls. Facts ¶ 28.) Viewing this evidence in

the light most favorable to plaintiffs, the Court concludes that this is not the exceptional case

where it can find as a matter of law that plaintiffs' non-expressive conduct was not a proximate

cause of AFSCME's decision to cancel its contract with Strategic Consulting.

 ***AUFC's decision to stop doing business with Strategic Consulting***:  Defendants argue

that the evidence also shows that *only* plaintiffs' conduct drove AUFC's decision to stop doing

business with Strategic Consulting. But, as defendants recognize, the most direct cause of that

decision was AFSCME's decision to stop funding AUFC, a decision that was made at the same

time that AFSCME canceled its contract with Strategic Consulting and, according to plaintiffs,

for the same reasons. As explained *supra*, those reasons included AFSCME's concern with the

"spying operation" itself, not just the content of the videos. Thus, again viewing the evidence in

the light most favorable to plaintiffs, the Court concludes that a reasonable jury could find that

plaintiffs non-expressive conduct was a proximate cause of AUFC's decision to cancel its contract with Strategic Consulting.

***Strategic Consulting's loss of a potential contract with Dialysis Patient Citizens***: Defendants argue that the evidence shows that Dialysis Patient Citizens canceled its meeting with Creamer because of the videos, not because of defendants' non-expressive conduct. In this instance, the Court agrees. Dialysis Patient Citizens' principal, Hrant Jamgochian, testified that Dialysis Patient Citizens' main concern was "PR" because Dialysis Patient Citizens was a "nonprofit organization," and it needed to "maintain the best possible public image." (Defs.' Facts ¶ 51.) Jamgochian further testified that he had been informed by his staff "of some of the negative publicity, which is why I decided to cancel pursuing our partnership or potential partnership." (*Id*.) In addition, in his email canceling the meeting, Jamgochian cited the fact that one of Dialysis Patient Citizens funders had seen reporting about plaintiffs on Fox News and "requested that we find a firm other than Democracy Partners to help with our grassroots effort." (*Id*.) Plaintiffs do not point to any evidence controverting Jamgochian's testimony. Their only response is to note that Jamgochian himself had not viewed the videos before he canceled the meeting. But that fact alone is not enough to create a genuine dispute as to Dialysis Patient Citizens' reason for cancelling its meeting.

Since there is insufficient evidence to support plaintiffs' claim that defendants' non-expressive conduct was a proximate cause of the loss of a potential contract with Dialysis Patient Citizens, plaintiffs' claim for damages based on that loss may not proceed.

Accordingly, the Court now turns to defendants' claim-specific arguments for summary judgment.

## II.     TRESPASS

"In the District of Columbia, the elements of a claim for trespass are '(i) an unauthorized entry (ii) onto the plaintiff's property (iii) that interferes with the plaintiff's possessory interest.'" *Democracy Partners*, 285 F. Supp. 3d at 118 (quoting *Council on American-Islamic Relations Action Network, Inc. ("CAIR") v. Gaubatz*, 793 F. Supp. 2d 311, 344 (D.D.C. 2011) ("*CAIR 2011*"); *see also Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1060 (D.C. 2014) ("The tort of trespass is defined as 'an unauthorized entry onto property that results in interference with the property owner's *possessory interest* therein.'" (quoting *Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871 A.2d 480, 490 (D.C. 2005))).

Plaintiffs claim that Maass is liable for trespass because "[t]he Democracy Partners office is not open to the public and may be accessed by third parties only upon invitation and authorization"; "Maass only gained access to the Democracy Partners office through the use of pretense, subterfuge, misrepresentation and/or concealment"; "Maass also exceeded the consent she fraudulently induced from Plaintiffs by recording conversations in the Democracy Partners office without permission"; "Maass' intrusion invaded and disrupted Democracy Partners' possession and control over its own property"; and "Maass' intrusion invaded and disrupted Democracy Partners' possession and control over its own property." (Compl. ¶¶ 95, 97, 98, 100.)

Defendants argue that they are entitled to summary judgment on plaintiffs' trespass claim against Maass because Democracy Partners lacked the necessary "possessory interest" in the office space. "A 'possessory interest' is defined as '[t]he present right to control property, including the right to exclude others, by a person who is not necessarily the owner.'" *Greenpeace*, 97 A.3d at 1060 (quoting Black's Law Dictionary 1203 (8th ed. 2004)). In other

words, trespass is "an invasion of the interest in the *exclusive possession* of land." *Carrigan v. Purkhiser*, 466 A.2d 1243, 1243 (D.C. 1983) (emphasis added) (internal quotation marks omitted). "[T]he mere fact that a tenant may have the 'authority' to permit access into . . . common areas does not confer onto the tenant a legally recognized possessory interest in those areas." *Greenpeace*, 97 A.3d at 1060.

Here, the undisputed facts establish that Democracy Partners did not have the right to exclude others from Suite 250. First, AUFC, not Democracy Partners, held the lease for Suite 250. Next, during Maass' internship, the individuals and entities using Suite 250, in addition to Democracy Partners/Creamer, included Strategic, Mike Lux Media, American Family Voices, Aaron Black, Mike Lux, and Lauren Windsor. Finally, Democracy Partners did not have a sublease arrangement with AUFC, and it paid no rent in 2016. Based on these undisputed facts, the Court concludes that multiple organizations shared Suite 250 and Democracy Partners had no legal right to exclude others from using the space. Without the "ability to control and exclude others from using" the space, *id.*, Democracy Partners lacked the exclusive possessory interest necessary to sustain a claim of trespass.

Presumably recognizing that, in light of these undisputed facts, the trespass claim as pleaded cannot survive, plaintiffs' response concedes that Democracy Partners lacked the necessary possessory interest in Suite 250. Instead, they argue that Strategic had a possessory interest in the property, relying on the fact that Strategic, unlike Democracy Partners, had a sublease and paid rent to AUFC in 2016. Plaintiffs did not allege, however, a trespass claim based on Strategic Consulting's possessory interest; rather the complaint repeatedly references only Democracy Partners' possessory interest. (*See* Compl. ¶¶ 95, 97, 98, 100.) Plaintiffs have not moved to amend their complaint, and "[i]t is well-established that a party may not amend its

complaint or broaden its claims through summary judgment briefing." *Bean v. Perdue*, 316 F.

Supp. 3d 220, 226 (D.D.C. 2018) (internal quotation marks omitted). Accordingly, since

plaintiffs' trespass claim is limited to Democracy Partners, which did not have an exclusive

possessory interest, defendants are entitled to summary judgment on plaintiffs' trespass claim

against Maass.[17]

## III.    BREACH OF FIDUCIARY DUTY

To establish a breach of fiduciary duty under District of Columbia law, a plaintiff must

show "(1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the

fiduciary relationship; and (3) injuries that were proximately caused by the breach of the

fiduciary duties." *Millennium Square Residential Ass'n v. 2200 M Street LLC*, 952 F. Supp. 2d

234, 248 (D.D.C. 2013) (internal quotation marks omitted).

Plaintiffs claim that Maass is liable for breach of fiduciary duty because (1) "[a] fiduciary

relationship existed between Maass and Democracy Partners based on Maass' status as an intern

with access to confidential information"; (2) she breached her fiduciary duty to Democracy

Partners by, *inter alia*, surreptitiously recording meetings and conversations held in non-public

spaces without consent or authorization and providing those recordings to her employer, Project

Veritas, for publication, and removing documents containing sensitive or confidential

information without consent or authorization and providing those documents to Project Veritas;

and (3) plaintiffs were injured by her breach because Strategic lost two existing contracts and

---

[17] Defendants also argue that they are entitled to summary judgment because Maass' entry was "authorized." (Mot. at 35.) Having already concluded that plaintiffs' trespass claim cannot proceed, the Court will not address this argument except to note that it previously concluded that, under District of Columbia law, consent obtained via fraud does not bar a claim for trespass. *Democracy Partners*, 285 F. Supp. 3d at 118-19.

one future contract.  (Compl. ¶¶ 70-73, 76.)

Defendants argue that they are entitled to summary judgment on this claim because the undisputed facts establish (1) that there was no fiduciary relationship between Maass and Democracy Partners; and (2) even if Maass owed Democracy Partners a fiduciary duty, any breach of that duty did not proximately cause any injury to Democracy Partners.

### A.     Existence of Fiduciary Relationship Between Maass and Democracy Partners

Before addressing the merits of defendants' contention that there was no fiduciary relationship between Maass and Democracy Partners, it is necessary to address plaintiffs' belated attempt to expand the scope of their breach of fiduciary duty claim to include all plaintiffs, not just Democracy Partners.  In their opposition to defendants' motion for summary judgment, plaintiffs assert that "the evidence in the record is more than sufficient for Plaintiffs to be able to establish the existence of a fiduciary duty between Maass on the one hand, and Creamer and his company, Strategic Consulting, on the other."  (*See* Opp. at 24.)  However, the complaint does not allege a fiduciary relationship between Maass and Strategic or Creamer, in his personal capacity or a breach of any fiduciary duty owed to Strategic or Creamer.  (*See* Compl. ¶ 70 (alleging only that "fiduciary relationship existed between Maass and Democracy Partners"); Compl. ¶ 73 (alleging only that "Maass breached her fiduciary duties to Democracy Partners").)  As previously noted, plaintiffs may not amend their complaint or broaden their claims through summary judgment briefing.  Thus, the Court will consider only plaintiffs' breach of fiduciary duty claim as alleged – that Maass owed a fiduciary duty to Democracy Partners.

"A fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of another."  *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (quoting *Gov't of Rwanda v. Rwanda Working Group* 227 F. Supp. 2d 45, 64 (D.D.C. 2002)).  "The rule embraces both technical fiduciary relations and those informal

relations which exist whenever one man trusts in, and relies upon, another . . . ." *Church of Scientology Int'l v. Eli Lilly & Co.,* 848 F. Supp. 1018, 1028 (D.D.C. 1994) (internal quotation marks omitted); *see also Gov't of Rwanda*, 227 F. Supp. 2d at 64 ("It is said that the relationship exists in all cases in which influence has been acquired and betrayed."). For situations that fall outside of fiduciary relationships recognized as a matter of law,[18] "the District of Columbia courts have deliberately left the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances." *CAIR 2011*, 793 F. Supp. 2d at 341.

Although "fiduciary relationships can be difficult to define, . . . '[o]ne characteristic that District of Columbia courts have traditionally looked for is a 'special confidential relationship' that transcends an ordinary business transaction and requires each party to act with the interests of the other in mind.'" *Ying Qing Lu v. Lezell*, 919 F. Supp. 2d 1, 6 (D.D.C. 2013) (quoting *High v. McLean Fin. Corp.*, 659 F. Supp. 1561, 1568 (D.D.C. 1987)); *MobilizeGreen, Inc. v. Cmty. Found. for Nat'l Capital Region*, 101 F. Supp. 3d 36, 46 (D.D.C. 2015) ("Fiduciary relationships arise when parties develop a certain amount of trust between themselves." (quoting *Cordoba Initiative Corp. v. Deak,* 900 F. Supp. 2d 42, 49 (D.D.C. 2012))); *CAIR v. Gaubatz*, 31 F. Supp. 3d 237, 257-61 (D.D.C. 2014) ("*CAIR 2014*"). To determine whether such a relationship exists in a particular case is a "fact-intensive" question that requires "a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate

---

[18] Such relationships include, for example, that of an attorney and client or an employee and employer. *See, e.g.*, *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 691 F. Supp. 2d 132, 154 (D.D.C. 2010) ("Attorneys unquestionably stand in a fiduciary relationship to their clients for matters related to their legal representation of their clients."); *Phillips v. Mabus*, 894 F. Supp. 2d 71, 92-93 (D.D.C. 2012) ) ("Employees, particularly managers and officers, 'owe an undivided and unselfish loyalty to the corporation" during the term of their employment, 'such that there shall be no conflict between duty and self-interest." (quoting *Mercer Mgmt. Consulting v. Wilde,* 920 F. Supp. 219, 233 (D.D.C. 1996))).

expectations of the parties." *CAIR 2011,* 793 F. Supp. 2d at 341 (quoting *Firestone v. Firestone,* 76 F.3d 1205, 1211 (D.C. Cir. 1996)); *see also Millennium Square Residential,* 952 F. Supp. 2d at 248-49. "Because the inquiry is fact-intensive, it is often inappropriate to decide whether a fiduciary relationship existed even in the context of a motion for summary judgment." *CAIR*, 793 F. Supp. 2d at 341.

In denying defendants' motion to dismiss plaintiffs' breach of fiduciary duty claim, the Court concluded, adopting the reasoning set forth in *CAIR 2011*, that the complaint adequately alleged the existence of a fiduciary relationship  between Maass and Democracy Partners by alleging that Maass "'secured h[er] internship only by making a number of affirmatively false statements and omitting material information about h[er] background, interests, and intentions with the specific intention of inducing [Democracy Partners] to repose a measure of trust and confidence in h[er]' and 'as a result of the trust and confidence reposed in her, [she] was afforded access to confidential, proprietary, and privileged materials as well as non-public areas of [Democracy Partners'] offices.'" *Democracy Partners*, 285 F. Supp. 3d at 122 (quoting *CAIR 2011*, 793 F. Supp. 2d at 341).

Defendants do not dispute that Maass obtained her internship under false pretenses, but they argue that there was no "special confidential relationship" between Maass and Democracy Partners and, thus, no fiduciary duty was owed by Maass to Democracy Partners.  (Mot. at 17.) In particular, defendants argue that plaintiffs "should have taken special steps to create the characteristic 'special relationship of trust and confidence,'" and that Creamer's single reference to a nondisclosure agreement, which Maass was never asked to sign, is not sufficient.  (Reply at 13.).

Plaintiffs maintain that even if some of their original allegations lack support, the critical

allegations are supported by competent evidence: (1) that Maass secured her internship only by "'making a number of affirmatively false statements and omitting material information about [her] background, interests and intentions with the specific intention of inducing Plaintiffs to repose a measure of trust and confidence in [her],'" and (2) that "[a]s a result of gaining the trust and confidence of Creamer, Maass was then provided access to confidential information."  (Opp. at 21-22 (quoting *CAIR 2011*, 793 F. Supp. 2d at 341).)

There are no disputed facts with respect to the first two factors: the "nature of the relationship" or the "promises made."  Maass was a part-time, unpaid intern for Democracy Partners, and she never signed a nondisclosure agreement or verbally promised to keep information confidential.  (*See* Defs.' Facts ¶¶ 69, 70, 83, 85; Pls.' Facts ¶¶ 69, 70, 83, 85). Given these undisputed facts, neither of these factors supports the existence of a fiduciary relationship.

But with respect to the third and fourth factors, the "type of services or advice given" and the "legitimate expectations of the parties," the situation is different.

*Types of Services*: Defendants argue that the "types of services" given weighs against finding a fiduciary relationship because Maass' "internship tasks were mundane," limited to taking inventory, making deliveries, clerical work, and using a computer program to assemble press clippings.  (Mot. at 18 (citing Defs.' Facts ¶¶ 125, 126, 128, 129, 130).)  Plaintiffs do not dispute that Maass performed such "mundane" tasks.  (*See* Pls.' Facts ¶¶ 125-26, 128-130.)  But they dispute that all of her work can be so characterized, for the evidence also shows that she was "given access to confidential meetings and briefings" and that "she did in fact knowingly obtain and then disclose confidential information."  (Opp. at 3, 24.)

Plaintiffs' primary example of Maass' access to confidential meetings and briefings was

that she participated on a confidential daily call with the Hillary Clinton Campaign and the DNC about both current "bracketing" events and future ones which had not yet been made public. (*See* Creamer Decl. ¶ 27 ("Maass was given access to telephone conference calls to which only certain individuals working for the DNC and its contractors were invited; and on which there was discussion of future 'bracketing' events. The passcode for those calls was kept confidential and circulated only to persons authorized to be on the call. In addition, Maass had access to lists of future bracketing events, the existence of which was maintained in strict confidence and had not yet been made public.").)

Defendants dispute plaintiffs' characterization of the conference calls as confidential, pointing out that the call-in number and passcode had been made publicly available through the hacked DNC e-mails published on the Wikileaks website. (*See* Mot. at 19; Reply at 4.) But Project Veritas employee Hartsock testified that a major advantage of Maass' deceptive infiltration of Democracy Partners' offices was that "[s]he had a front row seat to the conference calls . . ." and that he could not think of any other way that Project Veritas could get access to those conference calls. (Pls. Facts ¶ 127 (quoting Hartsock Dep. at 132:17-133:8; 133:14-134:6).)[19] Their argument is further undercut by the fact that Maass included a list of upcoming bracketing events in her memos to Project Veritas. (*See* Sandler Decl. Exs. 26-27.) In addition, on one call that Maass listened to there was a discussion about a "secret war room"; when asked about this during her deposition, Maass testified that if "they labeled it secret, they probably meant secret" and that "secret" is "similar" to "confidential." (Memorandum from Maass to

---

[19] Plaintiffs failed to include the cited pages of Hartsock's deposition in Exhibit 5 to the Sandler Declaration, which contains the other relevant excerpts from Hartsock's deposition, but, as defendants do not challenge plaintiffs' representation of the evidence, the Court is assuming that they have accurately quoted his testimony.

Project Veritas Production, Sept. 26, 2016 (Sandler Decl. Ex. 24); Maass Dep. at 93:1-7.)

As additional evidence of Maass' access to confidential information, plaintiffs point out that she received training on how to operate and use a tracking program called TVEyes to grab press clips about bracketing events after they occurred. (*See* Pls. Facts ¶ 124 ("training on how to curate video and other clippings" was "a process proprietary to Democracy Partners and its clients").) Again, defendants take a different view of the facts, arguing that the collection of TV clippings was a purely clerical assignment (*see* Mot. at 18), but for summary judgment purposes, the evidence must be viewed in the light most favorable to plaintiffs.

Given the above, the Court concludes that there is a genuine dispute as to whether Maass' work gave her access or exposure to confidential information.

*Legitimate Expectations of the Parties*: Defendants argue that the fourth factor – the "legitimate expectations of the parties" — weighs against finding a fiduciary relationship because "Democracy Partners did not treat Ms. Maass as though they expected she would act as a fiduciary, did not treat her as though she would have access to confidential or sensitive information, and did not treat its business operations as though they were confidential or sensitive." (Mot. at 20.) Again, there are contrary facts that preclude the granting of summary judgment.

Defendants' argument is undercut by their own actions. The fact that Maass created a false identity, and that defendants created false identities to introduce Maass to plaintiffs is evidence of their understanding that Maass would have fiduciary obligations to safeguard sensitive or confidential information. Moreover, as plaintiffs argue, "Creamer indicated that Maass would be asked to sign a non-disclosure agreement . . . which only makes sense as [a] way of informing Maass that she would be exposed to confidential information." (Pls.' Facts

¶ 85.)  This is a fair inference to draw, especially given Maass' testimony that her "understanding of a nondisclosure agreement" is that "you are agreeing not to give any information about . . . the company."  (Maass Dep. at 77:12-15.)

In addition, the evidence shows that Maass was given unrestricted access to the physical space within Suite 250, allowing her to overhear confidential conversations and view confidential documents.  For example, Maass admittedly eavesdropped on a conversation to which she was not a party.  (*See* PV Video Summary Form, Oct. 12, 2016 (Sandler Ex. 23) (Maass reported to Project Veritas that "I wasn't invited into the meeting but I pretended to be working and tried to listen to what they were saying").)  She was also in a position to look through Creamer's trash and take photographs of documents on his desk and on the desk of Aaron Black.  (*See* Sandler Ex. 28; Pls.' Facts ¶ 85 (citing Maass Dep. at 130:9-33:3).)[20]  While Maass apparently did not obtain any confidential information from these specific intrusions, her ability to listen and look reflects the trust that was placed in her.

For example, defendants claim that Democracy Partners has no IT Firewall (*see* Defs.' Facts ¶ 120), but access to the Wi-Fi was password protected (*see* Pls.' Facts ¶ 120; Cerabona Dep. at 142:1-3).)[21]  Defendants note that Democracy Partners' "Rule 30(b)(6) witness did not know how many key cards Democracy Partners issued to employees, guests, or affiliates, and did not know if Democracy Partners takes key cards back from its affiliates after the relationship ends" (Defs.' Facts ¶ 114), but the witness "was not called as a 30(b)(6) witness on those issues"

---

[20] Plaintiffs also failed to include these pages from the Maass deposition in their exhibits.

[21] Defendants claim that "Democracy Partners' email system was incapable of two-factor identification (Defs.' Facts ¶ 122 (citing Cerabona Dep. at 42:14-22, 43:1 (Klein Decl. Ex. 32)), but there is no reference to two-factor authentication in the portion of the record cited by defendants (*see* Pls.' Facts  122; *see also* Cerabona Dep. at 42:14-22, 43:1.)

and, moreover, the evidence shows that "Democracy Partners does take key cards back from employees of its members after the relationship ends" (Pls.' Facts ¶ 114 (citing Creamer Decl. ¶ 29)). Defendants dismiss the significance of Maass having a key card because she only used it once (*see* Defs.' Facts 113), but the doors to Suite 250 were generally unlocked during the normal business hours, when Maass worked, and Maass had been introduced to all the people who worked in the office regularly, so they knew who she was (Pls.' Facts ¶ 97 (citing Maass Dep. at 71:13-19); *id*. ¶ 111). Defendants note that "[t]he doors to Suite 250 were unlocked during business hours (Defs.' Facts ¶ 111), but an employee of a Democracy Partners member company was always present when the door was unlocked (*see* Pls.' Facts ¶ 111). Defendants point out that "Democracy Partners wrote its Wi-Fi password on a white board in a conference room near the front door of the office" (Defs.' Facts ¶ 119), but this fact does not imply that the password was visible outside the offices of Democracy Partners (Pls.' Facts ¶ 119 (citing Creamer Decl. ¶ 31)). Finally, defendants assert that "Democracy Partners makes no effort to change passwords, or other efforts regarding information security, when members leave the organization" (Defs.' Facts ¶ 121 (citing Cerabona Dep. at 149:5-150:8)), but plaintiffs respond that, while email passwords are not "rotated" when a member leaves, "typically when the partners leave, we take their information off the website and we remove them—remove their e-mail from the G Suite, we remove their email from the Google Group" (Pls.' Facts ¶ 121 (quoting Cerabona Dep. at 149:9-13)).

As there are genuine disputes as to whether Democracy Partners "did not treat [Maass] as though she would have access to confidential or sensitive information" and "did not treat its business operations as though they were confidential or sensitive," the Court cannot agree with defendants that the "legitimate expectations of the parties" weigh against finding a fiduciary

relationship.

Given the disputed facts as to third and fourth factors, the Court concludes that whether there was a fiduciary relationship between Maass and Democracy Partners cannot be resolved on summary judgment.

### B.    Injury to Democracy Partners

In the alternative, defendants argue that they are entitled to summary judgment on plaintiffs' breach of fiduciary duty claim because the undisputed facts show that her breach did not proximately cause any injuries to Democracy Partners – the third element of a breach of fiduciary duty claim.  Specifically, defendants argue that damages based on Strategic Consulting's lost contracts with AUFC and AFSCME and its lost potential contract with Dialysis Patient Citizens – the only damages plaintiffs are still claiming – are not an injury to Democracy Partners that was proximately caused by Maass' breach of fiduciary duty.

Plaintiffs counter that even though Strategic was the party to the lost contracts, Democracy Partners also suffered damages because Strategic is a member of Democracy Partners and therefore "[t]he loss of income to Strategic Consulting affected Democracy Partners as well by impacting the ability of Strategic Consulting to invest in and support Democracy Partners."  (Opp. at 14; Defs.' Facts ¶ 88; Pls.' Facts ¶¶ 19, 88.) [22]  Whether that injury was proximately caused by the breach of fiduciary duty, they say, is a matter for the jury to decide.

---

[22] Plaintiffs also argue that Creamer suffered damages because he "is the sole owner of Strategic Consulting," which is "a single member limited liability company in which profits and losses flow through to the owner" and thus "Creamer personally suffered the loss of income due to the loss of these contracts by Strategic."  (Opp. at 14; Pls.' Facts ¶ 20.)  However, as the Court has already rejected plaintiffs' attempt to add a breach of fiduciary duty claim against Creamer, it is not relevant if Creamer suffered any damages from the alleged breach.

Plaintiffs' theory that Democracy Partners was necessarily injured by any injury to Strategic lacks support in the record. Moreover, when plaintiffs were asked what damages they were seeking to recover with respect to each plaintiff, they failed to identify any damages to Democracy Partners. (*See* Defs. Facts ¶ 18.)

Because there is no *evidence* of any injury to Democracy Partners, defendants are entitled to summary judgment on plaintiffs' breach of fiduciary duty claim.

## IV.  FRAUDULENT MISREPRESENTATION CLAIM

In the District of Columbia, fraudulent misrepresentation requires proof of "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co., v. Shama Rest. Corp.,* 613 A.2d 916, 923 (D.C. 1992). In addition, "[t]o prevail, the plaintiff must also have suffered some injury as a consequence of his reliance on the misrepresentation." *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998) (citing *Dresser v. Sunderland Apartments Tenants Ass'n,* 465 A.2d 835, 839 (D.C. 1983) ("provable damages" required)). Liability extends only to damages that are "the natural and proximate consequences, or the direct consequences of the fraud, and to such damages as can be clearly defined and ascertained." *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 793 (D.C. Cir. 1983); *see also C & E Servs.*, 498 F. Supp. 2d at 256 ("defendant's challenged conduct is the proximate cause of a plaintiff's injury only if the injury is the natural and probable consequence of the . . . wrongful act and ought to [have been] foreseen in light of the circumstances" (internal quotation marks omitted)).

Plaintiffs' fraudulent misrepresentation claim is based on the false representations Maass made to Creamer about her identity and background, his reliance on those representations in

deciding to hire her as an intern, and the subsequent injuries to Strategic Consulting. (*See* Compl. ¶¶ 103-105; 111-12; Defs.' Facts ¶ 18.) Defendants seek summary judgment on the sole ground that plaintiffs will be unable to prove that the injuries suffered by Strategic Consulting were "suffered . . . as a consequence" of Creamer's reliance on Maass' misrepresentations. (Mot. at 37-41.)

Defendants first argue that plaintiffs will not be able to prove the necessary causal link between Creamer's reliance on Maass' false representations and the injuries suffered by Strategic Consulting because the evidence establishes that "contracts were lost strictly as a result of publication and the [p]laintiffs' other actions." (Mot. at 38.) However, as previously discussed, the Court has concluded that there is a genuine dispute as to whether defendants' publications were the *sole* cause of plaintiffs' injuries. *See supra* Section I.

In the alternative, defendants argue that the canceled contracts are not "cognizable" damages because for a fraudulent misrepresentation claim the injury "must relate to a specific transaction in which a plaintiff engages in reliance on a false representation." (Mot. at 38.) Here, according to defendants, the transaction at issue was the decision to hire Maass as an intern, but that transaction itself did not lead to the loss of contracts by Strategic Consulting because "Maass performed her duties as an unpaid intern to the benefit of the [p]laintiffs." (Mot. at 37; *id*. at 39 ("Maass was paid nothing by the Plaintiffs in salary, contractual wage or fringe benefits. She completed every task assigned to her as part of the internship.").) In other words, as defendants see it, because Maass' job as an "intern" did not include her surreptitious recording and disclosure of intercepted conversations, any injuries that resulted from those actions were not foreseeable, and the Court can decide as a matter of law that the decision to hire her as an intern caused no cognizable injuries.

This argument has no merit. This is not a case where the "purported injuries . . . would have been incurred by the plaintiffs irrespective of [the defendants'] alleged fraudulent conduct." *See Emory v. United Air Lines, Inc.*, 821 F. Supp. 2d 200, 243 (D.D.C. 2011), *aff'd,* 720 F.3d 915 (D.C. Cir. 2013). To the contrary, but for the decision to hire Maass as an intern, none of the injuries would have been incurred. The well-established legal test is whether a jury could find that plaintiffs' injuries were "the natural and probable consequence of the . . . wrongful act and ought to [have been] foreseen in light of the circumstances." *C & E Servs.*, 498 F. Supp. 2d at 256. And, "[o]nly in exceptional cases will questions of . . . proximate cause pass from the realm of fact to one of law." *Id.* Applying this test, the Court cannot find as a matter of law that Strategic Consulting's injuries were not proximately caused by the decision to hire Maass as an intern, and summary judgment will not be granted on plaintiffs' fraudulent misrepresentation claim.

## V.    FEDERAL AND D.C. WIRETAP CLAIMS

Plaintiffs claim that Maass' secret audio recordings, and the subsequent disclosure and use of those secret recordings, violated the Federal Wiretap Act, 18 U.S.C. § 2511, *et seq*., and the D.C. Wiretap Act, D.C. Code § 23-541, *et seq*. (*See* Compl. ¶¶ 78-103.) Defendants argue that they are entitled to summary judgment because (1) both statutes provide that it is not unlawful for a person to intercept an oral communication where such person is a party to the communication, as Maass was, as long as there was no criminal or tortious purpose, which there was not; (2) even if there was an unlawful interception, defendants believed their interceptions were lawful under the single-party consent provisions and are thus protected by the "good faith" defense in both statutes; and (3) if defendants' conduct violated the statutes, the relevant parts of those statutes are unconstitutional. (*See* Mot. at 23-24.) As explained below, none of these

arguments is persuasive.

### A. One-Party Consent

Both the federal and D.C. wiretap statutes provide that it is generally lawful to intercept an oral communications so long as one party to the communication has consented to the recording.  *See* 18 U.S.C. § 2511(2)(d); D.C. Code § 23-542(b)(3).  However, both statutes provide that the one-party consent rule does not apply if the communication is intercepted for the purpose of committing a tortious act.  *See* 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication . . . unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."); D.C. Code § 23-542(b)(3) ("It shall not be unlawful under this section for . . . —(3) a person not acting under color of law to intercept a wire or oral communication, where such person is a party to the communication . . .  unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States, any State, or the District of Columbia, or for the purpose of committing any other injurious act.").

Defendants argue that there were no unlawful interceptions because the undisputed facts establish that Maass was a party to every conversation she recorded and that the purpose of the interceptions was not to commit a tortious act but rather to report on a news story.  (*See* Mot. at 24.)  This argument fails.

First, the undisputed facts do not establish that Maass was a party to every communication she recorded.  For example, Maass was not a participant in the meeting she recorded between two members of Democracy Partners and the person who served as campaign manager for Bernie Sanders' presidential campaign in 2016.  (*See* Pls.' Facts ¶ 79.)  Defendants

argue that even though Maass was not a participant in this meeting, she was "legally a party" because the meeting took place in a conference room near Maass' desk, with the conference room door left open and while Maass was "clearly visible through the glass wall." (Reply at 18 (citing Second Klein Decl. Ex. 11, at 17:30-27:32 (raw video footage of meeting).) But the critical legal question is not whether Maass was "visible" but whether her "presence [wa]s apparent in the midst of a communication." *See CAIR 2014*, 31 F. Supp. 3d at 255 ("[W]hile the interceptor need not actively participate in the conversation for the one-party consent rule to apply, at the very least, his or her presence must be apparent to those individuals whose conversation is being intercepted."); *see also United States v. Brown*, No. 00-100, 2011 WL 576901, at *3 (M.D. La. Feb. 9, 2011) ("a person whose presence is apparent in the midst of a communication is considered a party"). Here, there is nothing in the video that suggests that Maass' presence was "apparent" to the participants in the intercepted conversation. (See Klein Decl. Ex. 11, at 17:30-27:32.) All the video shows is that Maass' desk directly faces a glass wall of the conference room, with the open door off to the side, and all that can actually be seen is a computer screen and a stack of file folders. (*Id.*) The video does not show who is inside the conference room and, if the items on Maass' desk are blocking Maass' line of sight into the conference room, one could infer that they are also blocking the line of sight from the conference room to Maass. (*Id.*) Thus, the video does not establish that Maass was "visible," much less that her presence was "apparent in the midst of [the intercepted] communications." *CAIR 2014*, 31 F. Supp. 3d at 255.

Second, there is sufficient evidence to support a finding that defendants had the tortious

purpose of committing a breach of fiduciary duty.[23]   Although defendants argue that the undisputed facts establish that there was no fiduciary relationship between Maass and Democracy Partners (*see* Mot. at 24), the Court has already determined that there is a genuine dispute as to whether a fiduciary relationship existed between Maass and Democracy Partners. *See supra* Section III.A.

Defendants also argue that they could not have had the purpose of committing a breach of fiduciary duty because the undisputed facts establish that the breach of fiduciary duty claim is "not otherwise cognizable."  (*See* Mot. at 24.)  While the Court has concluded that plaintiffs' breach of fiduciary duty is not "cognizable," it reached that conclusion because there is no evidence that Democracy Partners (as opposed to Strategic Consulting) incurred any injury as a result of any breach.  *See supra* Section III.B.  But this does not mean that plaintiffs cannot prove a tortious purpose of committing a breach of fiduciary duty.  The absence of provable damages does not mean that defendants' *purpose* could not have been to commit a breach of fiduciary duty.  As the court explained in *CAIR v. Gaubatz*, 123 F. Supp. 3d 83 (D.D.C. 2015) ("*CAIR 2015*"), the tortious purpose exception to the one-party consent rule does not "depend[] on [plaintiffs] being able to show actual injury as the result of the breach of fiduciary duty."  *Id*. at 85.

Finally, defendants argue that plaintiffs will be unable to prove a tortious purpose

---

[23] The complaint alleges that defendants "intercepted oral communications for the primary purpose of committing trespass, breach of fiduciary duty, [and] fraudulent misrepresentation." (Compl. ¶¶ 82, 90.)  However, the Court's ruling on defendants' motion to dismiss held that the claims could only proceed on the theory that defendants' tortious purpose was to commit a breach of fiduciary duty because the trespass and fraudulent misrepresentation claims were based on conduct that began before any recording took place.  *Democracy Partners*, 285 F. Supp. 3d at 124; *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 828 (N.D. Cal. 2016) (purpose must be to commit a "further tortious act").

because their "purposes were lawful." (Mot. at 24.) To prove a tortious purpose, plaintiffs will have to "'either (1) that the primary motivation, or (2) that a determinative factor in the actor's motivation in intercepting the conversation was to commit' a criminal or tortious act." *CAIR 2014*, 31 F. Supp. 3d at 256-57 (quoting *United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993)). According to defendants, plaintiffs will be unable to make this showing because "the record proves" that their only purpose was the lawful one of investigating and reporting a news story. (Mot. at 24.) The Court cannot agree. Here, the undisputed facts show that Maass secretly recorded all of the conversations, conference calls and meetings to which she had access as an intern precisely in order to disclose these conversations to her superiors at Project Veritas so they could be used by Project Veritas in their videos. These facts are sufficient to create a genuine dispute as to whether a "determinative factor in [defendants'] motivation in intercepting the conversation[s] was to commit a [breach of fiduciary duty]." *CAIR 2014*, 31 F. Supp. 3d at 257.

## B.    Good Faith Defense

Defendants argue that even if there are facts at issue regarding the lawfulness of the interceptions, they are still entitled to protection under the "good faith reliance" provisions in both statutes." *See* 18 U.S.C. § 2520(d); D.C. Code § 23-554(b).

The "good faith" defense in § 2520(d) of the Federal Wiretap Act provides that "A good faith reliance on--

**(1)** a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization;

**(2)** a request of an investigative or law enforcement officer under section 2518(7) of this title; or

**(3)** a good faith determination that section 2511(3), 2511(2)(i), or 2511(2)(j) of this title permitted the conduct complained of;

is a complete defense against any civil or criminal action brought under this
chapter or any other law.

18 U.S.C. § 2520(d). The D.C. Wiretap Act provides that "Good faith reliance on a court order

or legislative authorization shall constitute a complete defense to an action brought under this

section or any other law." D.C. Code § 23-554(b).[24]

According to defendants, they are covered by these good faith defenses because the

undisputed facts establish that they relied in good faith on the one-party consent provisions in

both statutes. In other words, defendants interpret the term "statutory authorization" in

§ 2520(d)(1) to encompass other sections of the wiretap statute.

The Federal Wiretap Act itself does not define "statutory authorization," but every court

to consider the question has concluded that the "statutory authorization" referred to in

§ 2520(d)(1) refers only to other statutes, not the Wiretap Act itself. *See Pyankovska v. Abid*,

No. 2:16-cv-2942, 2017 WL 5505037, at *4 (D. Nev. Nov. 16, 2017) ("[T]he term 'statutory

authorization' does not mean that defendant's belief that the [wiretap] statute authorized him to

intercept a communication serves as a defense. Rather, it means that a party's reliance on a

separate statute authorizing conduct that otherwise violates the Wiretap Act serves as a complete

defense."); *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1046-47 (N.D. Cal. 2014); *Diana v.

Oliphant*, No. 3:05-cv-2338, 2009 WL 385540, at *9 (M.D. Pa. Feb. 13, 2009) (law enforcement

exception in Federal Wiretap Act is not a "statutory authorization" for purposes of the good faith

defense), *vacated and remanded on other grounds*, 441 F. App'x 76 (3d Cir. 2011); *Abraham v.

Cty. of Greenville*, 237 F.3d 386, 390-91 (4th Cir. 2001) (same).

---

[24] Although the good faith defense in the D.C. Wiretap Act does not expressly include a
"statutory authorization," it is to be "construed to supplement, and not to supersede or otherwise
limit, the provisions of [the Federal Wiretap Act]." D.C. Code § 23-556(a).

This Court agrees that this is the only interpretation that makes sense because subsection (d)(3) specifically identifies three subsections of the Wiretap Act that can provide the basis for a good faith defense, none of which are the single-party consent provision.[25] *Backhaut*, 74 F. Supp. 3d at 1046-47 (("To the extent [the defendant] contends that Congress intended to allow a good faith defense in reliance on any provision of . . . the Wiretap Act, despite the explicit language of § 2520(d)(3) . . . , that argument is unavailing.") *Diana*, No. 3:05-cv-2338, 2009 WL 385540, at *9 (("a straightforward interpretation of the provision as a whole supports the conclusion that 'statutory authorization' was not intended to encompass an internal reference to another provision of Title III . . . [because] [t]he two subsections following that containing the 'statutory authorization' language contain internal cross-references to specific provisions of Title III, providing them good faith defenses. If Congress had intended to provide a good faith defense for the law enforcement exception, it would have similarly provided a specific statutory reference to § 2510(5)(a) (ii) in § 2520(d).")

Accordingly, defendants cannot rely on the "good faith" defense in the wiretapping statutes to avoid liability.

## C.    Constitutionality of Wiretap Statutes

Defendants' default position is that they are entitled to summary judgment on the wiretap claims because the tortious purpose exceptions to single-party consent in the federal and D.C. wiretap statutes (1) violate the First Amendment, and (2) are unconstitutionally vague.

---

[25] Subsection (2)(i) pertains to the interception of communications of "computer trespassers"; subsection (2)(j) concerns interceptions by providers in response to an order from a foreign government; and subsection (3) applies to the disclosure of communication by persons or entities "providing an electronic communication service to the public. 18 U.S.C. §§ 2511(2)(i), 2511(2)(j), 2511(3).

### 1. First Amendment

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. Laws regulating speech on the basis of content are subject to "strict scrutiny," which requires the government to show that the restrictions are "narrowly tailored" to promote a "compelling state interest," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226-27 (2015), while laws that are content-neutral are subject to "intermediate scrutiny," which requires that the restrictions be "narrowly tailored" to advance a "significant government interest," *McCullen v. Coakley*, 573 U.S. 464, 479, 486 (2014). A law is content-based if it facially determines whether speech is to be regulated by reference to its content or if it is facially neutral but was nonetheless motivated by the government's disagreement with a particular message. *Reed*, 135 S. Ct. at 2227.

Defendants argue that the tortious purpose exceptions to single-party consent in the wiretapping statutes violates the First Amendment because (1) they are not content-neutral, triggering strict scrutiny, and (2) they fail strict scrutiny because there is no "compelling interest" or, even if there is a compelling interest, the law is not "narrowly tailored to achieve that interest." (Mot. at 26-27.) In the alternative, defendants argue that the exception fails the tailoring prong of intermediate scrutiny. (*See* Mot. at 28-29; Reply at 20.)

The first question is whether the tortious purpose exception is "content-based" or "content-neutral." "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed" or if the law is "facially content neutral," but "cannot be 'justified without reference to the content of the regulated speech,' or that [was] adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 135 S. Ct. at 2227 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)). As defendants acknowledge, "[c]ourts analyzing

interception statutes have generally considered them content-neutral and thus subject to intermediate scrutiny." (Mot. at 26 (citing *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 603 (7th Cir. 2012) and *Martin v. Gross*, 340 F. Supp. 3d 87, 105 (D. Mass. 2018)).) Defendants argue, however, that the tortious purpose limitation on single-party consent is necessarily "content-based," at least where, as here, the alleged purpose is to commit a breach of fiduciary duty. As defendants explain it, an intended breach of fiduciary duty could only have occurred if Maass intended to record and disclose oral communications containing confidential information, but in "in order to determine whether an oral communication contains confidential information, its content must be analyzed and its substance distinguished from non-confidential information." (Mot. at 27.) But, "[a] law is not considered 'content based' simply because a court must 'look at the content of an oral or written statement in order to determine whether a rule of law applies.'" *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 603 (7th Cir. 2012) (quoting *Hill v. Colorado,* 530 U.S. 703, 721 (2000)). Accordingly, the Court concludes that the tortious purpose exceptions to single-party consent in the wiretapping statutes are content-neutral.

For a content-neutral statute to survive intermediate scrutiny, it must be "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F. 3d 391, 407 (D.C. Cir. 2017). The wiretapping statutes satisfy both requirements. The significant government interest is the deterrence of criminal or tortious acts such as blackmail that are facilitated by secret wiretaps. The exception is narrowly tailored to that end as its scope precisely tracks the behavior the government has a significant interest in deterring. Finally, the exceptions leave open ample alternative means of communication as defendants may continue to

gather news from their sources, just not by using secret recordings when such recordings are for a criminal or tortious purpose.

### 2. Unconstitutional Vagueness

Defendants also argue that the tortious purpose exceptions to single-party consent in the wiretap statutes are unconstitutionally vague.

Under the Fifth Amendment vagueness doctrine, a statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited[] or is so standardless that it authorizes] or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). However, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989).

Defendants assert that the tortious purpose exception fails to give fair notice because it requires them "to independently analyze every federal statute along with the statutes and common law torts of a jurisdiction" in relation to their recording activities. (Mot. at 30.) Defendants' argument is rejected for two reasons.

First, defendants' argument is not really about the "vagueness" of the term "tortious purpose." A statute is only unconstitutionally vague if its terms are "'so vague that men of common intelligence must necessarily *guess* at its meaning and differ as to its application.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (emphasis added) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)). Here, defendants are not claiming that they have to "guess" at the meaning of "tortious purpose." Rather they are objecting to the breadth of the statute's exception to the one-party consent rule.

Second, there is no legal authority that supports an argument that the term "tortious purpose" is unconstitutionally vague. On the contrary, the Seventh Circuit explicitly rejected the

argument in *United States v. Edelson*, where it stated "we are not persuaded by the appellant's claim that the terms 'criminal,' 'tortious' and 'injurious act' are so vague that 'men of common intelligence must necessarily guess at (their) meaning and differ as to (their) application.' . . . [W]e find the statute to be sufficiently explicit to 'inform those who are subject to it what conduct on their part will render them liable to its penalties.'" 581 F.2d 1290, 1292 (7th Cir. 1978) (quoting *Connally v. General Constr. Co.*, 269 U.S. at 391). [26]

Accordingly, defendants' vagueness challenge to the tortious purpose exception is without merit.

## VI. CIVIL CONSPIRACY

A civil conspiracy requires "(1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme." *Saucier v. Countrywide Home Loans,* 64 A.3d 428, 446 (D.C. 2013) (quoting *Paul v. Howard Univ.,* 754 A.2d 297, 310 (D.C. 2000)). Civil conspiracy "is a means for establishing vicarious liability for the underlying tort." *Id.* (internal quotation marks omitted). Thus, "liability for civil conspiracy depends on performance of some underlying tortious act." *Id.* (internal quotation marks omitted).

The complaint alleges that defendants are liable for civil conspiracy to commit the underlying torts of "trespass, fraudulent misrepresentation, unlawful wiretap, and to breach

---

[26] Defendants rely on a Sixth Circuit case, *Boddie v. Am. Broadcast Cos.*, but the holding in that case was limited to finding the term "injurious" to be unconstitutionally vague. 881 F.2d 267, 271 (6th Cir. 1989). The term injurious no longer appears in the Federal Wiretap Act. And while defendants may be right, as plaintiffs acknowledge, that the "injurious act" language in the D.C. Wiretap Act is unconstitutionally vague (*see* Mot. at 30 (citing *Boddie*, 881 F.2d at 271); Opp. at 29), plaintiffs' claim does not rely on that exception.

fiduciary duties." (Compl. ¶¶ 114-15.) Defendants seek summary judgment on the civil conspiracy claim on the ground that they are entitled to summary judgment on all of the underlying torts. (*See* Mot. at 44.) Although the Court has granted summary judgment on the trespass and breach of fiduciary duty claims, it has denied summary judgment on plaintiffs' claims for fraudulent misrepresentation and unlawful wiretapping. Accordingly, plaintiffs' civil conspiracy claim may proceed as to those torts.

## CONCLUSION

Accordingly, and for the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. Defendants are entitled to summary judgment with respect to plaintiffs' claims for trespass and breach of fiduciary duty, but not with respect to plaintiffs' claims for fraudulent misrepresentation, unlawful wiretapping, and civil conspiracy. A separate Order accompanies this Memorandum Opinion.

ELLEN S. HUVELLE
United States District Judge

Date: March 31, 2020