UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC,                          CASE NO.: 1:17-CV-1047-ESH
et al.,

     Plaintiffs,

v.

PROJECT VERITAS ACTION FUND,
et al.,

     Defendants.

_____/

### PROJECT VERITAS PARTIES' REPLY IN SUPPORT OF MOTION TO ADMIT CREAMER'S FEDERAL FELONY CONVICTIONS FOR BANK FRAUD AND TAX CRIMES

"Only an extraordinary individual could and would make his sentencing for multiple federal financial crimes an occasion for hagiography. Unfortunately, on the way to sainthood, Defendant [Creamer] got sidetracked by a years-long cycle of financial crimes that had one common element – Defendant [Creamer] helping himself to money that belonged to someone else." **Exhibit A**, Government's Response to Defendant's Position Paper on Sentencing, *United States v. Creamer*, Case No. 04-cr-281 (N.D. Ill.) at 1.

"Defendant [Creamer] notably avoids acknowledging that the conduct to which he pleaded guilty was part of a near ceaseless years long business modus operandi of cyclically availing himself of the money of others, without authorization, without request, without notice, for long periods of time – sometimes bank money, sometimes tax monies Defendant [Creamer] held in trust for his employees, and sometimes receivables Defendant [Creamer] knew were pledged to his financiers." *Id.* at 15.

Tigers cannot change their stripes. Neither can con men. And Creamer continues his cons, now with his testimony in this lawsuit. Pursuant to Rule 609(b), the jury must hear of his federal felony fraud and tax crime convictions to evaluate his lack of credibility. There are also two critical issues for which matters involving Creamer's conviction are direct evidence. First, because of Plaintiffs' allegations of a "tortious purpose," an "infiltration," and the like, the Project Veritas Parties' pre-internship knowledge of Creamer's crimes is also independently admissible to

establish their journalistic purposes in pursuing a newsworthy story.[1] The jury must also hear the Project Veritas Parties' reporting on Creamer's crimes as described in "Rigging the Election" Part I – the video that gave rise to the alleged damages when AFSCME stopped paying Creamer's entity for political consulting because "regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be a party to it." **Exhibit B**, Excerpts of AFSCME R. 30(b)(6) witness Scott Frey Depo. Tr. at 78:22-79:5.

## I. Creamer "Purposefully Broke the Law, Repeatedly, Cyclically, Over Many Years, for Long Stretches" -- His Attempts to Minimize his Crimes Fail and the Convictions Should Be Admitted for Impeachment Pursuant to Rule 609(b).

Creamer's convictions are felonies, as well as crimes of dishonesty, committed as part of a lengthy and sophisticated campaign of crime. The first of Creamer's known frauds was a 1990 check-kiting scheme for which the FBI questioned Creamer and which the United States noted was "investigated, with notice and warning to Defendant [Creamer], but by sheer grace was not charged . . . ." **Exhibit A** at 11. The earliest charged crime was the 1993 fraud, which "was not a short-running, temporary affair" but at least nine months long. "As early as March 1993, Defendant [Creamer] was churning the kite accounts with deposits and withdrawals that **each month** approximated [the entity's] gross income for the **entire year**. *Id.* at 9 (emphasis added). From March until September of that year, Creamer "churned approximately $42 million in deposits through the kite accounts, before he nearly doubled that amount in the remaining three months of the calendar years." *Id.* at 8; *see also* Gov. Exh. C to same. Next came Creamer's 1996

---

[1] Plaintiffs write in their introductory paragraph that Project Veritas Parties seek to introduce this evidence for the purpose of showing "in Defendants' own words, Mr. Creamer is a 'bad actor' . . . ." [D.E. 90] at 1. Plaintiffs excerpt that phrase from a sentence which is absolutely clear: "That Creamer was a criminal political operative and historical bad actor emphasized the newsworthiness of the story Project Veritas pursued." [D.E. 85] at 14.

scheme. In short order, the 1996 scheme flowed into Creamer's 1997 scheme: "defendant [Creamer] started the new year where he left off with the old – rampantly kiting, only with a different roster of banks." *Id.* at 9 n.6. "From January through March 1997 alone, defendant [Creamer] churned the 1997 kite accounts with over $71 million in largely kited deposits before piling on an additional $95 million in kite churning transactions in April and May 1997." *Id.* at 9-10 n.6; Gov. Exh. F to same. When banks finally discovered the fraud and froze the accounts Creamer manipulated, one of them had a negative balance of approximately -$2.385 million. [D.E. 85-1], Creamer Plea Agreement at 9-10. Creamer turned to his tax crimes, which he committed beginning in 1996 and running through 2000, in order to cover the debts of the entity he used in his rampant bank fraud. *Id.* at 9-10; [D.E. 85-3], Creamer Indictment at 22-32. Creamer willfully failed to pay over $50,000[2] in withholding taxes to the United States. [D.E. 95-1], Creamer Plea Agreement at 10.

Plaintiffs cite *United States v. Thorne*, No. 18-cr-389 (BAH), 2020 WL 122985 at *7 (D.D.C. Jan. 10, 2020) for its quotation of the 1974 Advisory Committee notes that convictions should be only admitted under Rule 609(b) in exceptional circumstances. Plaintiffs ignore that Chief Judge Howell ruled that the criminal defendant's prior conviction for a felony drug offense was admissible in *Thorne*, on far less compelling grounds. The reasons behind her ruling on the admissibility of that felony drug offense apply with even greater force to Creamer's felony convictions for bank fraud and tax crime. For example, the conviction was for "a serious crime

---

[2] Plaintiffs attempt to minimize Creamer's tax crimes by claiming that "the second offense to which Mr. Creamer pleaded guilty is failing to pay $1,892 in federal income tax withholdings . . . " [D.E. 90] at 2. This characterization is too clever by half, because while that is the amount referenced in the specific tax count to which Creamer pled (Count 21 of the Indictment), Creamer *also* agreed that relevant conduct for that count included "an additional $48,114 in federal income tax withholdings, FICA taxes and Medicare withholdings" which he had "similarly failed to pay over" to the IRS. [D.E. 95-1] Creamer Plea Agreement at 10.

and thus reflects more strongly on his credibility than a mere 'crime of impulse.'" *Id.* at 24 (citations omitted). Creamer was convicted of serious felonies which were deliberately planned and executed by Creamer over nearly a decade and which involve deception. The criminal defendant in *Thorne* was only 22 years old at the time of conviction, but Chief Judge Howell viewed his role in the drug transaction and the quantity of drugs involved as suggestive that the prior conviction was not "simply a youthful indiscretion." *Id.* Creamer was in his 50s at the time of his conviction, was the mastermind of the offense, kited over $100 million dollars of checks, and willfully failed to pay over $50,000 of withholding taxes to the government.

Plaintiffs' other principal Rule 609(b) case is Judge Kollar-Kotelly's ruling on totally inapposite facts in *United States v. Pettiford*, 238 F.R.D. 33 (D.D.C. 2006). The potential Rule 609(b) conviction in that case was a criminal defendant's conviction, which was an older conviction than Creamer's, for carrying a pistol without a license under the D.C. Code,[3] committed when the criminal defendant was a young man who had apparently been "caught up in the fast lane, growing up with older boys," and "[m]oreover, the Government will already have the ability to attack Defendant's credibility using his felony conviction for second-degree murder while armed . . . ." *Id.* at 42-43.

In fact, cases involving convictions like Creamer's, or cases where the witness to be impeached is a civil plaintiff, are exactly the kind of cases Courts are willing to find the requirements of Rule 609(b) satisfied. *Mattiaccio v. DHA Group, Inc.*, Case No. 12-1249, 2019 WL 6498865, *16 (D.D.C. Dec. 3, 2019) (Kollar-Kotelly, J.) (civil plaintiff's conviction for obtaining money by false pretenses under Virginia law was admissible); *United States v. Bumagin*,

---

[3] It was even uncertain whether the unlicensed pistol conviction was a misdemeanor or felony at the time of commission, although the court ultimately assumed it was a felony for purposes of the motion. *Id.* at 38

136 F. Supp. 3d 361 (E.D.N.Y. 2015) (bank fraud conspiracy conviction admissible 15 years after release because "the impeachment value of a fraud conviction is high" and bears significantly on the "propensity to testify truthfully"); *Herbst v. LBO Holdings, Inc.* 783 F. Supp. 2d 262 (D.N.H. 2011) (civil plaintiff's federal mail fraud conviction was admissible); *Sanders v. Ritz-Carlton Hotel Co., LLC*, Case No. 05-CV-6385, 2008 WL 4155635 (S.D.N.Y. Sept. 9, 2008) (Leisure, J.); (civil plaintiff's 19-20 year old federal tax evasion conviction admissible); *Salmons Inc. v. First Citizens Bank & Trust*, Case No. 2:10cv72, 2011 WL 4828838 (E.D. Va. Oct. 11, 2011) (Doumar, J.) (23 year-old bank fraud conviction admissible against the principal of civil plaintiff entity).

I(A). Creamer's Federal Felony Convictions for Bank Fraud and the Willful Failure to Pay Withholding Taxes are Highly Probative of His Lack of Credibility and Truthfulness.

Much of Plaintiffs' probity argument focuses on the statutory elements of his crimes and attempting to draw analogies to other offenses and contexts other than Rule 609(b), in an attempt to argue they were not crimes of dishonesty. This is a misguided analysis. When a person has pled guilty to felonies involving dishonesty like Creamer has, it certainly *helps* to demonstrate why the felony convictions are highly probative under Rule 609(b). But it is not a requirement. It is enough that the crime of conviction be a felony, as was the case when Chief Judge Howell recently ruled a felony drug conviction was admissible pursuant to Rule 609(b). *Thorne*, *supra*. The underlying logic of Rule 609 is the

> common-sense proposition that a person who has flouted society's most fundamental norms, as embodied in its felony statutes, is less likely than other members of society to be deterred from lying under oath in a trial by the solemnity of the oath, the (miniscule) danger of prosecution for perjury, or internalized ethical norms against lying.

*Mattiaccio*, 2019 WL 6498865 at *11 (citations omitted).

Plaintiffs are not availed by their argument that there are *some* ways to commit bank fraud that do not require prosecutors to prove a false statement.[4] Creamer committed *his* crimes in a way that did involve dishonesty and deceit, over the course of nearly a decade. He made this explicit in his plea agreement, in which he admitted factual statements about dishonest and deceptive conduct including "creating materially false and fraudulently inflated account balances" and instructing his employees to use specific ATMs in order to lengthen processing times to avoid detection. [D.E. 85-1], Creamer Plea Agreement at 4-5. The bank fraud count to which Creamer pled guilty (Count One) also specifically included in the charging language that Creamer "devised, **intended to deceive**, and participated in a scheme to defraud" three different banks. [D.E. 85-3], Creamer Indictment at 3. The charged facts underlying that count included that "CREAMER caused insufficiently funded checks and wire transfers to be drawn on certain of the accounts he controlled and deposited into other accounts he controlled, for the purpose of **creating the materially false and fraudulent appearance** of balance in the recipient accounts **in order to deceive** the respective financial institutions . . . ." *Id.* at 3-4.

To borrow the words of the United States of America on the occasion of Creamer's sentencing, Creamer is "a fraudster and tax scofflaw." **Exhibit A**. at 2. Creamer's prior attempts to minimize his frauds and the means and methods he used to perpetrate them (despite his detailed

---

[4] Plaintiffs' cite two Seventh Circuit criminal cases which analyze check-kiting in the context of challenges by criminal defendants which have nothing to do with Rule 609. Plaintiffs also attempt to analogize Creamer's crimes to inapposite offenses, mere *misdemeanors* considered under Rule 609(a)(2). [D.E. 90] at 4 (citing *United States v. Barb,* 20 F.3d 694 (6th Cir. 1994) (misdemeanor state court bad check conviction)); *Id.* at 5 (citing *Cree v. Hatcher*, 969 F.2d 34 (3d Cir. 1992) (misdemeanor willful failure to file tax return)). Further emphasizing the weakness of the bad check analogy, one federal Circuit Court of Appeals *has* affirmed the admission of a bad check conviction under Rule 609(b). *United States v. Colon*, 480 Fed. Appx. 509, 513 (11th Cir. 2012).

admissions in his plea agreement), prompted the United States of America to make the record thorough at sentencing, emphasizing the multiplicity of Creamer's crimes and their significance:

- "Defendant [Creamer] notably avoids acknowledging that the conduct to which he pleaded guilty was part of a near ceaseless years long business modus operandi of cyclically availing himself of the money of others, without authorization, without request, without notice, for long periods of time – sometimes bank money, sometimes tax monies Defendant [Creamer] held in trust for his employees, and sometimes receivables Defendant [Creamer] knew were pledged to his financiers." *Id.* at 15.

- "He purposefully broke the law, repeatedly, cyclically, over many years, for long stretches." *Id.* at 16.

- "Defendant [Creamer] committed multiple crimes, over many years. He kited over $100 million dollars in checks and knowingly diverted funds owed to the IRS over the course of many years." *Id.* at 11.

- "As is the case with his serial check-kiting, Defendant acted unlawfully, made repayment only after he was caught, and now fashions a post-hoc rationalization of good intentions and the pursuit of better angels to try to escape the penal consequences for his knowing misconduct." *Id.* at 13.

Plaintiffs' Opposition continues this "post-hoc rationalization of good intentions and the pursuit of better angels," *id.*, by arguing he was trying to keep his political group afloat, to escape the consequence of his convictions being used to impeach him under Rule 609(b). The federal prosecutor[5] referred to this as Creamer's "self-delusion." *Id.* at 16. In fact, by committing tax crimes, Creamer was "draining off funds to the federal fisc that ostensibly might have funded the very social welfare programs Defendant [Creamer] high-handedly claims to promote." *Id.* at 14. The prosecutor also noted Creamer's attempt to "use a years-long cycle of financial crimes" in which he "help[ed] himself to money that belonged to someone else" as an occasion for "hagiography." **Exhibit A** at 1.

---

[5] The prosecutor has spent his career in public service exposing fraud and public corruption, serving as the Deputy Chief and then Chief of the Money Laundering and Forfeiture Section of the United States Attorney's Office in the Northern District of Illinois. He now serves as the Inspector General for the City of Chicago.

It does not make the convictions a bit less probative that Creamer embraced bank fraud and tax crime as a means to maintain the organization that had been his livelihood and source of notoriety and political power for over 20 years. Creamer was "presiding over a financial wreck of an organization that was technically and functionally bankrupt." **Exhibit A** at 7-8. The ability to maintain it (through a criminal campaign of financial crimes and deceit) helped ensure Creamer's "public notoriety, acclaim, and a decent salary, all of which would have disappeared if Defendant[] [Creamer's] organization had tanked or had to downsize to function consistently with its resources." *Id.* at 11.

Plaintiffs also argue that the banks he defrauded did not ultimately end up losing money out-of-pocket. However, with one exception, "Defendant [Creamer] **never paid a cent to any victim until after he got caught**." *Id.* at 11 (emphasis added). That exception is also arguably a fraud in its own right: Creamer obtained a loan from New York lenders for an entirely different purpose and instead used those loan proceeds to pay off his 1996 check-kiting scheme. *Id.* "Defendant [Creamer] was knowingly robbing Peter – the New York lenders – to pay Paul – the victim banks, by using the very receivables *he personally* had pledged to secure the New York [loan]. The banks ultimately were made nearly whole, but the New York lenders were left with a default on their million dollar loan and none of the liquid receivables pledged to secure the note." *Id.* at 10. The New York lenders ultimately exercised their right to step in and attempted to run the Creamer entity's business as a going concern and "they were met with not only the absence of receivables, but also a mountain of overdue bills." *Id.* at 10 n.7. Moreover, Creamer's tax crimes arose following the collapse of the bank fraud schemes, when Creamer chose not to pay withholding taxes over to the United States but instead convert those funds to pay off his entity's

debts. [D.E. 85-1], Creamer Plea Agreement at 9-10. This is merely shuffling from victim-to-victim, in Ponzi-like fashion.

Creamer separated banks from their money by carefully orchestrating inflated bank balances and tricking them into honoring checks drawn against counts with insufficient funds, and then finding new victims. Far from suggesting that the fraud and tax crime felony convictions are not probative of Creamer's lack of truthfulness, the facts underlying Plaintiffs' 'banks didn't suffer out-of-pocket loss' argument actually highlight the profound dishonesty of Creamer's decade-long criminal campaign running from his uncharged 1990 bank fraud scheme, through the 1993, 1996, and 1997 bank fraud schemes admitted in his plea agreement, to his admitted failure to pay withholding taxes which continued through 2000.

Creamer also highlights quotes from the sentencing judge taken from news articles (not the sentencing transcript, which Plaintiffs do not supply), perhaps as though this somehow indicates the judge agreed with Creamer that Creamer's years-long campaign of fraud and tax crimes were not especially serious. Not so. In fact, the judge rejected Creamer's sentencing position, which was a request for house arrest. To use the words of the federal prosecutor, Creamer's request would have been "the equivalent of sending Defendant [Creamer] to his room – in this instance his five-bedroom North Shore home – from where Defendant offers himself up to carry on the very work he would have engaged [in] had he never been exposed as a fraudster and tax scofflaw." *Id.* at 1-2.  Fortunately for the interests of justice, Creamer was sentenced to five months in federal prison instead of escaping consequences in his home which "as sketched out in the PSR" would "by location alone likely be valued around the seven figure mark*." Id*. at 14-15 n.8.

I(B). The Length of Time Since Creamer's Release from Federal Prison is No Obstacle to Admissibility.

Plaintiffs argue that the Project Veritas Parties "fail to acknowledge" "that the conduct for which Mr. Creamer was charged actually took place in 1997 (bank fraud) and 1998 (failure to pay taxes) – *more than twenty years ago*." [D.E. 90] at 5 (emphasis theirs). Plaintiffs are wrong for several reasons.

First, the relevant date for Rule 609(b) purposes is "the witness's conviction or release from confinement for it, whichever is later." Creamer was released from federal prison on November 3, 2006 – it has been 13.5 years since his release, and courts admit older convictions for such crimes as Creamer's under Rule 609(b). *Salmons Inc.*, 2011 WL 4828838, at *2 (Oct. 11, 2011) (23 year old bank fraud conviction admissible); *Bumagin*, 136 F. Supp. 3d 361 (bank fraud conspiracy conviction admissible approximately 15 years after release); *Sanders*, 2008 WL 4155635 at *4-6 (tax evasion conviction admissible 19-20 years after release).

Second, Plaintiffs are wrong about the basic timeframe of Creamer's crimes. The earliest of the charged crimes was a bank fraud beginning on or about October 1993. [D.E. 85-3], Creamer Indictment at 17. The last charged crime was a failure to pay withholding taxes due April 30, 2000. *Id.* at 24. In his Plea Agreement, Creamer agreed that this was relevant conduct. [D.E. 85-1], Creamer Plea Agreement at 6-8 (bank fraud counts); 10 (willful failure to pay withholding taxes). It is not the Project Veritas Parties who "fail to acknowledge" the correct time span of Creamer's crimes, but Plaintiffs themselves. *Compare* Project Veritas Parties' Mot. [D.E. 85] at 2 ("The Indictment was structured around three of Creamer's check-kiting schemes; one which occurred in 1993, another in 1996, and another in 1997.") and 3 ("The counts charging Creamer with willfully failing to pay taxes he withheld from employees covers specified fiscal quarters from 1996 to 2000.").

Thus, Creamer's crimes spanned from when he was in his 40s into his 50s. The time between his crimes and his prosecution for them was lengthened because Creamer himself requested, and the United States acceded to, a series of tolling agreements for the purpose of "holding off charges so that he could provide additional evidence and justification for not being charged with the crimes for which he was ultimately charged, and to which he has pled guilty." **Exhibit A** at 14.  Creamer had even tried to delay further pre-indictment, but the United States did not agree. *Id.* He also obtained a delay after sentencing to allow self-surrender to the Bureau of Prisons at the prison to which he was designated. [D.E. 85-4], Creamer Judgment at 2. As with so much else, Creamer made his bed, he must now lie in it.

I(C). Creamer's Credibility is a Central Issue at Trial.

Plaintiffs' have staked their claims on Creamer's credibility. He is the sole individual Plaintiff. Plaintiff Strategic Consulting Group, N.A. is his wholly-owned entity. And he is the authority at Democracy Partners. Creamer is the driving force of this lawsuit and supplied the only witness affidavit on which Plaintiffs relied at the summary judgment stage. [D.E. 68-2].

Plaintiffs' view of the facts leans heavily on interpretation and implication instead of hard evidence. This has been true at every stage of the litigation and will necessarily be what Plaintiffs continue at trial. For example, Plaintiffs claim that investigative journalist Allison Maass obtained access to "confidential" information. But none of the materials she received were ever marked confidential and she was never told any of the materials were confidential. Instead, Plaintiffs have relied on "implied" duties, including based on Creamer's passing comment after Ms. Maass had already started the internship, "And, uh, [Windsor] has some kind of a nondisclosure agreement to sign or something." [D.E. 63-36], PVA00013211 at 02:21 to 02:38. It is undisputed that no agreement was ever even drafted much less offered to Ms. Maass, and no written agreement of

any kind governed her unpaid, part-time, three-week long internship. Plaintiffs have no experts, and if they intend to offer any evidence in support of their arguments on these and similar issues, it can only come through Creamer – the one who offered Ms. Maass the unpaid internship and supervised her menial tasks during it. *See e.g.* [D.E. 68-2], Creamer Affidavit at ¶¶23-24 (Creamer admission that he suggested to investigative journalist Allison Maass that she might be a good fit as an intern at Democracy Partners and that he offered her the unpaid internship); ¶25 (admission that Ms. Maas worked under Creamer's direction during her unpaid internship with Democracy Partners). They will ask the jury to take Creamer's word over what the documents and hours of recorded video demonstrate.

Moreover, it is apparent that despite Plaintiffs' quite appropriate choice not to bring a meritless defamation claim, Creamer will seek to deny his associate Foval's statements about Creamer. Creamer's summary judgment affidavit is replete with denials of the wrongdoing Foval attributed to him when Foval was recorded by investigative journalist Christian Hartsock. *Id.* at ¶12 (Creamer denying he has advised anyone to execute a voter fraud scenario), ¶13 (Creamer denying suggesting to Foval that Creamer does not care what the "legal or ethics people say, we need to win this motherfucker."); ¶14 (Creamer denying his involvement in instigating fights or attacks at campaign rallies). The fact that Creamer wishes to challenge his associate Foval's veracity in this manner, further emphasizes the importance of Creamer's personal credibility at trial.

I(D). There is No Risk of Prejudice; the Jury Will be Able to Take Creamer's Federal Felony Convictions for Their Proper Purpose.

Plaintiffs do not seriously challenge the analysis with regard to lack of prejudice. Their Opposition concedes that the risk of prejudice is lower in civil cases, [D.E. 90] at 9. Plaintiffs articulate no specific reason why impeaching Creamer with his felony convictions would be

prejudicial, merely reciting that the risk is "manifestly substantial." And they have certainly ventured no argument why an appropriate limiting jury instruction would not cure any arguable prejudice.

It is true Creamer's crimes are serious felonies. He deceived banks, tricking them into allowing checks to be drawn on accounts that were at times millions of dollars in the negative (including the last days of his scheme when banks discovered his fraud and froze accounts and one bank balance was as low as negative $2.385 million). [D.E. 85-1], Creamer Plea Agreement at 6. Then he turned to tax crimes, converting withheld funds for his own entity's use instead of paying them over to the United States of America as the law required. *Id.* at 9-10. But these felony convictions for bank fraud and tax crime are readily capable of being taken for their proper purpose in evaluating his lack of credibility pursuant to Rule 609(b).

Creamer's financial crimes are relatively sterile; a far cry from something like a murder, child pornography, or even a felony drug conviction (as was found admissible by Chief Judge Howell in *Thorne*). Any arguable prejudice is further minimized by the fact that Creamer chose to come into court as a civil plaintiff and stake his claims on his credibility. There are consequences for this choice, and one of them is that the jury must hear of his criminal convictions so it can evaluate the credibility of his testimony. This risk of prejudice is a concern dealing primarily with accused persons, not with the accuser. Creamer does not bear this risk.

As discussed below, the jury must also necessarily hear of Creamer's conviction as direct evidence of other crucial trial issues. This is the result of how Plaintiffs' chose to frame their case and what they chose to place at issue. The risk of prejudice is further minimized when the jury must hear of them for some other purpose. There will be no unfair prejudice created by the further admission of Creamer's federal felonies for impeachment purposes. Any minimal prejudicial

effect from introducing Creamer's felony convictions for impeachment purposes is substantially outweighed by its probative value for the jury's assessment

**II. Project Veritas's Prior Knowledge of Creamer's Crimes is Independently Admissible to Establish the Project Veritas Parties' Journalistic Purpose in Investigating a Newsworthy Story and to Rebut Plaintiffs' Claims of "Tortious Purpose," "Infiltration," and the Like.**

At the outset, the Project Veritas Parties must address Plaintiffs' mendacious claim, "[I]n Defendants' two full pages of discussion, in their Motion in Limine of the 'genesis' of their 'investigation' (Def. Mot. at 13-14), there is *not a single mention* of Mr. Creamer's prior conviction." [D.E. 90] at 9 (Plaintiffs' emphasis). **The Project Veritas Parties discussed this point, and did so precisely on page 14 (the page Plaintiffs explicitly claim it was not):**

> This prompted Project Veritas to begin its journalistic research as to Creamer. That same month, Project Veritas learned that "Robert Creamer is a convicted felon." *See* **Exhibit I**, 4/28/16 Email of R. Verney to J. O'Keefe. This was five months before investigative journalist Allison Maass started her unpaid internship with Democracy Partners.
>
> Far from Plaintiffs' claims of a "tortious purpose" and the like, Project Veritas organically followed the threads of this news story to Creamer. That Creamer was a criminal political operative and historical bad actor emphasized the newsworthiness of the story Project Veritas pursued.

[D.E. 85] at 14. Worse, Plaintiffs compound their deception by going on to cite the sentence "That Creamer was a criminal political operative and historical bad actor emphasized the newsworthiness of the story Project Veritas pursued[,] (Def. Mot. at 14)" and then describe it as "unsupported" and "out of nowhere" **even though the immediately preceding paragraph is the one where the Project Veritas Parties discuss their pre-internship knowledge of Creamer's convictions, and even though immediately following sentence is: "What Project Veritas knew at the time about Creamer's felony convictions is admissible at trial to demonstrate Project Veritas's newsgathering purposes and to rebut the arguments that Plaintiffs hinge their case on."**

*Compare* [D.E. 90] at 5 to [D.E. 85] at 14 and 14-15. This is not responsible advocacy by Plaintiffs. Instead it is a hit job, manipulating the truth and deceptively editing the facts to the Court.

A central dispute at trial will be whether there was a "tortious purpose" with regard to the 18 U.S.C. § 2511 claim and the D.C. Code § 23-542 claim.  Plaintiffs argue that the purpose was to breach a fiduciary duty. In fact, the purpose was the non-tortious purpose of investigating and reporting a newsworthy story. *See, e.g.*, *Vasquez-Santos v. El Mundo Broadcasting Corp.*, 283 F. Supp. 2d 561 (D.P.R. 2003) (defendant broadcast journalist prevailed on summary judgment in § 2511 case because Plaintiff showed no tortious purpose for recording as opposed to the purpose of gathering content for a broadcast). Additionally, as a matter of trial themes, it is also clear that Plaintiffs will characterize the work of investigative journalist Allison Maass and Project Veritas during her unpaid internship as an "infiltration" and deny the legitimacy of the journalism that they engage in and which led them to Creamer and Democracy Partners in the first place. *See e.g.* [D.E. 68], Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, *passim*.

By framing their case in this manner, Plaintiffs have made every single newsworthy fact the Project Veritas Parties knew about Creamer relevant, from the moment Foval first described the dishonest philosophy he shared with Creamer, up to and including what the Project Veritas Parties had learned by the time the tape started rolling on the last alleged "tortious purpose" recording.

That includes the Project Veritas Parties' research into Creamer's federal criminal conviction, known to them months before anyone from Project Veritas had spoken to Creamer (or anyone else from Democracy Partners), and even more months before Creamer offered investigative reporter Allison Maass her unpaid internship with Democracy Partners (which is the

sole basis of Plaintiffs' claims). The sequence of events is critical, and exposes Plaintiffs' false narrative that the Project Veritas "infiltrated" Democracy Partners through the unpaid internship the Creamer offered investigative journalist Allison Maass or had a "tortious purpose" in mind when she recorded. The Project Veritas Parties organically followed the threads of the news story, where it lead, and that was to Creamer and Democracy Partners.

The thread of that news story began when Creamer associate Scott Foval spoke to investigative reporter Christian Hartsock and first mentioned Creamer and Democracy Partners in April 2016. The Project Veritas Parties' Motion discusses some of what Foval attributed to Creamer in that conversation, including opining that Creamer was somebody who "hatches" schemes like the voter fraud scenario Foval brainstormed about with Mr. Hartsock "on an ongoing basis," and that "Bob Creamer comes up with a lot of these ideas." [D.E. 85] at 14. Foval also made his close relationship with Creamer plain, including among describing how he works "with Bob Creamer one to one. I'm the white hat, Democracy Partners is kind of a dark hat. I will probably end up being a partner there at some point, because our philosophy is actually the same." and "Bob Creamer is diabolical and I love him for it." *Id.* (citing recordings).

An admittedly dirty political operative willing to brainstorm how to commit voter fraud more effectively, pointing the way to a close associate who shares the same "philosophy" and "hatches" such voter fraud ideas regularly, was a natural journalistic lead to follow.

Especially when the Project Veritas Parties learned that the "diabolical" Creamer was a convicted felon.

Shortly after the conversation with Foval, the Project Veritas Parties began researching Creamer, and learned of his criminal past. For example, on April 28, 2016, James O'Keefe was

emailed the following regarding an initial transcript from the conversation in which Foval

brainstormed about voter fraud and identified Creamer as someone who "hatches" such schemes:

> James
> This transcript below refers to Bob Cramer [sic] and Democracy Partners.
> This news story about a hearing in Congress refers to Robert Creamer of
> Democracy Partners who is married to the ranking D on the House Select
> Committee on Infant Lives investigating Planned Parenthood and the selling of fetal
> tissue.        Robert        Creamer        is        a        convicted        felon.
> http://thefederalist.com/2016/04/28/how-the-abortion-industry-bought-off-the-
> top-democratic-leader-investigating-planned-parenthood/
> Russ

[D.E. 85-9].  The linked news article described, and made the Project Veritas Parties aware of, the

circumstances of Creamer's felonies:

> [Rep.] Schakowsky, who has been in office since 1999, is married to Robert
> Creamer, a community organizer and national progressive organizer. His firm,
> Democracy Partners, runs progressive issue campaigns. More on that in a bit. For
> now we'll note he was convicted of federal tax violations and bank fraud in 2005.
> He made a plea deal after being indicted on 16 counts of bank fraud in a check-
> kiting scheme that led banks to experience shortfalls of $2.3 million.

(link active as of May 7, 2020). This was among the information known to the Project Veritas

Parties months before Project Veritas made contact with Creamer in June 2016, and months before

Creamer offered investigative journalist Allison Maass an unpaid internship with Democracy

Partners in August 2016. The internship itself started on September 21, 2016. Having accused the

Project Veritas of a "tortious purpose" for recording, Plaintiffs squarely place at issue the Project

Veritas Parties advance knowledge of Creamer's felonies, and how that knowledge contributes to

their proper journalistic purposes in following Foval's leads to Creamer.

17

### III. The Details of Creamer's Crimes are Also Independently Admissible as They Were Reported on by the Project Veritas Parties in "Rigging the Election," Part I, the Video AFSCME Viewed As "Very Unfortunate Distraction, and We Didn't Want to be a Party to It."

In an attempt to avoid the Project Veritas Parties' First Amendment protections, Plaintiffs have disclaimed reputational damages and "maintain[] that they are seeking only damages proximately caused by [the Project Veritas Parties'] non-expressive conduct," namely lost business from AFSCME (which stopped paying Strategic for political consulting work following the release of "Rigging the Election" Part I) and AUFC (which could no longer pay Strategic for political consulting work and went out of business following AFSCME's contemporaneous decision not to fund it). *See* [D.E. 83], Memorandum Order on Summary Judgment at 13-18. The Court ruled that viewing the evidence in the light most favorable to Plaintiffs, "this is not the exceptional case where it can find as a matter of law that plaintiffs' [sic] non-expressive conduct was not a proximate cause of AFSCME's decision to cancel its contract with Strategic Consulting." *Id.* at 17.[6] First Amendment/Causation issues will be a critical contested issue at trial, particularly given the testimony of AFSCME's Rule 30(b)(6) witness that "the broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it." **Exhibit B** at 78:22-79:5. That video includes reporting on Creamer's prior crimes, and must be admitted in support of the Project Veritas Parties' argument that Plaintiffs' claims fail on lack of causation:

---

[6] The Project Veritas Parties have filed a Motion for Reconsideration addressing the discrete issue of a misapprehension of fact regarding the AFSCME Rule 30(b)(6) witness testimony on which the Court based its ruling in this regard. [D.E. 87].



Bob Creamer is Democracy Partners. He is the husband of Jan Schakowsky, a Democratic Congresswoman from Chicago. And in 2005, he pled guilty to tax violations and bank fraud. He was convicted and sentenced to five months in prison and eleven months of house arrest. He founded Democracy Partners in 2011.

[D.E. 63-6] (CD), "Rigging the Election" Part I at 4:01-4:20 (screenshot from 4:20). This is a clinical and accurate reporting of Creamer's crimes and his sentence. And it is an explicit part of the "video in itself and the way it was released" that AFSCME found such an "unfortunate distraction" that it "didn't want to be a party to it" and terminated its contract with Creamer's entity Strategic. **Exhibit B** at 78:22-79:5. The entire video must be shown to the jury, including the discussion of Creamer's conviction, given the simple fact of the timing of the cancellation and AFSCME's clear testimony that they reacted to "the video in itself" and not any alleged infiltration. It is an inextricable part of "the video in itself." What reputable labor union would want to be seen as employing a bank fraudster and tax cheat as its consultant, especially considering Creamer's own admissions broadcast in Video I and how Foval characterized Creamer in that reporting, on the eve of the election? This is what Plaintiffs have put at issue in framing their theory based on the termination of AFSCME's contract, and the Project Veritas Parties are entitled to respond at trial.

*Salmons Inc.*, 2011 WL 4828838, is a persuasively reasoned case on point. It was a civil case in which the defense sought to admit the conviction of the civil plaintiff's principal. Like Creamer, the principal came into court as a convicted bank fraudster. Like Creamer, the bank fraud conviction also implicated Rule 609(b) (and the court also admitted it for impeachment despite that bank fraud conviction being almost a decade older than Creamer's bank fraud conviction). Like Creamer, the conviction was also direct evidence of the defense's contrary theory of (lack of) causation. The issue was:

> whether Defendant's alleged fraudulent conduct was the proximate cause of Plaintiff's damages. Specifically, Defendant argues that the conviction and bankruptcy show that there were valid reasons, other than [Defendant's conduct] why Plaintiff could not obtain funding from other lenders to cover its margin calls[.]

*Id.* at *3. The court agreed it was relevant, not unfairly prejudicial under Rule 403, and ruled that Plaintiff had raised the issue "and has directed the blame toward Defendant[,]" and accordingly the conviction was admissible as direct evidence. *Id.*

Causation will be an important issue at trial: Plaintiffs have survived summary judgment on causation, but their remaining damages claims hinge on Strategic's lost business from AFSCME, and AFSCME's Rule 30(b)(6) witness testified that the reason for terminating AFSCME's contract with Strategic, the concern was "regardless of the circumstances that led to the video[.]" **Exhibit B**, Excerpts of AFSCME R. 30(b)(6) witness Scott Frey Depo. Tr. at 78:22-79:5. The Project Veritas Parties are entitled to rebut Plaintiffs' characterizations by showing the full video AFSCME reacted to, and that includes its discussion of Creamer's convictions.

## IV. Conclusion

A bank fraudster and tax cheat who pled guilty to two felonies and served time in federal prison, Creamer has come into this Court as a civil plaintiff, peddling a claim that puts his credibility front and center, and accusing the Project Veritas Project Veritas Parties of acting with

a "tortious purpose" when they investigated and reported on him in "Rigging the Election." In doing so, Creamer chose to place his crimes front and center. Accordingly, the Court should order:

(1) Creamer's federal felony convictions for bank fraud and the willful failure to pay withholding taxes are admissible as impeachment pursuant to Rule 609(b);

(2) the Project Veritas Parties' knowledge of Creamer's felony convictions prior to Allison Maass's unpaid internship is admissible as direct evidence of the Project Veritas Parties lack of "tortious purpose," to rebut allegations of "infiltration" or the like, and to show their journalistic purpose in gathering the news; and

(3) The description of Creamer's criminal case in "Rigging the Election," Part I is admissible as direct evidence.

Respectfully submitted,

By:   /s/ Paul A. Calli
Paul A. Calli
Florida Bar No. 994121
Chas Short
Florida Bar No. 70633
CALLI LAW, LLC
14 NE 1st Ave, Suite 1100
Miami, FL 33132
Telephone: (786) 504-0911
Facsimile (786) 504-0912
PCalli@Calli-Law.com
CShort@Calli-Law.com
*Admitted pro hac vice*

/s/ Kerry Brainard Verdi
Kerry Brainard Verdi, Esq.
Bar No. 478486
Benjamin R. Ogletree
Bar No. 475094
VERDI & OGLETREE PLLC
1325 G Street, NW, Suite 500

/s/ Michael J. Madigan
Michael J. Madigan
Bar No. 71183
LAW OFFICES OF MIKE MADIGAN PLLC
3910 Hillandale Court NW
Washington DC 20007
Telephone: (202) 255-2055

Washington, DC 20005
Telephone: (202) 449-7703
Facsimile: (202) 449-7701
kverdi@verdiogletree.com

/s/ Benjamin T. Barr
Benjamin Barr (*Pro Hac Vice*)
Stephen R. Klein
Bar No. 177056
BARR & KLEIN PLLC
444 N. Michigan Ave. #1200
Chicago, Illinois 60611
Telephone: (202) 719-1717
ben@barrklein.com
BARR & KLEIN PLLC
1629 K Street NW
Suite 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@barrklein.com

Mjm20@mac.com

*Counsel for Defendants Project
Veritas Action Fund, Project Veritas,
James O'Keefe, and Allison Maass*

## CERTIFICATE OF SERVICE

I CERTIFY that on May 13, 2020, I served the foregoing through the Court's electronic

filing system which served a copy on all counsel of record.

/s/ Paul A. Calli
Paul A. Calli, Esq.