UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC,                    CASE NO.: 1:17-CV-1047-ESH
et al.,

       Plaintiffs,

v.

PROJECT VERITAS ACTION FUND,
et al.,

       Defendants.

_____/

## PROJECT VERITAS PARTIES' MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' POLITICALLY-MOTIVATED EFFORTS TO INTRODUCE IRRELEVANT EVIDENCE

This is a case about investigative journalism and the First Amendment. In an effort to avoid First Amendment scrutiny, Plaintiffs' conceal their true intent by asserting claims unsupported by fact and law. Their case boils down to a First Amendment-offending complaint that truthful reporting by Project Veritas caused Plaintiffs to lose political consulting business.

After the investigative journalists of Project Veritas reported on the unethical conduct and dirty tricks discussed by Plaintiffs' partisan political consultants and their associates during the 2016 Presidential election, Plaintiffs filed this lawsuit. In their misuse of the judicial system to achieve political ends and revenge, Plaintiffs have also coordinated litigation with other plaintiffs who sued Project Veritas. Plaintiffs deny the legitimacy of Project Veritas's journalism and seek to make this case a politically charged referendum on Donald Trump. But trial is a place for facts and law, not political grudges. Plaintiffs have telegraphed several permutations of their political tactics and accordingly the Project Veritas Parties move *in limine* to exclude irrelevant evidence and spurious political arguments regarding: (1) various categories of Donald Trump-related distractions, (2) Plaintiffs' efforts to mischaracterize Project Veritas as a "political spying

operation," and (3) absurd "Russia" references intended to capitalize on the fear among some that "Russian interference" swung the result of the 2016 election for Donald Trump.

**The Facts and Issues at Trial**

This case was assigned to the Court following the retirement of Judge Huvelle. For this reason, the Project Veritas Parties provide the following background regarding the facts and issues at trial.

In April 2016, an investigative journalist from Project Veritas recorded political consultant Scott Foval stating that his colleague Plaintiff Bob Creamer "hatches" voter fraud schemes "on an on-going basis" and that "Bob Creamer comes up with a lot of these ideas."  [D.E. 63-8] (DVD) PVA00013718 at 23:59-24:38. The conversation occurred when the journalist, using an assumed identity in order to obtain candid responses, floated the idea of a scenario to commit voter fraud by bringing in out-of-state voters to cast ballots. Foval enthusiastically engaged with the scenario and suggested ways to make it harder to detect, for example: "So you use shells. Use shell companies. Cars come from one company, the paychecks come from another. There's no bus involved, so you can't prove it's en masse, so it doesn't tip people off. That's what I'm saying." [D.E. 63-8] (DVD) PVA00013717 at 42:49-42:52. In addition to identifying Creamer as someone who "hatches" such schemes on "an ongoing basis," Foval also described his close relationship with Creamer, stating that he works "with Bob Creamer one to one. I'm the white hat, [Plaintiff] Democracy Partners is kind of a dark hat. I will probably end up being a partner there at some point, because our philosophy is actually the same." [D.E. 63-8] (DVD), PVA00013718 at 23:59-24:38. "Bob Creamer is diabolical and I love him for it." *Id.* [D.E. 63-6] (DVD) (Ex. 1, Part I) at 4:46-4:49.

In a later phone call, Foval doubled down on his description of the unethical philosophy he, Creamer, and Democracy Partners all share: "[AUFC President] Brad [Woodhouse], Bob [Creamer], [Democracy Partners Member Mike] Lux and myself are all part of the old school method where it doesn't matter what the friggin' legal or ethics people say, we need to win this motherfucker." *Id.* at 12:15-12:23.

Foval's close relationship and description of his "diabolical" colleague Creamer as someone who "hatches" voter fraud schemes "on an ongoing basis" and his description of Creamer's "dark hat" consulting business was an obvious newsworthy lead. In short order, the Project Veritas Parties also learned that Creamer was a felon who had been convicted of bank fraud and tax crimes in federal court and sentenced to prison. *United States v. Robert B. Creamer*, Case No. 1:04-cr-00281 (N.D. Ill.); *see also* [D.E. 85] (Project Veritas Parties' Motion to Admit Creamer's Felony Convictions for Bank Fraud and Tax Crimes).[1] He committed these prior felonies in connection with his political "work." The Project Veritas Parties also learned that Creamer was the spouse of a sitting member of Congress.  [D.E. 85-9].

The Project Veritas Parties' news investigation continued. Months after the first conversations with Foval, Creamer offered Project Veritas investigative journalist Allison Maass (who was using an assumed identity) an unpaid, part-time, internship at Democracy Partners. That unpaid internship was for three days each week and lasted three weeks. Ms. Maass recorded her interactions, and some of that footage was used in a four-part series of video broadcasts that Project Veritas released online titled, "Rigging the Election." In addition to Foval's brainstorming regarding the voter fraud scenario and his attribution of such schemes to Creamer, the reporting also exposed unethical conduct like placing activists at Trump campaign rallies to incite violence.

---

[1] The Motion is fully briefed and pending.

*See e.g.* [D.E. 63-6] (Ex. 1, Part I) at 2:18-2:37 ("If you're there and you're protesting and you do these actions, you will be attacked at Trump rallies. That's what we want . . . . The whole point of it is that Trump's people will freak the fuck out, his security team will freak out, and his supporters will lose their shit.") and 13:48-13:55 ("We have mentally ill people we pay to do shit. Make no mistake."). The Project Veritas Parties' reporting was in turn picked up by cable news and legacy media outlets including CNN, Fox News, and MSNBC.

"Rigging the Election" Part I prominently featured Creamer's associate Foval and included a small amount of footage (roughly 13% of the footage used in the broadcast) recorded during Ms. Maass's unpaid internship. The facts reported in Part I focused largely on:

**(a) Foval's admissions of trained activists provoking violence at campaign events,** (including citing a specific example from the Republican primary that Foval tied directly to Creamer: "You remember the Iowa state fair thing where Scott Walker grabbed the sign out of the dude's hand and then the dude gets kind of roughed up . . . That was all us. The guy that got roughed up is my counterpart who works for Bob." *Id.* at 12:15-12:23); and

**(b) Suspect coordination between a presidential campaign and Super PACs,** (another category of conduct Foval tied Creamer directly to: "The campaigns and DNC cannot go near [the Super PAC] Priorities, but I guaran-damn-tee you that the people who run the Super PACs all talk to each other and we and a few other people are the hubs of that communication . . . . We're consultants so we're not the official entity and so those conversations can be had between consultants who are working for different parts . . . That's why there's Bob [Creamer] who is the primary there and I'm a sub to him and I'm also a primary to AUFC separately. That's why." *Id.* at 5:34-6:26).

Part I also noted the fact of Creamer's federal convictions for bank fraud and tax crimes, his prison sentence, and that he was the spouse of a sitting member of Congress. *Id.* at 4:02-4:19.

The broadcast of that first video prompted Creamer to fire Foval, a group called AUFC to fire Foval, and Creamer to resign from the Clinton campaign. Of particular focus because it forms the basis of Plaintiffs' damages, following the broadcast of "Rigging the Election" Part I, a union (AFSCME) that paid Creamer's entity Strategic Consulting Group ("Strategic") chose not to continue using Strategic's political consulting services. AFSCME also contemporaneously withdrew its funding from AUFC. AUFC had employed Foval and employed Brad Woodhouse, a person whom Foval had described to a Project Veritas journalist as sharing in the same "it doesn't matter what the friggin' legal or ethical people say, we need to win this motherfucker" mentality of Foval, Creamer, and Democracy Partners member Mike Lux.

AUFC went out of business after AFSCME stopped funding it. Like AFSCME, AUFC had also paid Creamer's entity for political consulting work. The loss of these two sources of political consulting business forms the basis of Plaintiffs' alleged damages.  This was a construct Plaintiffs adopted to thread the needle of First Amendment protections by claiming to seek non-reputational damages only. It has been partly successful through the summary judgment stage (the predecessor Judge granted summary judgment in the Project Veritas Parties' favor as to another lost source of business), but the First Amendment/causation issues will be one of the major issues at trial. The unavoidable fact is that to the extent Plaintiffs lost any business at all, such losses were caused by Plaintiffs' own words and their associate Foval's own words, coming out of their own mouths. As AFSCME's Rule 30(b)(6) witness testified, "[T]he broader concern was just clearly, regardless of the circumstances that led to the video, the video in itself and the way it was released and the timing was a very unfortunate distraction, and we didn't want to be party to it." [D.E. 63-11] at

5

78:22-79:1-5.[2] And no wonder: what reputable labor union would continue to hire a political consultant now widely exposed to the public as a convicted bank fraudster and whom his colleague described as not caring "what the friggin' legal or ethical people say"?

Plaintiffs frame their causes of action on Ms. Maass's unpaid, part-time, three day per week internship. The partial granting of the Project Veritas Parties' Motion for Summary Judgment eliminated causes of action for breach of fiduciary duty and trespass. The remaining counts at trial allege unlawful interception of oral communications under federal law (18 U.S.C. § 2511 *et. seq.*), unlawful interception of oral communications under D.C. law (D.C. CODE § 23-541, *et. seq.*), fraudulent misrepresentation, and civil conspiracy.

Plaintiffs' framing of their claims in this manner, based solely on investigative journalist Allison Maass's unpaid internship with Plaintiff Democracy Partners, gives rise to the second major trial issue. Ms. Maass was a party to every conversation she recorded during the unpaid

---

[2] Judge Huvelle nonetheless denied summary judgment, finding a disputed issue of fact existed in light of the AFSCME Rule 30(b)(6) testimony, including noting that the witness's one-word affirmative answer on cross-examination when Plaintiffs' counsel asked whether "part of" AFSCME's "concern" was that plaintiffs "had allowed their offices to be infiltrated by a Project Veritas operative," "would be sufficient evidence – when viewed in the light most favorable to plaintiffs – to defeat defendants' motion for summary judgment on the issue of whether defendants' non-First Amendment activity was a substantial factor in bringing about the damages attributable to AFSCME's cancellation of their contract." [D.E. 95] at 4-5; [D.E. 87-1] (Tr. at 102:16-19) (one word affirmative answer).

As the evidence at trial will show, even this is a reaction to Plaintiffs' own conduct, namely their chronic choice not to vet those with whom Creamer worked. Creamer and Democracy Partners offered Ms. Maass the unpaid internship because they hoped to get a donation from her "uncle," chose not to ask for a resume before offering the internship, chose not to ask for a list of references, chose not to perform a background check, and chose not to present her with (or even draft) a non-disclosure agreement. And as the AFSCME witness also testified, "[W]e did feel that there was an element of indiscretion that [Plaintiffs had] **allowed Mr. Foval into their midst without serious vetting**, that they had created the opportunity for this, for this operation to occur, and it had become a major distraction to, and an unnecessary one at a critical moment in time. We did not want, we did not, we did not want to, we did not welcome the distraction it created." [D.E. 87-1] at 76:21-77:14 (emphasis added).

internship. Both federal and D.C. law establish a general rule of one-party consent to record. 18 U.S.C. § 2511(2)(d); D.C. CODE § 23-542(b)(3). Plaintiffs' burden is to prove the exception to the one party consent to record rule: that Ms. Maass recorded with a "tortious purpose," namely their allegation that she recorded with the purpose of breaching a fiduciary duty that Plaintiffs believe unpaid interns owe. Plaintiffs' interception claims fail if they do not carry this burden.

Moreover, courts have ruled that newsgathering – Ms. Maass's purpose in recording -- is a non-tortious purpose. *Vasquez-Santos v. El Mundo Broadcasting Corp.*, 283 F. Supp. 2d 561, 568-69 (D.P.R. 2003) (summary judgment granted for journalist and other media defendants where plaintiffs offered no convincing evidence or argument why journalist "would have any reason to record the meeting with Plaintiff other than to gain information for his broadcast" and explaining that the requirement of a contemporaneous "express intent of committing a tort" is significant because "without it the media could be held liable for undercover reporting under § 2511 even when its sole intent was to gather the news."); *Sussman v. American Broadcasting Companies, Inc.*, 186 F.3d 1200 (9th Cir. 1999) (affirming summary judgment for media defendants where investigative reporter obtained job at "telephone psychic" company and recorded surreptitiously-- "[w]hile plaintiffs have claimed that ABC's story was factually incorrect and unfair, they have never claimed it was not newsworthy."); *Russell v. American Broadcasting Co. Inc.*, 1995 WL 330920, *4 (N.D. Ill. 1995) (granting media defendants' motion to dismiss as to unlawful surveillance where journalist got job at grocery store and surreptitiously recorded because media "defendants intended to expose sanitation problems in the commercial fish industry" therefore "it is clear that defendants did not intercept for the purposes of committing a crime or tort."); *Berger v. CNN, Inc.*, 1996 WL 390528 (D. Mont.) (summary judgment granted for media defendants because "this Court does not find that defendants made the recordings for the purpose of

committing a crime or tortious act. Instead, the recordings were made for the purpose of producing a news story and for defendants' financial gain"), *aff'd* 188 F.3d 1155 (9th Cir. 1999).

Ms. Maass herself and Project Veritas have themselves previously been vindicated in a "tortious purpose" exception case brought by one of Plaintiffs' allies. *Wentz v. Project Veritas, James O'Keefe, and Allison Maass*, Case No. 6:17-cv-1164, 2019 WL 1716024 (M.D. Fla. Apr. 16, 2019) (Sharp., J.) (rejecting tortious purpose argument by plaintiff who alleged Project Veritas "purposefully intercepted Wentz's conversations with [Ms.] Maass and [Mr.] Sandini in their efforts to embarrass Wentz and commit the tortious act of defamation" and granting summary judgment). All of this is consistent with Congress's intent as expressed by the legislative history of 18 U.S.C. § 2511(2)(d), which makes it clear that Congress did not intend to create a "stumbling block" for journalists because "[m]any news stories have brought to light by recording a conversation with the consent of only one of the parties involved – often the journalist himself. Many news stories are embarrassing to someone." S.Rep. No. 541, 99th Cong., 2d Sess. 17 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3571–72.

### Plaintiffs' Efforts to Misuse the Civil Justice System to Achieve Their Political Ends and to Use Their Media Allies to Manufacture Political Storylines about Project Veritas

Plaintiffs misuse the courts to achieve political ends, rather than to litigate an actual wrong. For all its window dressing in an effort to avoid First Amendment bars, their case reduces to a complaint that truthful reporting by Project Veritas caused Plaintiffs to lose political consulting business when AFSCME reacted to the words coming out of the mouths of Plaintiffs themselves and their close associate, Foval.

To that end, Plaintiffs have coordinated litigation with other subjects of Project Veritas's reporting, and worked with them in their pursuit of infirm cases. *See e.g.* [D.E. 71-2]. ("Post-Election Democracy Partners and [AUFC] plan legal counter attack on O'Keefe in coordination

with other groups that have been attacked in the past."). They have relied primarily on a trifling political operative and current Democracy Partners member named Lauren Windsor to carry out these schemes. Windsor is defined by her obsession with James O'Keefe and monomaniacally pursues him, including as Plaintiffs' point person in a national campaign to recruit plaintiffs to sue Mr. O'Keefe and coordinate with their lawyers. This weaponization of the legal system is an effort to bankrupt Project Veritas through the necessity of defending frivolous lawsuits across the Country. She has also enlisted media allies to amplify her specious innuendo, from "favorite reporters" at notable outlets to sparsely read bloggers who share her obsession with Mr. O'Keefe.

There are consequences for those who adopt these improper tactics with Windsor, namely that the schemes she concocts on behalf of Plaintiffs flop, fail, or fly back in the face of Windsor and her co-conspirators. For example, Windsor and one of Plaintiffs' former lawyers from this case coordinated with a plaintiff named Steve Wentz who sued the Project Veritas Parties, including in connecting Wentz to a "favorite reporter" to whom Wentz could pitch his case. [D.E. 71-3]. Wentz lost on summary judgment and was required to pay the Project Veritas Parties' fees and costs for improperly withholding documents in discovery, namely his and his lawyer's communications with Democracy Partners members and Democracy Partners' lawyers. *Wentz*, 2019 WL 1716024 (case-dispositive order granting summary judgment for the Project Veritas Parties on defamation and unlawful interception causes of action); *Wentz*, [D.E. 157] (Order imposing fees and costs for discovery violations).

At least two of Plaintiffs' lawyers also assisted lawyers representing a woman named Shirley Teter, prior to the filing of Teter's lawsuit. In "Rigging the Election" Part I, Project Veritas reported Foval's statement that Teter was "one of our activists." [D.E. 63-6] (CD) (Ex. 1, Part I) at 12:52-13:15. The Project Veritas Parties were completely vindicated in the Teter suit. In

granting the Project Veritas Parties' Motion for Directed Verdict, United States District Judge Martin Reidinger also ruled that "Rigging the Election" Part I was accurate: "[T]he Plaintiff's contention that the Defendants concocted a storyline (Video I) and then consciously set out to create the 'evidence' (Foval's statements) to conform to that storyline is simply unsupported by Plaintiff's own evidence." *Teter v. Project Veritas, Project Veritas Action Fund, and James O'Keefe,* Case No. 1:17-cv-00256, 2019 WL 2423294, *4 (W.D.N.C. June 7, 2019).

Windsor's latest effort in her obsessive quest against Mr. O'Keefe and Project Veritas involves what she describes as her "aid" to a New York Times "news" article that highlights the need for the relief requested.



Windsor Tweet, May 13, 2021, *available at https://twitter.com/lawindsor /status/1392937812559859712.* This is not an instance of Windsor duping credulous New York Times writers, but rather finding a jaundiced ear eager to believe malign lies and then repeat them in a hit piece. Prior articles by the New York Times have compelled Project Veritas to sue the New York Times in state court for defamation. That court recently denied the New York Times's motion to dismiss in an order where the Court explained,

> [I]f a writer interjects an opinion in a news article (and will seek to claim legal protections as opinion) it stands to reason that the writer should have an obligation to alert the reader . . . . the dictionary definitions of "disinformation" and "deceptive" . . . . certainly apply to [New York Times writers] Astor's and Hsu's failure to note that they injected their opinions in news articles, as they now claim . . . . Plaintiff [Project Veritas] is entitled to try to establish whether NYT's writers were purposely and/or recklessly inaccurate, or whether they were inaccurate, sloppy, or something else.

**Exhibit A,** Order Denying New York Times's Motion to Dismiss (NYSECF DOC. NO. 131), *Project Veritas v. New York Times et al.*

The most recent New York Times "news" "article" purports to "report" on a supposed "plot" to investigate the "enemies" of former President Trump serving in the administration. The "article" reads more like tabloid fodder, burying repeated concessions that it is "unclear" if the premise of article is true (it isn't):

- "Although several Project Veritas operatives were involved in the plot, it is **unclear** whether the group directed it."

- "Whether any of Mr. Trump's White House advisers had direct knowledge of the campaign is **unclear** . . . ."

- "Who initially ordered the operation is **unclear**."

- "It was **unclear** who was funding the operation."

Adam Goldman and Mark Mazetti, *Activists and Ex-Spy Said to Have Plotted to Discredit Trump 'Enemies' in Government,* N.Y. TIMES, May 13, 2021, *available at* https://www.nytimes.com/05/13/us/politics/mcmaster-fbi-trump-project-veritas.html (emphasis added). This Windsor-fed tripe masquerades as journalism.

As with others who have partnered with or relied on Plaintiffs and Windsor, there are consequences for the New York Times. Namely, when one lies down with dogs, one gets fleas. The Gray Lady, through its operatives Adam Goldman and Mark Mazetti, is now infested and has sullied its reputation as a real source for news. Regardless, the "journalism" of the Times with the

"assistance" of Windsor, demonstrate Plaintiffs' intent to turn this trial into a circus about who likes or dislikes the former President. Plaintiffs' media manipulations and selective editing of truth telegraph a classic impermissible approach to trial, of interjecting erroneous and irrelevant conspiracy theories and innuendo to detract from the frivolity of Plaintiffs' *de facto* defamation case, which is veiled in unsupportable and legally infirm torts.

## **Plaintiffs' Irrelevant Political Evidence and Spurious Political Arguments Should be Excluded**

To further Plaintiffs' political agenda and attempt to gloss over the factual and legal infirmities of their case, Plaintiffs have pursued numerous distracting and improper arguments. Based on Plaintiffs' efforts during discovery and at the summary judgment stage, the Project Veritas Parties expect that Plaintiffs' political efforts will include: (1) attempting to tie Project Veritas and its journalists to Donald Trump by various irrelevant and distracting means, (2) mischaracterizing Project Veritas as a "political spying operation," and (3) "Russia" references intended to capitalize on the fear among some that "Russian interference" swung the result of the 2016 election for Donald Trump.

Politics is for the ballot box, not the jury box. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Plaintiffs' effort to politicize this case is not permitted under the Rules of Evidence.

<u>Plaintiffs' "Donald Trump" Distractions</u>

As part of their effort to politicize their lawsuit, Plaintiffs have attempted to tie the Project

Veritas Parties to Donald Trump. These efforts have included:

- Deposition questioning of Ms. Maass about her contacts with any official or employee of the Donald Trump for President Campaign during 2016 ("Not at all."). **Composite Exhibit B** (Depo. Tr. Excerpts), Ms. Maass Tr. at 133:9-14.

- Deposition questioning of Ms. Maass regarding her contacts with the Republican National Committee ("No."). *Id.* at 133:15-17.

- Deposition questioning of the Project Veritas journalist who recorded Foval about a 2016 election night party he attended, the people he was photographed with, and whether the event was sponsored by the Trump campaign ("No.") or the California Republican Party ("No."). *Id.*, Mr. Hartsock Tr. at 32:21-33:22.

- Deposition questioning of the Project Veritas journalist who recorded Foval, about the journalist wearing a red Make America Great Again hat. *Id.* at 34:1-4.

- Deposition questioning of the Project Veritas journalist who recorded Foval, about contacts with any official or employee of the Trump campaign ("Not off the top of my head.") or any consultant to the campaign ("Not that I recall."). *Id.* at 34:9-13; *Id.* at 34:21-35:5.

- Deposition questioning of the Project Veritas Journalist who recorded Foval, about his contact with the Republican National Committee ("Not that I recall."). *Id.* at 34:18-20.

- Filing a 2018 article from Politico not germane to any issue in this lawsuit, but which discusses Trump Foundation donations to Project Veritas. [D.E. 68-7].

- Deposition questioning of Project Veritas founder and journalist James O'Keefe regarding transmitting information to the Trump campaign, Trump family members, or the Republican National Committee ("No" was the answer). **Composite Exhibit B**, Mr. O'Keefe Tr. at 174:2-10.

- Deposition questioning of Project Veritas Founder and journalist James O'Keefe regarding a five-minute impromptu meeting with Donald Trump, before Donald Trump was the Republican Party nominee. *Id.* at 78:12-80:15.

- Deposition questioning of Mr. O'Keefe regarding his being in the "spin room" at a presidential debate. *Id.* at 69:12-70:21.

- Deposition questioning of Mr. O'Keefe regarding his presence at a Trump election party in his capacity as a reporter. *Id.* at 73:1-73:19.

- Deposition questioning of Mr. O'Keefe about any contacts with Trump campaign officials during the 2016 election for the purpose of providing information to them ("I don't recall anything like that, no."). *Id.* at 78:8-10.

- Deposition questioning of Mr. O'Keefe regarding transmitting any information to any member of the Trump family ("No. I don't think so."). *Id.* at 174:9-10.

- Plaintiffs asked Mr. O'Keefe about the social media posting of a former Project Veritas employee from an election night party in which she wrote, "Daddy is going to win tonight." *Id.* at 71:5-22.

- Plaintiffs also used the occasion of Mr. O'Keefe's deposition to ask about an extraneous news article about a Fox News host who appeared on stage at a Donald Trump rally. *Id.* at 62:3-22.

The following exchange is illustrative of Plaintiffs' pursuit of a politicized "Trump" angle and the lack of evidence to support it:

```
          17   BY MR. SANDLER:
01:23:34 18        Q.   When you say Veritas has made its mark,
01:23:36 19   you meant Veritas helped Trump become president.
01:23:44 20   Right?
01:23:44 21        A.   No.
```

*Id.* at 75:17-21.

Plaintiffs have decided they are on more favorable ground trying this case before the jury as a referendum on Donald Trump than on the facts and the law as they actually exist. Any efforts to offer such "Trump evidence" under the guise of showing "tortious purpose" are irrelevant to the issues as framed by Plaintiffs. Plaintiffs have survived summary judgment on the theory that a "determinative factor" in Ms. Maass's motivation for recording was to breach a fiduciary duty. There is not even the thinnest evidence to imply a Trump connection as to Ms. Maass, much less at the time of her one-party consent recording as an unpaid intern with Democracy Partners. The "tortious purpose" analysis depends on contemporaneous intent – that is why the Judge Huvelle ruled at the motion to dismiss stage that the "tortious purpose" could not be based on Ms. Maass's

alleged "fraudulent misrepresentation" in connection with how she came to have the unpaid internship or a trespass since those claims were based on conduct that preceded her recording. *Democracy Partners v. Project Veritas et al.*, 285 F. Supp. 3d 109, 124 (D.D.C. 2008). The "specific contemporaneous intention" is what matters. *See e.g. In re Doubleclick Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 515 (S.D.N.Y. 2001) (Buchwald, J.) (granting motion to dismiss). None of Plaintiffs' various arguments about a Trump connection make the "tortious purpose" or any other fact in issue more likely. They do not make it more or less probable that Allison Maass acted with the specific contemporaneous attempt at the time of her recording to breach a fiduciary duty, for example.

The kind of Trump evidence offered by Plaintiffs would also lead to the risk of confusion of the issues by the jury and the risk of unfair prejudice given our politically polarized times. The figure of Donald Trump is a lightning rod for opinions, especially in D.C. (where, for example, Donald Trump received only 18,586 votes (5%) compared to the 317,323 votes (93%) received by his counterpart, Joseph Biden). Donald Trump produces strong reactions from those who approve of him and those who disapprove alike. By way of illustration, this Court has discussed Donald Trump extensively in a speech, describing Donald Trump's comments about judges in such terms as "violat[ing] all recognized democratic norms," "This is not normal," and "regrettably, the current President of the United States is feeding right into this destructive narrative." *Threats to Judicial Independence and the Rule of Law*, THE ELEVENTH ANNUAL JUDGE THOMAS A. FLANNERY LECTURE (Nov. 18, 2019), *available at* https://www.americanbar.org/groups/litigation/initiatives/committee-on-american-judicial-system/in-the-news/threats-to-judicial-independence-and-rule-of-law/. The Court did so while recognizing that "it is very difficult for judges themselves to speak out and that we should refrain,

leaving it to lawyers and the organized bar to come to our defense." That Donald Trump prompts extrajudicial commentary of this sort from a sitting federal judge illustrates the centrality of Donald Trump in the American public mindset and the strong reactions to him. Following the events that occurred in the District of Columbia on January 6, 2021 and subsequent political developments, Donald Trump is undoubtedly a lightning rod for juror opinions, particularly in this venue, whether negative or positive. If Plaintiffs are allowed to make this trial into a referendum on Donald Trump, the risk of confusion of the issues and potential unfair prejudice is profound.

This case will necessarily involve discussion of the 2016 election and Plaintiffs' and their associate Foval's conduct therein. That is what the Project Veritas Parties' reporting exposed and what those who paid Plaintiff Strategic for political consulting reacted to. But much as this Court observed in its speech that judges should not be viewed as Obama judges or Trump judges, Bush judges or Clinton judges, Plaintiffs should not be permitted to engage in the irrelevant exercise of attempting to paint Project Veritas journalists as Trump-connected or otherwise maneuver this case into a referendum on the former President. It simply is not relevant to the allegations as they themselves have framed them.

<u>Project Veritas is not a "Political Spying Operation;" Zero Evidence Supports Plaintiffs' Argument</u>

As part of their rhetorical strategy to make this case politically charged, Plaintiffs have attempted to characterize Project Veritas as a "political spying operation." *See e.g.* [D.E. 68] at 2, 32. It is not. Plaintiffs' contention is completely untethered to the facts and evidence. It would be improper argument, and monumentally prejudicial, for them to make this contention in front of the jury.

Plaintiffs' efforts to pursue "political spying" themes are not surprising. Prior to this suit, Windsor attempted what she called a "countersting" of Ms. Maass. The "countersting" was

16

planned with the aid of Plaintiffs' counsel Joe Sandler. [D.E. 72-5]. During her "countersting," Windsor and a male accomplice screamed at Ms. Maass about a "rape barn," chased Ms. Maass down the street screaming, "You got Creamed!" and Windsor's male accomplice ultimately forced his way into Maass's cab. *Id.* Working with one of her "favorite reporters" named Ryan Grim (then working for Huffington Post), Windsor choreographed the content and release of the video and the Huffington Post writer's "reporting" on it. [D.E. 71-6]. This was a collaborative process between Windsor and the writer, designed to expand its reach. She sent him a draft. He provided feedback. She incorporated the feedback:

From:     Lauren Windsor <laurenwindsor27@gmail.com>
Subject:  O'Keefe vid Case 1:17-cv-01047-ESH   Document 72-6   Filed 06/17/19   Page 2
Sent:     Tue, 10 Jan 2017 13:47:24 -0500
To:       Ryan Grim <ryan@huffingtonpost.com>

Your feedback is welcome... Please let me know your eta for a piece so I can be on the look out.

L.

Is Project Veritas Conducting Political Hit Jobs for Donald Trump?
https://www.youtube.com/watch?v=5WDWLeRKc2Y

* * *

On Jan 9, 2017, at 9:37 AM, Lauren Windsor <laurenwindsor27@gmail.com> wrote:

We pitched an exclusive on the teaser to Ryan Grim, and he wants to do it tonight if possible, and promises follow up coverage on the extended clip and thereafter. He gave us some feedback on it, and we revised accordingly. I think everyone will agree it is much better. We are aiming to finish the extended clip this afternoon. Back to the grind.
Please let me know your feedback on this revision asap.

https://www.youtube.com/watch?v=WYKIO9kWrPg

* * *

Subject:  Re: New JOK teaser
From:     Lauren Win Case 1:17-cv-01047-ESH   Document 72-4   Filed 06/17/19   Page 2 of 2
Sent:     Mon, 9 Jan 2017 11:21:37 -0500
Cc:       Joe Sandler <sandler@sandlerreff.com>, Mike Lux <mike@mikeluxmedia.com>, Lisa Graves <lisa@prwatch.org>, Niketa Kumar <niketa.kumar@berlinrosen.com>
To:       Robert Creamer <creamer2@aol.com>

There will be more context in Ryan's article about it. The point is not to explain everything in the teaser. A tweet from the Undercurrent is not going to get out to anyone. I only have 1800 followers.

Excerpted from [D.E. 72-6] and [72-4].

Ultimately, Windsor released a video of this "countersting" and titled a "teaser" of it, **"Is Project Veritas Committing Political Hit Jobs for Donald Trump?"** as she had proposed to Grim. [D.E. 72-3] (emphasis added). And the Huffington Post writer dutifully "reported" on the release that he himself had helped create.

This mirrors the recent New York Times article, for which Windsor claims she provided "aid." *See* Adam Goldman and Mark Mazzetti, *supra.* That article repeatedly adopts characterizations like "operations" and "operatives," in reference to Project Veritas. *Id.* Having apparently been ginned up by Windsor, the New York Times chose to refer to Project Veritas as "operatives" involved in "operations" instead of **journalists** engaged in **journalism**. The Windsor-aided New York Times operatives who wrote the article could apparently not even stomach a rhetorically neutral word like "employee."

This rhetorical strategy – adopted by Plaintiffs in their court filings and media efforts – has no basis in fact or evidence. It is an improper argument. And the Court should not permit it at trial.

<u>Plaintiffs' "Russia" Arguments Are Irrelevant and Unsupported by the Facts</u>

Attempting to capitalize on the fear among some that Russian interference swung the 2016 election for Donald Trump, Plaintiffs have claimed in this litigation that Project Veritas reviewed emails hacked by "Russian intelligence operatives" or "a criminal conspiracy of Russian intelligence operatives." [D.E. 68] at 6; [D.E. 68-1] PSMF ¶¶59, 127. That's nonsense.

Plaintiffs used this bombastic characterization to refer to the entirely ordinary fact that while researching this news story, Project Veritas journalists went online and searched the Wikileaks emails just like other news outlets and individuals did.[3] For example, legacy media

---

[3] *See* [D.E. 62-23] (Project Veritas Reporter on July 28, 2016: "Here are all the e-mails I've aggregated from Wikileaks across three separate document dumps regarding Democracy Partners and Robert Creamer. (Foval shows up nowhere)[.] I've gone through and color-coded much of the

outlets like the Washington Post and the New York Times read and reported on the contents of the Wikileaks emails. The Washington Post even published an article titled, "Here are the Latest, Most Damaging Things in the DNC's Leaked Emails." *See e.g.* Aaron Blake, July 25, 2016, *available at* http:///www.washingtonpost.com/news/the-fix/wp/2016/07/24/here-are-the-latest-most-damaging-things-in-the-dncs-leaked-emails/; *see also* Michael D. Shear & Matthew Rosenberg, *Released Emails suggest the D.N.C. Derided the Sanders Campaign*, N.Y. TIMES, July 22, 2016, *available at* https://www.nytimes.com/2016/07/23/us/politics/dnc-emails-sanders-clinton.html.

Just like Project Veritas, the New York Times, and the Washington Post, anyone with an internet connection can still go online and read the Wikileaks emails today. *Search the DNC Email Database*, WIKILEAKS, *available at* https://wikileaks.org/dnc-emails/ (last visited May 16, 2021).

The original source of the documents that came to be published by Wikileaks and made available to anyone with the internet has nothing to do with the issues in this case or with Project Veritas at all. Plaintiffs' characterization is part of its effort to make this case politically charged, create unfair prejudice, and invite the jury to decide its verdict on that basis instead of the facts and law. There may be further improper "Russia" efforts at trial as well -- Plaintiffs' lawyer asked Ms. Maass at her deposition if there was any reason why someone in Ukraine or Russia would have received an email from the email address she used during the news investigation. The undersigned wrote Plaintiffs' counsel requesting the good faith basis behind these questions, and

---

text as it pertains to our investigation and potential leads. Allison [Maass] has volunteered to assist in following up on them with research.").

This was months before Ms. Maass's unpaid internship. Those publicly available documents included information about the "bracketing" calls and activities Plaintiffs now claim are confidential, including the free conference call line dial-in information. *Id.* At the time, Plaintiffs were unconcerned that this information was available to the public via WikiLeaks. [D.E. 63-61] (July 22-23, 2016 email chain) ("Dem partners is in the wiki dump. Nothing bad per se just showing the coordinating on protest events." Creamer: "Bracketing calls").

Plaintiffs' counsel never responded. **Exhibit C**, 8/13/18 Letter of P. Calli to J. Sandler. No good faith basis for implying a "Russia" or "Ukraine" connection exists.

<u>**Conclusion**</u>

Trial must be based on the facts and law. Plaintiffs' efforts to inject political issues and use them to inflame the jury, distract and confuse the jury, and invite the jury to reach its verdict on an improper basis must be rejected. Accordingly, the Project Veritas Parties respectfully request that the Court grant this motion *in limine* and prohibit Plaintiffs from introducing irrelevant evidence and making spurious political arguments regarding: (1) various categories of Donald Trump-related distractions, (2) Plaintiffs' efforts to mischaracterize Project Veritas as a "political spying operation," and (3) absurd "Russia" references.

## Certification Regarding Conferral

Pursuant to the local rules, the undersigned conferred with counsel for Plaintiffs via both phone conference and email on multiple dates. Plaintiffs oppose this motion.

Respectfully submitted,

By:   /s/ Paul A. Calli
      Paul A. Calli
      Florida Bar No. 994121
      Chas Short
      Florida Bar No. 70633
      CALLI LAW, LLC
      14 NE 1st Ave, Suite 1100
      Miami, FL 33132
      Telephone: (786) 504-0911
      Facsimile (786) 504-0912
      PCalli@Calli-Law.com
      CShort@Calli-Law.com
      *Admitted pro hac vice*

/s/ Kerry Brainard Verdi
Kerry Brainard Verdi, Esq.
Bar No. 478486
Benjamin R. Ogletree
Bar No. 475094
VERDI & OGLETREE PLLC
1325 G Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 449-7703
Facsimile: (202) 449-7701
kverdi@verdiogletree.com

/s/ Michael J. Madigan
Michael J. Madigan
Bar No. 71183
LAW OFFICES OF MIKE MADIGAN PLLC
3910 Hillandale Court NW
Washington DC 20007
Telephone: (202) 255-2055
Mjm20@mac.com

/s/ Benjamin T. Barr
Benjamin Barr (Pro Hac Vice)
BARR & KLEIN PLLC
444 N. Michigan Avenue Ste. 1200
Chicago, IL 60611
Telephone: (202) 595-4671
ben@barrklein.com
*admitted pro hac vice*

/s/ Stephen R. Klein
Stephen R. Klein
Bar No. 177056
BARR & KLEIN PLLC
1629 K St. N.W., Ste. 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@barrklein.com

21

*Counsel for Defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maass*

## **CERTIFICATE OF SERVICE**

I CERTIFY that on May 17, 2021 I served the foregoing through the Court's electronic filing system which served a copy on all counsel of record.

*/s/ Paul A. Calli*_____
Paul A. Calli, Esq.