UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC,            CASE NO.: 1:17-CV-1047-PLF
et al.,

    Plaintiffs,
v.

PROJECT VERITAS ACTION FUND,
et al.,

    Defendants.
_____/

**PROJECT VERITAS PARTIES' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE ARGUMENT OR INTRODUCING EVIDENCE FOR PURPOSES OF ASSERTING A JOURNALISM DEFENSE [D.E. 117]**

"I keep running that [60 Minutes Investigative Journalist] Mike Wallace analogy through my mind. If you made this argument about Mike Wallace, would everybody in the room laugh?"

- United States District Court Judge Martin Reidinger to opposing party, prior to granting the Project Veritas Parties' Motion for Directed Verdict in *Teter v. Project Veritas Action Fund et al.*, Case No. 1:17-CV-256 (W.D.N.C.), attached with other Trial Transcript Excerpts as **Composite Exhibit A**.

Plaintiffs seek to prevent the jury from receiving and considering evidence of the Project Veritas Parties' newsgathering and journalism. Plaintiffs' efforts to suppress relevant and essential facts from the jury has no support in the Rules or law. In furtherance of their efforts to suppress relevant evidence, Plaintiffs distort the Court's October 14th Order. [D.E. 114.] They incorrectly describe their request to suppress evidence of the Project Veritas Parties' journalism as "consistent" with the October 14th Order. The Court articulated the central conflict through four years of this litigation, now to be resolved by the jury:

> As the Court noted at oral argument, defendants have made clear that they will frame their actions in this case as newsgathering by investigative journalists. The other side of the coin is that plaintiffs may seek to frame defendants' actions in other terms. In light of the good faith evidentiary basis discussed above, such

1

framing is not inherently prejudicial. **The jury will be able to evaluate which characterization it finds most persuasive, in view of all of the testimony, evidence, and arguments presented at trial**.

10/14/21 Order [D.E. 114] at 17 (citations omitted) (emphasis added). Over objection, the Court has already permitted Plaintiffs to frame the Project Veritas Parties' "conduct in relation to the events that gave rise to this case" as "political spying" and introduce certain items of "Trump" evidence. *Id.* To adapt the Court's phrasing to the present Motion, "[t]he other side of the coin is that" the Project Veritas Parties "may seek to frame [their] actions in other terms" – namely newsgathering by investigative journalists. *Compare id.*

Evidence about the Project Veritas Parties' newsgathering and investigative journalism is relevant and admissible:

(1) As an essential part of who the Project Veritas Parties are, and of "the events that gave rise to this case," including how investigative journalist Allison Maass came to record during her brief, unpaid internship with Democracy Partners;

(2) To respond to Plaintiffs' false narrative of "political spying" and their use of distracting political evidence, such that "[t]he jury will be able to evaluate which characterization it finds most persuasive, in view of all of the testimony, evidence, and arguments presented at trial," *see* [D.E. 114] at 7;

(3) To demonstrate the Project Veritas Parties' non-tortious purpose of newsgathering, such that the jury will have the opportunity to weigh Plaintiffs' claims of a "primary" or "determinative" tortious purpose of breach of fiduciary duty in the context of all of Project Veritas's non-tortious purposes, including newsgathering; and

(4) To defeat Plaintiffs' attempts to impose liability pursuant to civil conspiracy, because the only agreement was one to do a lawful act – to research, gather, and report the news.

## I. The Project Veritas Parties' Journalism is Well-Established

After four years of litigation in which it was a central argument, the Project Veritas Parties' journalism will be a contested issue at trial. The Project Veritas Parties are not strangers to litigating against parties driven by political motivation, who deny the fact of Project Veritas's journalism. Fortunately, every court to hear a challenge to Project Veritas's investigative journalism has rejected such spurious claims.

When a plaintiff filed suit alleging claims arising from "Rigging the Election Part 1" (the publication that gave rise to this case), United States District Judge Martin Reidinger granted directed verdict for the Project Veritas Parties. *Teter v. Project Veritas Action Fund et al.*, Case No. 1:17-cv-00256-MR, 2019 WL 2423294, (W.D.N.C. June 7, 2019). As he observed to plaintiffs' counsel, "I keep running that [60 Minutes Journalist] Mike Wallace analogy through my mind. If you made this argument about Mike Wallace, would everybody in the room laugh?" **Comp. Ex. A,** 5/21/19 Trial Tr. at 59:14-17. Judge Reidinger also explained,

> I believe that the First Amendment implications also extend to a greater degree in a case like this because the court is being asked to walk a very fine line. On the one hand, the free exchange of ideas requires a very broad latitude for the media, and for private citizens alike, to express their views, to say what they feel needs to be said, particularly on issues of great public importance. And at the top of the list of issues of great public importance would be an issue regarding who should be elected as president. Therefore, if citizens and the media are handcuffed by a fear of liability, that's detrimental to political discourse, it is detrimental to society as a whole, and it is detrimental, really to our fundamental freedom.

*Id.*, 5/22/19 at 8:18-9:7.

That court specifically rejected the claim that the Project Veritas Parties had a "preconceived story" in producing the "Rigging the Election" video publications. *Id.*, 5/22/19 Trial Tr. at 11:12-12:7; *see also* written order granting directed verdict, *Teter*, 2019 WL 2423294 at *3 ("the Plaintiff's contention that the [Project Veritas Parties] concocted a story line ([Rigging the Election] Video I) and then consciously set out to create the 'evidence' ([Plaintiffs' associate Scott]

3

Foval's [voluntary] statements) to conform to that storyline is simply unsupported by Plaintiff's own evidence.").

This is the same video publication at issue in this case, which when released prompted Creamer to quit his role with the DNC, prompted him and AUFC to fire his longtime associate Foval, and caused AFSCME and AUFC to stop paying Creamer's entity Strategic Consulting Group for political consulting. In granting direct verdict for the Project Veritas Parties, Judge Reidinger commented that if he had somehow gotten it wrong, "I hesitate to think where the First Amendment is going in this country." **Comp. Ex. A,** 5/22/19 at 15:23-16:1.

In Project Veritas's suit against the New York Times for defamatory smears the Times has printed about Project Veritas, a New York state court judge accurately described Project Veritas as the New York Times' "upstart competitor." *Project Veritas v. New York Times Co.*, Case No. 63921/2020, 2021 WL 2395290, *10-11 (N.Y. Sup. March 18, 2021) (Wood, J.). Observing that "one of the largest newspapers in the world since Abraham Lincoln was engaged in the private practice of law, is claiming protections from an upstart competitor armed with a cell phone and a web site" and denied the Times' efforts to dismiss the defamation claim. *Id* .[1]

Project Veritas, Allison Maass, and James O'Keefe were likewise vindicated on summary judgment in another "tortious purpose" to record case, in which the court identified the Project Veritas reporters as journalists throughout. *Wentz v. Project Veritas, James O'Keefe III,, and Allison Maass*, Case No. 6:17-cv-1164-Orl-18GJK 2019 WL 1716024, (M.D. Fla. April 16, 2019) (Sharp, J.). In both *Wentz* and *Teter, supra*, Plaintiffs' key witness Lauren Windsor worked to assist and coordinate the various plaintiffs in their failed litigation.

---

[1] Appeal pending.

In this suit, Plaintiffs seek to pretend the essential fact of Project Veritas's journalism doesn't exist. They do not like the substance of Project Veritas's reporting. But they and this jury must reckon with the facts and the truth.

**II. Evidence of the Project Veritas Parties' Investigative Journalism and Newsgathering Is An Essential and Inextricable Part of the Facts That Gave Rise to This Case**

The central thrust of Plaintiffs' Motion appears to be an attempt to carve out certain "uses" of evidence related to the Project Veritas Parties' journalism by arguing a conception of relevance that too narrowly focuses on what the specific elements of its cause of actions are and arguing whether journalism will negate those elements. *See e.g.*, [D.E. 117-1] at 2 (arguing "[t]hat Defendants are, or were acting as, journalists, is not a legal defense either to the wiretapping claims or the fraudulent misrepresentation claims."). This too-narrow view of relevance is not the law. Because Plaintiffs' requested relief is so amorphous (other than their identification of PV Trial Exs. 131, 145, 146, and 147 – exhibits that demonstrate Project Veritas's journalism is in the long-established journalistic tradition of Nellie Bly and other forerunners in the field of investigative journalism), it is hard to know exactly what evidence the Plaintiffs are asking the Project Veritas Parties to exclude at this juncture.

The exhibits the Plaintiffs specifically seek to exclude are relevant and probative. One details legendary journalist Nellie Bly's use of an alias and a cover story to induce a lobbyist to share with her the dirty underbelly of political dealing in Albany, New York in the late 19th Century. [D.E. 117-2.] In a more modern example, another article documents journalist Ken Silverstein following almost the exact same approach as Bly's right here in Washington, D.C. in 2007. [D.E. 117-4.] The other three articles detail efforts by three other journalists acting as volunteers—in brief, unpaid capacities—for George W. Bush in 2004 and Hillary Clinton and

Barack Obama in 2008, respectively. [D.E. 117-3, 117-5, 117-6.] The only difference between Allison Maass's journalism and this rich tradition is this lawsuit.

As discussed in Sections IV and V below, the Project Veritas Parties' non-tortious intent to gather the news for an online news broadcast is clearly relevant to negating the "tortious purpose" element of Plaintiffs' causes of actions under the surveillance statutes and negates Plaintiffs' civil conspiracy allegations by demonstrating that the only agreement between the Project Veritas Parties was to do the lawful act of newsgathering and news reporting.

But the facts and evidence related to Project Veritas's journalism and newsgathering are relevant regardless of the exact elements of Plaintiffs' causes of action which they negate. They are inextricable background facts that permeate every aspect of the events that gave rise to this suit, and the video and documentary evidence must necessarily be admitted at trial. Plaintiffs essentially concede as much, when they state that "[t]here are a considerable number of documents on the Exhibit Lists of both parties that refer to Defendants as journalists or their activity as journalism, but are relevant for other purposes" and that they do not "seek to exclude any document that refers to the journalistic status of Defendants but is relevant for, and introduced solely for, an evidentiary purpose unrelated to establishing journalistic status or purpose." [D.E. 117-1] at 7. It would be an impossibility to sever discussion of the Project Veritas Parties' journalism and newsgathering from trial. Parties have the right to present to the jury relevant background evidence at trial that tells the story of *what happened*. Or as the Court put it in explaining that it would be relevant that the Project Veritas Parties researched Plaintiffs in the WikiLeaks emails, it "does appear relevant to the factual history of this case." *See* [D.E. 114] at 2.

Likewise, the Project Veritas Parties are journalists, plain and simple. James O'Keefe established Project Veritas as a non-profit journalism entity to continue his undercover reporting

6

work. Allison Maass was employed by Project Veritas as a journalist. It was in this role that she came to record during her brief, unpaid internship at Democracy Partners. Counsel must be permitted to explain who the Project Veritas Parties are, their background, and their roles in the facts. A result otherwise would be nonsensical.

### III. Evidence of the Project Veritas Parties' Journalism is Relevant to Respond to Plaintiffs' False Narrative of "Political Spying" and Political Evidence, So that "The Jury Will Be Able to Evaluate Which Characterization It Finds Most Persuasive, In View of All Of The Testimony Evidence, and Arguments Presented at Trial."

The Court has determined that it will allow Plaintiffs to characterize the Project Veritas Parties as engaged in "political spying." This is a mischaracterization, but the Project Veritas Parties recognize that their Motion in Limine on that point has been denied. However, because Plaintiffs will be allowed to put forth a framing of "political spying," the Project Veritas Parties must also be entitled to frame their actions as investigative journalism in a long-established tradition of journalists going undercover to obtain the truth.

Every fact the Court cited as giving rise to the inference Plaintiffs wish to make also supports the (correct) characterization of investigative journalism:

- "Defendants argue that at least three agents of Project Veritas used false identities in their interactions with plaintiffs."
- Allison Maass "secretly recorded" throughout her internship.
- "[S]he provided her superiors at Project Veritas detailed daily written summaries of all key events, calls, and conversations she had secretly recorded that day. This is consistent with 'spying.'"

[D.E. 114] at 8.[2] It is also consistent with investigative journalism. The use of assumed identities is unremarkable in the context and tradition of investigative journalism (as the specific exhibits

---

[2] Likewise, the Court cited excerpts from James O'Keefe's book that made various historical analogies. [D.E. 114] at 15. If the stray sentences on which Plaintiffs focus were sufficient to provide a basis for Plaintiffs' characterizations, surely the book's focus on Project Veritas's journalism is far more than sufficient to support framing Project Veritas's investigative journalism as such.

Plaintiffs challenge in this Motion demonstrate). It is likewise entirely consistent with newsgathering and the constraints of investigative journalism that Ms. Maass would keep her camera rolling throughout her internship. And it is entirely consistent that she would provide her footage to her editors and those who do the work of turning raw footage into publication quality news stories with Project Veritas's production department. Identical to a journalist whose notes result in a draft written article for an editor's review, this *is* journalism, and the Project Veritas Parties must be able to explain so to the jury to counter Plaintiffs' "political spying" mischaracterization.

The Court has already summarized the issue neatly:

> As the Court noted at oral argument, defendants have made clear that they will frame their actions in this case as newsgathering by investigative journalists. The other side of the coin is that plaintiffs may seek to frame defendants' actions in other terms. In light of the good faith evidentiary basis discussed above, such framing is not inherently prejudicial. **The jury will be able to evaluate which characterization it finds most persuasive, in view of all of the testimony, evidence, and arguments presented at trial**.

10/14/21 Order [D.E. 114] at 17 (citations omitted) (emphasis added).

### IV. Evidence of the Project Veritas Parties Non-Tortious Purpose of Newsgathering Is Admissible so that the Jury Can Properly Weigh What the "Primary" or "Determinative" Purpose for Recording Was

The fact that the Project Veritas Parties are journalists who engaged in the non-tortious purpose of gathering newsworthy facts when reporter Allison Maass recorded during her brief, unpaid internship at Democracy Partners is relevant. In case after case, in district after district and circuit after circuit, courts have considered "tortious purpose versus newsgathering purpose." At trial, Plaintiffs will try to prove that a "tortious purpose" was a "primary" or "determinative" factor in recording during Ms. Maass's unpaid internship. The Project Veritas are entitled to show any alternative purpose for the recording, such that no "tortious purpose" could be "primary" or

"determinative." Here, the determinative purpose was research and investigate a news story. Journalist follow facts.

Promoting a distorted reading of the Court's October 14 order [D.E. 114], Plaintiffs claim that "the Court has concluded that journalistic status and purposes are irrelevant to Plaintiffs' claims under the federal of District of Columbia wiretapping statutes." [D.E. 117-1] at 3. That turns the Court's prior analysis regarding Trump evidence upside down. What the Court concluded in the prior Order on Plaintiffs' efforts was that "**plaintiffs** have failed to establish that defendants' status is a fact of consequence in this action, FED. R. EVID. 401, and therefore **they** have failed to establish that evidence connecting defendants to Mr. Trump is relevant on this basis." [D.E. 114] at 12 (alterations omitted) (emphasis added); *see also id.* at 11 ("**[P]laintiffs** do not identify any legal or factual issues that turn on this claim.") (emphasis added). It is in this context that the Court wrote that it was not then "persuaded" that the journalistic "status" of the Project Veritas Parties was a fact of consequence, relying on *Sussman v. Am. Broadcasting Co.*, 186 F.3d 1200, 1202 (9th Cir. 1999). [D.E. 114] at 11. It does not come as a surprise that Plaintiffs failed to establish the relevance of the Project Veritas Parties' journalism – they are the ones that do not want the jury to hear about it.

Plaintiffs' obtuse interpretation of the Court's order nonetheless provides the Project Veritas Parties an opportunity to address any misapprehension the Court may have regarding what the Project Veritas Parties will argue. The Project Veritas Parties position is entirely consistent with the portion of *Sussman* that the Court quoted, namely that "Congress could have drafted [18 U.S.C. § 2511] so as to exempt all journalists from its coverage, but did not'" and the Court's observation that "these statutes do not include any special provision for recordings made by

journalists." [D.E. 114] at 11. The Project Veritas Parties are not at trial arguing that the press enjoys some sort of free-standing immunity under the surveillance statutes.

In the Court's dictum that Plaintiffs seized on, the Court wrote that it was not yet "persuaded that defendants' supposed journalistic **status** is a fact of consequence in determining this action." [D.E. 114] at 11 (alterations omitted) (emphasis added). But the issue under the surveillance statutes is not free-standing journalistic "status," but rather one of journalistic *purpose to record*. The Project Veritas Parties are entitled to defend themselves at trial by showing that news gathering was not just *a* purpose in recording, but their only purpose in recording during reporter Allison Maass's brief, unpaid internship at Democracy Partners. Plaintiffs' claims fail if they prove that an intent to breach a fiduciary duty—if plaintiff can even prove the existence of a fiduciary duty—was *anything less* than "primary" or "determinative." This necessarily involves asking the jurors to weigh what the possible purposes were. Thus, the Project Veritas Parties are necessarily entitled to demonstrate to the jurors an alternative (i.e., their actual) "primary" or "determinative" purpose of gathering the news. It is patent that the Project Veritas Parties are entitled to present their non-tortious purposes, and the jury can decide whether Plaintiffs have proven that "intent to breach a fiduciary duty" was "primary or determinative" or if something else (newsgathering) was.

The Court also concluded that "the five items of 'Trump evidence' discussed in this Opinion are admissible in relation to plaintiffs' wiretap claims." [D.E. 114] at 2. And while the Project Veritas Parties argued that this was far too attenuated to shed any light on whether the Project Veritas Parties had the intent to breach an alleged fiduciary duty, the Court concluded, "The fact that defendants favored the Republican presidential candidate, while plaintiffs supported the Democratic Party and opposed the Republican candidate, it relevant to defendants' motivation

for intercepting plaintiffs' communications in the context of this election-related activity." [D.E. 114] at 7.

It would be a strange outcome indeed if the Plaintiffs were allowed to introduce attenuated political affiliation evidence (like a Project Veritas employee who was not even one of the reporters whose conduct is at issue here hitting a piñata), *see* [D.E. 114] at 4, in support of their intent to breach a fiduciary duty theory, but the Project Veritas Parties were not permitted to show their express non-tortious purpose in gathering the news. Necessarily, it must also be relevant to the Project Veritas Parties' motivations that they had a purpose in mind unrelated to whom their candidate of choice was—investigating and publishing a newsworthy story on one of the most pressing issues of the time. That journalistic motivation was vindicated by the impact of Project Veritas's reporting, not just by the reactions of parties and witnesses in the case (following publication of Project Veritas's reporting, AFSCME stopped paying Plaintiff Strategic Consulting Group for political consulting, withdrew its support from AUFC such that AUFC was no longer able to pay Strategic, Creamer quit his role with the Clinton Campaign, and Creamer and AUFC fired Foval) but also by the numerous legacy media outlets that picked up Project Veritas's scoop.[3]

---

[3] *See e.g.*, David Weigel, *Two Democratic Operatives Lose Jobs after James O'Keefe Sting*, WASH. POST (Oct. 19, 2016), *available at* ; Daniella Diaz and Drew Griffin, *Dem Operative 'Stepping Back' After Video Suggests Group Incited Violence at Trump Rallies*, CNN (Oct. 18, 2016) *available at* https://www.cnn.com/2016/10/18/politics/project-veritas-action-robert-creamer-donald-trump-rallies/index.html; Scott Detrow, *Sting Video Purports to Show Democrats Describing How to Commit Voter Fraud*, NPR (Oct. 19, 2016) *available* at https://www.npr.org/2016/10/19/498587397/sting-video-purports-to-show-democrats-describing-how-to-commit-voter-fraud;*'Draw Them to Punch You': 2 Dem Operatives Lose Jobs After Undercover Video Comments*, FOX NEWS (Oct. 19, 2016) *available at* https://www.foxnews.com/politics/draw-them-to-punch-you-2-dem-operatives-lose-jobs-after-undercover-video-comments.

### V. Because Plaintiffs Seek to Impose Liability Pursuant to Civil Conspiracy, Evidence of the Project Veritas Parties' Journalism Is Admissible to Show that the Agreement Between the Parties was a Lawful Agreement to Gather the News

Plaintiffs have alleged a cause of action for civil conspiracy as a means by which they will ask the jury to impose liability against the Project Veritas Parties, if the jury finds liability as to an underlying claim. To prove civil conspiracy, Plaintiffs must establish:

1) An agreement between two or more persons
2) To participate in an unlawful act and
3) An injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to an in furtherance of the common scheme.

*See, e.g., Democracy Partners LLC v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 290–91 (D.D.C. 2020).

By framing their case in this manner, Plaintiffs ensure that one focus at trial must be the nature of the agreement between James O'Keefe, Project Veritas, Project Veritas Action Fund, and Allison Maass. Plaintiffs will claim that the nature of the agreement was "to participate in an unlawful act." In truth, the agreement was one to investigate and report a newsworthy story: one that began when Creamer's longtime associate Scott Foval implicated Creamer in developing voter fraud schemes and the like, that continued as the Project Veritas Parties learned of Creamer's past and that he was the spouse of a sitting Member of Congress, continued further as the Project Veritas Parties learned about such unethical activities as Democracy Partners' role in creating fake grassroots (i.e., astroturf) events such that the Democratic National Committee could appear to be hands off, and culminated in the published news story that gives rise to this case.

This was the agreement between the Project Veritas Parties: to investigate and report a newsworthy story. And by framing their claims as they have, Plaintiffs have ensured that the facts

about the Project Veritas Parties' journalism and the rich history of investigative journalism are relevant and admissible.

## VI. Conclusion

Plaintiffs distort the Court's prior Order in their effort to suppress relevant facts from the jury.[4] The notion that the Project Veritas Parties are somehow not journalists is a lie. Plaintiffs' Motion would withhold essential, relevant facts from the jury. The Court must deny their motion.

Respectfully submitted,

By:   /s/ Paul A. Calli
Paul A. Calli
Florida Bar No. 994121
Chas Short
Florida Bar No. 70633
CALLI LAW, LLC
14 NE 1st Ave, Suite 1100
Miami, FL 33132
Telephone: (786) 504-0911
Facsimile (786) 504-0912
PCalli@Calli-Law.com
CShort@Calli-Law.com
*Admitted pro hac vice*

---

[4] Plaintiffs' allies in the media have likewise deceptively characterized the Court's Order. *The Daily Beast* published an article about the Court's order on the same day Plaintiffs filed their Motion *in Limine*. The article bore the false headline, "Judge Rules James O'Keefe's Project Veritas is 'Political Spying.'" Following Project Veritas's demand for correction, the Daily Beast revised the headline to *Judge Rules O'Keefe's Schemes Can Be Portrayed to Jury as 'Political Spying.'* See https://www.thedailybeast.com/judge-rules-okeefes-schemes-can-be-portrayed-to-jury-as-political-spying (correction noted at bottom of article).

Case 1:17-cv-01047-PLF   Document 133   Filed 11/02/21   Page 14 of 15

/s/ Kerry Brainard Verdi
Kerry Brainard Verdi, Esq.
Bar No. 478486
Benjamin R. Ogletree
Bar No. 475094
VERDI & OGLETREE PLLC
1325 G Street, NW, Suite 500
Washington, DC 20005
Telephone: (202) 449-7703
Facsimile: (202) 449-7701
kverdi@verdiogletree.com


| /s/ Benjamin T. Barr | /s/ Stephen R. Klein |
|---|---|
| Benjamin Barr (Pro Hac Vice) | Stephen R. Klein |
| BARR & KLEIN PLLC | Bar No. 177056 |
| 444 N. Michigan Avenue Ste. 1200 | BARR & KLEIN PLLC |
| Chicago, IL 60611 | 1629 K St. N.W., Ste. 300 |
| Telephone: (202) 595-4671 | Washington, DC 20006 |
| ben@barrklein.com | Telephone: (202) 804-6676 |
| *Admitted pro hac vice* | steve@barrklein.com |

*Counsel for Defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maas*

14

## **CERTIFICATE OF SERVICE**

I CERTIFY that on November 2, 2021 I served the foregoing through the Court's electronic filing system which served a copy on all counsel of record.

                                                */s/ Paul A. Calli*
                                                Paul A. Calli, Esq.