UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                          )
DEMOCRACY PARTNERS, LLC, et al.,          )
                                          )
            Plaintiffs,                   )
                                          )
     v.                                   )        Civil Action No. 17-1047 (PLF)
                                          )
PROJECT VERITAS ACTION FUND, et al.,      )
                                          )
            Defendants.                   )
                                          )
_____ )
```

OPINION

Pending before the Court are four pretrial motions in limine to exclude certain

testimony and evidence from being presented at trial.[1]  Plaintiffs have filed three motions in

limine, which seek to exclude (1) the testimony of witness Aaron Black; (2) evidence related to a

confrontation involving witness Lauren Windsor and defendant Allison Maass; and (3) videos

from Ms. Windsor's YouTube channel The Undercurrent.  Defendants have filed one motion in

limine, which seeks to exclude plaintiffs' proposed trial Exhibit 121.  The Court heard oral

argument on these motions on July 14, 2022.[2]

_____

[1]        Plaintiffs also filed a fifth Motion in Limine to Preclude Defendants from Making
Any Argument or Introducing Evidence for Purposes of Asserting a Journalism Defense
("Pl. Journalism Mot.") [Dkt. No. 117].  On July 21, 2022, plaintiffs withdrew this motion and
acknowledged their "expectation and understanding" that defendants at trial "will make
arguments, offer evidence and/or elicit testimony concerning their status as investigative
journalists, and will be permitted to do so for any relevant purpose."  See Plaintiffs' Status Report
("PSR") [Dkt. No. 160] at ¶ 2.  In return, defendants agreed to withdraw their proposed trial
Exhibits 171 through 175.  Id. at ¶ 5.

[2]        The Court has reviewed the following documents and their attachments:  Plaintiffs'
Motion and Memorandum of Points and Authorities in Support of Plaintiffs' Motion in Limine to

I.    BACKGROUND

As previously described, see Democracy Partners, LLC. v. Project Veritas Action Fund ("Democracy Partners III"), 453 F. Supp. 3d 261, 266-67 (D.D.C. 2020), this case arises out of an undercover operation conducted in 2016 by Project Veritas to infiltrate the Washington, D.C. office of Democracy Partners.  Project Veritas employee, Allison Maass, used a false identity to obtain an unpaid internship with Democracy Partners, and then "secretly recorded everything she saw and heard during her internship."  Id. at 271 (emphasis in original).  Project Veritas gained access to confidential information regarding work that Democracy Partners was doing on behalf of the Democratic National Committee ("DNC") related to the 2016 Presidential election.  Id. at 267.  Project Veritas used the recordings, along with other materials, in a four-part series it published on YouTube entitled "Rigging the Election."  Id.

---

Exclude Testimony of Aaron Black ("Pl. Black. Mot.") [Dkt. No. 118]; Project Veritas Parties' Response in Opposition to Plaintiffs' Motion in Limine to Exclude Testimony of Aaron Black ("Def. Black Opp.") [Dkt. No. 139]; Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion in Limine to Exclude Testimony of Aaron Black. ("Pl. Black Reply") [Dkt. No. 149]; Plaintiffs' Motion and Memorandum of Points and Authorities in Support of Motion in Limine to Exclude Undercurrent Videos ("Pl. Undercurrent Mot.") [Dkt. No. 119]; Project Veritas Parties' Opposition to Plaintiffs' Motion in Limine to Exclude "The Undercurrent" Videos ("Def. Undercurrent Opp.") [Dkt. No. 131]; Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion in Limine to Exclude Undercurrent Videos ("Pl. Undercurrent Reply") [Dkt. No. 148]; Plaintiffs' Motion and Memorandum of Points and Authorities in Support of Motion in Limine to Exclude Evidence Relating to Exposure of Defendant Allison Maass' Subsequent Attempt to Secretly Record Another Organization ("Pl. Countersting Mot.") [Dkt. No. 120]; Project Veritas Parties' Opposition to Plaintiffs' Motion in Limine Regarding Lauren Windsor Impeachment Evidence ("Def. Countersting Opp.") [Dkt. No. 129]; Plaintiffs' Reply Memorandum in Support of Plaintiff's Motion in Limine to Exclude Evidence Related to Exposure of Defendant Allison Maass' Subsequent Attempt to Secretly Record another Organization ("Pl. Countersting Reply") [Dkt. No. 147]; Project Veritas Parties' Motion in Limine to Exclude Plaintiffs' Proposed Trial Exhibit 121 ("Def. Exhibit 121 Mot.") [Dkt. No. 164-1]; Plaintiffs' Memorandum in Response to Defendants' Motion in Limine to Exclude Plaintiffs' Proposed Trial Exhibit 121 ("Pl. Exhibit 121 Opp.") [Dkt. No. 165-1]; Project Veritas Parties' Reply in Support of Motion in Limine to Exclude Plaintiffs' Proposed Trial Exhibit 121 ("Def. Exhibit 121 Reply") [Dkt. No. 164-2]; Joint Pretrial Statement ("JPS") [Dkt. No. 138]; and Plaintiffs' Status Report ("PSR") [Dkt. No. 160].

In 2017, Democracy Partners; Robert Creamer, its president; and Strategic Consulting Group, NA, Inc. ("Strategic Consulting"), a member of Democracy Partners owned and operated by Mr. Creamer, filed this lawsuit against Project Veritas; Project Veritas Action Fund; James O'Keefe, the founder and president of both Project Veritas organizations; and Ms. Maass.  See Complaint [Dkt. No. 1].  Judge Ellen Huvelle, who presided over this case before her retirement, denied in part defendants' motion for summary judgment, and concluded that two substantive claims remain for trial:  (1) wiretapping violations pursuant to federal and District of Columbia statues; and (2) fraudulent misrepresentation.  See Democracy Partners III, 453 F. Supp. 3d at 284-85, 286-87, 291.[3]  Plaintiffs' wiretapping claim alleges that defendants unlawfully intercepted communications when Allison Maass, operating under the false identity of "Angela Brandt," secretly recorded their conversations with a "tortious purpose" of committing a breach of fiduciary duty.  See id. at 267, 270.  Plaintiffs' fraudulent misrepresentation claim is premised on "false representations Maass made to [Robert] Creamer about her identity and background, his reliance on those representations in deciding to hire her as an intern, and the subsequent injuries to Strategic Consulting."  Id. at 284.

The parties' pending motions in limine revolve around the exclusion of testimony and evidence at trial.  Plaintiffs' three motions pertain to two individual witnesses who will be called to testify at trial, Aaron Black and Lauren Windsor, neither of whom is a party to this suit.  See Pl. Black Mot.; Pl. Undercurrent Mot.; Pl. Countersting Mot.  Mr. Black and Ms. Windsor both worked in Democracy Partners' office and interacted with defendant Allison Maass during the course of her internship at Democracy Partners.  See Democracy Partners III, 453 F. Supp. 3d

---

[3]        Judge Huvelle also concluded that plaintiffs may proceed to trial on a civil conspiracy claim to commit the underlying torts of fraudulent misrepresentation and unlawful wiretapping.  See Democracy Partners III, 453 F. Supp. 3d at 290-91.

at 267.  At the time, Mr. Black was a contractor for Strategic Consulting, see Pl. Black Mot. at 1- 2, and Ms. Windsor was a principal of Mike Lux Media, a "member" company of Democracy Partners, see Pl. Undercurrent Mot. at 1.[4]  In defendants' motion in limine, defendants seek to exclude plaintiffs' proposed trial Exhibit 121, an email conversation between James O'Keefe, the founder and president of Project Veritas, and a Project Veritas staff member regarding donor relations and donor input on a pending "news publication."  See Def. Exhibit 121 Mot. at 2.

The parties appeared for oral argument on all four pending motions on July 14, 2022.  See Transcript of Motions Hearing, July 14, 2022 ("Oral Arg. Tr.") [Dkt. No. 161]. Upon careful consideration of the parties' arguments and for the reasons that follow, the Court concludes that the testimony of Aaron Black as to the existence of a fiduciary duty between Allison Maass and Democracy Partners is admissible.  Mr. Black has no other relevant or admissible testimony to offer.  The Court further concludes that two of the emails relating to Lauren Windsor's planned confrontation with Ms. Maass are admissible, but all other disputed evidence – including the remaining exhibits related to the confrontation, the Undercurrent videos, and Exhibit 121 – will be excluded.  The parties, however, may question witnesses about the underlying facts and conduct related to these exhibits so long as the line of questioning is relevant to the issue at trial.

---

[4]     Democracy Partners has a unique membership structure.  It is "a limited liability company to which a number of companies and sole proprietorships belong as members.  The members include a number of consultants and vendors to progressive organizations and Democratic campaigns and committees.  Democracy Partners itself does not have employees, but it serves as a common marketing vehicle for its members, in which capacity it retains various consultants to serve the members' common interests.  Membership is governed by a formal operating agreement, and members contribute to cover some of the shared costs through modest annual dues or in-kind services."  Democracy Partners III, 453 F. Supp. 3d at 267 (internal citations omitted).

II.   LEGAL STANDARDS

*A.  Relevance and Admissibility*

Courts evaluate the admissibility of evidence on a pretrial motion in limine

according to the framework established by Rules 401 and 402 of the Federal Rules of Evidence.

See Daniels v. District of Columbia, 15 F. Supp. 3d 62, 66-67 (D.D.C. 2014).  First, "the Court

must assess whether the evidence is relevant."  Id. at 66.  "Evidence is relevant if: (a) it has any

tendency to make a fact more or less probable than it would be without the evidence; and (b) the

fact is of consequence in determining the action."  FED. R. EVID. 401.  "Relevant evidence is

admissible" unless an applicable authority provides otherwise, whereas "[i]rrelevant evidence is

not admissible."  FED. R. EVID. 402.  The proponent of admitting an item of evidence has the

initial burden of establishing relevance.  See Dowling v. United States, 493 U.S. 342, 351 n.3

(1990); United States v. Oseguera Gonzalez, 507 F. Supp. 3d 137, 147 (D.D.C. 2020).  And under

Rule 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a

finding that the witness has personal knowledge of the matter."  FED. R. EVID. 602.

Even if the proponent of an item of evidence can demonstrate its relevance,

however, a court may still conclude that it is inadmissible if "the United States Constitution; a

federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court"

provide for its exclusion.  FED. R. EVID. 402.  Further, Rule 403 of the Federal Rules of Evidence

provides that a court may "exclude relevant evidence if its probative value is substantially

outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence."  FED. R. EVID. 403.

The D.C. Circuit "has long made clear . . . that statements made in opening and

closing arguments to the jury [must be] supported by evidence introduced at trial."  United States

v. Watson, 171 F.3d 695, 702 (D.C. Cir. 1999).  Counsel must have "a good faith basis" for

initiating a line of questioning in cross-examination that has the potential to cause prejudice or mislead the jury. United States v. Lin, 101 F.3d 760, 767 (D.C. Cir. 1996); see also United States v. Sampol, 636 F.2d 621, 658 (D.C. Cir. 1980) ("[C]ounsel must have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness and thereby create an unfounded bias which subsequent testimony cannot fully dispel.").

## B. Witness Bias

Bias refers to the "relationship between a party and a witness which might lead the witnes to slant, unconsciously or otherwise, his testimony in favor of or against a party." United States v. Abel, 469 U.S. 45, 52 (1984). Bias may be shown by a "witness' like, dislike, or fear of a party, or by the witness' self-interest." Id. "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." Id.; see also United States v. Anderson, 881 F.2d 1128, 1136 (D.C. Cir. 1989); United States v. Slough, 22 F. Supp. 3d 29, 34 (D.D.C. 2014) (admitting evidence that will aid the jury "in assessing [the witness'] credibility and his conscious or unconscious motivations for making specific claims").

Although "[p]roof of bias is almost always relevant[,] [] the Court must still engage in the Rule 403 balancing test before the evidence may be admitted." United States v. Young, Crim. No. 12-0042, 2013 WL 12430555, at *3 (D.D.C. Apr. 22, 2013) (quoting United States v. Harper, Crim. No. 05-6068L, 2009 WL 140125 at *3 (W.D.N.Y. Jan. 20, 2009) (internal quotation marks omitted)). "The District Court retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body." Hamling v. United States, 418 U.S. 87, 127 (1974).

III.   PLAINTIFFS' MOTION TO EXCLUDE
THE TESTIMONY OF AARON BLACK

Aaron Black worked with Robert Creamer as a contractor for Strategic Consulting

and shared office space with Democracy Partners, Mike Lux Media, and American Family Voices

out of Suite 250 at 1250 Eye Street, NW, in Washington, D.C. ("Suite 250"). See Democracy

Partners III, 453 F. Supp. 3d at 267.  Strategic Consulting hired Mr. Black as a subcontractor to

perform its contract with Mobilize, Inc., which was contracted by the DNC to manage its

"bracketing" program, the purpose of which was to present counter-messaging wherever then-

candidate Trump held events.  See Pl. Black Mot. at 1-2; see also Democracy Partners III, 453 F.

Supp. 3d at 268.  Mr. Black had a desk in Suite 250, where Democracy Partners, Strategic

Consulting, American Family Voices, and Mike Lux Media also operated.  See Democracy

Partners III, 453 F. Supp. 3d at 267.  Because of this proximity, Mr. Black interacted with Ms.

Maass at Democracy Partners and assigned Ms. Maass at least one project during her internship.

See Def. Black Opp. at 1; see also Defendants' Exhibit 124 – Video of Allison Maass' first day at

Democracy Partners ("Def. Ex. 124") [PVA00013196] at 13:18-23:18 (footage of Mr. Black

giving Ms. Maass an assignment for upcoming bracketing events on her first day).

Defendants seek to examine Mr. Black at trial about "his work during the 2016

election cycle; his relationship with Democracy Partners; his relationship with SCG; his

relationship with Mobilize, Inc.; his relationship with Robert Creamer; his relationship with Scott

Foval; his relationship with Lauren Windsor; his work with Allison Maass during Maass's

internship; the alleged confidentiality of material to which Allison Maass was exposed; [and] his

interactions with Trevor Kendrick on September 16, 2016." JPS at 15.

Plaintiffs argue that testimony from Mr. Black is not relevant because Mr. Black

was never deposed by the defendants, did not work with Ms. Maass, did not provide any

confidential information to Ms. Maass, and did not have any interactions that would be probative

of the existence of a fiduciary relationship between Democracy Partners and Ms. Maass or Ms.

Maass' purpose in undertaking her secret recordings. See Pl. Black Mot. at 1-3. Defendants

contend that Mr. Black will provide testimony that is relevant to (1) whether Ms. Maass breached

her fiduciary duty to Democracy Partners; (2) whether Ms. Maass may be considered a party in a

particular meeting at Democracy Partners; and (3) whether the publication of Project Veritas'

videos proximately caused the American Federation of State, Country and Municipal Employees

("AFSCME") to cancel its contract with Strategic Consulting and terminate its support for

Americans United for Change ("AUFC"). See Def. Black Opp. at 4-7. The Court addresses these

three topics in turn.[5]

### A. Existence of a Fiduciary Duty

Defendants assert that Mr. Black's testimony is relevant to the jury's determination

of whether a fiduciary duty existed between Ms. Maass and Democracy Partners. See Def. Black

Opp. at 2. To find a fiduciary duty, "one characteristic that District of Columbia courts have

traditionally looked for is a special confidential relationship that transcends an ordinary business

transaction and requires each party to act with the interests of the other in mind." Democracy

Partners III, 453 F. Supp. 3d at 279 (internal quotation omitted). As Judge Huvelle explained in

---

[5]     The Court does not discuss in this opinion plaintiffs' argument that Mr. Black's
testimony is not relevant because he was never deposed. See Pl. Black Mot. at 2. This argument
has no merit; a witness need not be deposed to testify at trial. See C & E Servs., Inc. v. Ashland
Inc., Civ. No. 03-1857, 2008 WL 1744618, at *3 (D.D.C. Apr. 14, 2008). In fact, "the Federal
Rules of Civil Procedure do not require parties to identify lay witnesses who may be called to
testify at trial until 30 days before trial, unless the court orders otherwise," at which point
discovery will have likely already closed. Id. (citing FED. R. CIV. P. 26(a)(3)(A)(i). Cf.
LCvR 16.5(b)(1)(iv)); see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.,
Civ. No. 03-2006, 2007 WL 4916959, at *1 (D.D.C. Dec. 18, 2007) ("In every case, a party,
having received her opponent's initial disclosures, must husband the limited number of depositions
and choose the most important or significant witnesses.").

her summary judgment opinion, there are four factors to consider when determining whether a fiduciary relationship exists: "a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties." Id. (quoting Council on American-Islamic Relations Action Network, Inc. ("CAIR") v. Gaubatz, 793 F. Supp. 2d 311, 341 (D.D.C. 2011) (internal quotation mark omitted)).  She concluded that there are disputed facts under the third and fourth factors of this test. See id. at 280.  Mr. Black's testimony therefore may be relevant to the existence of a fiduciary duty if he can speak to the "types of services" performed by Ms. Maass or "the legitimate expectations of the parties." See id. at 279.

The Court concludes that defendants have "a good faith basis" for initiating a line of questioning based on these factors. See United States v. Lin, 101 F.3d at 767.  To start, because Mr. Black gave Ms. Maass at least one internship assignment, his testimony will help reveal the "types of services" performed by Ms. Maass and may shed light on whether her tasks were substantial.  In fact, at oral argument, plaintiffs' counsel conceded that Mr. Back "gave Ms. Maass an assignment on one of the first days of her internship and [] did interact with her at the offices of Democracy Partners." Oral Arg. Tr. at 40:23-24.  This testimony is relevant because defendants argue that the "types of services" performed by Ms. Maass were purely "mundane" and were limited to tasks like counting inventory, participating in public conference calls, assembling news coverage clips, and general clerical work. Democracy Partners III, 453 F. Supp. 3d at 280. Plaintiffs dispute this characterization and contend that while Ms. Maass did perform some "mundane" tasks, she was also given access to confidential matters including daily calls with the Clinton Campaign and the DNC, briefings which included non-public information about future bracketing events, and training on how to curate video using a process proprietary to Democracy Partners and its clients. See id. at 280-81.

Furthermore, there is sufficient evidence to support a finding that Mr. Black has personal knowledge regarding whether there was a "legitimate expectation" of the parties that matters in the Democracy Partners office were confidential. See FED. R. EVID. 602; Def. Black Opp. at 4. Although the parties agree that Mr. Black did not provide any confidential information about bracketing to Ms. Maass at any time, see Def. Opp. at 4.; see also Pl. Black Reply at 2, Mr. Black played a role in Ms. Maass' supervision and onboarding, as evidenced by their interaction on the first day of Ms. Maass' internship. See Def. Ex. 124; Oral Arg. Tr. at 40:23-24.

Defendants also raise a third reason for why Mr. Black's testimony regarding the existence of a fiduciary duty is relevant. According to defendants, one week before Ms. Maass began her internship at Democracy Partners, Mr. Black "invite[d] a stranger he just me[t] on the street in a protest, organized by Mr. Creamer, . . . up to the [Democracy Partners] offices." Oral Arg. Tr. at 46:20-24. Defendants' counsel asserted that during this interaction, "Mr. Black says virtually, part and parcel, the same thing to [Mr. Kendrick], which is captured on videotape, that he says to Allison Maass when she starts 20 minutes into her first day. It gives more proof to the nontortious purpose and the sole purpose of newsgathering." Id. at 47:4-9. Defendants argue that the lack of confidentiality Mr. Black displayed during his interaction with Mr. Kendrick is probative of the absence of a legitimate expectation of confidentiality between Ms. Maass and Democracy Partners. Counsel for plaintiffs responded at oral argument that the interaction with Mr. Kendrick and "the tape he made" are not at issue in this case because "[h]e didn't infiltrate Democracy Partners. And this is another situation in which the jury can just be misled and confused about the conduct that's at issue." Id. at 56:25-57:4.

Although the Court agrees that Mr. Black's testimony may be relevant to the jury's determination of whether there was a fiduciary duty between Ms. Maass and Democracy Partners, the record is unclear regarding Mr. Black's interaction with Mr. Kendrick. The Court therefore

will decide at trial – either through a proffer from counsel or by examining Mr. Kendrick outside

the presence of the jury – whether defendants may question Mr. Black about Mr. Kendrick.

### B.  Whether Ms. Maass was a Party in a Meeting at Democracy Partners

Defendants' second argument is that Mr. Black can offer testimony that may be

relevant to whether Ms. Maass should be considered "a party" in a particular meeting at the

Democracy Partners office on October 12, 2016.  See Def. Black Opp. at 6.  This meeting is

significant because both District of Columbia and federal wiretap statutes provide that it is

generally lawful to intercept an oral communication so long as one party consents, unless one of

the exceptions specified in the statute is met.  See 18 U.S.C. § 2511(2)(d); D.C. Code

§ 23-542(b)(3) (emphasis added).  For most of the recordings at issue in this lawsuit, plaintiffs are

proceeding on the theory that an exception to the one-party consent rule applies because

defendants intercepted communications with the "tortious purpose" of committing a breach of

fiduciary duty.  See Democracy Partners III, 453 F. Supp. 3d at 285.  Plaintiffs also claim,

however, that Ms. Maass recorded at least one conversation in which she was not "a party."  See

Pl. Black Reply at 3; see also Democracy Partners III, 453 F. Supp. 3d at 285 ("[T]he undisputed

facts do not establish that Maass was a party to every communication she recorded.").

The meeting at issue occurred on October 12, 2016 in Suite 250.  See Democracy

Partners III, 453 F. Supp. 3d at 282.  Plaintiffs assert that Ms. Maass eavesdropped on a

conversation between two members of Democracy Partners and Jeff Weaver, the campaign

manager for former presidential candidate, Senator Bernie Sanders.  See Pl. Black Reply at 3; see

also Democracy Partners III, 453 F. Supp. 3d at 285.  In her daily summary, Ms. Maass reported

to Project Veritas that she "wasn't invited into the meeting but [she] pretended to be working and

tried to listen to what they were saying." Democracy Partners III, 453 F. Supp. 3d at 282 (quoting

Plaintiffs' Exhibit 109 – PV Video Summary Form for 10/12/2016 [PVA00006340]).[6]  Defendants

contend that "even though Maass was not a participant in this meeting, she was 'legally a party'

because the meeting took place in a conference room near Maass' desk, with the conference room

door left open and while Maass was 'clearly visible through the glass wall.'"  Id. at 285-86.

    Under the relevant wiretapping statutes, the question here is not whether Ms. Maass

was visible to the participants, but whether her presence was "apparent" to the meeting

participants while they were in the midst of the intercepted communications.  See Democracy

Partners III, 453 F. Supp. 3d at 286 (citing CAIR v. Gaubatz, 31 F. Supp. 3d 237, 255 (D.D.C.

2014) ("[W]hile the interceptor need not actively participate in the conversation for the one-party

consent rule to apply, at the very least, his or her presence must be apparent to those individuals

whose conversation is being intercepted.")).  After carefully reviewing the video, the Court

concludes that Mr. Black's testimony has extremely low probative value regarding this meeting.

In the video, Mr. Black approaches Ms. Maass while she is sitting at her desk, briefly inquires as

to whether it was "[Bernie] Sanders' old campaign manager" in the meeting, and subsequently

walks down the hallway towards his office.  See Def. Ex. 130 at 18:14-18:35.  Mr. Black is not

present for the duration of the meeting and appears in the recording for less than thirty seconds.

See id.  Furthermore, defendants' counsel conceded at oral argument that because there is a video

recording of the meeting, Mr. Black's testimony is not necessary to answer the question of

whether Ms. Maass' presence was apparent to the meeting participants.  See Oral Arg. Tr. at

55:22-23 ("So, you know, look, is Black necessary for that reason?  Probably not because I got the

videotape . . . I'll play the video.  I don't need that basis.").

---

[6]   Ms. Maass "secretly recorded everything during her internship" and "provided her
supervisors at Project veritas detailed daily written summaries of all the key events, calls, and
conversations she had secretly recorded that day."  Democracy Partners III, 453 F. Supp. 3d at 271
(emphasis in original).

The Court therefore concludes that Mr. Black's testimony regarding the

October 12, 2016 meeting is not admissible.  There is no evidence that Mr. Black has any personal

knowledge of what the meeting participants were aware, including whether Ms. Maass' presence

in the office was apparent to the meeting participants.  See FED. R. EVID. 602.  Furthermore, even

if defendants could demonstrate that Mr. Black had relevant personal knowledge of the facts at

issue, see FED. R. EVID. 401, his testimony has extremely low probative value – as acknowledged

by defendants at oral argument – and carries a high risk of "confusing the issues" because Mr.

Black was not a participant in the meeting.  See FED. R. EVID. 403.

### C. Causation

Defendants' final contention is that Mr. Black has relevant testimony to offer

concerning the disputed issue of causation – namely, whether defendants' non-expressive conduct

actually and proximately caused AFSCME to cancel its contracts with Mr. Creamer and Strategic

Consulting Group and to cease its funding of AUFC.  See Def. Black Opp. at 7.  Defendants argue

that Mr. Black's testimony is relevant to the issue of causation because "Ms. Maass never had any

contact whatsoever with any officials or staff of AFSCME or [AUFC]." Id.  According to

defendants, his testimony will therefore "illustrate all of the things that were not occurring in the

Democracy Partners office for four weeks in September and October 2016 —namely, anything

having to do with AFSCME." Id.  Plaintiffs counter that Mr. Black's testimony is not relevant

because there is nothing in the record that indicates that he had any contact with AFSCME or

AUFC or any knowledge into why AFSCME canceled its contracts with Strategic Consulting and

terminated its support for AUFC.  See Pl. Black Reply at 4-5.

Defendants' argument regarding causation fails for two reasons.  First, at trial,

plaintiffs must prove that the contract terminations were proximately caused by the publication of

Project Veritas' videos on October 17, 2016, which occurred <u>after</u> Ms. Maass' internship was

terminated on October 14, 2016. <u>See</u> <u>Democracy Partners III</u>, 453 F. Supp. 3d at 275-76, 271.

Mr. Black's testimony about whether Ms. Mass had contact with AFSCME and AUFC during her

internship – which occurred <u>prior</u> to the publication of the videos – is therefore wholly irrelevant

to the question of whether the videos proximately caused the contract cancellations. Second,

defendants do not claim that Mr. Black has any knowledge of facts related to AFSCME or what

caused the cancellation of its contract. Rather, defendants' argument is that Mr. Black's testimony

will reveal that matters concerning AFSCME "were not occurring in the Democracy Partners

office" during the period of Ms. Maass' internship. Def. Black Opp. at 7. His testimony will not

be probative of whether defendants' non-expressive conduct was a "substantial factor in bringing

about the harm." <u>Democracy Partners III</u>, 453 F. Supp. 3d at 274-75 (quoting <u>District of</u>

<u>Columbia v. Carlson</u>, 793 A.2d 1284, 1288 (D.C. 2002)).

      In sum, the Court agrees that "Mr. Black's awareness of Strategic Consulting

Group's contract with AFSCME[,] . . . or lack thereof, has [no] relevance to the issue of

causation." Pl. Black Reply at 5. Defendants offer no evidence that Mr. Black has relevant

testimony to offer regarding whether defendants' non-expressive conduct actually and proximately

caused AFSCME to cancel its contracts with Mr. Creamer and Strategic Consulting and to cease

its funding of AUFC.

IV.    PLAINTIFFS' MOTIONS REGARDING
LAUREN WINDSOR

      Lauren Windsor is the executive director of a non-profit organization, American

Family Voices, and a member of Democracy Partners. <u>See</u> Pl. Undercurrent Mot. at 1; <u>About</u>

14

Lauren, Lauren Windsor, https://www.laurenwindsor.com/ (last visited July 1, 2022).[7]

Ms. Windsor also co-launched and runs a political YouTube channel, The Undercurrent. See Pl.

Undercurrent Mot. at 3. Although Ms. Windsor was not a member of Democracy Partners at the

time of Allison Maass' internship, she worked in Suite 250 and served as a principal of Mike Lux

Media, a corporate member of Democracy Partners. See Democracy Partners III, 453 F. Supp. 3d

at 267. Ms. Windsor interacted with Ms. Maass during her internship and appears in some of her

secret recordings. See id. at 270-71. For example, after Ms. Maass started her internship, Ms.

Maass "provided a fake resume" to Ms. Windsor. JPS at 4.

      Both plaintiffs and defendants intend to call Ms. Windsor to testify at trial. For

plaintiffs, she will testify about "[b]ackground on Democracy Partners," her interactions with Ms.

Maass, and Ms. Maass' responsibilities as an intern. See JPS at 12-13. For defendants, Ms.

Windsor will testify, among other subjects, about her "investigative journalism methods; [and] her

interactions with Allison Maass in January, 2017." Id. at 15.

### A.  Motion to Exclude Countersting Evidence

      Plaintiffs' first motion regarding Lauren Windsor relates to a confrontation that

ensued two months after the events giving rise to this lawsuit. See Pl. Countersting Mot.

Plaintiffs assert that after Ms. Maass concluded her internship at Democracy Partners, she again

used the alias "Allison Brandt" to request a meeting with an employee of People's Action, another

progressive organization. Id. at 3.[8] An individual from People's Action contacted Ms. Windsor

---

[7]    American Family Voices is a 501(c)(4) non-profit founded by Mike Lux in 2000 that aims to connect progressive groups and promote innovation in political strategy. See About Us: Our Mission, AMERICAN FAMILY VOICES, https://www.americanfamilyvoices.org/about (last visited Aug. 9, 2022).

[8]    People's Action is a 501(c)(4) advocacy organization with the stated goal of building "the power of poor and working people . . . through issue campaigns and elections." PEOPLE'S ACTION, About Us, https://peoplesaction.org/about/history (last visited Aug. 9, 2022).

about this inquiry. See id. Ms. Windsor recognized Ms. Maass' alias after having "dealt with Maass at Democracy Partners," and she saw this as an opportunity to expose Project Veritas and confront Ms. Maass about the misrepresentation of her identity. Id. at 3; Def. Countersting Opp. at 3. Ms. Windsor proceeded to plan a meeting between Ms. Maass and Ryan Clayton, then the head of a different progressive group allied with People's Action, to confront Ms. Maass about her secret identity. See Pl. Countersting Mot at 3; Def. Countersting Opp. at 3. The parties jointly characterize this confrontation as a "countersting." See Joint Status Report [Dkt. No. 156] at 2.

Defendants proffer fifteen exhibits relating to the countersting operation. The first is the videotape taken by Ms. Maass of the confrontation at the restaurant and the subsequent chase ("the Chase Video"). See Defendants' Exhibit 178 ("Def. Ex. 178") [PVA00014009-14011]. The Chase Video captures the confrontation on January 5, 2017 from Ms. Maass' camera, during which Ryan Clayton – who is not a party or witness in this case – met Ms. Maass at a restaurant in Washington, D.C. as Ms. Windsor sat at a nearby table and secretly videotaped the encounter. See Pl. Countersting Mot. at 3; Def. Countersting Opp. at 3. At a certain point in the meeting, Mr. Clayton and the other "Maass sting operation participants" revealed to Ms. Maass that they knew her true identity. See Pl. Countersting Mot. at 3. Ms. Windsor and Mr. Clayton then pursued Ms. Maass down the street, "yelling at her at close range and appearing to harass her," id., while "us[ing] foul language and hurl[ing] insults," Pl. Countersting Reply at 8. The Chase Video depicts a partial, shaky view of Ms. Maass walking briskly down the street away from her pursuers. See Def. Ex. 178. It includes audio of intermingled, disembodied voices yelling insults, such as calling Ms. Maass a "bitch" and saying she had been "creamed," an apparent reference to the plaintiff Robert Creamer. Id.; see also Def. Countersting Opp. at 4.

The remaining exhibits consist of fourteen emails sent or received by Ms. Windsor in the days leading up to and directly following the January 5, 2017 confrontation with Ms. Maass

(the "Windsor Emails").  See Defendants' Exhibits 157-170.  The Windsor emails include

discussions between Ms. Windsor and individuals affiliated with Democracy Partners, including

Robert Creamer and Mike Lux, regarding plans to publicize Ms. Windsor's video of the

confrontation.  See id.  In one email, Ms. Windsor writes to two individuals asking for help with

producing the audio and video of the confrontation, stating, "I'm not sure your level of knowledge

of the attack on our firm and other progressive firms by James O'Keefe last fall -- or of your

interest in ratf***ing him for good -- but we came across an opportunity to do just that."

Defendants' Exhibit 158 ("Def. Ex. 158") [DP_0009713] (attached as Ex. 3 to plaintiffs' motion

[Dkt. No. 120-4]).  In another email to a Democracy Partners listserv, Ms. Windsor writes that

"Bob [Creamer] has taken a big financial hit already on everything re [James] O'Keefe . . .

HOWEVER, this is our opportunity to really hit back and hit back HARD.  And POSSIBLY take

him out of the fame for good."  Defendants' Exhibit 159 ("Def. Ex. 159") [DP_0010213] (attached

as Ex. 4 to plaintiffs' motion [Dkt. No. 120-5]) (emphasis in original).

       Plaintiffs argue that the disputed evidence is not relevant because it bears "no

conceivable relevance to any factual issue in this case."  Pl. Countersting Mot. at 2.  They

maintain that Ms. Windsor's conduct in confronting Ms. Maass – two months after her internship

at Democracy Partners was terminated – "does not make more or less probable . . . the existence of

a fiduciary duty by Maass . . . the purposes of her secret recordings [or] whether the damages to

[Plaintiffs] were proximately caused by the infiltration."  Id. at 4-5.  They assert that the

countersting operation does not involve the same type of conduct at issue in this case, noting the

distinction between secret recordings in public, versus secretly recording others inside their private

offices, access to which was gained by misrepresentation.  See id. at 2, 5-6 (emphasis added).

Defendants respond that the disputed evidence is relevant "to impeach Ms. Windsor with evidence

of her bias, personal animus, and motive to lie and shade her testimony on the stand consistent with her goal of destroying the Project Veritas Parties." Def. Countersting Opp. at 2.

The Court concludes that both the Chase Video and the Windsor Emails are relevant because they are probative of Ms. Windsor's bias as a witness. Specifically, Ms. Windsor's conduct in confronting Ms. Maass is relevant to show both Ms. Windsor's favor towards plaintiffs and her animosity towards defendants. As the Supreme Court has held, "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. at 52. The Court may nonetheless exclude such evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403; see also United States v. Young, 2013 WL 12430555, at *3.

For the reasons that follow, the Court will admit Exhibits 158 and 159 of the Windsor Emails, and exclude the remaining emails. The Court will also exclude the Chase Video. At trial, defendants will, however, be permitted to question Ms. Windsor about the underlying events the Chase Video captured – namely, her motivation and conduct surrounding the "countersting" operation.

### 1. The Windsor Emails

The Court concludes that two of the Windsor Emails are admissible under Rules 401 and 403. As detailed above, Exhibits 158 and 159 demonstrate that Ms. Windsor attempted to publicize the confrontation with Ms. Maass in order to "take [defendant James O'Keefe] out of the game for good." Def. Ex. 159. These emails are probative of Ms. Windsor's

bias as a witness because they demonstrate her personal animus towards Project Veritas at a level that "exceeds that of a typical party in civil litigation," Def. Countersting Opp. at 8, and surpasses "ill feelings," Pl. Countersting Reply at 3.  In fact, the emails include explicit evidence of Ms. Windsor's personal vendetta against a defendant in this action, James O'Keefe.  Furthermore, the prejudice stemming from these two emails does not outweigh their probative value.  Although Ms. Windsor uses profanity, see Def. Ex. 162; Def. Countersting Opp. at 1, isolated instances of written profanity do not carry the same risk of inflaming the jury's emotions as the drawn-out aggressive behavior shown in Chase Video, discussed below.  See infra Part IV.A.2.  Likewise, there is little risk of jury confusion because these emails involve statements made by Ms. Windsor herself – the witness whose testimony is being attacked – and do not include aggressive and offensive language from non-witnesses like Mr. Clayton.  See Pl. Countersting Reply at 4.  Because Exhibits 158 and 159 are probative of Ms. Windsor's bias and not unfairly prejudicial or confusing, they are admissible under Rule 403.

The remaining emails are not admissible.  To start, many of the emails were written by individuals other than Lauren Windsor.  See Exhibits 157, 160-62, 165-70.  Hearsay concerns aside, these exhibits have low probative value for the purpose of demonstrating Ms. Windsor's bias as a witness.  And although Exhibits 163 and 164 are emails written by Ms. Windsor, they contain the names and affiliations of individuals completely unrelated to this litigation who Ms. Windsor identified as potential donors, raising additional privacy concerns.  After extensive redactions to remove this information, the emails will be cryptic and confusing for the jury to understand.  Moreover, the text that remains will be duplicative of the language the Court has already admitted in Exhibits 158 and 159.  Compare Def. Ex. 158 (explaining that the countersting publicity will "take [James O'Keefe] out of the game for good") with Def. Ex. 164 (stating that it

"[w]ould be a no brainer for the opportunity to take down [James O'Keefe] for good"). In sum, these remaining emails are confusing, cumulative, and difficult to follow.

### 2. The Chase Video

Like the Windsor Emails, the behavior shown in the Chase Video – namely, chasing a defendant down the street while yelling insults – is also probative of Ms. Windsor's bias in this litigation. But the Chase Video contains a "cacophony of disembodied voices and frequent inflammatory content interspersed within [Ms. Windsor's statements]," Pl. Countersting Reply at 6, which would make it difficult for the jury to distinguish Ms. Windsor's statements in the chaotic recording. Furthermore, the most inflammatory parts of the video feature Mr. Clayton, a non-party and non-witness in this case, whose actions "cannot be probative of the bias of Ms. Windsor." Id. at 4. And cross-examination of Ms. Windsor in combination of Exhibits 158 and 159 are sufficient to show Ms. Windsor's alleged bias against defendants, which further diminishes the probative value of the Chase Video.

The highly inflammatory nature of the Chase Video also cannot be overstated. The video depicts overtly aggressive behavior, which includes taunts about sexual abuse that "any reasonable jury would find difficult to ignore." Pl. Countersting Reply at 7 (quoting Charles v. Home Depot U.S.A., Inc., Civ. No. 16-2054, 2021 WL 4439057, at *8 (D.D.C. Sept. 28, 2021)). For example, Ms. Windsor repeatedly asked Ms. Maass whether she had been to a "rape barn." See Def. Ex. 178; Def. Countersting Opp. at 4. The video carries a risk that a juror would be swayed to rule against plaintiffs based on "distaste for [this] crude language or aggression." Pl. Countersting Reply at 7. The video is also extremely confusing. It is difficult to identify specific individuals from the "cacophony of disembodied voices" or to follow what is happening in the shaky footage. Id. at 6.

The Court therefore concludes that the Chase Video's probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues . . . [and] needlessly presenting cumulative evidence." FED. R. EVID. 403.  Defendants nonetheless have demonstrated "a good faith basis" for questioning Ms. Windsor about the underlying events depicted in the Chase Video.  See United States v. Lin, 101 F.3d at 767.

### B.  Motion to Exclude Undercurrent Videos

Plaintiffs' second motion related to Lauren Windsor pertains to The Undercurrent, a YouTube channel that Ms. Windsor launched in 2012 and re-launched in 2017.  See Pl. Undercurrent Mot. at 3; see also About, The Undercurrent, https://www.theundercurrent.tv/about (last visited Aug. 9, 2022).  According to plaintiffs, The Undercurrent is a "political web show and YouTube channel on which Ms. Windsor posts, among other content, secret recordings made of her interactions with various elected and public officials in public spaces, such as at political events and in legislative buildings."  Pl. Undercurrent Mot. at 1-2.  The five Undercurrent videos at issue were recorded and posted between June 29, 2021 and September 9, 2021, nearly five years after the events giving rise to this litigation.  See id. at 2.  The videos show Ms. Windsor "approaching and secretly recording public officials in crowded legislative buildings and at Republican Party events" by "pretending to be supportive of the official's political stance" and eliciting candid responses.  Id.  At oral argument, plaintiffs' counsel indicated that defendants also wish to include nine additional Undercurrent videos in their proposed exhibit list for trial.  See Oral Arg. Tr. at 5:11-15.  Defendants' counsel later explained that defendants would narrow the scope of the videos for the Court, see id. at 26:1-7, although the Court has not yet received an amended exhibit list.

Plaintiffs' motion to exclude argues that the Undercurrent videos "ha[ve] no conceivable relevance to any factual issues in this case." Pl. Undercurrent Mot. at 2. Defendants disagree for two reasons. First, defendants assert that the evidence will be used to "[r]ebut Plaintiffs' false 'political spying' characterization [of Defendants' activity] by demonstrating that Plaintiffs view the same surreptitious recording activity as appropriate 'journalism' when one of their own does it." Def. Undercurrent Opp. at 1. Second, defendants argue that the videos will be used to impeach Ms. Windsor by "[d]emonstrat[ing] that Windsor is steeped in political biases such that she views harming Project Veritas as part of her political project." Id. For the reasons that follow, the Court concludes that the five Undercurrent videos – along with any additional Undercurrent videos that defendants seek to present at trial – are not admissible to either "attack [plaintiffs'] hypocrisy" or to impeach Ms. Windsor by demonstrating her bias. Defendants may, however, question Ms. Windsor about The Undercurrent webpage and her interviews.

### 1. Relevance

Pursuant to Rule 401, the Undercurrent videos may be relevant if they have "any tendency to make a fact more or less probable" and "the fact is of consequence in determining the action." FED. R. EVID. 401. Defendants argue that the "fact of consequence" in this instance is defendants' alleged journalistic status, which rebuts plaintiffs' assertion that they had a tortious purpose in intercepting plaintiffs' communication. See Democracy Partners III, 453 F. Supp. 3d at 287 (concluding that there remains a "genuine dispute" about whether breach of fiduciary duty is – or is not – a "determinative factor in [defendants'] motivation in intercepting the conversation[s]"). Specifically, defendants contend that the Undercurrent videos are relevant to attack the alleged "hypocrisy" of plaintiffs' political spying characterization by allowing the jury to compare Ms. Maass' conduct to Ms. Windsor's. See Def. Undercurrent Opp. at 1; see also Oral

Arg. Tr. at 15:13-19.  Defendants' further argue that the Undercurrent videos are admissible as impeachment evidence, specifically to reveal Ms. Windsor's political biases and "demonstrate how Plaintiffs view this lawsuit as part of a partisan political project."  Def. Undercurrent Opp. at 6.  Plaintiffs respond that "[t]he videos are not remotely needed to show such political orientation," because "the fact that Ms. Windsor favors and works for Democratic and progressive causes is not disputed."  Pl. Undercurrent Reply at 3.[9]

The Court concludes that the Undercurrent videos are relevant for the two reasons asserted by defendants.  They are probative of defendants' claims to be a newsgathering organization, and they also help demonstrate Ms. Windsor's bias by portraying her active role in partisan political reporting.

### 2. Rule 403 Balancing

Although relevant, the Court concludes that the probative value of the Undercurrent videos is extremely low.  See FED. R. EVID. 403.  To start, The Undercurrent videos were recorded and posted to YouTube nearly five years after the events giving rise to this litigation, see Pl. Undercurrent Mot. at 2, and they do not feature or discuss any of the individuals implicated in this litigation besides Ms. Windsor.  See Pl. Undercurrent Reply at 3.  Rather, the five videos show excerpts of Ms. Windsor soliciting comments – in public settings – from Republican state and federal elected officials on a variety of topics.  See Def. Exs. 132-136.  Nor do the Undercurrent videos relate to defendants' defenses.  Defendants do not assert counterclaims or allege fraudulent misrepresentation or wiretapping violations by any of the plaintiffs or by Ms. Windsor.  They also

---

[9]     Plaintiffs also contend that Ms. Windsor's political leanings do not affect the truthfulness of her testimony, and therefore this extrinsic evidence would be inadmissible under Rule 608(b)(1) of the Federal Rules of Evidence.  See Pl. Undercurrent Mot. at 6.  Defendants do not seek to inquire about the videos on cross-examination "to attack . . . the witness's character for truthfulness," FED. R. EVID. 608(b), so the Court need not reach this argument.

do not claim the existence of a fiduciary duty between Ms. Windsor and the elected officials in the
videos. The officials whom Ms. Windsor recorded are not claiming injury.

Furthermore, Ms. Windsor's conduct in the videos cannot be "fair[ly]"
characterized as "political spying" in the same way that defendants' conduct can. See Democracy
Partners v. Project Veritas ("Democracy Partners VI"), Civ. No. 17-1047, 2021 WL 4785853,
at *8 (D.D.C. Oct. 14, 2021). In a prior opinion resolving other motions in limine in this case, this
Court found a "sufficient good faith evidentiary basis for the plaintiffs to characterize the
defendants' conduct [] as a 'political spying operation," based on James O'Keefe's statements in
his book AMERICAN PRAVADA and the undisputed facts in this case. See id. at *8 ("[T]he
book shows that Mr. O'Keefe himself . . . viewed the conduct at issue as accomplished by
'operatives' who were 'stealthily' infiltrating restricted spaces."). By contrast, the circumstances
surrounding the five Undercurrent videos are murkier. While the Undercurrent videos are clearly
"political" and partisan in nature, the methods that Ms. Windsor employed in recording the videos
are different from those employed by Ms. Maass. Plaintiffs concede that Ms. Windsor "engaged
in a certain level of deceit" by "pretend[ing] [to] share the political sentiment of the public
officials she spoke with." Pl. Undercurrent Mot. at 7. The videos, however, do not involve
"infiltrating restricted spaces," as described by Mr. O'Keefe. Democracy Partners VI, 2021 WL
4785853, at *8. Rather, the five original Undercurrent videos portray Ms. Windsor "secretly
recording public officials in public places." Pl. Undercurrent Mot. at 6 (emphasis added); see also
id. at 2 ("These videos show Windsor approaching and secretly recording public officials in
crowded legislative buildings and at Republican Party events." (page number refers to plaintiffs'
motion attached to the memorandum of points and authorities)).

Defendants' counsel played additional videos at oral argument that they request be
admitted at trial. In one video, in which Ms. Windsor interviews political figures at a National

Rifle Association ("NRA") convention, plaintiffs' counsel clarified that "[Ms. Windsor] became a member of the NRA under her own name to do that." Oral Arg. Tr. at 6:22-25. And in another video in which Ms. Windsor attended a fundraiser at Mar-a-Lago to ask questions of Republican Senate candidate, Herschel Walker, plaintiffs' counsel explained that Ms. Windsor "registered for [the] event under her own name and bought a ticket." Id. at 7:5-6.[10] Counsel for defendants did not dispute the facts proffered by plaintiffs' counsel at oral argument, instead arguing that Ms. Windsor "lied to or misled the subjects of her information gathering . . . because she is a far left progressive activist and has been her whole adult life." Id. at 9:23-10:2. In response to the Herschel Walker video, defendants' counsel conceded that he "[didn't] know how she got in there," but asserted that Ms. Windsor was "[p]retending to be someone she's not, in a venue secured by the Secret Service, five rows from the former president of the United States . . . in Mar-a-Lago." Id. at 25:14-21. Defendants' counsel further pointed out that Ms. Windsor entered the NRA event by "circumventing the United States Secret Service and sneaking in a door for the purpose of . . . showing that [she could enter with] a firearm." Id. at 19:9-12.[11] Based on these descriptions of Ms. Windsor's methods, the Court cannot definitively find that the Undercurrent

---

[10]   Ms. Windsor was deposed about her methods of collecting information for The Undercurrent and was asked whether she secretly recorded herself at the American Legislative Exchange Council ("ALEC") summit in Washington D.C. See Transcript of Videotape Deposition of Lauren Windsor ("Windsor Dep.") [Dkt. No. 119-2] at 146:12-156:21. Ms. Windsor testified that she did not assume a false identity or forge documents to gain access to this event. See id. at 151:11-13; 156:3-11. She attended the ALEC summit by obtaining a visitor pass, which clearly displayed her name. See id. at 156:3-21; 148:7-11 (explaining that she "walked in the door . . . at a hotel in D.C.").

[11]   Ms. Windsor tweeted that she "walked in an unlocked side door – no screening – past an officer and into reserved seating." @lawindsor, TWITTER (May 28, 2022, 1:34 PM), https://twitter.com/lawindsor/status/1530603445736001536?s=20&t=mQmkXFWYLsAgEcyEZtt cKw. According to Ms. Windsor, she did this to illustrate that the NRA and Secret Service were unable to implement Senator Ted Cruz's policy proposal that "every school in America [] operate w/ a single point of entry every day." Id.

videos provide a "sufficient good faith evidentiary basis" to characterize Ms. Windsor's activity as "political spying." Democracy Partners VI, 2021 WL 4785853, at *8.

Lastly, the Undercurrent videos have very minimal probative value for impeachment purposes. See FED. R. EVID. 403. Direct and cross-examination of Ms. Windsor will sufficiently demonstrate her political and personal bias and any potential self-interest she has in the outcome of this litigation. In fact, defendants have already stated that they plan to question Ms. Windsor regarding "[h]er past political work; her work at Democracy Partners; her work in the 2016 election cycle," and her relationship with key figures in this case, including Mr. Creamer, Ms. Maass, and Mr. Black. JPS at 15. It is also undisputed that Ms. Windsor is highly partisan and has close professional and personal ties to Democracy Partners. See Pl. Undercurrent Reply at 3; Oral Arg. Tr. at 8:8-10 ("She's a senior staff member of one of the companies of Democracy Partners. For all intents and purposes, she's a party witness."). And further, the Court has already concluded that two of the emails demonstrating Ms. Windsor's desire to publicize the "countersting" operation are admissible to show personal bias. See supra Part IV.A.1. These Windsor Emails, along with cross-examination, will be sufficient to show Ms. Windsor's alleged bias and animosity.

The Undercurrent videos are also highly likely to cause prejudice and confuse the jury. First, it is important to note that although Ms. Windsor is not a named party in this case, she is a key witness with strong ties to the plaintiffs – she shared office space with Mr. Creamer and Democracy Partners, interacted with Ms. Maass, and played a leading role in the countersting operation in January 2017. See supra Part IV.A. The videos may cause undue prejudice against plaintiffs because the jury may attribute Ms. Windsor's behavior to Democracy Partners and Strategic Consulting. Furthermore, the videos may mislead the jury to believe that Ms. Windsor's surreptitious recording of Republican officials in public places is similar to Ms. Maass' secret

recording at Democracy Partners.  But as discussed above, defendants' and Ms. Windsor's methods are not the same.[12]  And further, plaintiffs' wiretapping claim involves an allegation of tortious purpose – breach of fiduciary duty – which does not exist between Ms. Windsor and the elected officials she interacted with in the videos or any of the other people and events she filmed.

Given the minimal probative value of the Undercurrent videos and the alternative avenues through which defendants can illustrate Ms. Windsor's bias, the Court concludes that the probative value of the Undercurrent videos "is substantially outweighed by the danger of…unfair prejudice, [and] misleading the jury." FED. R. EVID. 403.  The five Undercurrent videos listed on defendants' exhibit list (Exhibits 132-136), as well as any additional Undercurrent videos that defendants may wish to introduce, will not be admitted in evidence at trial.

## V.      DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' PROPOSED TRIAL EXHIBIT 121

Defendants separately move to exclude plaintiffs' proposed trial Exhibit 121, which they assert is an internal email that "references a news publication by Project Veritas that is unrelated to the news investigation at issue in this case" and was only produced "because it bears the name 'Creamer' in it." Def. Exhibit 121 Mot. at 2.  Defendants maintain that nothing in the exhibit speaks to the existence or breach of a fiduciary duty, nor does it support plaintiffs' allegations of conspiracy or fraudulent misrepresentation. Id. at 2-3.  They further argue that even if Exhibit 121 is relevant, it should be excluded for risk of confusing the issues or misleading the jury. See id. at 3; FED R. EVID. 403.

---

[12]      Although defendants have also secretly recorded Mr. Creamer and Scott Foval in public places, plaintiffs do not raise any claims relating to those videos.  See Pl. Undercurrent Mot. at 5.

Plaintiffs oppose defendants' motion and assert that "the sole purpose for which Plaintiffs would introduce this document is to show that Project Veritas is not a legitimate news organization." Pl. Exhibit 121 Opp. at 1. They maintain that "[r]eal news organizations – whether Fox News, the New York Times or any other recognized media outlet – do not go to their donors, or advertisers, and ask for their 'input' on when stories should be run." Id.[13] For support, plaintiffs cite this Court's prior opinion, which stated that "plaintiffs [] will be entitled to present additional argument, introduce rebuttal evidence, or cross-examine witnesses on this subject 'to prevent the jury from forming the erroneous impression that the proper characterization of [defendants' journalistic status] is undisputed.'" Id. at 2 (citing Democracy Partners VI, 2021 WL 4785853, at *6 (internal citation omitted)).

Plaintiffs are correct that this Court has already established that they are entitled to introduce evidence to rebut defendants' journalism defense. See Democracy Partners VI, 2021 WL 4785853, at *6. The probative value of Exhibit 121, however, is substantially outweighed by a risk of confusing the issues and misleading the jury. See FED R. EVID. 403. To start, the exhibit says nothing substantive about Project Veritas' journalistic activities or its conduct in relation to Ms. Maass' infiltration of Democracy Partners. Instead, it is a back-and-forth between Project Veritas employees discussing various fundraising strategies in a way that is hard to follow and confusing. Furthermore, the exhibit likely would require substantial redactions if presented to the jury, which would further diminish its probative value and enhance its risk of confusing the jury.

---

[13]  Plaintiffs originally agreed to withdraw Exhibit 121 if the Court granted plaintiffs' motion in limine to preclude defendants from making a journalism defense. Pl. Exhibit 121 Opp. at 2. On July 21, 2022, however, plaintiffs voluntarily withdrew their motion regarding the journalism defense and acknowledged their "expectation and understanding" that defendants at trial "will make arguments, offer evidence and/or elicit testimony concerning their status as investigative journalists, and will be permitted to do so for any relevant purpose." See PSR at ¶ 2. In return, defendants agreed to withdraw their proposed trial Exhibits 171 through 175. Id. at ¶ 5.

The Court therefore concludes that plaintiffs' proposed Exhibit 121 should not be admitted in evidence at trial.

Despite Exhibit 121's exclusion, plaintiffs have demonstrated "a good faith basis" to question Project Veritas witnesses at trial about the facts underlying this exhibit – namely, whether defendants have a practice of "ask[ing] [donors] for their 'input' on when stories should be run." See United States v. Lin, 101 F.3d at 767; Pl. Exhibit 121 Opp. at 1. As stated in a prior opinion resolving other motions in limine in this case, if defendants "open the door" at trial by arguing that they were acting "as 'investigative journalists,' engaged in 'truthful reporting,'" plaintiffs may present "additional arguments, [] rebuttal evidence, or cross-examin[ation]" to rebut these contentions. Democracy Partners VI, 2021 WL 4785853, at *6. At oral argument, counsel for defendants stated that he plans to do exactly this – "open the door" to the defendants' journalistic status "out of the gate, [during] opening argument." Oral Arg. Tr. at 67:14-15; see id. at 68:6-7 ("[M]y defense, on behalf of my clients, is that they were journalists who had no tortious purpose . . . That's it. Cat is out of the bag. There's my defense. No big secret."). Plaintiffs in turn are entitled to elicit testimony regarding whether Project Veritas "go[es] to their donors, or advertisers, and ask for their 'input' on when stories should be run" to contradict defendants' claim to be a legitimate news organization. Pl. Exhibit 121 Opp. at 1.

## VI.   CONCLUSION

For the reasons set forth above, the Court concludes that the testimony of Aaron Black as to the existence of a fiduciary duty between Allison Maass and Democracy Partners, as well as two of the emails relating to Lauren Windsor's planned confrontation with Ms. Maass (Exhibits 158 and 159), are admissible.  All other disputed evidence raised by the parties in their motions in limine – including the Chase Video, the remaining Windsor Emails, the Undercurrent videos, and Exhibit 121 – will be excluded.  The parties may, however, question witnesses about the underlying facts related to the excluded exhibits so long as the line of questioning is relevant to the issue at trial.  An order consistent with this Opinion shall issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE:  8/12/22