UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC,        CASE NO.: 1:17-CV-1047-PLF
et al.,

  Plaintiffs,

v.

PROJECT VERITAS ACTION FUND,
et al.,

  Defendants.
_____/

### PROJECT VERITAS PARTIES' <br> RULES 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW

  Unhappy with the loss of business that resulted when AFSCME reacted to Project Veritas Action Fund's published reporting of Plaintiffs' own words coming out of their own mouths along with the mouths of their other associated political operatives, Plaintiffs attempted to construct claims challenging the means by which Project Veritas gathered the news: journalist Allison Maass's undercover status and her use of hidden camera recording during her eight-day unpaid internship with Democracy Partners.

  After a week-long trial, Plaintiffs have failed to prove a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on any of the claims they asserted. *See* Dkt. 1 at 17-24. Accordingly, Project Veritas Action, Project Veritas, James O'Keefe, and Allison Maass move pursuant to Fed. R. Civ. P. 50(a) for entry of a judgment in their favor on each cause of action alleged by Plaintiffs based on the facts and law discussed below. Our principal focus at oral argument will be on:

 (1) **No fiduciary duty.** Plaintiffs failed to demonstrate a legally sufficient evidentiary basis for the jury that Allison Maass's recordings were made for the primary or determinative

purpose of breaching a fiduciary duty and accordingly Plaintiffs' federal and D.C. wiretap causes of action fail.

(2) **Complete failure of causation.** Plaintiffs failed to prove a legally sufficient evidentiary basis for a reasonable jury to find that Ms. Maass's actions during her internship caused Strategic Consulting's alleged loss of business (as opposed to, for example, the First Amendment-protected expressive conduct of the published reporting and the words coming out of Plaintiffs' own mouths and the mouths of their associates).

The Project Veritas Parties will stand on these papers regarding the balance of the issues argued herein.

## I. Plaintiffs Failed to Introduce Evidence that Allison Maass's Recordings Were Made for the Primary or Determinative Purpose of Breaching a Fiduciary Duty

Because Ms. Maass was a party to every conversation she recorded, the one-party consent to record rule applies. *See* 18 U.S.C. § 2511(2)(d); D.C. Code § 23-542(b)(3). To defeat the one-party consent to record rule, Plaintiffs must establish that Allison Maass recorded for the primary or determinative purpose of breaching a fiduciary duty. *See* 18 U.S.C. § 2511(2)(d); D.C. Code § 23-542(b)(3). Following the order granting in part the Project Veritas parties' motion to dismiss, the only permissible theory on which Plaintiffs could proceed is demonstrating the tortious purpose of breaching a fiduciary duty. *Democracy Partners v. Project Veritas et al.*, 285 F. Supp. 3d 109, 125 (D.D.C. 2018).

### I(A). No Fiduciary Duty Existed

The factors in determining whether a fiduciary duty exists are: (1) the nature of the relationship, (2) the promises made, (3) the types of services rendered, and (3) the legitimate expectations of the parties. *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 341 (D.D.C. 2011). At the summary judgment stage, the Court

ruled that based on the undisputed facts, the first two factors did not support the existence of a fiduciary duty. [D.E. 83] at 25. With the benefit of a week-long trial, it is clear that the other factors do not support Plaintiffs' claims.

Ms. Maass's internship tasks were routine. In the phone call in which he offered her the internship, Creamer suggested that she might do work on glorified campaign volunteer tasks like making calls for turnout, and "organizing data." Def. Ex. 117. Ms. Maass's actual internship tasks ended up being even more mundane, including tasks like counting signs, Def. Ex. 124-3, and assembling press clippings. There is no evidence of any duties that caused the internship to rise to the level of a fiduciary duty. *See generally Iacangelo v. Georgetown*, 760 F. Supp. 2d 63, 65 n.1 (D.D.C. 2011) (Friedman, J.) (ruling in context of duplicative claims that doctor's procuring medical devices for patient did not give rise to a fiduciary duty).

Nor does the evidence of the "legitimate expectations of the parties" assist Plaintiffs. As an unpaid intern for no more than eight days for Democracy Partners, Allison Maass was asked for no resume prior to her start date, was not asked for her ID by Bob Creamer or anyone else at Democracy Partners at any time, received no written non-disclosure agreement, had no verbal discussion about confidentiality or similar duties, did not receive an employee handbook, and was not given a company email address or computer. Cross-Examination of Allison Maass, Sept. 19, 2022.[1]

Plaintiffs took no steps to bind an unpaid intern to one of the highest duties under the law, and took no steps to define her duties as an intern or communicate their expectations.

---

[1] As transcripts for this trial are not yet available, the undersigned have supplied citations to the relevant testimony to the best of their ability.

The sole reference to non-disclosure was Creamer's statement after the internship had already begun[2] that Lauren Windsor "has some kind of a non-disclosure agreement to sign or something." Def. Ex. 124-7; Cross-Examination of Robert Creamer, Sept. 15, 2022 (affirming this was the only discussion Creamer had with Maass about confidentiality). It is undisputed that no such agreement was ever drafted much less presented, and the topic never came up again.

The parties stipulate that Lauren Windsor's testimony is:

(1) that she never provided Ms. Maass a written non-disclosure agreement or confidentiality agreement;

(2) that she never drafted a non-disclosure agreement or confidentiality agreement for Ms. Maass;

(3) that she never had a discussion with Ms. Mass about confidentiality agreements or non-disclosure agreements;

(4) that she never discussed with Ms. Maass the need to not discuss or disclose what she learned, did, saw, or heard during the internship at Democracy Partners.

*See* Dkt. 174 (read into the trial record on Sept. 16, 2022). Creamer likewise admitted that no agreement was provided. He testified that Plaintiffs "just neglected to ask her to sign one and we were not appropriately rigorous in that respect." Direct Examination of Robert Creamer, Sept. 15, 20229/15/22 Creamer direct. Windsor's stipulated testimony is that she broached the matter twice with Creamer, "but he said that I should not worry, that it was the niece of a friend of his and that

---

[2] In fact, Aaron Black's admissions regarding Plaintiffs' involvement in disruptive bracketing events came before *before* Creamer's oblique reference to a never-drafted and never-provided hypothetical non-disclosure agreement. Cross-Examination of Allison Maass, Sep. 19, 2022 (affirming this discussion occurred within a couple of hours of Maass beginning the internship). This is still more evidence that Plaintiffs did not treat their work in a manner consistent with implying a fiduciary duty for an unpaid intern.

it was under control. He told me that if I wanted to get that information, than I should." Dkt. 174] (read into the trial record on Sept. 16, 2022). Windsor chose not to ask for a non-disclosure agreement because she "didn't get around to it and also because I felt uncomfortable openly challenging someone Bob represented as a friend." *Id.* Through their own actions, Plaintiffs chose not to establish the parameters and duties of Ms. Maass's unpaid internship.

Nor are there facts from which to conjure a fiduciary duty for the unpaid intern based on the "legitimate expectations of the parties" in the absence of any writing or discussion of Ms. Maass's internship obligations. No résumé was required before Ms. Maass began the internship. Windsor also did not recall ever asking Ms. Maass for an ID. Dkt. 174 (read into the trial record on Sept. 16, 2022). There is no evidence anyone at Democracy Partners saw the ID; while Ms. Windsor may have been present when Ms. Maass showed the ID to get into the Communication Workers of America building, the record is silent as to how that implies a fiduciary duty to Democracy Partners, which never asked for nor saw the ID.

Plaintiffs did not treat their work as though it were confidential. Before Ms. Maass's internship (and therefore pre-dating any act alleged by Plaintiffs to be tortious), Creamer explained his terminology of so-called "bracketing events" in his first in-person meeting with journalist Dan Sandini, a stranger. Def. Ex. 113-1 (*e.g.*, "[M]ost TV markets, you know, the presidential candidate comes into town, its' going to be on the evening news . . . So we want to do something that is – meanwhile, the Democrats or a bunch of organizations say the following about the son of a b—"). The meeting occurred in a public place (a hotel atrium) and before Creamer had even sat down, he described his role in bracketing to the journalist.

In the phone conversation where Creamer offered Ms. Maass the Democracy Partners internship, Creamer explained the nature of the disruptive political events he planned and executed.

Def. Ex. 117. Creamer volunteered that on behalf of "the Clinton campaign" he handled "events which involve – you know, going after Trump and Pence" in order to "frame up the response." *Id.* In this pre-internship conversation, Creamer even revealed that there would be future events in Washington D.C. *Id.*

Likewise, Aaron Black invited *another* Project Veritas journalist whom he had just met at a protest up into the Democracy Partners office. Def. Ex. 177-1 and 177-2. Black described Plaintiffs' bracketing program, including future bracketing plans. *Id.* With a whiteboard to his left and a map to his right, *see* Def. Ex. 177-1, Black regaled this stranger with details of how the events generated favorable press coverage, and future plans for "Donald Ducks" including that the duck would be going to Charlotte again and that Plaintiffs planned to distribute toy "Donald Ducks." Ex. 177-2 ("We did bring a duck a couple of weeks ago [to North Carolina]. We're going to bring the Duck back, too . . . . We're going to hand these out, too."). It turns out that Plaintiffs also do not treat their work as confidential if there's a total stranger they might want to impress.

Within a couple hours[3] of the start of Ms. Maass's internship (and before Creamer's brief reference to the hypothetical, never-drafted non-disclosure agreement), Aaron Black described bracketing events, including his role as "deputy rapid response director for the DNC for all things Trump on the ground." Def. Ex. 124-3. He revealed his own role – and emphasized Creamer's more significant role – in the violent and disruptive protests in Chicago:

> [W]hen they shut all that, that was us. It was more him than me [gesturing towards Robert Creamer's office], but none of this is supposed to come back to us, because want it coming from people. We don't want it to come from the party. So if we do a protest, and its brand – oh, DNC protest, right away press is going to say "partisan."
> . . .
> You know, now if I'm out there protesting like stuff – or protesting – getting people to protest stuff, like from different community groups, different

---

[3] Cross Examination of Allison Maass, Sept. 19, 2022.

>organizations, they brand it themselves and then we say: "Look, this came across our desk," or "look, you know, you guys should be out there because these folks in the community are doing this." Then it has more of a legitimate – this is coming from voters, it's not necessarily coming – I mean, it is coming from voters, I just happen to be the person stirring it up.

*Id.* These words, coming out of Black's own mouth, described how Plaintiffs planned fake grassroots protests that were in fact organized by partisan political operatives, in order to manipulate media coverage. Black concluded this explanation of his role in political spying by saying, "And nobody is really supposed to know about me." *Id.*

At another meeting – this time over wine in a crowded restaurant – Creamer again provided non-public information about future bracketing Donald Ducks to journalist Dan Sandini, describing an upcoming event in Charlotte. Def. Ex. 115-1.

Even more broadly, Creamer testified that in his experience, "it is not at all unusual" to tell a potential donor to a party committee or organization non-public information about the organization's plans. Re-direct Examination of Robert Creamer, Sept. 15, 2022. Creamer also recognized a distinction between something a person does not want another to know, and something that's actually confidential: when asked on direct examination about how he revealed Secretary Clinton's creation of "Donald Ducks" to journalist Dan Sandini, he testified that he may have asked him not to say anything to anybody else because it was "kind of personal." Direct Examination of Robert Creamer, Sept. 15, 2022.

Moreover, the analysis of whether fiduciary duties exist depend on the legitimate expectations of the *parties* – plural. Plaintiffs cannot unilaterally impose a fiduciary duty, especially given the absence of any agreement defining the scope of the supposed duty. What Allison Maass expected is critical to the analysis, and she testified that she had no reason to believe she was bound to a fiduciary duty or to keep anything confidential. For example, regarding the

hypothetical and never-drafted non-disclosure agreement referenced by Creamer near the end of her first day as an intern at Democracy Partners, Allison Maass testified that she never saw any such agreement, so she does not know what it might have said. Direct Examination of Allison Maass, Sept. 16, 2022.

Thus, Plaintiffs' criteria for sharing non-public information is based exclusively on Creamer's judgment about whether he thinks the person he's sharing with can help him or hurt him. This sort of ad hoc, gut decision-making is not determinative of the confidentiality. To the contrary, it demonstrates why Plaintiffs were obligated to *do something* to define the parameters of how their work should be treated if they expected to come to federal court hold an unpaid intern to the highest standard of duty under the law. They did not.

Instead of a tortious purpose, the evidence showed that Project Veritas Parties acted with the sole purpose of gathering the news. *See e.g. Vasquez-Santos v. El Mundo Broadcasting Corp.*, 283 F. Supp. 2d 561, 568-69 (D.P.R. 2003) (summary judgment granted for journalist and other media defendants where plaintiffs offered no convincing evidence or argument why journalist "would have any reason to record the meeting with Plaintiff other than to gain information for his broadcast" and explaining that the requirement of a contemporaneous "express intent of committing a tort" is significant because "without it the media could be held liable for undercover reporting under § 2511 even when its sole intent was to gather the news."); *Russell v. American Broadcasting Co. Inc.*, 1995 WL 330920, *4 (N.D. Ill. 1995) (granting media defendants' motion to dismiss as to unlawful surveillance where journalist got job at grocery store and surreptitiously recorded because media "defendants intended to expose sanitation problems in the commercial fish industry" therefore "it is clear that defendants did not intercept for the purposes of committing a crime or tort.").

The first time the Project Veritas Parties learned of Creamer or Democracy Partners was when Foval described Creamer as a person who "hatches" voter fraud schemes: "I work with Bob Creamer one-to-one all the time. I'm the white hat. Democracy Partners is kind of the dark hat." Def. Ex. 112-2. Allison Maass became involved in the news investigation when she read the reporter's notes that Christian Hartsock stayed up all night preparing. Cross-Examination of Allison Maass, Sept. 19, 2022. The evidence is undisputed that no one at Project Veritas Action Fund had ever heard of Plaintiffs before. *See, e.g.*, Cross-Examination of Christian Hartsock, Sept. 16, 2022. Project Veritas Action Fund continued following leads and corroborating information its journalists had learned, including from Aaron Black and Creamer himself.

Having failed to establish a fiduciary duty between Allison Maass and Democracy Partners and that Ms. Maass had no purpose to breach such a duty with her hidden camera recording, the Project Veritas Parties are entitled to judgment as matter of law on Counts Two and Three.

**I(B). The Evidence Regarding the Conference Room Conversation is Insufficient to Support a Wiretap Claim – The Contents of the Communications Were Not Recorded**

Plaintiffs cannot salvage their wiretap claims with the meeting that occurred in the glass-walled conference room directly in front of Allison Maass. *See* Pl. Ex. 118-1 and 118-2.

A wiretap claim requires an interception. 18 U.S.C. § 2511(1)(a); D.C. Code § 23-542(a)(1). An interception is "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4); *see also* D.C. Code § 23-541(3). An "oral communication" is an "oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2); D.C. Code § 23-541(2). The term "contents" of an oral communication means its intended message. *In re Zygna Priv. Litig.*, 750 F.3d 1098, 1105-06 (9th Cir. 2014); 18 U.S.C. § 2510(8) ("contents", when used

9

with respect to any . . . oral . . . communication, includes any information concerning the substance, purport, or meaning of that communication); *see also* D.C. Code § 23-541(6). "In other words, it is not simply the fact that a defendant intercepted sound or audio, but the defendant must have gathered information about the meaning or substance of the oral communication." *Mousavi v. John Christner Trucking, LLC*, 487 F. Supp. 3d 1194, 1202 (N.D. Okla. 2020). In *John Christner Trucking*, defendants recorded a conversation in which plaintiff spoke entirely in Farsi, a language which the defendants did not understand. "The issue before the [c]ourt [was] whether the ECPA imposes civil liability for the interception of a communication when the contents or message of the communication have remained private, and the [c]ourt f[ound] that the ECPA does not impose such liability." *Id.* at 1202.

The facts at trial are even more cut-and-dried than in *John Christner Trucking*. Allison Maass did not acquire any information about the substance or meaning of the communication that took place in the glass-walled conference room directly in front of her. The videos shown by Plaintiffs do not contain any discernible words from the conference room, only noise. *Compare* Pl. Ex. 118-1 and 118-2. This was patent to all in the courtroom when Plaintiffs played the videos for the jury. Nor did any of the Plaintiffs testify that the contents of their communications in the conference room had been intercepted. This point is also determinative: the conference room communications included three male voices, two of whom were part of the Bernie Sanders campaign. *See id.* Only one of them, Mike Lux, was as a member of Democracy Partners, and Plaintiffs did not call him (or anyone else) to identify his voice or the communications allegedly intercepted. Ms. Maass herself testified that she could not hear the conference room conversation on the recording and she could not understand from the recording what was being said. Direct Examination of Allison Maass, Sept. 16, 2022. When Plaintiffs asked about Ms. Maass's typed

reporter's notes, Ms. Maass testified that her notes were not based on the recording but rather "[b]ased on what I heard sitting at my desk." *Id.*; *see* Pl. Ex. 110. Ms. Maass's ears are not a "device."[4] No interception occurred and the Project Veritas Parties are entitled to judgment as a matter of law as to the Conference Room claim under Counts Two and Three.

## II. Plaintiffs' Failure to Demonstrate Causation

In an effort to avoid the Project Veritas Parties' First Amendment protections, Plaintiffs disclaimed any alleged damages flowing from expressive conduct (i.e., Project Veritas's published reporting). The predecessor judge took Plaintiffs at their word and recognized the effect of these disclaimers repeatedly. The sole theory which they may pursue is that damages allegedly suffered were the result of "disclosures and actions of Maass described in paragraphs 27-44 [of the Complaint], which "make no reference whatsoever to the creation or posting of the Project Veritas videos or any other publication." *See* Dkt. 25 at 25 (Order Denying Mot. to Dismiss) (citing Pl. Opp.). Plaintiffs claimed that their alleged injuries would have resulted "even if the YouTube Videos had never been published." Dkt. 19 at 11 (Opp. to Mot. to Dismiss).

The evidence does not support Plaintiffs' theory. The evidence is that independent actors made their own decisions after viewing Project Veritas's published reporting and seeing the words come out of the mouths of Plaintiffs' and their associates. Plaintiffs fail to show the causal link between the loss of business following the publication of "Rigging the Election - Part I" (Def. Ex. 131, and the Project Veritas Parties' non-expressive conduct.

---

[4] A "device" is "any device or apparatus which can be used to intercept a wire, oral, or electronic communication . . . ." 18 U.S.C. § 2510(5).

### II(A). AFSCME Reacted to the Publication of Project Veritas's Reporting – First Amendment-Protected Expressive Conduct

The testimony of Scott Frey could not have been clearer. Lead counsel for the Project Veritas Parties asked, quoting Frey's prior deposition testimony, whether "the broader concern, regardless of the circumstances that led to the video, that the video in itself and the way it was released and the timing was a very unfortunate distraction and AFSCME didn't want to be a party to it." Cross-Examination of Scott Frey, Sept. 19, 2022 (quoting Dkt. No. 68-15 (AFSCME R. 30(b)(6) Witness Frey Depo. Tr. at 78:22-79:5)). Not only did Frey agree, he went even further than his prior testimony, describing this as a "major factor" in the decision. *Id.*

Even on direct examination, Frey testified that *the video itself* created a "sense of scandal." Direct Examination of Scott Frey, Sept. 19, 2022. Likewise, he described how AFSCME was concerned about the "optics of the video" at the time it came out, with the Presidential election just weeks away. Cross-Examination of Scott Frey, Sept. 19, 2022. Frey also testified that Creamer's indiscretion in making comments like those in Def. Ex. 115-2 (discussing how Secretary Clinton wanted 'ducks on the ground') was a major factor. *Id.* The chain of causation is completely broken by Plaintiffs' own words coming out of their own mouths.

### II(B). The Total Disconnect Between Strategic Consulting Group's Alleged Actual Damages and Ms. Maass's Unpaid Internship

Strategic Consulting Group is the only Plaintiff alleging actual damages – i.e., that AFSCME did not hire Strategic Consulting Group with yearly consulting contracts and did not continue to use Strategic as a vendor for its patch-through calling, and that AFSCME stopped funding AUFC, which then went out of business and also could not pay Strategic for consulting and ad hoc patch-through calling.

In contrast, Allison Maass was an unpaid intern for Democracy Partners. She did not work on Strategic Consulting Group projects for AFSCME or AUFC. Cross-Examination of Allison Maass, Sept. 19, 2022. At the time of the internship, she did not know what Strategic Consulting Group was. Re-direct Examination of Allison Maass, Sept. 19, 2022. She never heard of Strategic Consulting Group before this lawsuit. *Id.* She did not work on AFSCME matters. *Id.*

### II(C). Plaintiffs' Damages Calculation is Speculative and the Causal Chain Broken by Intervening Events

Plaintiffs base their damages calculation on assumptions about the "average" payments Strategic Consulting Group received in prior years for (1) annual consulting contracts and (2) patch-through calling services provided on an ad hoc basis to AFSCME and AUFC, and projecting them forward. There is zero expert testimony or other statistical analysis to support these calculations. After more than half a decade of litigation, the Plaintiffs' math has *evolved even in the midst of this lawsuit*. *Cf.* Plaintiffs' Demonstrative Exhibit for Americans United for Change at Opening *with* Plaintiffs' Demonstrative Exhibit for Americans United for Change at Brad Woodhouse Examination.

Strategic Consulting Group's payments from AFSCME and AUFC were already on the wane, decreasing year-over-year. AFSCME's patch-through calling decreased steadily from $191,887 in 2013 to $36,716 in 2016. Plaintiffs offered only two years of invoices for AUFC, and those invoices show Strategic Consulting Group's pay for patch-through calling being cut nearly in half – from $153,653 in 2015 to $80,500 in 2016. For Plaintiffs to suggest that there is an "average" that can be projected forward is totally speculative.

### III. Plaintiffs' Punitive Damages Claims Fail as a Matter of Law

Plaintiffs' efforts to obtain punitive damages fail as a matter of law. To establish an entitlement to punitive damages, a plaintiff must prove by clear and convincing evidence that a

13

defendant (1) acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff; and (2) the defendant's conduct was outrageous, grossly fraudulent, or reckless toward the safety of the Plaintiff.

Plaintiffs have pled their claim for punitive damages strictly on the basis of their wiretap counts. *See* Complaint, Dkt.. 1 at 26 (Request for Relief "H. Award Plaintiffs punitive damages pursuant to 18 U.S.C. § 2520(b)(2) and D.C. Code § 25-554(a)(2)(B) in an amount to be determined at trial."). Any claim for punitive damages must be therefore be proved in connection with Allison Maass's hidden camera recording – but as discussed above, there was no "evil motive' or the like at all. Only an intent to gather the news.

Likewise, because Plaintiffs have pled their claim for punitive damages only on the basis of the wiretap counts, if the Court grants this motion with regard to Counts Two and Three as discussed above, then Plaintiffs have no basis to seek punitive damages.

## IV. Conspiracy

The evidence demonstrates that far from an agreement to pursue tortious ends, the only agreement between James O'Keefe, Allison Maass, and Project Veritas agreed to acts that were not only lawful, but First Amendment protected – gathering and reporting the news.

An actionable conspiracy requires an underlying actionable cause of action. Because the underlying causes of action for wiretap under federal law, wiretap under the D.C. Code, and fraudulent misrepresentation fail.

## V. The Claims of Interception with Tortious Purpose and Fraudulent Misrepresentation Are Unconstitutional Under the First Amendment

The Project Veritas Parties renew and preserve their First Amendment challenges against each of the remaining claims. *See* U.S. CONST. amend. I. The tortious purpose exceptions to one-party consent recording in both 18 U.S.C. § 2511(2)(d) and D.C. Code § 23-542(b)(3) are

14

unconstitutional on their face and, on the record before this Court, unconstitutional as applied to the Project Veritas Parties. Moreover, the Plaintiffs' application of fraudulent misrepresentation presents a damages theory that amounts solely to reputational harm. Because the Plaintiffs did not prove—much less plead—defamation, they cannot recover for reputational harm and this application of fraudulent misrepresentation is also unconstitutional under the First Amendment. The Plaintiffs' entire case violates the First Amendment.

## VI. Conclusion

At the close of their case, Plaintiffs have failed to demonstrate a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on any of the claims they asserted. Accordingly, Project Veritas Action, Project Veritas, James O'Keefe, and Allison Maass move pursuant to Fed. R. Civ. P. 50(a) for entry of a judgment in their favor on each cause of action alleged.

Respectfully submitted,

By:   /s/ Paul A. Calli
      Paul A. Calli
      Florida Bar No. 994121
      Chas Short
      Florida Bar No. 70633
      CALLI LAW, LLC
      14 NE 1st Ave, Suite 1100
      Miami, FL 33132
      Telephone: (786) 504-0911
      Facsimile (786) 504-0912
      PCalli@Calli-Law.com
      CShort@Calli-Law.com
      *Admitted pro hac vice*

      /s/ Stephen R. Klein
      Stephen R. Klein
      Bar No. 177056
      BARR & KLEIN PLLC
      1629 K St. N.W., Ste. 300
      Washington, DC 20006
      Telephone: (202) 804-6676
      steve@barrklein.com

*Counsel for Defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maas*

## **CERTIFICATE OF SERVICE**

I CERTIFY that on September 20, 2022, I served the foregoing through the Court's electronic filing system which served a copy on all counsel of record.

                                                                /s/ Stephen Klein
                                                                Stephen R. Klein