UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC,                          CASE NO.: 1:17-CV-1047-PLF
et al.,

      Plaintiffs,

v.

PROJECT VERITAS ACTION FUND,
et al.,

      Defendants.

_____/

## PROJECT VERITAS PARTIES'
## RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW

     As Mr. Calli stated to the jury in his closing argument, this is a court of law. It is not a court of public opinion. With little evidence, the Plaintiffs in their presentation to the jury tapped into the vitriol that infects our society and the figure of Donald Trump. The plaintiffs played to the jurors' base political feelings. It worked.

     This Court is empowered to rise above. Judges are independent.. There is zero doubt that Project Veritas, James O'Keefe, and Allison Maass are journalists. This Court is obligated to adhere to precedent and take a disciplined approach to the facts and the law which the jurors, pressed by being sent back into the jury room a second time at the end of a day of deliberations, unfortunately did not. This was a trial in which more than twenty cause challenges were granted (largely because of prospective jurors' political beliefs and judgments) in a district where 94.6% of voters cast their ballot against Donald Trump, and the Plaintiffs' refrain was: SPIES FOR DONALD TRUMP!

The judiciary is a gatekeeper against this kind of lawfare and the exploitation of the current political climate. As this Court observed regarding this gatekeeping function in its Trump-era speech *Threats to Judicial Independence and the Rule of Law*:

> Judicial independence consists of the "intellectual honesty and dedication to [the] enforcement of the rule of law regardless of popular sentiment," and the ability "to render a decision in the absence of political pressures and personal interests." Chief Justice Rehnquist called judicial independence "one of the crown jewels of our system of government today."

THE ELEVENTH ANNUAL JUDGE THOMAS A. FLANNERY LECTURE (Nov. 18, 2019), *available at* https://www.americanbar.org/groups/litigation/initiatives/committee-on-american-judicial-system/in-the-news/threats-to-judicial-independence-and-rule-of-law/. The Court must independently evaluate the evidence and the relevant burdens. A fiduciary duty is the "highest order of duty imposed by law." *See, e.g., In re Sallee*, 286 F.23d 878, 891 (6th Cir. 2002). Fraudulent misrepresentation and damages therefrom must be proved by clear and convincing evidence. The First Amendment overlay on review of factual issues that might burden speech makes that test even more stringent. Accordingly, merely finding that there was "some" evidence from which a jury "might" have concluded X or Y or Z is not enough. Mere smatterings of evidence that might be sufficient under an ordinary burden of proof are woefully inadequate to provide clear and convincing evidence of anything. And where there is considerable and credible counter-evidence or even uncertainty, it seems almost impossible for the evidence on the Plaintiffs' side to be clear and convincing.

This Court reserved ruling on the Project Veritas Parties' Rule 50(a) Motion for Judgment as a Matter of Law (Dkt. 179). *See* 9/20/22 Minute Entry Reserving Ruling. Following the reservation of its ruling, the Court agreed that the same standard would apply to the renewal of the Rule 50 motion following a verdict and requested additional briefing. On September 22, 2022, the

Court stated that its charge to the jury to continue deliberating was "a big issue" for appeal or Rule 50.

Notwithstanding the verdict obtained by Plaintiffs in a case that they succeeded in making politically charged, the evidence remains insufficient for a reasonable jury to have found for Plaintiffs. The jury's rejection of Plaintiffs' theory about a "non-party" interception puts the surviving issues into sharp focus: particularly that the evidence was insufficient as a matter of law to find that Allison Maass, through her unpaid internship and unbound by any agreement whatsoever, owed a fiduciary duty to Plaintiffs. The evidence demonstrates that she could not have had the primary or determinative purpose of breaching a fiduciary duty through her recording.

The jury's deadlock as to damages resulting from fraudulent misrepresentation, and the Court's multiple charges to the jury including the final *Thomas* charge over objection, add further focus to the issue of Plaintiffs' speculative and unconstitutional theory of causation and damages. *See generally U.S. v. Thomas*, 449 F.2d 1177 (D.C. Cir. 1971); *see also* U.S. CONST. amend. I.

Accordingly, Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maass renew their prior Motion for Judgment as a Matter of Law, Dkt. 179, and seek entry of a judgment in their favor on each cause of action alleged by Plaintiffs based on the facts and law discussed below.[1]

---

[1] The Project Veritas Parties preserve all objections, including to jury instructions, and grounds for new trial and will raise them in the appropriate course. *See* 10/18/22 Minute Order. This Rule 50(b) Motion focuses on the insufficiency of the evidence, requiring that the Court enter judgment as a matter of law in favor of the Project Veritas Parties.

### I. The Evidence was Insufficient for a Reasonable Jury to Find that Allison Maass's Recordings Were Made for the Primary or Determinative Purpose of Breaching a Fiduciary Duty

Because Ms. Maass was a party to every conversation she recorded, the one-party consent to record rule under each wiretap statute applies. *See* 18 U.S.C. § 2511(2)(d); D.C. Code § 23-542(b)(3). To defeat this rule, Plaintiffs were required to prove that when Allison Maass recorded her conversations during her unpaid internship, she did so for the primary or determinative purpose of committing a tort. *Id.* That is, it must be shown that the "purpose of the interception—its intended use—was criminal or tortious." *Sussman v. American Broadcasting Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). Following the order granting in part the Project Veritas Parties' motion to dismiss, the only permissible theory on which Plaintiffs could proceed was demonstrating the primary or determinative tortious purpose of breaching a fiduciary duty. *Democracy Partners, et al. v. Project Veritas Action Fund, et al.*, 285 F. Supp. 3d 109, 125 (D.D.C. 2018). Moreover, the alleged tortious purpose must be independent of the recording itself. *See, e.g.*, *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010) ("a cause of action under § 2511(2)(d) requires that the interceptor intend to commit a crime or tort independent of the act of recording itself. Thus, to survive a motion to dismiss, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording."); *Payne v. Norwest Corp.*, 911 F. Supp. 1299, 1304 (D. Mont. 1995) (under § 2511, "the focus is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception—its intended use—was criminal or tortious."), *aff'd in part and rev'd in part*, 113 F.3d 1079 (9th Cir. 1997); *Planned Parenthood Fed. of Am. V. Newman et al.*, __ F.4th __, 2022 WL 12234037 at  *7 (9th Cir. Oct. 21, 2022) (reversing verdict on wiretap count because "Planned Parenthood's argument is circular:

according to Planned Parenthood, the civil RICO conspiracy is furthered by the recordings, and the recordings themselves further the ongoing civil RICO conspiracy. Such reasoning is not permitted by § 2511(2)(d)") (citing *Sussman v. Am. Broad. Companies, Inc.* 186 F.3d 1200, 1202 (9th Cir. 1999)). Thus, the general agreement among courts interpreting Section 2511, most recently stated by the Ninth Circuit, is that the purpose for the recording must be essential to the interception and directly facilitate criminal or tortious conduct. *Id.* at *6. The evidence was insufficient to establish that Ms. Maass acted with the primary or determinative purpose of breaching any fiduciary duty that an unpaid intern unbound by any agreement could "owe," and therefore the Project Veritas Parties are entitled to judgment as a matter of law on these wiretapping claims. *Cf.* Dkt. 191 at 4.

The factors in determining whether a fiduciary duty exists are: (1) the nature of the relationship, (2) the promises made or not made, (3) the types of services or advice given, and (4) the legitimate expectations of the parties. *Democracy Partners, et al. v. Project Veritas Action Fund, et al.*, 453 F. Supp. 3d 261, 279 (D.D.C. 2020) (Summary Judgment Order).  Given ordinary understandings of what a fiduciary is – covering highly skilled professionals or persons entrusted with financial control over a person's or company's assets -- it borders on the absurd to conclude that an unpaid menial intern subject to no confidentiality agreement could be categorized as a fiduciary. Indeed, serious First Amendment concerns would arise if all such incidental workers, or even actual employees, were deemed fiduciaries forbidden from disclosing negative conduct by their employers.  News sources, whistleblowers, and even potential litigants would be subject to tort liability for disclosing truthful information to the press, the public, or the government in a public filing. Simply labeling someone as a fiduciary can "claim no talismanic immunity from constitutional limitations." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).

Apart from those broader legal limitations on the definition of a fiduciary for these purposes, even under the facial terms of basic tort law, Ms. Maass was not a fiduciary.  As summarized here and discussed in detail in the subsections below, application of the specific factors to the evidence at trial shows that as a matter of law[2], no fiduciary duty existed and Ms. Maass could not have had the primary or determinative purpose to breach a non-existent duty:

| Factor | Evidence |
|---|---|
| The Nature of the Relationship | **Already held as a matter of law on summary judgment that this factor favors the Project Veritas Parties and Plaintiffs cannot rely on this factor.**<br><br>-   Unpaid intern<br><br>-   Part-Time<br><br>-   Worked about 8 days |
| The Promises Made or Not Made | **Already held as a matter of law on summary judgment that this factor favors the Project Veritas Parties and Plaintiffs cannot rely on this factor.**<br><br>-   No promises made or even requested |
| The Types of Services or Advice Given | -   No advice given<br><br>-   Menial tasks performed<br><br>-   No work ever marked as "confidential"<br><br>-   Plaintiffs did not treat their own work as confidential, instead disclosing without limitation to third parties the very information they claim is confidential as to the unpaid intern<br><br>-   Creamer explained bracketing before he even sat down to meet with journalist Dan Sandini for the first time |

---

[2] *Armenian Genocide Museum and Memorial, Inc. v. Cafeesjian Family Foundation, Inc.*, 691 F.Supp.2d 132, 147 (D.D.C. 2010) (existence of a legal duty is usually a question of law); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499-503 n(1984) (appellate courts are obligated to make independent review of facts essential to First Amendment issues)

| | |
|---|---|
| | - Creamer explained bracketing to Allison Maass in the phone call where he offered her the unpaid internship |
| | - Aaron Black revealed bracketing to an altogether different Project Veritas journalist before Ms. Maass's internship had even started, including future bracketing events |
| | - Creamer revealed "Donald Ducks" to Sandini, including future events |
| | - Creamer testified "it is not at all unusual" to provide information about future events to potential donors |
| The Legitimate Expectations of the Parties | - Plaintiffs expected Ms. Maass to work on a part-time basis without pay |
| | - No discussion about keeping things confidential (Creamer receded from this false testimony when confronted with the video evidence) |
| | - Plaintiffs understood the unpaid intern to have no political experience, and understood her to be a college student who had worked at Applebee's |
| | - No confidentiality document provided |
| | - No confidentiality document even drafted |
| | - Allison Maass did not believe she was bound to such a duty, she did not even know what proposed terms would have been because no agreement was ever presented |

**I(A). The Court's Summary Judgment Ruling Already Held that Plaintiffs Could Not Prove a Fiduciary Relationship based on the "Nature of the Relationship" or the "Promises Made"**

At summary judgment, the Court ruled that based on the undisputed facts the first two factors did not support the existence of a fiduciary duty. *Democracy Partners*, 453 F. Supp. 3d at 280. Moreover, the Court granted summary judgment for the Project Veritas Parties on Plaintiffs' trespassing claim because they did not have the "legal right to exclude others from using the space" and therefore lacked the exclusive possessory interest necessary to sustain a trespass claim. *Id.* at

7

277.[3] This further emphasizes the non-existence of any fiduciary duty. And with the benefit of a week-long trial, it is clear that as a matter of law there was no fiduciary duty and that Ms. Maass could not have had the primary or determinative purpose of breaching a non-existent "duty."

**I(B). The Trial Evidence Is Insufficient for a Reasonable Jury to find Existence of a Fiduciary Duty Based on the "Types of Services or Advice Given" by the Unpaid Intern**

With regard to the factor of the types of services or advice given, imposition of a fiduciary duty is typically reserved for far different types of services or advice than the mundane volunteer work at issue here. *See generally Iacangelo v. Georgetown*, 760 F. Supp. 2d 63, 65 n.1 (D.D.C. 2011) (Friedman, J.) (ruling in context of duplicative claims that doctor's procuring medical devices for patient did not give rise to a fiduciary duty: "the plaintiffs have identified no relationship between Ms. Kerris and Dr. Watson, other than the standard relationship between doctor and patient, that imposed on Dr. Watson any legal duty to Ms. Kerris."); *Swenson v. Bender*, 764 N.W.2d 596, 602 (Minn.App. 2009) (college professor-student relationship not fiduciary as it includes none of the pecuniary obligations usually found in trust relationships); *U.S. v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (usual relationships giving rise to a fiduciary relationship include attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate officials and shareholders); *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 266 (D.Mass 2008) (duty of loyalty typically does not extend to "rank-and-file" employees); *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 16 (Mo. 2012) (refusing to find a fiduciary duty to extend to at-will employees unless they have executed a non-compete

---

[3] At the Motion to Dismiss stage, the Court also ruled, "The Court agrees with the PV defendants that the plaintiffs have not plausibly alleged that the 'purpose' of the recordings was to commit trespass or make a fraudulent misrepresentation because both of those alleged torts took place *before* any recordings were made." *Democracy Partners v. Project Veritas Action Fund er al.*, 285 F. supp. 3d 109, 123 (D.D.C. 2018).

agreement); *Areda v. S-W Transp., Inc.*, 365 S.W.3d 838, 841 (Tex.App. 2012) (even with access to banking accounts, limousine company employee did not owe fiduciary duty to employer); *U.S. v. Smith*, 985 F.Supp.2d 547, 600 (S.D.N.Y 2014) (determining whether a fiduciary duty exists requires an analysis if a party "repose confidence in another and reasonably relied on the other's superior expertise or knowledge").

The record shows that Ms. Maass gave no advice at all. Ms. Maass's services as an intern were routine. In the phone call in which he offered her the internship, Creamer suggested that she might do work on what amounts to campaign volunteer tasks like making calls for turnout, and "organizing data." Def. Ex. 117. Ms. Maass's actual internship tasks ended up being even more mundane, including counting signs, *see* Def. Ex. 124-3, and assembling press clippings. There is no evidence of any duties that caused the internship to rise to the level of a fiduciary duty.

A major topic at trial was Plaintiffs' efforts to disrupt or distract from opposition political events, a practice Plaintiffs labeled as "bracketing." Creamer testified that "the bracketing program itself was not confidential." Ex. A, 9/15/22 Tr. at 149:19-21. Although Creamer claimed in his testimony that events listed on a specific bracketing report were confidential, those entries merely said, "Planning in progress." Pl. Ex. 10. The record is bereft of any evidence showing why "Planning in progress" could create a fiduciary duty:

> **10/15 – Trump – Speech to Republican Hindu Coalition, Holmdel, NJ.**
>
> Planning in progress.
>
> **10/15 – Pence in Tampa for fundraiser**
>
> Planning in progress.
>
> **10/17 – Pence in McComb County, MI – Fund Raiser**
>
> Planning in progress.

*Id. See also* Ex. A, 9/15/22 Tr. at 87:13-20. Indeed, there is no evidence that such bland reference to planning in progress was itself confidential, the documents do not list it as such, and given the prior discussions of bracketing in general, there is no reason for Ms. Maass to have had any reasonable expectation that such bland references were intended to be confidential and to create a fiduciary duty in anyone who came into possession of that knowledge.

Caselaw analyzing whether a fiduciary relationship exists note that even "entrusting confidential information to another does not, without more, create the necessary relationship and its correlative duty to maintain the confidence." *Chestman*, 947 F.2d at 568. Even entrusting confidential information to a bank fails to create a fiduciary relationship. *Walton v. Morgan Stanley & Co. Inc.*, 623 F.2d 796 (2d Cir. 1980); *see also generally. Trudel v. Suntrust Bank*, 924 F.3d 1281, 1285 (D.C. Cir. 2019) (plaintiff failed to show "some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party" as necessary to establish fiduciary duty under Florida law – even though plaintiff bank customers spoke little or no English, there was no evidence bank undertook to advise or protect them); *Geiger v. Crestar Bank*, 778 A.2d 1085, 1095 (D.C. 2001) (citations omitted)  (bank owed no fiduciary duty to its depositor, even though depositor suffered from mental disability, explaining "the existence of a fiduciary duty would depend on whether the parties, through the past history of the relationship and their conduct, had extended the relationship beyond the limits of contractual obligations."). This just reflects a standard understanding of the special and rare status of fiduciary relationships—they exist where they have been specifically bargained for and accepted or, rarely, implied if one party has superior knowledge or expertise. *Russell Pub. Group, Ltd. v. Brown Printing Co.*, 2014 WL 1329144 (S.D.N.Y. April 3, 2014). That Democracy Partners shared its operations with a new intern about whom they had little knowledge, did not enter into a contract

to create any special relationship, and did so with a rank-and-file, low-level intern suggests no fiduciary relationship should be found here. Offering an intern access to non-confidential information does not a fiduciary duty create.

Furthermore, there no evidence that Ms. Maass actually shared this particular information (bland and vacuous as it is) with anyone other than her journalist colleagues. Hence not only was there no fiduciary duty created by her learning this information, there also is no evidence that she breached any narrowly conceived duty by publicizing such information.  It simply did not happen.

**I(C). The Trial Evidence is Insufficient for a Reasonable Jury to Find that the Unpaid Intern Owed a Fiduciary Duty Based on the "Legitimate Expectations of the Parties"**

The last factor, the "legitimate expectations of the parties," does not support the existence of a fiduciary duty. Plaintiffs took no steps to bind an unpaid intern to one of the highest duties under the law and took no steps to define her duties as an intern or communicate their expectations. Case law examining the legitimate expectations of the parties in cases exploring possible fiduciary duties are careful to focus on bargained-for understandings between parties and the parties' relative knowledge and experience. For example, where an experienced and sophisticated aviation business regularly counseled clients on insurance requirements, its superior knowledge and history of providing such information could give rise to a fiduciary duty. *Heidi Aviation, LLC v. JetCraft Corporation*, 573 F.Supp.3d 182, 207 (D.D.C. 2021). This reflects the common understanding that a fiduciary usually is one with "superior expertise or knowledge." *Smith*, 985 F.Supp.2d at 600. To ignore this rule is to destroy the special nature of fiduciary relationships that exists for roles like attorney, trustee, or senior corporate officials.

At the outset, it is important to emphasize that Plaintiffs' perception of Ms. Maass until October 14, 2016. weighs against them, not for them. Plaintiffs sought to blur the lines of their fraudulent misrepresentation claim with their fiduciary duty arguments, suggesting that because

11

Ms. Maass presented a false name and résumé (showing prior work as a waitress at Applebee's) she *knew* of her duties and thus the Plaintiffs could *expect* her to behave as a fiduciary despite believing she was an undergraduate intern with no campaign experience. *See* Pl. Ex. 97. At summary judgment, this Court made a similar error, concluding that "[t]he fact that Maass created a false identity, and that defendants created false identities to introduce Maass to plaintiffs is evidence of *their understanding* that Maass would have fiduciary obligations to safeguard sensitive or confidential information." *Democracy Partners*, 453 F. Supp. 3d at 281 (emphasis added). These circular arguments leave a fiduciary duty as a one-way street as opposed to a meeting of the minds, or agency. *Trump v. Corcoran Group, Inc.*, 240 A.D.2d 159 (NY.App. 1997) (recognizing that parties should engage in self-ordering in private relationships, explaining that if "these sophisticated parties wanted a fiduciary-like relationship, they could have bargained for it and spelled it out in their agreements"). If the plaintiffs in this case had no expectation of confidentiality or fiduciary protections, then it matters not one bit what Ms. Maass's private thoughts on the matter were. Indeed, under such an erroneous one-way standard, any secretive behavior by whistleblowers, investigative journalists, or employees seeking to remedy a wrong would ipso facto create a fiduciary duty and such agents of the public good would routinely be liable in tort, *especially* where they disclosed genuine bad behavior and hence the consequence of the disclosure was (properly) significant. This stands contrary to recognized First Amendment protection against torts that squelch newsgathering and reporting on topics of public import— unbounded fiduciary duty would instill a serious fear of damages by future journalists and effectively cut off undercover journalism. *Cf. New York Times Co.*, 376 U.S. at 276-78.

Any expectation must run both ways in order to be the predicate for any violation of plaintiffs' claimed rights. Furthermore, such a one-way supposed expectation by Ms. Maass is

insufficient under D.C. Circuit precedent to create a fiduciary duty without consideration of the other elements, all of which fail in this case:

> [A]s plaintiffs point out, "the existence of a fiduciary duty is partly triggered by expectations of the parties." . . . Those expectations, though, must be "legitimate" and must be considered as part of "a searching inquiry into the nature of the relationship, the promises made, [and] the type of services or advice given."

*Krukas v. AARP, Inc.*, 458 F. Supp. 3d 1, 12 (D.D.C. 2020) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996)). In finding for the Project Veritas Parties on the first two prongs of fiduciary duty, the Court could only find a legitimate expectation if it dovetailed with the type of services Maass provided or advice she gave to Democracy Partners at their behest. These did not add up, either. *See supra* Section I(A).

The lack of any reasonable expectation of a confidential fiduciary relationship is demonstrated by the actual lack of concern with any confidentiality agreement. After Ms. Maass's internship had already begun, there was a passing and uncertain mention of a non-existent confidentiality agree that did not exist and which Ms. Maass was never asked to sign. After the internship had already begun, and after Aaron Black had already explained the disruptive nature of the bracketing events, Creamer merely stated that Windsor "has some kind of a non-disclosure agreement to sign or something." Def. Ex. 124-7. Confronted with this video evidence, Creamer receded from his earlier false testimony that he told Ms. Maass she "should treat everything here as confidential," Ex. A, 9/15/22 Tr. at 79:23-80:2, and admitted the truth:

> Q. But you never said you told Ms. Maass anything about the confidential nature. You never said anything else beside what the jury just heard. Right?
> A. That's correct.

Ex. A, 9/15/22, Tr. at 154:20-23. More broadly, this exchange is a microcosm that demonstrates the validity of the Project Veritas Parties' newsgathering methods. Because a video record exists of what Creamer actually said, he was forced to recant his false claim. *See also* Dkt. 1 at 8-9

(Compl. ¶32). Insofar as mere undercover investigation, reporting, or whistleblowing are not themselves tortious, and Ms. Maass could simply have walked out and recounted her experience to any reporter who asked, the fact that she used modern methods to ensure that her rendition of events was accurate, and that any denials were falsifiable, does not miraculously make the conduct tortious or create a fiduciary duty.

Creamer admitted that he provided no non-disclosure agreement to Ms. Maass. He testified, "I think we – somebody just neglected to ask her to sign one, and we were not appropriately rigorous in that respect." Ex. A, 9/15/22 Tr. at 80:3-9. It is undisputed that no such non-disclosure or confidentiality agreement was ever presented to Ms. Maass, much less drafted. And as Creamer ultimately was forced to concede, he never referenced confidentiality apart from his stray comment reflected in Def. Ex. 124-7 about Windsor and "some kind of a non-disclosure agreement to sign or something." The parties stipulated to what Windsor's testimony at trial would have been, and those stipulations are in accord:

(1) that she never provided Ms. Maass a written non-disclosure agreement or confidentiality agreement;

(2) that she never drafted a non-disclosure agreement or confidentiality agreement for Ms. Maass;

(3) that she never had a discussion with Ms. Mass about confidentiality agreements or non-disclosure agreements;

(4) that she never discussed with Ms. Maass the need to not discuss or disclose what she learned, did, saw, or heard during the internship at Democracy Partners.

Dkt. 174 (read into the trial record on Sept. 16, 2022). Windsor's stipulated testimony is also that she broached the matter twice with Creamer, "but he said that I should not worry, that it was the niece of a friend of his and that it was under control. He told me that if I wanted to get that information, then I should." *Id.* Windsor chose not to ask for a non-disclosure agreement because

she "didn't get around to it and also because I felt uncomfortable openly challenging someone Bob represented as a friend." *Id.* Through their own actions, Plaintiffs chose not to establish the parameters and duties of Ms. Maass's unpaid internship and chose not to create any expectation of a fiduciary duty. This is not negated because they perceived her as a college student with only waitressing and bartending experience: to the contrary, it evinces only that they had no reason to assume confidentiality. *See* Pl. Ex. 97. At a minimum, their lax regard for ensuring confidentiality confirms that they had no *reasonable* expectation of confidentiality. This reasoning is in accord with other courts nationwide who have required individuals to hold a special position of trust, usually with superior knowledge or expertise, to find any fiduciary relationship. *See, e.g., Smith,* 985 F.Supp.2d at 600 (in examining fiduciary duty it is proper to inquire whether a party "reposed confidence in another and reasonably relied on the other's superior expertise or knowledge"); *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 16 (Mo.2012) ("This Court declines to extend the law of fiduciary duty . . . to include at-will employees who are not constrained by a non-compete agreement"); *World Surveillance Group Inc. v. La Jolla Cove Investors, Inc.*, 66 F.Supp.3d 1233, 1235 (N.D. Cal. 2014) ("This is why a fiduciary relationship will be found only when an individual or entity has knowingly undertaken that high duty or when the law imposes the duty in special relationships such as agency, partnership or joint venture"). Plaintiffs welcomed an unknown college student into their midst, allowed her access to their operations, and did nothing to establish boundaries of that relationship. Consistent with national caselaw, no fiduciary relationship could be found under such facts.

Plaintiffs' argument that Creamer's mention of a hypothetical non-disclosure agreement "or something" that Plaintiffs never drafted and never gave to the intern does not create a *legitimate* expectation for the parties nor does it provide a basis for a *reasonable* jury to find the existence of

a fiduciary duty. Plaintiffs may be entitled to the benefit of inferences at this stage, but those inferences are bound by rationality. *See*, *e.g.*, *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir. 2007) (affirming judgment as a matter of law and noting that courts are not bound to indulge "unreasonable inferences," "those at war with the undisputed facts," or speculation). The burden of proof remained on the Plaintiffs and there is no reasonable inference by which the jury could find, more likely than not, that there was a reasonable expectation of a fiduciary relationship. The Court is not required to, and must not, give facts their opposite meaning or an illegitimate or unreasonable meaning. The undisputed fact is that Plaintiffs chose not to establish any expectations in writing. "A single sentence in an . . . 'internal document' cannot" create a fiduciary duty. *Krukas*, 458 F. Supp. 3d at 12. Here, there wasn't even a single sentence.

Nor are there facts from which to conjure a fiduciary duty for the unpaid intern based on the "legitimate expectations of the parties" in the absence of any writing or discussion of Ms. Maass's internship obligations. Allison Maass testified that she never saw any such agreement, so she does not know what it might have said. Ex. B, 9/16/22 Tr. at 90:17-21. This is not self-serving testimony: it is axiomatic that a contract without terms is unenforceable. *See Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005) ("[F]or a contract to be enforceable, it 'must be sufficiently definite as to its material terms (which include, *e.g.*, subject matter . . . payment terms, quantity, and duration) that the promises and performance to be rendered by each party are reasonably certain.'"). And as an unpaid intern for no more than eight days for Democracy Partners, Allison Maass was not asked for a résumé prior to her start date, was not asked for her ID by Creamer or anyone else at Democracy Partners at any time, had no verbal discussion about confidentiality or similar duties, did not receive an employee handbook, and was not given a company email address or computer. Ex. C, 9/19/22 Tr. at 25:19-26:20.

Plaintiffs did not treat their work as though it were confidential, and none of the documents or emails she received were marked as confidential. Such behavior would be essential to instill a legitimate expectation in anyone, especially someone perceived as a college student with no campaign experience. Before Ms. Maass's internship (and therefore pre-dating any act alleged by Plaintiffs to be tortious), Creamer explained his terminology of so-called "bracketing events" in his first in-person meeting with journalist Dan Sandini, a stranger. Def. Ex. 113-1 (*e.g.*, "[M]ost TV markets, you know, the presidential candidate comes into town, its' going to be on the evening news . . . So we want to do something that is – meanwhile, the Democrats or a bunch of organizations say the following about the son of a b—"). The meeting occurred in a public place (a hotel atrium) and before Creamer had even sat down, he described his role in bracketing to the journalist:

```
4        Q.    And before you even hit the chair, you are telling
5   him about bracketing and how it involves all of the future,
6   the future events where you bracket the opposition's
7   campaign.  Right?
8        A.    That's correct, yes.
```

Ex. A, 9/15/22 Tr. at 148:4-8.

In the phone conversation where Creamer offered Ms. Maass the Democracy Partners internship, Creamer explained the nature of the disruptive political events he planned and executed. Def. Ex. 117. Creamer volunteered that on behalf of "the Clinton campaign" he handled "events which involve – you know, going after Trump and Pence" in order to "frame up the response." *Id.* In this pre-internship conversation, Creamer even revealed that there would be future events in Washington D.C. *Id.* This is exactly the sort of future event Creamer claimed was confidential, but he shared it with Ms. Maass *before* the internship.

17

Likewise, Aaron Black invited *another* Project Veritas journalist whom he had just met at a protest into the Democracy Partners office. Def. Ex. 177-1 and 177-2. Black described Plaintiffs' bracketing program, including future bracketing plans. *Id.* With a whiteboard to his left and a map to his right, *see* Def. Ex. 177-1, Black regaled this stranger with details of how the events generated favorable press coverage, and future plans for "Donald Ducks" including that the duck would be going to Charlotte again and that Plaintiffs planned to distribute toy "Donald Ducks." Def. Ex. 177-2 ("We did bring a duck a couple of weeks ago [to North Carolina]. We're going to bring the Duck back, too . . . . We're going to hand these out, too."). It turns out that Plaintiffs also do not treat their work as confidential if there's a total stranger they might want to impress.

Within a couple hours[4] of the start of Ms. Maass's internship (and before Creamer's brief reference to the hypothetical, never-drafted non-disclosure agreement), Aaron Black described bracketing events, including his role as "deputy rapid response director for the DNC for all things Trump on the ground." Def. Ex. 124-3. He revealed his own role – and emphasized Creamer's more significant role – in the violent and disruptive protests in Chicago:

> [W]hen they shut all that, that was us. It was more him than me [gesturing towards Robert Creamer's office], but none of this is supposed to come back to us, because want it coming from people. We don't want it to come from the party. So if we do a protest, and its brand – oh, DNC protest, right away press is going to say "partisan."
> . . .
> You know, now if I'm out there protesting like stuff – or protesting – getting people to protest stuff, like from different community groups, different organizations, they brand it themselves and then we say: "Look, this came across our desk," or "look, you know, you guys should be out there because these folks in the community are doing this." Then it has more of a legitimate – this is coming from voters, it's not necessarily coming – I mean, it is coming from voters, I just happen to be the person stirring it up.

---

[4] Ex. C, 9/19/22 Tr. at 24:10-12.

*Id.* These words, coming out of Black's own mouth, described how Plaintiffs planned fake grassroots protests that were in fact organized by partisan political operatives in order to manipulate media coverage. Black concluded this explanation of his role in political spying by saying, "And nobody is really supposed to know about me." *Id.* Notably, before trial, Plaintiffs conceded, "Mr. Black himself did not provide confidential information about bracketing." Dkt. 149 at 2. Plaintiffs' concession that these admissions about bracketing are not confidential emphasizes the total disconnect between any harmful disclosures and the supposed breach of fiduciary duty. How is it that Plaintiffs can claim "Planning in Progress" is a confidence suggestive of a fiduciary duty but Black's bragging in multiple contexts about bracketing events are not? This is Plaintiffs' analytical flaw – to them, confidentiality is whatever Creamer claims, regardless of how Plaintiffs otherwise treat the information. This goes far beyond the reasonable inference that the Court must indulge at this stage.

At another meeting – this time over wine in a public, crowded restaurant – Creamer again provided non-public information about future bracketing Donald Ducks to journalist Dan Sandini, describing an upcoming event in Charlotte. Def. Ex. 115-1.

Even more broadly, Creamer testified that in his experience, "it is not at all unusual" to tell a potential donor to a party committee or organization non-public information about the organization's plans. Ex. A, 9/15/22 Tr. at 171:6-16. Creamer also recognized a distinction between something a person does not want another to know, and something that's actually confidential: when asked on direct examination about how he revealed Secretary Clinton's creation of "Donald Ducks" and the upcoming "program" to journalist Dan Sandini, he testified that it was not "confidential information" and Creamer may have asked him not to say anything to anybody else because it was "kind of personal." Ex. A, 9/15/22 Tr. at 72:10-73:2.

Moreover, the analysis of whether fiduciary duties exist depends on the legitimate expectations of the *parties* – plural. Plaintiffs cannot unilaterally impose a fiduciary duty, especially given the absence of any agreement defining the scope of the supposed duty. What Allison Maass actually expected is critical to the analysis, and she testified that she had no reason to believe she was bound to a fiduciary duty or to keep anything confidential. *World Surveillance Group, Inc.*, 66 F.Supp.3d at 1235 ("This is why a fiduciary relationship will be found only when an individual or entity has knowingly undertaken that high duty").

Thus, Plaintiffs' criteria for sharing non-public information is based exclusively on Creamer's judgment about whether he thinks the person he's sharing with can help him or hurt him. This sort of ad hoc, gut decision-making is not determinative of confidentiality. To the contrary, it demonstrates why Plaintiffs were obligated to *do something* to define the parameters of how their work should be treated if they expected to come to federal court and hold an unpaid intern to the highest duty under the law in an area fraught with First Amendment concerns. The Plaintiffs failed to do so. The Seventh Circuit's formulation is instructive: "[W]here a fiduciary relationship does not exist as a matter of law, the burden of proving facts from which such a relationship arises is upon the person seeking to establish the relationship, and the proof must be clear, convincing, and so strong as to lead to but one possible conclusion." *Vargas v. Esquire, Inc.*, 166 F.2d 651, 653 (7th Cir. 1948); *Ekern v. Sew/Fit Co., Inc.*, 622 F. Supp. 367, 373 (N.D. Ill. 1985). When an alleged fiduciary does not occupy a traditional role (like a lawyer or trustee), where fiduciary duties do not exist as a matter of law, and where there is no agreement detailing a bargained-for fiduciary relationship, courts should not lightly infer the existence such a duty and must hold plaintiffs strictly to their burdens. This is especially true here, where First Amendment activity is imperiled.

Instead of a tortious purpose, the evidence showed that Project Veritas Parties acted with the sole purpose of gathering the news. *See, e.g.*, *Vasquez-Santos v. El Mundo Broadcasting Corp.*, 283 F. Supp. 2d 561, 568–69 (D.P.R. 2003) (summary judgment granted for journalist and other media defendants where plaintiffs offered no convincing evidence or argument why journalist "would have any reason to record the meeting with Plaintiff other than to gain information for his broadcast" and explaining that the requirement of a contemporaneous "express intent of committing a tort" is significant because "without it the media could be held liable for undercover reporting under § 2511 even when its sole intent was to gather the news."); *Russell v. American Broadcasting Co. Inc.*, 1995 WL 330920, *4 (N.D. Ill. 1995) (granting media defendants' motion to dismiss as to unlawful surveillance where journalist got job at grocery store and surreptitiously recorded because media "defendants intended to expose sanitation problems in the commercial fish industry" therefore "it is clear that defendants did not intercept for the purposes of committing a crime or tort."). The verdict, if allowed to stand, would turn these cases on their head and would support liability in every instance of undercover reporting where a person spoke more freely than they might have otherwise if they were aware they were being recorded or talking to a journalist.

The first time the Project Veritas Parties learned of Creamer or Democracy Partners was when Scott Foval described Creamer as a person who "hatches" voter fraud schemes: "I work with Bob Creamer one-to-one all the time. I'm the white hat. Democracy Partners is kind of the dark hat." Def. Ex. 112-2. Allison Maass became involved in the news investigation when she read the reporter's notes that Christian Hartsock stayed up all night preparing. Ex. C, 9/19/22 Tr. at 28:7-29:8. The evidence is undisputed that no one at Project Veritas Action Fund had ever heard of Plaintiffs before. *See, e.g.*, Ex. B, 9/16/22 Tr. at 69:14-70:3. Project Veritas Action Fund continued following leads and corroborating information its journalists had learned, including from Aaron

Black and Creamer himself. There is zero evidence of the Project Veritas Parties sharing the results of their news investigation with any political opponents of Plaintiff. It did not happen. Instead, Project Veritas Action gave an exclusive to Sinclair Media, with whom James O'Keefe worked to formulate a request for comment to Creamer. Ex. C, 9/19/22 Tr. at 120:11-14; 121:14-.17; *see also* Def. Ex. 98-1 And when Sinclair Media chose not to publish the reporting, Project Veritas Action published it directly on YouTube. Other media outlets picked up the reporting, including the *New York Times* (as AUFC's Brad Woodhouse testified). Ex. D, 9/20/22 Tr. at 43:4-6. This is investigative undercover reporting in its purest form, not a breach of some nebulous, ill-defined, and ad hoc fiduciary duty.   To hold otherwise would be a plain infringement of the First Amendment in the context of the core protected activity of newsgathering. *See generally New York Times Co. v. United States*, 403 U.S. 713 (1971); *Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972).

Having failed to establish a fiduciary duty between Allison Maass and Democracy Partners and that Ms. Maass had the purpose to breach such a duty with her hidden camera recording, the Project Veritas Parties are entitled to judgment as matter of law on Counts Two and Three. *See* Dkt. 1 at 19-22.

## II. The Evidence is Insufficient for a Reasonable Jury to Find Causation

In an effort to avoid the Project Veritas Parties' First Amendment protections, Plaintiffs disclaimed any alleged damages flowing from expressive conduct (i.e., Project Veritas Action's published reporting). The predecessor judge took Plaintiffs at their word and recognized the effect of these disclaimers repeatedly. The sole theory that they may pursue is for damages allegedly suffered as a result of "disclosures and actions of Maass described in paragraphs 27-44 [of the Complaint], which "make no reference whatsoever to the creation or posting of the Project Veritas

videos or any other publication." *See* Dkt. 25 at 25 (Order Denying Mot. to Dismiss) (citing Pl. Opp.). Plaintiffs claimed that their alleged injuries would have resulted "even if the YouTube Videos had never been published." Dkt. 19 at 11 (Opp. to Mot. to Dismiss). Plaintiffs' failure to establish causation defeats both the wiretap claims and fraudulent misrepresentation. In fact, the alleged harm is even further downstream for purposes of the fraudulent misrepresentation count, where a misrepresentation must "directly cause damage to the person who justifiably relies on it" and to be a "direct result of a false representation[.]" Dkt. 193 at 22.

During oral argument on the Rule 50(a) Motion at trial, the Court asked, "Can't the jury conclude [Rigging the Election – Part I] is selectively edited?" Ex. D, 9/20/22 Tr. at 74:20-21. It absolutely could not. First, because there was no evidence of selective editing,[5] and more fundamentally because Plaintiffs did not plead defamation and claimed to not seek damages from expressive conduct or reputational harm, but only alleged injuries that supposedly would have resulted "even if the YouTube Videos had never been published." *See, e.g.*, Dkt. 19 at 11. The Court must give effect to these disclaimers and enforce them. In an effort to thread a First

---

[5] "Selectively edited" is a narrative manufactured by Creamer, and neither he nor any other witness could point to any way in which the video was "selectively edited." Nor did Plaintiff offer any expert testimony on what the possible difference between "selectively edited" and "edited" would be. All editing is necessarily "selective" and Creamer's recitation of "selectively edited" is a meaningless trope untethered to any specific fact. For his part, AFSCME witness Scott Frey made it clear that his notion of "selective editing" only came from Creamer. Ex. C, 9/19/22 Tr. at 65:12-69:3. Frey admitted that he had no basis to say whether the video was manipulated, he was not present during the conversation, and if he was not in the room, he could not know what was said. *Id.* The irony that Plaintiffs admitted scant raw video evidence at trial while Project Veritas introduced extensive raw video evidence is lost only on Plaintiffs.

The "selectively editing" canard is also nonsensical on a conceptual level: no print reporters publish their raw reporters' notes in linear fashion; no broadcast journalist publishes hours of raw footage in linear fashion. Every news media company, from the Washington Post, to journalists who, like Project Veritas, publish on the internet, to cable news networks, edit their news stories down from raw footage or raw notes.

Amendment needle, Plaintiffs have disclaimed such damages. If the Court believes the conduct which caused damages is "selective editing" (or anything else to do with the videos), ***Plaintiffs lose.***

Any injury resulting from protected speech that is not false and defamatory in a way that would support a constitutionally viable libel or defamation claim cannot be the basis for finding tort causation from the predicate acts that led to such protected speech. The protected nature of the speech breaks the chain of causation. The evidence is that independent actors made their own decisions after viewing the Project Veritas Parties' published reporting and hearing the words of the Plaintiffs' and their associates. There are thus numerous intervening causal factors between the method of newsgathering (Ms. Maass's hidden camera recordings during her unpaid internship), including First Amendment protected activity like the publication of the reporting, and AFSCME's termination of its relationships with Strategic Consulting Group. The causal chain is even more broken as to AUFC, which could no longer hire Creamer on a "friendly arrangement" (*i.e.*, non-contractual) basis because AFSCME was its principal funder and withdrew financial support.

These intervening factors are of constitutional and pragmatic consequence here. *See* Rest. (2d) Torts § 431. In *Medical Laboratory Management Consultants*, ABC produced *Rush to Read*— an investigative journalism piece on fraudulent and corrupt practices in reading cervical cancer tests. 306 F.3d at 820. While Medical Laboratory Management Consultants claimed that ABC committed numerous intentional torts in the manner of investigation and subsequent publication, the Ninth Circuit would have none of it:

> The doctors' testimony indicates that Medical Lab's performance in the ABC study, missing cervical cancer on several of the pap smear slides, was the predominant factor in their decisions to discontinue their business with Medical Lab. Any injurious effect from Devaraj's statement that Medical Lab's cytotechnologists work at other laboratories as well, a statement captured on

> videotape by the ABC representatives during their alleged trespass,
> was negligible by comparison.

*Id.* at 820-21. In short, customers were outraged that the medical labs frequently failed to detect cervical cancer. As provided for in the Second Restatement of Torts, it is the burden of Plaintiffs to show that Defendants' actions were the "substantial factor" in bringing about harm. And First Amendment precedent precludes reliance on publication and reputational damages in making that examination. *Id.* at 821-22. The record here shows that the predominant factor at issue were the publications demonstrating the shady practices engaged in by Plaintiffs, not the mode, manner, or happenstance of infiltration per se. And if there is ambiguity about examining precisely what caused any alleged harm in question, the "tie goes to the speaker." *Federal Election Com'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 475 (2007).

In fact, even Creamer himself reacted to the *expressive* content of the Project Veritas Parties' reporting. After viewing the footage in his meeting with Sinclair Media, he spoke with AUFC's Brad Woodhouse "and we all agreed that Foval had to be terminated immediately; that the views he expressed on that video were simply inconsistent with the values of our firm, inconsistent with the values of the campaign . . . ." Ex. A, 9/15/22 Tr. at 109:19-109:25. AUFC's Brad Woodhouse also testified that once he watched the published video, he "fired Scott Foval immediately." Ex. D, 9/20/22 Tr. at 25:13-15. Not only is this all protected by First Amendment speech, it is classic whistleblower activity. Had the recordings revealed that Foval was acting inconsistently with Plaintiffs' values by hitting on young interns, this case would never have reached a jury. And it should not have here either.

In addressing the lack of evidence that any non-expressive conduct caused the harm Plaintiffs complain of (particularly with regard to fraudulent misrepresentation), the Tenth Circuit's analysis in *Animal Legal Defense Fund v. Kelly*, 9 F. 4th 1219 (10th Cir. 2021) is

instructive. That recent opinion struck down a Kansas statute which attempted to forbid individuals from gaining access to Animal Facilities and recording for the purpose of harming the enterprise because it violated the First Amendment. In addressing whether conduct or speech caused the harm Kansas sought to prevent, the Tenth Circuit explained,

> Whatever legally cognizable harm is, it cannot be harm from protected, true, speech . . . Although the information from which the harms flow would not have been obtainable without the false statement used to gain entry to the facility, the false statement itself does not directly cause the harm. Simply put, the 'harm' Kansas seeks to avoid is the type of harm that is not only legally non-cognizable but legally protected: that arising out of true speech on a matter of public concern.

*Id.* at 1235. *See also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (noting "Food Lion attempted to avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims").

### II(A). AFSCME Reacted to the Publication of Project Veritas's Reporting – First Amendment-Protected Expressive Conduct

The day Project Veritas Action released "Rigging the Election – Part I," Creamer called AFSCME's Scott Frey to deny the content of the video, and AFSCME called him back to tell him Strategic Consulting Group's contract would be terminated. Ex. A, 9/15/22 Tr. at 113:12-114:6. Scott Frey's testimony could not have been clearer. Lead counsel for the Project Veritas Parties asked, quoting Frey's prior deposition testimony, whether "the broader concern, regardless of the circumstances that led to the video, that the video in itself and the way it was released and the timing was a very unfortunate distraction and AFSCME didn't want to be a party to it." Ex. C, 9/19/22 Tr. at 101:22-102:3 (quoting Dkt. No. 68-15 (AFSCME R. 30(b)(6) Witness Frey Depo. Tr. at 78:22-79:5)). Not only did Frey agree, he went even further than his prior deposition testimony, describing these issues as a "major factor" in the decision. *Id.*

Even on direct examination, Frey testified that *the video itself* created a "sense of scandal." Ex. C, 9/19/22 Tr. at 50:24-51:2. Likewise, he described how AFSCME was concerned about the "optics of the video" with the Presidential election just weeks away and "the union wanted to distance itself from the relationship." Ex. C, 9/19/22 Tr. at 51:10-13. Frey also testified that Creamer's indiscretion in making comments like those in Def. Ex. 115-2 (discussing how Secretary Clinton wanted "ducks on the ground") were a concern. *Id.* at 93:15-17. The chain of causation is completely broken by Plaintiffs' own words. To attribute even a part of the ultimate decisions by AFSCME to anything other than the expressive activity itself is entirely speculative. Under D.C. law, causation and damages for breach of fiduciary duty must be proved by clear and convincing evidence, even absent the specific First Amendment concerns at issue here. The First Amendment concerns heighten the flaws in Plaintiffs' evidence.

At oral argument during trial, the Court focused on the testimony "and the way it [Rigging the Election – Part I] was released," commenting at one point that it was not sure whether "the way it was released" was part of the expressive conduct. Ex. D, 9/20/22 Tr. at 73:16-17. It is. The way in which a news media company like Project Veritas – or anyone else for that matter – edits and releases their publication is part and parcel of their expressive conduct. The Supreme Court in *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) answered this question. The Court struck down, on First Amendment grounds, a Florida "right-of-reply" statute which required newspapers that attacked a political candidate's character or record to give equal space for the candidate to respond. *Id.* at 243–58. The Supreme Court ruled that

> [t]he choice of material to go into a newspaper and the decisions made as to the limitation the size and content of the paper and treatment of public issues and public officials, whether fair or unfair, constitutes the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved over time."

*Id.* at 248.   Likewise, when a broadcaster "exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 674 (1998). Programming decisions constitute communicative acts. *Id.*

Because what goes in and what stays out of a news story, as well as how it is broadcast, receive full First Amendment protection, reliance on these factors to support any hypothetical damages constitutes clear error, necessitating correction here.

### II(B). The Insufficiency of the Evidence is Even More Stark as to AUFC

The evidence on causation as to AUFC is even more speculative and broken by intervening events. AUFC was downstream of AFSCME. Woodhouse testified on direct examination that when AUFC lost the AFSCME funding, that caused AUFC to need to shut down. Ex. D, 9/20/22 Tr. at 34:15-18. "It was a cascading event. AFSCME was our big time primary funder." *Id.* Creamer himself admitted that AUFC ceased operations

> Because the chair of the board, who was the President of AFSCME, had stepped back at the same time from being chairman. He was the princip[al] supporter and fundraiser for that organization. And its economic situation deteriorated to the point where they had to close up shop.

Ex. A, 9/15/22 Tr. at 115:11-18. Woodhouse testified that the role of the intern was never communicated by AFSCME to AUFC as a basis for its decision to stop funding AUFC. Ex. D, 9/20/22 Tr. at 38:8-11. In fact, he had no discussion with either Frey or Saunders about the role of the intern at Democracy Partners. Ex. D, 9/20/22 Tr. at 38:12-16. Rather, AFSCME President Lee Saunders (who was also the Chair of AUFC's board) was upset about a Wisconsin news article. *Id.* at 38:17-24. That article was admitted as a part of an email chain involving the decision-makers at AFSCME as Def. Ex. 3, and it reveals no concerns whatsoever about the presence of the intern in the Democracy Partners office. If anything, it indicates that AFSCME was as concerned about

their association with Scott Foval as Mr. Creamer and Mr. Woodhouse, respectively. And in a December 2016 meeting to try to restart the funding from AFSCME, Saunders told Woodhouse that irrespective of the veracity of the videos, 40% of AFSCME membership did not support Secretary Clinton or the Democratic side, and therefore he could not be associated with the video and the statements in it. Ex. D, 9/20/22 Tr. at 40:14-19.

Woodhouse also testified that Saunders was upset about late notification of the Project Veritas Parties' publication. *Id.* at 38:25-39:2. Creamer had spent the weekend before its release arguing to Sinclair Media that it should not publish the Project Veritas Parties' reporting, but never informed AFSCME of the issue. This, too, completely undermines the Plaintiffs' arguments: instead of pursuing the allegedly confidential information acquired by Allison Maass, or interacting in any way with the Project Veritas Parties, Creamer and his attorneys spent the weekend after they learned of the investigation endeavoring to prevent publication of everything, including the words of Scott Foval, whom Creamer had fired the morning after seeing raw video that would be included in the release.

Mr. Saunders never used the word "infiltration" in his discussions with Woodhouse and never talked about the intern. *Id.* at 40:20-22. To the contrary, the late notification is what had upset Saunders, and that is what Frey relayed to Woodhouse. *Id.* at 43:10-13. If, indeed, a supposed breach of confidential information truly concerned Creamer, he would have informed all his clients immediately. Instead, he endeavored to prevent publication, and brought this suit and all its unsupportable legal theories after he failed to do so.

Moreover, AUFC never had a contract with Creamer. *Id.* at 35:17-19. "It was a friendly arrangement." *Id.* at 35:20-22 He testified that AUFC was not contractually obligated to pay Creamer. *Id.* The Plaintiffs' exhibits illustrate sporadic invoicing by SCG. *Cf.* Pl. Exh's 43, 44, 45

(three invoices dated January 5, 2015, covering three months' worth of work dating to November, 2014). Nor did AUFC have a formal budget (a fact Woodhouse only conceded when impeached with his deposition testimony). Ex. D, 9/20/22 Tr. at 37:2-4. The causal chain is completely broken and Plaintiffs' claimed damages are speculative.

### II(C). The Total Disconnect Between Strategic Consulting Group's Alleged Actual Damages and Ms. Maass's Unpaid Internship

Strategic Consulting Group is the only Plaintiff alleging actual damages – i.e., that AFSCME did not hire Strategic Consulting Group with yearly consulting contracts and did not continue to use Strategic as a vendor for its patch-through calling, and that AFSCME stopped funding AUFC, which then went out of business and also could not pay Strategic for consulting and ad hoc patch-through calling.

In contrast, Allison Maass was an unpaid intern for Democracy Partners. She did not work any projects for AFSCME or AUFC. Ex. C, 9/19/22 Tr. at 26:21-27:1. She did not work on any projects specifically for Strategic Consulting Group. *Id.* at 27:2-4. At the time of the internship, she did not know what Strategic Consulting Group was. *Id.* at 36:3-37:2. She never heard of Strategic Consulting Group before this lawsuit. *Id.* Woodhouse testified that he never had any interaction with Ms. Maass. *Id.* at 38:5-7. In such circumstances it is impossible to conclude that Ms. Maass had *any* relationship with Strategic Consulting Group, much less a fiduciary relationship with it.   The Plaintiffs cannot piggyback on Strategic's downstream work for Democracy Partners any more than could Scott Foval's landlord or his favorite restaurant if his losing his job caused them to lose money downstream.

**II(D). Plaintiffs' Damages Calculation is Speculative and the Causal Chain Broken by Intervening Events**

Plaintiffs based their damages calculation on assumptions about the "average" payments Strategic Consulting Group received in prior years for (1) annual consulting contracts and (2) patch-through calling services provided on an ad hoc basis to AFSCME and AUFC and projecting them forward. There was zero expert testimony or other statistical analysis to support these calculations. After more than half a decade of litigation, the Plaintiffs' math evolved *even in the midst of trial*. *Cf.* Plaintiffs' Demonstrative Exhibit for Americans United for Change at Opening *with* Plaintiffs' Demonstrative Exhibit for Americans United for Change at Brad Woodhouse Examination.

Strategic Consulting Group's payments from AFSCME and AUFC were already on the wane, decreasing year-over-year. AFSCME's patch-through calling decreased steadily from $191,887 in 2013 to $36,716 in 2016. Plaintiffs offered only two years of invoices for AUFC, and those invoices show Strategic Consulting Group's pay for patch-through calling being cut nearly in half – from $153,653 in 2015 to $80,500 in 2016. For Plaintiffs to suggest that there is an "average" that can be projected forward is totally speculative.

**II(E). The Jury's Deadlock on Damages Until after Multiple Charges by the Court Emphasizes the Speculative Nature of the Damages**

Understanding that causation and damages were hard-fought issues at every stage of the litigation, the parties and the Court prepared a verdict form that addressed the possibility that the jury would be unable to reach a verdict on damages. The jury's inability to do so until 6:03 PM after a full day of deliberation and being sent back into the jury room twice reinforces the Project Veritas Parties' position argued at summary judgment and in its Rule 50(a) motion – Plaintiffs presented no reliable evidence of damages. When pressed to respond with a number lest they had

31

to return for another day of deadlocked deliberations, the jury ultimately pulled a number out of thin air.

The jury deliberated for a full day on September 22, 2022. At approximately 4:45 PM, the Court convened the parties (initially under seal) in the courtroom because the jury had provided a verdict form that was filled in except for the answer to Question 6, which read:

**Actual Damages**

1.      If you answered YES to Question #5, how much do you award Plaintiff Strategic Consulting Group in damages for Fraudulent Misrepresentation? You must consider the damages from Fraudulent Misrepresentation independently from the Wiretapping Claims. All jurors must agree on the same answer. Otherwise, leave the line below blank.

$

Consistent with the verdict form language agreed on by the parties ("All jurors must agree on the same answer. Otherwise, leave the line below blank."), the jury had left the line blank, demonstrating they had deadlocked on this issue. The Court questioned whether leaving the line blank meant that the jury could not reach a unanimous number, or whether the jury meant the number was zero, or whether the jury had misunderstood its instructions. Ex. E, 9/22/22 Tr. at 13:4-22. After hearing the arguments of counsel, the Court called the jury into the courtroom and asked the jurors to clarify what they meant.  As the jurors exited after this instruction, they looked at each other as though wondering whether they should verbally apprise the Court of their response.

Rather than immediately send back a note, the jurors evidently continued deliberating. Approximately fourteen minutes later, the Court received and read a note:

NOTE FROM JURY

For #6 we left it blank because
we could not agree on an amount

Dkt. 187 (Juror Note #3 at 5:05 PM). The jurors had followed their instructions and were in fact still deadlocked.  There was no indication that a juror refused to participate in deliberations. The Court heard further argument from the parties on what the next step should be. As the Court recognized, some jurors may have accepted the Project Veritas Parties' argument that "the evidence doesn't support damage, they haven't proved it, it's speculative." Ex. E, 9/22/22 Tr. at 33:24-25. The Court also commented, "If they can unanimously find for the plaintiff on the claim, they should be able to unanimously find for the plaintiff a certain amount. And a zero amount, in my mind, wouldn't make sense, although Mr. Calli has presented some arguments as to why it might." *Id.* at 33:13-18. But the jury might have deadlocked over all manner of issues – including a belief among some jurors that alleged damages actually resulted from the constitutionally impermissible grounds of Project Veritas's expressive conduct. Or jurors may well have been concerned about the speculative nature of the damages as discussed *supra* Section II.

Jury instruction #20 accurately stated that SCG was obligated to show "damages as a result of its reliance on the representation . . . by clear and convincing evidence." Strategic Consulting Group did not do so, and $120,000 in damages was awarded strictly because the jury pulled a number out of thin air after being sent back into the jury room after the close of business hours (again). Over defense objection, the Court ruled that it would give a *Thomas* charge, recognizing also, "[T]his is a big issue on appeal and maybe for renewed Rule 50." *Id.* Indeed it was, and the

very need for a *Thomas* charge should, as a matter of law, negate a view that the evidence was clear and convincing.

The jury indicated to the courtroom deputy that it did not wish to return the next day. And at 6:03 PM, having followed the directions on the agreed upon verdict form and having twice been sent back into the jury room, the foreperson sent a note at 6:03 PM stating, "We have agreed on an amount for #6." Dkt. 189, Jury Note #4.

The propriety of the charge itself, following an agreed upon verdict form and apparent further deliberations after the Court asked the jury to clarify, will be raised in the appropriate course. The Project Veritas Parties emphasize it here in connection with Rule 50(b) because the nature of the deliberations, the deadlock on damages, and its ultimate ending at 6:03 PM in the evening underscore the failure of Plaintiffs' evidence on this point, particularly for a tort that must be proved by clear and convincing evidence. The number that the jury settled on at 6:03 PM is $120,000. It is a speculative number bearing no relation to any of the numbers Plaintiffs presented at trial. Damages cannot be based on mere speculation for the sake of making it home for dinner and not having to return the next day.

### III. Plaintiffs' Punitive Damages Claims Fail as a Matter of Law

Plaintiffs' efforts to obtain punitive damages fail as a matter of law. To establish an entitlement to punitive damages, a plaintiff must prove by clear and convincing evidence that a defendant (1) acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff; and (2) the defendant's conduct was outrageous, grossly fraudulent, or reckless toward the safety of the Plaintiff.

*Hickey v. Scott*, 162 F. Supp. 3d 1 (D.D.C. 2011) is instructive on the high burden that a Plaintiff must show to be awarded punitive damages, and the Court's function as gatekeeper:

> "In the District of Columbia, "[t]he test for punitive damages ... is a rigorous one." . . . Punitive damages may only be awarded "in cases of outrageous or egregious wrongdoing where the defendant has acted with evil motive, actual malice, or in willful disregard for the rights of the plaintiff." . . . The party seeking punitive damages . . . bears the burden of proving "egregious conduct and the requisite mental state by clear and convincing evidence." . . . Moreover, "[t]he determination of whether there is a sufficient legal foundation for the award of punitive damages lies with the trial court." . . . In other words, a trial court should only allow the issue of punitive damages to be submitted to the jury if there is a "sufficient legal foundation" for such damages—*i.e.*, if a jury reasonably could find the requisite malicious intent or willful disregard of another's rights needed to sustain such an award.

*Id.* at 2 (citations omitted).

Plaintiffs have pled their claim for punitive damages strictly on the basis of their wiretap counts. *See* Dkt. 1 at 26 (Request for Relief "H. Award Plaintiffs punitive damages pursuant to 18 U.S.C. § 2520(b)(2) and D.C. Code § 25-554(a)(2)(B) in an amount to be determined at trial."). Any claim for punitive damages must therefore be proved in connection with Allison Maass's hidden camera recording – but as discussed above, there was no "evil motive' or the like at all. Only an intent to gather the news. Given the long and storied history of undercover journalism in the U.S., such conduct and the newsgathering motive behind cannot be deemed egregious, outrageous, evil, or indeed any of the other adjectivally extreme prerequisites for punitive damages. To hold otherwise would, again, run headlong into the First Amendment and be unconstitutional.

Likewise, because Plaintiffs have pled their claim for punitive damages only on the basis of the wiretap counts, if the Court grants this motion with regard to Counts Two and Three as discussed above, then Plaintiffs have no basis to seek punitive damages.

## IV. Conspiracy

The evidence demonstrates that far from an agreement to pursue tortious ends, the only agreement between James O'Keefe, Allison Maass, Project Veritas and Project Veritas Action Fund agreed to acts that were not only lawful, but First Amendment protected – gathering and reporting the news. There was no agreement that she enter a fiduciary relationship, much less that she breach any such relationship erroneously imputed to her.  To allow an "agreement" to do something that is only deemed unlawful after the fact based on variable fact-balancing not possibly knowable by most, if not all, of the alleged conspirators, would be so grossly vague and unpredictable that it cannot form the basis for conspiracy liability on this evidence.

Furthermore, an actionable conspiracy requires an underlying actionable cause of action. Because the underlying causes of action for wiretap under federal law, wiretap under the D.C. Code, and fraudulent misrepresentation fail, there is no liability for any party based on conspiracy.

## V. The Claims of Interception with Tortious Purpose and Fraudulent Misrepresentation Are Unconstitutional Under the First Amendment

The Project Veritas Parties renew and preserve their First Amendment challenges against each of the remaining claims. *See* U.S. CONST. amend. I. The tortious purpose exceptions to one-party consent recording in both 18 U.S.C. § 2511(2)(d) and D.C. Code § 23-542(b)(3) are unconstitutional on their face and, on the record before this Court, unconstitutional as applied to the Project Veritas Parties.

In that regard, *Animal Legal Defense Fund v. Kelly*,[6] 9 F.4th 1219 (10th Cir. 2021) is instructive authority that post-dates the summary judgment arguments in this matter. In that case, a non-profit organization that "conducts undercover operations through investigators who seek

---

[6] As discussed in Section II, its analysis is also instructive with regard to the insufficiency of the evidence of causation.

Case 1:17-cv-01047-PLF   Document 196   Filed 11/14/22   Page 37 of 40

employment at animal facilities" brought a declaratory judgment action to hold unconstitutional a Kansas law that, among other prohibitions, precluded entering an animal facility without the owner's consent with the intent to damage the enterprise being conducted at that facility. *Id.* at 1223–26. The undercover journalists "will not reveal their associations with ALDF or their purpose in seeking a job; if asked directly, the investigators falsely state they were not sent by an animal rights organization." *Id.* at 1225. "Once employed by an animal facility, investigators wear hidden camera, often in violation of posted notices forbidding recording." *Id.* The non-profit "will provide information and recorded images to the media and to the public." *Id.*

The court found the operative sections of the statute "involve speech rather than merely conduct because they regulate what may be permissibly said to gain access to or control over an animal facility" and that the recording provision "is speech-creating activity within the ambit of the First Amendment." *Id.* at 1232. In its analysis, the Tenth Circuit observed that "The damage Kansas fears is that animal facilities may face 'negative publicity, *lost business*, or boycotts.' But these harms would be accomplished by ALDF disseminating true information – to the extent that information is injurious, it does not cause legally cognizable harm." *Id.* at 1235 (alterations omitted) (emphasis added) (citing *Desnick v. Am. Broad. Cos. Inc.*, 44 F.3d 1345, 1353–54 (7th Cir. 1995) (holding that "public exposure of misconduct" did not constitution "injurious act' under wiretap statute)). "Although the information from which the harm flows would not be obtainable without the false statement used to gain entry to the facility, the false statement itself does not directly cause the harm." *Id.* "[T]he 'harm' Kansas seeks to avoid is the type of harm that is not only non-cognizable but legally protected: that arising out of true speech on a matter of public concern." *Id.* The Court found that the challenged provisions were viewpoint discriminatory in violation of the First Amendment. *Id.* at 1236–37.

Moreover, Plaintiffs' assertion of fraudulent misrepresentation presents a damages theory that amounts solely to reputational harm. Because the Plaintiffs did not prove—much less plead—defamation, they cannot recover for reputational harm based on *true* speech (often coming from the mouths of their own personnel) and this application of fraudulent misrepresentation is also unconstitutional under the First Amendment. The Plaintiffs' entire case violates the First Amendment.

## VI. Conclusion

At the close of their case, Plaintiffs failed to demonstrate a legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs on any of the claims they asserted. Accordingly, Project Veritas Action, Project Veritas, James O'Keefe, and Allison Maass move pursuant to Fed. R. Civ. P. 50(b) for entry of a judgment in their favor on each cause of action alleged.

Respectfully submitted,

By:     /s/ Paul A. Calli
           Paul A. Calli
           Florida Bar No. 994121
           Chas Short
           Florida Bar No. 70633
           CALLI LAW, LLC
           14 NE 1st Ave, Suite 1100
           Miami, FL 33132
           Telephone: (786) 504-0911
           Facsimile (786) 504-0912
           PCalli  Calli-Law.com
           CShort@Calli-Law.com
           *Admitted pro hac vice*

/s/ Erik Scott Jaffe
Erik Scott Jaffe
SCHAERR JAFFE LLP
Bar No. 440112
1717 K Street, NW
Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
ejaffe@schaerr-jaffe.com

/s/ Stephen R. Klein
Stephen R. Klein
Bar No. 177056
BARR & KLEIN PLLC
1629 K St. N.W., Ste. 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@barrklein.com

/s/ Benjamin T. Barr
Benjamin Barr (Pro Hac Vice)
BARR & KLEIN PLLC
444 N. Michigan Avenue Ste. 1200
Chicago, IL 60611
Telephone: (202) 595-4671
ben@barrklein.com
*Admitted pro hac vice*

*Counsel for Defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, and Allison Maass*

## **<u>CERTIFICATE OF SERVICE</u>**

I CERTIFY that on November 14, 2022, I served the foregoing through the Court's electronic filing system which served a copy on all counsel of record.


_/s/ Paul A. Calli_____
Paul A. Calli, Esq.