## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

DEMOCRACY PARTNERS, LLC, *et al.*,              )
                                                )
            Plaintiffs,              )
                                                ) Civ. No. 1:17-cv-1047-PLF
            v.                       )
                                                )
PROJECT VERITAS ACTION FUND, LLC, *et al.*,     )
                                                )
            Defendants.              )
_____)

### PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO PROJECT VERITAS PARTIES'
### RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW

In their Rule 50(b) Motion for Judgment as a Matter of Law [Dkt. No. 196] ("Def. Mot."), Defendants complain that the verdict was "obtained by Plaintiffs in a case they succeeded in making politically charged." *Id*. at 3. In this case, the jury returned a verdict against Defendants on two counts after a five-day trial in which there were virtually no evidentiary disputes and in which Plaintiffs' ability to introduce any negative evidence about Project Veritas and its founder, Defendant James O'Keefe, their nefarious past exploits, outrageous statements, and political ties and activities, had been significantly restricted through the Court's guidance in its rulings on motions *in limine* and by agreement of the parties. And almost all of the jury instructions were agreed between the parties. In those circumstances, Defendants' refrain that the verdict was "politically charged" and based on an "exploitation of the current political climate," *id*. at 2, rings utterly hollow.

It is also meaningless in the context of their motion. Defendants bear a heavy burden in attempting to overturn the verdict. "Because a judgment as a matter of law intrudes upon the

rightful province of the jury it is highly disfavored. We have repeatedly emphasized that '[t]he jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable men could not disagree on the verdict.'" *Boodoo v. Cary*, 231 F.3d 1157, 1161 (D.C. Cir. 1994)(quoting *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 640-41 (D.C. Cir. 1988)).  Defendants have not come close to making that showing.

To the contrary, with respect to both the wiretapping and fraudulent misrepresentation counts, the Court had previously held, in denying summary judgment, that if Plaintiffs were able to establish certain ultimate facts at trial, a reasonable jury could find for Plaintiffs on each of those counts.  Plaintiffs at trial presented more than sufficient evidence to support findings in their favor on both counts.

As to the existence of a fiduciary duty, with respect to the nature of the services provided, Plaintiffs presented evidence that Defendant Allison Maass regarded her work as an intern in preparing reports of bracketing events as important, and that she had significant access to confidential information, materials, meetings and briefings. With respect to the legitimate expectations of the parties, there was very substantial evidence that Maass should have understood, and did understand, that she was expected to maintain in confidence non-public information she learned during her internship.  The evidence showed that, for their part, Plaintiffs reasonably expected that Maass would not disclose to a group of pro-Trump operatives every bit of information she gleaned from secretly recording private meetings and briefings with Democratic Party officials and consultants, and from non-public documents shared with her about future political events, and that she would not eavesdrop on private conversations, secretly rummage through the trash and take pictures of documents lying on the desks of Creamer and others in the

Democracy Partners offices.  In all, there was more than sufficient evidence for a jury to conclude that Creamer had reposed enough confidence and trust in Maass to create a fiduciary relationship.

The evidence also showed that the primary or determinative factor in Maass' motivation for making her secret recordings was to disclose them to her superiors at Project Veritas—a clear breach of her fiduciary duty.

With respect to the issue of causation in the fraudulent misrepresentation claim, Scott Frey's testimony taken as a whole  supported a finding that the infiltration of Democracy Partners by Maass was a substantial factor in AFSCME's decision to terminate its business relationships with Plaintiffs Robert Creamer and Strategic Consulting. And that decision led directly to the closure of AUFC, and the loss of future business to Creamer and Strategic from that client.

As to the amount of damages awarded, the evidence of past payments to Strategic Consulting by AFSCME and Americans United for Change, presented by Plaintiffs, together with evidence introduced by both sides bearing on how the amounts of those payments would have fluctuated in  the future, together with the Court's instructions, provided more than an adequate framework for the jury to make a reasonable estimate of damages.  No more was  required. There is no basis at all for disturbing the jury's determination.  In particular, Defendants' challenge to the Court's instructions to the jury following the jury's initial inability to determine the amount of damages to award, was not raised in Defendants' Rule 50(a) motion and therefore cannot be considered by the Court in deciding the pending Rule 50(b) motion.

Defendants' challenge to Plaintiff's punitive damages claims  is puzzling, to say the least, given that the parties agreed that punitive damages could not be considered by the jury, the jury was not instructed on punitive damages, the verdict form did not include them, and none were awarded. Likewise, no verdict was returned on the civil conspiracy count.

Finally, Defendants' contentions that the wiretapping and fraudulent misrepresentation claims are unconstitutional under the First Amendment was previously ruled upon and rejected by the Court.  That ruling is  the law of the case and Defendants offer no compelling  reason to revisit it.

## I.   LEGAL STANDARD

As noted, "[b]ecause a judgment as a matter of law intrudes upon the rightful province of the jury, it is highly disfavored."  *Boodoo,* 21 F.3d at 1161. "Ordinarily the jury has the final word at trial; indeed, this is an integral part of having juries adjudicate disputes in the first place. If the losing party hopes for a different result, it faces a heavy burden…."  *Lewis v. District of Columbia*, 315 F. Supp.  3d 571, 577 (D.D.C. 2018). "'Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor.'"  *Id.* at 576 (quoting *Muldrow v. Re-Direct, Inc*., 493 F.3d 160, 165 (D.C. Cir. 2007)).

"'[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  *Reeves v. Sanderson Plumbing Prods, Inc*., 530 U.S. 133, 150 (2000)(quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250-51 (1986)).  '"[I]n entertaining a  motion for judgment as a  matter of law, the court should review all of the evidence in the record.  In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves*, 530 U.S. at 150.  "In making that determination, a court may not assess the credibility of witnesses or weigh the evidence." *Hayman v. Nat'l Academy of Sciences*, 23 F.3d 535, 537 (D.C. Cir. 1994). *Accord*, *Smith v. District of Columbia*, 413 F.3d 86, 97 (D.C. Cir. 2005).

4

## II.   ARGUMENT

### A.   Plaintiffs Presented Evidence From Which A Reasonable Jury Could Conclude that the Secret Recordings Were Made for the Primary or Determinative Purpose of Breach of Fiduciary Duty

As the Defendants correctly note, in order to establish a violation of the federal and D.C. wiretapping statutes, because Defendant Allison Maass was a party to all of the secret recordings, Plaintiffs had to establish that the recordings were made for a "tortious purpose"—in this case, to commit the tort of breach of fiduciary duty.  Def. Mot. at 4. As the Court previously ruled, in denying summary judgment, Plaintiffs were required to prove that breach of a fiduciary duty was a "primary motivation" of  Maass or a "determinative factor" in Maass' motivation.  *Democracy Partners, LLC v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 287 (D.D.C. 2020)("*Democracy Partners II*"). At trial, Plaintiffs presented evidence sufficient for a jury to find both (i) that Maass had a fiduciary duty to Democracy Partners and (ii) that a determinative factor in her motivation to make the recordings was to breach that fiduciary duty by disclosing confidential information to her superiors at Project Veritas.

### 1.   There Was Sufficient Evidence to Find the Existence of a Fiduciary Duty

To determine whether a fiduciary relationship "exists in a particular case is a 'fact-intensive' question that requires a 'searching inquiry into the nature of the relationship, the promises made, the type of services or advice given, and the legitimate expectations of the parties.'"  *Democracy Partners II*, 453 F. Supp. 3d at 279 (quoting *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz,* 793 F. Supp. 2d 311, 341 (D.D.C. 2011)(internal quotations omitted)). In its ruling on Defendants' summary judgment motion,  the Court found that Plaintiffs lacked evidence sufficient to support the first two factors—nature of the relationship or promises made—but had adduced sufficient evidence to support the existence of the third and

fourth factors: the "type of services or advice given" and the "legitimate expectations of the parties." *Id*. at 280. At trial, Plaintiffs presented more than enough evidence for the jury reasonably to find the existence of these third and fourth factors.

    (a) <u>Type of Services or Advice Given</u>

At trial, Plaintiffs presented evidence that went well beyond what they offered in opposition to Defendants' summary judgment motion, as to the type of services or advice given. Maass testified that her role with respect to the "bracketing program"—counter-messaging events planned for the DNC, to take place before and after Trump/Pence campaign events—was "to clip these protests that appeared on local news, to have the clips for a report that was put together about all of the media that covered these protests." Excerpts of Trial Transcript, Sept. 16, 2022, attached hereto as Exhibit 2 ("9/16/22 Tr.") at 105:10-14. Maass further testified that the DNC "wanted to track these protestors, …so that they could report it back to the campaign and Hillary. *Id.* at 105:17-19. Maass was told by a DNC official that Hillary Clinton herself looked at those reports. *Id.* at 105:20-22. In one of the reports sent by Maass to her superiors at Project Veritas, Maass stated that with respect to the reports of bracketing events she was tasked with compiling, the "DNC has to report up to Brooklyn up to the Clinton campaign headquarters so that the Clinton campaign headquarters is kept in the loop….This is a very important project, because occasionally the candidate herself, meaning Hillary Clinton, reads this stuff. So it's very important that we get it right." Plaintiffs' Trial Exhibit 104. Mass confirmed she was told that by a DNC official. Ex. 2 hereto, 9/16/22 Tr. at 108:14-24.

In addition, with respect to the type of services or advice given, the Court, in its decision on summary judgment, held that evidence showing that Maass was given access to confidential briefings, information and meetings, could support a finding of a fiduciary relationship.

*Democracy Partners II*, 453 F. Supp. 3d at 280-81. At trial, Plaintiffs presented a substantial amount of such evidence—specifically, that "Maass' work gave her access or exposure to confidential information." *Id*. at 281.

In her report to her Project Veritas superiors about the second day of her internship, Maass recalled that she was allowed to sit in on obviously confidential strategy calls on Democratic Party strategy about key issues, including one with Democratic Leader Nancy Pelosi's daughter "about strategy for the next few months for pushing their issues in Congress."  Plaintiffs' Trial Exhibit 98.  "Just kind of interesting listening to the behind the scenes strategy sessions from the Dems." *Id*.  In the course of her internship, Maass went to DNC headquarters, where on one occasion she was told about a secret bus program before it was launched, Plaintiffs' Trial Exhibit 104;  Ex. 2 9/16/22 Tr.  at  107:23-108:10.   Maass  gained  access  to  a  private  polling  briefing  at  the Communications Workers of America headquarters, with a top Democratic Party pollster,  only by presenting her fake ID at the entrance to the headquarters building.  Plaintiffs' Trial Exhibit 92; Ex. 2 hereto,  9/16/22 Tr. at 94:7-23

Maass sat in on daily calls about the bracketing events, calls that included representatives of the DNC, Democracy Partners and the Clinton Campaign. Ex. 2, 9/16/22  Tr. at 100:9-11; 24:3-18; Plaintiffs' Trial Exhibit 100.  Maass reported that, on one of those calls, "they mentioned a secret war room where they discuss these thing [influencing the social media narrative on legislative and policy issues] with other organizations like Planned Parenthood." Plaintiffs' Trial Exhibit 100.  Maass acknowledged that she understood that the participants in that call wanted to keep that information confidential.  Ex. 2, 9/16/22 Tr. at 126:21-127:4.

As Creamer testified, Maass  had access to daily written reports about the bracketing events, reports that included plans for future events.  Excerpts of Trial Transcript, Sept.  15, 2022,

attached as Exhibit 1 hereto ("9/15/22 Tr.") at 84:16-85:14.; *see e.g.,* Plaintiffs' Exhibit 10 (listing future bracketing events). Creamer testified that, although bracketing events were designed to be publicized as they took place, the existence and nature of future events was confidential:

> Q. Were the bracketing events, when they took place publicized?
> A. Yes.  The purpose of the events was to generate earned media, that is to say, press coverage of the message being undertaken.
> Q. And while they were being planned, but before they were announced publicly, were those—were the plans for the bracketing events confidential?
> A. Absolutely.

Ex. 1 hereto, 9/15/22 Tr.at 83:18-84:1.

Defendants contend that the reports of past and future bracketing events to which Maass was given access, including Plaintiffs' Trial Exhibit 10, were not really confidential because the entries for future events just said, "Planning in progress." *Id*. at 9.  But those entries identified the specific dates and locations for future bracketing events—information that was indisputably confidential at the time Maass disclosed the document to her Project Veritas superiors.  Creamer specifically confirmed that the plans for bracketing events to take place in connection with specific future Trump/Pence events on specific dates—as set out, for example, in Plaintiffs' Exhibit 10— were indeed confidential at the time Maass received that the report. Ex. 1,  9/15/2022 Tr. at 87:13-20.

Ignoring most of this substantial body of evidence, Defendants cite cases from other jurisdictions for the proposition that entrusting confidential information to another in itself does not create a fiduciary relationship.  Def. Mem. at 10.  That  may be true, but it misses the point. Under D.C. law, "'[a] fiduciary relationship is founded upon trust or confidence reposed by one person  in the integrity and fidelity of another.'"  *Doe v. Roman Catholic Diocese of Greensburg*, 581 F. Supp. 3d 176, 202 (D.D.C. 2022)(quoting *Xereas v. Heiss*, 987 F.3d 1124, 1131 (D.C. Cir.

2021)(internal quotation omitted)). "This definition is extremely similar to that of a confidential relationship…" *Id*. at 203.

In ruling on summary judgment in this case, the Court did not actually hold that mere access to confidential information is sufficient to create a fiduciary relationship. Rather, the Court held that such access was probative of the nature of the services provided by Maass—that such services were not merely clerical and mundane but, precisely because they did involve access to confidential and sensitive information, were indicative of a fiduciary relationship. *Democracy Partners II*, 453 F. Supp. 3d at 280-81.

Thus, the evidence presented by Plaintiffs was sufficient for a jury to conclude that the factor of types of services rendered, supported a finding of the existence of a fiduciary relationship.

**(b) Legitimate Expectations of the Parties**

Defendants insist that a jury could not find the existence of a fiduciary duty based on the legitimate expectations of the parties because (i)  they failed to get Maass to sign a non-disclosure agreement or specifically instruct her about any obligation of confidentiality; (ii) there was insufficient evidence that Plaintiffs themselves expected her to keep information confidential; and (iii) Plaintiffs failed to treat certain of their own information as confidential and thus could not have expected Maass to keep in confidence anything she learned during her internship.  Def. Mot. at 11-20.  Those contentions fall apart upon examination of the law and the evidence presented at trial.

**(i)      Maass' Expectations**

First, although Maass did not sign a non-disclosure agreement and Plaintiffs did not specifically discuss with her an obligation of confidentiality, Plaintiffs presented substantial evidence at trial that Maass expected and understood that much of the information she would learn

9

through her internship was to be kept confidential.  In ruling on summary judgment, the Court found that the fact that "Maass created a false identity and that defendants created false identities to introduce Maass to plaintiffs is evidence of their understanding that Mass would have fiduciary obligations to safeguard sensitive or confidential information."  *Democracy Partners II*, 453 F. Supp.3d at 281.

At trial, Plaintiffs introduced a substantial amount of evidence of precisely that understanding.  Plaintiffs established that Creamer had been deliberately misled into entrusting Maass with the internship, with its access to confidential information, through a sophisticated, complex chain of deceptions, including false narratives and identities for "Steve Packard" (Christian Hartsock); "Charles Roth" (Daniel Sandini); and then "Angela Brandt," played by Maass.  *See* Hartsock testimony, Ex. 2 hereto, 9/16/22 Tr. at 16:6-17:10; 20:23-21:12; 31:3-12; Plaintiffs' Trial Exhibit 78;  Hartsock testimony, Ex. 2  hereto  9/16/2022 Tr. at 32:10-34:1;  Maass testimony, Ex. 2  hereto, 9/16/2022 Tr. at 81:25-82:21; Plaintiffs' Trial  Exhibit 97 (fake resume); Maass testimony, Ex. 2 hereto 9/16/2022 Tr. at  93:13-18; Plaintiffs' Trial Exhibit 92 (fake ID); Maass testimony, Ex. 2 hereto 9/16/2022 Tr. at 94:2-12.

Further, it is undisputed that Creamer told Maass that she would be asked to sign a non-disclosure agreement, though she was never given one to sign.  Maass testimony, Ex. 2 hereto 9/16/22 Tr. at 89:19-90:7.  That statement by Creamer made enough of an impression on Maass that she included that statement in the report she gave to her superiors of her first day at Democracy Partners.  Plaintiffs' Trial Exhibit 130.  In her deposition, Maass admitted that  her understanding of a non-disclosure agreement is that "you are agreeing not to give any information about the company."  *Democracy Partners II*, 453 F. Supp.3d at 261 (quoting Transcript of Deposition of Allison Maass at 77:12-15).

At trial, a well-coached Maass admitted that she was told by Creamer that she was to sign a non-disclosure agreement and conceded that she understood what a nondisclosure agreement was. Ex. 2 hereto, 9/16/22 Tr. at 90:5--11. She also testified that her understanding was that a nondisclosure agreement "is a written document that outlines what you can and cannot disclose," *id*. at 90:8-11, and since she never got a written agreement, "I don't know what this one would have said." *Id*. at 90:19-21. That evasive response, however, hardly undercuts the understanding she would have gleaned from Creamer's reference to an NDA, given that she recorded and disclosed *everything* she saw and heard during her internship (Ex. 2 hereto, 9/16/2022 Tr. at 85:3-16). The specific scope of any nondisclosure agreement would thus have been utterly irrelevant.

In addition, as noted, Maass was repeatedly told, or clearly would have understood, that certain information disclosed to her specifically was confidential—the secret war room, the private polling briefing at CWA headquarters, the "inside" strategy sessions to which she was privy. Certainly, a reasonable jury could conclude that Maass understood she was expected to maintain what she learned through her internship in confidence.

**(ii)    Plaintiffs' Expectations**

Defendants argue that this Court "made an error" in relying solely on evidence showing Defendants' expectations, because Plaintiffs expectations must also be considered. Def. Mot. at 12. But, at trial, Plaintiffs established that they, the Plaintiffs themselves, indeed expected Maass to keep confidential the non-public information she learned during her internship. As noted, it is undisputed that Creamer told Maass that she would be given a nondisclosure agreement to sign. That in itself shows that Creamer expected Maass to keep information confidential and so informed her.

The understanding of Plaintiffs is further reflected in the stipulated testimony of Lauren Windsor. [Dkt No. 174].  Windsor was supposed to obtain the non-disclosure agreement from Maass.  Her stipulated testimony, which was read to the jury by the Court, states that "I don't recall having a specific conversation with Ms. Maass about confidentiality during her internship, *but it would have been implied from the nature of the work we were doing*."  Ex. 2 hereto, 9/16/22 Tr. at 9:7-10 (emphasis added).  Ms. Windsor's testimony also states that she "did not ask Ms. Maass for a non-disclosure agreement," "[*b*]*ut I thought it was clear from the nature of the work and the fact that we issued her a card to get into the office the nature of the work was sensitive*."  *Id*. at 9:11, 17-19 (emphasis added).

In addition, in its ruling on summary judgment, with respect to the "legitimate expectations" factor, the Court relied in part on evidence showing "that Maass was given unrestricted access to the physical space within [the Democracy Partners office], allowing her to overhear confidential conversations and view confidential documents."  *Democracy Partners II*, 453 F. Supp. 3d at 282.  The Court cited the conversation that Maass overhead (including Mike Lux and Sen. Sanders' former campaign manager) to which she was not a party; and the fact that she searched through Creamer's trash and took photographs of documents on the desk of Creamer and Aaron  Black. *Id*.

All of those facts were evidenced at trial.  While the jury did not find that Maass recorded the conversation in the office to which she was not a party, there is no doubt that she eavesdropped on, and actually listened  to  that  private conversation. "I pretended to be working and tried to listen to what they were saying."  Maass report, Plaintiffs' Trial Exhibit 110.  "Q. So do I understand correctly that while your recording device was on you were listening to this conversation…. A. Yes."  Ex. 2 hereto,  9/16/22 Tr. at 118:14-18. And Maass admitted that she

took photographs of documents on the desks of Creamer and Black; and that she rummaged through the trash in Creamer's office when he was not there.  *Id*. at 127:16-128:6.  As the Court stated in its summary judgment ruling, "her ability to listen and look reflects the trust that was placed in her" by Plaintiffs.  *Democracy Partners II*, 453 F. Supp. 3d at 282.

Certainly, Creamer and Democracy Partners would have reasonably expected that Maass would not eavesdrop on private conversations (and attempt, albeit unsuccessfully, secretly to record them) and would not rummage through the trash or take pictures of documents on their desks.  A reasonable jury could conclude that Plaintiffs had every expectation that Maass  would not do such things—that she would maintain basic confidences and basic loyalty in that regard.  The evidence thus supported a finding that the expectations of trust and confidence on the part of Creamer and Maass indeed ran both ways.

> **(iii)**   **Plaintiffs' Treatment of Their Own Confidential Information**

Defendants argue that Plaintiffs themselves could not have had a reasonable expectation of confidentiality because they "did not treat their work as though it were confidential."  Def. Mot at 17.  Not so.  First, the examples cited do not support that proposition.  For example, that Creamer explained to Roth (played by Sandini) and to Maass (before her internship) the general nature of bracketing events (Def. Mot. at 17) —events which were intentionally public once they were put on—does not in any way undercut the fact that the plans for *specific future* bracketing events were "absolutely" confidential, as Creamer explained.   Ex. 1 hereto, 9/15/22 Tr. at 83:18-84:1.  Likewise, Defendants point out that Aaron Black—who is not a Plaintiff and was not a principal or employee of Dem Partners at the time—described the nature of bracketing generally to another Veritas operative and talked about plans for the Donald Ducks demonstrations, that had already started.  Def. Mot. at 18 (citing Defendants' Trial Exhibits 177-1 and 177-2).  That disclosure,

however, is completely irrelevant to what Plaintiffs' expectations were with respect to Maass. That operative (Trevor Kendrick) had one conversation with Black at the Democracy Partners office with Black present. Kendrick had no other access to the office, did not listen in on any private calls, meetings or briefings or rummage through anyone's trash.

Likewise, Defendants cite Creamer's disclosure to Sandini, when they had dinner, that the Donald Ducks demonstrations would start the next day, as selectively disclosing confidential information about "future bracketing" events—implying that what Creamer chose to keep confidential was based on his "ad hoc" judgments, which Maass could not possibly guess without a specific confidentiality agreement in place. Def. Mot. at 19-20. Expectations of confidentiality, however, are created by all of the facts and circumstances surrounding a particular relationship. As the Court emphasized in its summary judgment ruling, to determine "whether such a [fiduciary] relationship exists in a particular case, is a 'fact intensive' question." *Democracy Partners II*, 453 F.3d at 279 (internal quotation omitted). "District of Columbia courts have 'deliberately left the definition of a "fiduciary relationship" open-ended, allowing the concept  to fit a wide array of factual circumstances.'" *Doe*, 581 F. Supp. 3d at 202 (quoting *CAIR*, 793 F. Supp. 2d at 341).

The overall circumstances of the relationship between Creamer and Sandini were vastly different than those of the relationship between Creamer/Democracy Partners and Maass. Sandini never tried to embed himself in Democracy Partners. He did not try to sit on private meetings and briefings with top Democratic Party officials and consultants, let alone use a fake ID to do it. He did not secretly  rummage through trash or take pictures of documents lying on desks. For all of those reasons, Plaintiffs never asserted that Sandini had any fiduciary duty to Creamer or Democracy Partners. And for precisely that reason, Plaintiffs  have *never* asserted that the secret taping by Sandini of his conversations with Creamer was in any way tortious or unlawful.

In the end, in its overall approach, Defendants' analysis ignores the fundamental legal framework for determining the existence of a fiduciary relationship under D.C. law. "'A fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of another.'" *Democracy Partners II*, 453 F. Supp. 3d at 279 (quoting *Bolton v. Crowley*, *Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015)(internal quotation omitted)). "District of Columbia law has deliberately left the definition of 'fiduciary relationship' flexible, so that the relationship may change to fit new circumstances in which a special relationship of trust may properly be implied." *High v. McLean Fin. Corp.*, 659 F. Supp. 1561, 1568 (D.D.C. 1987).

Taken as a whole, the evidence presented at trial was more than enough for a reasonable jury to find that Creamer had reposed trust and confidence in Maas. It was more than enough for a reasonable jury to find that Creamer reasonably expected and trusted that Maass would not disclose to a group of Trump-supporting operatives, non-public information she secretly gleaned from closed door meetings on political and policy strategy, confidential polling briefings, meetings at DNC Headquarters, private conference calls and reports about future political events, and from secretly photographing documents on people's desks and rummaging through their trash. There was more than enough evidence of a "relationship of trust" for the jury to find the existence of a fiduciary relationship.

### 2. There Was Sufficient Evidence That Breach of Fiduciary Duty Was A Determinative Factor in Mass' Motivation

Defendants argue that, "[i]nstead of a tortious purpose, the evidence showed that Project Veritas Parties acted with the sole purpose of gathering the news." Def. Mot. at 21. The issue, however, is whether breach of fiduciary duty was a determinative factor specifically in the motivation of Maass to make her secret recordings of literally everything she saw and heard during her internship. That the Defendants believed they could use some of the recordings in a

presentation they believed would be "news" makes no difference.  As this Court held in its ruling

on the Defendants' motion *in limine* regarding admissibility of certain Trump-related evidence,

the "presence of a valid, non-tortious purpose does not immunize a defendant from liability under

the wiretap statutes if that defendant also has a tortious purpose that is 'the primary motivation' or

'a determinative factor' in intercepting the communications."  Opinion and Order, Oct. 14, 2021,

Dkt. No. 114 at 7.

       In their motion for summary judgment, Defendants made the exact same argument they

make here: that there could be no tortious purpose because Maass' sole motivation was to

investigate and report a news story.  The Court rejected that argument, finding that "the undisputed

facts show that Maass secretly recorded all of the conversations, conference calls and meetings to

which she had access as an intern precisely in order to disclose these conversations to her superiors

at Project Veritas so they could be used by Project Veritas in their videos."  *Democracy Partners

II*, 453 F. Supp. 3d at 287. The Court found that those facts created a genuine issue as to whether

a determinative factor in her motivation was to commit a breach of fiduciary duty.  *Id.* In other

words, the breach of fiduciary duty was Maass' *own* disclosure, to her superiors at Project Veritas,

of the all the information she saw and heard, through providing her daily summary reports and all

of her raw videos, to those superiors.

       At trial, Maass confirmed that she recorded literally everything she saw and heard

during her internship, Ex. 2, 9/16/2022 Tr. at 85:7-13; and that she provided all of the raw videos,

and daily summary written reports, to her superiors at Project Veritas. *Id*. at 86:5-87:5. *See also*

Hartsock testimony, Ex. 2 hereto, 9/16/22 Tr. at 48:21-49:18 (Maass sent reports to O'Keefe and

Hartsock every day of her internship, and the raw videos every day within 24 hours).  A reasonable

jury could certainly conclude, as the Court found in its summary judgment ruling based on these

same facts, that a determinative factor in Maass' motivation for the secret recordings was precisely to do what she in fact did do: disclose everything she recorded to her superiors at Project Veritas.

Indeed,  it would be illogical for a reasonable jury to conclude otherwise.  In *CAIR,* at the summary judgment stage, the Court found that, there being enough evidence to find the existence of a fiduciary duty, the defendant's disclosure of intercepted communications that took place within an organization he infiltrated, in itself showed that his primary motivation or determinative factor was breach of that fiduciary duty.  "If [the defendant] understood himself to be bound by a fiduciary duty of non-disclosure, then it appears obvious that the breach of this fiduciary duty was the primary motivation, or at least a motivating factor, in his interception of the communications at issue.  No one disputes that [his] purpose in making these recordings was to provide them to individuals outside of CAIR."  *Council on American-Islamic Relations Action Network v. Gaubatz,* 31 F. Supp. 3d 237, 259 (D.D.C. 2014).

For these reasons, there was more than sufficient evidence to conclude that Maass' secret recordings were made for the tortious purpose of breaching a fiduciary duty, in violation of the federal and D.C. wiretapping statutes.

**B.  The Evidence Was Sufficient for a Reasonable Jury to Find Causation**

The Court has recognized from the outset of this case that, because this is not a defamation case, Plaintiffs cannot recover damages to reputation resulting from an act of expression or publication.  Rather, Plaintiffs were required to plead and prove that their reputation damages were proximately caused by Defendants' non-expressive conduct. *Democracy Partners, LLC v. Project Veritas Action Fund*, 285 F. Supp.3d 109, 125-126 (D.D.C. 2018)(denying motion to dismiss).

In their Rule 50(b) motion, Defendants reprise the refrain they have offered *ad nauseum* through this proceeding: that a jury could not, consistent with the First Amendment,  have found

that the damages to Strategic Consulting resulting from the fraudulent misrepresentation were caused by Ms. Maass' infiltration of Democracy Partners as opposed to Defendants' "expressive" conduct—namely, the posting and contents of the first video released by Project Veritas. Def. Mot. at 22-23. The evidence presented at trial, however, put the lie to that refrain once and for all. There was more than sufficient evidence from which the jury could find that Defendants' *non-*expressive conduct—the fact of the infiltration—was a substantial factor in the decision of AFSCME to cancel its business relationship with Strategic Consulting, and to withdraw its support from Americans United for Change ("AUFC").

### 1.  AFSCME's Decision

Defendants contend that, as to AFSCME's decision to terminate its business relationships with Creamer and Strategic, "the predominant factor at issue were the publications demonstrating the shady practices engaged in by Plaintiffs, not the mode, manner or happenstance of infiltration per se." Def. Mot. at 25. Defendants note that Scott Frey, the AFSCME legislative director at the time with first-hand knowledge of the reasons for AFSCME's decision, called the "video in itself and the way it was released" a "major factor" in the decision. Def. Mem. at 26.

Plaintiffs were not, however, required to prove that the contents of the video played *no* role in AFSCME's decision to terminate its business with Strategic Consulting. Nor would it matter even if the contents were the "predominant factor." Rather, as the Court ruled in its decision on summary judgment, under D.C. law, the first component of "proximate cause" "does not require that a defendants' conduct be the sole cause of the harm, only that it be a 'substantial factor in bringing about the harm.'" *Democracy Partners II*, 453 F. Supp. 3d at 275 (quoting *District of Columbia v. Carlson,* 793 A.2d 1285, 1288 (D.C. 2002)). "So, as long as a defendant's conduct

18

was a substantial factor in causing the harm, it is irrelevant that there may other legal or proximate

causes of the injury." *Id.*

Consistent with this statement of the law, the Court instructed the jury as follows, using

language that had ultimately been agreed to by both sides:

> A proximate cause of an injury is a cause which is a substantial factor in
> bringing about the injury.  An injury or damage is proximately caused by a fraudulent
> misrepresentation when the plaintiff proves by clear and convincing evidence that the
> misrepresentation played a substantial part in bringing about the  injury—in bringing
> about the injury or damage.
> When I say a substantial part or substantial factor, I mean that the defendant's acts
> must have such an effect in producing the harm so that a reasonable person would
> regard the conduct as a cause of the harm.
> There may be more than one cause of harm—there may be more than one cause
> of harm. For the maker of the misrepresentation to be liable for damages, the harm
> must be a direct result of the misrepresentation.
> In determining whether plaintiff Strategic Consulting Group suffered damages
> caused by the alleged misrepresentation, you must determine whether the damages
> were proximately caused by the actions of the defendants other than the content and
> public posting of their videos.  In other words, you must determine whether other
> actions of one or more of the defendants was a substantial factor in bringing about the
> damages.

Excerpts of Trial Transcript, Sept. 21, 2022, attached as Exhibit 5 hereto ("9/21/22 Tr.") at 88:23-

89:18.

There was more than sufficient evidence from which the jury could conclude that a

substantial factor in AFSCME's firing of Strategic Consulting was the action of one or more

defendants "other than the content and  public posting of their videos"—specifically, the actions

of Ms. Mass in infiltrating Democracy Partners.  First, the testimony of Scott Frey, AFSCME's

legislative director at the time with first-hand knowledge of the reasons for AFSCME's decision,

indicated that the infiltration itself was a substantial factor in the decision:

> Q. Okay.  Did you have a concern that Mr. Creamer had created the opportunity for this
> video by allowing the Project Veritas operation to have occurred?
> A. We did have that concern.  As I recall, we weren't  clear how—you know, whether or
> not there was appropriate vetting of the staff that was working with him, and whether or

not they had been thorough in their background review of some of the people that he had
hired….

Q. Was the infiltration of Democracy Partners by a Project Veritas operative a factor in
your decision to terminate the relationship with Mr. Creamer?

A. Yes.

Excerpts of Trial Transcript, Sept. 19, 2022, attached hereto as Exhibit 3 ("9/19/22 Tr.") at 52:18-

53:11.  Mr. Frey further testified that the reasons for AFSCME's withdrawal of support for AUFC,

including the resignation of the AFSMCE President an AUFC Board member were the same as

those for AFSCME firing Creamer and:

> Q. And when was that decision made?
> A. Simultaneous to the decision about Mr. Creamer and his business.
> Q. And were the reasons for that decision the same as those—
> THE COURT:  *And what was the reason*?
> A.  Again, because of—by allowing—*by creating the opportunity for this—these people
> to infiltrate the organization,* that they had created a major embarrassment for the
> presidential campaign of Secretary Clinton, which we were supporting.  It was
> something that we did not want to be associated with just weeks—particularly just
> weeks before the election.  And we felt it had created a challenging climate, and we
> wanted to separate ourselves from it.

Ex. 3 hereto,  9/19/22 Tr. at 54:10-24 (emphasis added). Thus, in response to the Court's question,

Mr. Frey offered as "*the* reason" for AFSCME's decision, "creating the opportunity for this—these

people to infiltrate the organization…"

Second, Mr. Frey made clear that the actual contents of the video—the portrayal of the

"shady practices of the Plaintiffs," as Defendants would have it (Def.  Mot.  at 25)—were *not* a

significant factor in AFSCME's decision because AFSCME officials did not believe the video

accurately portrayed Creamer and his associates as having done anything wrong:

> Q.  Were you—as to your own reasons for agreeing with [AFSCME Chief of Staff Bill]
> Lurye that the business relationships with Mr. Creamer should be terminated, were you
> concerned that the video itself had disclosed that Mr. Creamer had engaged in any illegal
> conduct?
> A. No.
> Q. What about wrongful conduct?
> A. Not really, no.

Ex.3 hereto,  9/19/2022 Tr. at 50:11-18.

"'In most cases, the existence of proximate cause is a question of fact for the jury.'" *Smith v. Hope Village, Inc*., 481 F. Supp. 2d 172, 185 (D.D.C. 2007)(quoting *McNeil v. Hi-Lo Powered Scaffolding, Inc*., 836 F.2d 637, 644 (D.C. Cir. 1988)). "[A]nd 'only if it is absolutely clear the [defendant's] negligence could not have been a proximate cause of the harm asserted by the plaintiff] is it a question of law.'" *Id.* (brackets in original)(quoting *Boodoo*, 21 F.3d at 1161).

In *Boodoo*, the Court of Appeals for the D.C. Circuit reversed the District Court's post-verdict grant of judgment as a matter of law.  In that case,  the key issue was whether the excessive speed of a bus was the proximate cause of an accident in which the bus collided with a car. "Whether the accident was inevitable at the lower speed hinges on  factual variables that were clearly in dispute at trial, and thus the question whether excessive speed was a proximate cause of the collision was properly one for the jury to decide." *Boodoo*, 21 F.3d at 1161.

The same is true in this case.  Taken as a whole, Frey's testimony was more than sufficient to provide a basis for the  jury to reasonably conclude that the infiltration was a substantial factor in  AFSCME's decision to terminate the business relationships with Creamer and Strategic Consulting.  The Court's instructions to the jury were clear.  The issue was one for the jury to decide.  There is no basis for overturning its verdict.

## 2.   Loss of Business from AUFC

Defendants contend that the "evidence on causation as to AUFC is even more speculative and broken by intervening events."  Def. Mot. at 28. But the very evidence Defendants cite established that Strategic's loss of business from AUFC was the direct result of AFSCME's decision to stop funding AUFC and have its President resign from the Board.  *Id.*, citing Creamer testimony: "Because the chair of the Board, who was the President of AFSCME, had stepped back

at the same time from being chairman.  He was the principal supporter and fundraiser for that

organization" Def. Mot. at 28 (quoting Def. Mot. Ex. A , 9/15/22 Tr. at 115:11-18).  Frey testified

that the reason for AFSCME's decision to pull its support for AUFC was "because of—by

allowing—by creating the opportunity for this—these people to infiltrate the organization

[Democracy Partners]…"  Ex. 3 hereto, 9/19/22 Tr. at 54:10-24.

      Defendants cite evidence that AFSCME was concerned about late notification that the first

Project Veritas video was being released  and an article from Wisconsin.  Def. Mem. at 28-29.  But

Bradley Woodhouse, who headed AUFC at the relevant time, testified as follows:

> Q.  …You testified that two of the reasons AFSCME withdrew its support from AUFC
> had  to do with late notification of the infiltration and disclosure of the board.  To your
> knowledge, based on your personal knowledge, were there any other reasons that they
> terminated their support?
> A. My understanding from the various conversations I had was that there was just a sense
> that we had failed, that we had allowed ourselves to be compromised, and that that—that
> was the  original sin.

Excerpts of Trial Transcript, Sept. 20, 2022, attached as Exhibit 4 hereto ("9/20/22 Tr.") at

48:24-49:8.

      "The second component of proximate cause only limits a defendant's liability when the

chain of events leading to the injury is 'highly extraordinary in retrospect.' " *Democracy*

*Partners II,* 453 F. Supp. 3d at 275 (quoting *Majeska v. District of Columbia*, 812 A.2d 948, 950

(D.C. 2002)).  That was certainly not the case here, as to Strategic's loss of business from AUFC

There were no unrelated, intervening events to "break the chain of causation."  AFSCME's

decision to withdraw support from AUFC was caused by the same factors as those that caused

their decision to fire Creamer and Strategic, and one substantial factor in that decision was that

infiltration of Democracy Partners by Maass.  And Woodhouse made clear that had AFSCME

not withdrawn its support, causing AUFC to shut down, AUFC would have absolutely continued to work with and pay Strategic.  Ex. 4 hereto, 9/20/22 Tr. 34:15-35:7.

For those reasons, there was more than sufficient evidence for the jury to find that the loss of business from AUFC was proximately caused by Maass' infiltration of Democracy Partners.

### C.   There Is No Basis for Overturing the Jury's Determination of Damages

Defendants complain that Plaintiffs' damages calculations were based on average payments that Strategic Consulting had received in prior years, which Defendants argue had fluctuated and were not predictive of payments in future years.  Def. Mem. at 31.  But Plaintiffs introduced specific evidence that the patch-through calling payments from AFSCME  would have continued had AFSCME not terminated the relationship, and that the amount of the payments would actually have  *increased* in 2017 and 2018.  Frey testimony, Ex. 3 hereto, 9/19/2022 Tr at 59:12-60:6.  And Woodhouse testified that AUFC would have continued to pay Strategic for consulting and patch-through services, but for the loss of AFSCME support that caused AUFC to fold.  Woodhouse testimony, Ex. 4 hereto, 9/20/22 Tr. at 35:6-7.  Defendants were free to, and did, bring out on cross-examination and in argument, that the prior payments were not necessarily predictive of what Strategic would have been paid in future years.

The Court then instructed the jury about how to calculate damages, stating specifically in language jointly submitted by the parties, that, "You may only award a plaintiff damages for past harm, injury and expenses that are not speculative.  Speculative damages are those that might be possible but are remote or based on guesswork. But the plaintiff does not have to prove his exact damages.  You may award the plaintiff damages that based on a just and reasonable estimate derived from the relevant evidence."  Ex. 5 hereto, 9/21/2022 Tr. at 90:10-17.

In those circumstances, determination of the amount of damages was clearly a question for the jury.  The past payments to Strategic Consulting by AFSCME and AUFC, showing the trends, together with evidence about whether those payments would have been less or more in future years based on various factors, together with the Court's instructions, provided a framework for the jury to make a reasonable estimate of damages.  In  *Carter v. Duncan-Higgins, Ltd*., 727 F.2d 1225 (D.C. Cir. 1984),  the Court of Appeals, affirming the  District court's denial of judgment as a matter of law, held that:

> In reviewing the actual amount of a jury's award our task is limited and a reluctance to interfere is our touchstone… In reviewing the amount of the jury's award, we thus need not—and indeed cannot—reconstruct the precise mathematical formula that the jury adopted….Our inquiry ends once we are satisfied that the award is within a reasonable range and that the jury did not engage in speculation or other improper activity.

*Carter*, 727 F.2d at 1238-39. Where the evidence provides "a reasonable basis for the damages awarded," judgment as a matter of law based on the amount awarded should be denied.  *United States Conference of Mayors v. Great-West Life & Annuity Ins. Co*., 327 F, Supp. 3d 125, 134-36 (D.D.C. 2018).  And, as the Court stated in that case, defendant "is mistaken about the precision required in determining damages.  Juries are not required to show their work."   *U.S. Conference of Mayors,*  327 F. Supp. 3d at 134. In this case, the award was within a reasonable range (a fraction of what Plaintiffs had claimed) and there was more than ample support for it in the record.

Defendants attempt to introduce the issue of the Court's instruction to the jury after it had initially deadlocked on the amount of damages.  Def. Mot. at 31-34. This issue, of course, could not have been raised in Defendants' Rule 50(a) motion and was not included in that motion. Accordingly, the Court cannot consider that issue at all in ruling on the present Rule 50(b) motion. "Because a  post trial Rule 50(b) motion is limited to a renewal of a Rule 50(a) motion for judgment

as a matter of law, the post trial motion is limited to those grounds that were specifically raised in the prior motion." *Rice v. District of Columbia*, 818 F. Supp. 2d 47, 54 (D.D.C. 2011).

For these reasons, there is no basis to set aside the jury's determination of the amount of damages.

### D.  No Punitive Damages Were Awarded

Defendants' attack on Plaintiffs' original punitive damages claim makes no sense.  Def. Mot. at 34-35. As noted above, the parties agreed that punitive damages could not be considered by the jury, the jury was not instructed on punitive damages,  the verdict form did not include them, and none were awarded.  There is no occasion for the Court to revisit that issue.

### E.  No Verdict Was Returned on the Civil Conspiracy Count

The Verdict Form [Dkt. No. 191] did not ask the jury to return any verdict on the civil conspiracy count and none was returned.  There is no reason for the Court to address defendants' arguments with respect to that issue.

### F.  The Court Should Not Revisit Defendants' Constitutional Challenges

In their motion, Defendants renew their contention that the tortious purpose exceptions to the law allowing one-party consent recording, in the federal and D.C. wiretapping statutes, are unconstitutional.  Def. Mem. at 36-37. That precise issue was considered by the Court in ruling on Defendants' motion for summary judgment, and the Court rejected the constitutional challenge. *Democracy Partners II*, 453 F. Supp. 3d at 288-90.

Under the law of the case doctrine, "the same issue presented a second time in the same case in the same court should lead to the same result." *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999).  While the Court certainly has discretion to reconsider its decisions prior to final judgment, the law of the case doctrine "instructs, however, that 'where litigants have once battled

for the court's decision, they should neither be required to without good reason permitted, to battle for it again.'"  *Spirit of the Sage Council v. Kempthorne*, 511 F. Supp. 2d 31, 38 (D.D.C. 2007)(quoting *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)).  On this basis, courts have declined to revisit decisions on issues of law previously made in rulings on summary judgment in the absence of a "compelling reason".  *E.g., Fleming v. Medicare Freedom of Info. Group*, No. 15-cv-1135-EGS, 2019 U.S. Dist. LEXIS 99203 at *6-*9 (D.D.C., June 13, 2019).

Defendants offer no such compelling reason here.  The case cited by Defendants, *Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021) is not binding precedent in this Circuit and did not involve the DC or federal wiretapping statutes. That  decision, moreover, relied heavily on a finding of viewpoint discrimination, an argument which was specifically carefully considered and rejected by this Court with respect to the wiretapping statutes  *Democracy Partners II*, 453 F. Supp. 3d at 289. The Court in this case analyzed the specific wiretapping statutes and found them constitutional.  There is no reason to revisit that decision.

## .CONCLUSION

For the reasons set forth above, Defendants' Rule 50(b) Motion for Judgment as a Matter of Law should be denied.

Respectfully submitted,

Dated: December 12, 2022                    /s/ Joseph E. Sandler

Joseph E. Sandler, D.C. Bar No. 255919
Christina E. Bustos DC Bar. No. 229699
SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.
1090 Vermont Ave., N.W.  Suite 750
Washington, D.C.  20005
Tel:  202-479-1111
Fax:  202-479-1115
sandler@sandlerreiff.com

26

bustos@sandlerreiff.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2022, I electronically filed the foregoing Plaintiffs'
Status Report with the Clerk of Court using the CM/ECF system, which will cause a copy to be
served on all counsel of record.

/s/ Joseph E. Sandler

Joseph E. Sandler

Counsel for Plaintiffs