## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEMOCRACY PARTNERS, LLC, *et al.*,

        *Plaintiffs,*

     v.

PROJECT VERITAS ACTION FUND, LLC, *et al.*,

        *Defendants.*

Civil Action No.: 17-1047 (PLF)

## DEFENDANTS' REPLY IN SUPPORT OF
## RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

ARGUMENT ................................................................................................................. 1

I.   The First Amendment Requires the Court to Review the Jury's Verdict Closely and
     to Cabin Overbroad Elements of State-Law Torts. ............................................... 2

II.  The Trial Evidence Cannot Establish a Breach of Fiduciary Duty. ....................... 6

     A.   The evidence cannot support any legitimate expectation that the parties
          were entering a fiduciary relationship................................................................ 7

     B.   Defendant Maass did not perform the types of services that clearly establish
          a fiduciary relationship. ................................................................................. 12

     C.   Considering these factors together, all evidence demonstrates that Maass was
          not Plaintiffs' fiduciary. .................................................................................. 13

III. Plaintiffs Failed to Identify Evidence Showing that Defendants' Activity Caused
     Plaintiffs' Injuries. .............................................................................................. 16

     A.   The jury's verdict violated the general principles of causation. .......................... 16

     B.   The jury's causation finding is particularly troubling in the First
          Amendment context. ...................................................................................... 19

     C.   The jury's deadlock on damages underscores the need for this Court's
          close review. .................................................................................................. 21

IV.  Defendants' Arguments are Properly Raised, and the Court may Consider Them........... 22

     A.   The Court has not previously rejected these arguments. ................................... 22

     B.   The law of the case doctrine also does not apply................................................ 24

CONCLUSION............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Acme Int'l Gen. Trading & Contracting Co. v. CCI*,
   No. 12-cv-1895 (EGS), 2015 WL 12559867 (D.D.C. Sept. 14, 2015)..................................... 24

*AFT Michigan v. Project Veritas*,
   No. 17-cv-13292, 2017 WL 6604040 (E.D. Mich. Dec. 27, 2017) ......................................... 15

*Allen v. United States*,
   164 U.S. 492 (1896)........................................................................................................ 21

*Alvarado v. KOB-TV, LLC*,
   493 F.3d 1210 (10th Cir. 2007) ......................................................................................... 4

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
   22 F.4th 1018 (D.C. Cir. 2022) ..................................................................................... 19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ....................................................................................................... 2

*Anderson v. Suiters*, 4
   99 F.3d 1228 (10th Cir. 2007) ....................................................................................... 4

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016) ..................................................................................... 19

*Armenian Assembly of Am. v. Cafesjian*,
   758 F.3d 265 (D.C. Cir. 2014) ..................................................................................... 18

*Armenian Genocide Museum & Mem'l v. Cafesjian Fam. Found.*,
   607 F. Supp. 2d 185 (D.D.C. 2009) ............................................................................. 13

*Awan v. U.S. Dep't of Justice*,
   46 F. Supp. 3d 90 (D.D.C. 2014) ................................................................................. 24

*Bolton v. Crowley, Hoge & Fein, P.C.*,
   110 A.3d 575 (D.C. 2015) ..................................................................................... 7, 13

*Boodoo v. Cary*,
   21 F.3d 1157 (D.C. Cir. 1994) ...................................................................................... 2

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984) ............................................................................................. *passim*

*Celle v. Filipino Rep. Enters.*,
   209 F.3d 163 (2d Cir. 2000) .......................................................................................... 4

*Claytor v. Owens-Corning Fiberglas Corp.*,
   662 A.2d 1374 (D.C. 1995) .......................................................................................... 25

*Colorado v. New Mexico*,
   467 U.S. 310 (1984) ..................................................................................................... 19

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
   31 F. Supp. 3d 237 (D.D.C. 2014) ............................................................................... 14

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health*,
   497 U.S. 261 (1990) ....................................................................................................... 3

*Democracy Partners v. Project Veritas Action Fund*,
   285 F. Supp. 3d 109 (D.D.C. 2018) ............................................................................. 22

*Democracy Partners v. Project Veritas Action Fund*,
   453 F. Supp. 3d 261 (D.D.C. 2020) ..................................................................... *passim*

*Doe v. Roman Cath. Dioceses of Greensburg*,
   581 F. Supp. 3d 176 (D.D.C. 2022) ................................................................. 5, 8, 10

*Filebark v. U.S. Dep't of Transp.*,
   555 F.3d 1009 (D.C. Cir. 2009) ................................................................................... 24

*Food Lion v. Capital Cities/ABC*,
  964 F. Supp. 956 (M.D.N.C. 1997) ............................................................... 15, 20

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
  194 F.3d 505 (4th Cir. 1999) ........................................................................... 20

*Fortune v. United States*,
  65 A.3d 75 (D.C. 2013) ................................................................................... 21

*Friends of Phil Gramm v. Ams. for Phil Gramm in '84*,
  587 F. Supp. 769 (E.D. Va. 1984). ................................................................... 6

*Frome v. Renner*,
  No. 97-cv-5641, 1997 WL 33308718 (C.D. Cal. Oct. 1, 1997) ............................ 20

*Gertz v. Robert Weltch*,
  418 U.S. 323 (1974) ..................................................................................... 4, 7

*Greenberg v. De Tessieres*,
  902 F.2d 1002 (D.C. Cir. 1990) ....................................................................... 18

*Hayman v. Nat'l Acad. of Scis.*,
  23 F.3d 535 (D.C. Cir. 1994) ............................................................................ 2

*High v. McLean Fin. Corp.*,
  659 F. Supp. 1561 (D.D.C. 1987) ...................................................................... 7

*Hustler Mag. v. Falwell*,
  485 U.S. 46 (1988) ........................................................................................... 5

*Jenkins v. Strauss*,
  931 A.2d 1026 (D.C. 2007) ............................................................................. 13

*John Simmons Co. v. Grier Bros. Co.*,
  258 U.S. 82 (1922) ......................................................................................... 24

*Krukas v. AARP*,
  458 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 8

*Langevine v. District of Columbia*,
  106 F.3d 1018 (D.C. Cir. 1997) ....................................................................... 24

*Lewis v. District of Columbia*,
  791 F. Supp. 2d 136 (D.D.C. 2011) ................................................................. 24

*Milkovich v. Lorain J. Co., Inc.*,
  497 U.S. 1 (1990) ............................................................................................. 4

*Murphy v. PricewaterhouseCoopers, LLP*,
  580 F. Supp. 2d 4 (D.D.C. 2008) ..................................................................... 25

*National Railroad Passenger Corp. v. Veolia Transportation Services*,
  791 F. Supp. 2d 33 (D.D.C. 2011) ................................................................... 15

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ..................................................................................... 4, 6

*Prunte v. Universal Music Grp.*,
   484 F. Supp. 2d 32 (D.D.C. 2007) ........................................................................... 14

*Pub. Citizen, Inc. v. Trump*,
   361 F. Supp. 3d 60 (D.D.C. 2019) ........................................................................... 24

*Reeves v. Sanderson Plumbing Prods.*,
   530 U.S. 133 (2000) ................................................................................................... 2

*Schoen v. Washington Post*,
   246 F.2d 670 (D.C. Cir. 1957) ................................................................................ 24

*Sexual Minorities Uganda v. Lively*,
   960 F. Supp. 2d 304 (D. Mass. 2013) ................................................................... 5, 6

*Shepherd v. Am. Broad. Cos., Inc.*,
   62 F.3d 1469 (D.C. Cir. 1995) .................................................................................. 6

*Smith v. Goguen*,
   415 U.S. 566 (1974) ................................................................................................... 5

*Smoot v. State*,
   355 A.2d 495 (Md. Ct. Spec. App. 1976) ............................................................... 22

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ............................................................................................. 3, 5

*Steele v. Isikoff*,
   130 F. Supp. 2d 23 (D.D.C. 2000) ...................................................................... 5, 20

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ........................................................................... 4, 5, 6

*Thomas v. Archer*,
   384 P.3d 791 (Alaska 2016) .................................................................................... 14

*United States v. Maragh*,
   894 F.2d 415 (D.C. Cir. 1990) .................................................................................. 3

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) .................................................................................. 5

**Statutes**

18 U.S.C. § 2511 ........................................................................................................... 15

**Other Authorities**

25 Am. Jur. Proof of Facts 2d 725 .............................................................................. 15

3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations (Thompson
   Reuters 2010) ......................................................................................................... 15

H.H. Hansen & D.E. Buckner, Annotation, *Time Jury May Be Kept Together on Disagreement in
Criminal Case*, 93 A.L.R.2d 627 (1964) .............................................................. 21

Victor Brudney, *Contract and Fiduciary Duty in Corporate Law*, 38 B.C. L. Rev. 595 (1997) . 14

This case is, and has always been, about Defendants' First Amendment activity. Defendants investigated and truthfully informed the public about Plaintiffs' activities, which caused the public and business partners to change their views of Plaintiffs. That is the core of investigative journalism. If the jury's verdict here stands, every investigative journalist, source, or leaker will face the serious risk of liability for obtaining or providing information that public figures would prefer remain secret.

While Plaintiffs barely even mention the First Amendment, much less acknowledge its supervening constraints on this case, that Amendment protects against precisely such dangers posed by this case by erecting guardrails cabining state-law torts and heightening judicial review of jury verdicts. By requiring a plaintiff to establish any speech or press impinging claim by clear and convincing evidence, raising the bar for various tort elements, and limiting liability absent genuine damages, the First Amendment protects speakers and the press from jury speculation and punishment of unpopular speakers and views. The trial evidence here fell far short of those heightened requirements and thus the jury's verdict must be set aside.

## ARGUMENT

Unlike a typical post-trial motion, the Court in a case involving First Amendment activity should not blithely defer to a jury's conclusions. Here, the meager evidence claimed to support the existence or breach of any fiduciary duty, and thus avoid the single-party consent rule for recording conversations, cannot withstand even ordinary review, much less the heightened standards and scrutiny required by the First Amendment. Likewise regarding the misrepresentation claim, the slim evidence of injury causation and damages, and the failure to disentangle allegedly non-expressive causes of injury from the overwhelming and protected cause of merely *exposing* Plaintiffs' own bad behavior and lax security to their business partners and the

public, cannot overcome First Amendment constraints on state law liability.  Finally, contrary to Plaintiffs' assertion, Defendants' arguments are each properly before the Court.

## I.   The First Amendment Requires the Court to Review the Jury's Verdict Closely and to Cabin Overbroad Elements of State-Law Torts.

The jury's verdict in this case suffers from many shortcomings.  And, while this Court's initial instinct may be to defer to that verdict, the First Amendment activities involved in this case demand otherwise.  In cases potentially impinging on First Amendment rights and activities, Courts must apply both heightened substantive and evidentiary standards to statutory or tort claims that might otherwise chill speech, and must independently review the record to see whether such standards have been met.

1.  Much of Plaintiffs' defense of the verdict rests on claimed deference to the jury such that even the weakest of evidence is sufficient to sustain the verdict.  *See* Pls.' Opp'n to Defs.' Rule 50(b) Mot. at 3–4 ("Opp'n") (ECF No. 203).  But the deference cases they cite are *ordinary* cases without First Amendment implications.  *See, e.g., id.* at 4 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (age discrimination); *Hayman v. Nat'l Acad. of Scis.*, 23 F.3d 535, 537 (D.C. Cir. 1994) (same); *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994) (automobile accident)).  Plaintiffs noticeably fail to cite any cases, like this one, involving First Amendment activity.[1]  In suits that potentially burden First Amendment activity, courts have an independent role that supersedes ordinary policy considerations and even the Federal Rules of Civil Procedure.  *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984) (declining to apply Rule 52(a) because "Judges, as expositors of the Constitution, must

---

[1] In fact, Plaintiffs ignore that one case they cite—*Reeves, supra*—relies on *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), where the Court reversed because the appellate court gave *too much* deference to the jury in a First Amendment case.  *Id.* at 257.

independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by *clear and convincing* proof of 'actual malice.'") (emphasis added); *Snyder v. Phelp*s, 562 U.S. 443, 453 (2011) ("the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.") (cleaned up).

"[T]he rule of independent review assigns to judges a constitutional *responsibility* that cannot be delegated to the trier of fact." *Bose*, 466 U.S. at 501 (emphasis added); *see also United States v. Maragh*, 894 F.2d 415, 418 (D.C. Cir. 1990) (same).  Deference is inappropriate in First Amendment cases because a "jury's application of such a standard is unlikely to be neutral with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of" rights secured by "the First and Fourteenth Amendments[.]" *Bose*, 466 U.S. at 510 (cleaned up) (discussing role of jury in "determin[ing] the relevance of a defamatory statement to the plaintiff's status as a public figure").

Plaintiffs also contend (at 4) that the Court "may not assess the credibility of witnesses or weigh the evidence."  But in the First Amendment context, the Supreme Court has rejected this precise argument.  *See Bose*, 466 U.S. at 500 (reversing because the court of appeals erroneously "declined to second-guess the District Judge on the credibility of the witnesses.").  Unlike under the preponderance of the evidence standard, the trier of fact must be able to form a "firm belief or conviction as to the truth of the allegations sought to be established, [based on] evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 285 n.11 (1990) (second alteration in original). A reviewing court must independently determine if the verdict is supported by "clear and convincing proof" and, if not, it

must set the verdict aside.  *Bose*, 466 U.S. at 511.  Indeed, "in cases raising First Amendment issues," courts have "an *obligation* to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression."  *Milkovich v. Lorain J. Co.*, *Inc.*, 497 U.S. 1, 17 (1990) (emphasis added; quotation marks omitted); *see also Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987) (en banc) (given the "First Amendment nature of this litigation, the jury verdict must be measured … against the heavy burden of proof imposed on a plaintiff who is a public figure.").

2.  The Court must also enforce the First Amendment's substantive limits on tort claims. For example, the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), noted that nearly a dozen state cases apply heightened standards in defamation cases and extended such standards, along with judicial oversight of their application, as a matter of constitutional prophylaxis.  *Id.* at 270–71; *id.* at 298 n.2 (Goldberg, J., concurring in the result) (discussing need for scrutiny because the "requirement of proving actual malice or reckless disregard may, in the mind of the jury, add little to the requirement of proving falsity"); *see also Gertz v. Robert Weltch*, 418 U.S. 323, 349 (1974) (rejecting lax scienter standards in defamation cases); *Celle v. Filipino Rep. Enters.*, 209 F.3d 163, 176 (2d Cir. 2000) (independent judicial review of jury conclusions where "the First Amendment requires actual malice") (citing cases); *Anderson v. Suiters*, 499 F.3d 1228, 1235 (10th Cir. 2007) (tort liability for publishing private facts limited to matters "not of legitimate concern to the public" as a "constitutional limitation imposed by the First Amendment[,]" even if state law previously imposed no such requirement); *accord Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1220 n.9 (10th Cir. 2007) (noting "that state law now defines torts involving publication to take into account First Amendment restrictions announced by the Supreme Court").

Such constitutional limits and heightened review apply to all manner of torts that threaten First Amendment activity. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627–28 (D.C. Cir. 2001) ("Though invasion of privacy false light is distinct from the tort of defamation, the same First Amendment protections apply."); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 328 (D. Mass. 2013) (Constitution limits tort liability linked to First Amendment activity including "intentional infliction of emotional distress claims—which ask a jury to consider whether speech was 'outrageous'" because such claims "are too subjective to meet the requirements of the First Amendment when applied to public figures or topics of public concern.") (citing *Snyder*, 562 U.S. at 562); *Hustler Mag. v. Falwell*, 485 U.S. 46 (1988)). Such heightened standards are an especially appropriate limit on tort elements calling for highly subjective judgments by the jury, such as those involved in assessing an alleged breach of fiduciary duty under D.C. law.[2] Indeed, "long before *Bose*, … reviewing courts carefully and independently reviewed findings of fact and rejected jury verdicts when all favorable inferences did not constitute clear and convincing evidence of actual malice." *Tavoulareas*, 817 F.2d at 778.[3]

---

[2] To be sure, the First Amendment does not *bar* these claims, but it nonetheless *constrains* them. *Steele v. Isikoff*, 130 F. Supp. 2d 23, 29 (D.D.C. 2000). That is particularly true where a jury applies a fact-intensive test, like the fiduciary-duty test. *See, e.g., Hustler Mag.*, 485 U.S. 46 (First Amendment precludes certain application of tort of intentional infliction of emotional distress); *Bose*, 466 U.S. at 510 (A "jury's application of such a standard 'is unlikely to be neutral'"). And these concerns are heightened here, because the fiduciary-duty standard in D.C. is intentionally vague: "District of Columbia courts have 'deliberately left the definition of a "fiduciary relationship" open-ended, allowing the concept to fit a wide array of factual circumstances.'" *Doe v. Roman Cath. Dioceses of Greensburg*, 581 F. Supp. 3d 176, 202 (D.D.C. 2022). Such open-ended standards virtually ensure that any verdict will be tainted by the political context of the case, making deference inapplicable. This also raises serious void for vagueness concerns. *See Smith v. Goguen*, 415 U.S. 566, 572–73 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.").

[3] These limitations are also seen in the criminal context, where the First Amendment insulates even the advocacy of illegal conduct "'except where such advocacy is directed to inciting or producing

The reason for such safeguards is clear.  The First Amendment "demand[s] that writers and speakers enjoy enough 'breathing space' to avoid self-censorship and encourage 'debate on public issues [that is] uninhibited, robust, and wide open[.]'"  *Tavoulareas*, 817 F.2d at 771 (quoting *Sullivan*, 376 U.S. at 270) (second alteration in original); *see also Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1477 (D.C. Cir. 1995) (stricter standard of proof is justified because the "interests at stake in th[e]se cases are deemed to be more substantial than mere loss of money[.]").  That reasoning is equally applicable here.  If Plaintiffs could sustain their wiretapping claim with only the bare minimum of inferential evidence suggesting a fiduciary duty, or if Plaintiffs could base their causation arguments again on the thinnest of speculation or indeterminate mixture of protected and unprotected causes, the First Amendment rights of defendants and all other newsgatherers, sources, whistleblowers, and others would be left by the wayside, and substantial speech on important public issues would be chilled.

## II.     The Trial Evidence Cannot Establish a Breach of Fiduciary Duty.

The evidence at trial does not establish either the existence or breach of a fiduciary duty, much less do so clearly and convincingly.  Given the Court's earlier conclusion that Plaintiffs could not demonstrate a fiduciary duty based on the nature of the relationship or the promises made, *see Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 279 (D.D.C. 2020) (*Democracy Partners II*); Opp'n at 5–6, the flimsy evidence and argument on the remaining

---

imminent lawless action and is likely to incite or produce such action.'"  *Lively*, 960 F. Supp. 2d at 328 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969)).  The First Amendment thus precludes "an expansive interpretation" of state law if it "would trench on important freedoms secured by the First Amendment."  *Friends of Phil Gramm v. Ams. for Phil Gramm in '84*, 587 F. Supp. 769, 774 (E.D. Va. 1984).

and indeterminate factors are not even close to sufficient to support a fiduciary duty or its breach

and hence the wiretapping claim must fail.[4]

### A.   The evidence cannot support any legitimate expectation that the parties were entering a fiduciary relationship.

The trial evidence confirms that neither Maass nor Plaintiffs reasonably expected that they

were entering a fiduciary relationship.

For instance, Plaintiffs did not hire Maass to work as their lawyer, *see Bolton v. Crowley,*

*Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015), broker, *High v. McLean Fin. Corp.*, 659 F.

Supp. 1561, 1568 (D.D.C. 1987), or even as an intern supporting such work.   Rather, Maass

performed simple and menial tasks in an informal office environment.   *See* Trial Tr. 105:12–14

(discussing news clipping) (Sept. 16, 2022) (attached as Ex. A) ("9/16/22 Tr."); Trial Tr. 23:10

(counting signs), 23:18 (organizing data) (Sept. 19, 2022) (attached as Ex. B) ("9/19/22 Tr.");

Defs.' Tr. Exs. 117 at 5:1–3 & 124-3 at 2:2–4 (attached as Exs. C & D).   Plaintiffs did not pay

Maass or ever require her to sign a nondisclosure agreement.   *See* Defs.' Tr. Ex. 117 at 6:4–7;

Defs.' Tr. Ex. 124-7 (attached as Ex. E) (Maass vaguely told there may be "some kind of a non-

disclosure agreement to sign or something."); 9/16/22 Tr. 90:17–21.   And, as discussed below, the

only purportedly confidential information available to her was general information about future

political activities, and often mundane ones at that.   In fact, much of this information was largely

---

[4] Additionally, in the First Amendment context, the lack of any cognizable injury requires a finding that there is no liability.  *See Robert Weltch*, 418 U.S. at 349 (noting in defamation case that "the States may not permit recovery of presumed or punitive damages").   Otherwise, undertaking harmless protected activity could lead to liability, thereby chilling speech.   This Court has already held that "there is no *evidence* of any injury to Democracy Partners" from an alleged breach of fiduciary duty, and entered summary judgment for Defendants on Plaintiffs' separate breach of fiduciary duty claim.  *Democracy Partners II*, 453 F. Supp. 3d at 283.   A breach of fiduciary duty without cognizable harm cannot be the predicate for liability or statutory damages under the wiretapping statutes any more than a state could impose statutory damages for defamation without proof of actual damages.

public, as Plaintiffs spoke openly about their activities.   Trial Tr. 148:4–8 (Sept. 15, 2022) (attached as Ex. F) ("9/15/22 Tr.").   Under these facts, no reasonable person would have expected that Maass had entered into "a relationship founded upon trust and confidence."  *Krukas v. AARP*, 458 F. Supp. 3d 1, 8 (D.D.C. 2020).

Plaintiffs respond by asking the Court to draw a series of strained inferences from snippets of evidence to suggest that they expected Maass to operate as a fiduciary.  That is not how it works in the context of First Amendment activities, where Plaintiffs must satisfy their burden by *clear and convincing* evidence.  *Bose*, 466 U.S. at 511.

For instance, Plaintiffs respond (at 9–10) that Maass was exposed to information "to be kept confidential," from which she must have understood that she was intended to be Plaintiffs' fiduciary.  But that is not the law: while "all fiduciary duties are confidential … not all confidential duties are fiduciary." *Doe*, 581 F. Supp. 3d at 202.  As Plaintiffs argue it, however, confidentiality and a fiduciary duty should be interchangeable because the fiduciary-duty "definition is extremely similar to that of a confidential relationship …."  Opp'n at 9 (quoting *Doe*, 581 F. Supp. 3d at 202) (ellipses in Plaintiffs' opposition).  But Plaintiffs' ellipses hide the key difference: "This definition is extremely similar to that of a confidential relationship, *which 'arises when one party, having gained the trust and confidence of another, exercises extraordinary influence over the other party.'"  Doe*, 581 F. Supp 3d at 202 (emphasis added).  Here, Plaintiffs did not identify *any* evidence that Mass "exercise[d] extraordinary influence"—or *any* influence—"over Plaintiffs." Absent such influence, any confidentiality in the relationship did not transform it into a fiduciary relationship.  Expanding D.C. law to transform everyone with access to confidential information into a fiduciary far exceeds the current scope of D.C. law and would be especially inappropriate given the First Amendment constraints that operate in this case.

Equally unavailing is Plaintiffs' fixation (at 10) on Maass creating a false identity as supposed evidence that she expected to be a fiduciary. But there is simply no evidence to support that leap in logic. Rather, all reasonable inferences point elsewhere: Maass created a false identity in furtherance of her undercover investigative reporting and the self-evident concern that the object of such reporting would not hire a reporter for any even non-fiduciary role. That obvious motive does not suggest any knowledge or expectation of a fiduciary relationship, just knowledge that potentially bad actors like to conceal their bad acts. If creating a false identity, or otherwise gaining access to a location based on false pretenses, is enough to create a fiduciary duty that is breached by disclosing information, the jury's verdict puts an end to nearly *all* undercover reporting and whistleblower activity. Plaintiffs do not cite any support for such an untenable proposition, and the First Amendment obliges this Court to protect against such an overbroad rule and its far-reaching consequences.

As for the non-existent non-disclosure agreement, the evidence also squarely undermines Plaintiffs' fiduciary claims. *See* Opp'n at 10–11. While it is undisputed that Robert Creamer made passing reference to such a potential agreement, it never came to pass and any theoretical inferences from the earlier reference are woefully deficient to support a finding of fiduciary duty. For instance, Plaintiffs claim (at 10) that Maass must have understood this statement to be important because "she included that statement in the report she gave to her superiors of her first day at Democracy Partners." Of course, it is infinitely more plausible that Maass reported on most of what happened during the day, that her reference to Creamer's statement was simply part of a detailed update, and that she left it to her editors to determine what was newsworthy enough to be included in the eventual reporting. *See* 9/16/22 Tr. 86:5–87:1 (Maass testifying that she would "write down everything that I learned" and "put together a report afterwards"). The same is true

of Plaintiffs' speculation (at 11) that Maass must have "gleaned" from Creamer's statement an understanding that she would work under a non-disclosure agreement.  But again, it is far more plausible that, after such potential agreement never materialized, Maass "gleaned" that Plaintiffs determined a non-disclosure agreement would not be necessary for an unpaid intern performing menial tasks and that she had not incurred any heightened legal obligations towards Plaintiffs.  The conflicting and speculative inferences from Creamer's stray remark are not the type of evidence that even remotely satisfies the clear and convincing standard.  *Bose*, 466 U.S. at 511.

Plaintiffs also ask the Court (at 12–13) to make several inferences based on Maass's access to their office.  For instance, Plaintiffs put great emphasis on Lauren Windsor's testimony, where she opined that she thought Maass's work would have "implied" confidentiality because, among other things, Plaintiffs gave Maass a "card to get into the office."  Once again, this fact does not "imply" the relationship Plaintiffs suggest, as Plaintiffs did not show that everyone with card access to the office expected to be a fiduciary.[5]  Without such evidence, any inference from ordinary office access is pure speculation.  The same is true of Maass being able to hear conversations and observe trash containers in the office.  *See* Opp'n at 12–13. Without any evidence regarding the reasonable expectations of many others who had access to that information (e.g., visitors to the office, custodial staff, contractors, etc.), Plaintiffs merely speculate on the inferences they seek to draw.  And, as noted earlier, any such confidentiality does not automatically convert the relationship into a fiduciary one.  *Doe*, 581 F. Supp. 3d at 202.

---

[5] In fact, the evidence shows the opposite.  AUFC, which held the office-space lease, continued to possess access cards long after it had left the premises.  *See Democracy Partners II*, 453 F. Supp. 3d. at 268 n.1.  Similarly, American Family Voices, which was not a member of Democracy Partners and thus was not a fiduciary of Democracy Partners, also had access to the office space. Pls.' Stmt. of Material Facts ¶ 93 (ECF No. 68-1).  Indeed, this Court previously recognized that Democracy Partners did not even maintain sufficient control over office access to sustain a trespassing claim.  *Democracy Partners II*, 453 F. Supp. 3d at 277.

While Plaintiffs ask the Court to endorse all these speculative inferences, they also ask the Court to ignore the contrary evidence. For instance, Plaintiffs downplay (at 13–14) their repeated public statements about bracketing events, including *future* events. Yet, they base their fiduciary duty argument on Maass receiving a document stating "planning in progress" for certain future bracketing events. *Id.* at 8. That small phrase cannot withstand the weight Plaintiffs put on it even in ordinary circumstances. But here, where Plaintiffs face a *high* burden, that small phrase cannot turn otherwise public information into highly sensitive information sufficient to show a bilateral expectation of a fiduciary relationship. Perhaps that is why Plaintiffs (at 14) do not engage the fact that Creamer publicly disclosed that "Donald Ducks demonstrations would start the next day[.]" Yet, they absurdly claim that Maass's access to that same information created a fiduciary duty.[6] When Maass informs a news organization and the public about the same activities, Plaintiffs claim that she violated a fiduciary duty. When it is Creamer leaking the information, Plaintiffs ask the Court (at 14) to look the other way. Plaintiffs cannot have it both ways.

At each turn, the evidence suggests that no one understood Maass to be a fiduciary.[7] Were Plaintiffs genuinely expecting Maass to owe them a fiduciary duty, they would have engaged in at least *some* vetting. But the record shows none and Plaintiffs "allowed [themselves] to be compromised."[8] Trial Tr. 49:5–7 (Sept. 20, 2022) (attached as Ex. G) ("9/20/22 Tr."). Or the

---

[6] Plaintiffs (at 14) downplay Creamer's public statements to Daniel Sandini about future bracketing events because "Sandini never tried to embed himself in Democracy Partners." But that is a non sequitur; Creamer's public release of that information negates any claim that it was so confidential that Maass's access to comparable information could form the predicate for any claimed fiduciary duty.

[7] And, even if the evidence suggested some sort of fiduciary duty owed to Democracy Partners, Plaintiffs fell even further short of demonstrating that such a duty extended to other Plaintiffs.

[8] Also, were unpaid interns expected to be fiduciaries with access to confidential information, they would not have been expected to use their personal e-mail and computers, with no security software or verification in place. *See* 9/19/22 Tr. 26:12–20.

record would show that they made sure to memorialize expectations into an agreement.  Here again, nothing.  *See* 9/16/22 Tr. 90:17–21.  Moreover, if Plaintiffs were genuinely expecting everyone who entered their premises to treat the workplace with confidentiality, Plaintiffs likely would have kept the premises secured.  *Democracy Partners II*, 453 F. Supp 3d at 277 (Democracy Partners had no right to "exclude others from Suite 250.").  The evidence shows that neither the Plaintiffs nor Maass expected her to operate as a fiduciary.  That failing is evident under any standard of review and is overwhelmingly fatal under heightened First Amendment standards.

### B.    Defendant Maass did not perform the types of services that clearly establish a fiduciary relationship.

Plaintiffs also failed at trial to introduce sufficient evidence showing that Maass performed the types of services required to create a fiduciary relationship.  Rather, as Plaintiffs acknowledge (at 6), Maass was responsible for "clip[ping]" public news reports for use by others.  That falls far short of the type of work that shows a fiduciary relationship.

Plaintiffs try to elevate this menial work through name dropping and outsized rhetoric.  For instance, by referencing Hillary Clinton (at 6) and "Nancy Pelosi's daughter" (at 7), Plaintiffs would have this Court (and the jury) infer that Maass was performing more important work.[9]  And by discussing (at 6–7) "secret war room[s]," "secret bus programs," and "very important project[s]," Plaintiffs again sought to cloak Maass's work with an air of importance.[10]  True, Plaintiffs also permitted Maass to observe calls that Plaintiffs characterized as confidential.  *See*

---

[9] Of course, Plaintiffs ignore the contradictory evidence.  9/15/22 Tr. 72:21–73:2 ("Q. Was it confidential information that Secretary Clinton knew and approved about the duck program? A. ... I don't know that she would care one way or the other.").

[10] It is notable that these are the types of "secret" programs that Creamer also leaked publicly.  Moreover, the fact that Maass sat in on a call where a "secret war room" meeting was mentioned does not demonstrate a fiduciary relationship.  *See* Opp'n at 7.  Maas was not invited to that "secret" room, and it is hardly confidential that political operatives use "war rooms."

Opp'n at 7.  Confidentiality, however, does not create a fiduciary duty. *See supra*, at 8.  Plaintiffs concede as much when they acknowledge (at 9) that this "access to confidential information" is merely "probative" of a fiduciary relationship.  But considering the complete lack of other evidence suggesting a fiduciary relationship, mere access to purportedly confidential information is not enough to transform an unpaid intern's role into a fiduciary one.

Plaintiffs' self-serving claims regarding what they and Maass should have expected simply underscore the important role this Court plays in policing the jury's verdict, one that may well have been swayed by such name dropping and rhetoric.  *Bose*, 466 U.S. at 510 (risk that jury will not neutrally apply fact-intensive questions in First Amendment context).  Despite the rhetoric, it remains the case that Maass had menial and mundane job responsibilities.  That she incidentally encountered political activities or incautious individuals does not convert her ordinary responsibilities into those of a fiduciary, particularly where Defendants' First Amendment rights are on the line.  *Id.* at 511.

### C.    Considering these factors together, all evidence demonstrates that Maass was not Plaintiffs' fiduciary.

Upon review of the trial record as a whole, it is apparent that an unpaid intern like Maass does not have the sort of duty typically associated with lawyers, brokers, corporate board members, and high-level managers.  The limited instances where courts in this District have found fiduciary relationships confirm that conclusion.  *See, e.g.*, *Bolton*, 110 A.3d at 584 (lawyer and client); *Jenkins v. Strauss*, 931 A.2d 1026, 1032–33 (D.C. 2007) (home buyer and real estate agent); *Armenian Genocide Museum & Mem'l v. Cafesjian Fam. Found.*, 607 F. Supp. 2d 185 (D.D.C. 2009) (lawyer and client).  Maass's relationship with Plaintiffs did not bear any similarity to those types of relationships.  In fact, the relationship between Maass and Plaintiffs involved even less expertise and influence than existed in cases where this Court concluded there was no fiduciary

relationship. *Prunte v. Universal Music Grp.*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007) (no fiduciary relationship between music creator and reviewer because "ordinary and intermittent transactions to a service provider cannot give rise to the special relationship of trust and confidence required for fiduciary duty to be present.").[11]

While Defendants do not claim that an intern can *never* be deemed a fiduciary, it would require far more than is present in this case. For instance, a fiduciary relationship may exist when one party, who lacks some special expertise, "relie[d] on the [intern]'s judgment and care and is especially vulnerable to the [intern]'s mistakes." *Thomas v. Archer*, 384 P.3d 791, 797 (Alaska 2016). But it is telling that Plaintiffs cite only a single non-First Amendment case with very different facts holding that interns *might* have fiduciary duties. Opp'n at 17 (citing *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 31 F. Supp. 3d 237, 259 (D.D.C. 2014) ("*CAIR*")). But in that case, the intern was "presented with a confidentiality agreement on the first day of his internship," dealt with trade secrets, and the facility maintained "a 'very strict' policy for outsiders entering the building." *CAIR*, 31 F. Supp. 3d at 260-61. None of those factors is present here.

Given Plaintiffs' inability to identify any similar instances where a fiduciary duty has been found, the Court should not endorse the jury's novel view that an unpaid intern performing menial tasks is a fiduciary and, moreover, intended to breach that duty when she made the recordings for the admittedly protected purpose of newsgathering and reporting. Rather, the Court should look

---

[11] In fact, even calling certain highly complex contractual relationships "fiduciary" is "dubious" at best. *See* Victor Brudney, *Contract and Fiduciary Duty in Corporate Law*, 38 B.C. L. Rev. 595, 595 (1997) (Fiduciary duty has "its origins in the law of trusts" and "has been invoked in agency, partnership, and corporate relationships, and dubiously has often been said to be entailed in a large number of other contractual relationships, such as banks with borrowers or depositors, franchisors with franchisees, licensors with licensees, and distributorships.")

to the Eastern District of Michigan where, in a nearly identical case, the court dismissed a breach of fiduciary duty claim involving an intern, because the "concept of fiduciary duty generally does not apply to typical employees" unless "the employee is a high-level employee, or if there is a specific agency relationship[.]" *AFT Michigan v. Project Veritas*, No. 17-cv-13292, 2017 WL 6604040, at *8 (E.D. Mich. Dec. 27, 2017) (citation omitted); *see also* 3 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations, § 846, p. 1 (Thompson Reuters 2010) ("An officer's fiduciary duties appear coextensive with those of directors ... However, the concept of fiduciary duty generally does not apply to typical employees.").[12]

Accordingly, it is clear that the trial record lacks the evidence necessary to demonstrate that Maass was working as Plaintiffs' fiduciary. And, if she was not a fiduciary, the wiretapping claim must fail because Plaintiffs did not establish that Maass made the recording with the primary or determinative *intention* of breaching a non-existent duty. *See* 18 U.S.C. § 2511(2)(d). Given the First Amendment implications, the evidence must clearly and convincingly show that Maass

---

[12] This Court's decision in *National Railroad Passenger Corp. v. Veolia Transportation Services*, 791 F. Supp. 2d 33, 47 (D.D.C. 2011), is not to the contrary. That case did not state that employees categorically owe employers a fiduciary duty—indeed, doing so would render useless the fact-intensive nature of the usual test applied in D.C. Rather, the court stated that fiduciary "principles" and "loyalty" are generally applicable in all employer-employee relationships. *Id.* True, but so what? That would be true of line cooks, meat packers, or grocery store employees. *Food Lion v. Capital Cities/ABC*, 964 F. Supp. 956, 963 (M.D.N.C. 1997). That does not mean that every such employee owes a fiduciary duty to the employer, as would be the case for employees who provide expertise to their employers, and where employers rely on that expertise. Furthermore, the case dealt with a tort claim of competition against a current employer. *Id.* In such cases, courts are particularly likely to use the language of fiduciary duties. *See* 25 Am. Jur. Proof of Facts 2d 725 § 3 (Originally published in 1981). But there is nothing analogous to the unpaid intern here. And the First Amendment context of this case demands more.

made the recording with the *purpose* of breaching a fiduciary duty.  A mere smattering of strained inferences will not do.[13]

## III.   Plaintiffs Failed to Identify Evidence Showing That Defendants' Activity Caused Plaintiffs' Injuries.

Regarding the misrepresentation claim, the verdict also must be set aside because there was no sufficient evidentiary basis for concluding that any unprotected conduct caused Plaintiffs' injuries.  Indeed, the trial evidence confirms that all potential causes of Plaintiffs' injuries can be traced back to Defendants' First Amendment-protected activity and the information disclosed thereby.  And the jury's rank speculation about the existence or weight of other potential causes is not permitted when it would undermine Defendants' First Amendment rights.

### A.   The jury's verdict violated the general principles of causation.

As noted, the trial showed a multitude of potential causes of Plaintiffs' harm, by far the greatest of which was the protected disclosure of their bad behavior.  And at nearly every turn, the other supposed causes of harm were still connected to Defendants' First Amendment activity.  Initially, there was substantial evidence that Plaintiffs' injuries were overwhelmingly caused by Defendants' publishing videos (*i.e.*, expressive conduct).   Creamer testified that he viewed Defendants' videos and "agreed that [Scott] Foval had to be terminated immediately" because "the views he [Foval] expressed on that video were simply inconsistent with the values of our firm[.]" 9/15/22 Tr. 109:19–24.  Similarly, Brad Woodhouse testified that he watched the video and, based on what he saw, he "fired Scott Foval immediately."  9/20/22 Tr. 25:13–15.  Under questioning

---

[13] Considering the serious First Amendment implications here, it was inappropriate for the jury to speculate that, in addition to newsgathering, Maass may have had other motives.  Rather, each of Maass' actions (obtaining access to the office space, recording, and reporting to editors) was a part of her First Amendment activity.  A jury's searching for a mixed motive, along with speculation about which motive was the "substantial" one, cannot suffice where the allegedly tortious activity is intertwined with an individual's protected First Amendment activity.

during his deposition and at trial, Scott Frey similarly testified that "the video in itself and the way it was released and the timing" caused his decision making because "AFSCME didn't want to be a party to it."  9/19/22 Tr. 101:22–102:3.  In fact, Frey testified that the video's release was "a major factor" in the decision.  *Id.*  Other examples abound.  *See, e.g.*, *id.* at 50:24–51:2 ("the main concern was ... that the video itself had created a sense of scandal we did not want to be associated with."); 9/20/22 Tr. 38:17–24 (AFCSME ceased funding AUFC because, among other things, "Mr. Saunders was angry about the publication, which concerned the video we've been discussing; right? A: That's correct"); *id.* at 40:16–21 ("[Saunders told you] I can't be associated with that video and the statements in them; right? A: Correct.").

But that evidence cannot support a finding of causation because Plaintiffs expressly conceded that they are not basing their claims on Defendants' publishing videos.  Opp'n at 19.  And, if Plaintiffs are not basing their claims on that First Amendment activity, they cannot claim any harm caused by that same activity.

Once Defendants' expressive activity revealing Plaintiffs' bad behavior—the overwhelming "cause" of Plaintiffs' alleged harm—is off the table as a basis of liability, Plaintiffs are left only with a variety of other *incidental* potential causes for their injuries, none of which is substantial when measured against the consequences of the protected disclosure and nearly all of which relate to *Plaintiffs'* own actions.  And even those potential incidental causes are substantially related to Defendants' First Amendment activity.  For instance, the claim (at 18) that the breach itself injured them independent of the information published as a result of that breach really boils down to the consequence of Defendants merely having shed light on Plaintiffs' own inability to manage their office security diligently.  It was the lax security that cost them business opportunities; Defendants merely exposed such existing flaws as they exposed Plaintiffs' other

bad behavior. *Id.* at 54:16–19 ("Again, because of – by allowing – by creating the opportunity for this ... they had created a major embarrassment[.]"); 9/20/22 Tr. 49:5–7 ("My understanding from the various conversations I had was there was just a sense that we had failed, that we had allowed ourselves to be compromised[.]") (responding to 9/20/22 Tr. 48:25–49:2 (asking about "the late notification of the infiltration and disclosure of the board")). Information exposed by the breach itself is thus no different from information obtained and reported as a result of the breach. Both are protected and quite unlike any damage that might be claimed had someone misrepresented their way into the office and then destroyed equipment that had to be replaced or obtained bank account passwords in order to embezzle funds. But the harm from merely *exposing* Plaintiffs' security deficiencies such that others lost confidence in them is not distinct from any other protected revelation of Plaintiffs' many flaws.

In any tort case, "a plaintiff must show that it was the natural and continual sequence of events flowing from an act or omission of the defendant, unbroken by any intervening cause, that produced the plaintiff's injury." *Greenberg v. De Tessieres*, 902 F.2d 1002, 1004 (D.C. Cir. 1990) (quotation marks omitted). But the evidence shows myriad "intervening cause[s]" or events between Defendants' misrepresentation and Plaintiffs' purported harms. Plaintiffs cannot simply pick one such potential cause, at the expense of all the other more likely causes, *id.*, particularly when the overwhelming intervening cause—the public reporting—is protected by the First Amendment and eschewed as a valid basis for liability.

By ignoring those causes and pointing instead to the "infiltration" alone (Opp'n at 3, 18–23), Plaintiffs ask this Court to endorse the jury's rank speculation. But in this Circuit speculation will not do. *See Armenian Assembly of Am. v. Cafesjian*, 758 F.3d 265, 277 (D.C. Cir. 2014) ("Plaintiffs blame Cafesjian ... for their inability to fundraise, but that claim is speculative.")

(citation omitted); *Aref v. Lynch*, 833 F.3d 242, 266 (D.C. Cir. 2016) (harm "must 'be shown with sufficient certainty to avoid damages based either on pure speculation or the so-called inherent value of the rights violated.'") (citation omitted).[14]   The dominant, yet protected, cause of Plaintiffs' injuries, coupled with the speculative nature and weight of other incidental alleged causes, demonstrates that the jury lacked sufficient cognizable evidence of causation to support its verdict.

**B.      The jury's causation finding is particularly troubling in the First Amendment context.**

The need to set aside the verdict is particularly stark when considered in the First Amendment context.  Even if the Court concludes that Defendants' conduct was one possible cause of Plaintiffs' injuries, courts routinely require more evidence in cases where such findings implicate the First Amendment.  And the record discussed above clearly falls short of showing by clear and convincing evidence that any of Defendants' non-protected actions caused Plaintiffs' injuries.  *See supra*, at 2–3 (cases setting forth stringent requirements for clear and convincing evidence in First Amendment context); *see also Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022) ("factfinder … [must have] an 'abiding conviction' that her findings are 'highly probable' to be true.") (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)) (cleaned up).

That Defendants' First Amendment activity simply shined a light on Plaintiffs' business and security failures, which were the obvious and overwhelming causes of Plaintiffs' losses, underscores the similarities between this case and *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194

---

[14] Of course, this speculation is even more problematic considering witnesses testified that it was *not* the infiltration that caused injury.  *See* 9/20/22 Tr. 40:16–21 ("[Saunders told you] I can't be associated with that video and the statements in them, right? A: Correct. Q: He never used the word 'infiltration'; right? A: He did not.").

F.3d 505 (4th Cir. 1999).  In *Food Lion*, undercover reporters obtained jobs at the grocery chain by "submitting false employment backgrounds, false references and other false information.  Once they were hired, each reporter wore a hidden camera while on the job and recorded some of the events which took place." *Food Lion*, 964 F. Supp. at 958.  They then provided such footage to be broadcast in a "report on Food Lion [that] was highly critical of the company's food handling and labor practices."  *Id.*  After a drop in Food Lion's revenue, the company sued ABC for the loss of revenue, alleging, among other claims, breach of duty of loyalty, fraud, and trespass. *Id.* at 956.  But those claims failed, because it was Food Lion's poor food handling practices—not the exposure thereof—that caused the loss of business.

Indeed, as this Court held previously, investigative reporting that uncovers a plaintiff's own faults—such as poor vetting—is not the proximate cause of harm.  *Steele*, 130 F. Supp. 2d at 35 ("Steele's harm is rooted in her own lie, ... Steele has suffered because people—friends, employers, customers, and even strangers—changed their opinions of her .... While Isikoff printed that fabrication and Steele's subsequent recantation, Steele herself proximately caused the harm."). Here, as in *Food Lion*, it was *Plaintiffs'* actions—exposed through Maass obtaining access and the resulting recordings—that caused any losses.  It was the public revelation of their poor vetting, 9/19/22 Tr. 54:16–19, late notification, 9/20/22 Tr. 49:1–7, and questionable activities, 9/15/22 Tr. 109:19–25, that caused the losses.  *See Frome v. Renner*, No. 97-cv-5641, 1997 WL 33308718, at *2 (C.D. Cal. Oct. 1, 1997) ("Like the 'PrimeTime Live' episode at issue in *Food Lion*, '48 Hours' merely served as a forum through which the public could learn about Plaintiff's medical practices.  Profits lost subsequent to the broadcast could not have been proximately caused by Renner's misrepresentation.").  In cases involving First Amendment activity, the jury's verdict must be set aside for lack of causation.

**C.     The jury's deadlock on damages underscores the need for this Court's close review.**

The lack of sufficient evidence of causation is confirmed by the jury's deadlock when determining whether Plaintiffs suffered any damages from Defendants' misrepresentation.  After deliberating for several hours, the jury remained deadlocked on this question.  Only when the Court sent the jury back for further deliberations twice, and issued a *Thomas* charge over Defendants' "vehement objections[,]"[15] Trial Tr. 33:7–34:6 (Sept. 22, 2022) (attached as Ex. H) ("9/22/2022 Tr."), did the jury finally throw in the towel and pick a damages number out of thin air.  This underscores that Plaintiffs had not marshalled clear and convincing evidence that Defendants caused any harm.  Forcing the jury to speculate regarding damages is the opposite of the protective review required in the First Amendment context.

To be sure, courts routinely issue charges to juries.  And a trial judge generally has the discretion to do so.  *See Allen v. United States*, 164 U.S. 492, 501 (1896).  But there are also many instances where a court should be hesitant to do so, considering the importance of ensuring that a verdict is not "the result of fatigue, exhaustion, weariness, and the physical and mental inability of disagreeing minority jurors to withstand the arguments and importunities of the majority, instead of the result of free action and voluntary agreement by each individual juror."  H.H. Hansen & D.E. Buckner, Annotation, *Time Jury May Be Kept Together on Disagreement in Criminal Case*, 93 A.L.R.2d 627, § 2 (1964).[16]

---

[15] This charge was so suspect that even the Court recognized it may present issues for a Rule 50 motion or an appeal.  9/22/22 Tr. 33:13–18, 34:1–6.

[16] The criminal context is particularly instructive here, as repeated charges have led to reversals of convictions.  *See, e.g.*, *Fortune v. United States*, 65 A.3d 75 (D.C. 2013) (3 deadlocks and excessive *Allen* charge by judge created reversible error); *State v. Albers*, 174 N.W.2d 649 (Iowa 1970) (reversible error where jury deliberated until 2 a.m., reported they were deadlocked, and inquired through bailiff as to how long they would have to deliberate, to which court replied there

This case illustrates a situation when the Court should have exercised its discretion to *not* issue a charge to the jury given that the Court's intervention increased the likelihood that the jury's initial conclusion of no damages already demonstrated the lack of clear and convincing certainty of harm required by the First Amendment.[17]

## IV.    Defendants' Arguments are Properly Raised, and the Court may Consider Them.

Plaintiffs contend (at 4, 25) that the Court must ignore many of these issues because, in Plaintiffs' estimation, the Court has already addressed them, and they are governed by the law of the case.  Plaintiffs are mistaken.

### A.    The Court has not previously rejected these arguments.

At the outset, this Court has not previously rejected Defendants' arguments.  According to Plaintiffs (at 4), Defendants' argument "under the First Amendment was previously ruled upon and rejected by the Court."  Not so.  When discussing the First Amendment issues at the motion to dismiss stage, the Court merely stated that it would be different to "make this determination based on a fully-developed trial record[.]"  *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 117 n.7 (D.D.C. 2018); *see also id.* at 125 ("Whether plaintiffs will ultimately be able to show that the PV defendants' non-expressive conduct resulted in damage to their

---

was no specific time limit on deliberations; final verdict returned at 4:30 a.m.); *Smoot v. State*, 355 A.2d 495 (Md. Ct. Spec. App. 1976) (reversible when judge gave *sua sponte Allen* charge when jury had been deliberating for six hours after three-hour trial and jury had twice informed court that it was absolutely deadlocked).  While the standard of proof here is slightly lower than in a criminal case, that only makes matters worse.  Since the jury was not responsible for someone's liberty, it was likely more susceptible to judicial pressure.

[17] Plaintiffs largely ignore this indication of a fatal problem of proof.  Instead, their only response (at 24–25) is that Defendants cannot raise this argument because it was not included in Defendants' Rule 50(a) motion, even though the issue only arose *after* the Rule 50(a) motion was filed.  Defendants maintain that the Court may address this issue in the course of resolving Defendants' motion and the bearing it has on the sufficiency of the evidence.  But if the Court is not inclined to do so, it may defer the issue until Defendants file their Rule 59 motion, if necessary.

reputation remains to be seen, but the Court cannot prematurely deprive them of that opportunity.").  At summary judgment, too, most of the First Amendment arguments were either not addressed or were left open.  *See, e.g.*, *Democracy Partners II*, 453 F. Supp. 3d at 274–76 (finding a dispute of material fact on proximate causation of damages by only non-expressive conduct).

The only argument that the Court actually addressed and rejected, and only at the summary judgment stage, was about the constitutionality of the tortious purpose exception to the wiretapping statutes. *Id.* at 288–90 (rejecting as-applied and facial First Amendment and void for vagueness challenges).  However, even with respect to that argument, Defendants renew it as the full record confirms that the Court's earlier decision was in error.  As the discussion above confirms, as-applied, the tortious purpose exception for breach of fiduciary duty violates the First Amendment, even assuming it was content-neutral, because it is not narrowly tailored to "the deterrence of criminal or tortious acts such as blackmail that are facilitated by secret wiretaps." *Id.* at 289. Narrow tailoring would involve an exemption for acts such as blackmail, rather than this broader catch-all.  And it is invalid both facially and as-applied under the void-for-vagueness doctrine. While "tortious purpose" may be ascertainable in the abstract, the actual torts that it incorporates are often "fact-intensive" and "require[] 'a searching inquiry'" into the circumstances of the case. *Id.* at 279.  Thus, "men of common intelligence must necessarily guess at its meaning and differ as to its application" and it is excessively vague. *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).  And the void-for-vagueness doctrine is particularly stringent when the law can foreseeably infringe on First Amendment interests. *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching

expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.").

In short, Plaintiffs are mistaken in their attempt to shield the jury's verdict from this Court's close review.

**B.      The law of the case doctrine also does not apply.**

But even if the Court had previously rejected Defendants' arguments, that would not bar Defendants from raising them here.  Contrary to Plaintiffs' view (at 25), courts in this Circuit do not apply the law of the case doctrine to interlocutory orders: "Federal Rule of Civil Procedure 54(b) provides that any order or other decision, however designated, that adjudicates fewer than all the claims … may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009); *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (same); *Schoen v. Washington Post*, 246 F.2d 670, 673 (D.C. Cir. 1957) (same) (quoting *John Simmons Co. v. Grier Bros. Co.*, 258 U.S. 82, 90–91 (1922)); *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.3 (D.D.C. 2011) ("review of interlocutory orders is not bound by the law of the case doctrine"); *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 76 (D.D.C. 2019).  And there is no doubt the summary judgment proceedings here were interlocutory.  *Awan v. U.S. Dep't of Justice*, 46 F. Supp. 3d 90, 91 (D.D.C. 2014) ("Denial of a summary judgment motion is an interlocutory order") (quotation marks omitted).

To be sure, the Court is still "guided by the general principles underlying the law-of-the-case doctrine," *Acme Int'l Gen. Trading & Contracting Co. v. CCI*, No. 12-cv-1895 (EGS), 2015 WL 12559867, at *2 (D.D.C. Sept. 14, 2015), which looks to the "principles of judicial efficiency and expedition," *Pub. Citizen*, 361 F. Supp. 3d at 76.  But this principle carries far less weight when the earlier decision on the issue was rendered under a less demanding standard.  Indeed, in

such cases, this is not a "re-decision" in the normal sense, and so the requirements of just cause are almost always satisfied.  *See, e.g.*, *Murphy v. PricewaterhouseCoopers*, *LLP*, 580 F. Supp. 2d 4, 9 n.7 (D.D.C. 2008) ("because the arguments presented in PwC's current motion for summary judgment are based, at least in part, on an expanded record, Schuler's law of the case argument fails"), *aff'd sub nom. Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370 (D.C. Cir. 2010).

Plaintiffs are thus mistaken in their attempt to use the law of the case doctrine to prevent this Court's review of the verdict.  Rather, this Court expressly left the door open to such review: "In addition, if the court determines that a certain 'chain of events appears highly extraordinary in retrospect,' the case should also be taken from the jury." *Democracy Partners II*, 453 F. Supp. 3d at 275 (quoting *Claytor v. Owens-Corning Fiberglas Corp.*, 662 A.2d 1374, 1382 (D.C. 1995)). Here, the evidence confirms that the jury's verdict was improper at each turn and was against the weight of the evidence, particularly when evaluated under heightened First Amendment standards.

## CONCLUSION

Without the Court's intervention, the jury's verdict lays waste to Defendants' First Amendment rights.  Indeed, the trial record confirms that the jury could only return a verdict for Plaintiffs by engaging in speculation or acting out of political animus.  But the First Amendment cannot be so easily set aside, and this Court must intervene to protect Defendants' rights.

January 27, 2023

Stephen R. Klein
Bar No. 177056
BARR & KLEIN PLLC
1629 K St. N.W., Suite 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@barrklein.com

Benjamin Barr
BARR & KLEIN PLLC
444 N. Michigan Avenue Ste. 1200
Chicago, IL 60611
Telephone: (202) 595-4671
ben@barrklein.com
*Admitted pro hac vice*

Respectfully submitted,

*/s/ Erik S. Jaffe*
Erik S. Jaffe (D.C. Bar No. 440112)
Brian J. Field (D.C. Bar No. 985577)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com