# EXHIBIT B

```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   DEMOCRACY PARTNERS, LLC,         .
     et al.,                          .
 4                                    .  Case Number 17-cv-1047
              Plaintiffs,             .
 5                                    .
          vs.                         .
 6                                    .
     PROJECT VERITAS ACTION FUND,     .  Washington, D.C.
 7   et al.,                          .  September 19, 2022
                                      .  10:17 a.m.
 8            Defendants.             .
     - - - - - - - - - - - - - - - -

 9

10                  TRANSCRIPT OF JURY TRIAL, DAY 5
                  BEFORE THE HONORABLE PAUL L. FRIEDMAN
11                    UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   For the Plaintiffs:          JOSEPH SANDLER, ESQ.
                                  CHRISTINA BUSTOS, ESQ.
15                                Sandler, Reiff, Lamb, Rosenstein &
                                     Birkenstock, P.C.
16                                1090 Vermont Avenue Northwest
                                  Suite 750
17                                Washington, D.C. 20005

18   For the Defendants:          PAUL CALLI, ESQ.
                                  CHARLES SHORT, ESQ.
19                                Calli Law, LLC
                                  14 Northeast First Avenue
20                                Suite 1100
                                  Miami, Florida 33132
21

22                       -- continued --

23

24

25
```

```
 1    APPEARANCES (CONTINUED):

 2                                    STEPHEN KLEIN, ESQ.
                                      Barr & Klein PLLC
 3                                    1629 K Street Northwest
                                      Suite 300
 4                                    Washington, D.C. 20006

 5

 6    Official Court Reporter:        SARA A. WICK, RPR, CRR
                                      United States District Court
 7                                       for the District of Columbia
                                      333 Constitution Avenue Northwest
 8                                    Room 4704-B
                                      Washington, D.C. 20001
 9                                    202-354-3284

10    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    A.   Yes.
2    Q.   I'm going to switch gears to asking you a few questions
3    about the duties that the political operative Bob Creamer and
4    the political operative Aaron Black assigned to you during your
5    internship.
6         Do you understand?
7    A.   Yes.
8    Q.   What'd they ask you to do?
9    A.   Yes.  Bob connected me with Aaron Black in the office, and
10   I counted signs, the signs that they bring to the protest.
11   Q.   One second, please.
12            THE COURT:  Allergies.  I don't know if anybody else
13   is suffering this time of year, but I am.
14            MR. CALLI:  I just wanted you to hear the testimony,
15   Judge.  I'm sorry.
16            BY MR. CALLI:
17   Q.   In addition to counting signs -- by the way, did you just
18   hear on the audio it saying "you can help organize data"?
19   A.   Yes.
20            MR. CALLI:  I would move to admit 124-3 without
21   objection and publish it to the jury.
22            MR. SANDLER:  No objection, Your Honor.
23            MR. CALLI:  Defense 124-3.
24            THE COURT:  It will be admitted without objection, and
25   the jury can see it and hear it.

1            (Defendants' Exhibit 124-3 received into evidence.)
2                 MR. CALLI:  Thank you, Your Honor.
3            (Video recording played.)
4                 BY MR. CALLI:
5       Q.   Is that Aaron Black?
6       A.   Yes.
7       Q.   Is that the first day of your internship, as far as you
8       remember?
9       A.   Yes.
10      Q.   How -- do you have a recollection of how far into the first
11      day of your internship this was timewise?
12      A.   No.  A couple of hours.
13      Q.   Go ahead, please.
14           (Video recording played.)
15      Q.   Did you hear Aaron Black raise a protest in Chicago at a
16      Trump rally that shut down everything?
17      A.   Yes.
18      Q.   Did you -- did you tell him to say that?
19      A.   No.
20      Q.   Did you force him to say that?
21      A.   No.
22      Q.   In fact, as we just saw, did you say the word "Chicago" at
23      all before he told you about his role in the Chicago protest?
24      A.   No.
25      Q.   No.  And what's your understanding when he said "it was

```
 1    more him than me"?  Who is he talking about, in your mind?
 2    A.   Bob Creamer.
 3    Q.   In your experience as a journalist, did what Aaron Black
 4    just voluntarily told you corroborate what Scott Foval had told
 5    your colleague, Christian Hartsock?
 6    A.   Yes.
 7    Q.   Was your internship paid?
 8    A.   No.
 9    Q.   Did it last more than eight days?
10    A.   No.
11    Q.   Was there a resume requested from you before you started?
12    A.   No.
13    Q.   Did Lauren Windsor ask you for a resume two or three days
14    after you started?
15    A.   Yes.
16    Q.   Prior to starting the internship, did Bob Creamer ask you
17    for an ID?
18    A.   No.
19    Q.   During the eight days of your internship, did anybody at
20    Democracy Partners --
21    A.   No.
22    Q.   -- ever ask you for an ID?
23    A.   No.
24    Q.   Did anybody ever give you a nondisclosure agreement that
25    specified what their expectations were and what your obligations
```

1   were to them?
2   A.   No.
3   Q.   Did anybody discuss that with you verbally?
4   A.   No.
5   Q.   Did anybody give you from Democracy Partners a
6   confidentiality agreement which specified in writing what their
7   expectations were and your obligations were?
8   A.   No.
9   Q.   Did Mr. Creamer or anybody else ever discuss
10  confidentiality with you at all?
11  A.   No.
12  Q.   Were you given an employment contract?
13  A.   No.
14  Q.   How about an employee handbook?
15  A.   No.
16  Q.   Were you issued a company computer?
17  A.   No.
18  Q.   Were you given a company e-mail address, or did you use
19  your personal address?
20  A.   No, my personal.
21  Q.   Did you do any work on any AFSCME projects, the union that
22  we've heard about?
23  A.   No.
24  Q.   Did you do any work on any AUFC projects, the union or
25  organization, if you will, that we've heard about?

1    Mr. Lurye?
2    A.   Yes.
3    Q.   As to your own reasons for agreeing with Mr. Lurye that the
4    business relationship with Mr. Creamer should be terminated,
5    were you concerned that the video itself had disclosed that
6    Mr. Creamer had engaged in any illegal conduct?
7            THE COURT:  I'm sorry.  I'm just having a lot of
8    trouble hearing you again today.
9            MR. SANDLER:  I'm sorry.
10           BY MR. SANDLER:
11   Q.   Were you -- as to your own reasons for agreeing with
12   Mr. Lurye that the business relationships with Mr. Creamer
13   should be terminated, were you concerned that the video itself
14   had disclosed that Mr. Creamer had engaged in any illegal
15   conduct?
16   A.   No.
17   Q.   What about wrongful conduct?
18   A.   Not really, no.
19   Q.   Do you think that the videos, though, themselves suggested
20   or implied that Mr. Creamer had done something illegal or
21   wrongful?
22   A.   Yes.
23   Q.   And so why were you not concerned about that?
24   A.   I think the main concern was our -- that this was a few
25   weeks before a major presidential election, that the video

```
 1   itself had created a sense of scandal that we did not want to be
 2   associated with.  I did not -- we were aware that the video was
 3   probably selectively edited.  I've known Mr. Creamer
 4   professionally for some time.  It didn't cross my mind that what
 5   we saw in the video was necessarily something that would
 6   indicate that there was anything other than a problem with the
 7   optics of the video at the time that it came out.
 8   Q.   Did you know --
 9            THE COURT:  Would you say that again?
10            THE WITNESS:  I said that, you know, we were concerned
11   about the optics of the video at the timing of the presidential
12   election, which was just weeks away.  The union wanted to
13   distance itself from its relationship.
14            BY MR. SANDLER:
15   Q.   Were you concerned -- did you know at the time you
16   terminated the relationship that Mr. Creamer's offices at
17   Democracy Partners had been infiltrated by a Project Veritas
18   employee acting undercover?
19   A.   I'm sorry.  Could you repeat that?
20   Q.   Sure.  Did you know at the time that you terminated the
21   business relationships with Mr. Creamer that Mr. Creamer's
22   offices at Democracy Partners had been infiltrated by a Project
23   Veritas employee acting undercover?
24   A.   I did, yes.
25            THE COURT:  You did or did not?
```

1          THE WITNESS:  I did.
2          BY MR. SANDLER:
3     Q.   How did you learn that?
4     A.   Well, Mr. Creamer told me, and after we saw the video, it
5     became apparent that that is what had occurred.
6     Q.   Were you concerned that Mr. Creamer had created the
7     opportunity for this video by allowing the employee of Project
8     Veritas --
9          MR. CALLI:  Objection as to leading.  This is the
10    issue I raised with Your Honor in advance of court today.  This
11    is a favorable, not adverse, witness to Mr. Sandler.  I object
12    to the leading nature of the questions.  These should be
13    open-ended questions for the witness to testify.
14         THE COURT:  What was the question?  If you want to
15    rephrase the question, rephrase it.  If not, you can repeat it,
16    and I will rule.
17         BY MR. SANDLER:
18    Q.   Okay.  Did you have a concern that Mr. Creamer had created
19    the opportunity for this video by allowing the Project Veritas
20    operation to have occurred?
21    A.   We did have that concern.  As I recall, we weren't clear
22    how -- you know, whether or not there was appropriate vetting of
23    the staff that was working with him, and whether or not they had
24    been thorough in their background review of some of the people
25    that he had hired.

1  Q.   And let me ask you, was the fact that Mr. Creamer and his
2  company had allowed this operation to occur, specifically
3  including the --
4       THE COURT:  He's going to object to leading again.  So
5  beware.
6       MR. SANDLER:  Okay.
7       BY MR. SANDLER:
8  Q.   Was the infiltration of Democracy Partners by a Project
9  Veritas operative a factor in your decision to terminate the
10 relationship with Mr. Creamer?
11 A.   Yes.
12 Q.   Now, at the time the Project Veritas video was released,
13 was AFSCME a supporter -- a financial supporter of -- let me ask
14 you this:  What was the relationship of AFSCME at the time the
15 video was released to Americans United for Change?
16 A.   At the time it was released, we were major contributors to
17 Americans United for Change, and our president of the union was
18 on the board of directors of Americans United for Change.
19      THE COURT:  The president of?
20      THE WITNESS:  The president of AFSCME, Lee Saunders,
21 was on the board of Americans United.
22      BY MR. SANDLER:
23 Q.   After the release of the Project Veritas video, did AFSCME
24 in any way change its relationship with Americans United for
25 Change, AUFC?

1  A.   Yes.  The AFSCME president stepped down from his position
2  on the board, and we made a decision that we were going to
3  discontinue any financial support.
4         THE COURT:  Discontinue what?
5         THE WITNESS:  Financial support.
6         BY MR. SANDLER:
7  Q.   And who made that decision?
8  A.   Again, it was a recommendation to the president of the
9  union, but he readily agreed.
10 Q.   And when was that decision made?
11 A.   Simultaneous to the decision about Mr. Creamer and his
12 business.
13 Q.   And were the reasons for that decision the same as those --
14         THE COURT:  And what was the reason?
15         BY MR. SANDLER:
16 Q.   What was the reason for the decision you just discussed --
17 A.   Again, because of -- by allowing -- by creating the
18 opportunity for this -- these people to infiltrate the
19 organization, that they had created a major embarrassment for
20 the presidential campaign of Secretary Clinton, which we were
21 supporting.  It was something that we did not want to be
22 associated with just weeks -- particularly just weeks before the
23 election.  And we felt it had created a challenging climate, and
24 we wanted to separate ourselves from it.
25 Q.   Okay.  After you terminated -- just to be clear, when you

```
 1               BY MR. CALLI:
 2    Q.   Did you hear that?
 3    A.   I did, yes.
 4    Q.   Do you have any information that that conversation was
 5    selectively edited?
 6    A.   It does not appear to be.
 7    Q.   Do you have any indication that anybody forced Bob Creamer
 8    to say those words?
 9    A.   No.
10    Q.   Is that the kind of discretion AFSCME and its president Lee
11    Saunders expect from somebody who is doing work on behalf of a
12    candidate supported by that union?
13    A.   Clearly, we made a decision to terminate our business
14    relationship with Mr. Creamer.
15    Q.   Was a substantial factor of that decision comments like
16    that on the tape?
17    A.   Indiscretion was a concern.
18    Q.   Was it a substantial factor, sir?
19               THE COURT:  Was what?
20               MR. CALLI:  Mr. Creamer's statements on these two
21    exhibits about his work for Hillary Rodham Clinton and a protest
22    he was organizing.
23               THE COURT:  Had you seen those tapes before you
24    terminated?
25               MR. CALLI:  It's in video 2.
```

1            BY MR. CALLI:
2       Q.   Take a moment, please, and familiarize yourself.
3       A.   So I think the answer to your question is yes.
4       Q.   Okay.  Mr. Rommel writes nothing about the infiltration, as
5       Mr. Creamer calls it, nothing about the infiltration; right?
6       A.   No.
7       Q.   He's focused on published media reports; correct?
8       A.   That was his job.
9       Q.   And that's what he did here; right?
10      A.   Yes.
11      Q.   He's drawing to your attention, counsel and chief of staff
12      and the president of the union, the published -- what you
13      described this thing as being published all over, right, in this
14      instance by a particular place in Wisconsin; right?
15      A.   Correct.
16      Q.   And Wisconsin is important to Mr. Saunders because that's
17      where AFSCME started initially, or where he's from?  Wisconsin's
18      important beside being a so-called battleground state?
19      A.   Every state we're in is important, but Wisconsin was the
20      founding chapter of AFSCME.
21      Q.   Founding chapter.
22           Would you agree with me, sir, that for yourself and
23      Mr. Lurye on behalf of AFSCME, that the broader concern,
24      regardless of the circumstances that led to the video, that the
25      video in itself and the way it was released and the timing was a

```
 1    very unfortunate distraction and AFSCME didn't want to be a
 2    party to it?
 3    A.   I agree, that was a major factor in the decision, yes.
 4              MR. CALLI:  Thank you, Mr. Frey.
 5              THE COURT:  Mr. Sandler.
 6                         REDIRECT EXAMINATION
 7              BY MR. SANDLER:
 8    Q.   Mr. Frey, Mr. Calli just showed you a letter terminating
 9    the consulting agreement that was dated October 21st.  Did you
10    communicate the decision to terminate AFSCME's business
11    relationships with Mr. Creamer to Mr. Creamer before that letter
12    was sent?
13    A.   Yes.  It was immediately after the decision was made
14    earlier in the week.  The letter was a formality required by the
15    contract.
16    Q.   And when you communicated the decision to terminate the
17    business relationships with Mr. Creamer earlier in the week, was
18    that decision limited -- did that decision -- was that about the
19    consulting contract, or was it about the patch-through calling?
20    A.   It was about both.
21    Q.   Mr. Calli played Defendants' Exhibit 131, which is the
22    first tape that was -- and on that tape, you heard Mr. O'Keefe
23    talk about Mr. Creamer's attack dogs and fomenting violence at
24    Trump rallies, and immediately after that was a clip in which
25    Mr. Creamer is heard to say, "We have a call with the campaign
```

1       morning.

2            (Proceedings adjourned at 4:18 p.m.)

3

4       - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6                  CERTIFICATE OF OFFICIAL COURT REPORTER

7

8            I, Sara A. Wick, certify that the foregoing is a

9       correct transcript from the record of proceedings in the

10      above-entitled matter.

11

12      /s/ Sara A. Wick                      October 10, 2022

13      SIGNATURE OF COURT REPORTER           DATE

14

15

16

17

18

19

20

21

22

23

24

25