# EXHIBIT G

```
                 BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


    DEMOCRACY PARTNERS, LLC,         .
    et al.,                          .
                                     .  Case Number 17-cv-1047
              Plaintiffs,            .
                                     .
         vs.                         .
                                     .
    PROJECT VERITAS ACTION FUND,     .  Washington, D.C.
    et al.,                          .  September 20, 2022
                                     .  10:22 a.m.
              Defendants.            .
    - - - - - - - - - - - - - - - - -


                   TRANSCRIPT OF JURY TRIAL, DAY 6
                 BEFORE THE HONORABLE PAUL L. FRIEDMAN
                      UNITED STATES DISTRICT JUDGE



    APPEARANCES:

    For the Plaintiffs:         JOSEPH SANDLER, ESQ.
                                CHRISTINA BUSTOS, ESQ.
                                Sandler, Reiff, Lamb, Rosenstein &
                                   Birkenstock, P.C.
                                1090 Vermont Avenue Northwest
                                Suite 750
                                Washington, D.C. 20005

    For the Defendants:         PAUL CALLI, ESQ.
                                CHARLES SHORT, ESQ.
                                Calli Law, LLC
                                14 Northeast First Avenue
                                Suite 1100
                                Miami, Florida 33132


                      -- continued --
```

```
 1    APPEARANCES (CONTINUED):

 2                                STEPHEN KLEIN, ESQ.
                                  Barr & Klein PLLC
 3                                1629 K Street Northwest
                                  Suite 300
 4                                Washington, D.C. 20006

 5

 6    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  United States District Court
 7                                  for the District of Columbia
                                  333 Constitution Avenue Northwest
 8                                Room 4704-B
                                  Washington, D.C. 20001
 9                                202-354-3284

10    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      C O N T E N T S

 2                          TESTIMONY

 3    WILSON BRADLEY WOODHOUSE   Direct Examination...........  10
                                 Cross-Examination............  35
 4                               Redirect Examination.........  48

 5


 6                       EXHIBITS RECEIVED

 7    Plaintiffs' 64.......................................  15

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    references before you hired him?
2    A.   I believe Bob did that.  Bob had been working with him on a
3    project.  And I knew him.  I mean, I knew him loosely.  I mean,
4    we had participated in events together.  We were both a part of
5    a coalition that had been working on the Supreme Court
6    nomination of Merritt Garland.  And so I got to see him in
7    action.  I got to hear him on calls.  He worked for an
8    organization, People for the American Way, which I have a lot of
9    respect for.
10       So I didn't do a reference check on him.  I took my prior
11   knowledge of him, plus Bob Creamer's work with him to be enough,
12   and I had known of him for many years.
13   Q.   Once you watched the video, did you take any actions
14   related to Mr. Foval's employment?
15   A.   I fired Scott Foval immediately.
16   Q.   In the Rigging the Election video, Mr. Foval makes some
17   claims about some unethical and illegal campaign tactics.
18       Do you have any knowledge of his involvement in those kind
19   of tactics on behalf of AUFC?
20   A.   Well, first of all, to my knowledge, when he made those
21   comments, he wasn't working for AUFC.  I know one of the videos
22   was from, I believe, primary election night in Wisconsin in the
23   spring at a bar.  They filmed him drinking.  So he was not
24   working for AUFC at the time.
25       But when we saw the videos and saw his claims, we were able

1    A.    Yeah.
2    Q.    Okay.  At the time that AFSCME terminated its relationship
3    with AUFC -- let me back up for one second.
4          Do you remember Ms. Bustos asked you if you had any
5    interaction with Allison Maass or Angela Brandt and you replied
6    that you did not?
7    A.    That is correct.  I do recall that.
8    Q.    At the time AFSCME terminated its relationship, the role of
9    the intern in AFSCME's decision, if any, was never communicated
10   to you as a basis why AFSCME stopped funding AUFC?
11   A.    That is correct.
12   Q.    In fact, you recall no discussion with either Mr. Frey,
13   Scott Frey at AFSCME, or with Mr. Lee Saunders, the president of
14   AFSCME and the chair of the AUFC board, about the role of the
15   intern at Democracy Partners; correct?
16   A.    That is correct.
17   Q.    And there were two reasons AFSCME expressed to you in your
18   communications with the AFSCME representatives as to why it
19   ceased funding of AUFC.  And those were, were they not, one,
20   that Mr. Saunders, the head of the union, had been criticized
21   for being the chair of AUFC in a Wisconsin news article, and
22   Mr. Saunders was angry about that publication, which concerned
23   the video we've been discussing; right?
24   A.    That's correct.
25   Q.    And the second reason was that Mr. Saunders was upset that

1    sir, your purpose in requesting the meeting was to try and
2    restart the relationship with AFSCME?
3    A.   That is correct.
4    Q.   And after hearing from you, Mr. Sanders --
5    A.   Saunders.  Excuse me.
6    Q.   That's okay.  Thank you for -- I've always pronounced it
7    Creamer and just realized it was Creamer.
8    A.   I messed that one up, too.
9    Q.   Yeah.  Saunders.
10   A.   Correct.
11   Q.   Mr. Saunders said no, kept his decision and declined your
12   request to restart the relationship?
13   A.   Correct.
14   Q.   And what he told you was irrespective of the veracity of
15   the videos, 40 percent of the membership of his union, AFSCME,
16   don't support Secretary Clinton or the Democratic side, and I
17   can't be associated with that video and the statements in them;
18   right?
19   A.   Correct.
20   Q.   He never used the word "infiltration"; right?
21   A.   He did not.
22   Q.   Never talked about the fake intern; right?
23   A.   He did not.
24   Q.   Never talked about the fake donor, the 20 grand from
25   offshore?  He talked about the video?

```
 1   contribution was wired to AUFC, did Mr. Creamer ever tell you
 2   that on two or three occasions, this man had floated voter fraud
 3   schemes to him?
 4   A.   He did not.
 5   Q.   And you wouldn't have taken the 20,000 if Mr. Creamer had
 6   told you that, would you?
 7   A.   I wouldn't have held the meeting.
 8            MR. CALLI:  Mr. Woodhouse, nice to see you again.
 9        I'm done, Judge.
10            THE COURT:  Ms. Bustos?
11                     REDIRECT EXAMINATION
12        BY MS. BUSTOS:
13   Q.   Mr. Woodhouse, Mr. Calli brought up that you weren't --
14            THE COURT:  You can take off your mask.
15            MS. BUSTOS:  Sorry.  I forgot.
16            THE COURT:  I know it's hard to remember.
17            BY MS. BUSTOS:
18   Q.   Mr. Calli brought up that you weren't under contract with
19   Mr. Creamer's group, Strategic Consulting Group, for the
20   consulting or patch-through calls.
21        But you had been paying Mr. Creamer for this work for many
22   years?
23   A.   Many, many years, yes.
24   Q.   Let's talk about the reasons AFSCME ended its relationship
25   with AUFC.  You testified that two of the reasons AFSCME
```

1   withdrew its support from AUFC had to do with the late
2   notification of the infiltration and disclosure of the board.
3        To your knowledge, based on your personal knowledge, are
4   there any other reasons that they terminated their support?
5   A.   My understanding from the various conversations I had was
6   there was just a sense that we had failed, that we had allowed
7   ourselves to be compromised, and that that -- that was the
8   original sin.
9   Q.   Is it your understanding that Mr. Frey had that same
10  sentiment that he expressed to you that you talked to him about?
11  A.   That was the sense that I got.  I don't remember
12  specifically, but that was the sense.  It was how did you let
13  this happen was the tone, and probably what was said at the
14  time.
15            MS. BUSTOS:  I have no further questions.
16            MR. CALLI:  Nothing, Your Honor.
17            THE COURT:  Thank you, Mr. Woodhouse.  You may step
18  down.  You're excused.
19            MR. SANDLER:  Your Honor, at this time the plaintiff
20  rests.
21            THE COURT:  The plaintiff rests, subject to -- we're
22  going to have a discussion with you and Mr. Calli and talk to
23  Ms. Johnson to make sure everybody is on the same page with
24  regard to exhibits that are admitted.  Subject to that, the
25  plaintiff rests?