UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
DEMOCRACY PARTNERS, LLC, et al.,               )
                                                )
            Plaintiffs,                         )
                                                )
      v.                                        )        Civil Action No. 17-1047 (PLF)
                                                )
PROJECT VERITAS ACTION FUND, et al.,           )
                                                )
            Defendants.                         )
_____)

OPINION

This matter is before the Court on defendants' Motion for Judgment as a Matter of

Law ("Def. Mot.") [Dkt. No. 179] and Renewed Motion for Judgment as a Matter of Law ("Def.

Renewed Mot.") [Dkt. No. 196].  The Court issued an Order denying the Motions on March 26,

2025 [Dkt. No. 217].  This Opinion explains the reasoning underlying that Order.[1]


I.   BACKGROUND

Plaintiffs Democracy Partners, Strategic Consulting Group, and Robert Creamer

(hereinafter "Democracy Partners" or "plaintiffs") filed a lawsuit in June of 2017 against

defendants Project Veritas Action Fund, Project Veritas, James O'Keefe, Allison Maass, and

Daniel Sandini (hereinafter "Project Veritas" or "defendants") alleging that they violated state

and federal wiretapping statutes and committed multiple common law torts in their execution of

an undercover sting operation directed at plaintiffs.  See Complaint, [Dkt. No. 1].

---

[1]    Judge Ellen Segal Huvelle presided over this case until her retirement, at
which time the case was reassigned to the undersigned.

Plaintiffs' complaint initially had six separate claims:  (1) fraudulent misrepresentation; (2) trespass; (3) breach of fiduciary duty; (4) Federal Wiretap Act; (5) D.C. Wiretap Act; and (6) civil conspiracy.  On January 4, 2018, Judge Huvelle denied the defendants' motion to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Criminal Procedure.  See Democracy Partners v. Project Veritas Action Fund, 285 F. Supp. 3d 109 (D.D.C. 2018); Order of January 4, 2018 [Dkt. No. 24].  On March 31, 2020, she granted the defendants' motion for summary judgment in part and denied it in part.  See Democracy Partners v. Project Veritas Action Fund ("Democracy Partners III"), 453 F. Supp. 3d 261 (D.D.C. 2020); Order of March 31, 2020 [Dkt. No. 82].  She granted summary judgment for defendants on the claims for trespass and breach of fiduciary duty and denied the motion for summary judgment as to plaintiffs' claims for fraudulent misrepresentation, unlawful wiretapping, and civil conspiracy.  See Democracy Partners III, 453 F. Supp. 3d at 291; Order of March 31, 2020 [Dkt. No. 82].

The case was tried before a jury for five days beginning on September 15, 2022. Over the course of the five days, the jury heard testimony from Robert Creamer, the owner of Strategic Consulting Group; Christian Hartsock, an employee of Project Veritas; Allison Maas, an employee of Project Veritas, who used the name Angela Brandt while an intern at Democracy Partners; Scott Frey, the Director of Government Affairs at the American Federation of State, County & Municipal Employees ("AFCSME"); James O'Keefe, the Chief Executive Officer of Project Veritas Action Fund; Wilson Bradley Woodhouse, President of Americans United for Change ("AUFC").  The jury also considered a Joint Stipulation as to Testimony of Lauren Windsor [Dkt. No. 174], an employee of Democracy Partners.  At the close of plaintiffs' case, the defendants filed an initial motion for judgment as a matter of law under Rule 50(a) of the

Federal Rules of Civil Procedure.  See Def. Mot.  The Court reserved ruling on the motion.  See

Trial Transcript September 20, 2022 ("Sept. 20 Tr.") [Dkt. No. 199] at 148:12-13.  After

deliberations, the jury returned a verdict in favor of the plaintiffs on two claims of wiretapping

and one claim of fraudulent misrepresentation.  It awarded plaintiff Strategic Consulting

Group $120,000 in damages on the fraudulent representation claim.  See Jury Verdict [Dkt.

No. 191].  In November 2022, defendants filed a renewed motion for judgment of acquittal under

Rule 50(b) of the Federal Rules of Civil Procedure, arguing that plaintiffs had failed to

demonstrate a legally sufficient evidentiary basis for a reasonable jury to find for plaintiffs on

any of the claims they had asserted.  See Project Veritas Parties' Rule 50(b) Motion for

Judgment as a Matter of Law [Dkt. No. 196].  Plaintiffs filed an opposition to defendants'

Rule 50(b) motion.  See Plaintiffs' Memorandum of Points and Authorities in Opposition to

Project Veritas Parties' Rule 50(b) Motion for Judgment as a Matter of Law [Dkt. No. 203].

Defendants filed a Reply.  See Defendants' Reply in Support of Rule 50(b) Motion for Judgment

as a Matter of Law [Dkt. No. 208].  In the spring of 2024, the parties filed a number of

supplemental briefs.  See Defendants' Supplemental Briefing in Support of Previous Arguments

[Dkt. No. 212]; Plaintiffs' Response to Defendants' Supplemental Briefing [Dkt. No. 213];

District of Columbia's Response to Defendants' Supplemental Briefing in Support of Previous

Arguments [Dkt. No. 214]; Defendants' Reply in Support of Supplemental Briefing in Support

of Previous Arguments [Dkt. No. 215]; and Plaintiffs' Response to Defendants' Argument re

First Amendment Requires Court to Review Jury's Verdict Closely and Cabin Overbroad

Elements of State Law Torts [Dkt. No. 216].

Having carefully considered the arguments of the parties, the trial transcript, and the relevant case law, the Court denied the defendants' motions by Order of March 26, 2025 [Dkt. No. 217].[2]  This Opinion explains the Court's reasoning.

## II.  STANDARD OF REVIEW

Rule 50(a) of the Federal Rules of Civil Procedure provides that after one party has fully presented its case in a jury trial, the court may grant a motion for judgment as a matter of law if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  FED R. CIV. P. 50(a)(1).  A party may move for judgment as a matter of law at any time before the case goes to the jury.  Id. at (a)(2).  The court may defer ruling on the motion and submit the case to the jury to render a verdict.  FED R. CIV. P. 50(b).  A party may file a renewed motion for judgment as a matter of law within 28 days after the entry of judgment.  Id.

A court will "not lightly disturb a jury verdict."  Xereas v. Heiss, 987 F.3d 1124, 1135 (D.C. Cir. 2021).  Once the jury has rendered a verdict, the court may grant a motion for judgment as a matter of law only "if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in [the non-moving party's] favor."  Radtke v. Lifecare Management Partners, 795 F.3d 159, 163 (D.C. Cir. 2015) (citing Muldrow v. Re-Direct, Inc., 493 F.3d 160, 165 (D.C. Cir. 2007)).  In addressing this question, a court may not assess the credibility of witnesses or weigh the evidence.  See Smith v. District of Columbia, 413 F.3d 86, 97 (D.C. Cir. 2005); Radtke

---

[2]      In addition to those mentioned above, the Court has reviewed the following filings:  Joint Submission re Jury Instructions [Dkt. No. 137]; Joint Pretrial Statement [Dkt. No. 138]; Joint Revised Filing of Proposed Jury Instructions [Dkt. No. 173]; and Joint Revised Filing of Proposed Jury Instructions [Dkt. No. 175].

v. Lifecare Management Partners, 795 F.3d at 163. The court may not "substitute its judgment for that of the jury." Lloyd v. Ashcroft, 208 F. Supp. 2d 8, 10 (D.D.C. 2002) (citing Boodoo v. Cary, 21 F.3d 1157, 1161 (D.C.Cir.1994)); United States Conference of Mayors v. Great-West Life & Annuity Insurance Company, 327 F. Supp. 3d 125, 129 (D.D.C. 2018). The court must view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in [their] favor." United States Conference of Mayors v. Great-West Life & Annuity Insurance Company, 327 F. Supp. 3d at 129; Halcomb v. Woods, 610 F. Supp. 2d 77,80 (D.D.C. 2009) (citing Hendry v. Pelland, 73 F.3d 397, 400 (D.C. Cir. 1996)). Defendants raise several challenges under the umbrella of their motion for judgment as a matter of law. The Court will consider each in turn.

### III. FIRST AMENDMENT

#### A. Standard of Review

Defendants argue that because this case potentially burdens expressive activity protected by the First Amendment, "courts have an independent role that supersedes ordinary policy considerations and even the Federal Rules of Civil Procedure." Def. Rep. at 2 (citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 (1984)). As a result, defendants assert, the Court must "make an independent examination of the whole record" to determine whether the judgment is supported by clear and convincing proof. Def. Rep. at 2-3 (quoting Snyder v. Phelps, 562 U.S. 443, 453 (2011)); see also Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. at 511. This standard, defendants argue, is much more exacting than the typical deferential treatment given to jury verdicts under Rule 50. Defendants maintain that this heightened standard is warranted because juries are not able to remain neutral as to the content of

the speech.  Def. Rep. at 3 (citing <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. at 510).

Plaintiffs respond that defendants' contention is meritless.  Plaintiffs say that the heightened standard of review that defendants request applies only to an appellate court's review of "a determination of actual malice in a [defamation] case governed by <u>New York Times v. Sullivan</u>, 376 U.S. 254 (1964)".  Pl. Second Resp. at 3 (citing <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. at 514).  Plaintiffs further assert that the independent review standard is only relevant in the context of "a defamation claim or of another type of claim in which the outcome could <u>punish or restrict speech based on its content</u>", where courts should treat the sufficiency of the evidence as a question of law, rather than one for the trier of fact.  Pl. Second Resp. at 3.  These heightened standards, plaintiffs argue, are not applicable in this case, because there is neither a defamation claim for which actual malice must be proven nor a tort claim on which plaintiffs could recover based on the content of defendants' speech.  <u>Id</u>. at 4-5.

The Court agrees with the plaintiffs.  The directive articulated by the Supreme Court in <u>Bose</u> is limited to cases involving findings of actual malice for defamation claims and other First Amendment issues involving the content of speech.  <u>See</u> Pl. Second Resp. at 2.  This case does not involve any claim of defamation, and the only common law tort claim the jury was asked to consider was fraudulent misrepresentation.  Furthermore, as plaintiffs have said, the Court only permitted plaintiffs to proceed to trial with claims predicated on harms caused by defendants' non-expressive conduct.  Pl. Second Resp. at 4-6 (citing <u>Democracy Partners III</u>, 453 F. Supp. 3d at 275 (D.D.C. 2020)).  Finally – to repeat – the <u>Bose</u> standard applies only to an appellate court's assessment of a district court judge's findings.  <u>See</u> <u>Bose Corp. v. Consumers Union of U.S.</u>, 466 U.S. at 514 ("[a]ppellate judges in [a defamation] case must exercise

independent judgment and determine whether the record establishes actual malice with convincing clarity."). See also Easley v. Cromartie, 532 U.S. 234, 243 (2001); Illinois, ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 621 (2003). That is not the posture of this case. The Court therefore will apply the traditional Rule 50 standard, and, as that Rule requires, give deference to the jury's verdict.

### B.  First Amendment Substantive Limitations on Tort Claims

Defendants assert that the Court must impose additional limitations on plaintiffs' tort claims because heightened standards are appropriate when assessing "all manner of torts that threaten First Amendment [a]ctivity," and especially those "calling for highly subjective judgments by the jury". Def. Rep. at 5. Absent such safeguards, defendants maintain, "the First Amendment rights of defendants and all other newsgatherers, sources, whistleblowers, and others would be left by the wayside, and substantial speech on important public issues would be chilled." Id. at 6. Specifically, defendants assert that, like other torts arising out of a defendant's speech or expression, constitutional limits must exist to constrain plaintiffs' claim for relief. Id. at 5 (citing Weyrich v. New Republic, Inc., 235 F.3d 617, 627-28 (D.C. Cir. 2001) (invasion of privacy false light tort claim requires plaintiff to show the same intent requirement as applied to defamation of a public figure); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988) (public figure bringing intentional infliction of emotional distress claim based on defendant's publication may not recover unless they demonstrate that the publication included a false statement of fact made with actual malice)).

The Court disagrees. The reasoning of the cases cited by defendants does not extend to claims of injury unrelated to a defendant's expressive conduct. As Judge Kollar-Kotelly has correctly noted:

> If a party seeks damages for harm to reputation or state of mind, the suit can only proceed if that party meets the constitutional requirements of a defamation claim. If a party seeks damages for non-reputational harms, which include lost jobs and diminished employment prospects, then the First Amendment does not bar suit as long as the claims are brought under generally applicable laws [that do not target or single out the press].

Steele v. Isikoff, 130 F. Supp. 2d 23, 29 (D.D.C. 2000) (citing Hustler Magazine, Inc. v. Fallwell, 485 U.S. 46); see also Cohen v. Cowles Media Co., 501 U.S. 63 (1991). As plaintiffs correctly assert, this case falls squarely into the latter category. See Pl. Resp. at 2. Plaintiffs are not seeking damages for reputational harms. See Democracy Partners III, 453 F. Supp. 3d at 272-73 (noting that plaintiffs limited their claim for actual damages to those relating to lost contracts, abandoning those related to reputational damage). While defendants state that the wiretapping statutes are unconstitutional for targeting speech based on content and viewpoint, there is no suggestion that the statutes are not generally applicable or that they single out the press specifically. See Def. Supp. at 1-5. Plaintiffs' claims therefore need not reach a heightened burden of proof in this case.

### C.  Violation of Federal and D.C. Wiretapping Statutes

Under the District of Columbia and the federal wiretapping statutes, a defendant may be liable if she intentionally intercepts an oral communication or intentionally discloses the contents of that communication. See D.C. Code § 23-542(a); 18 U.S.C. § 2511(1). Both statutes provide an exception to liability where the person intercepting the communication is a party to the communication (the "one-party consent" exception). But this exception is inapplicable where the defendant has intercepted the communication for the purpose of committing a criminal or tortious act. See D.C. Code § 23-542(b)(3); 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or

electronic communication where such person is a party to the communication . . . unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.")  Plaintiffs argue that breach of fiduciary duty is a tort and that by infiltrating the office of Democracy Partners and creating secret recordings to share with her supervisors at Project Veritas, defendant Allison Maass acted with the purpose to breach her fiduciary duty to Democracy Partners.  Pl. Opp. at 5.

   A breach of fiduciary duty under District of Columbia law is established when a plaintiff shows "(1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the fiduciary relationship; and (3) injuries that were proximately caused by the breach of the fiduciary duties."  <u>Democracy Partners III</u>, 453 F. Supp. 3d at 278 (citing <u>Millennium Square Residential Ass'n v. 2200 M Street LLC</u>, 952 F. Supp. 2d 234, 248 (D.D.C. 2013)).  Defendants assert that Maass had no fiduciary duty to Democracy Partners, that she did not act with the purpose of breaching any such duty, and that her actions were not the cause of Democracy Partners' injury or damages.  Def. Mot. at 1-2.

### 1.  Existence of Fiduciary Duty

   A fiduciary relationship between two parties "is founded upon trust or confidence reposed by one person in the integrity and fidelity of another."  <u>Gov't of Rwanda v. Rwanda Working Group</u>, 227 F. Supp. 2d 45, 64 (D.D.C. 2002).  While several relationships – like that between an attorney and client – are explicitly recognized as exhibiting this fiduciary character, "the District of Columbia courts have deliberately left the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances."  <u>Council on American-Islamic Relations Action Network, Inc. ("CAIR") v. Gaubatz</u>, 793 F. Supp. 2d 311, 341 (D.D.C. 2011).  To assess the existence of a fiduciary duty, the Court must

consider several factors, including "the nature of the relationship, the promises made, the types of services or advice given and the legitimate expectations of the parties." Id. (citing Firestone v. Firestone, 76 F.3d 1205, 1211 (D.C. Cir. 1996)). When addressing defendants' motion for summary judgment, Judge Huvelle concluded that the undisputed facts did not support the grant of summary judgment for defendants on the federal and D.C. wiretapping claims and that a trial was necessary to resolve the disputes among the parties. Democracy Partners III, 453 F. Supp. 3d at 283. The Court now will assess whether the evidence presented at trial is such that a reasonable jury would have had a basis to find in plaintiffs' favor on these claims.

a. Nature of Relationship and Services Provided

Project Veritas argues that the work Maass performed as an intern for Democracy Partners was insufficiently significant or substantive to create a fiduciary relationship. See Def. Renewed Mot. at 8. It characterizes her duties – including assembling press clippings and organizing data – as "mundane," distinguishing them from the substantive responsibilities that characterize those in an explicitly recognized fiduciary relationship like the relationship between a guardian and ward, a principal and agent, or a senior corporate official and shareholders. Id. at 8-9 (citing United States v. Chestman, 947 F.2d 551, 568 (2d Cir. 1991)). Plaintiffs have a very different view of Maass's responsibilities, emphasizing that Maass was tasked with assembling news clips covering the "bracketing program," a set of counter-messaging events planned by progressive organizations to take place before and after Trump presidential campaign events. Pl. Opp. at 6 (citing Trial Transcript September 16, 2022 ("Sept. 16 Tr.") [Dkt. No. 198] at 105:10-14). Maass testified that she was aware that this was a "very important project" and part of the communications between plaintiffs and the Democratic National Committee, and that Hillary Clinton, the Democratic candidate, herself occasionally reviewed those reports. Sept. 16

Tr. at 108:14-24.  To plaintiffs, the fact that Maass was assigned to perform this role is probative

of the trust and confidence placed in her by Democracy Partners.  Pl. Opp. at 9.

The parties also dispute whether the information provided to Maass over the

course of her internship was truly confidential.  Plaintiffs assert that Maass's reports to Project

Veritas included reference to "obviously confidential strategy calls on Democratic Party strategy

about key issues."  Pl. Opp. at 7.  She was also privy to conversations involving a "secret bus

program", a "secret war room", and a "private polling briefing".  Id.  Defendants maintain that

these descriptions are an attempt to "elevate [Maass's] menial work through name dropping and

outsized rhetoric."  Def. Rep. at 12.  But plaintiffs emphasize that Maass's access to information

about the bracketing events was beyond what they would have shared with an outsider.  See Pl.

Opp. at 7-8 (citing Trial Transcript September 15, 2022 ("Sept. 15 Tr.") [Dkt. 208-7]

at 83:18-84:1).  Defendants counter that the bracketing reports only included the notation

"[p]lanning in progress", which they argue is "bland" information that was not clearly

confidential.  Def. Renewed Mot. at 9-10.  Plaintiffs respond that the entries marked "planning in

progress" also included details including the time and location of future events, which were

"indisputably confidential" because they related to counterprogramming at upcoming Trump

campaign events, which was not public until it was officially announced.  Pl. Opp. at 8.

Defendants assert that even if Maass had been given access to confidential

information, it would not be probative of a fiduciary relationship, because "without more, [it

does not] create the necessary relationship and its correlative duty to maintain the confidence."

Def. Renewed Mot. at 10 (citing United States v. Chestman, 947 F.2d at 568).  They emphasize

that fiduciary relationships have a "special and rare status" that is typically specifically bargained

for rather than implied.  Def. Renewed Mot. at 10 (citing Russell Pub. Group, Ltd. v. Brown

Printing Co., 2014 WL 1329144 (S.D.N.Y. 2014)).  Plaintiffs respond that Judge Huvelle already ruled at the summary judgment stage that Maass's access to confidential information was "probative of the nature of the services provided by Maass. . . not merely clerical and mundane, but, precisely because they did involve access to confidential and sensitive information, were indicative of a fiduciary relationship."  Pl. Opp. at 9 (citing Democracy Partners III, 453 F. Supp. 3d at 280-81).

Given the open-ended definition of "fiduciary relationship," the instructions given to the jury – which were agreed upon by all the parties, see Sept. 21 Tr. at 7:23-8:7 – and viewing the evidence in the light most favorable to plaintiffs, the Court concludes that a reasonable jury could have found that the nature of Maass's services created a fiduciary duty to the plaintiffs.  And on a Rule 50 motion, the Court must not assess the weight of the evidence, but rather determine only whether the evidence was sufficient to support the jury's verdict.  See Radtke v. Lifecare Management Partners, 795 F.3d at 163; United States Conference of Mayors v. Great-West Life & Annuity Insurance Company 327 F. Supp. 3d at 129.  The apparent confidentiality of the information shared with Maass, coupled with her participation in private strategy calls and her duties pulling press coverage for review by top campaign officials and the candidate herself, is more than sufficient to support a jury finding of trusted confidence.  See Gov't of Rwanda v. Rwanda Working Group, 227 F. Supp. 2d at 64.

b.  Legitimate Expectations of the Parties

Other factors to consider in determining whether a fiduciary relationship exists are the legitimate expectations of the parties and the promises made or not made.  Defendants argue that Democracy Partners did not have a bargained-for understanding with Maass that would create a mutual expectation of a fiduciary relationship.  See Def. Renewed Mot. at 11.

12

Nor did her prior experience as she had represented it to Democracy Partners suggest the kind of knowledge or experience upon which Democracy Partners could rely.  Id. (citing Heidi Aviation, LLC v. JetCraft Corporation, 573 F. Supp. 3d 182, 207 (D.D.C. 2021) (finding a fiduciary relationship where an experienced aviation business had knowledge and history of counseling clients on insurance requirements)).  Plaintiffs counter that by considering in concert Maass's expectations, Democracy Partners' expectations, and Democracy Partners' own treatment of confidential information, the Court can find a reasonable basis on which the jury could have found a fiduciary relationship.  This trifurcation provides a useful framework for the Court to consider the parties' contentions on this issue.

i.  Maass's Expectations

In her ruling on summary judgment, Judge Huvelle found that the undisputed fact that "Maass created a false identity and that defendants created false identities to introduce Maass to plaintiffs is evidence of their understanding that Maass would have fiduciary obligations to safeguard sensitive or confidential information." Democracy Partners III, 453 F. Supp.3d at 281.  Defendants disagree, arguing that the creation of a false identity cannot be grounds upon which a jury could find a fiduciary duty.  Def. Rep. at 9.  The Court rejects this argument and concludes that Judge Huvelle had it exactly right.  While such evidence may not be sufficient on its own, it allows for reasonable inferences that Maass and her colleagues at Project Veritas understood that Maass could not use her true identity if she and Project Veritas wanted to gain the confidence of Democracy Partners and obtain access to information suitable for publication (some of it potentially confidential).

Furthermore, the fact that Robert Creamer, the owner of plaintiff Strategic Consulting Group, told Maass that she would be asked to sign a nondisclosure agreement –

coupled with Maass's knowledge that a nondisclosure agreement requires the signer to agree not to disclose information about their employer – is evidence from which the jury could infer that Maass was aware that she would be exposed to confidential information during her internship. Democracy Partners III, 453 F. Supp. 3d at 281-82; Sept. 16 Tr. at 90:5-21.  Defendants rely on the fact that no such agreement was ever presented to Maass, or even drawn up by plaintiffs. See Def. Renewed Mot. at 14 (citing Joint Stipulation as to Testimony of Lauren Windsor, ("Windsor Stipulation"), [Dkt. No. 174]).  Regardless of the fact that ultimately no confidentiality agreement was given to her to sign, the jury could easily find that Maass's understanding of the request for confidentiality made an impression on her, and a significant impression – so significant that she reported it later that same day to her superiors at Project Veritas, evidencing her knowledge of the importance of the request.  Pl. Opp. at 10.  The fact that Maas did not know the scope or details of the potential nondisclosure agreement and, in the end, was not asked to sign it does not undermine the conclusion that Maass would have understood that such an agreement – no matter its specific scope – would have limited her ability to share what she learned with anyone outside the organization.  Id. at 11 (citing Sept. 16 Tr. at 90:5-21).

        Defendants also argue that it is equally likely that Maass reported everything, even unimportant facts, to her superiors, and that she believed that plaintiffs had decided that a nondisclosure agreement was unnecessary in her case.  Def. Rep. at 9-10.  That there are plausible alternative conclusions that the jury might have drawn does not make their determination unreasonable.  Defendants have not demonstrated that the evidence supporting the jury's verdict was so one-sided that the jury could not have reasonably reached the conclusion it

did.  See Halcomb v. Woods, 610 F. Supp. 2d at 80.  Defendants have not satisfied their burden under Rule 50.

### ii.  Democracy Partners' Expectations

As noted, Creamer notified Maass that she would be asked to sign a nondisclosure agreement as part of her internship, but the agreement was never presented to her for signature. In conversations between Creamer and his colleague, Lauren Windsor, Windsor recommended to Creamer that he seek such an agreement.  Creamer responded that it was not an issue because Maass – then known to him as Angela Brandt – was the niece of a friend, and "that it was under control…[but] that if [Windsor] wanted to get that information, then [she] should."  Windsor Stipulation at ¶ 14.  Windsor did not prepare an agreement for Maass to sign because she did not want to challenge Creamer's assertion that Maass was a friend.  Id.  at ¶¶ 15, 18.  Nevertheless, Windsor stated that she believed confidentiality would have been implied by the sensitive nature of Democracy Partners' work and by the fact that Maass was issued a keycard to access the office.  Id. at ¶¶ 17, 19.

Plaintiffs also emphasize the Court's earlier finding that Maass's "ability to listen [to private conversations] and look [at confidential documents] reflects the trust that was placed in her."  Democracy Partners III. 453 F. Supp. 3d at 282.  Creamer's trust in Maass based on her purported relationship to a supporter – played by Daniel Sandini using a false identity, also a Project Veritas operative – while unfounded and perhaps unwise, is evidence that a reasonable jury could find that Creamer expected Maass to respect the confidentiality of Democracy Partners' even without the need for a written nondisclosure agreement.  Coupled with Windsor's statements about her own expectations and drawing all reasonable inferences in favor of plaintiffs, the Court will defer to the jury's findings on this point.

iii.  Plaintiffs' Treatment of Confidential Information

Defendants next argue that plaintiffs' own acts of sharing information about bracketing events undermines the legitimacy of their assertion that the information that Maass shared about the program was genuinely confidential.  Def. Renewed Mot. at 17.  Specifically, they assert that because Creamer explained the bracketing events to Sandini and Maass before the start of her internship, it would be inconsistent for Creamer to then expect that Maass would treat information about bracketing events as confidential during the course of her internship.  Id. at 17-19.  The details shared in those earlier conversations, however, were distinct from the type of information that plaintiffs argue was confidential.  While, in earlier conversations, Creamer described the general nature of the bracketing events and the goal to infiltrate coverage of Trump campaign events, he did not share the specific details of future events not yet announced.  See id. at 17; Pl. Opp. at 13-14.  This distinction undercuts defendants' argument that Creamer made ad hoc determinations as to whether information was confidential.  It further supports a reasonable jury's finding that plaintiffs believed that the information that they shared with Maass as an intern would be treated as confidential.

Considering the evidence in its full context and in the light most favorable to plaintiffs, a reasonable jury could have found that plaintiffs proved an expectation of confidentiality from both Maass and Democracy Partners, thus creating another avenue for finding a fiduciary relationship.

2.  Breach of Fiduciary Duty

To satisfy the tortious purpose exception to the federal and District of Columbia wiretapping statutes, a plaintiff must demonstrate "either (1) that the primary motivation, or

(2) that a determinative factor in the actor's motivation in intercepting the conversation was to commit a criminal or tortious act." Democracy Partners III, 453 F. Supp. 3d at 287 (quoting CAIR v. Gaubatz, 31 F. Supp. 3d at 256-57) (internal quotation marks omitted). While an actor may be motivated by multiple interests simultaneously, the "presence of a valid, non-tortious purpose does not immunize a defendant from liability under the wiretap statutes if that defendant also has a tortious purpose that is" either their primary motivation or a determinative factor in the interception. Democracy Partners, LLC v. Project Veritas Action Fund, 2021 WL 4785853, at *3 (D.D.C. 2021) (citing Democracy Partners III, 453 F. Supp. 3d at 287).

The Court has already found that Maass recorded all of the conversations and meetings to which she had access "precisely in order to disclose those conversations to her superiors at Project Veritas so they could be used by Project Veritas in their videos." Democracy Partners III, 453 F. Supp. 3d at 287. While this may have been motivated in part by her interest in investigating and publishing a news story, it would be enough to demonstrate liability if she had a determinative purpose to breach her fiduciary duty by sharing confidential information outside of Democracy Partners. If Maass "understood [herself] to be bound by a fiduciary duty of non-disclosure, then it appears obvious that the breach of this fiduciary duty was the primary motivation, or at least a motivating factor, in [her] interception of the communications at issue." CAIR v. Gaubatz, 31 F. Supp. 3d at 259.

In this case, it would be reasonable for the jury not only to find that Maass understood that she was bound by a fiduciary duty, but also to find that the evidence presented demonstrated a purposeful breach of that duty. In addition to sharing information about the bracketing events, Maass admitted that she took photographs of documents on Creamer and Black's desks and that she went through the trash in Creamer's office when he was not present.

Sept. 16 Tr. at 127:16-128:6.  This sort of invasion of privacy is beyond the ambit of newsgathering.  It would permit a reasonable jury to find that Maass intended to learn and share private information found both within the scope of her internship – as with the bracketing schedule – and outside it, as with Creamer's office trash – a domain into which interns would not be expected to trod.  The jury reasonably could find that this conduct satisfied the tortious purpose exception, and the Court will not disrupt that finding.

## IV.  CONSTITUTIONALITY OF WIRETAP STATUTES

In addition to the First Amendment issues already discussed, defendants assert that the tortious purpose exceptions to one-party consent recording under 18 U.S.C. § 2511(2)(d) and D.C. Code § 23-542(b)(3) are unconstitutional under the First Amendment.  They argue that the statutes regulate speech on the basis of its content and – even if they were content-neutral – they are not narrowly tailored to accomplish a significant government purpose.  Def. Rep. at 28.  They also say that the laws are void for vagueness.  Id.  In denying the defendants' motion for summary judgment, Judge Huvelle rejected both theories.  See Democracy Partners III, 453 F. Supp. 3d at 288-290.  As Judge Huvelle noted, the fact that a court would need to look at the content of a statement to determine whether a law applies does not inherently support a finding that the law is content based.  Id. at 289 (citing Am. Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583, 603 (7th Cir. 2012)).

A content-neutral law must only satisfy intermediate scrutiny to pass constitutional muster, requiring that it be "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication."  Democracy Partners III, 453 F. Supp. 3d at 289 (citing Act Now to Stop War & End Racism Coal. v. District of Columbia, 846 F.3d 391, 407 (D.C. Cir. 2017)).  Because the tortious purpose exception to the

wiretapping statutes serves a significant purpose to deter criminal or tortious acts, is narrowly tailored to target the conduct at issue, and leaves open alternative methods not involving secret recordings, the statutes survive intermediate scrutiny. Democracy Partners III, 453 F. Supp. 3d at 289. Judge Huvelle also found defendants' vagueness argument to be without merit, determining that defendants' main contention that the law was overly broad did not make it vague, and that the term "tortious purpose" is sufficiently explicit to notify the public of the conduct that the statute penalizes. Id. at 290. Defendants now assert that the Court's earlier conclusions were in error, and they ask the Court to reconsider and find for defendants on these issues. Def. Rep. at 23.

Plaintiffs contend that the Court's earlier ruling on these issues operates as the law of the case, and that defendants should not be permitted to relitigate them. Pl. Resp. at 2. The law of the case doctrine "refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open cases decided by that court or a higher one in earlier phases." Freeman v. Giuliani, Civil Action No. 21-3354 (BAH), 2024 WL 1616675, at *8  (D.D.C. 2024) (citing Wye Oak Tech., Inc. v. Republic of Iraq, 24 F.4th 686, 697 (D.C. Cir. 2022)) (cleaned up). The law of the case doctrine applies only where a party asks the court to revisit the same question resolved in a prior ruling. See  Freeman v. Giuliani, 2024 WL 1616675, at *8 (citing Simon v. Republic of Hungary, 77 F.4th 1077, 1120 (D.C. Cir. 2023)). Defendants dispute that this doctrine applies here. They argue that any decision made in an order that adjudicates fewer than all the claims in a case – like a decision denying summary judgment on certain claims and granting it on others – may be revised subsequently. Def. Rep. at 24 (citing Filebark v. U.S. Dep't of Transp., 555 F.3d 1009, 1013 (D.C. Cir. 2009)). They acknowledge the goal of judicial efficiency underlying the law of the

case doctrine, but they argue that the Court should still not be bound by its earlier decision in this case.  Def. Rep. at 24-25.

While defendants are correct that the Court is not bound by the law of the case doctrine, courts nevertheless should be reluctant to change course without justification. LaShawn A. v. Barry, 87 F.3d 1389, 1393  (D.C. Cir. 1996) (en banc), cert denied, 520 U.S. 1264 (1997).  "[W]here litigants have once battled for the court's decision, they should not be required, nor without good reason permitted, to battle for it again."  Spirit of Sage Council v. Kempthorne, 511 F. Supp. 2d 31, 38 (D.D.C. 2007) (quoting Singh v. George Washington Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005)).  This rationale is especially strong when the earlier decision resolved a motion for summary judgment; otherwise, such orders "could not perform their function of simplifying and narrowing disputed issues."  Acme International General Trading & Contracting Co. v. CCI, Inc., 2015 WL 12559867 at *2 (D.D.C. 2015) (citing Cruz v. Am. Airlines, Inc., 356 F.3d 320, 330 (D.C. Cir. 2004)).  Thus, the question before this Court is whether defendants have provided good reason to prevail on their renewed constitutional claims.

In support of their argument, defendants rely in part on a case in which there was a challenge to the constitutionality of a North Carolina statute that penalized unauthorized recordings made with the purpose of breaching the duty of loyalty to an employer.  The Fourth Circuit found the law regulated speech on the basis of its content and viewpoint, because it targeted speech critical of an employer but not speech praising an employer, and therefore the statute should be subject to strict scrutiny.  See People for the Ethical Treatment of Animals, Inc. ("PETA") v. North Carolina Farm Bureau Federation, Inc., 60 F.4th 815, 830 (4th Cir. 2023). The Fourth Circuit concluded, however, that the statute did not pass muster even under

intermediate scrutiny, because it was not tailored to any substantial government interest and because the state did not present evidence that less restrictive means would not accomplish the same purpose.  Id. at 831, 833 (citing Reynolds v. Middleton, 779 F.3d 222, 229 (4th Cir. 2015)).  Defendants argue that the tortious purpose exception to the federal and D.C. wiretapping statutes similarly restricts speech based on content and viewpoint.  Def. Supp. at 3.

Plaintiffs and the D.C. government say that the PETA case is inapposite, because the North Carolina law targeted speech based on the identity of the speaker and the message she conveyed.  But, they argue, the tortious purpose exceptions to the federal and D.C. wiretapping statutes are content and viewpoint neutral, because they prohibit recordings on any subject and from any perspective so long as they are created with the purpose of committing a crime or tort.  Pl. Resp.at 2-3; D.C. Resp. at 3.  Furthermore, they argue, the Court has already found that the tortious purpose exceptions are subject to and satisfy intermediate scrutiny, because the statutes serve the significant government purpose of deterring criminal or tortious acts facilitated by secret wiretaps and leave open many alternative methods for defendants and others to gather and disseminate information.  Pl. Resp. at 3; D.C. Resp. at 4 (citing Democracy Partners III, 453 F. Supp. 3d at 289).

The Court agrees with plaintiffs and the District of Columbia.  The North Carolina statute is dissimilar in scope and effect to the statutes at issue in this case.  Furthermore, the Fourth Circuit found that, "[q]uite obviously, a journalist cannot invoke the First Amendment to shield herself from charges of illegal wiretaps, breaking and entering, or document theft", because those restrictions are consistent with the First Amendment, and a party may not wield their right to free speech as a means of escaping liability for cognizable legal claims.  PETA v. North Carolina Farm Bureau Federation, Inc., 60 F. 4th at 824.  The Fourth Circuit's decision in

the PETA case does not present good cause for this Court to revisit its prior finding on the constitutionality of the federal and D.C. wiretapping statutes.

Defendants also reassert their argument that the federal and D.C. wiretapping statutes are unconstitutionally vague because the torts encompassed in the tortious purpose exception are often "fact-intensive" and "require a searching inquiry." Def. Rep. at 23 (citing Democracy Partners III, 453 F. Supp. 3d at 279). They emphasize that the void for vagueness doctrine is especially strict where the law may infringe on rights protected by the First Amendment. Id. (citing Smith v. Goguen, 415 U.S. 566, 572-73 (1974)). This argument is similarly unavailing. The Court has already denied defendants' vagueness challenge in its ruling on summary judgment. See Democracy Partners III, 453 F. Supp. 3d at 290. Defendants provide no additional justification for the Court to revisit that conclusion.

## V.  FRAUDULENT MISREPRESENTATION

With respect to plaintiffs' fraudulent misrepresentation claim, defendants challenge both the jury's finding of causation and their conclusion as to an appropriate damages award.

### A.  *Causation of Injury*

To recover on their fraudulent misrepresentation claim, plaintiffs needed to demonstrate that their injury was proximately caused by defendants' non-expressive conduct. Democracy Partners, LLC v. Project Veritas Action Fund, 285 F. Supp. 3d 109, 125-126 (D.D.C. 2018). Defendants contend that a reasonable jury could not have found that the harm alleged by plaintiffs was the result of Maass's misrepresentation of her identity and infiltration of Democracy Partners (i.e., non-expressive conduct), as opposed to the First Amendment protected expressive conduct of publishing her secret recordings. Def. Renewed Mot. at 22-26. Plaintiffs

do not dispute this limitation on recoverable damages but argue that there was sufficient evidence for the jury to find that the fact of Maass's infiltration, rather than her expressive conduct, caused Democracy Partners to lose business from its affiliates.

To find proximate cause, defendants' conduct need not be the sole cause of the harm, but rather a "substantial factor in bringing about the harm." Democracy Partners III, 453 F. Supp. 3d at 275. This is true even if there may be other legal or proximate causes of the injury. See id. (citing Estate of Kurstin v. Lordan, 25 A.3d 54, 69 (D.C. 2011)). The existence of proximate cause is typically a question of fact for the jury, and "only if it is absolutely clear the defendant's [conduct] could not have been a proximate cause of the harm asserted by the plaintiff is it a question of law." Smith v. Hope Village, Inc., 481 F. Supp. 2d 172, 185 (D.D.C. 2007) (citing Boodoo v. Cary, 21 F.3d 1157, 1161 (D.C. Cir. 1994)). If the Court finds in retrospect that the chain of events leading to the harm was "highly extraordinary," the case should be taken from the jury. Democracy Partners III, 453 F. Supp. 3d at 275 (citing Claytor v. Owens-Corning Fiberglass Corp., 662 A.2d 1374, 1381-82 (D.C. 1995)).

Plaintiffs claim injury based on the fact that the AFSCME decided to end its business relationship with Strategic Consulting, and to withdraw support from AUFC. See Pl. Opp. at 18. AUFC is an organization that had previously engaged Strategic Consulting for consulting services, which subsequently ceased operations due to the loss of funding from AFSCME. The Court will consider each in turn.

### 1. AFSCME's Withdrawal of Support

Defendants contend that AFSCME's decision to terminate its business relationships with Creamer and Strategic Consulting were due to the "shady practices engaged in by [p]laintiffs, not the mode, manner, or happenstance of infiltration per se." Def. Renewed

Mot. at 25.  Scott Frey, AFSCME's legislative director, rejected that notion, testifying at trial that he did not give much credence to the video's contents and that they were not a significant factor in AFCSME's decision to sever ties.  Trial Transcript September 19, 2022 ("Sept. 19 Tr.") [Dkt. No. 201] at 50:11-18.  Rather, Mr. Frey emphasized that he had been concerned about whether Democracy Partners engaged in "appropriate vetting" of its staff, and that "by creating the opportunity for. . . these people to infiltrate the organization," Democracy Partners had invited embarrassment for the Clinton campaign in the weeks leading up to the election.  Id. at 52:18-24; 54:13-24.  Mr. Frey also acknowledged that "the video itself created a sense of scandal that [AFSCME] did not want to be associated with" and that he was concerned with the "optics of the video."  Sept. 19 Tr. at 50:25-51:2; 51:7.

Defendants argue that because releasing the video was expressive conduct, the chain of causation to AFSCME's withdrawal of support was broken.  Def. Renewed Mot. at 27. But as the Court has already outlined, the defendants' culpable conduct need not be the sole cause of the harm to plaintiff to fall within the ambit of proximate cause; rather, it need only be a substantial factor.  Democracy Partners III, 453 F. Supp. 3d at 275 (citing District of Columbia v. Carlson, 793 A.2d 1284, 1288 (D.C. 2002)).  Furthermore, Mr. Frey testified that he believed the video was "selectively edited" and that he did not put credence in its truthfulness.  See Sept. 19 Tr. at 50:11-51:7.  This testimony supports the argument that AFSCME cut ties with plaintiffs for reasons other than the content of the video.

In its instructions to the jury on the definition of "substantial factor," the Court stated that "the defendant's acts must have such an effect in producing the harm so that a reasonable person would regard the conduct as a cause of the harm."  Trial Transcript September 21, 2022 ("Sept. 21 Tr.") [Dkt. No. 202] at 89:5-7.  Based on the evidence presented

at trial, the jury could reasonably have found that the fact of Maass's infiltration of Democracy Partners caused Mr. Frey to believe that Democracy Partners had been compromised by allowing an outsider to enter its midst without proper vetting – irrespective of the fact that the video itself also may have given AFSCME pause.  This is not the kind of extraordinary finding that the Court should seek to remove from the jury, and the Court will not disturb the jury's verdict.

### 2.  Loss of Business from AUFC

Defendants argue that the "evidence on causation as to AUFC is even more speculative, and that the causation chain was broken by intervening events."  Def. Renewed Mot. at 28.  They point to the testimony of AUFC Executive Director Wilson Bradley Woodhouse, who testified that it was the "'cascading event'" from the loss of AFSCME funding that caused AUFC to shut down.  Id. (quoting Sept. 20 Tr. at 34:15-18).  AFSCME did not name Maass's infiltration of Democracy Partners as the reason for its withdrawal of support from AUFC.  Defendants interpret this to mean that AFSCME was not in fact concerned about Maass's presence in Democracy Partners' office.  Id.  Plaintiffs respond that this is immaterial: Regardless of whether they named Maass specifically, AFSCME withdrew its support from AUFC because Democracy Partners had created the opportunity for Maass to infiltrate the organization.  Pl. Opp. at 22.  Director Woodhouse testified that "there was just a sense that we had failed, that we had allowed ourselves to be compromised. . . that was the original sin." Sept. 20 Tr. at 49:6-8.

Defendants highlight other issues that may have motivated AFSCME's decision to stop funding AUFC, including a late notification of the publication of the Project Veritas video and a lack of support for the Clinton campaign among AFSCME membership.  Def. Renewed. Mot. at 29 (citing Sept. 20 Tr. at 40:14-19; 38:25-39:2).  But as the Court has already

detailed, the existence of other potential causes for the harm to plaintiffs is not fatal to their claim that defendants' non-expressive conduct was a substantial factor in the loss of business. See Democracy Partners III, 453 F. Supp. 3d at 275. As plaintiffs emphasize, there were no intervening events that broke the chain of causation or appear "highly extraordinary in retrospect." Pl. Opp. at 22 (citing Democracy Partners III, 453 F. Supp. 3d at 275 (quoting Majeska v. District of Columbia, 812 A.2d 948, 950 (D.C. 2002)). The evidence consistently showed that AFSCME terminated its support of both Democracy Partners and AUFC because the infiltration – the "original sin" – compromised Democracy Partners' integrity and security and that of its affiliates. It was thus eminently reasonable for the jury to find that proximate cause was satisfied as to both of plaintiffs' claimed injuries.

### B. Damages for Fraudulent Misrepresentation

Defendants challenge the sufficiency of the evidence supporting the jury's damages award on the ground that plaintiffs' reliance on average payments from prior years was speculative. They also point to the jury's initial deadlock on damages, which, they say, makes the ultimate award of $120,000 dubious. Def. Renewed Mot. at 31-34. Plaintiffs argue that the issue of damages is not properly raised in defendants' Rule 50(b) motion, because such a motion is limited to the renewal of the movant's arguments from their Rule 50(a) motion. Pl. Opp. at 24-25 (citing Rice v. District of Columbia, 818 F. Supp. 2d 47, 54 (D.D.C. 2011)). It is generally true that a party who omits an argument from its Rule 50(a) motion waives its right to raise the theory under Rule 50(b). See Huthnance v. District of Columbia, 793 F. Supp.2d 183, 197 (D.D.C. 2011); Whelan v. Abell, 48 F.3d 1247, 1251 (D.C. Cir. 1995). And when a party later claims that the amount of a damages award is erroneous, a court is more likely to consider either a new trial or remittitur as an appropriate remedy. Third Wave Technologies,

Inc. v. Strategene Corp., 405 F. Supp. 2d 991, 1009 (W.D. Wis. 2005) (finding that a defendant was technically barred from raising a challenge on damages in a 50(b) motion). But because defendants raise their challenge as a matter of the sufficiency of the evidence – echoing a claim from their Rule 50(a) motion – the Court may appropriately consider their renewed argument. See Def. Mot. at 13 (describing the plaintiffs' claims regarding the income that they would have earned from business lost as a result of defendants' infiltration as speculative).

### 1.  Reasonableness of Damages

When considering a jury's award of damages, there is no need for "mathematical precision". When the evidence presented creates "a reasonable basis for the damages awarded," a court should not supplant the jury's conclusion. United States Conference of Mayors v. Great-West Life & Annuity Insurance Co., 327 F. Supp. 3d at 134-36. With respect to fraudulent misrepresentation, the Court instructed the jury that plaintiffs were required to demonstrate all elements of the fraudulent misrepresentation claim – including damages – by clear and convincing evidence. See Jury Instructions [Dkt. No. 193] at 20.

Before Maass's infiltration of the Democracy Partners' office, AFSCME and AUFC paid Strategic Consulting for patch-through calling and consulting services. Defendants argue that the damages claimed by plaintiffs were based on the assumptions that AFSCME and AUFC would continue to engage with plaintiffs after the presidential election. See Def. Renewed Mot. at 31. And the evidence presented at trial demonstrated that such assumptions were warranted. Mr. Frey testified that had AFSCME not terminated its relationship with plaintiffs, he would have continued to contract with Strategic Consulting. In fact, he said there was an "absolute uptick in the [patch-through calling] activity" in subsequent years after then-President Trump introduced policies "of great concern" to AFSCME. Sept. 19 Tr. at 59:12-60:6.

27

Furthermore, Director Woodhouse testified that, had AUFC not lost funding from AFSCME and shut down, there was "no chance" that AUFC would have stopped working with Creamer and Strategic Consulting, as they were "part of the fabric" of the organization.  Sept. 20 Tr. at 35: 3-7.  On the basis of this evidence, the jury could reasonably conclude that plaintiffs had proved both liability and damages by clear and convincing evidence.

Defendants also argue that the payments coming into Strategic Consulting had waned in the years prior to the infiltration by Project Veritas, and that a calculation based on the average payment amounts over the prior years therefore was improper.  Def. Renewed Mot. at 31.  Specifically, the invoices from AFSCME and AUFC showed a significant drop-off before 2016.  Id.  Even accepting those facts, a court must be wary when reviewing the amount of a jury's damages award, because a court is fundamentally incapable of recreating the "precise mathematical formula that the jury adopted" or guessing at what was discussed in jury deliberations.  Carter v. Duncan-Higgins, Ltd., 727 F.2d 1225, 1238-39 (D.C. Cir. 1984).  "Juries are not required to show their work."  United States Conference of Mayors v. Great-West Life & Annuity Insurance Co., 327 F. Supp. 3d at 134.  Based on the evidence provided about the past payments, as well as the anticipated increase in business in the years after the election, the jury reasonably could have come to an estimate of the income that plaintiffs would have earned were it not for the severing of their relationships with AFSCME and AUFC precipitated by Maass's infiltration.  The Court cannot now attempt to peer inside the jury room and second guess the verdict.

### 2.  Jury Deadlock

Defendants also argue that the amount of damages awarded was speculative because the jury was initially deadlocked when deciding the issue.  See Def. Renewed Mot.

at 31-32.  Specifically, the verdict form asked jurors to identify an amount for the plaintiffs'

injuries resulting from the defendants' fraudulent misrepresentation and stated that "[a]ll jurors

must agree on the same answer. Otherwise, leave the line below blank."  Verdict Form [Dkt.

No. 191] at 7.  The jurors initially returned the form with the line left blank.  The Court brought

this to counsels' attention in a proceeding outside the presence of the jury.  The Court and

counsel discussed the questions of whether this meant that the jury could not unanimously agree

on a number, whether the jury intended to award zero damages, or whether it misunderstood the

instructions.  Trial Transcript September 22, 2022 ("Sept. 22 Tr.") [Dkt. No. 200] at 13:4-10.

After conferring with counsel as to the appropriate response, the Court called the jury back into

the courtroom to ask for clarification, then sent them back to the jury room to regroup and come

back with an answer as to their intentions.  Id. at 18:19-25, 19:17-19.  The jury then sent a note

indicating that they had left the line blank because they could not agree on an amount.  Id.

at 22:3-4; see also Note from Jury [Dkt. No. 188].

          Defendants argued that the Court should not ask the jury to continue their

deliberations to attempt to agree upon an amount, and instead treat the blank line as

representative of their conclusion that damages were not possible to calculate.  Defendants

highlighted the time that the jury had already spent deliberating over the question and the

additional fifteen minutes after being sent back to the jury room.  Id. at 22:9-23:9; 24:10-22.

Plaintiffs maintained that it was not clear from the jury's response that they had intended to

return without a number, whether zero or greater.  Plaintiffs asked the Court to instruct the jury

with an "Allen-type charge." Id. at 24:7-10. [3]  Defendants disagreed, arguing that the jury had

---

[3]        When a jury returns to the court for further instructions after rendering an
incomplete verdict, some courts deliver a so-called Allen charge, that "although the verdict must
be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his

not in fact returned an incomplete verdict and should not be asked to continue deliberations.  Id. at 32:21-22.  The Court determined that "if [the jury] can unanimously find for the plaintiff on the claim, they should be able to unanimously find for the plaintiff a certain amount."  Id. at 33:13-15.  The Court went on to instruct the jury that it should "deliberate with a view to reaching an agreement. . . but each [juror] must decide the case for [themselves]" in attempting to reach a unanimous verdict.  Id. at 36:22-25.  After approximately fifteen more minutes of deliberations, the jury then returned to the courtroom with the line on the verdict form filled in with a damages award of $120,000.  Id. at 40:12-18.

Defendants argue that "the very need for a Thomas charge should, as a matter of law, negate a view that the evidence was clear and convincing."  Def. Renewed Mot. at 33-34.  They assert that the $120,000 in damages for fraudulent misrepresentation "was awarded strictly because the jury pulled a number out of thin air after being sent back into the jury room after the close of business hours."  Id. at 33.  Defendants provide no legal authority in support of the notion that the manner in which the jury reached its verdict provides any insight into the sufficiency of the evidence presented.  Defendants guess as to what may have been the cause of the jury's initial inability to agree on a number, but do not provide any persuasive reason to believe that it was related to the sufficiency of the evidence rather than any of a myriad of other explanations.  The Court will not now engage in the same kind of speculation that defendants decry.  As the Court said at trial, if the jury was able to find for the plaintiff on the fraudulent

---

fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it [is] their duty to decide the case if they could conscientiously do so."  Allen v. United States, 164 U.S. 492, 501 (1896).  This type of charge is not permitted in the D.C. Circuit.  Instead, the Court is to give an instruction that avoids unduly coercing the jury into a verdict when conscientious jurors could find that evidence was inconclusive.  See United States v. Thomas, 449 F.2d 1177 (D.C. Cir. 1971); United States v. Berroa, 46 F.3d 1195 (D.C. Cir. 1995).

misrepresentation claim, it follows that they would have also been able to find an appropriate amount of damages to compensate for that harm.  Neither finding was unreasonable, and the Court will not disrupt either.

## VI.  CONSPIRACY

Defendants assert that the Court must find that there is no liability for conspiracy between James O'Keefe, Allison Maass, Project Veritas, and Project Veritas Action Fund.  Def. Renewed Mot. at 36.  This argument need not be addressed.  The plaintiffs did bring a civil conspiracy claim against all defendants initially and that claim was renewed before trial; in fact, the Court gave a jury instruction related to civil conspiracy.  Sept. 21 Tr. at 96:14-97:2.  But the joint proposed verdict form submitted by the parties themselves and the final verdict form presented to the jurors did not ask the jury to reach a verdict on the conspiracy claim, and no such verdict was returned.  See Joint Proposed Verdict Form [Dkt. No. 180]; Verdict Form. Thus, there is no jury finding upon which the Court must act under Rule 50.  The point is moot.

## VII.    CONCLUSION

To grant a motion for judgment as a matter of law, the Court must find that no reasonable jury could have found for the prevailing party based on the evidence presented at trial.  Defendants here attempt to undermine the legitimacy of the jury's verdict on the basis that the jury could have come to alternative conclusions about Maass's relationship to Democracy Partners and the impact of her infiltration of the organization.  Absent a showing that the evidence was so one-sided that the jury could not have reasonably found for the plaintiff, however, the Court has no basis on which to disrupt the finality of the jury's verdict.

For the reasons explained in this Opinion, the Court denied defendants' Motion for Judgment as a Matter of Law [Dkt. No. 179] and defendants' Renewed Motion for Judgment as a Matter of Law [Dkt. No. 196] by its Order [Dkt. No. 217] of March 26, 2025.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/11/25

32